LEXSEE



Positive
As of: Jun 26, 2007

**STELLA GARRETT, Plaintiff, VERSUS GARDEN CITY HOTEL, INC., Defendant.**

**No 05-CV-0962 (JFB) (AKT)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 31106**

**April 19, 2007, Decided**
**April 19, 2007, Filed**

**COUNSEL:** [*1] For plaintiff is Nadira S. Stewart, Esq., Charmaine M. Stewart & Associates, Rosedale, New York.

For defendant is Peter Romero, Esq., Frank & Associates, P.C., Farmingdale, New York.

**JUDGES:** JOSEPH F. BIANCO, United States District Judge.

**OPINION BY:** JOSEPH F. BIANCO

**OPINION**

Memorandum and Order

JOSEPH F. BIANCO, District Judge:

Plaintiff Stella Garrett ("Garrett") brings this action alleging employment discrimination on the basis of her race and age, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 ("ADEA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981; the New York State Human Rights laws, Executive law § 296 ("NYHRL"); and the New York City Human Rights Law ("CHRL"); against defendant Garden City Hotel, Inc. ("GCH" or "the Hotel"). Plaintiff asserts that she was passed over for promotion and was terminated as a result of her race and age, was subjected to a hostile work environment and was retaliated [*2] against for raising complaints of race and age discrimination. Defendant moves for summary judgment as to all of plaintiff's claims. The central issues in this case are whether certain claims are time-barred and whether Garrett has presented sufficient evidence in support of her claims so as to survive defendant's motion for summary judgment. For the reasons that follow, defendant's motion is granted in its entirety.

I. BACKGROUND

A. The Facts

1. The Parties

Garrett is an African-American woman over sixty years of age. (Def.'s 56.5, 1 P 1.) [1] GHC maintains and operates a luxury hotel in Garden City, New York. (Def.'s 56.1 P 9.)

> 1    Where only one party's 56.1 Statement is cited, the facts are taken from that party's 56.1 Statement, and the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

2. The Failure to Promote Garrett

In 1983, Garrett began working at GHC as a Room Attendant. (Def.'s 56.1 P 3.) When she was hired by GHC, Garrett had no prior experience [*3] working in a hotel and, for the previous ten years, had cleaned private homes. (Def.'s 56.1 P 4.) Subsequently, Garrett was promoted through the ranks of the GHC's Housekeeping division until, in 1998, she obtained the position of Assistant Executive Housekeeper. (Def.'s 56.1 PP 6, 12.)

As Assistant Executive Housekeeper, Garrett's duties included supervising 50-60 employees in the Rooms Division, inspecting the performance of Floor Supervisors, performing administrative tasks related to her job, such as preparing a daily summary of work done by those under her supervision, and, in general, monitoring and maintaining cleanliness in her assigned areas. (Def.'s 56.1 PP 14-21.) Moreover, Garrett was responsible for training employees in the Rooms Division. (Def.'s 56.1 P 14.) Garrett was also required to participate in a "Train the Trainer" program, which aimed to train managers and supervisors on how to properly train their own staff. (Def.'s 56.1 P 17.)

Garrett was promoted to the Assistant Executive Housekeeper position by the Executive Housekeeper at the time, Ms. Loretta ("Loretta"), who is Caucasian. (Def.'s 56.1 P 6; Pl.'s 56.1 P 6.) Garrett replaced a Hispanic female who had [*4] previously held the position for one year. (Def.'s 56.1 P 13.) Garrett's promotion was approved by Cathy Miro ("Miro"), the Director of the Rooms Division, who is Caucasian. (Def.'s 56.1 PP 11-12.)

Soon thereafter, Loretta was replaced as the Executive Housekeeper by Creola Mills ("Mills"), an African-American woman hired from outside the Hotel's staff. (Def.'s 56.1 PP 7-8.) According to Garrett, Mills was terminated by GCH in April 1999 (Compl. P 20.) Defendant asserts that Mills "retired" at that time. (Samman Aff. P 8.)

Following Mills' departure from GCH, the Hotel hired two Executive Housekeepers from outside the Hotel's staff. According to defendant, at that time, GCH was looking to hire an Executive Housekeeper with prior experience working in luxury hotels. (Def.'s 56.3, 1 P 121; Pl.'s 56.3, 1 P 121.)

In July 1999, GCH hired Tomasz Marcinow ("Marcinow") as Executive Housekeeper. (Samman Aff. P 13.) Marcinow had previously worked at luxury hotels in Manhattan, including the Roger Williams Hotel, the Hotel Inter-Continental, Essex House, Morgan's Hotel and the Plaza Hotel. (Id.) Marcinow voluntarily resigned from GCH in September 1999. (Id. P 15.)

On October 20, 1999, GCH [*5] hired George Burroughs ("Burroughs") as Executive Housekeeper. (Samman Aff. P 15.) Burroughs had formerly served as the Director of Housekeeping at the W Hotel and the Millenium Hilton in Manhattan. In those positions, Burroughs acquired experience in managing employees, performing administrative functions such as preparing payroll reports, and procuring shipments and supplies from vendors. (Id. PP 16-17; Def.'s 56.1 PP 114-116.) When Burroughs was hired by GCH, he asked a GCH supervisor why Garrett had not been promoted to fill the

Executive Housekeeper position. (Def.'s 56.1 P 126.) He was told that GCH did not see Garrett as ready for promotion. (Def.'s 56.1 P 126.)

Garrett never submitted a written application for the Executive Housekeeper position. (Def.'s 56.1 P 111.) She did not prepare or submit a resume or a letter to GCH management stating why she believed she was qualified for the position. (Def.'s 56.1 P 111.) Nevertheless, Garrett asserts that, at some point, she "went to Human Resources to apply for the position" of Executive Housekeeper. (Pl.'s 56.1 P 205.)

Garrett alleges that GCH decided to obtain Executive Housekeepers from outside the Hotel in order to "avoid [*6] promoting [Garrett] to the Executive Housekeeper" position; according to Garrett, GCH's decision was made on the basis of Garrett's race and her age. (Compl. P 22.)

However, defendant asserts that Garrett was not considered for the Executive Housekeeper position because she lacked certain skills necessary for the position, including computer literacy, customer service training, and the ability to prepare annual budget and expense reports. (Samman Aff. P 9.) Moreover, defendant asserts that Garrett lacked the communication and interpersonal skills necessary for the position, and that other staff considered her to be rude and abrasive. (Samman Aff. P 11.) Garrett concedes that at the time Burroughs was hired as Executive Housekeeper, she was "very limited" in the duties she could perform due to her lack of knowledge. (Def.'s 56.1 P 127.)

3. Plaintiff's Proffered Evidence of Discrimination

In support of her discrimination claims, Garrett alleges that in 1999, prior to Marcinow leaving GCH, Marcinow told Garrett that GCH's General Manager, Nasser Samman ("Samman"), had instructed Marcinow to "fire that black bitch," allegedly referring to Garrett. (Defs.' 56.3, 1 P 109.)

Garrett also [*7] alleges that GCH discriminated against her because she did not have the "right look." (Compl. PP 34, 58; Garrett Tr. at 168.) Garrett alleges that, in May 2000, she learned from Burroughs about a so-called "look test" used by GCH. (Pl.'s 56.1 P 99; Def's 56.1 PP 93-94.) According to Garrett, Burroughs relayed to her a conversation between Burroughs and Laura Brown ("Brown"), GCH's Assistant Director of Human Resources. (Def.'s 56.1 P 93.) Burroughs allegedly told Garrett that GCH had turned down an African-American job applicant and that Brown had said the reason for the African-American applicant's rejection was that she did not "have the look." (Def.'s 56.1 P 92-93.) In turn, according to Garrett, Burroughs said that he believed that requiring employees to have "the look" meant that em-

2007 U.S. Dist. LEXIS 31106, *

ployees must be Caucasian or "light-skinned Latino" in order to "work the lobby, deal with the guests or be in the public eye." [2] (Def.'s 56.1 P 93; Pl.'s 56.1 P 98; Garrett Tr. at 168.)

> [2] Plaintiff concedes that her handwritten notes regarding her conversation with Burroughs in May 2000 indicate that *plaintiff* was the one who explained to Burroughs that the "look test" disfavored non-blonde, non-blue-eyed job applicants, but nevertheless asserts, and this Court assumes *arguendo,* that Burroughs explained the meaning of the "look test" to plaintiff. (Garrett Tr. at 173.)

[*8] Defendant disputes that it made any hiring decision based on a "look test" or that the job applicant at issue was rejected due to such a test. First, defendant notes that Burroughs denies knowing the reason for the rejection of the job applicant and being told by anyone in GCH management that African-American applicants did not have "the look." (Def.'s 56.1 PP 95-99; Pl.'s 56.1 P 95-99; Burroughs Tr. at 232-33.) Second, defendant points out that it is undisputed that Garrett cannot identify the rejected job applicant and has no first-hand knowledge of the job applicant's qualifications. (Def.'s 56.1 PP 92, 94.)

Garrett also alleges that GCH did not promote her and denied her training opportunities because of her age. (Pl.'s 56.1 P 105.) In support, Garrett points out that both Marcinow and Burroughs were younger than Garrett, and that Mills, a woman formerly employed by GCH as Executive Housekeeper, also did not receive training during her time at GCH because of her age. (*Id.*)

4. Complaints to GCH Employees

Garrett asserts that she complained to several supervisors at GCH about racial discrimination. First, Garrett asserts that she complained of racial discrimination to Peggy [*9] O'Boyle ("O'Boyle"), in 1999. (Def.'s 56.1 P 134; Garrett Dep. at 189-90.) O'Boyle left GCH in August 1999. (Def.'s 56.1 P 134.)

Second, Garrett alleges that she complained of racial discrimination to Samman and another GCH employee, Cathy Nelkin, respectively, but she cannot recall when she complained to them or the specific substance of her complaints. (Pl.'s 56.3, 1 P 138; Garrett Tr. at 188-89.)

Finally, Garrett alleges that she complained to Burroughs in January 2002 regarding GCH's treatment of her, the lack of training she had received, "the homogeneity of management," and of racial discrimination. (Pl.'s 56.1 P 140.)

Garrett never complained to Muro about alleged racial or age discrimination or alleged discriminatory remarks made by other GCH employees. (Def.'s 56.1 P

135.) Moreover, Brown, the GCH employee who fired Garrett, was not aware that Garrett had complained of discrimination based upon her race or age. (Def.'s 56.1 P 142; Brown Aff. P 12.)

5. Garrett's Job Performance

a. Performance Evaluations

In early November 1999, Muro conducted a performance evaluation of Garrett. (Def. 's 56.3, 1 P 27.) Muro told Garrett that she needed to improve her "employee relationships. [*10] " In a written evaluation, Muro also relayed that Garrett needed to improve in the areas of Staff Development and Promotion, Task Management, Team Development and Leadership. (Def.'s 56.1 PP 28-29; Pl.'s 56.1 PP 28-29.) Following the performance evaluation, Garrett signed an acknowledgment, indicating that she had read, discussed and understood the performance evaluation, and understood that she could attach additional comments to the form containing the evaluation if she wished to do so; Garrett did not attach any such comments. (Def.'s 56.3, 1 P 30.) In February 2000, Burroughs told Garrett that one of Garrett's subordinates had complained about her demeanor towards the staff; Burroughs warned Garrett that further complaints might result in her termination. (Def.'s 56.3, 1 P 32.) Later, in a performance evaluation in August 2000, Garrett was again informed that she needed to improve her performance in the area of Staff Development and Promotion. (Def.'s 56.1 P 34.)

In another evaluation of Garrett's performance, conducted by Burroughs on February 27, 2001, Garrett was informed that she needed to improve in the areas of Preferred Standards Compliance, Staff Development and Promotion, Team [*11] Development, and Business Values and Leadership. (Def.'s 56.3, 1 P 50.) At that time, Garrett received an overall performance rating of Meets Expectations/Improvement Needed. (Def.'s 56.3, 1 P 50.) Garrett's mid-year review in 2001 indicated that she needed to improve her performance in the area of Staff Development and Promotion, and that she needed to continue to train her staff to meet GCH standards. (Def.'s 56.1 P 52.)

Garrett's 2002 performance review noted her need to improve in the areas of Employee Relations, Staff Development and Promotion, Team Development and Leadership. (Def.'s 56.1 P 53.) The 2002 review also indicated that Garrett's "obligation [is] to cease any activity which could be construed as negative or contributing to unrest with the dept . . . [She] needs to work on her communication skills and treatment of fellow employees." (Def.'s 56.1 P 53.) Moreover, the 2002 review indicated that Garrett needed "to be consistent in" training her staff. (Def.'s 56.1 P 53.) On April 10, 2002, Burroughs reminded Garrett of her responsibility to con-

duct weekly training of her staff. (Def.'s 56.3, 1 P 76.) Garrett has acknowledged that there were weeks when she did not hold the [*12] required training classes for employees under her supervision. (Def.'s 56.1 P 49; Pl.'s 56.1 P 49.)

b. The November 1999 Failure to Report Lost Property

In November 1999, Garrett was aware that GCH's procedures required employees to immediately report to Hotel security any valuable property found in unoccupied rooms. (Def.'s 56.1 P 23.) Nevertheless, on November 20, 1999, Garrett failed to report to security a laptop computer found in an unoccupied room. (Def.'s 56.1 P 24.) Consequently, Garrett was issued a written warning regarding her failure to follow procedure and was orally reprimanded by Burroughs, her supervisor at the time. (Def.'s 56.1 P 24.)

c. The December 2000 Party

In December 2000, GCH hosted one of its largest and most important corporate affairs, the Canon Christmas Party. According to Garrett, she was not informed by GCH that she was required to be on hand for the party and, as a result, was not at GCH during the event. (Def.'s 56.1 PP 36-37; Pl.'s 56.1 P 37.) Garrett was disciplined by Muro for her absence. (Def.'s 56.1 P 37.)

d. Room Inspections

On December 14, 2000, Garrett told her supervisors that a room under her supervision had been inspected and was [*13] ready for new occupants. (Def.'s 56.1 P 38.) Later, the Director of Operations, Nasser Samman ("Samman"), found the room littered with debris and discovered hair on the towels. (Def.'s 56.1 P 39.) According to Garrett, Burroughs believed that Samman had placed the debris in the room himself. (Def.'s 56.1 P 38; Pl.'s 56.1 P 39.) Nevertheless, it is undisputed that, following the incident, Burroughs issued a memorandum to Garrett stating that Garrett's level of performance was unacceptable and warning her that "[i]f immediate improvement is not made Stella's position . . . will be re-evaluated." (Def.'s 56.3, 1 P 41.)

On January 12, 2001, Garrett was issued a "final warning" for her failure to properly inspect yet another room with which she was charged with inspecting and approving as properly cleaned. (Def.'s 56.1 P 44.) The warning indicated that "if immediate improvement to [Garrett's] performance is not made[,] further actions . . . not excluding termination will occur." (Romero Decl., Ex. K.) Burroughs had also reprimanded Garrett on other occasions for her failure to properly inspect rooms in areas under her supervision. (Def.'s 56.3, 1 P 25.)

e. Muro's Opinion of Garrett's [*14] Job Performance

Both Muro and Burroughs, in separate meetings with Garrett since 1999, discussed the need for her to improve her relations with other employees, her problems using e-mail, her bluntness with underperforming employees under her supervision, and her failure to instruct staff in how to perform their duties properly without yelling at them. (Def.'s 56.1 PP 64-67, 72; Pl.'s 56.1 PP 64, 67.)

However, Muro and Burroughs held differing opinions as to Garrett's abilities and her job performance. (Def.'s 56.3, 1 P 61.) According to Garrett, Burroughs thought that Garrett was a "disciplined supervisor" who was too blunt. (Pl.'s 56.1 P 67.) By contrast, Muro, who was Burroughs' and Garrett's superior, told Burroughs that Garrett was "not the right person for her job," criticized Garrett's knowledge of computers, her communication skills, and her ability to handle administrative duties, and noted the need for Garrett to improve "across the board" as an employee. (Def.'s 56.3, 1 P 61.) In addition, Muro exercised her authority to adjust performance evaluations of GCH employees with regard to evaluations of Garrett that were made by Burroughs. (Def.'s 56.1 P 63.) Specifically, Muro occasionally [*15] reviewed Burroughs' evaluations of Garrett and recommended that, based upon Muro's own observations, such evaluations include more criticisms of Garrett's job performance. (Def.'s 56.3, 1 P 66.) Whenever Muro changed Garrett's performance evaluation, Garrett was made aware of such changes. (Def.'s 56.1 PP 60, 68.)

The parties dispute the closeness with which Muro supervised Garrett and, as such, the accuracy of Muro's criticisms of Garrett's performance. Defendant asserts that Muro was a "hands on" supervisor who worked very closely with Garrett and thus could observe Garrett's job performance. (Def.'s 56.1 P 56.) However, Garrett asserts that Muro's duties were primarily administrative and that she only supervised Garrett when the Executive Housekeeper position was vacant. (Pl.'s 56.1 P 56.)

Garrett concedes that Burroughs told her that Muro was unhappy with Garrett's job performance, that Muro thought Garrett needed to improve her relations with other employees, and that Garrett's staff perceived her to be "nasty." (Def.'s 56.1 PP 54, 64; Pl.'s 56.1 P 64.) Moreover, Garrett concedes that Muro's opinion of Garrett's job performance "was more important" than Burroughs' opinion because [*16] Muro was a higher-ranking employee than both Garrett and Burroughs.

6. Garrett's Termination

In April 2002, Burroughs had to remind Garrett of her responsibility to conduct weekly training of her staff.

(Def.'s 56.1 PP 75, 76.) Moreover, also in April 2002, Burroughs learned of allegations that, during his absence for an illness, Garrett had criticized Burroughs for being absent from work. (Def.'s 56.1 P 77; Pl.'s 56.1 P 77.)

Subsequently, according to defendant, on April 12, 2002, Burroughs held a meeting with Garrett to address her job performance issues. (Brown Aff. P 6.) Burroughs wrote a memorandum summarizing the issues he discussed with Garrett, including her inconsistency in completing paperwork, complaints from Garrett's staff regarding how she "mistreats them," and Garrett's failure to provide breaks for one staff member. (Romero Decl., Ex. Q.) Garrett concedes that she met with Burroughs to discuss complaints from Garrett's staff and other job performance issues.

Later in the day on April 12, 2002, Assistant Human Resources Director Brown discharged Garrett from her position. (Def.'s 56.3, 1 P 78; Pl.'s 56.3, 1 P 78.) According to defendant, Garrett was terminated due to "numerous [*17] complaints" regarding her performance and her inability to get along with other employees. (Def.'s 56.3, 1 P 78; Brown Aff. P 11.)

GCH did not hire an Assistant Executive Housekeeper to replace Garrett following her termination. Defendant asserts that Garrett's position was no longer necessary due to a decreased occupancy rate at GCH following the events of September 11, 2001. (Def.'s 56.1 P 83.) However, plaintiff contends that her position was effectively filled when GCH created the new position of Housekeeping Manager and hired Jeanine Contessini, a Caucasian woman, to fill that position. (Pl.'s 56.1 PP 83, 283; Compl. P 56.)

7. Garrett's State Discrimination Complaint

On June 3, 2002, Garrett filed a complaint with the New York State Division of Human Rights ("SDHR"). (Def.'s 56.1 P 84.) In her complaint, Garrett alleged that she was terminated because of her race and not for the reasons given by GCH. (Def.'s 56.1 P 85.) The complaint did not include allegations that Garrett had been discriminated against on the basis of her age or that she was terminated in retaliation for complaining of racial or age discrimination. (Def.'s 56.1 P 87.) According to Garrett, within six months [*18] of filing her initial SDHR complaint, she filed an affidavit that amended her complaint to include claims of retaliation and age discrimination, but the SDHR did not issue an order accepting the amendment until January 30, 2004. (Def.'s 56.1 P 90; Pl.'s 56.1 P 90; Romero Decl., Ex. W.)

Following an investigation, the SDHR determined that there was an "absence of proof to support the claim[s] of age, race and color discrimination and retalia-

tion for opposing discrimination" and thus dismissed the complaint. (Romero Decl., Ex. BB.)

B. Procedural History

Garrett filed a complaint in this case on February 18, 2005. Defendant moved for summary judgment on September 18, 2006. The Court heard oral argument on defendant's motion on October 13, 2006. [3]

> 3   At oral argument, plaintiff requested, and the Court granted, a thirty-day continuance for plaintiff to locate and to depose O'Boyle and Marcinow. By letter dated December 11, 2006, counsel for plaintiff informed the Court that she had been unable to find or to depose those individuals and requested that the Court decide the pending motion on the parties' previous submissions.

[*19] II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) [*20] (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the non-moving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omit-

ted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is [*21] needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *Bell-South Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) [*22] ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

III. DISCUSSION

A. State and City Claims

Plaintiff is barred from asserting claims in this Court under the anti-discrimination provisions of New York State and New York City law. New York Executive Law § 297(9) provides:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . and

such other remedies as may be appropriate . . . *unless such person had filed a complaint hereunder or with any local commission on human rights.*

N.Y. Exec. Law § 297(9) (emphasis added). New York City law contains a provision with "nearly identical" language and of similar effect. *York v. Ass'n of the Bar*, 286 F.3d 122, 127 (2d Cir. 2002) ("'[T]he language of the CHRL is nearly identical to that of [*23] § 297(9),' and discussion of the latter applies equally to the former.") (quoting *York v. Ass'n of the Bar*, No. 00 Civ. 5961 (DC), 2001 U.S. Dist. LEXIS 9457, 2001 WL 776944, at *5 (S.D.N.Y. July 9, 2001) (citing N.Y.C. Admin. Code § 8-502(a)[4])).

4    Section 8-502(a) provides in relevant part:

> Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice . . . shall have a cause of action in any court of competent jurisdiction . . . unless such person has filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence.

As the Second Circuit has observed, "by the terms of the [State] statute and [New York City] code, respectively, the NYHRL and CHRL claims, once brought before [*24] the NYSDHR, may not be brought again as a plenary action in another court." *Moodie v. Fed. Res. Bank of N.Y.*, 58 F.3d 879, 882 (2d Cir. 1995). Furthermore, once a plaintiff brings a case before the NYSDHR, she may appeal only to the Supreme Court of the State of New York. *York*, 286 F.3d at 127 (citing N.Y. Exec. Law § 298); *see, e.g., Ganthier v. North Shore-Long Island Jewish Health Sys.*, 345 F. Supp. 2d 271, 282-83 (E.D.N.Y. 2004). This "limitation on the election of remedies applies equally to NYHRL [or CHRL] claims brought in state court and to those brought as pendant claims in federal court." *Moguel v. Covenant House/New York*, No. 03 Civ. 3018 (RWS), 2004 U.S. Dist. LEXIS 19342, 2004 WL 2181084, at *9 (S.D.N.Y. Sept. 29, 2004) (citations omitted).

In this case, plaintiff filed a complaint with the NYSDHR which, following an amendment, alleged that

defendant discriminated against her on the basis of race and age, and retaliated against her for filing a complaint. The NYSDHR found that there was an "absence of proof to support the claim[s] of age, race and color discrimination [*25] and retaliation for opposing discrimination" and thus dismissed the complaint. (Romero Decl., Ex. BB.) Therefore, because plaintiff elected initially to bring her NYHRL and CHRL claims before the NYSDHR and those claims were dismissed by the agency, plaintiff is barred from asserting such claims in this action. N.Y. Exec. L. § 297(9); N.Y.C. Admin. Code § 8-502(a).

Plaintiff argues that the NYSDHR ruled on the merits of plaintiff's case only as to those claims arising within one year prior to the filing of plaintiff's complaint with the NYSDHR on June 3, 2002. Therefore, according to plaintiff, she may continue to assert in this Court NYHRL and CHRL claims relating to "the failure to promote, the discriminatory disciplines, the failure to pay Plaintiff her full raise" because the events underlying those claims occurred prior to June 3, 2001. (Pl.'s Opp. Mem. at 5.)

The Court rejects plaintiff's argument. The NYSDHR's determination specifically addressed plaintiff's claims relating to events that occurred prior to June 3, 2001. (See Romero Decl., Ex. BB (finding that "[t]here is a lack of evidence" that the [*26] failure to promote plaintiff in 1999 was "due to alleged discrimination complaints or . . . [plaintiff's] age and/or race")).

Moreover, even assuming arguendo that the NYSDHR only addressed plaintiff's claims that arose after June 3, 2001, plaintiff would be barred from asserting in this Court claims that arose prior to June 3, 2001. NYHRL and CHRL claims are subject to a three-year statute of limitations. See, e.g., Cabrera v. NYC, 436 F. Supp. 2d 635, 642 (S.D.N.Y. 2006) (citing N.Y.C.P.L.R. § 214(2)); Milani v. Int'l Bus. Machines Corp., Inc., 322 F. Supp. 2d 434, 451 (S.D.N.Y. 2004); N.Y. Admin. Code § 8-502(d). Therefore, because this action was commenced on February 22, 2005, plaintiff is barred from asserting any NYHRL or CHRL claims that arose prior to February 22, 2002. In sum, all of plaintiff's NYHRL and CHRL claims are dismissed due to the election-of-remedies doctrine or, alternatively as to those claims arising prior to February 22, 2002, as time-barred.

B. Timeliness of Plaintiff's Failure to Promote Claims

1. Limitations Periods

Defendant argues that [*27] all of plaintiff's federal claims relating to GCH's alleged failure to promote plaintiff are untimely. For the reasons that follow, this Court finds that such claims, because they relate to an allegedly unlawful employment practice that occurred prior to August 7, 2001, are time-barred.

(i) Title VII and ADEA Claims

In order to assert a Title VII or an ADEA claim in federal court, a plaintiff must file an administrative charge alleging discrimination within 300 days of the alleged discriminatory conduct. See 42 U.S.C. § 2000e-5(e) (Title VII); 29 U.S.C. §§ 626(d), 633(b) (ADEA); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-09, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("In the context of a request to alter the timely filing requirements of Title VII, this Court has stated that 'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'") (quoting Mohasco Corp. v. Silver, 447 U.S. 807, 826, 100 S. Ct. 2486, 65 L. Ed. 2d 532 (1980)); Ruhling v. Tribune Co., No. 04 Civ. 2430 (ARL), 2007 U.S. Dist. LEXIS 116, at *24 (E.D.N.Y. Jan. 3, 2007) [*28] ("Under Title VII and the ADEA, a plaintiff must file an administrative charge . . . within 300 days after a claim accrues."); Hill v. Citibank Corp., 312 F. Supp. 2d 464, 472 (S.D.N.Y. 2004). These statutory filing periods are "analogous to [] statute[s] of limitations," Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996), and, as such, "a failure to timely file a charge acts as a bar to a plaintiff's action." Butts v. N.Y. City Dep't of Hous. Pres. & Dev., No. 00 Civ. 6307 (KMK), 2007 U.S. Dist. LEXIS 6534, at *20 (S.D.N.Y. Jan. 29, 2007) (citing Hill, 312 F. Supp. 2d at 472); see also McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 214 (2d Cir. 2006). This "statute of limitations" begins to run for each discrete discriminatory act when each such act occurs. See Morgan, 536 U.S. at 114; Hill, 312 F. Supp. 2d at 472.

In this case, plaintiff filed a discrimination claim with the NYSDHR on June 3, 2002. Accordingly, the statute of limitations had run for any of plaintiff's Title VII and ADEA claims relating to allegedly discriminatory [*29] acts that occurred prior to August 7, 2001, three-hundred days prior to the filing of plaintiff's charge of discrimination with the NYSDHR. Therefore, plaintiff's Title VII and ADEA claims relating to GCH's alleged failure to promote plaintiff in 1999 are dismissed as time-barred.

(ii) 42 U.S.C. § 1981 Claims

Claims brought under Section 1981 are subject to a four-year statute of limitations. See, e.g., Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004); Mahmud v. Kaufmann, 454 F. Supp. 2d 150, 156-57 (E.D.N.Y. 2006). Thus, in this case, plaintiff's Section 1981 claims relating to acts that took place prior to February 18, 2001 (four-years before the commencement of this action) are time-

barred. Accordingly, plaintiff's Section 1981 claims relating to GCH's alleged failure to promote plaintiff in 1999 are dismissed as time-barred.

### 2. Equitable Estoppel

Plaintiff argues that, even if such claims are time-barred, equity requires this Court to consider plaintiff's discrimination claims relating [*30] to GCH's failure to promote plaintiff in 1999. [5] (See Pl.'s Opp. Mem. at 6.) Specifically, plaintiff argues that defendant should be estopped from using the statutory limitations period against plaintiff because "affirmative misconduct by [] defendant lulled [plaintiff] into inaction." (Id.) For the reasons that follow, this Court finds that plaintiff has failed to offer any evidence to support the application of the doctrine of equitable estoppel in this case.

> 5    Plaintiff does not argue that the "continuing violation" doctrine preserves her time-barred claims because the acts underlying those claims are related to acts alleged in her timely hostile work environment claim. In any event, the Court notes that this doctrine would not apply to plaintiff's time-barred claims. As the Supreme Court observed in Morgan, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113; see Petrosino v. Bell Atlantic, 385 F.3d 210, 220 (2d Cir. 2004) ("The law is clear that termination and promotion claims may not be based on discrete acts falling outside the limitations period."); Butts, 2007 U.S. Dist. LEXIS 6534, at *22-*23; see also Sundaram v. Brookhaven Nat'l Labs., 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) ("The exception usually applies only in those cases involving specific discriminatory policies or mechanisms, such as discriminatory seniority lists or employment tests. Thus, the exception does not apply to discrete, completed employment actions such as transfers, failures to promote, demotions, or inadequate wages.") (citations omitted).

[*31]    Equitable estoppel based on a defendant's misconduct applies "in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 60-61 (2d Cir.1986) ("The doctrine properly may be invoked in a case in which the employer has misrepresented the length of the limitations period or in some other way has lulled the plaintiff into believing that it was not necessary for him to commence litigation.") (quotations and citation omitted); see also Kavowras v. New York Times Co.,

328 F.3d 50, 56 (2d Cir. 2003). The doctrine only applies where "the alleged conduct . . . amount[s] to the type of bad faith, dilatory actions that require equity to step in and estop a statute of limitations defense." Carrion v. Coca-Cola Bottling Co., No. 05 Civ. 1720 (JCH), 2006 U.S. Dist. LEXIS 91571, at *12 (D. Conn. Dec. 1, 2006) (quoting Dillman, 784 F.2d at 60). Thus, "[t]o invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe [*32] that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to [her] detriment." Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995)). Moreover, "[t]he burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000).

Here, plaintiff argues that defendant "lulled" her into inaction by promising plaintiff, even after the hiring of Burroughs in 1999, that she would eventually be promoted to the Executive Housekeeper position. (See Pl.'s Opp. Mem. at 6-7.) According to plaintiff, she failed to file a timely charge of discrimination based on defendant's promise of a forthcoming promotion.

Plaintiff's argument must fail for the sole reason that plaintiff fails to offer any evidence that would entitle her to invoke the doctrine of equitable estoppel. That is, plaintiff fails to offer an affidavit or some other form of evidence from which this Court could find that defendant's conduct caused plaintiff to delay filing a charge of discrimination; rather, plaintiff only offers argument to that effect in her memorandum [*33] of law responding to defendant's motion. Moreover, plaintiff has failed to point to any portion of the record demonstrating that some act or statement of defendant or one of its employees caused plaintiff to fail to file a discrimination complaint. Thus, the Court finds that there is no evidence whatsoever to support a finding that plaintiff is entitled to equitable relief from her failure to pursue her claims in a timely manner. See, e.g., Wayne v. Principi, No. 01 Civ. 941 (GWG), 2004 U.S. Dist. LEXIS 3141, at *19 (S.D.N.Y. March 3, 2004) (finding at the summary judgment stage that "because there is no evidence of conduct by the [defendant] or any of its employees that caused [plaintiff] to file this suit defectively, equitable estoppel does not apply"); see also Johnson v. Al Tech Specialties Steel Corp., 731 F.2d 143, 146 (2d Cir. 1984) (declining to apply equitable tolling where plaintiff "refused to attest to his version of the facts in an affidavit"); cf. Buttry, 68 F.3d at 1493-94 (2d Cir. 1995) (relying on affidavits of plaintiffs to evaluate equitable estoppel argument).

Plaintiff argues that by not foreclosing [*34] the possibility that plaintiff would be promoted to the Executive Housekeeper position, GCH effectively lulled plain-

tiff into inaction. (*See* Pl.'s Opp. Mem. at 7.) However, even assuming *arguendo* that defendant failed to foreclose the possibility of plaintiff's promotion, that conduct, by itself, cannot support the application of the equitable estoppel doctrine. More specifically, there is no evidence from which one could reasonably infer that defendant engaged in the type of "bad faith, dilatory" conduct that merits equitable estoppel. *Dillman*, 784 F.2d at 60. Under plaintiff's logic, unless an employer affirmatively tells a plaintiff that he or she will never be promoted and thereby forecloses any future promotion, the statute of limitations on prior decision to deny promotion would be tolled indefinitely under the doctrine of equitable estoppel. That is not the law and, here, plaintiff has failed to point to sufficient facts that could reasonably warrant the equitable tolling of her claims regarding the failure to receive a promotion in 1999.

## C. Discrimination Claims

### 1. Legal Standard

On a motion for summary judgment, employment discrimination claims [*35] brought under Title VII, 42 U.S.C. § 1981 [6] and the ADEA are analyzed under identical standards. *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000) (analyzing Section 1981 claim under Title VII standard); *Viola v. Philips Medical Sys. of N. Am.,* 42 F.3d 712, 715 (2d. Cir. 1994) (noting that ADEA claims follow the same analytical framework as Title VII cases); *Moore v. Consol. Edison Co. of N.Y., Inc.,* No. 00 Civ. 7384 (PAC), 2007 U.S. Dist. LEXIS 19118, 2007 WL 831807, at *5 (S.D.N.Y. March 20, 2007).

6   While the elements of a Section 1981 claim and a Title VII claim are distinct, discriminatory intent is a necessary element of both claims. *See Patterson v. Cty. of Oneida,* 375 F.3d 206, 226 (2d Cir. 2004) ("[A] plaintiff pursuing a claimed violation of § 1981 . . . must show that the discrimination was intentional."). Thus, "a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under § 1981." *Hill v. Rayboy-Brauestein,* 467 F. Supp. 2d 336, 367-68 (S.D.N.Y. 2006); *see Gonzalez v. City of New York,* 354 F. Supp. 2d 327, 330 n.2 (S.D.N.Y. 2005) ("Although claims under 42 U.S.C. § 1981 . . . involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination.") (internal quotations and citations omitted). Therefore, the Court's conclusion, as discussed below, that plaintiff's Title VII claim

does not survive summary judgment due to insufficient evidence regarding defendant's discriminatory intent also results in dismissal of plaintiff's Section 1981 claims.

[*36] Because plaintiff presents no direct evidence of discriminatory treatment based on her race or age, the Court reviews her discrimination claims under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "[T]he employee bears the initial burden of producing evidence sufficient to support a *prima facie* case of discrimination [or retaliation]." *Id.* at 807. To establish a *prima facie* case of race or age discrimination, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a *prima facie* [*37] case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson,* 375 F.3d at 221 (quoting *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson,* 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson,* 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs,* 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case, as well as additional evidence. Such additional evidence may include direct or circumstantial evidence [*38] of discrimination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99-101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). It is not sufficient, however, for a plaintiff merely to show that he or she satisfies "*McDonnell Douglas'* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the re-

cord from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.; Connell v. Consol. Ed. Co. of N.Y., Inc.,* 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

### 2. Application

Defendant argues that plaintiff's discrimination claims fail as a matter of law because the undisputed facts demonstrate that she was terminated for legitimate, non-discriminatory reasons. For the reasons set forth below, the Court grants defendant's motion. [7]

> 7  As an initial matter, the Court dismisses plaintiff's discrimination claims under the ADEA. Assuming *arguendo* that plaintiff has made a *prima facie* case of age discrimination and given that defendant has articulated legitimate reasons for her discharge (as discussed below), the Court finds that the evidence, viewed in the light most favorable to plaintiff, provides no basis whatsoever for a reasonable jury to infer that plaintiff's discharge was the product of age discrimination. As discussed in detail below, the evidence regarding defendant's alleged discriminatory intent relates solely to *racially* discriminatory remarks allegedly made by GCH employees. In support of her ADEA claim, plaintiff offers nothing more than mere conjecture that she and another former GCH employee "of mature age" were denied training opportunities. (Pl.'s Resp. Br. at 12.) However, plaintiff fails to articulate when or how such opportunities were denied to plaintiff, or to offer any evidence that such opportunities were offered to similarly situated employees outside the protected class. *See, e.g., Butts v. N. Y. City Dep't of Hous. Pres. & Dev.,* No. 00 Civ. 6307 (KMK), 2007 U.S. Dist. LEXIS 6534, 2007 WL 259937, at *10 (S.D.N.Y. Jan. 29, 2007) (granting summary judgment where plaintiff offered only "general and speculative allegations" that plaintiff was "treated differently than similarly situated employees not of Plaintiff's protected class"). Thus, because "the ADEA protects only against discrimination motivated by age," and plaintiff has failed to present any evidence from which a reasonable jury could draw such an inference, the Court dismisses plaintiff's age discrimination claims. *Graves v. Finch Pruyn & Co., Inc.,* 457 F.3d 181, 188 (2d Cir. 2006) (citing 29 U.S.C. § 623).

[*39]  Initially, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas* as to her discrimination claims. [8] In response,

defendants have articulated legitimate non-discriminatory reasons for her dismissal, namely, plaintiff's failure to perform her job adequately and her poor relationships with other employees. Hence, "the pattern of presumptions and burden shifts established by *McDonnell Douglas* drops away, and the question in adjudicating [defendant's] motion for summary judgment becomes simply whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by discrimination. *Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111, 114 (2d Cir. 2007) (internal citation omitted); *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber,* 40 F. Supp. 2d 516, 520 (S.D.N.Y. 1999). For the reasons that follow, the Court finds that, viewing the evidence in the light most favorable to plaintiff, the evidence is insufficient [*40] to sustain a reasonable finding that plaintiff's discharge was the product of discrimination.

> 8    The Court notes that defendant disputes whether plaintiff has produced evidence to support the "satisfactory job performance" and "inference of discrimination" elements of the *McDonnell Douglas* standard. However, as to the job performance element, plaintiff has proffered evidence demonstrating that she received positive performance evaluations during her time as an Assistant Executive Housekeeper at GCH, and challenges the accuracy of her more recent job performance evaluations. Thus, although plaintiff's proof on the issue of satisfactory job performance is admittedly thin, the Court finds that, given the *de minimis* burden at the *prima facie* stage, plaintiff has satisfied that element of the *McDonnell Douglas* standard. *See, e.g., De La Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 20-21 (2d Cir. 1996) ("To satisfy the second element of the test, [plaintiff] need not demonstrate that his performance was flawless or superior. Rather, he need only demonstrate that he possesses the basic skills necessary for performance of [the] job.") (internal quotation marks and citation omitted). As to the inference of discrimination element, plaintiff has produced evidence demonstrating that, following plaintiff's termination, a person outside the protected class at issue in this case was promoted to a position that, according to plaintiff, was effectively identical to plaintiff's former position at GCH. Thus, because "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage,"

*Zimmermann*, 251 F.3d at 381, the Court finds that plaintiff has also satisfied that element of the *McDonnell Douglas* standard.

[*41] a. Proffered Evidence of Plaintiff's Job Performance

As noted above, defendant asserts that plaintiff was terminated because of her inadequate job performance and her failure to treat other GCH employees "with courtesy and respect." (Dft.'s Reply Br. 12.) Defendant has offered evidence to support its proffered reasons in the form of depositions, affidavits, and extensive employer records regarding plaintiff's negative job performance. Specifically, defendant has produced evidence of complaints from GCH staff, negative evaluations of plaintiff's job performance from plaintiff's supervisors, and accounts of specific instances of errors by plaintiff during her employment, including her failure to properly inspect rooms and to follow GCH procedures for reporting items found in vacant rooms. The record regarding plaintiff's performance evaluations demonstrates that, from late 1999 to her termination in 2002, plaintiff was rated negatively by her supervisors in areas such as employee relations, staff development and promotion, and team development and leadership, and that plaintiff was repeatedly and explicitly warned that she needed to improve her relationships with other GCH employees. [*42] Moreover, plaintiff was repeatedly warned that failure to improve her performance could result in her termination.

As to nearly all of defendant's evidence, plaintiff does not dispute that, in fact, such complaints and evaluations were made, or that she made certain mistakes during her employment. [9] In addition, plaintiff concedes that GCH supervisors were dissatisfied with her job performance, that she was repeatedly informed of their dissatisfaction through interactions with her supervisors, that she was advised by supervisors to improve her relationships with other employees, that there was a perception among GCH staff working under plaintiff's supervision that plaintiff "was nasty," and that plaintiff had been warned that complaints about her demeanor toward other employees could lead to her termination. [10] (Pl.'s 56.1 32, 43, 64, 67, 69, 75.)

9    Plaintiff does dispute the factual basis for certain incidents proffered by defendant. Specifically, plaintiff disputes that (1) she was responsible for the failure to inspect and to clean a room on December 14, 2000; (2) she was notified that she was required to work during the Canon Christmas party at GCH in December 2000; and (3) her comments regarding the absence of her supervisor, Burroughs, from work in April 2002 were disrespectful. At summary judgment, the

Court assumes *arguendo* that plaintiff's version of events is accurate -- namely, that (1) Samman left the room dirty in December 14, 2000 and blamed plaintiff, (2) plaintiff was not aware of the Canon Christmas party, and (3) that her comments regarding Burroughs' absence were misconstrued. Nevertheless, as discussed herein, even resolving these contrasting accounts in plaintiff's favor, plaintiff fails to present sufficient evidence from which a reasonable jury could find that GCH discriminated against plaintiff on the basis of her race.

[*43]

10    Plaintiff argues that during one such meeting with Muro on November 2, 1999, Muro did not advise plaintiff of her need to improve her relationships with other employees. (Pl.'s 56.1 P 28.) The Court assumes *arguendo* that plaintiff's version of events is accurate, but notes that plaintiff does not dispute defendant's account of other interactions between plaintiff and her supervisors wherein plaintiff was repeatedly advised of her supervisor's displeasure with her job performance and/or complaints by other GCH employees regarding plaintiff.

Nevertheless, plaintiff argues that she did not "see anything wrong" with her job performance and, thus, she contends that a reasonable factfinder could find that defendant's reasons for terminating plaintiff were pretextual. [11] (Garrett Tr. at 63-64.) The Court finds that, viewing the evidence in the light most favorable to plaintiff, the evidence is insufficient to sustain a reasonable finding that defendant's proffered non-discriminatory reasons for her termination were a pretext for discrimination.

11    The record demonstrates that, when given an opportunity by her supervisors to comment on the negative evaluations, plaintiff did not dispute the accuracy of such evaluations. Cf. *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (finding summary judgment appropriate where plaintiff disputed the accuracy of his job performance evaluations but, "[w]hen invited by his supervisors to comment, [plaintiff] did not dispute even half of the negative evaluations").

[*44] Plaintiff attempts to rebut her employer's proffered explanations by generally disputing the accuracy of her supervisors' assessments, and providing her own contrary appraisal of her work. However, "[t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot[,] standing on its own show[,] that her employer's asserted reason[s] for termination [were] pretextual." *Ricks v. Conde Nast Pub., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) (in-

ternal citation omitted); *see McLee*, 109 F.3d at 135 (finding summary judgment appropriate on Section 1981 and Title VII discriminatory discharge claims where plaintiff's "disputations [of his employer's proffered explanations] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried"); *Brown v. Soc. for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination [*45] . . . were false or a pretext for discrimination."); *see also D'Cunha v. N.Y. Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445 (DLI), 2006 U.S. Dist. LEXIS 11929, 2006 WL 544470, at *6 (E.D.N.Y. March 6, 2006). Instead, "[plaintiff's] fundamental disagreement with the conclusions their supervisors drew from incidents which she admits occurred, and her subjective belief that they should not have reflected badly on her performance . . ., is not evidence that her supervisors' appraisals were a sham, invented to mask discrimination." *See Taylor v. Polygram Records*, No. 94 Civ. 7689 (CSH), 1999 U.S. Dist. LEXIS 2583, 1999 WL 124456, at *10 (S.D.N.Y. March 8, 1999).

In addition, plaintiff argues that she had received good job performance evaluations in the past, and, therefore, that the negative evaluations she received more recently must be the product of discrimination. However, that evidence, standing alone, does not create a genuine factual issue as to whether discrimination was the actual motive behind plaintiff's discharge, and fails completely to address the extensive record of plaintiff's negative job performance and complaints regarding her [*46] demeanor towards her staff. *See, e.g., Brown*, 194 F. Supp. 2d at 192 ("Plaintiff also points to the good evaluations that she had received, but that evidence does not tend to show that her discharge was the product of discrimination."); *Brinson v. N.Y.C. Transit Auth.*, 60 F. Supp. 2d 23, 29 (E.D.N.Y. 1999) (finding that evidence of prior good evaluations "fail[s] to dispute the existence of plaintiff's extensive record of warnings, reprimands and suspensions so as to create a genuine issue of fact regarding her job performance"); *Taylor*, 1999 U.S. Dist. LEXIS 2583, 1999 WL 124456, at *14 ("The fact that [plaintiff] may have received prior positive evaluations cannot in itself demonstrate that her later negative evaluations, and the concomitant proffered explanation, are unworthy of credence."); *see also Del Franco*, 429 F. Supp. 2d 529, 539 (E.D.N.Y. 2006) ("While plaintiff may have had other positive qualifications for her job, it does not prove that defendant's stated reason was pretextual.") (citation omitted).

Finally, plaintiff argues that she was held to a higher standard than other supervisors and [*47] that GCH dis-

ciplined her for "several events without conducting an investigation." (Pl.'s Br. at 13.) However, plaintiff fails to point to any affirmative evidence in the record relating to her being subjected to a higher standard than other similarly situated GCH employees.

In sum, the Court rejects plaintiff's attempt to rebut defendant's proffered explanations by asserting her mere *belief* that her discharge was the product of discrimination. Plaintiff's arguments raise issues, if at all, *only* as to the accuracy or the wisdom of GCH's decision to terminate plaintiff, but fails to create a triable issue as to whether GCH's proffered reasons were a pretext for discrimination. However, because federal antidiscrimination law "may not be used as a vehicle for second-guessing an employer's business judgment," the Court finds that plaintiff's arguments -- regarding (1) the accuracy of GCH's opinions as to her job performance and (2) her job performance in the more distant past -- fails to provide any basis for a reasonable jury to infer that GCH discriminated against plaintiff on the basis of her race. *Brown*, 194 F. Supp. 2d at 191; *see also Argueta v. N. Shore Long Island Jewish Health Sys.*, No. 01 Civ. 4031 (JG), 2003 U.S. Dist. LEXIS 20456, 2003 WL 22670915 (E.D.N.Y. Nov. 6, 2003) [*48] ("It is not the province of this Court, however, to second-guess the nondiscriminatory business decisions of private employers.").

b. Proffered Evidence of Defendant's Discriminatory Intent

In addition to disputing the wisdom and accuracy of her supervisors' view of her job performance, plaintiff points to three pieces of evidence that allegedly demonstrate the discriminatory intent of defendant and certain employees: (1) the alleged statement made by Marcinow to plaintiff in 1999 that GCH's General Manager, Samman, had instructed Marcinow to "fire that black bitch," allegedly referring to Garrett (Defs.' 56.1 P 109) [12]; and (2) Burroughs' alleged statement to plaintiff that Laura Brown, GCH's Assistant Director of Human Resources, had applied a race-based "look test" to reject an African-American job applicant in May 2000. For the reasons set forth below, the Court, viewing the evidence in the light most favorable to plaintiff, finds that plaintiff's evidence is insufficient to sustain a reasonable inference that her dismissal was motivated at least in part by discrimination.

12    As noted above, plaintiff has failed to depose Marcinow, or to provide a sworn statement from Marcinow to support plaintiff's version of the conversation. In fact, the Court gave plaintiff's counsel additional time after oral argument to conduct additional discovery on that issue, but plaintiff subsequently reported that she was un-

able to locate Marcinow. However, the Court finds that, based upon the summary judgment record, the alleged double-hearsay remark by Samman, and the hearsay statement by Marcinow relaying that comment to plaintiff are still admissible as admissions of defendant GCH, pursuant to Fed. R. Evid. 801(d)(2)(D). At the time they allegedly made the comments, both Marcinow and Samman were employees of GCH. Moreover, the alleged comment by Samman concerned matters within the scope of his employment because it related to a personnel decision, as did the alleged statement by Marcinow relaying Samman's comment to plaintiff. *See Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (finding that plaintiff's account of double-hearsay statements allegedly made by plaintiff's supervisors were admissible as admissions of party's agents); Fed. R. Evid. 805 (hearsay within hearsay admissible if each part falls within an exception).

[*49] First, the Court finds that the alleged discriminatory remark by Samman, when considered in the context of all the evidence, is too "remote and oblique . . . in relation to the employer's adverse action" to permit a reasonable jury to find for plaintiff. [13] *Tomassini,* 478 F.3d at 115. Marcinow allegedly made the statement to plaintiff regarding Samman's comment at some point during the Summer of 1999. Thus, Samman's allegedly discriminatory comment was made at least three years before plaintiff was terminated, in the Spring of 2002. A remark made so distant in time from the allegedly discriminatory behavior does not tend to support plaintiff's claim that her discharge was the product of discrimination. [14] *See, e.g., Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir. 2001); *Del Franco,* 429 F. Supp. 2d at 536 (finding no connection where three months elapsed between alleged discriminatory statements and termination); *Argueta v. N. Shore Long Island Jewish Health Sys.,* No. 01 Civ. 4031 (JG), 2003 U.S. Dist. LEXIS 20456, 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) [*50] (five-month gap); *Emanuel v. Oliver, Wyman & Co., LLC,* 85 F. Supp. 2d 321, 335 (S.D.N.Y. 2000) ("months"-long gap).

13   The Court notes that Samman denies making the alleged remark. (Samman Aff. P 28.)

14   The Court also notes that the fact that plaintiff previously received favorable evaluations and promotions from Muro, the person primarily responsible for plaintiff's discharge, "tends to refute [plaintiff's] claim of discrimination." *Brown,* 194 F. Supp. 2d at 192 (E.D.N.Y. 2002); *see also*

*Brinson,* 60 F. Supp. 2d at 29. However, because the so-called "same actor inference" is less compelling where, as here, a significant period of time elapses between promotion and firing, *see, e.g., Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 138 (2d Cir. 2000), the Court, in reaching its decision, does not rely on this inference in substantial part.

Moreover, although Samman had to give final approval prior to the discharge of an employee, [*51] plaintiff specifically alleges that Muro and, to a lesser extent, Brown, were the driving forces behind plaintiff's negative evaluations and her dismissal. The record before this Court indicates that Samman had no involvement whatsoever in evaluating plaintiff's job performance or in compiling complaints about plaintiff from other GCH employees. In addition, the Court notes that Samman allegedly made the discriminatory remark to Marcinow alone -- and did not repeat the remark or make similar remarks regarding plaintiff to or in the presence of any other GCH employees at any time preceding plaintiff's discharge -- thus further removing the remark from the alleged adverse action in this case. Finally, the Court also notes that Marcinow left the Hotel more than three years prior to plaintiff's discharge and is not alleged to have relayed the remark to any individual involved in the decision to discharge plaintiff, such as Muro or Brown.

Thus, although the Court recognizes that the alleged double-hearsay remark is highly offensive, the remark, viewed in the context of the case as a whole, (1) preceded the allegedly discriminatory action -- plaintiff's discharge -- by more than three years, [*52] (2) was made by an individual who is not identified by plaintiff as being a driving force in the decision to discharge plaintiff, (3) was made to an employee -- Marcinow -- who left the Hotel three years prior to plaintiff's discharge, and (4) fails to undermine the overwhelming evidence that defendant had legitimate, non-discriminatory reasons to discharge plaintiff. Thus, the Court finds that Samman's alleged remark, viewed in the context of the case as a whole, does not tend to support a reasonable inference that plaintiff's discharge was the product of discrimination. *See, e.g., Tomassini,* 478 F.3d at 115 ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."); *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir. 2001) (acknowledging the probative value of a supervisor's allegedly discriminatory remark at the *prima facie* stage but finding that, when the remark is "considered in the context of the case as a whole . . . [it] does not in the end carry the burden [the plaintiff] bears of showing he was [*53] treated

adversely for discriminatory reasons"); *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination.").

Second, Burroughs' alleged explanation in May 2000 of the meaning of Brown's comment that an African-American job applicant did not have "the look" also fails to provide an evidentiary basis from which a reasonable jury could find that GCH discriminated against Garrett in April 2002. [15] Viewing the evidence in the light most favorable to plaintiff, the Court finds that Burroughs' remarks are too remote from the allegedly discriminatory action in this case to support a reasonable finding of discrimination. [16]

> 15    The Court notes that the alleged double-hearsay remark by Brown and the alleged hearsay statement by Burroughs are admissible pursuant to Rule 801(d)(2)(D) as an admission of an agent of GCH made within the scope of the agent's employment. Brown allegedly made the remark while discussing an employment decision in which she was a "significant participant." *See Phipps v. Comprehensive Cmty. Dev. Corp.,* No. 00 Civ. 6063 (RJH), 2005 U.S. Dist. LEXIS 1672, 2005 WL 287413, at *13 (S.D.N.Y. Feb. 4, 2005) (finding that, to be admissible under Rule 801(d)(2)(D), the declarant must be "'an advisor or other significant participant in the decision-making process that is the subject matter of the statement'") (quoting *Evans v. Port Auth. of New York and New Jersey,* 192 F.Supp.2d 247, 263 (S.D.N.Y.2002)). Moreover, although Burroughs testified at his deposition that he could not recall making such remarks to Garrett and that he was unaware of a race-based "look test" used by GCH (Burroughs Tr. at 233, 243-44), Burroughs' alleged description of the "look test," as recounted by plaintiff, is also admissible as an admission.

[*54]

> 16    Although plaintiff's own notes of her conversation with Burroughs indicate that *plaintiff* was the one who characterized the "look test" as racially discriminatory (Garrett Tr. at 173; Romero Decl. Ex. X), the Court assumes to be true, for the purposes of this motion, plaintiff's deposition testimony that Burroughs was the one that offered such a description of the "look test."

Brown's and Burroughs' remarks are sufficiently remote in time from plaintiff's discharge so as to critically undermine their probative value in demonstrating that plaintiff's discharge was the product of discrimination. Burroughs explained his view of the meaning of "the look" in May 2000, and, as such, Brown must have made the remark sometime prior to that date; plaintiff was discharged almost two years later, in April 2002. As discussed *supra,* where, as here, there is an extended period between an allegedly discriminatory remark and an adverse action, the probative value of the remark as to a discrimination claim is significantly reduced, at least where plaintiff cannot point to any intervening remarks evincing [*55] defendant's discriminatory motives. *See, e.g., Gorman-Bakos,* 252 F.3d at 554; *Del Franco,* 429 F. Supp. 2d at 536.

Moreover, the statement by Brown allegedly relayed by Burroughs to plaintiff does not, by itself, support the conclusion that plaintiff was discriminated against on the basis of her race. That is, the double-hearsay statement allegedly made by Brown does not address the actual reasons -- permissible or otherwise -- for which the job applicant was rejected in May 2000, and does not support a reasonable inference that Brown was referring to the job applicant's race when she used the term "the look." Moreover, Burroughs' alleged remarks constitute mere speculation as to the meaning of Brown's statement. Although plaintiff broadly alleges that Burroughs "was privy to certain information" in his role as Muro's assistant (Pl.'s 56.1 P 96), she fails to allege or to offer any basis for a reasonable factfinder to infer that Burroughs had first-hand knowledge of a race-based "look test" being used to reject an African-American job applicant in May 2000, or at any other time. Thus, Brown's and Burrough's remarks do not, when considered in the [*56] context of this case as a whole, tend to support a reasonable inference that plaintiff's discharge was the product of discrimination. [17]

> 17    The Court also notes that, in his deposition testimony, Burroughs recalled Muro stating at some point that applicants for positions in the "front of the house" at GCH must have the "right look." (Burroughs Tr. at 250-51.) However, Burroughs also testified that Muro's statement did not relate to race-based criteria for employment, and plaintiff fails to offer any evidence, beyond Burroughs' temporally remote and speculative comments relating to the application of a "look test" by Brown, to support an inference that Muro's statement evinced a discriminatory intent. (*Id.* at 250.) Thus, the Court finds that Muro's alleged statement, considered in the context of this case as a whole, does not tend to support a reasonable inference that GCH supervisors acted on a discriminatory motive in discharging plaintiff, especially in light of the overwhelming evidence in support of defendant's proffered reasons for discharging plaintiff.

[*57] Finally, to the extent that plaintiff asserts that she was denied training opportunities by GCH and that such denials are evidence of defendant's discriminatory intent, the Court finds that plaintiff has failed to offer any evidence, beyond mere conjecture, that she was denied any training opportunities that were offered to other, similarly situated GCH employees, let alone that she was denied such training opportunities on the basis of her race or age.

In sum, viewing the evidence in the light most favorable to plaintiff, the Court finds that the evidence pointed to by plaintiff, taken either individually or as a whole, is insufficient to permit a reasonable jury to find that plaintiff's discharge was the product of discrimination. Accordingly, plaintiff's discrimination claims pursuant to Title VII and Section 1981 are dismissed.

D. Hostile Work Environment Claim

Defendants seek dismissal of plaintiff's hostile work environment claim under Title VII. Because plaintiff's opposition papers did not address defendant's motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone. See de Dussuau v. Blockbuster, Inc., No. 03 Civ. 6614 (WHP), 2006 U.S. Dist. LEXIS 7368, 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) [*58] (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim) (citing Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)); see also Devito v. Barrant, No. 03 Civ. 1927 (DLI), 2005 U.S. Dist. LEXIS 22444, 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (same); Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); Arias v. Nasdaq/Amex Mkt. Group, No. 00 Civ. 9827 (MBM), 2003 U.S. Dist. LEXIS 166, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); see also Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . [*59] in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

Nevertheless, the Court proceeds to consider the substance of plaintiff's hostile work environment claim, and finds it to be without merit. A hostile work environment, in violation of Title VII, is established by a plain-

tiff showing that his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.'" Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993), abrogated on other grounds by, Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); see Feingold v. N.Y., 366 F.3d 138, 150 (2d Cir. 2004); see also Terry v. Ashcroft, 336 F.3d 128, 147 (2d Cir. 2003); Richardson v. N.Y. Dep't of Corr. Servs., 180 F.3d 426, 437 (2d Cir. 1999) [*60] , abrogated on other grounds, Burlington N. and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 165 L. Ed. 2d 345 (2006). "Isolated instances of harassment ordinarily do not rise to this level." Cruz, 202 F.3d at 570.

Plaintiff's hostile work environment claim is dismissed, as the Court concludes as a matter of law that plaintiff has failed to show that her workplace was "permeated" with discriminatory intimidation that altered the conditions of her employment. Howley, 217 F.3d at 153. The Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to state a claim. See Richardson, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Howley, 217 F.3d at 154 (quoting Harris, 510 U.S. at 23). The Court concludes, as a matter of law, that the alleged [*61] discriminatory conduct by defendant fails to rise to the severe level required to support a claim of hostile work environment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (holding that "simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment"); Brennan v. Met. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); Williams v. Cty. of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) (holding that to meet his burden, the plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination "does not suffice); Knight v. City of N.Y., 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004); Ruggieri v. Harrington, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment"); Francis v. Chem. Bank. Corp., 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) [*62] (dismissing

hostile work environment claim where plaintiff only alleged four incidents).

Based on the complaint, plaintiff appears to argue that the two allegedly discriminatory remarks discussed above, as well as the denial of training and promotion opportunities to plaintiff over the course of several years, constituted a hostile work environment. However, viewing the evidence in the light most favorable to plaintiff, the Court finds that these complaints are at best "episodic," and are not "sufficiently continuous and concerted in order to be deemed pervasive," and, therefore, dismisses plaintiff's hostile work environment claim. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. N.Y. City Hous. Auth.,* 890 F.2d 569, 577 (2d Cir. 1989); *see, e.g., Petrosino v. Bell Atlantic,* 385 F.3d 210, 223 (2d Cir. 2004) (noting that "[i]solated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment") (citation omitted); *Alfano v. Costello,* 294 F.3d 365, 380 (2d Cir. 2002) (finding the alleged conduct non-actionable when the incidents [*63] were "too few, too separate in time, and too mild . . . to create an abusive working environment"); *Trinidad v. N.Y. City Dep't of Corr.,* 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a bitch and making sexual remarks over the course of her five and one-half years of employment insufficient to support a claim of discriminatory harassment); *Augustin v. Yale Club,* No. 03 Civ. 1924 (KMK), 2006 U.S. Dist. LEXIS 67462, 2006 WL 2690289, at * (S.D.N.Y. Sept. 15, 2006) (finding that "four or five" comments over a five-year period insufficient to support a hostile work environment claim); *Mark v. Brookdale Univ. Hosp. & Med. Ctr.,* No. 04 Civ. 2497 (JBW), 2005 U.S. Dist. LEXIS 12584, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (finding two "alleged isolated remarks" by plaintiff's supervisor insufficiently "frequent and pervasive"); *Pagan v. N.Y.S. Div. of Parole,* No. 98 Civ. 5840 (FM), 2003 U.S. Dist. LEXIS 20752, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18 2003) (finding that two racially derogatory remarks by supervisor directly to plaintiff did "not amount to the [*64] sort of 'extremely serious' behavior required to give rise to a hostile work environment under Title VII") (citations omitted); *Hawana v. City of New York,* 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) (finding single remark by supervisor insufficient); *Upshur v. Dam,* No. 00 Civ. 2061 (DC), 2003 U.S. Dist. LEXIS 628, 2003 WL 135819, at *7-*8 (S.D.N.Y. Jan. 17, 2003) (finding one week of "patronizing and racist comments" by supervisor insufficient); *Dorrilus v. St. Rose's Home,* 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (finding that supervisor's use of racially derogatory slur to refer to defendant on four or more occasions does not alter conditions of employment significantly enough to implicate Title VII).

E. Retaliation Claims

Defendant also seeks to dismiss plaintiff's retaliation claims under Title VII, the ADEA, and applicable state law. To establish a *prima facie* case of retaliation, plaintiff must show that (1) she was engaged in protected activity; (2) defendant was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment [*65] action. *Terry,* 336 F.3d at 141. Although the burden that a plaintiff must meet at the *prima facie* stage is minimal, the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.,* 46 F.3d 196, 204 (2d Cir. 1995).

Defendant contends that plaintiff did not engage in protected activity prior to her discharge, or, in the alternative, that plaintiff cannot establish a causal connection between the protected activity and her discharge. For the reasons that follow, the Court finds that plaintiff has demonstrated that she engaged in protected activity, but has failed to establish a causal connection and, thus, the Court dismisses her retaliation claims as a matter of law.[18]

18    As an initial matter, the Court dismisses plaintiff's retaliation claims under the ADEA. It is undisputed that plaintiff failed to engage in activity protected by the ADEA; that is, plaintiff fails to allege or to argue that she related any of her complaints to age-based discrimination. Accordingly, because "in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring," *Ramos v. City of New York,* No. 96 Civ. 3783 (DLC), 1997 U.S. Dist. LEXIS 10538, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997), the Court finds that plaintiff has failed to satisfy the first element of a *prima facie* case for retaliation under the ADEA.

[*66]    1.    Protected Activity and Defendant's Awareness

The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e-3(a); *see also Wimmer v. Suffolk Co. Police Dep't,* 176 F.3d 125, 134-35 (2d Cir. 1991). In addition to protecting the filing of formal charges of discrimination, Title VII also protects "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-

workers who have filed formal charges." *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990). Moreover, to establish that her activity is protected, a plaintiff "need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Id.; see also Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir. 1989). However, general complaints about working conditions unrelated [*67] to discriminatory employment practices will not serve to satisfy this element of plaintiff's *prima facie* case; that is, "retaliation cases require some level of specificity before a court will find that a plaintiff has sufficiently complained of discrimination." *Duviella v. Counseling Serv.,* No. 00 Civ. 2424 (ILG), 2001 U.S. Dist. LEXIS 22538, 2001 WL 1776158, at *12 (E.D.N.Y. Nov. 20, 2001); *Ramos,* 1997 U.S. Dist. LEXIS 10538, 1997 WL 410493, at *3 ("While there are no magic words that must be used when complaining about a supervisor, in order to be protected the complainant must put the employer on notice that the complainant believes that discrimination is occurring.").

Here, plaintiff asserts that she made oral complaints of racial discrimination to several GCH employees, including her supervisor, Burroughs. Although plaintiff cannot recall the dates and the substance of several of those complaints, she does assert that she complained of racial discrimination at GCH in 1999, to O'Boyle, and in January 2002, to Burroughs. Thus, viewing the evidence in the light most favorable to plaintiff, a jury could find that (1) plaintiff's alleged [*68] complaints constitute protected activity under Title VII, and, (2) due to Burroughs' position as a supervisor and his close proximity to Muro and Brown in the GCH hierarchy, defendant was aware of that activity.

## 2. Causal Connection

Although plaintiff has satisfied her burden as to the first two elements of the *prima facie* test, she has not raised any issue of fact concerning the third prong -- causal connection. An inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a sufficiently distant time after the protected activity; or (2) if there was an "intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." *Yarde v. Good Samaritan Hosp.,* 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *see, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998), *abrogated in part on other grounds by Morgan,* 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106. In the present case, plaintiff's most recent complaint of discrimination was made to Burroughs sometime in January 2002, and plaintiff was terminated in April 12, 2002. Thus, construing [*69] the record in the light most favorable to plaintiff, there was approximately a two and

one-half month interval between her most recent complaint of racial discrimination and her discharge.

Under the circumstances of this case, such a time lapse, in the absence of other evidence of defendant's retaliatory motive, precludes a finding of a causal connection between the protected activity and the adverse employment action. To establish a *prima facie* case of retaliation under Title VII, the temporal proximity between the protected activity and the adverse action "must be 'very close.'" *Cunningham v. Consol. Edison, Inc.,* No. 03 Civ. 3522 (CPS), 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at *19 (S.D.N.Y. March 28, 2006) (quoting *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos,* 252 F.3d at 554-555, district courts in this Circuit have consistently held that a passage of more than two months between [*70] the protected activity and the adverse employment action does not allow for an inference of causation. *See, e.g., Ruhling v. Tribune Co.,* No. 04 Civ. 2430 (ARL), 2007 U.S. Dist. LEXIS 116, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) (finding that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Cunningham,* 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914 ("[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line."); *Hussein v. Hotel Emples. & Rest. Union, Local 6,* No. 98 Civ. 9017 (SAS), 2002 U.S. Dist. LEXIS 19, 2002 WL 10441 (S.D.N.Y. Jan. 3 2002) (finding that the passage of more than two months defeats any retaliatory nexus); *Ponticelli v. Zurich Amer. Ins. Group,* 16 F. Supp. 2d 414, 436 (S.D.N.Y.1998) (finding that a "two-and-a-half month" interval "is hardly the close proximity of time . . . for allowing a plaintiff to establish the 'causal connection' element") (citation omitted); *see also Hollander v. Amer. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir. 1990) [*71] (three and a half months insufficient); *Yarde,* 360 F. Supp. 2d at 562 ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."); *Ashok v. Barnhart,* 289 F.Supp.2d 305, 315 (E.D.N.Y 2003) ("[A] period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); *Nicastro v. Runyon,* 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation."). Thus, because there was a two and one-half month interval between plaintiff's most recent complaint and her discharge, the Court finds that plaintiff has failed

to make a *prima facie* case of retaliation and dismisses her retaliation claims.

However, even assuming *arguendo* that plaintiff made her *prima facie* case, her retaliation claims must still fail. After plaintiff makes a *prima facie* case and defendant offers a non-discriminatory reason, "[s]ummary judgment [*72] is appropriate . . . only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38. Here, under step three of the *McDonnell Douglas* analysis, there is insufficient evidence for a reasonable jury to conclude that defendant's grounds for firing plaintiff on the basis of her negative job performance evaluations, her failures to follow GCH policies and procedures, and her poor relationships with her staff and her supervisors were actually a pretext for retaliation. Plaintiff concedes that nearly all of the events cited by defendant as the basis for plaintiff's discharge did, in fact, occur -- namely, that she received negative evaluations over a period of several years, that GCH supervisors were dissatisfied with her job performance, that she was repeatedly informed of their dissatisfaction through interactions with her supervisors, that she was advised by supervisors to improve her relationships with other employees, that there was a perception among GCH staff working under plaintiff's supervision that plaintiff "was nasty," and that plaintiff was warned that complaints [*73] about her demeanor toward other employees could lead to her termination. Moreover, plaintiff concedes that, immediately preceding her termination, Burroughs met with Garrett and informed her that GCH staff had continued to complain about Garrett's demeanor and that Garrett's job performance was not satisfactory. However, other than the temporal proximity of plaintiff's complaints to her discharge -- which, by itself, is insufficient to support a finding of retaliation -- plaintiff fails to offer any evidence from which a reasonable jury could infer that any adverse action taken by defendant was the product of a retaliatory motive. [19] Accordingly, because the evidence is insufficient to sustain a reasonable finding that plaintiff's complaints were linked to her termination and because plaintiff has failed to establish a genuine issue of material fact as to the reasons for her termination, plaintiff's retaliation claims are dismissed.

19   The Court notes that plaintiff concedes that Brown, the supervisor directly responsible for discharging plaintiff, was not aware of plaintiff's complaints of racial discrimination at GCH.

## [*74] IV. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is GRANTED in its entirety. Plaintiff's claims are dismissed. The Clerk of the Court shall enter judgment in favor of defendant and close this case.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: April 19, 2007

Central Islip, New York

Westlaw.

Page 1

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1702026 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**C**

Graff v. Enodis Corp.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Jason A. GRAFF, Plaintiff,
v.
ENODIS CORP. and Kysor Industrial Corporation,
Defendants.
No. 02 Civ. 5922(JSR).

March 28, 2003.

*MEMORANDUM ORDER*

RAKOFF, J.
**\*1** Defendant Kysor Industrial Corporation ("Kysor") seeks summary judgment on all remaining claims in the Amended Complaint.[FN1] The pertinent facts, either undisputed or, where disputed, taken most favorably to plaintiff are as follows:

> FN1. Claims against defendant Enodis Corp. were dismissed by stipulation earlier in the case.

In August 1998, plaintiff Jason A. Graff sought employment as a salesperson with Kysor; his application provided that, if hired, he would be hired on an at-will basis. Hardy Decl. Ex. A at 5. Graff was hired, and began work as a regional sales manager on October 5, 1998. He was furnished with Kysor's Associate Handbook, which confirmed that he was an at-will employee. Hardy Decl. Ex. B.

Graff's compensation at Kysor was pegged to commissions on his sales. While he contends in conclusory fashion that he had an understanding at the outset that such commissions would be considered earned as of the date orders were placed, it is undisputed that he was shortly thereafter furnished with a "policy bulletin" dated January 1, 1999 that provided that "[a]ctual sales volume *used*

*to determine commissionable values* will be the NET SALES value for *equipment actually shipped and invoiced ....*" Hardy Decl. Ex. C ¶ A.6 (emphases added); Graff Decl. ¶ 54. The bulletin further provided that "[a]ctual payment of commission is made during the last pay period of the month after commission is earned," Hardy Decl. Ex. C ¶ A.8, and it is undisputed that Graff was usually paid his commissions the month after the ordered products were actually shipped.

On April 13, 2000, Graff's supervisor, Joe Harm, told him that he would be terminated. After Graff protested that the termination would deprive him of valuable commissions because of his high sales to-date, Harm allegedly replied, "Don't worry Jason. The company will pay all of your commissions on the orders you booked to date." Graff Decl. ¶ 38. Subsequently, Kysor sent Graff a proposed termination package that would provide him with four weeks of severance pay and commissions on April orders shipped in May, but in exchange Graff was required to sign a release of all other claims against the company, including any relating to post-termination commissions on goods shipped after May. Hardy Decl. Ex. M. Graff refused to sign the release and was paid only for orders that were shipped by May 6, 2000. Likewise, he received no severance pay even though he contends, again in conclusory fashion, that when he was hired he was orally promised severance pay in the event of subsequent termination.

By this lawsuit, Graff seeks to recover the commissions on all orders he placed prior to his termination, as well as the severance pay offered to him on terms he considered unacceptable. The seven counts in his Amended Complaint can be grouped into three claims: breach of contract (counts 1, 2, and 4),[FN2] quasi-contract (counts 3 and 5),[FN3] and promissory estoppel (counts 6 and 7).[FN4]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1702026 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

FN2. Plaintiff's first cause of action, under New York Labor Law art. 6, for willful failure to pay wages, rises or falls with his breach of contract claim (count 2). *See Tierney v. Capricorn Investors, L.P.,* 592 N.Y.S.2d 700, 703 (1st Dep't 1993). Plaintiff's fourth cause of action alleges a breach of the covenant of good faith and fair dealing, which cannot lie where the defendant has faithfully complied with the terms of the contract. *See M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990). Additionally, no such duty of good faith and fair dealing is owed plaintiff as an at-will employee. *See Gallagher v. Lambert,* 549 N.E.2d 136 (N.Y.1989).

FN3. Graff's claims for quantum meruit (count 3) and restitution (count 5) state only one cause of action. *See Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir.1996).

FN4. Graff's seventh count (denominated " detrimental reliance") merely states an element of his sixth count (promissory estoppel).

Here, the policy bulletin concerning the method of calculating commissions is a contract between the parties that Graff, an at-will employee, assented to when he remained in Kysor's employ after receiving it. *See Dwyer v. Burlington Broadcasters, Inc.,* 744 N.Y.S.2d 55 (3d Dep't 2002). Regardless of what the parties' oral agreement was when Graff was hired, their relationship became governed by this written agreement, which is open to only one reasonable interpretation.[FN5]

FN5. Harm's alleged subsequent promise that Graff, in connection with his termination, would receive commissions on all "orders ... booked to date" fails to create an enforceable contract for lack of consideration.

**\*2** Specifically, the bulletin provides that

commissions will be paid the month after they are " earned," Hardy Decl. Ex. C ¶ A.8, and that such commissions will be calculated based on the value of equipment "actually shipped and invoiced," *Id.* ¶ A.6. The only reasonable reading of this language is that commissions are earned when orders are shipped and the customer is invoiced, with payment made the following month.

Plaintiff argues that the fact that commissions may not be finally calculated until after shipment is made does not necessarily preclude the possibility that they are earned when an order is placed. But such an interpretation would make the provision that commissions are paid the month after they are " earned" inoperative whenever more than a month elapsed between order and shipment-a frequent occurrence. *See* Graff Decl. ¶ 5; Hardy Decl. ¶¶ 3, 12; Harm Decl. ¶ 7. Because plaintiff would thereby read a contradiction into the contract that is not apparent on its face, his interpretation is not reasonable, and defendant is entitled to summary judgment on the meaning of the contract. *Savers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993); *see also Swits v. New York Systems Exchange Inc.,* 722 N.Y.S.2d 300, 302 (3d Dep't 2001) ("An at-will sales representative is entitled to post-discharge commissions only if the parties expressly provided for such compensation.") (internal quotation marks omitted).

Because, moreover, the parties entered into an enforceable contract that governs the subject matter of this action, plaintiff cannot recover in quasi contract. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 516 N.E.2d 190, 193 (N.Y.1987); *accord R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir.1997).

As for plaintiff's claim under the doctrine of promissory estoppel, the only evidence supporting this claim is the declaration that Graff "was promised that [he] would receive commissions, in accordance with a written schedule, upon [his] procurement of orders, regardless of when shipped or invoiced." Graff Decl. ¶ 54. Plaintiff's claim is fatally flawed because there is no evidence of his reliance on that promise or the detriment to him

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1702026 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

from relying on it. *See Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 85 (2d Cir.2001). Furthermore, even if the Court assumes *arguendo* that, as asserted in the Amended Complaint (but otherwise unsupported), Graff relied on that promise in leaving his previous employ and foregoing a change of employment, that would still be insufficient as a matter of law. *See Dalton v. Union Bank of Switzerland,* 520 N.Y.S.2d 764, 766 (1st Dep't 1987); *Cunnison v. Richardson Greenshields Sec., Inc.,* 485 N.Y.S.2d 272, 275 (1st Dep't 1985); *see also Shapira v. Charles Schwab & Co., Inc.,* 225 F.Supp.2d 414, 419 (S.D.N.Y.2002) ( "New York does not apply the doctrine of promissory estoppel in the employment context. A prospective employee ... cannot sue an employer who reneges on a[n] ... employment promise on such a theory.")

**\*3** Finally, as to Graff's claim for severance pay, there is no basis for a reasonable jury to conclude Graff was entitled to such. The only evidence plaintiff offers on this point is a declaration that if he had received the post-termination commissions he claims he is entitled to, he would have executed the release. Graff Decl. ¶ 58. Since Graff has not provided any evidence of a regular practice of making severance payments to employees who refused to sign the release, much less any reliance by him on that practice, there is no basis for him to recover severance pay in contract. *Smith v. New York State Elec. and Gas Corp.,* 548 N.Y.S.2d 117 (3d Dep't 1989).

Accordingly, for the foregoing reasons, defendant's motion for summary judgment is granted as to all counts in the Amended Complaint. Clerk to enter judgment.
SO ORDERED.

S.D.N.Y.,2003.
Graff v. Enodis Corp.
Not Reported in F.Supp.2d, 2003 WL 1702026 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**c**
Grasso v. Chase Manhattan Bank
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Francisco GRASSO, Plaintiff,
v.
CHASE MANHATTAN BANK, at al. Defendants.
**No. 01 Civ. 4371(AKH).**

April 17, 2002.

*MEMORANDUM AND ORDER GRANTING
MOTION TO DISMISS PORTIONS OF THE
AMENDED COMPLAINT*
HELLERSTEIN, J.
**\*1** Defendants Chase Manhattan Bank and Carol A.
Pizzingrillo move to dismiss portions of plaintiff
Francisco Grasso's pro se employment
discrimination lawsuit based upon defendants'
refusal to hire plaintiff in connection with several
employment applications from 1992 through 2001.
In his amended complaint, plaintiff alleges that
defendants' actions violated the Age Discrimination
in Employment Act (ADEA) and Title VII of the
Civil Rights Act. Plaintiff further alleges claims for
intentional and negligent infliction of emotional
distress, deceptive advertising, entrapment, and
intentional and negligent infliction of emotional
distress under the Jones Act.

For the reasons explained below, I grant defendant
Chase Manhattan's motion to dismiss all of
plaintiffs employment discrimination claims under
Title VII and the ADEA based on events occurring
over 300 days before February 7, 2001, when
plaintiff filed a charge with the EEOC. I also
dismiss plaintiff's claims for negligent and
intentional infliction of emotional distress under
both common law and the Jones Act, deceptive
advertising, and entrapment for failure to state a
claim. Finally, I dismiss all of plaintiff's claims
against the individual defendants, including Carol

A. Pizzingrillo, Jane Does numbers one through
three, and John Doe, because there is no individual
liability for employment discrimination under Title
VII or the ADEA.

Therefore, Plaintiff's only remaining claims are
those under Title VII and the ADEA alleging that
Chase discriminated against him on the basis of
race, national origin, and age when it refused to hire
him in January 2001.

*I. Background*

Plaintiff Francisco Grasso alleges that he is an
Hispanic male born in Costa Rica on September 12,
1956. His original complaint, filed May 22, 2001,
alleged causes of action under Title VII and the
ADEA arising from defendant Chase Manhattan
Bank's ("Chase") denial of his January 2001
application for employment as a teller. Plaintiff
alleged that Chase's decision based on his race,
national origin and age. On August 27, 2001,
plaintiff filed an amended complaint which added
additional Title VII and ADEA causes of action
based upon Chase's denial of previous employment
applications in 1992 through 1995 and in December
1998. The amended complaint also alleged
additional causes of action for intentional and
negligent infliction of emotional distress under both
New York law and the Jones Act, as well as claims
for deceptive advertising and entrapment.

In his amended complaint, plaintiff alleges that
defendants discriminated against him in refusing to
hire him over three distinct time periods. Plaintiff
alleges that he applied for jobs with Chase several
times between 1992 and 1995. During this period,
he alleges that he was twice interviewed by an
African-American female who was "odious in her
demeanor" toward him. He alleges that she refused
to consider him for employment despite his having
passed Chase examinations in mathematics and
reasoning.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*2 For the second group of incidents of discrimination, the amended complaint alleges that plaintiff again applied for a position as a teller at Chase's Long Beach branch in December of 1998.[FN1] Again, he alleges that he passed the examination given and was offered training for the job. Plaintiff returned for training and completed additional testing. He then alleges that defendant Carol A. Pizzingrillo told him that he had failed the final examination and asked him to leave. When plaintiff asked to see his results, Ms. Pizzingrillo told him he had to contact Chase headquarters to obtain his results. Plaintiff alleges that he was the only "older" person at the training, and that the African-American trainees were given special assistance which was not offered to plaintiff. Plaintiff further alleges that he went to see the manager of the Long Beach Branch approximately two weeks later and was received by defendant Jane Doe # 2 who, acting bewildered, referred him to defendant Jane Doe # 3, who appeared "completely alarmed by his presence" because she moved bundles of cash away from him to the far side of her table.

FN1. In this section of his complaint, plaintiff makes allegations concerning a sequence of alleged discrimination occurring in December 1998 and January 1998. Because the complaint states the allegations in sequential narrative form, it is likely that plaintiff's allegations refer either to December 1997 and January 1998 (as is assumed by the defendants in their motion papers), or to December 1998 and January 1999. Because all of plaintiff's Title VII and ADEA allegations arising out of events in 1997, 1998 or 1999 would be time-barred, the remainder of this opinion gives plaintiff the benefit of the more recent dates, and thus assumes that plaintiff's second set of allegations refer to events in December 1998 and January 1999.

For a third incident of discrimination, plaintiff alleges that he again applied for work at Chase on January 26, 2001 and passed the exams given to him. Plaintiff alleges that he subsequently returned for an interview with Chase employee Miriam Morales, who "treated him with contempt." Plaintiff alleges that Ms. Morales told plaintiff that she could not hire him because he had not mentioned on his application that he had been previously employed by Chase. Plaintiff alleges that his explanation that he had not realized that his brief training program in January 1998 amounted to employment was rebuffed by Ms. Morales.

On February 7, 2001, plaintiff filed a claim with the Equal Employment Opportunity Commission (EEOC) complaining that Chase's failure to hire him in January of 2001 was a result of discrimination based upon his age, race and national origin. The EEOC issued a Right to Sue letter to plaintiff on February 15, 2001. Plaintiff filed the original complaint in this lawsuit on May 22, 2001, naming only Chase as the defendant and alleging discrimination based only upon his January 2001 employment application. On August 27, 2001, plaintiff filed an amended complaint adding defendant Carol A. Pizzigrillo and four other unidentified individual defendants, and adding allegations concerning his employment applications in 1992 through 1995 and in December 1998. The amended complaint also added causes of action for negligent and emotional infliction of emotional distress under common law and the Jones Act, deceptive advertising, and entrapment to plaintiff's original discrimination claims under Title VII and the ADEA.

## II. *Discussion*

### A. *12(b)(6) Standards*

A district judge may dismiss a complaint challenged by a Rule 12(b)(6) motion, Fed.R.Civ.P. 12(b)(6), only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir.1991). Thus, for the purposes of this motion, all material allegations of the complaint are to be accepted as true, and all reasonable inferences

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

are to be drawn in favor of the nonmoving party. *Id.* Moreover, "it is well settled that pro se litigants generally are entitled to a liberal construction of their pleadings, which should be read 'to raise the strongest arguments that they suggest.' ' *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)).

### B. *Plaintiff's Title VII and ADEA Claims for Discrimination Prior to April 2000 Are Time-Barred*

**\*3** In his amended complaint, plaintiff brings discrimination claims under Title VII and the ADEA arising out of his employment applications with Chase in 1992 through 1995, in December 1998, and in January 2001. In order for a plaintiff to bring a civil lawsuit for employment discrimination under Title VII or the ADEA, he must first timely file a charge of discrimination with the EEOC. 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5; *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001); *Tewksbury v. Ottaway Newspapers,* 192 F.3d 322, 325 (2d Cir.1999). In a state, such as New York, which authorizes an agency to enforce the state's own laws forbidding discrimination, such charge must be filed with the EEOC within 300 days after the unlawful discrimination occurred or within 30 days after the plaintiff receives notice of the termination of state proceedings, whichever is earlier. 29 U.S.C. § 626(d)(2); 42 U.S.C. § 2000e-5(e)(1).

According to plaintiff's allegations, he filed his only complaint with the EEOC on February 7, 2001. Applying the limitations periods outlined above, I may only consider plaintiff's claims involving discrimination which occurred within 300 days before February 7, 2001-that is, actions that occurred on or after April 13, 2000. Therefore, all of plaintiff's claims in his amended complaint arising out of his employment applications with Chase in 1992-1995 and in December 1998 and January 1999 are stricken, and the causes of action based upon them are dismissed. Chase's allegedly discriminatory decision to deny plaintiff employment had been made and communicated to

plaintiff in each of these alleged incidents long before April 13, 2000. *See Delaware State College v. Ricks,* 499 U.S. 250, 262 (1980) (discrimination occurs when discriminatory employment decision is made by employer and communicated to plaintiff). I therefore dismiss all of plaintiff's Title VII and ADEA claims based on events which allegedly occurred before April 13, 2000.

### C. *Individual Defendants Not Liable for Discrimination*

Plaintiff's discrimination claims under Title VII and the ADEA cannot be maintained against the individual Chase employees named as defendants. Neither Title VII nor the ADEA authorizes discrimination suits against individual employees. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1314 (2d Cir.1995) (individual employees are not subject to civil liability for discrimination under Title VII); *Boise v. Boufford,* 127 F.Supp.2d 467, 472 (S.D.N.Y.2001) (applying *Tomka'* s reasoning to the ADEA and citing cases). Therefore, all of plaintiff's claims against individual defendants Jane Doe # 1, Jane Doe # 2, Jane Doe # 3, John Doe # 1, and Carol Pizzingrillo, alleging discrimination on the basis of race, national origin, and age under Title VII and the ADEA are dismissed.

### D. *Plaintiff's Claims for Infliction of Emotional Distress Are Untenable*

#### 1. *Intentional Infliction of Emotional Distress*

**\*4** Even construing the plaintiff's original and amended complaints leniently, plaintiff's allegations do not state a cause of action for intentional infliction of emotional distress. To make out a claim for intentional infliction of emotional distress under New York law, plaintiff must allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 121 (1993). Plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

amended complaint fails to adequately allege the first element; "extreme or outrageous conduct" on the part of Chase or its employees.

Because the threshold of "extreme and outrageous conduct" is so high, the pleading requirements for intentional infliction of emotional distress are difficult to satisfy. *Id.; Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303 (1983). Indeed, the New York Court of Appeals has recognized that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, as utterly intolerable in a civilized community." *Murphy,* 58 N.Y.2d at 303 (quoting Restatement (Second) of Torts § 46[1], cmt. d).

Here, the conduct alleged against Chase employees and agents does not satisfy this stringent standard. In conjunction with his employment applications in 1992 through 1995 plaintiff was interviewed twice by a woman who, he claims, exhibited an "odious demeanor." In conjunction with his employment application at the end of 1998, plaintiff alleges that he was dismissed from the training program by Chase trainer Carol Pizzingrillo because she informed him that he had failed a test. Plaintiff further alleges that when he returned for training one unidentified manager acted "bewildered" to see him, and another unidentified employee assigned to train him was "completely alarmed by [plaintiff's] presence" and moved bundles of cash away from him to the other side of her table. Finally, plaintiff alleged that Chase employee Miriam Morales treated him with "contempt" when he was interviewed again in January 2001. After telling plaintiff to wait outside her office for half an hour, Ms. Morales told plaintiff she could not hire him because he had neglected to mention that he had been previously employed by Chase. She refused to change her mind after plaintiff explained that he did not understand that his brief stint in a Chase training program did not count as previous employment.

The alleged behavior of Chase employees does not exceed the bounds of civilized decency. The tort of intentional infliction of emotional distress is not adequately alleged. *See Murphy v. American Home*

*Prods. Corp.,* 112 Misc.2d 507, 508-09 (Sup.Ct.N.Y.Cty.), *modified* 88 A.D.2d 870 (1st Dep't 1982), *modified* 58 N.Y.2d 293 (1983) (describing employer's conduct in discharge of plaintiff employee which the Court of Appeals held inadequately outrageous as a matter of law). Plaintiff's claims for intentional infliction of emotional distress are therefore dismissed.[FN2]

> FN2. To the extent that any of plaintiff's claims for intentional or negligent infliction of emotional distress arise out of events occurring before May 22, 1998 they would also be time-barred by the applicable three-year New York statute of limitations. N.Y. CPLR § 214 (McKinney's 1990).

### 2. *Negligent Infliction of Emotional Distress*

**\*5** In New York, a plaintiff cannot recover on a claim for negligent infliction of emotional distress unless the defendant's negligence unreasonably threatened plaintiff's physical safety, or, in other words, unless plaintiff was in the "zone of danger." *DeAguiar v. County of Suffolk,* 289 A.D.2d 280, 281 (2d Dep't 2001); *Doe v. Archbishop Stepinac High School,* 286 A.D.2d 478, 479 (2d Dep't 2001). Plaintiff does not allege that his physical safety was in any way threatened by the defendants' negligence and therefore his negligent infliction of emotional distress claims are dismissed.

### E. *Plaintiff Fails to State a Claim for Deceptive Advertising*

In his amended complaint, plaintiff adds a claim of "deceptive advertising" against Chase to his employment discrimination and tort claims. Presumably, plaintiff is arguing that Chase's advertisements seeking prospective employment applicants were false because he responded to such advertisements several times and was not hired. Plaintiff does not, however, allege consumer-oriented conduct required to state a claim for false advertising under New York Law. *Oswego Laborers' Local 214 Pension Fund v. Marine*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Midland Bank,* 85 N.Y.2d 20, 25 (1995); N.Y. Gen. Bus. Law §§ 349, 350 (McKinney's 1990). His deceptive advertising claims are therefore dismissed.

### F. *Plaintiff Fails to State Claims for Entrapment or Under the Jones Act*

In his amended complaint, plaintiff also appends conclusory allegations of entrapment and of intentional and negligent infliction of emotional distress under the Jones Act. Neither claim is applicable to this lawsuit. Under New York law, entrapment is a defense only to criminal charges and has no applicability as an affirmative civil claim. Similarly inapplicable, the Jones Act only involves maritime tort claims. Plaintiff's entrapment and Jones Act claims are therefore also dismissed.

### III. *Conclusion*

For the forgoing reasons, plaintiff's claims arising out of alleged occurrences before April 13, 2000, and all of plaintiff's claims against the five individual defendants are dismissed. Plaintiff's claims for intentional and negligent infliction of emotional distress, deceptive advertising, entrapment, and all claims under the Jones Act are likewise dismissed.

Therefore, Plaintiff's only remaining claims are those alleged in his original complaint under Title VII and the ADEA alleging that Chase discriminated against him on the basis of race, national origin, and age when it refused to hire him in January 2001. The amended complaint is stricken.

The parties shall appear for a case management conference on Friday, May 3 at 9:30 a.m. in Courtroom 14D, in the United States Courthouse at 500 Pearl Street, New York, New York.

SO ORDERED.

S.D.N.Y.,2002.
Grasso v. Chase Manhattan Bank
Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.