LEXSEE



Cited
As of: Jun 26, 2007

**GLORIA JELKS, Plaintiff, -v.- CITIBANK, N.A., Defendant.**

**99 Civ. 2955 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2001 U.S. Dist. LEXIS 381**

**January 19, 2001, Decided
January 22, 2001, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted.

**COUNSEL:** For plaintiff: Roosevelt Seymour, Brooklyn, NY.

For defendant: Rory McEvoy, Littler Mendelson, P.C., New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

*OPINION and ORDER*

JOHN S. MARTIN, Jr., District Judge:

Gloria Jelks ("Plaintiff") brings this action claiming that Citibank, N.A. ("Defendant") fraudulently induced her into accepting a position as Technical Specialist in the Global Risk Reporting division and breached an implied contract of employment when it terminated her position. Defendant moves for summary judgment. For the reasons set forth below, Defendant's motion is granted.

I. BACKGROUND

In 1997, Plaintiff was happily employed as a Senior Analyst at a consulting firm called Automatic Data Concept ("ADC"). In August or September 1997, Plaintiff learned through a friend who worked at Citibank, Patricia Samuels ("Samuels"), of a job opening for a Technical Specialist in the Global Risk Reporting department. Pursuant to conversations with Samuels and her supervisor, Barbara Freitas ("Freitas"), Plaintiff "reluctantly" agreed to apply for the job in October 1997. In a telephone [*2] call with Plaintiff, Freitas discussed the terms of the position, which included an annual salary of $ 65,500, eligibility for annual bonuses, an Assistant Vice President title, a staff, an executive diner's card, and car service for the nights she worked late. Plaintiff formally interviewed for the job later that month.

In early December 1997, Plaintiff received an offer letter from Freitas. Plaintiff accepted the job in mid-December and informed Freitas that her start date would be January 12, 1998. On December 16, 1997, Plaintiff filled out an employment application; this application provided that it was not a contract of employment and indicated that Plaintiff would be an at-will employee who could be terminated for any reason. (McElvoy Aff., Jelks Dep. Ex. 2.) Plaintiff also received a Citibank Employee Guide ("Employee Manual") which indicated that she was employed at-will and could be terminated at any time "for any reason not expressly prohibited by law." (McElvoy Aff., Jelks Dep. Ex. 3.)

On January 12, 1998, Plaintiff began employment at Citibank. The Global Risk Reporting department maintains a data warehouse of credit risk information, collected from computer systems world-wide, [*3] that can be accessed by internal and external users. In her position as Technical Specialist, Plaintiff was responsible for maintaining a computer system called Hewlett Packard

Information Manager, which was designed to eliminate the need for users seeking information about credit risk to speak with human employees. Plaintiff was charged with configuring and modifying the software to produce reports customized to reflect the user's requests. Plaintiff claims that upon her arrival at Citibank, her computer did not have the software she needed in order to perform her job, and that she was not given an appropriate computer until June 1998. Plaintiff was therefore forced to use Samuels' computer when it was available. Plaintiff also claims that she was not provided with a staff.

Because the Hewlett Packard system was performing poorly, Citibank's goal in early 1998 was to stabilize the program, and accordingly external users, as opposed to internal users, were instructed to refrain from making data requests until April 1, 1998. After reading a memo to this effect, Plaintiff questioned Freitas and Samuels about the freeze, apparently because she thought that the entire system had been [*4] frozen. She was told that enhancements would nevertheless continue, and Plaintiff acknowledges that she continued to make enhancements for internal users during that period. Requests from external users comprised only ten percent of Plaintiff's regular workload.

Defendant claims that it decided to halt further development of the Hewlett Packard program in July or August 1998. Defendant states that it made this decision due to the data warehouse's slow response time, the time and money spent on making changes to the system, frequent changes in vendors, and the current vendor's refusal to comply with Defendant's Y2K policies. As a result of this decision, all changes and modifications to the software were allegedly ceased, and the system was frozen in its present state. Defendant claims that in late 1998 or early 1999, the need for the system was eliminated altogether when users were able to directly connect to the information system.

The decision to freeze development of the Hewlett Packard program impacted on Plaintiff's job, as her primary responsibilities involved changing and modifying the data warehouse. Accordingly, in September 1998, Freitas informed Plaintiff that her job [*5] was being discontinued because there would be no further enhancements to the data warehouse. Later that same day, Plaintiff met with Koula Angelinas ("Angelinas"), Human Resources Specialist, regarding her severance package. Plaintiff was given a Notice of Job Discontinuance that described Plaintiff's separation benefits and options, including the ability to apply for relocation at Citibank. As to the latter option, Angelinas told Plaintiff to contact the Resource Center for assistance in finding another job within Citibank. Plaintiff never visited the Resource Center despite an initial telephone call for instructions on how to proceed.

Plaintiff brings this action claiming that Defendant never intended to employ her as a Technical Specialist, and that she gave up her prior job in reliance on Defendant's promise to do so. She also claims that her job was not terminated for a "business reason," and that she was therefore fired without cause in contravention of the employee manual. To this end, Plaintiff states that she continued to make the enhancements that had allegedly been halted up until the time she was told that her job was being discontinued, and she claims that Defendant still [*6] uses the Hewlett Packard software. Plaintiff also claims that Defendant fraudulently concealed from her the fact that the decision to eliminate the Hewlett Packard system had already been made when Defendant hired Plaintiff, and that it concealed this fact during her employment in order to induce her to stay. Plaintiff's allegations are utterly devoid of merit, and border on the frivolous.

## II. DISCUSSION

### A. Implied Breach of Employment Contract

Plaintiff first claims that her termination constituted a breach of an implied employment contract. In order to overcome the at-will employment doctrine, New York courts require an express limitation on an employer's ability to terminate the employee, such as a definite period of employment. *See, e.g., Wright v. Cayan*, 817 F.2d 999, 1002-04 (2d Cir. 1987); *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 448 N.E.2d 86, 91-92, 461 N.Y.S.2d 232 (N.Y. 1983). An employee can also attempt to demonstrate that the employer's actions amounted to an express limitation that the employee relied upon in accepting the job. *See Murphy*, 461 N.Y.S.2d at 237; *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 443 N.E.2d 441, 445, 457 N.Y.S.2d 193 (N.Y. 1982). [*7] Under the strict *Weiner* standard employed by New York courts, Plaintiff must show at a minimum that she relied upon an assurance that she could only be discharged for cause, and that this assurance was incorporated into the employment manual. *See De Petris v. Union Settlement Assoc.*, 86 N.Y.2d 406, 657 N.E.2d 269, 271, 633 N.Y.S.2d 274 (1995).

Both the job application that Plaintiff completed and Defendant's Employee Manual indicated that Plaintiff's employment was at-will. Plaintiff suggests that the Employee Manual contains limitations on Defendant's ability to terminate her because it states that employees can be terminated for failure to meet performance expectations, misconduct, and due to job discontinuance for "business reasons." This language only describes some scenarios in which an employee might be asked to leave Defendant's employ; it does not set forth any express limitation that an employee can only be terminated for

one of these reasons. This allegation is therefore insufficient to sustain Plaintiff's claim. *See, e.g.*, *Cucchi v. New York City Off-Track Betting Corp.*, 818 F. Supp. 647, 650 (S.D.N.Y. 1993); *Gmora v. State Farm Mut. Auto. Ins.*, 709 F. Supp. 337, 341 (E.D.N.Y. 1989), [*8] *aff'd*, 888 F.2d 1376 (2d Cir. 1989).

Plaintiff also points to her offer letter and her Notice of Job Discontinuance, received on her last day of employment, as evidence of an implied contract of employment. Neither of these documents contains express limitations on Defendant's ability to terminate Plaintiff. [1] Thus, Plaintiff has submitted absolutely no evidence of any limitation on Defendant's ability to terminate her employment, nor has she shown reliance upon any representation under the Weiner standard.

    1   Although the offer letter states that Plaintiff's salary will be paid annually, a salary measured by a certain time period does not bind the employer to an employment term of the same period. *See Chase v. United Hosp.*, 60 A.D.2d 558, 400 N.Y.S.2d 343, 344 (App. Div. 1977).

## B. Fraudulent Inducement

Plaintiff next alleges that Defendant fraudulently induced her into leaving her position at ADC and accepting a job with Defendant. Under New York law, at-will employees cannot evade the [*9] bar against suing for wrongful termination by suing in tort. *See Murphy*, 461 N.Y.S.2d at 235-36; *Ullmann v. Norma Kamali, Inc.*, 207 A.D.2d 691, 616 N.Y.S.2d 583, 584 (App. Div. 1994). In addition, plaintiffs cannot masquerade a breach of contract claim as a fraud claim. *See Saleemi v. Pencom Sys., Inc.*, 2000 U.S. Dist. LEXIS 6645, No. 99 Civ. 667, 2000 WL 640647, at *4-5 (S.D.N.Y. May 17, 2000). Under very limited circumstances, however, at-will employees can recover for fraudulent statements that induce them into accepting positions of employment by showing: (1) a material false representation; (2) scienter; (3) reasonable reliance; (4) damages; and, relevant here, (5) that the fraudulent misrepresentation was collateral or extraneous to the employment agreement. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996); *Stewart v. Jackson & Nash*, 976 F.2d 86, 88-90 (2d Cir. 1992). Since the Second Circuit's seminal decision in *Stewart v. Jackson & Nash*, courts have upheld claims for fraudulent inducement where the injury alleged stems from leaving a former place of employment or agreeing to remain [*10] in a compromised position at a current place of employment, rather than from the termination itself or failure to perform terms of the employment agreement. *See, e.g.*, *Doehla v. Wathne Ltd.*, 2000 U.S. Dist. LEXIS 9913, No. 98 Civ. 6087, 2000 WL 987280, at *5-6 (S.D.N.Y. July

17, 2000); *Caron v. The Travelers Corp.*, 1998 U.S. Dist. LEXIS 10481, No. 96 Civ. 6236, 1998 WL 395319, at *3-5 (S.D.N.Y. July 15, 1998); *Kissner v. Inter-Continental Hotels Corp.*, 1998 U.S. Dist. LEXIS 9248, No. 97 Civ 8400, 1998 WL 337067, at *3 (S.D.N.Y. June 25, 1998); *Cole v. Kobs & Draft Adver., Inc.*, 921 F. Supp. 220, 224-26 (S.D.N.Y. 1996); *Garnier v. J.C. Penney Co.*, 863 F. Supp. 139, 140-41, 143 (S.D.N.Y. 1994); *see also Navaretta v. Group Health, Inc.*, 191 A.D.2d 953, 595 N.Y.S.2d 839, 841 (App. Div. 1993). Plaintiff cannot avail herself of these precedents, however, because she alleges no damages that result from being induced away from her prior position. She alleges only the damages relating to the termination of her employment with Defendant.

Plaintiff claims that Defendant hired her for a job that did not exist because Defendant had already frozen the information warehouse before she began work [*11] and because she was not given the appropriate computer when she arrived. However, Plaintiff has alleged no specific misrepresentation that was made to her prior to beginning her employment with Defendant. One would have to theorize broadly that the job offer alone was fraudulent because no such position existed, or if it did, was soon to be eliminated. However, a job offer is by definition central, not collateral, to the employment agreement itself, and accordingly a hidden intention not to perform gives rise to a breach of contract claim, not a fraud claim. *See Gruber v. Victor*, 1996 U.S. Dist. LEXIS 12567, 95 Civ. 2285, 1996 WL 492991, at *6-7 (S.D.N.Y. Aug. 28, 1996); *Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 61-62 (S.D.N.Y. 1994). Moreover, Plaintiff was not promised employment for any specific period of time; as an at-will employee, she could not reasonably rely on a mere promise of employment. *See Garwood v. Sheen & Shine, Inc.*, 175 A.D.2d 569, 572 N.Y.S.2d 237, 237 (App. Div. 1991). Nor, as noted above, has Plaintiff specifically alleged any damages that are separate from the loss of a job, such as damage to career growth, loss of reputation, or loss of benefits [*12] and security.

In addition, Plaintiff performed her job for eight months, albeit with some difficulty until she obtained her new computer. Plaintiff has submitted no evidence to contradict Defendant's testimony that the decision to freeze further enhancements of the Hewlett Packard system was made in July or August 1998, several months after Plaintiff began work. Plaintiff has therefore failed to raise a question of fact on her fraudulent inducement claims. [2]

    2   Plaintiff also claims that the assurances of her supervisors in January 1998 that data enhancements would continue, despite a memo stating

that enhancements were frozen until March 31, 1998, induced her to remain in her job. Plaintiff has not shown that these assertions are false, as she admitted in her deposition testimony that she continued to make enhancements from January through March. The only freeze was on external users' requests for information, which comprised only ten percent of Plaintiff's workload. Moreover, external users were reinstated in April.

[*13]    Finally, Plaintiff charges that Defendant fraudulently concealed from her the fact that the information system was soon to be frozen, thus inducing her to accept and then to remain in her job. In order to sustain a claim for fraudulent concealment, Plaintiff must show that Defendant concealed material facts and that it owed a duty to disclose the information allegedly concealed. *See Nadal v. Otto Gerdau Co.*, 1992 U.S. Dist. LEXIS 292, No. 90 Civ. 4173, 1992 WL 8346, at *5 (S.D.N.Y. Jan. 14, 1992). Even were Plaintiff able to establish the existence of a duty to disclose, she has submitted no evidence that the decision to freeze the data warehouse was made prior to July or August 1998. Nor has she alleged any conversations or statements from which a "concealment" might be implied. Plaintiff has therefore failed to raise an issue of fact regarding the existence of a concealment or Defendant's scienter. Because Plaintiff was employed at-will, Defendant had no duty, once the decision was made, to provide advance warning that Plaintiff's job might be terminated. Therefore, Plaintiff's fraudulent concealment claim also fails. [3]

3    Plaintiff alleges numerous other actions by Defendant that amounted to "fraud." For example, she claims that she did not receive all of the benefits that she was promised, such as a staff. This is merely a restatement or her breach of contract claim and is not cognizable as fraud in New York. *See Saleemi v. Pencom Sys., Inc.*, 2000 U.S. Dist. LEXIS 6645, No. 99 Civ. 667, 2000 WL 640647, at *4-5 (S.D.N.Y. May 17, 2000). Plaintiff also claims that Defendant did not assist her in finding a new job as promised in the Notice of Job Discontinuance. This allegation has nothing to do with any fraudulent misrepresentation that induced her to accept a job with Defendant or with any limitation on Defendant's ability to terminate Plaintiff, nor does it constitute fraud in its own right.

[*14]  III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

**SO ORDERED.**

Dated: New York, New York

January 19, 2001

JOHN S. MARTIN, JR., U.S.D.J.

LEXSEE

**DRORA KEMP, Plaintiff, -against- METRO-NORTH RAILROAD, Defendant.**

**04 Civ. 9926 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 43568**

**June 12, 2007, Decided**
**June 14, 2007, Filed**

**COUNSEL:** [*1] For Plaintiff: RESNICK NIRENBERG & SIEGLER, Roseland, NJ, By: Gerald Jay Resnick, Esq., Steven Siegler, Esq.

For Defendant: BROWN RAYSMAN MILLSTEIN FELDER & STEINER, LLP, New York, NY, By: Eric D. Witkin, Esq.

**JUDGES:** Robert W. Sweet, U.S.D.J.

**OPINION BY:** Robert W. Sweet

**OPINION: Sweet, D.J.**

Defendant Metro-North Railroad ("Metro-North" or the "Defendant") has moved pursuant to Rule 56, F. R. Civ. P., for summary judgment dismissing the complaint of plaintiff Drora Kemp ("Kemp" or the "Plaintiff"). For the reasons set forth below, the motion is granted.

**Prior Proceedings**

Kemp filed her complaint on December 16, 2004 (the "Complaint"), and it contained twelve counts:

Count One alleged harassment based on disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); Count Two, demotion/termination in violation of the ADA; Count Three, retaliation in violation of the ADA; Count Four, age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"); Count Five, harassment based on disability or perceived [*2] disability in violation of the New York State Human Rights Law, Executive Law, Article 15 § 290, et seq. ("NYSHRL"); Count Six, demotion/termination on the basis of disability or perceived disability in violation of the NYSHRL; Count Seven, retaliation in violation of the NYSHRL; Count Eight, age discrimination in viola-

tion of the NYSHRL; Count Nine, harassment on the basis of disability or perceived disability in violation of the New York City Human Rights Law, Administrative Code § 8-107(1)(a) ("NYCHRL"); Count Ten, demotion, termination on the basis of disability or perceived disability in violation of the NYCHRL; Count Eleven, retaliation in violation of the NYCHRL; and Count Twelve, age discrimination in violation of the NYCHRL. Kemp has voluntarily withdrawn Counts One, Two, Four, Six, Eight, Ten, and Twelve and her claim for punitive damages has also been withdrawn. What remains at issue are Counts Three, Five, Seven, Nine and Eleven: claims of harassment based on disability under NYSHRL and NYCHRL and retaliation under ADA, NYSHRL and NYCHRL.

Discovery has proceeded and the instant motion was argued and marked fully submitted on January 10, 2007.

**The Facts [*3]**

The facts are set forth in the Defendant's Statement of Undisputed Material Facts, the Plaintiff's Material Facts in Dispute and the Defendant's Reply to Plaintiff's Response. The facts are not disputed except as noted below.

Kemp is a New Jersey resident formerly employed by Metro-North. She is a college graduate and possesses a Masters degree in Library Science. Prior to joining Metro-North, she worked as a librarian for the law firm of Sullivan and Cromwell and as a librarian and records manager for the Metropolitan Transit Authority ("MTA") for five years.

Metro-North is a public benefit subsidiary corporation of the MTA, which is a New York State public benefit corporation created by the New York State legislature to provide transportation for commuters in the New York City metropolitan area. Each public benefit

subsidiary corporation of the MTA, including Metro-North, is a "body politic and corporate and [has] all those powers vested in the [MTA] shall determine to include in its certificate of incorporation." N.Y. Pub. Auth. Law § 1266 (5).

At all times relevant to the period covered by the Complaint, Metro-North maintained and published to [*4] its employees a policy prohibiting discrimination based on age and disability and prohibiting retaliation for complaining about discrimination. The policy encouraged employees to report discriminatory treatment or offensive behavior.

Metro-North's General Counsel, Richard Bernard ("Bernard"), hired Kemp in February 1993 as the Legal Department's Manager of Administration and Legal Support Services.

Kemp initially reported to Metro-North's Deputy General Counsel. In or about the mid-1990s, she began reporting directly to Bernard. Kemp had worked with Bernard at the MTA for one year prior to her joining Metro-North.

The Metro-North Position Description for the Manager of Administration and Legal Support Services position outlines the following "Major Accountabilities" and percentages of time on each:

.   Prepare and monitor departmental budget - 10%

.   Create and supervise maintenance of litigation, contract, memorandum, correspondence files for department, including summarization of each document and establishment of cross references for computer-assisted information and retrieval systems - 40%

.   Maintain law library - 10%

.   Manage all personnel-related activities [*5] - 10%

.   Supervise clerical, paralegal and other support services for professional staff - 15%

.   Execute wide variety of administrative functions, including implementation of Company's policies, procedures and internal controls - 15%

(Siegler Certification, Ex. K).

Kemp worked in the Legal Department, which was located at 347 Madison Avenue. She had a windowed, lawyer-sized office. The salary for her position began at $ 52,000 per year and was gradually increased to $ 70,000 annually by 2004.

Kemp supervised a filing clerk who was a union employee and undertook research projects for the lawyers in the department when requested. At one point in time she assisted one of Metro-North's lawyers in the trial of a Federal Employers' Liability Act ("FELA") claim. In addition, from time to time she would assist the lawyers in working with various software programs the Legal Department had in place.

In the late 1990s Kemp sought, unsuccessfully, other employment both within Metro-North and with other Metropolitan Transportation Authority ("MTA") agencies. In 1997 Kemp was absent as a result of a hysterectomy and in 1999, she was absent after an automobile accident.

From [*6] the late 1990s through 2002, Bernard looked for other jobs for Kemp, both inside and outside of Metro-North, personally and through Celia Ussak ("Ussak"), Metro-North's Director of Human Resources, and Shirley Joshua ("Joshua"), who succeeded Ussak in the spring of 2002. In an attempt to increase her salary and responsibilities, Kemp proposed an upgrade of her title. While Bernard supported this effort, the Human Resources Department ("HR") rejected it.

In July 2001, Bernard noted on her performance appraisal:

> Ms. Kemp performs her job duties with a great deal of skill. I believe, however, that she does not feel adequately challenged by those duties. She has explored, with my support, assignments outside the Law Dept which can make better use of her skills. We will continue to explore the availability of those opportunities.

(Siegler Certification, Ex. L).

Kemp has conceded that her position in the Legal Department did not fully utilize her skills. Before 2002, Bernard considered abolishing her position and distributing her responsibilities to the secretaries.

Before 2002, there had been friction between Kemp, attorneys Sue Barnett ("Barnett") and Lisa Hart ("Hart"), [*7] and members of the support staff. In addition, employees in other departments informed Joshua that Kemp

was argumentative and condescending, that she was difficult to work with and that they did not want her in their departments.

Before 2002, Barnett told Bernard that Kemp was unproductive, that Kemp frequently came in late and left early and did not adequately manage the files. According to Barnett, Kemp failed to compile on time the "brief bank" Bernard had requested, had a dispute with Barnett on the issue of Internet access for secretaries, and did not accept the authority of anyone other than Bernard.

Beginning in 2000, Barnett and Joshua began to consider revising Kemp's job description. Barnett complained to Bernard that Kemp was accessing their personal documents. Kemp had responsibility for archiving documents and had access to network documents.

Kemp was diagnosed as having breast cancer in June of 2002. She underwent a lumpectomy in July 2002 and radiation therapy, which began in August and was completed by mid-October.

Kemp's Job Performance Appraisals reflect that at all times prior to her diagnosis of breast cancer, Kemp performed her job duties in a manner which [*8] met Metro-North's expectations.

After obtaining clearances from her doctor and Metro-North's medical department, she returned to work on a three-day per week basis on October 21, 2002 and then full time as of December 16, 2002. When she worked part-time, she was still paid as though she were working full time. According to Kemp, Bernard insisted that Kemp come to work the same three days every week. Kemp explained that she had a number of doctor's appointments which made her schedule difficult to predict weeks in advance. Kemp designated Monday, Wednesday and Friday as her workdays and told Bernard that sometimes she would have to take other days off when she had a doctor's appointment.

When Kemp returned to work full time, against the advice of her doctors, she was able to perform all of her job duties. Kemp was fatigued due to her cancer treatment and testified that she was also suffering with worry, depression and difficulty sleeping. Kemp spoke about her diagnosis with Barnett, who also had been treated for breast cancer, and who was "absolutely" sympathetic in a conversation, sometime prior to October 2002. (Kemp Tr. 94).

In December 2002, Kemp complained to the payroll department, [*9] to Bernard's assistant, and then to Bernard that she was missing four days' pay. Bernard asked Joshua to investigate, and she in turn involved Payroll Director Gary Blaner ("Blaner"). On January 10, 2003, Kemp emailed the President of Metro-North, accusing unnamed persons of "maliciously" or "recklessly" de-

ducting four days from her pay in December 2002. (Kemp Tr. 147). Bernard responded to Kemp's email by stating that the matter was being investigated and that no one had maliciously or recklessly done anything to her. The Vice President for Human Resources and Workforce Diversity, Gregory Bracley ("Bradley"), investigated Kemp's complaint, met with her, Joshua and Blaner on January 15, 2003 and determined she was owed additional pay, which she received subsequently.

In the early part of 2003, Bernard expressed anger at Kemp regarding a party that she had planned for a retiring attorney; he was upset with the amount of money that the party would cost and that Kemp and her colleague had overestimated the headcount.

In January 2003, Bernard became acting General Counsel of the MTA while continuing to serve as Metro-North General Counsel. On January 30, 2003, he formally delegated to [*10] Barnett all administrative supervision of the Legal Department, including the functions for which Kemp was responsible.

On January 30, 2003, Kemp requested a two-week vacation, for which she had already purchased airline tickets. Both Bernard and Barnett told Kemp a two-week vacation was inappropriate in light of the large backlog of filing. Barnett wrote to the Legal Department staff on February 3, 2003 that they should submit vacation requests before making firm vacation plans. Barnett told Kemp she would approve only two days of the eight requested unless Kemp brought in the airline tickets.

Kemp had never been denied vacation or asked to bring in plane tickets in the past. To her knowledge, the requirement to produce plane tickets was not imposed on any other employee. Kemp canceled the vacation.

On February 3, 2003, Barnett's temporary secretary Roz Gillespie ("Gillespie"), requested intranet/internet access to do research for Barnett. Barnett asked Kemp to arrange the access. One week later, Gillespie and Kemp had a verbal altercation. After Kemp protested, Barnett responded on February 12 with a two-page memo about the incident, copying Bernard. On February 6, 2003, Kemp [*11] supplied Barnett with a status report on her workload, which revealed a filing backlog dating back to July 2002 and including nine boxes of unfiled files of Hart, who had left the department in November of 2001. Barnett then wrote Kemp that she should have filed Hart's files when Hart left.

On February 21, 2003, Kemp met with Maryanne Gormley-O'Connor ("Gormley-O'Connor") from the Workforce Diversity Department to complain about Barnett's treatment and tone, citing the vacation request and memo about Internet access, and according to Kemp reported that it appeared that Barnett was trying to fire

her because of her recent diagnosis with, treatment of, and medical leave for breast cancer. During the conversation, Gormley-O'Connor explained the distinction between formal complaints and informal complaints. Kemp submitted an oral, informal complaint at that time.

In mid-February, 2003, Kemp was advised by several of her coworkers that Barnett had been soliciting them to say negative things about her work habits and personality. Barnett asked Kemp's co-workers whether she was "really and truly helpful" and whether she was ever nasty or negative.

On February 24, 2003, Kemp heard from [*12] Joshua that she and Barnett were revising Kemp's job description. Kemp then filed a formal internal complaint against Barnett with Workforce Diversity because she feared the new job description, which she had not seen, would have an adverse impact on her position.

The internal complaint alleged that Barnett harassed Kemp "on a continuous basis" after becoming Kemp's supervisor. It referred to "an especially nasty memorandum" from Barnett on February 12, 2003 and "two more hand written missives, this time with an explicit threat included." It asserted Kemp's belief "that Ms. Barnett's aim is to give me a negative performance review, after 10 years of above-average reviews, and, ultimately, to fire me, because of my illness and/or because of my [January 10, 2003] email to [Metro-North President] Mr. Cannito [about her missing pay]." In her deposition, Kemp stated that the harassment alleged in her internal complaint consisted solely of Barnett's writings described above and did not allege verbal harassment by Barnett and that she had no further facts to suggest that there was any connection between her breast cancer in 2002 and the conduct of Barnett in February 2003. She testified [*13] that her basis for alleging that Barnett's conduct was based on her illness was that "all the problems after she had become my supervisor and all of this kind of supervision which I encountered from her happened after my illness. Immediately following it". (Kemp Tr. 238).

Workforce Diversity hired the law firm of Seyfarth Shaw ("SS") to investigate Kemp's internal complaint and informed Kemp, who did not object.

On June 3, 2003, SS attorney Gloria Galant ("Galant"), a first-year associate, interviewed Kemp, Barnett and Bernard. Kemp told Galant that Barnett's conduct to which Kemp objected stopped after Kemp's February 24, 2003 internal complaint but that she could not "foresee productive relations with" Barnett. (Galant Aff. Ex. 1, at D-2634).

Kemp told Galant that she was amenable to placement outside the Legal Department on the condition that the new job was not punishment, was in her field and fit her knowledge, experience and education.

On June 18, 2003, SS sent its report and recommendations to Kay Turner, Director of Workforce Diversity ("Turner"). The report found no discrimination, but instead found an irreparable personality conflict between Kemp and Barnett, and recommended [*14] (1) transferring Kemp, (2) ending Barrett's supervision of Kemp, and (3) training for Barnett. The SS report recommended that Kemp be moved to a position "of comparable status" which "provide[s] comparable opportunities and compensation" as her current one and that if Kemp was not willing to move to an open position, then she should no longer report to Barnett and that if removing Barnett as Kemp's supervisor was not possible, then Barnett should receive training "to assist her in addressing performance issues and interacting with subordinate employees." (Siegler Certification, Ex. NN, at 10.) The report also recommended that Barnett receive "assistance with regard to the tone she utilizes when interacting with her coworkers, especially those who may have sensitive issues, such as Kemp." (Siegler Certification, Ex. NN, at 10.) When she later read the redacted report Kemp did not take issue with any of its factual determinations or findings. In July 2003, Workforce Diversity began looking for another position for Kemp.

During the latter part of 2003, Kemp took two medical leaves totaling nine weeks in connection with surgery on her foot and knee: from August 18, 2003 to September 29, 2003 and [*15] then again from October 9, 2003 through November 3, 2003.

On October 3, 2003, between Kemp's two medical leaves, Gormley-O'Connor told Kemp about the results of the investigation. At their meeting, Gormley-O'Connor told Kemp that Barnett was no longer her supervisor as of that day, that Metro-North would be looking to put her in a different position, that the entire Legal Department would receive training, that Kemp's job description would be updated to reflect her expanded job responsibilities, and that Bernard would contact her regarding the update. Gormley-O'Connor stated that Metro-North regretted the unfortunate events which occurred. Kemp stated that she did not want the new job to be punishment for her complaining, and Gormley-O'Connor assured her that would not be the case.

Barnett was provided a copy of the SS report by Bernard and given an opportunity to correct any inaccuracies. Barnett wrote a several page rebuttal, which was edited by Bernard. Barnett then requested that her rebuttal be included in the investigation record, which it was. Kemp was initially not given a copy of the SS report.

Kemp complimented Gormley-O'Connor's "professional and compassionate handling" [*16] of her inter-

nal complaint as well as her "scrupulously" kept notes and responsiveness. (Kemp Tr. 277-278, 410-412, 524).

On November 5, 2003, Gormley-O'Connor asked Kemp for her updated resume to aid in finding her another job. Kemp complied on November 18.

Kemp by a November 17 email to Gormley-O'Connor indicated that she "was not wanted in the Legal Department." On December 17, 2003, Gormley-O'Connor replied that

> the independent investigation . . . concluded that the likelihood of a productive future working relationship between you and Ms. Barnett was remote. Thus, alternate placement within the MTA family is the preferable course. This issue was discussed during our October 3, 2003 meeting my office and you agreed that your working relationship with Ms. Barnett was not repairable. We also discussed and you expressed interest in doing something different outside the Legal Department that would utilize your skills. Therefore your updated resume that Workforce Diversity received on November 18, 2003 was promptly forwarded in our efforts to comply with the recommendation of the independent investigation and your wishes.

(Witkin Aff., Ex. 30). Kemp conceded that Gormley-O'Connor's [*17] email accurately summarized events. (Kemp Tr. 432-33).

Kemp emailed Bernard on November 18, 2003, stating that "I do hope that HR finds me some placement which I will find challenging, would utilize my education and skills and which would be suitable on a personal level." (Witkin Aff., Ex. 30). Bernard responded on November 19 that if she also wished to look at her Legal Department job description "please tell me in what respects you wish to modify it". (Witkin Aff., Ex. 30).

On November 27, 2003, Bernard responded to Kemp's November 10 email about her October 3, 2003 meeting with Gormley-O'Connor. Bernard's response stated: "alternate placement within the MTA family is the preferable course. You should pursue that. HR is working on potential placement". (Witkin Aff., Ex. 8, at 58).

Kemp took off Thanksgiving week, November 24-28, returning to work on December 1. The entire Legal Department received a one-day conflict resolution train-

ing session on December 2, 2003, which fulfilled the SS report's recommendation that Barnett receive such training, though she was not singled out.

The day after the training session, Kemp commenced eight weeks of medical leave from December 3, 2003 through [*18] January 28, 2004. She testified that the December 2, 2003 training session caused her to take the eight weeks' leave.

On December 18, 2003, Bernard announced by email that Ana Aviles ("Aviles") would temporarily replace Kemp during her medical leave. Kemp objected to what she perceived as the sarcastic tone of the email but did not dispute its accuracy. (Kemp Tr. 439-48). That same day, Kemp emailed Gormley-O'Connor, blaming her situation on her complaint one year earlier about missing pay.

On January 14, 2004, David Bownas ("Bownas") of the HR department wrote to Kemp and informed her that she had utilized her allotment of 160 days of Short Term Disability as of January 12 and was on unpaid Family Medical Leave Act ("FMLA") leave until January 28.

On January 17, 2004, while out on medical leave, Kemp emailed Bradley, accusing Bernard of insulting and untruthful emails and expressing apprehension about returning to work. On January 27, 2004, Bradley responded that Workforce Diversity was looking for another job for her.

On February 10, 2004, two weeks after returning from eight weeks of leave, Kemp filed an Equal Opportunity Commission Charge ("EEOC") against Metro-North (the "Charge"). [*19] The Charge repeated her complaints about her payroll problem and about Barnett's alleged harassment leading to the filing of the February 24, 2003 internal complaint. It also complained about the "delay of three and a half months" in telling her about the results of the SS investigation and conceded that, as the outside investigation had recommended, Barnett had been removed as her supervisor and a new job was being sought for her. She complained that Barnett had been allowed to see the investigator's report but she had not. She alleged no specific harassment but instead alleged an "anticipatory" retaliation claim based on her "fear that a new job may be a setup for failure" and her belief that "Metro-North is retaliating against me, is trying to constructively discharge me in violation of Title VII . . . and . . . the Americans with Disabilities Act . . . ." (Witkin Aff., Ex. 8, at 97-102).

In her deposition, Kemp testified that Bernard harassed her as follows: he objected to her initial refusal to specify which three days she would work when she returned to work part time in October 2002; he failed to address her lost pay issue quickly enough; he appointed

Barnett to supervise her [*20] and failed to stop Barnett from criticizing her; he refused to discuss the outside investigation of Kemp's internal complaint; he asked her if she saw confidential information on Barnett's computer screen when he found Kemp alone in Barnett's office; and he refused to do a performance evaluation on Kemp in April 2004 because she had been out so much and her transfer was pending. Bernard did not process the paper-work regarding Kemp's request for Short Term Disability in a timely manner, according to Kemp.

Turner, the Director of Workforce Diversity, was in charge of implementing the SS recommendation that Kemp be moved to a comparable position. In the Fall of 2003, Turner approached Sherry Herrington ("Herrington"), Chief Operations Officer, about employ-ing Kemp in a position which would address the reasons why Metro-North was losing so many of its Step One grievances. n1

    n1 A "Step One" is a disciplinary hearing pursuant to Metro-North's collective bargaining agreement with its employees.

On February 23, 2004, Kemp [*21] met with Turner and Gormley-O'Connor about this new job in Operations Services, which would carry the title of Senior Research Specialist. Herrington and Joshua prepared a job descrip-tion for the position and shared it with Kemp. At that time, Kemp advised them she had filed the Charge. This was the first notice Metro-North received about the Charge. The duties of the new position were as follows:

    . Working with senior management in Crew Dispatching, research the types of absenteeism, analyze the results to find potential causes and recommend possible solutions to improve attendance.

    . Working with managers responsible for discipline and Hearing Officers, research types and frequency of infractions, ana-lyze the results and recommend several options to improve the consistency for the discipline process and possible alterna-tives.

    . Working with local safety committees, research types of injuries, analyze results and potential causes and recommend pos-sible strategies to avoid future injuries.

    . Assist in any other Operation Services' initiatives as directed by Chief Operation Services Officer.

(Siegler Certification, Ex. BBB).

On February 24, 2004, Kemp [*22] initially told Gormley-O'Connor she was not interested in the Opera-tions Services job. However, later in that same conversa-tion, Kemp reconsidered and agreed to meet with Herrington, who also served as Metro-North's Chief of Operations. According to Kemp, she advised Gormley-O'Connor, Turner and Bernard she did not want the Op-erations job.

Kemp, Turner and Gormley-O'Connor met with Herrington on February 27, 2004. During that meeting, Kemp further questioned Herrington about the Senior Research Specialist job. Herrington told Kemp that if she took the position, she would be in a group that reported directly to her (Herrington), and that she would have the same salary and pay grade she had in the Legal Depart-ment. They discussed the issues of computer software and forecasting. The meeting ended with Herrington shaking Kemp's hand and saying "welcome." Herrington, Turner and Gormley-O'Connor left the meeting with the impression that Kemp had all of her questions answered, that the job would be a good fit for her and that she would take it.

There is a factual dispute as to whether or not after the February 27, 2004 meeting with Herrington, Kemp said anything to Turner, Gormley-O'Connor [*23] or Herrington concerning the Operations job. Kemp has asserted that she rejected the job.

On March 1, 2004, Kemp told Gormley-O'Connor that she would accept the new job in Operations with an Assistant Director title and a $ 10,000 salary increase. Kemp testified in her deposition that she was joking about the title and salary changes.

On or about May 31, 2004, Bernard called Kemp into his office and directed her to report to the Opera-tions Department the next day. According to Kemp, she stated that she absolutely did not want that job. Bernard did not recall Kemp telling him this, although he recalled that Turner had relayed that Kemp had accepted the posi-tion.

On June 1, 2004, Kemp reported to her new position in the Crew Management Center, which is located in Grand Central Terminal. She testified that she was sup-posed to report to Herrington in Operations but reported instead to Robin Brown ("Brown"), a Manager who did not appear to know what Kemp's job was supposed to be, but who did show her the existing computerized data-

2007 U.S. Dist. LEXIS 43568, *

bases for absences and how to access information in the system. She was assigned to a cubicle and called staff who were out sick, filed documents in their folders, [*24] made copies of documents and entered data from the telephone calls into a computer. She could not recall how much time she spent on each of those tasks, which she considered to be clerical.

Kemp testified that if the new job in Operations had been as it had been described to her, it would not have been a demotion.

Gormley-O'Connor thought there was striking similarity between the duties Kemp had performed in the Legal Department and the duties planned for her Senior Research Specialist position in Operations. The similarity included research and analysis and information technology work, including the development of databases.

Turner recalled that Herrington explained the new Operations job to Kemp in their February 27, 2004 meeting as follows:

> Sherry Herrington explained to [Kemp that the job was going to be a new job in her department and that she wanted attention paid to the disciplinary component of the job in that Miss Kemp was coming from legal and had a legal background and, therefore, she was expecting that Miss Kemp would have the opportunity to review the arbitration decisions of the employees under her jurisdictions to give some understanding, some - she was losing [*25] a lot of her step ones and so she wanted somebody who could read the arbitration decisions and understand and see whether there were any similarities, what were they doing in these step ones, why were they losing, were there any similarities and requirements that the arbitrators would need, can we somehow put that in a database so that she could communicate that to the employees that are conducting the step ones and, therefore, raise her - the probability of being successful in those step ones. That was the disciplinary piece of the job.

(Turner Tr. 44-45).

Turner believed the move to Operations was a great opportunity for Kemp:

> I truly believed that this was an opportunity for a bad situation to work out for all. I truly believed that this would have been an opportunity give Miss Kemp a new start. Legal can carry on, we wouldn't have a tiny department with conflict, and we would have an opportunity for Mrs. Kemp to start over in a very significant position. There is certainly more growth in the [Operations] division than there is in any other division of the railroad . . . .

(Turner Tr. 91-92).

The Legal Department gave up Kemp's budget line to Operations. [*26]

According to Turner, Kemp never told her she did not want the Senior Research Specialist position. Turner believed that Kemp had accepted the position: she had seen Herrington welcome Kemp and the two of them shake hands; Kemp had given Turner the impression that "it was a fit, that she was satisfied with the position and she was gonna take it," and Gormley-O'Connor had told Turner that Kemp would accept it. (Turner Tr. 104). Turner told Bernard that Kemp had accepted it.

Neither Barnett nor Bernard participated in Workforce Diversity's decision to offer the Senior Research Specialist job to Kemp or to transfer her to Operations. Turner made that decision.

Kemp left work on June 4 for a scheduled doctor's appointment and then left on vacation through June 14.

On June 4, 2004, Bernard informed the Legal Department that Aviles would perform many of Kemp's former duties in addition to Aviles' existing duties as a legal secretary, and that two other legal secretaries would also be performing some of Kemp's former duties. Neither Turner, Gormley-O'Connor nor anyone else in Workforce Diversity participated in the decision concerning the reassignment of Kemp's former duties to others [*27] in the Legal Department.

On June 15, 2004, Kemp returned from vacation to her new job in Operations. On the morning of June 16, 2004, Kemp emailed James DeMilt ("DeMilt"), her new supervisor in Operations, that she was not coming in because she had had a splitting headache "for a few days" and had made an "emergency appointment" with her doctor. (Witkin Aff., Ex. 23). That afternoon, she emailed DeMilt that she had met with her doctor, who "advised me to take a long term leave from work," and she asked DeMilt to let her know "which forms I have to fill out and what my options are regarding a leave that will probably last a few weeks." (Witkin Aff., Ex. 8, at

118). Kemp did not indicate that the leave had anything to do with the new job or the transfer.

Kemp never complained to Herrington, Gormley-O'Connor, Turner, or anyone else in Operations or Workforce Diversity about the duties of the new job after she transferred. She testified that she did tell DeMilt that she could not do the job in a noisy cubicle. She also subsequently authorized her counsel to complain about the position.

On June 21, 2004, Kemp elected to have surgery on her foot. On July 20, 2004, Metro-North received [*28] Kemp's FMLA leave request form claiming that her "own serious health condition" rendered her "unable to perform the essential functions" of her position. (Witkin Aff., Ex. 47). That same day, July 20, 2004, unknown to Metro-North, Kemp had foot surgery, and her doctor directed she be not bear weight for six weeks.

On July 29, 2004, Kemp emailed DeMilt and Gormley-O'Connor, stating that she had been advised that she had exhausted her FMLA leave, asking DeMilt to "advise what my status is currently" and attaching her doctor's medical report dated June 23, 2004. (Witkin Aff., Ex. 8, at 120). Her psychiatrist's June 23, 2004 Medical Report stated that Kemp was "unable to attend her assigned work duties" and did not provide any date when she could return to work. (Witkin Aff., Ex. 8, at 119).

On July 30, 2004, Kemp emailed Turner and Gormley-O'Connor, stating that she had been "home sick for a few weeks" and further stating:

> My doctor and I feel that I am now capable to look for other job opportunities at Metro-North or at other MTA agencies. There are no positions that I can consider fit for me in the Web postings. Please let me know if there are any suitable jobs that you can [*29] offer.

(Witkin Aff., Ex. 8, at 121).

On August 10, 2004, Joshua responded to Kemp's July 30 email, stating:

> Your July 30th email makes no reference to the position as Senior Research Specialist ("SRS") in the Operations Services Department ("OSD"), which you assumed on June 2, 2004.
>
> On June 15, 2004, you commenced sick leave from your SRS position right after

taking vacation from June 7-14. While on that sick leave you were advised that your Family and Medical Leave Act leave entitlement would be exhausted on July 14, 2004. You have exhausted your 2004 vacation and sick leave. You are also aware that employees on sick leave should contact their departments to make the necessary arrangements for their return to duty. You have not done so. Instead, you sent your July 30th email to the Workforce Diversity Department asking about jobs other than the SRS position to which you transferred on June 2, 2004.

> If you do not contact me and arrange to comply with Metro-North's return to duty procedures before the close of business on August 12, 2004, we will treat your July 30th email as confirmation that you have abandoned the SRS position and resigned from Metro-North [*30] Railroad effective July 30, 2004.

(Witkin Aff., Ex. 8, at 123).

On August 12, 2004, Kemp responded to Joshua's August 10, 2004 letter:

> My sick leave has been ordered by my psychiatrist, Dr. Adrian Zisu and I do not have his permission to return to work yet . . . . Please allow me to respond to your letter formally within two weeks by August 26, 2004. I cherish working for Metro-North and will return to work as soon as I can.

(Witkin Aff., Ex. 8, at 124).

On August 13, 2004, Joshua replied to Kemp's August 12, 2004 email:

> We understand from your August 12, 2004 email that you are not now able to return to work at your Sr. Research Specialist (SRS) position. However, neither your email nor MD-1 form signed by Dr. Zisu states the date when you will be able to return to work. No later than August 18, 2004 I must be in receipt of a statement of the date on which you will be

able to return to work at your SRS posi-
tion. If at this point you are not able to de-
termine when you will be able to return to
work, please state that.

(Witkin Aff., Ex. 8, at 126).

Kemp signed and swore to an amendment to her
EEOC charge (dated June 20, 2004) on August 2, 2006
and [*31] submitted it to the EEOC on August 5, 2006.
The amendment sought to add claims of age discrimina-
tion arising out of Kemp's June 2, 2004 transfer. On Au-
gust 12, 2004, the EEOC issued a Notice of Dismissal of
Kemp's Charge, and a letter to Kemp stating that the
EEOC had been "unable to conclude that the information
[gathered from the EEOC investigation] establishes vio-
lations of the statutes" as claimed by Kemp. (Witkin
Aff., Ex. 8, at 134-36).

On or about August 17, 2004, Joshua received a let-
ter from an attorney representing Kemp stating that:

> Ms. Kemp is unable to return to the posi-
> tion to which she was transferred in re-
> taliation for her complaints, as she finds
> the transfer and the working conditions to
> be intolerable. Furthermore, her psychia-
> trist will not release her to return to that
> hostile work environment . . . .
>
> Ms. Kemp is more than willing and able
> to accept an appropriate transfer to the
> Legal Department of MTA and/or any of
> its agencies . . . .

(Witkin Aff., Ex. 49).

After Kemp's attorney's August 17, 2004 letter,
Gormley-O'Connor checked whether there were any le-
gal positions available in the MTA agencies, but found
none.

On August 26, 2004, Joshua [*32] wrote to Kemp
(copying her attorney), replying to her attorney's August
17, 2004 letter, stating in part as follows:

> You transferred to the SRS position effec-
> tive June 2, 2004 without any reduction in
> your pay or benefits, but you reported to
> work in that position for only two or three
> days. We do not see how the transfer or
> the working conditions could have been
> "intolerable" or the work environment

"hostile" in a position you barely started.
Yet you state that you will not return to
the SRS position.

You also claim the transfer to the SRS po-
sition was "retaliation." But you accepted
that transfer and the Equal Employment
Opportunity Commission has dismissed
your "charge of discrimination" and re-
taliation.

Because you are "more than willing and
able" to accept another position, you do
not appear to have a disability. You are
thus "willing and able" to work. Accord-
ingly, since your attorneys' August 17,
2004 letter confirms your refusal to return
to your job, we treat that letter as confirm-
ing your resignation from Metro-North
Railroad effective as of that date.

(Witkin Aff., Ex. 8, at 137).

Kemp stated in her deposition that Metro-North did
not terminate [*33] her employment, but that she instead
"left a job that I didn't want, that I did not take, that I
didn't accept," and that she "abandoned" the Senior Re-
search Specialist job to which she had transferred.
(Kemp Tr. 651).

Herrington did not replace Kemp after Kemp re-
fused to return to work in her Operations Services job.
No one is performing the functions Herrington envi-
sioned for that position.

Kemp's psychiatrist, Dr. Adrian Zisu ("Dr. Zisu")
testified that he never released her to return to either the
Legal or Operations jobs. Neither Kemp nor her doctor
saw returning to the Legal Department as a viable option.
Dr. Zisu stated: "By the time she was seeing me [No-
vember 25, 2003] she was very eager to be moved out of
that [Legal] department." (Zisu Tr. 256).

Kemp has not prepared a resume or looked for work
since she stopped working at Metro-North in June 2004,
and her doctor advised her not to work. She testified that
she is still dysfunctional.

On August 18, 2004, Dr. Zisu signed a Statement of
Sickness form of the U.S. Railroad Retirement Board
("RRB") attached to Kemp's RRS application for sick-
ness benefits claiming benefits since July 21, 2004, stat-
ing that Kemp would be [*34] able to resume work in
six months to one year.

On November 18, 2004, Dr. Zisu signed an Attend-
ing Physician's Statement in connection with Kemp's

application to Prudential Financial for Long Term Disability ("LTD") insurance benefits, which stated, in part, that Ms. Kemp was "not presently expected to return to work."

On December 30, 2004, Dr. Zisu signed a RRB Statement, which stated that Kemp was not able to work and estimated her return to work date as June 1, 2005.

On February 23, 2005, Dr. Zisu signed a RRB Statement, which stated that Kemp was not able to work and estimated her return to work date as July 1, 2005. On June 13, 2005, Dr. Zisu signed a RRB Statement estimating Kemp would be able to resume work in six months to one year. He signed RRB Statements on October 8, 2005, January 23, 2006, and September 1, 2006 stating that she was unable to work and that her estimated return to work was "indefinite".

Kemp hired an attorney to pursue her LTD claim who sent Kemp to Dr. Richard Podell ("Dr. Podell"). Dr. Podell on July 15, 2005, wrote that Kemp "was disabled" with Chronic Fatigue Syndrome ("CFS") together with Fibromyalgia as of the time she stopped working at Metro-North, [*35] that "this disability is likely to be permanent," and that she "is unable to work on a sustained basis at any job full or part time." (Witkin Aff., Ex. S).

Kemp was not diagnosed with CFS while employed by Metro-North and never told Metro-North that she had CFS or Fibromyalgia. Kemp testified that Dr. Podell advised her, as had Dr. Zisu, that she was not capable of working.

**Summary Judgment Standard**

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970), and can discharge this burden by demonstrating that there [*36] is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir. 1987); see also Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If there is not, summary judgment is proper. See id. at 249-50.

"The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than [*37] to commercial or other areas of litigation." Nicastro v. Runyon, 60 F. Supp. 2d 181, 183 (S.D.N.Y. 1999) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). Greater caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue. Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999). This is so because "employers are rarely so cooperative as to include a notation in the personnel file that the [action complained of] is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks and citation omitted; brackets in original). But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); see also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

**Defendant is Not Immune from the NYCHRL**

Section 1266(8) of the New York State Public [*38] Authorities Law, referring to Metro-North's parent, the MTA, provides that:

> no municipality or political subdivision . . . shall have jurisdiction over any facilities of the authority or any of its activities or operations. The local laws, resolutions, ordinances, rules and regulations of a municipality or political subdivision . . . conflicting with this title or any rule or regulation of the authority, shall not be applicable to the activities or operation of the authority.

Section 1266(5) of that statute gives MTA subsidiaries, including Metro-North, the same privileges and immunities as the MTA. Metro-North has argued that this law renders it immune from the anti-discrimination provisions contained in the NYCHRL. See Robinson v. Metro-North Commuter R.R., 1998 U.S. Dist. LEXIS 373, at *33 (S.D.N.Y. Jan. 15, 1998). However, courts that have considered the issue in a more nuanded fashion have rejected Metro-North's position. See Levy v. City Comm'n on Human Rights, 85 N.Y.2d 740, 746, 651 N.E.2d 1264, 628 N.Y.S.2d 245 (1995); Everson v. New York City Transit Auth., 216 F. Supp. 2d 71, 80-81 (E.D.N.Y. 2002); Wahlstrom v. Metro-North Commuter R.R., 89 F. Supp. 2d 506, 527 n. 21 (S.D.N.Y. 2000). [*39] Metro-North is not immune from the reach of the NYCHRL insofar as the law is not inconsistent with any New York State law. See Levy, 85 N.Y.2d at 746. Here, Defendant has not identified any way in which the NYCHRL conflicts with state law. Accordingly, Metro-North is not exempted from the requirements of the NYCHRL.

## Harassment Resulting from Disability Has Not Been Established

To survive a motion for summary judgment, a plaintiff alleging harassment due to disability under the NYSHRL and NYCHRL, a plaintiff must adduce sufficient evidence of the following elements: (1) she is disabled within the definition of the NYSHRL and/or NYCHRL; (2) she suffered unwelcome harassment; (3) she was harassed because of her disability; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. See Ruhling v. Tribune Co., 2007 U.S. Dist. LEXIS 116 (S.D.N.Y. Jan. 3, 2007); see also Weinstock, 224 F.3d at 42 n.1 (noting that "identical standards apply to employment discrimination claims brought under Title VII, Title IX, [the NYSHRL, and the NYCERL]"). n2 [*40]

n2 While the parties have agreed that the NYSHRL prohibits only harassment that is "severe and pervasive," Plaintiff has argued that under the NYCHRL, "liaoility should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages." Farrugia v. N. Shore Univ. Hosp., 13 Misc. 3d 740, 820 N.Y.S.2d 718, 725 (N.Y. Sup. 2006). As discussed below, Defendant is entitled to summary judgment on the harassment claims even under the relaxed Farrugia standard. Accordingly, the Court need not resolve the issue.

Kemp has asserted that the evidence of harassment consisted of Bernard's unhappiness with her working part time; his failure to help her with a payroll problem; his anger related to a retirement party; his appointment of Barnett to supervise her; Barnett's denial of her vacation and criticism of her performance.

Kemp testified that when she told Bernard she would not work the same three days each week, he "made a face" she interpreted as "not [*41] happy" or "kind of disgusted" but what he said was that he preferred she come in the same three days. (Kemp Tr. 118-20). Kemp testified that the "animosity" she claimed to feel was not based on the "face" she said Bernard made in any event. (Kemp Tr. 121).

Kemp testified she returned to work full time because part-time employees do not get paid for holidays, not because of Bernard's alleged "animosity," and that Bernard never flippantly referred to "this cancer of yours" or said that her absences were "ridiculous." (Kemp Tr. 129, 251).

Bernard asked Joshua to look into her payroll problem and then told Kemp that she would get paid.

Kemp has asserted that Bernard "expressed anger" about a retirement party planned, but did not note that without Bernard's permission, she had guaranteed a paid headcount to the restaurant which Bernard subsequently had to withdraw. (Kemp Tr. 154-58).

Kemp failed to identify any facts to establish that Bernard appointed Barnett to supervise Kemp to harass her because of breast cancer. Bernard's promotion of Barnett further weakens the claim that Bernard discriminated against Kemp because of her illness, as Bernard promoted Barnett in 1999 after Barnett's [*42] 1997 breast cancer surgery and medical leave. Barnett testified that Bernard was generous to her and others who were ill. Kemp did not allege disability animus by Bernard in either her February 2003 internal complaint or her February 2004 EEOC Charge.

Kemp has presented no evidence that Barnett's February 2003 conduct concerning her vacation, job performance and job description was based on Kemp's 2002 breast cancer. Kemp's allegation of Barnett's discriminatory motive is especially problematic, given Barnett's status as a breast cancer survivor herself. See Fosen v. New York Times, 2006 U.S. Dist. LEXIS 75662, at *14-*15 (S.D.N.Y. Oct. 11, 2006) (finding discrimination unlikely where decision-maker was in same protected class as plaintiff); Zeigler v. Marriott Int'l, Inc., 2005 U.S. Dist. LEXIS 7647, at *42 (S.D.N.Y. May 4, 2005) (citing Sykes v. Mt. Sinai Med. Ctr., 967 F.Supp. 791, 797 (S.D.N.Y. 1997)); Banks v. Metro-North Commuter

R.R., 2000 U.S. Dist. LEXIS 508, at *23-*24 (S.D.N.Y. Jan. 14, 2000), aff'd, 234 F.3d 1261 (2d Cir. 2000).

Kemp has admitted that her vacation was not denied, but [*43] merely conditioned on showing the tickets she had bought without pre-clearing the vacation. Kemp cancelled her vacation in February after breaking her toe and getting her ticket money refunded and took the vacation in May instead with Barnett's approval.

The criticism of Kemp by Barnett was expressed in relatively a few emails and memos, and no facts have been presented to suggest that the criticisms were based on anything other than Barnett's view of Kemp's job performance.

Barnett's attempt to change Kemp's job description was not new, as she concedes that Barnett had tried to revise the job description "for some time." (Pl., Mem. in Opp., at 12). The change was not material because Bernard did not approve the change, and Kemp never saw the new job description before she filed her complaint.

Kemp has failed to establish harassment based upon her disability. The alleged conduct was not based on her 2002 breast cancer. It was not severe or pervasive, nor a denial of equal treatment. Barnett viewed Kemp to be unproductive, insubordinate and in need of more supervision. These are legitimate, non-discriminatory reasons for her conduct, and Kemp has presented no evidence they were pretextual. [*44] Kemp's speculations about the motives of Bernard and Barnett are not sufficient to defeat a motion for summary judgment. See McPherson v. New York City Dep't of Ed., 457 F.3d 211, 215 n.4 (2d Cir. 2006).

The claim of disability-based harassment has not been established under either the NYSHRL or NYCHRL.

**The Retaliation Claims Have Not Been Established**

"Under both the [NYSHRL and NYCHRL], it is unlawful to retaliate against an employee for opposing discriminatory practices." Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 312-13, 819 N.E.2d 998, 786 N.Y.S.2d 382 (2004).

To establish a prima facie case of retaliation under the ADA, NYSHRL, NYCHRL, a plaintiff must establish that (1) she was engaged in an activity protected by the ADA, NYSHRL, and/or NYCHRL, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action. See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999); Cooney v. Consolidated Edison, 220 F. Supp. 2d 241, 248 (S.D.N.Y. 2002), aff'd, [*45] 63 Fed. Appx.

579 (2d Cir. May 13, 2003); Forrest, 3 N.Y.3d at 312-313 (applying the same standard for NYSHRL and NYCHRL retaliation claims).

When evaluating claims of retaliation under the ADA, NYSHRL, and NYCHRL, courts use the well-known McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001); Cooney, 220 F. Supp. 2d at 248. First, the plaintiff must prove by a preponderance of the evidence a prima facie case of retaliation. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); McDonnell Douglas, 411 U.S. at 802-04; Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Weinstock, 224 F.3d at 42. Only if the plaintiff meets this initial burden will the burden then shift to the defendant to produce evidence that the adverse employment action was taken for some legitimate, non-discriminatory reason. See Burdine, 450 U.S. at 254-55. If the defendant articulates a legitimate non-discriminatory [*46] reason for its action, "the presumption raised by the prima facie case is rebutted, and drops from the case." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (quoting Burdine, 450 U.S. at 255 n.10). Then, the plaintiff has the ultimate burden to demonstrate by a preponderance of the evidence that the articulated reason offered by the defendant for the adverse employment action is merely a pretext for actual discrimination. Mandell v. County of Suffolk, 316 F.3d 368, 380-81 (2d Cir. 2003).

Kemp has maintained that her June 2004 transfer to Operations was retaliation for her (1) February 2003 internal complaint and (2) February 2004 EEOC Charge. However, Kemp has failed to show by a preponderance of the evidence that the transfer was causally connected with either of the above actions.

Defendant asserts that Kemp's internal complaint did not constitute protected conduct, citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). However, there exists a genuine dispute of fact over whether Kemp had a good-faith belief that a violation existed. See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). [*47] There is no dispute that Defendant was aware of both the 2003 internal complaint and the 2004 EEOC Charge.

For an employment action to qualify as retaliation, it must be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (citation and quotation

marks omitted). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 2417 (citation and quotation marks omitted).

Kemp claims that her June 2004 transfer was materially adverse because the new job was "clerical" and thus a "demotion" and that the people who transferred her knew she did not want the job.

Kemp testified that her duties in the Legal Department in 2004 included: most importantly, indexing documents and files and "different databases like registered contracts" (Kemp Tr. 77-79, 86-87, 184, 578-79, 586) and maintaining a database for [*48] the FELA group (Kemp Tr. 578, 582-85); being "in charge of the library" which "diminished as the computerized records appeared" and as computerized legal research databases replaced books (Kemp Tr. 80-81, 184); administratively "supervising" three secretaries (Kemp Tr. 77, 80); being "the computer guy" (Kemp Tr. 77-78, 184); (preparing the department's budget, internal controls review, letters to outside auditors, monthly reports to MTA on outside counsel expense and quarterly reports on ongoing litigation (Kemp Tr. 77, 578-82); and doing "legal research" (Kemp Tr. 184-86, 583-84).

Kemp has acknowledged that the Operations position paid the same as her job in Legal and that the job was supposed to report to Herrington. The duties of the Operations job remain in dispute, however, largely because Kemp held the position for only a few days.

Kemp's contention that she refused the Operations job are also matters of factual dispute and contradicted in this record.

Viewed in the light most favorable to Kemp, there is a triable issue as to whether the transfer to Operations "could well have dissuaded a reasonable employee in [Kemp's] position from complaining of unlawful discrimination. [*49] " Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 209 (2d Cir. 2006).

Kemp's retaliation claim fails because she cannot establish a causal connection between the alleged protected conduct and the transfer. She cannot claim the transfer was retaliation for her Charge, because the transfer was determined and being implemented before she filed the Charge. See Breeden, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). The transfer decision (communicated to her October 3, 2003) was made before she filed the EEOC

Charge, even though the actual transfer occurred after the Charge.

In addition, Kemp has not established a causal connection between her transfer and the internal complaint. First, the transfer occurred more than fifteen months after the complaint. While "there is no bright line distinction for how close in time an adverse action must be to the protected activity" in order to establish an inference of causation, [*50] Uddin v. City of N.Y., 427 F. Supp. 2d 414, 433 (S.D.N.Y. 2006), courts have routinely found much shorter gaps of time insufficient to show causation. See Shah v. Consol. Edison Corp., 2005 U.S. Dist. LEXIS 4012, at *8 (S.D.N.Y. Mar 14, 2005) (gap of six months "far too long"); Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half month gap "hardly the close proximity of time" necessary); see also Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (finding no causation when adverse employment action occurred three months after protected activity); Milford v. New York City Bd. of Health, 2005 U.S. Dist. LEXIS 1131, at *26 (S.D.N.Y. Jan. 27, 2005) (same, after nine month gap); Taylor v. Potter, 2004 U.S. Dist. LEXIS 15992, at *70-*71 (S.D.N.Y. Aug 16, 2004) (same, after eight month gap); Dodson v. CBS Broad. Inc., 2004 U.S. Dist. LEXIS 10787, at *76 n. 27 (S.D.N.Y. June 15, 2004) (same, after eight month gap); Knight v. City of New York, 303 F. Supp. 2d 485, 497 (S.D.N.Y. 2004) (same, after fifteen [*51] month gap). The temporal link between Kemp's February 21, 2003 internal complaint and transfer to a new job starting on June 1, 2004 is too attenuated to constitute evidence of a causal nexus.

That the investigation of Kemp's internal complaint did not begin until 90 days after she filed it is not evidence of a causal connection. Metro-North engaged outside counsel to do the investigation, as it involved a member of the Legal Department. Once engaged, outside counsel swiftly investigated and wrote a report (in fewer than three weeks) signed by a member of the firm. Turner and Gormley-O'Connor, of the Workforce Diversity Department, working with Herrington, arranged and implemented the transfer. No evidence has been adduced to suggest that those who arranged for the transfer had a motive to retaliate. See Dullard v. City of N.Y., 274 F. Supp. 2d 347, 363 (S.D.N.Y. 2003) (granting summary judgment against retaliation claim where plaintiff "failed to link the decision to transfer him . . . with any decision maker who might have had a retaliatory motive"); Taylor v. Lenox Hill Hosp., 2003 U.S. Dist. LEXIS 5429, at *28-*29 (S.D.N.Y. April 3, 2003) (granting [*52] summary judgment against retaliation claim where plaintiff presented no evidence tending to show that decision-makers intended to retaliate against him); Cooney, 220 F. Supp. 2d at 251.

Having received a report finding no discrimination and recommending Kemp's transfer to resolve a personality conflict with Barnett, Turner's only demonstrated interest was for the transfer to succeed. Neither Barnett nor Bernard participated in the decision-making.

Kemp has failed to present adequate evidence of a causal link between her internal complaint and her transfer to the Operations job.

Metro-North has also presented legitimate, non-discriminatory reasons to transfer Kemp: her personality conflict with Barnett and dissatisfaction with her work environment.

Kemp testified that she could not stand being in the "hostile" atmosphere of the Department, even after Barnett no longer supervised her. On December 3, 2003, Kemp wrote that she could not function at work. On January 17, 2004, six weeks into a leave of absence that lasted eight weeks, she expressed apprehension about returning to work in the Legal Department. She said it was so bad that she had to take a two-month leave [*53] of absence in December 2003 and January 2004. Kemp stated it was "unbearable" for her to remain the Legal Department, and that neither she nor her doctor saw returning to the Department as a viable option.

The SS report's recommendation that Kemp be transferred supports one of Metro-North's legitimate non-discriminatory reasons for the transfer: resolving Kemp's conflict with Barnett. The SS report found -- and Kemp has admitted -- an irreparable personality conflict between Kemp and Barnett. See Diaz v. TMC Servs., 451 F. Supp. 2d 566, 575-76 (S.D.N.Y. 2006) (finding adverse employment action based on personality conflict not discriminatory).

"Criticisms that precede the protected activity are relevant to a finding that there was no causal nexus." Ponniah Das v. Our Lady of Mercy Med. Ctr., 2002 U.S. Dist LEXIS 7771, at *36 (S.D.N.Y. Apr. 30, 2002), aff'd, 56 Fed. Appx. 12 (2d Cir. Jan. 23, 2003) (citations omitted). Kemp's conflict with Barnett -- dating back to before 2002 -- preceded the filing of her internal complaint by more than a year. Barnett, and others, repeatedly complained about Kemp's work habits in the months and [*54] years prior to the internal complaint.

To rebut Metro-North's non-discriminatory explanation, Kemp "must produce not simply 'some' evidence,

but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" Weinstock, 224 F.3d at 42 (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)) (brackets in original).

Kemp has failed to adduce any evidence that Metro-North's stated reasons for the transfer were pretextual. The fact that Barnett no longer directly supervised Kemp at the time of the transfer casts scant suspicion on Metro-North's justification for the transfer. In fact, the removal of Barnett as Kemp's direct supervisor actually supports Metro-North's explanation; it was a remedial action specifically recommended by the SS report as a way of easing Kemp's personality conflict with Barnett. See Avillan v. Potter, 2006 U.S. Dist. LEXIS 80062, at *63-*64 (S.D.N.Y. Nov. 1, 2006) ("[W]here, as here, the nonretaliatory justification [*55] is supported by an employer's conclusions following an investigation, a plaintiff cannot escape summary judgment by simply attacking the legitimacy of the employer's findings."); see also McPherson, 457 F.3d at 215-16 (investigatory conclusions -- that plaintiff improperly used corporal punishment -- were legitimate non-discriminatory reasons for terminating her employment); Simpson v. Metro-North Commuter R.R., 2006 U.S. Dist. LEXIS 50331, at *40-*42 (S.D.N.Y. Jul. 21, 2006).

"To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." Weinstock, 224 F.3d at 42 (citation and quotation marks omitted). Because Kemp has not established that the reasons for transferring her were pretexts for retaliating against her, her claims should be dismissed.

## Conclusion

As set forth above, Defendant's motion for summary judgment is granted. The Clerk of the Court is ordered to enter judgment in favor of Defendant and close this case.

It is so ordered.

New York, NY

June 12, 2007

Robert W. Sweet, U.S.D.J.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Kendall v. Fisse
E.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Jeffrey KENDALL, Plaintiff,
v.
William J. FISSE, Laurie Ledford, Gilbert Sutcliffe,
Lawrence Phillips, Citibank, N.A., Citigroup, Inc.,
and Citicorp, Inc., Defendants.
**No. 00 CV 5154SJ.**

May 25, 2004.

Pollack & Kotler, Mineola, New York, By: Ruth M.
Pollack, for Plaintiff.
Proskauer Rose LLP, New York, New York, By:
Joseph Baumgarten, Michael J. Lebowich, for
Defendants.

*MEMORANDUM AND ORDER*
JOHNSON, Senior J.
**\*1** Jeffrey Kendall ("Kendall" or "Plaintiff") filed
the present action against William J. Fisse ("Fisse"
), Laurie Ledford ("Ledford"), Gilbert Sutcliffe ("
Sutcliffe"), Lawrence Phillips ("Phillips"),
Citibank, N.A. ("Citibank"), Citigroup, Inc., and
Citicorp, Inc. (collectively, "Defendants") for (1)
employment discrimination pursuant to the
Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101 *et seq;* New York State Human
Rights Law ("NYSHRL"), N.Y. McKinney's Exec.
Law § 296; and New York City Human Rights Law
("NYCHRL"), New York City Admin. Code §
8-107; (2) breach of employment contract; and (3)
improper termination to avoid providing employee
benefits as provided in § 510 of ERISA (29 U.S.C. §
1140). Before this Court are Defendants' motions
for (a) summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure, (b) attorney's
fees and costs, and (c) sanctions against Plaintiff
pursuant to Rule 11(c) of the Federal Rules of Civil
Procedure, as well as Plaintiff's letter request

(which this Court construes as a motion) for
sanctions against Defendants and/or their counsel.
For the reasons stated below, Defendants' motion
for summary judgment is GRANTED and their
motion for attorney's fees, costs, and sanctions is
DENIED. Plaintiff's motion for sanctions is also
DENIED.

BACKGROUND [FN1]

FN1. After numerous extensions, this
Court ordered due on March 28, 2003
Plaintiff's Opposition to Defendants'
Summary Judgment Motion ("Opposition
Brief") and Plaintiff's Rule 56.1(b)
Statement. It is disputed whether Plaintiff
submitted its 40 page Opposition Brief and
its Rule 56.1(b) Statement on that date or
on April 2, 2003.
Defendants ask this Court to strike
Plaintiff's response to Defendants' motion
because of Plaintiff's (1) alleged late filing
(on April 2, 2003) of his response, and (2)
disregard for the Court's individual
practices, which limit opposition briefs to
25 pages. (*See* Letter from Joseph
Baumgarten to Judge Johnson of 4/3/03.)
Even if Plaintiff did submit his opposition
papers five days late, this delay was not
excessive and did not result in great
prejudice to Defendants. *See LoSacco v.
City of Middletown,* 71 F.3d 88, 93 (2d
Cir.1995). Similarly, Plaintiff's misconduct
in submitting an opposition brief that
exceeds this Court's page limit by fifteen
pages does not justify this Court striking
the brief in its entirety. *See Abu-Nassar v.
Elders Furniture, Inc., et al,* No. 88 CIV
7906, 1994 WL 445638, at \*5 (S.D.N.Y.
Aug. 17, 1994). This Court will therefore
not strike Plaintiff's opposition papers;
however, it cautions Plaintiff that a party's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

failure to comply with Court rules can result in a range of penalties, from striking the entire brief to imposing sanctions. *See Id., McConnell v. Costigan*, No. 00 CIV 4598, 2002 WL 313528, at *14-15 (S.D.N.Y. Feb. 28, 2002).

In approximately June 1996, Plaintiff began his employment as a "Lead Consultant" in the Human Resources Department of Citibank's New York Consumer Bank ("NYCB").[FN2] In this position, Plaintiff reported directly to William Fisse, then Director of Human Resources for NYCB. Plaintiff alleges that in September 1996, he began having health problems. (Compl.¶ 32.) Shortly thereafter, Plaintiff contends, he discussed his health problems with Fisse. (Compl.¶ 33.) Plaintiff alleges that Fisse reacted in an unsupportive manner, distancing himself from Plaintiff and "start[ing] a campaign of both questioning [Plaintiff] about his personal affairs, his marriage and his health." (Pl.'s Opp'n to Defs.' Summ. J. Mot. ("Pl.'s Opp'n") at 8; Compl. ¶ ¶ 35-36.)

> FN2. In any motion for summary judgment, the moving party is required, pursuant to Local Rule 56.1(a), to submit a Statement of Material Facts that it contends are in dispute. The non-moving party then must, pursuant to Local Rule 56.1(b), set forth the material facts that it believes are in dispute. In this case, each of the parties has submitted a Statement of Material Facts pursuant to Local Rule 56.1. However, Plaintiff's Rule 56.1(b) Statement of Material Facts failed to controvert Defendants' Rule 56.1(a) Statement in many respects. Some of the facts set forth by Plaintiff contradict Defendants' Rule 56.1 Statement; others are in accord with Defendants' Statement. Plaintiff's Rule 56.1(a) Statement thus fails to specify which facts create a genuine issue of material fact. Although it is not required to do so, this Court will attempt to wade through Plaintiff's Rule 56.1(b) Statement in an effort to do what Plaintiff should have done: determine which facts

set forth by Defendants in their Rule 56.1(a) statement are controverted by Plaintiff. *See Bagdasarian v. O'Neill*, 00 CIV 0258, 2002 WL 1628722, at *2 (W.D.N.Y. July 17, 2002). The Court will not, however, consider facts set forth by Plaintiff in his Rule 56.1(b) Statement that do not controvert specific facts set forth by Defendants in their Rule 56.1(a) Statement. To the extent the parties describe facts which are consistent, the Court does not cite to any specific document. To the extent there is a disagreement as to any particular fact, the Court cites to the relevant document asserting the specific fact.

In April 1997, Plaintiff was transferred to the Long Island Region of NYCB, where he worked in the position of Generalist.[FN3] In August 1997, Fisse was formally transferred out of NYCB and did not thereafter supervise Kendall. Kerry Piercy served as Fisse's interim replacement until February 1998, when Laurie Ledford was appointed as Director of Human Resources for NYCB. In approximately September 1998, NYCB's Long Island and Queens business regions were consolidated and one Generalist position (Plaintiff's) was eliminated. In November 1998, Plaintiff received a notice of job discontinuance and was terminated.

> FN3. Plaintiff claims that this transfer constituted a demotion. (Compl.¶ 53.)

Plaintiff remained in his position during a "notice period" through February 5, 1999. After that date, he was placed on salary continuation and received his full salary and medical insurance coverage for six months (through August 6, 1999). Plaintiff never applied for disability benefits, even though he was eligible to do so through February 5, 1999.

**\*2** On August 18, 1999, Plaintiff applied for Social Security Disability Insurance ("SSDI"), stating in his application that he "became unable to work because of [his] disabling condition on November 15, 1998." (Decl. of Joseph Baumgarten (" Baumgarten Decl.") Ex. 15.) Plaintiff also stated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

that he "worked from 1984 through November, 1998 when [he] was laid-off rather than be placed on disability leave." (Id.) After evaluating his disability claim, the Social Security Administration (SSA) determined that Plaintiff had become disabled under SSA rules on November 15, 1998 and was eligible for SSDI benefits beginning May 1999. (Baumgarten Decl. Ex. 16.) SSA thereafter began to pay Plaintiff disability benefits.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). It is well-established that "summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines*, 239 F.3d 456, 466 (2d Cir.), *cert. denied*, 534 U.S. 993 (2001); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

The party seeking summary judgment has the burden of showing that no genuine factual dispute exists. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995). Once the movant has made a showing that there are no genuine issues of material fact to be tried, the burden shifts to the nonmoving party to raise triable issues of fact. *See Anderson*, 477 U.S. at 250. Mere conclusory allegations will not suffice. Instead, the nonmoving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 249.

A genuine issue for trial exists if, based on the

record as a whole, a reasonable jury could find in favor of the nonmoving party. *Id.* at 249. In conducting its analysis, the court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 254-255; *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir.1995). However, the court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative. *See Parker v. Chrysler Corp.*, 929 F.Supp. 162, 165 (S.D.N.Y.1996).

### II. *Plaintiff's ADA Claims*

**\*3** A Plaintiff seeking to bring an action under the ADA in New York State must file a charge with the Equal Employment Opportunity Commission (" EEOC") within 300 days of the alleged discriminatory act. 42 U.S.C. § 12117(a), incorporating 42 U.S.C. § 2000e-5(e)(1) (2004). *See also Butts v. City of N.Y. Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993). The statute of limitations begins to run when the employee receives notice of an allegedly discriminatory decision-not when the employee is actually impacted by it. *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980); *Miller v. ITT Corp.*, 755 F.2d 20, 24 (2d Cir.1985).

In the present case, it is undisputed that Plaintiff received a job discontinuance notice sometime in November 1998, and that Plaintiff believed that he would not be offered another job at Citibank. (Baumgarten Decl., Ex. 4 at 47-48, 71-72, 709-10.) Plaintiff's EEOC charge was not filed until November 5, 1999, well beyond the 300 day statute of limitations. (*See* Baumgarten Decl., Ex. 2.) Therefore, Plaintiff's ADA claims are time-barred and must be dismissed in their entirety.

### III. *Plaintiff's State and City Claims*

#### A. Jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

When Plaintiff commenced this action on August 25, 2000, he was a domiciliary of California. (*See* Baumgarten Decl. Ex. 3, ¶ 1.) Thus, this Court continues to have jurisdiction over Plaintiff's NYSHRL and NYCHRL claims by virtue of diversity of citizenship. 28 U .S.C. § 1332.

### B. Timeliness

A cause of action brought under NYSHRL and NYCHRL is subject to a three year statute of limitations. See N.Y. CPLR § 214(2) (2004); N.Y.C. Admin. Code § 8-502(d) (2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998). Because the instant action was filed on August 25, 2000, any incidents of discrimination alleged to have occurred prior to August 25, 1997 would ordinarily be time-barred, unless Plaintiff was subjected to a 'continuing violation' of such a character as to extend the limitations period.

"The continuing-violation exception 'extends the limitations period for all claims of discriminatory acts committed *under an ongoing policy of discrimination* even if those acts, standing alone, would have been barred by the statute of limitations. " ' *Quinn,* 159 F.3d at 765 (emphasis in original) (citations omitted). However, multiple and even similar discriminatory acts that are not the result of a discriminatory policy do not amount to a continuing violation. *Id.* A continuing violation may be found to exist, however, where a plaintiff can prove that the employer has permitted 1) related and 2) repeated instances of discrimination to continue unremedied so as to amount to a discriminatory policy or practice, and 3) the circumstances are such that the plaintiff was not obligated to have sued earlier. *Berry v. Board of Supervisors of La. State Univ.,* 715 F.2d 971, 981 (5th Cir.1983); *Quinn,* 159 F.3d at 765; *Johnson v. Nyack Hosp.,* 891 F.Supp. 155, 165 (S.D.N.Y.1995); *Dodson v. N.Y. Times Co.,* No. 97 CIV 3838, 1998 WL 702277, at *3-4 (S.D.N.Y. Oct. 7, 1998); *McKenney v. Off-Track Betting Corp.,* 903 F.Supp. 619, 622 (S.D.N.Y.1995); *Riedenger v. D'Amicantino,* 974 F.Supp. 322, 326 (S.D.N.Y.1997).

*4 Here, Plaintiff's complaint points to similar acts of discrimination occurring with sufficient frequency to satisfy the first two prongs of the *Berry* test.[FN4] For example, Plaintiff alleges that from September 1996, when he informed Fisse of his health problems, to November 1998, the date of his termination, Plaintiff's supervisors at NYCB continually made inappropriate comments and asked unduly probing questions with respect to his disability; distanced themselves personally and professionally from Plaintiff; spoke inappropriately about Plaintiff's health condition with his clients; " chastised" Plaintiff for "acting strange and for discussing his health" with co-workers; demoted Plaintiff in retaliation for a complaint Plaintiff made about mistreatment; and eventually terminated Plaintiff on the basis of his disability. (Compl.¶¶ 33-36, 41-47, 50, 53-58, 61-62, 65, 67-70, 75.)

> FN4. The Court notes that even if the " bulk of Kendall's complaints" relate to Fisse's conduct toward him, such conduct, if discriminatory, will fall within the continuing violation doctrine if Plaintiff's subsequent supervisors engaged in behavior that contributed to an ongoing policy of discrimination or that could amount to a discriminatory policy or practice. (*See* Defs.' Mem. of Law in Supp. of Defs.' Mot. for Sum. Judg. ("Defs.' Mot. " at 9.)

As to the final prong of the *Berry* test, however, this Court cannot find, as a matter of law, that the circumstances surrounding this alleged discrimination were such that a "reasonable person in the plaintiff's position would not have sued earlier." *Johnson,* 891 F.Supp. at 165. Here, Plaintiff alleges that in April 1997, "Fisse demoted Plaintiff from Lead Human Resources Consultant to Generalist in only the Long Island region of the bank." (Pl.'s Rule 56.1(b) Statement ¶ 8.) Such an overt act, in combination with the alleged discriminatory statements and conduct described above, would have been sufficient to warrant the commencement of litigation. *See Johnson,* 891 F.Supp. at 166. No reason has been advanced as to why Plaintiff's claims of discrimination were not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

asserted until August 2000. Accordingly, this Court holds that the continuing violation doctrine does not apply, and that Plaintiff's complaints relating to Fisse's conduct toward him before August 1997 are time-barred. Nevertheless, Plaintiff's claim that he was unlawfully terminated is timely under NYSHRL and NYCHRL.

### C. Plaintiff's Discriminatory Termination Claim

To make out a prima facie case of unlawful termination under NYSHRL and NYCHRL, Plaintiff must establish: (1) that Defendants are subject to NYSHRL and NYCHRL; (2) that he suffers from a disability within the meaning of NYSHRL and NYCHRL; (3) that he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) that Defendants took adverse employment action against him because of his disability. *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001); *Woolley v. Broadview Networks, Inc.,* No. 01 CIV 2526, 2003 WL 554754, at *8 (S.D.N.Y. Feb. 26, 2003); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 147 (2d Cir.1998); *Torrico v. Int'l Bus. Mach. Corp.,* No. 01 CIV 841, 2004 WL 439493, at *12 (S.D.N.Y. March 9, 2004). Defendants do not dispute that they are subject to the NYSHRL and NYCHRL,[FN5] nor, for purposes of this motion, that Plaintiff suffers from a disability within the meaning of NYSHRL and NYCHRL. (Defs.' Mot. at 10-11.)[FN6] Moreover, it is beyond dispute that Defendants' discharge of Plaintiff constitutes an adverse employment action.[FN7] The principal issues for the Court to decide are whether Plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation, and, if so, whether Defendants discharged Plaintiff because of his disability rather than on account of some nondiscriminatory reason.

FN5. Although Defendants do not dispute that they are subject to NYSHRL or NYCHRL, they assert that there is no basis for asserting a claim under NYSHRL or NYCHRL against Fisse, Phillips, or

Sutcliffe because no evidence exists that these individuals "engaged in any form of actionable discriminatory practice." (Defs.' Mot. at 19.) The Court agrees with Defendants with respect to Fisse, since Plaintiff's claims against Fisse are time-barred. With respect to Sutcliffe and Phillips, Plaintiff's only mention of either defendant in his Opposition Brief is contained in paragraph 78, where he states: "Kendall's allegations in his complaint ... properly included acts of ... Phillips ... and Sutcliff [sic] by identifying acts or omissions on the part of each defendant ..." (Pl.'s Opp'n ¶ 78.) In fact, Plaintiff makes no specific allegations of discriminatory conduct on the part of Sutcliffe or Phillips in his Complaint.

Plaintiff's Complaint contains only the following references to Sutcliffe: "From on or about September 1996 through August 14, 1999 Sutcliff [sic] was Executive Vice President for Citibank Human Resources in New York" (Compl.¶ 10); "Fisse ... disparage[d] [Plaintiff] to Gilbert Sutcliff [sic] and Laurie Ledford, who at that time controlled the careers of all HR professionals at Citibank" (Compl.¶ 68); and "[a]s a result of the actions of ... Gilbert Sutcliff [sic] ... in abruptly discontinuing Kendall's employment, Kendall could not apply for short or long term disability benefits through company and he is now without the benefits that he desperately requires to live." (Compl.¶ 82.)

Plaintiff's Complaint makes even fewer references to Phillips: "From on or about September 1994 through August 14, 1999 Phillips was Chief Personnel officer for Citibank in New York" (Compl.¶ 11), and "Plaintiff's performance was so exemplary that ... he was asked by the company to attend an event for high potential/performers' to meet Senior Vice President of Human Resources, Larry Phillips." (Compl.¶ 31.) Although Plaintiff did not allege specific discriminatory conduct with respect to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Sutcliffe and Phillips in his Complaint and Opposition Brief, the Court declines to dismiss the claims against Sutcliffe and Phillips. If Sutcliffe and Phillips were Plaintiff's supervisors at Citibank, they could be found to be individually liable under NYSHRL and NYCHRL, even though the Complaint failed to specify their role in allegedly discriminatory termination. *See Tomka v. Seiler,* 66 F.3d 1295, 1317 (2d Cir.1995); *Bonner v. Guccione,* No. 94 CIV 7735, 1997 WL 362311, at *14-15 (S.D.N.Y. July 1, 1997) ; *Sacay v. Research Found. of City Univ. of N.Y.,* 44 F.Supp.2d 496, 503-04 (E.D.N.Y.1999).

FN6. Plaintiff's third cause of action asserts that even if Plaintiff was not actually disabled, he was discriminated against because he was regarded as having a disability. (*See* Compl. ¶¶ 108-115.) First, the Court finds that Plaintiff is, as he asserts, "an individual with a disability under Title I of the ADA." (Compl.¶ 102.) Second, even if Plaintiff could show that Defendants regarded him as disabled, *see Giordano,* 274 F.3d at 748, Plaintiff fails to make out a prima facie case of discriminatory termination, as discussed *infra.*

FN7. Plaintiff claims that he also suffered an adverse employment action when he was denied the opportunity to apply for and receive Citibank disability leave and benefits. (Compl.¶¶ 64, 82, 104.) The Court discusses Plaintiff's requested disability leave *infra.* With respect to the issue of benefits, any claim that Plaintiff was improperly denied benefits under Citibank's disability policy should have been asserted under ERISA. In any event, Plaintiff fails to put forward any evidence that he attempted to apply for benefits, much less that he was denied the right to seek benefits because of a disability. Defendants persuasively argue that Plaintiff remained eligible for disability

benefits after he received his job discontinuance notice, but simply failed to apply. (Defs.' Mot. at 15.) *The Big Book,* Citibank's guide to employee benefits, clearly states that the only way an employee can receive benefits is by "[c]all[ing] the Citibank Managed Disability Unit" associated with Citibank's disability administrator. (Id.; Pl.'s Ex. I, 1997 *Big Book* at 91, 1998 *Big Book* at 95.) The disability administrator-not the employee's manager-investigates the claim and makes a determination as to whether the employee is entitled to disability benefits. (Id.) In this case, Plaintiff has not offered any evidence to show that he attempted to apply for benefits by following the *Big Book* procedure, or that his supervisors ever thwarted his efforts to do so.

Defendants also assert that "[t]here is no question that Kendall knew or should have known about his continued eligibility. He had a copy of both *The Big Book* and the *Management Guide to U.S. Human Resources Policy* and, as a Human Resources Generalist, he frequently referred to them in counseling other employees." (Defs.' Mot. at 15.) Indeed, Plaintiff readily admitted as much in deposition testimony. (*See* Baumgarten Decl., Ex. 4 at 369-70.) Plaintiff responds that three versions of the *Big Book* manual were published by Citibank between 1996 and 1999, and therefore "[w]hat books, if any, were provided to Kendall is an issue for the jury." (Pl.'s Opp'n at 18.) This Court disagrees with Plaintiff. Plaintiff includes in his Exhibit I two versions of *The Big Book,* one from 1997 and one from 1998. (Pl.'s Ex. I, 1997 *Big Book* at 91, 1998 *Big Book* at 95.) The text of the "Claiming Benefits" section is nearly identical in the two versions. The primary difference is that Citibank's disability administrator in 1997 was Aetna; in 1998 it was CNA. Both versions clearly state that the disability administrator is responsible for determining a claimant's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 7

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

eligibility for benefits and the duration of the individual's disability. (Id.) The issue of which disability administrator would have made a decision with respect to Plaintiff's application for benefits is irrelevant.

For the reasons stated above, the Court concludes that, with respect to Plaintiff's claim that he was discriminatorily denied the opportunity to apply for and receive Citibank disability benefits, Plaintiff has failed to "set forth specific facts showing there is a genuine issue for trial." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (citations omitted).

1. Plaintiff's Qualification to Perform the Essential Functions of His Job With or Without Reasonable Accommodation

**\*5** Defendants argue that Plaintiff "has repeatedly stated in sworn testimony that, given his alleged condition, he was incapable of performing as a human resources professional at the time of his job discontinuance." (Defs.' Mot. at 11.) Defendants also contend that Plaintiff "readily admitted that there was no reasonable accommodation that would allow him to perform his job." (Id. at 12.) To support these propositions, Defendants cite to several statements made by Plaintiff in depositions in 2001, *e.g.:*

Q: *Do you believe you can't work?*
A: Yeah.


Q: At any time *since you received the job discontinuance* from Citibank, have you felt well enough to be able to work?
A: No.


Q: ... [A]t any time *since you left Citibank,* ... have you ever felt that you might be well enough, mentally and physically, to work if you were provided with an accommodation, that is being able to work at home or any other kind of accommodation? ...

A: No.
Q: *Sitting here today,* can you think of any kind of accommodation, whether it is working at home or any special assistance, with which you could feel that you could work?
A: No, because if you can't remember, I mean, how do you perform?

(Baumgarten Decl., Ex. 4 at 146, 442, 448-49) (emphasis added.)

Defendants' reliance on these statements is misplaced. Plaintiff made all of these statements during two depositions in June 2001, and the statements focus only on the time period following his job termination. Plaintiff's deposition testimony does not indicate that he perceived himself as suffering from physical and/or mental disabilities that made him incapable, even with reasonable accommodation, of performing as a human resources professional at the time of (or any time prior to) his job discontinuance. In fact, his deposition testimony indicates otherwise: "... had I gotten an accommodation and/or been able to go out on disability, what kind of condition would I be in today? You never know. I could have gotten different medical treatment." (Id. at 720.) Such a statement indicates that a triable issue remains as to whether or not Plaintiff was qualified to perform his job at NYCB with reasonable accommodation.

Having been classified as disabled by the SSA, however, Plaintiff has the burden, even at the summary judgment stage, of explaining the inconsistency between this classification and the prima facie requirement that he be able to perform the essential functions of his job, at least with a reasonable accommodation. *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 798, 807 (1999); *see also Disanto v. McGraw Hill,* 220 F.3d 61, 65 (2d Cir.2000); *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 8 (2d Cir.1999); *Parker v. Columbia Pictures Indus.,* 204 F.3d 326 (2d Cir.2000); *Nodelman v. Gruner & Jahr USA Publ'g,* No. 98 CIV 1231, 2000 WL 502858, at \*7-9 (S.D.N.Y. April 26, 2000); *Felix v. N.Y. City Transit Auth.,* 154 F.Supp.2d 640, 651-52 (S.D.N.Y.2001). Defendants persuasively argue that Kendall "does not even attempt to offer an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 8

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

explanation. Indeed, he readily conceded that he is and has been totally and completely disabled and unable to work" since November 15, 1998. (Defs.' Mot. at 12.)

**\*6** Plaintiff asserted in his SSDI application on August 18, 1999 that he was "unable to work because of [his] disabling condition on November 15, 1998," and he affirmed in deposition testimony that SSA classified him as permanently disabled in 1999, dating to November 15, 1998. (Baumgarten Decl. Ex. 15; Ex. 4 at 143-44.) Yet Plaintiff now asserts, without citing to any evidentiary support, that "the facts show that Kendall was qualified for the position for which he was hired and later from which he was discharged." FN8 (Pl.'s Opp'n at 34.)

> FN8. In a letter to Laurie Ledford, Plaintiff's attorney asserted that Plaintiff's physician advised Plaintiff to take a temporary disability leave so that his health condition could be diagnosed. (Pl.'s Ex. C, Letter from Ruth Pollack to Laurie Ledford of 3/5/99.) Plaintiff then indicated in his Complaint, Opposition Brief, and SSDI application that he requested and was denied by NYCB temporary disability leave relating to his disabling health condition. (Compl. ¶¶ 63, 64; Pl.'s Opp'n at 36; Baumgarten Decl. Ex. 15.) Within his voluminous submissions to the Court, Plaintiff cites to no case law and offers no evidence-not even an affidavit from his doctor or himself-to support the proposition that disability leave could have constituted a reasonable accommodation.

Plaintiff has failed to explain this inconsistency between the statements in his SSDI application and his claim that he was qualified to perform the essential functions of his job with or without reasonable accommodation. Absent such an explanation, there is no basis for a reasonable juror to conclude that Plaintiff could perform the essential functions of his job at NYCB. Defendants are therefore entitled to summary judgment dismissing Plaintiff's discriminatory termination claim.

## IV. *Plaintiff's Breach of Contract Claim*

Count One of Plaintiff's Complaint alleges that on May 9, 1996, Plaintiff and Citigroup entered into "an agreement" that included an implied covenant of good faith and fair dealing, and that Citigroup breached the agreement and covenant by discontinuing Plaintiff's job. (Compl.¶¶ 95-100.) Under New York law, absent a contrary contractual provision, employment is "presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason." *Murphy v. American Home Prod. Corp.,* 58 N.Y.2d 293, 300 (1983). No implied obligation of good faith and fair dealing exists with respect to an at-will employment contract. *Id.* at 304-05. Therefore, under New York law, "absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired." *Id.* at 305.

The parties dispute whether such an agreement exists. At Plaintiff's deposition, Plaintiff's counsel clarified that the May 9, 1996 "agreement" referred to in the Complaint is actually the combination of a job offer letter and a verbal agreement with respect to a "standard relocation package." (Baumgarten Decl. Ex. 4 at 193-94.) Plaintiff's counsel specifically stated that "[i]t is not like he got some contract that laid everything out.... This [May 9, 1996 letter] appears to encapsulate in sum and substance the agreement between Mr. Kendall and Citibank, but this is not a contract. That is all I have. That is all I know of other than what Mr. Kendall testified about." (Id.) At that same deposition, Defendants' counsel asked Plaintiff whether he received any booklets or packages, in addition to the May 9, 1996 letter, before entering into employment with Citibank. (Id. at 191-93.) Plaintiff responded, "[n]o. I mean I can't remember. The only thing I can tell you is I knew it came with whatever the relocation package said I was going to get. That is the only other type of compensation I can remember was included." (Id. at 193.) In his Opposition Brief, Plaintiff argues, without citing to evidentiary support, that he and Citibank had entered into an "explicit contract." (Pl.'s Opp'n ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

40.)

*7 As Defendants persuasively argue, the " purported May 9, 1996 'agreement' was simply an offer letter that did not purport to employ Kendall for a definite duration." (Defs.' Mot. at 20.) Additional support for Defendants' argument comes from the *Citibank Management Guide to U.S. Human Resources Policy,* which expressly preserves the at-will employment relationship with respect to Citibank employees: "[t]his guide should not be construed as a guarantee of continued employment. Employment with the corporation is on an 'at-will' basis...." (Baumgarten Decl. Ex. 5 at i.) FN9

> FN9. As discussed *supra, see* n. 7, Plaintiff had a copy of the *Management Guide to U.S. Human Resources Policy* and, as a Human Resources Generalist, he frequently referred to it in counseling other employees. (Defs.' Mot. at 15.)

The Court agrees with Defendants. Because Plaintiff was an at-will employee, Citibank was entitled to terminate him at any time for a legitimate, nondiscriminatory reason. Accordingly, Plaintiff's breach of contract claim must be dismissed.

### V. *Plaintiff's ERISA Claim*

Count Four of Plaintiff's Complaint alleges that " [b]y improperly terminating Kendall, Citigroup refused to pay Kendall proper severance, caused him to forfeit his benefits, this action of defendants constituting a violation of ERISA [sic]." (Compl.¶ 118.) Plaintiff claims that because Defendants violated ERISA, Plaintiff is entitled to "severance, reinstatement in the retirement plan and statutory damages, including attorney's fees, and costs." (Id.¶ 119.) Although Plaintiff's Complaint is vague, Plaintiff presumably sought to raise a claim under § 510 of ERISA, 29 U.S.C. § 1140, which prohibits the discharge of a benefit plan participant "for the purpose of interfering with the attainment of any right to which such participant may be entitled

under the plan." "To prevail in a claim under § 510 of ERISA, a plaintiff must show that his employer had the specific intent to engage in conduct prohibited by that section; if loss of benefits was merely a consequence of, as opposed to a motivating factor behind, the termination, then plaintiff's claim will fail." *Brink v. Union Carbide Corp.,* 41 F.Supp.2d 406, 416-417 (S.D.N.Y.1999), *aff'd,* 210 F.3d 354 (2d Cir.2000).

Plaintiff acknowledged during his deposition that he had received proper severance payments. (Baumgarten Decl., Ex. 4 at 444-446.) Moreover, there is no evidence whatsoever that there was any intent on Defendants' part "1) to deprive [Plaintiff] of benefits, or even 2) that any decision-maker knew where [Plaintiff] stood vis-a-vis retirement benefits, then, or in the future." FN10 *Brink,* 41 F.Supp.2d at 417. Plaintiff must prove more than the simple fact that his termination precluded him from vesting into a pension plan; he must also show that Citibank had an unlawful purpose in firing him. *Id., Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir.1988). Because there is no genuine issue of material fact with respect to Plaintiff's ERISA claim, Defendants' motion for summary judgment is granted.

> FN10. Plaintiff's assertion in his Opposition Brief that he never received an exit interview or severance package is of no avail. (See Pl.'s Opp'n ¶ 72.) Even if this assertion is in fact true (and Plaintiff's deposition testimony indicates it is not), this does not demonstrate that Citibank had the "specific intent" to engage in conduct prohibited by § 510 of ERISA. *See Brink,* 41 F.Supp.2d at 406.

### VI. *Attorney's Fees, Costs, and Sanctions*

Defendants claim that they are entitled to attorney's fees and costs pursuant to 42 U.S.C. § 12205 and *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 422 (1978), as Plaintiff's action was "frivolous, unreasonable *and* groundless." (emphasis in original) (Defs.' Mot. at 23.) Additionally, they claim that attorney's fees are an appropriate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 10

Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

sanction, since Plaintiff and his attorney have acted in bad faith, engaged in deceitful conduct, and demonstrated disdain for the judicial process. (Defs.' Mot. at 23-25 .) Plaintiff, in turn, asserts that this Court should sanction Defendants and/or their counsel for dishonest conduct. (Letter from Ruth Pollack to Judge Johnson of 4/9/03 at 3).

**\*8** This Court finds that neither attorney's fees, costs, nor sanctions are appropriate in this case. Plaintiff's action was not sufficiently "frivolous, unreasonable, or groundless" to merit the award of attorney's fees and costs to Defendants under 42 U.S.C. § 12205 or *Christianburg.* Additionally, neither party has sufficiently demonstrated that the other "has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons' " that would warrant the imposition of a sanction. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46 (1991). The specific acts misconduct alleged by both parties did not result in a substantially increased expenditure of time and services, nor was it of much relevance to the legal and factual issues before this Court. *Cf. Rybner v. Cannon Design, Inc.,* 1996 WL 470668, at \*6 (S.D.N.Y. Aug. 20, 1996); *Tedesco v. Mishkin,* 629 F.Supp. 1474, 1486 (S.D.N.Y.1986). Accordingly, Defendants' application for attorney's fees and costs, and Defendants' and Plaintiff's applications for sanctions, are DENIED.


CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is GRANTED and their motion for attorney's fees, costs, and sanctions is DENIED. Plaintiff's motion for sanctions is also DENIED.

SO ORDERED.

E.D.N.Y.,2004.
Kendall v. Fisse
Not Reported in F.Supp.2d, 2004 WL 1196811 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.