Westlaw.

Slip Copy                                                                                  Page 1

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

**H**
Moore v. Consolidated Edison Co. Of NY, Inc.
S.D.N.Y.,2007.

United States District Court,S.D. New York.
Matricia MOORE, Plaintiff,
v.
CONSOLIDATED EDISON COMPANY OF NEW
YORK, INC., and John Morrill, Defendants.
**No. 00 Civ. 7384(PAC).**

March 20, 2007.

*OPINION AND ORDER*
Honorable PAUL A. CROTTY, United States
District Judge.
*1 Plaintiff Matricia Moore ("Moore") brings this
action for employment discrimination, libel, and
defamation against Defendants Consolidated Edison
Company ("Con Ed"), her former employer, and
John Morrill ("Morrill"), her former supervisor.
Moore brings her discrimination claims against both
Defendants under 42 U.S.C. § 1981, New York
State Law Executive Law § 296 and New York City
Administrative Code § 8-502, and additional claims
against Con Ed under Title VII of the 1964 and
1991 Civil Rights Acts, 42 U.S.C. § 2000e, *et sec.* ("
Title VII"). Moore alleges that she was subjected to
differential treatment on the basis of race and sex, a
hostile workplace environment, and retaliation for
complaining about these conditions. Moore also
alleges violations of the sick leave provisions of the
Family and Medical Leave Act, 29 U.S.C. § 2601 *et
sec.* ("FMLA"), including retaliation for taking such
leave. Defendants now move for summary judgment
on all claims.[FN1] The motion is granted in part and
denied in part.

> FN1. At oral argument, Moore's counsel
> acknowledged that Plaintiff has abandoned
> her libel, defamation, and FMLA claims.
> Accordingly, these claims are dismissed.

**BACKGROUND**

**I. Factual History**[FN2]

> FN2. These facts are derived from the
> Amended Complaint, and the parties'
> Local Rule 56.1 Statements and the
> supporting evidence. Sources will be cited
> only when quoted. The facts are
> undisputed unless otherwise indicated.

Moore, an African-American woman, was
employed by Con Ed between 1989 and 2004.
Moore's claims arise from events occurring during
her tenure as a Real Estate Representative in the
Con Ed Real Estate department, from on or about
October 1996 to January 30, 2004.[FN3]

> FN3. Plaintiff's job responsibilities are not
> clearly explained by the submissions of
> either party, perhaps due to alterations
> over time. Her responsibilities apparently
> included tracking tenants' insurance
> certificates and taxes, and assisting in
> negotiating leases and inspecting tenancies.

*Sexual and Racial Harassment by Co-Worker*

Moore alleges that Louis Carnevale ("Carnevale"),
a Senior Real Estate Representative, made racially
and sexually offensive statements and engaged in
other harassing conduct from on or about November
1997 up to on or about November 2000. These
statements and conduct allegedly included regularly
asking Moore if she wanted sex, referring to his
penis size and sexual prowess, staring at her body
while she worked, making unwelcome efforts to
touch Moore, and generally making sexually
suggestive comments to her. He also regularly
squeezed between Moore and Jeanette Grant ("Grant
"), an African-American female clerk in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

department, and said, "Let's do an oreo cookie," or some variation of that remark. Fields Dec. Exhibit K, 134-35. Moore recalled one particular incident in which Carnevale stroked Moore's arms and, after she pushed him away, said to her and Grant that " back in the days the two of you would be having my babies." *Id.* at 130-31. Carnevale allegedly harassed Moore in this fashion "continually" and attempted to touch her "weekly," amounting to "countless" incidents during the entire three year period. *Id.* at 132-35, 746-48.[FN4]

> FN4. Defendants' argue that Moore conceded that the harassment occurred less often, and the oreo cookie comment only once, but the deposition transcript on which Defendants rely does not support their position. The transcript clearly shows that Moore conceded only that the "oreo cookie" remarks occurred less often than weekly and still asserted they occurred countless times in total. More importantly, she maintained at all times that Carnevale's harassment more generally occurred constantly during the relevant period.

Moore complained about Carnevale's conduct to her supervisor Domenick Lorenzon ("Lorenzon"), and two Directors of the Real Estate department: Robert Mele ("Mele"), Director until December 1, 1997, and his successor Robert Flock ("Flock"). It is not clear precisely how detailed those complaints were in describing Carnevale's conduct, though Moore admitted that she never mentioned that Carnevale touched her.[FN5] In any event, both Flock and Lorenzon allegedly witnessed "oreo cookie" incidents personally, Lorenzon apparently more than once. Moore did not contact Con Ed's Equal Employment Opportunity Affairs office ("EEOA") or any EEOA official regarding Carnevale, and no disciplinary or remedial action was taken by Con Ed at any time.

> FN5. In asserting that Moore has admitted that she complained of nothing more than generic "vulgarity," Defendants' mischaracterize the deposition record.

Aside from using the terms "vulgarity" and "vulgar" as shorthand to refer to Carnevale's statements during her depositions, Moore mentioned that in making one complaint she "probably" used the term "vulgar" to refer to Carnevale's remarks, *as well as* "other terms." Fields Dec. Exhibit K, 140. This is the only instance in her deposition testimony in which Moore discussed how she characterized Carnevale's conduct in her complaints to her supervisors. Moreover, in her affidavit in support of her opposition to Defendants' motion, Moore states that she told Lorenzon and Flock that Carnevale's conduct was "racially and sexually offensive in nature." Mitchell Cert. Exhibit M, ¶ 1.

### *Exclusionary Treatment by Morrill*

**\*2** Moore alleges that between 2000 and 2004 Morrill excluded her from work related meetings and denied her necessary feedback and guidance on her assigned tasks. She further alleges that the white males in the department were included in meetings and other related professional development opportunities that were denied to her. Defendants dispute Moore's general allegations, and also present evidence that any meetings or instructional opportunities denied to Moore were unrelated to her actual job responsibilities. It is undisputed that the white males in the Real Estate department were higher-ranking Senior Real Estate Representatives, and had different and greater responsibilities than Moore.

### *Internal Complaints of Discrimination*

In addition to her complaints regarding Carnevale, Moore was persistent in filing repeated internal complaints concerning discrimination in the Real Estate department. On September 22, 2000, Moore wrote a letter to Eugene McGrath ("McGrath"), Con Ed's Chairman, alleging that she was facing a hostile work environment, and adding an allegation that Flock was not promptly reimbursing her for college courses taken while she was absent for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

health reasons.[FN6] Moore refused to cooperate with the ensuing EEOA investigation. On April 6, 2001, Moore sent another email to McGrath complaining that a February 21, 2001 assignment to clean and furnish a corporate apartment with Senior Real Estate Representative Edmund Corini ("Corini"), a white male, had constituted sex discrimination. Moore alleges that she was ordered to perform this assignment, as well as particular tasks such as ironing that reflected gender stereotypes. Defendants allege that Moore volunteered for the task, that Corini assisted her in all aspects of the assignment, and that she did not complain about the assignment at the time. The ensuing EEOA investigation, with which Moore again refused to cooperate, found no discrimination.

> FN6. A week later, she filed the original complaint in this action against Con Ed, as discussed further in Section II, *infra*.

Starting in or about August 2001 and continuing through October 11, 2001, Moore communicated on six separate occasions-twice a month for three months-with various Con Ed officers, including Richard Cowie, Director of Human Resources, Lilliana Gonzalez ("Gonzalez"), Director of EEOA, and McGrath, for the purpose of complaining that Morrill was discriminating and retaliating against her. In the final communication, an email sent on October 11, she accused Morrill of lying, "terroristic tactics" and discrimination against female employees under his supervision. Fields Dec. Exhibit ZZ. EEOA subsequently investigated and determined that Moore's complaints were unfounded.

### *Performance Reviews and Salary Treatment*

In March 1998, Moore received an annual performance review noting a variety of areas in which she needed to improve while stating she had potential to be a productive member of the department. She subsequently received a salary increase she believed was "minimal." Fields Dec. Exhibit K, 728. On January 8, 1999, Moore received a poor annual performance review, and

was subsequently denied a salary increase. Flock also warned her that failure to improve could result in termination. In March of 2000, Moore received a much-improved performance review and received another "minimal" salary increase. *Id.*

*3 On July 30 2001, Moore received a negative performance review, the first prepared by Morrill, and was denied a salary increase. On February 27, 2002, Moore discovered a draft of her annual performance review, prepared by Morrill, on an office printer. The draft summary of her performance stated that her performance was poor, that her behavior was argumentative and erratic, and that "the department will never be able to function as an effective team under these conditions." Mitchell Cert. Exhibit D. One of the three paragraphs in the performance summary read:
Matricia filed a harassment and discrimination claim with EEO in the fall of 2001. EEO investigated that claim and the claim was determined to be unfounded. The claim caused significant morale damage to this department.

*Id.* Morrill also wrote in the review's "Initiative" section that, "Her primary focus appears to be perpetuating her claims of harassment and discrimination as evidenced by the many emails she distributes to that effect." *Id.* This statement was accompanied by another reference to Moore's October 2001 EEOA complaint.

Moore complained to Rosemary Stewart, the Manager of Performance Management, and in response Stewart assisted Morrill in revising the performance review to omit reference to Moore's complaints. The new report continued to rank her performance as "below an acceptable level" and Moore was again denied a salary increase. On March 24, 2003, Moore's performance review was negative, summed up by the statement that "Although Matricia has made some improvement in her cooperation over the past year, overall her performance continues to be below an acceptable level for her position." Grodnitzky Dec. Exhibit F. She was once again denied a salary increase.

### *Termination*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

On October 24, 2003, Moore received an interim performance review and Performance Improvement Notice ("PIN") warning that she would be terminated if her performance did not improve. Following the delivery of the PIN, Morrill and Moore met weekly to review her progress in meeting the PIN requirements. Defendants allege Morrill worked regularly with Moore to help her meet and understand the PIN requirements. Moore alleges Morrill sabotaged her performance in a variety of ways, and that the PIN requirements were set by Morrill to ensure her failure. The deadline for completion of the specific improvements contained in the PIN was 30 days, but Morrill extended the deadline. On November 23, Moore complained to EEOA that she was being set up to fail her PIN. In January 2004, Moore asked Morrill to approve her participation in a mentoring program, and Morrill refused. Moore filed a complaint with EEOA on January 23, 2004 alleging that this refusal was retaliatory. Defendants assert that Human Resources guidelines reserved the program for high performers. On January 30, 2004, Con Ed Treasurer Robert Stelben, Morrill and two Human Resources officers met to discuss Moore's performance and agreed to terminate her.

## II. Relevant Procedural History

**\*4** On September 29, 2000, Moore filed the initial Complaint in this action against Con Ed, alleging violations of FMLA, § 1981, and New York State Executive Law § 296. On October 3, 2002, Moore was granted leave to file an amended complaint. On December 11, 2002, she filed a charge against Con Ed for race and sex discrimination and retaliation with the United States Equal Employment Opportunity Commission (EEOC), and was issued a right-to-sue letter on April 15, 2003. In the interim, on February 26, 2003, Moore filed a complaint against Morrill alleging violations of, *inter alia,* § 1981, New York State Executive Law § 296, and New York City Administrative Code § 8-502.

On May 27, 2003, Judge Mukasey granted Moore's unopposed application for leave to amend her complaint, and ordered the separate cases against Con Ed and Morrill consolidated for discovery

purposes. To facilitate mediation and settlement, the Court repeatedly extended Moore's deadline for filing an amended complaint, with the final order being that "[a]bsent a settlement plaintiff will serve an amended complaint by September 19, 2003." Mitchell Cert. Exhibit KK. The procedural history of Moore's multiple complaints and the various amendments and consolidations is less than clear, but subsequent procedural events are even murkier.

Moore's attorney, Stephen Mitchell ("Mitchell") asserts that he served Defendants with an amended complaint on September 19, 2003 and filed a stamped copy with the Clerk of the Court's office two days later. Moore has produced an amended complaint against Con Ed that includes Title VII and New York City claims and bears such a stamp with a September 21, 2003 date. Mitchell Cert. Exhibit NNN. He further argues that the amended complaint was discussed at a conference on September 26, 2003 and that the Defendants did not object to the amended complaint. Mitchell asserts that Judge Mukasey's practice in this case was to have amended complaints served in this manner, such that they would be officially filed, if Defendant did not object.

Defendants do not directly contest any of these assertions, but maintain that amended complaint was never officially filed. Filing the amended complaint required, Defendants argue, an order permitting the filing which Judge Mukasey never issued, and that therefore even if Mitchell did deposit a stamped copy with the court, it was never accepted for filing, and therefore never became operative. Defendants acknowledge receiving the amended complaint in September, and that they did not object, but state that they "followed up and found it was never filed with the court." Transcript of Oral Argument, October 25, 2006, at 43.

Judge Mukasey apparently issued another order on October 7, 2003, allowing Moore to file a consolidated amended complaint against Con Ed and Morrill. [FN7] On October 28, he ordered that the consolidated amended complaint be served by October 31, 2003. Apparently no complaint was filed at that time. On February 3, 2004, Judge Mukasey ordered that Moore provide Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

with her "proposed second amended complaint" and ordered Defendants to advise the Court as to whether they opposed plaintiff's application for leave to file it. Judge Mukasey granted another request by Plaintiff to amend the complaint on June 21, 2004, but only insofar as it was the consolidated amended complaint contemplated by the October 7, 2003 order.

> FN7. Such an order is referred to in Judge Mukasey's order of June 21, 2004, but was never docketed.

**\*5** In July 2004, the case was apparently reassigned to Judge Holwell, and then quickly reassigned on August 13, 2004 to Judge Castel. On March 21, 2005, Judge Castel reaffirmed Judge Mukasey's June 21, 2004 order, and the current consolidated and amended complaint was filed on March 26, 2005. The case was reassigned to this Court on August 1, 2005.

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment shall be granted " if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment should only be granted if "the nonmoving party ' has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof'." *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ). In ruling on a motion for summary judgment, the Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citation omitted). Summary judgment should not be granted where issues of fact are " genuine," and "a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### II. Retaliation

On a motion for summary judgment, employment discrimination claims brought under Title VII, 42 U.S.C. § 1981, and New York State and City statutes are analyzed under identical standards. *See, e.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 186 (1989) (*McDonnell Douglas* framework applies to both § 1981 and Title VII); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000) ("identical standards apply to employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York").

Retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). First, the plaintiff must make out a *prima facie* case of retaliation. *Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426, 443 (2d Cir.1999). If the plaintiff presents such a case, the burden shifts to the defendant to present evidence of "a legitimate, nonretaliatory reason for the complained of action." *Id.* If the defendant meets this burden, the plaintiff must then demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is a mere pretext for retaliation. *Id.*

### A. Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of retaliation, Plaintiff must show: " '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.' " *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995) (alteration in original)). The burden of proof at the *prima facie* stage is *de minimis. Weinstock,* 224 F.3d at 42.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 6

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

### Plaintiff's Protected Activities

**\*6** There is no question that Plaintiff has made out the first element of a *prima facie* case of retaliation. A " 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000). Moore has sufficiently alleged that she complained internally about Carnevale's harassment on a number of occasions between 1997 and 2000. She also indisputably complained about race and sex discrimination by Morrill, beginning with the corporate apartment furnishing assignment in 2001, escalating with the six complaints made between August and October 2001, and persistently thereafter, including filings with the EEOC and in this Court. Defendants may on occasion dispute the precise knowledge decision-makers possessed as to individual complaints, but there is no dispute that all relevant persons were aware of the complaints in general.

### Adverse Employment Actions

The Supreme Court recently promulgated a new standard for determining the existence of an adverse employment action in a retaliation claim. *Burlington Northern and Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2415 (2006); *see also Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 207 (2d Cir.2006) (recognizing new standard). *Burlington Northern* adopts a broader standard in retaliation claims than in other employment discrimination claims, requiring only that the employer's action "well might have ' dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington Northern,* 126 S.Ct. at 2415 (quoting *Rochon v. Gonzales,* 438 F .3d 1211, 1219 (D.C.Cir.2006) (internal quotation marks omitted).

There is no question that Moore's termination by Con Ed constitutes an adverse employment action. In addition, Moore's performance evaluations resulting in a denial of any salary increase in 1999, 2001, 2002 and 2003 constituted adverse employment actions even under the *pre-Burlington Northern* standard.[FN8] *See, e.g., Lawson v.*

*Federal Reserve Bank of New York,* 03 Civ. 1154, 2004 WL 1497567, at \*12 (S.D.N.Y. July 1, 2004); *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 544 (E.D.N.Y.2003); *Richetts v. Ashcroft,* 00 Civ. 1557, 2003 WL 1212618, at \*6 (S.D.N.Y. March 17, 2003); *Ogbo v. New York State Dept. of Finance,* 99 Civ. 9387, 2001 WL 986546, at \*5 (S.D.N.Y. August 28, 2001); *Cooper v. Morgenthau,* No. 99 Civ. 11946, 2001 WL 868003, at \*8 (S.D.N.Y. July 31, 2001). Indeed, Defendants explicitly conceded in briefing this motion that Moore's salary treatment after 2000 constituted adverse employment action, *Defendants' Memorandum of Law,* 14 ("only Plaintiff's wage treatment and termination satisfy the third prong").[FN9]

> FN8. These actions also constitute adverse employment actions for purposes of a differential treatment claim, where the *pre-Burlington Northern* standard continues to apply.

> FN9. Defendants reversed their position at oral argument and suggested that only the termination constituted an adverse employment action, but they presented no authority in support of that position. *Burlington Northern* renders this argument untenable.

Moore's allegedly "minimal" salary increases in 1998 and 2000 present a closer question, but under the *Burlington Northern* standard the claims for these years suffice as well. Minimal salary increases to a complaining employee, if an intentional reduction in the range of the salary earned by comparable employees, might well dissuade similarly situated employees from complaining of discrimination.[FN10] Moore also argues that her exclusion from meetings and opportunities for professional development and her assignment to set up the corporate apartment in February 2001 were adverse employment actions. The Court rejects this argument. Unlike the allegations in *Burlington Northern,* these actions did not alter Moore's job responsibilities or prestige, or involve even a temporary deprivation of compensation. No

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 7

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

reasonable employee would refrain from complaining of discrimination if threatened with such exclusion, and so the retaliation claims based on such exclusion are inadequate.

> FN10. A "minimal" salary increase, however, would not be sufficient to constitute an adverse employment action in the context of a differential treatment claim. Such an action is not a "materially adverse change in the terms and conditions " of employment. *Weeks v. New York State (Div. of Parole),* 273 F.3d 76, 85 (2d Cir.2001).

**_Causal Connection Between the Protected Activities and Adverse Actions_**

*7 Moore can show that her protected activity was the cause of the relevant adverse employment action either: (1) directly, through "evidence of retaliatory animus directed against the plaintiff by the defendant"; or (2) indirectly, through circumstantial evidence including that the protected activity was followed closely by the adverse action. *Gordon v. New York City Bd. of Educ.* 232 F.3d 111, 117 (2d Cir.2000).

As to the 1998, 1999 and 2000 evaluations and salary treatment, Moore has not met her burden. She presents no direct evidence of retaliatory animus, and relies solely on the temporal proximity of a number of her complaints regarding Carnevale's alleged harassment to her evaluations. The only evidence Moore presents regarding the timing of those complaints is her testimony that she complained to Mele in November 1997 and to Flock in June or July of 1998. The 1998 evaluation was issued in March, and so the protected activity occurred approximately five months prior to the evaluation. In prior cases, the Second Circuit has found even three months to be too remote to support a retaliation claim.[FN11] *See, e.g., Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (passage of three months too long to suggest a causal relationship between complaint and failure to provide good recommendation). Similarly, the 1999 evaluation

apparently occurred six to seven months after the last protected activity for which Moore presented evidence, and there is no evidence whatsoever of protected activity prior to the 2000 evaluation.

> FN11. Defendant cites no cases finding a causal connection based on temporal proximity of more than three months, and the Court notes that where the Second Circuit has made such a finding, there were unusual aspects of the case that explained the delay. *See, e.g., Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir.1980) (eight-month delay between EEOC complaint and retaliatory act explained by binding eight-month job assignment already given prior to notice of complaint).

Moore has, however, produced sufficient evidence to support her claims of retaliation based on her 2001, 2002 and 2003 evaluations and salary treatment, and her 2004 termination. Morrill clearly relied on Moore's complaints of discrimination in his draft of Moore's "poor" 2002 performance evaluation. [FN12] Moreover, Carolene George (" George"), a former subordinate of Con Ed EEOA Director Gonzalez, testified that Gonzalez told her that Defendants were retaliating against Moore in putting her on a PIN, and strongly implied that such retaliation had been ongoing at least since the 2002 draft evaluation. *See* Mitchell Cert. Exhibit CCC, 89-90, 97.[FN13] Together, these facts constitute substantial direct evidence of retaliatory animus affecting the 2002 evaluation and the actions that followed. Additionally, a reasonable juror could easily believe that Morrill had already possessed such retaliatory animus by the time of Moore's July 30, 2001 evaluation but managed to avoid creating documentary evidence of the fact. The direct evidence alone is therefore adequate to support a *prima facie* case covering all retaliation claims based on Morrill's tenure as Moore's supervisor.

> FN12. Defendants' argument that the draft evaluation written by Morrill is irrelevant because the final evaluation did not rely on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 8

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

Moore's complaints is unpersuasive. If anything, revision after Moore complained demonstrates the draft's probative value in showing a retaliatory animus.

FN13. This testimony is admissible non-hearsay as an admission by Con Ed through its agent under F.R. Evid. 801(d)(2)(D). The existence of discrimination or retaliation in the workplace was clearly within the scope of Gonzalez's employment as EEOA Director.

### B. Defendants' Justifications

Defendants argue that Moore's evaluations, salary treatment, and eventual termination were the legitimate result of her poor and declining performance during the relevant period. This is undoubtedly a sufficient non-discriminatory justification, supported by substantial evidence. Plaintiff's direct evidence of retaliatory animus, however, is more than sufficient to allow a reasonable juror to believe that Moore's alleged poor performance was only an excuse and that the central motive was retaliatory. Retaliation occurs when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause ... even if valid objective reasons for the discharge exist." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993). Moore's evidence raises genuine issues of material fact regarding the motive behind her treatment by Defendants after Morrill joined the Real Estate Department.

*8 Defendants attempt to avoid this conclusion by arguing in the alternative that they were entitled to act against Moore based in whole or in part on her complaints of discrimination, given the unsupported and disruptive nature of those complaints. They assert that it was the disruptive and abusive nature of the complaints, rather than the fact of them, that motivated Defendants' actions. Even assuming the absence of any dispute that Moore's complaints were unsupported, disruptive, and abusive, Defendants' argument is unpersuasive in light of the direct evidence of retaliatory motive presented by Moore. By contrast, the three cases cited by

Defendants all rest on the plaintiffs' lack of evidence that the true reason for the relevant employment actions was retaliation for protected activity. *See Harrison v. Administrative Review Bd. of U.S. Dept. of Labor,* 390 F.3d 752, 758 (2d Cir.2004) ("petitioner failed to demonstrate at trial that he was discharged for communicating safety concerns" as required for a retaliation claim under Surface Transportation Assistance Act); *Ashjari v. Nynex Corp.,* 98 Civ. 9411, 1999 WL 464977 at *2 (2d Cir. July 22, 1999) ("As Ashjari provided no evidence that this reason [*i.e.* his filing of 'multiple unsubstantiated complaints against his supervisor'] was pretextual, the court properly dismissed the retaliation claim."); *Estrada v. Lehman Bros., Inc.,* 99 Civ. 8559, 2001 WL 43605 at *5 (S.D.N.Y. January 18, 2001) ("Nor has Plaintiff submitted evidence that retaliation for his formal complaints and emails alleging that Miller favored black employees was the true reason for his termination." ). Here, however, the Director of the employer's own equal employment opportunity office herself believed Defendants' actions to be retaliatory. Surely a reasonable juror could reach the same conclusion. FN14

FN14. As this is a motion for summary judgment, the Court assumes the credibility of George's testimony to that effect.

### III. Hostile Work Environment

"A hostile work environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Torres v. Pisano,* 116 F.3d 625, 630-31 (2d Cir.1997) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). The underlying conduct must be pervasive enough that a reasonable person would find the environment hostile or abusive. *See id.* This requires that the incidents be "repeated and continuous," rather than mere "isolated acts or occasional episodes." *Kotcher v. Rosa and Sullivan Appliance Ctr ., Inc.,* 957 F.2d 59, 62 (2d Cir.1992).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

Moore alleges two types of conduct that she asserts created a hostile work environment: (1) her sexual and racial harassment by Carnevale; and (2) her general exclusion by Morrill from opportunities for professional development. Morrill cannot be liable for the Carnevale claim because the underlying incidents occurred prior to his tenure as Director of the Real Estate department. For Con Ed to be held liable, Moore must demonstrate that "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994).

### A. Sexual and Racial Harassment by Carnevale

**\*9** Moore's testimony regarding Carnevale's conduct raises triable issues of fact regarding the existence of a racially and sexually hostile work environment. Even setting aside Carnevale's unwelcome efforts to touch Moore, which she admittedly never complained of to her supervisors, his "countless" sexual propositions and sexually and racially offensive comments, made on a weekly basis over two years, could be sufficiently pervasive as to alter the conditions of her employment. This is true even if Moore could not identify more than a few specific incidents. *See Torres,* 116 F.3d at 631 ( "If a jury were to credit Torres' general allegations of constant abuse ... it could reasonably find pervasive harassment, even in the absence of specific details about each incident"). Defendants, while implicitly disputing Moore's allegations regarding Carnevale, failed to produce any evidence or testimony contradicting Moore's version of the events. In light of that failure, Moore's testimony is clearly adequate to defeat summary judgment, especially given "that the pervasiveness of harassing conduct 'is the sort of issue that is often not susceptible of summary resolution.' " *Id.* (quoting *DiLaurenzio v. Atlantic Paratrans, Inc.,* 926 F.Supp. 310, 314 (E.D.N.Y.1996)).

Moore has also produced sufficient evidence to raise a genuine issue of fact as to whether Con Ed knew of the harassment. It is undisputed that Moore complained about Carnevale being vulgar to her direct supervisor, two successive Directors of the

Real Estate department, and Con Ed's Treasurer, though it is unclear how much detail she provided. Moreover, Moore has presented uncontradicted testimony that one of the Directors, Flock, actually witnessed Carnevale squeeze between Moore and Grant and make an "oreo cookie" comment. No disciplinary or remedial action was taken. The fact that some awareness of Carnevale's conduct existed at multiple supervisory levels is sufficient to make Con Ed's knowledge of the hostile work environment a jury issue, notwithstanding Moore's failure to utilize the established EEOA procedure. *See Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004) (holding that where the immediate supervisor and the supervisor for the entire department knew of the hostile work environment and failed to take remedial action, the trier-of-fact could impute the conduct to the employer).

### B. Exclusion by Morrill

Moore's hostile work environment claim based on Morrill's exclusion of her from opportunities for professional development, however, is not adequately supported. No reasonable person would have felt that Morrill's alleged conduct created a hostile and abusive work environment, and the sole case relied on by Moore, *Feingold,* is not to the contrary.

The training and support denied to the plaintiff in *Feingold* were given to other similarly situated employees and were necessary to perform his duties. *Id.* at 151. Moore has not produced evidence that the meeting involvement, feedback, and instruction she was allegedly denied were essential to the job duties of a Real Estate Representative or that other Real Estate Representatives were given such opportunities. Instead, she relies exclusively on the opportunities allegedly provided only to the Senior Real Estate Representatives in her office. Even more important, *Feingold* involved extensive direct evidence that racial and religious hostility was the basis for denying the plaintiff training and support. *Id.* at 150-51. Here, Moore has presented no direct evidence that her race or sex motivated Morrill's actions. Moore's reliance on *Feingold* is unavailing,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 10

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

and her hostile work environment claim based on Morrill's conduct must be dismissed.

### C. Timeliness under Title VII and the Statute of Limitations under State Law

**\*10** Defendants argue that because Carnevale undisputedly ended his employment at Con Ed more than 300 days prior to the filing of Moore's EEOC charge, her Title VII claims based on allegations relating to him are time-barred under 42 U.S.C. § 2000e-5(e)(1). The Supreme Court has held that an employee can recover on a hostile work environment theory for acts occurring more than 300 days before a charge was filed with the EEOC if a defendant also committed an act within the 300-day period that was part of the "same actionable hostile work environment practice." *National R .R. Passenger Corp. v. Morgan,* 536 U.S. 101, 120 (2002). In light of this Court's determination that none of Morrill's alleged conduct constituted a hostile work environment, however, there was no continuing violation within the 300-day period. Moore's Title VII claim for hostile work environment is accordingly dismissed as time-barred.

Defendants also note that all state and city claims based on conduct by Carnevale occurring before September 29, 1997, three years prior to the filing of Moore's original Complaint, would be barred by the statute of limitations. *See* N.Y. C.P.L.R. § 214(2) (McKinney 2006); N.Y.C. Admin. Code § 8-502(d). As the Amended Complaint only covers harassment beginning in November 1997, however, the point is moot.[FN15]

> FN15. There is no dispute that all of Plaintiff's claims under § 1981 are timely.

### IV. Differential Treatment

Under the *McDonnell Douglas* framework, a plaintiff making a differential treatment claim must first make out a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3)

she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See Weinstock,* 224 F.3d at 42; *Stratton v. Department for the Aging for City of New York,* 132 F.3d 869, 879 (2d Cir.1997). There is no dispute that Moore is a member of a protected class, satisfying the first element of the *prima facie* case, and Moore's termination in 2004 and her poor evaluations and denials of salary increases in 2001-2003 constitute adverse employment actions. Moore fails, however, to present evidence sufficient to demonstrate that her performance was satisfactory or that her treatment gives rise to an inference of discrimination.

Moore presents no evidence that her performance was actually satisfactory during the relevant periods. Instead, she relies exclusively on her testimony that she was excluded from opportunities for training and professional development available to the Senior Real Estate Representatives in the Department. This is insufficient because it does not provide any evidence that her performance nonetheless met a minimal standard of adequacy. As Moore has not presented such evidence, or even argued the point except in brief and conclusory form, she cannot meet even the *de minimis prima facie* standard.

Assuming for the sake of argument that the lack of evidence of satisfactory performance of her position's responsibilities was not dispositive, Moore has also failed to present evidence creating an inference that the adverse employment actions were the result of racial or sexual discrimination. "[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination," but they include "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus ..., preferential treatment given to employees outside the protected class ..., [or] the timing or sequence of events leading to the [adverse employment action]." *Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir.1996) (citations omitted). Here, the timing of the actions is not indicative of racial or sexual discrimination, as opposed to retaliation, and Moore has presented no direct evidence reflecting discriminatory animus or evidence of the treatment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 11

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

of any similarly situated employees, as opposed to her superiors within the department. Nor does the evidence show any special circumstances suggesting discrimination. Therefore Moore has failed to satisfy this element of the *prima facie* case as well.

## V. Timeliness of All Claims Brought under Title VII

*11 Defendants' argue that Moore's failure to file an Amended Complaint within 90 days of receiving her right-to-sue-letter from the EEOC bars her Title VII claims, which were not asserted in the original Complaint. While failure to bring the claims within the prescribed 90-day limit is certainly grounds for dismissal, the Supreme Court has affirmed the availability of "equitable tolling" of the statutory deadline. *See Irwin v. Department of Veterans Affairs,* 498 U.S. 89 (1990); *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147 (1984). " Generally, to merit equitable relief, a plaintiff must have acted with reasonable diligence during the time period she seeks to have tolled." *Chapman v. ChoiceCare Long Island Term Disability Plan,* 288 F.3d 506, 512 (2d Cir.2002). The Supreme Court has allowed equitable tolling "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period," *see Irwin,* 498 U.S. at 457-58, and both the Supreme Court and the Second Circuit have implicitly acknowledged its availability "where the court has led the plaintiff to believe that she had done all that was required of her." *South v. Saab Cars USA, Inc.,* 28 F.3d 9, 11 (2d Cir.1994); *see also Baldwin County Welcome Ctr.,* 466 U.S. at 1725-26 ("This is not a case ... where the court has led the plaintiff to believe that she had done everything required of her").

Moore received her right-to-sue letter on April 15, 2003, and therefore would normally have been required to file suit by July 14, 2003. Undoubtedly, Judge Mukasey's order extending the deadline to file an amended complaint incorporating Moore's Title VII until September 19, 2003 sufficed to toll the limitations period. It is further undisputed that an amended complaint was served on Defendants

and received by the Court by the deadline. Moreover, Judge Mukasey's later orders regarding Moore's requests to amend her complaint, including the reference to a *second* amended complaint, seem to indicate that the Court was under the impression that an Amended Complaint had been timely filed. The fact that at least one of Judge Mukasey's orders was not docketed also suggests that holes exist in the record.

The admittedly confused record therefore convinces that Court that the cause of the failure to file Moore's Amended Complaint in September 2003 may well have been an administrative error rather than an error on the part of Moore or her attorney. Even were the opposite true, the failure to formally file the Amended Complaint with the Court is akin to the timely defective filings for which the Supreme Court and Second Circuit have sanctioned equitable tolling. Moreover, it seems clear from the record that the Court implicitly led Plaintiff to believe that she had done what was required of her. Therefore, equitable tolling of the statutory limitation is appropriate. Defendants have suffered no prejudice, having made a strategic decision not to raise the failure to formally file the Amended Complaint with Court in order to preserve the issue for its current use in a motion for summary judgment. In light of all the circumstances, the 90-day limit is properly tolled, and Moore's Title VII claims are not time-barred.

## VI. Statutory Bar to the New York City Claims

*12 At oral argument, Defendants for the first time raised the issue of Moore's failure to serve her complaint on the New York City Human Rights Commission when bringing a claim under N.Y.C. Admin. Code § 8-502. Moore did not contest Defendants' assertion at oral argument, and has not presented any evidence that her complaint was so filed. While N.Y.C. Admin Code § 8-502(c) does indeed include such a service requirement, this Court has repeatedly held that failure to satisfy that requirement is not fatal to a plaintiff's claim. *See, e.g., Naftchi v. New York University,* 14 F.Supp.2d 473, 491 (S.D.N.Y.1998); *Westphal v. Catch Ball Products Corp.,* 953 F.Supp. 475 (S.D.N.Y.1997);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair Empl.Prac.Cas. (BNA) 474
**(Cite as: Slip Copy)**

*see also Bernstein v.1995 Associates,* 630 N.Y.S.2d
68, 71-72 (1st Dep't.1995).

### CONCLUSION

Defendants' motion is GRANTED IN PART and
DENIED IN PART. The surviving claims in this
matter are:
(1) The § 1981, New York State, and New York
City claims against both Defendants for Plaintiff's
termination and her 2001, 2002, and 2003
performance evaluations and corresponding salary
increase denials; and
(2) the Title VII claims against Defendant Con Ed
for retaliation based on the aforementioned adverse
employment actions; and
(3) the § 1981, New York State and New York City
hostile work environment claims against Defendant
Con Ed based on harassment by Carnevale.

The following claims brought by Plaintiff are
dismissed:(1) All libel, defamation, and FMLA
claims; and
(2) all claims for differential treatment; and
(3) all hostile work environment claims against
Defendant Morrill; and
(4) the Title VII hostile work environment claims
against Defendant Con Ed; and
(5) the hostile work environment claims against
Defendant Con Ed based on allegations other than
sexual or racial harassment by Carnevale; and
(6) The retaliation claims based on allegations other
than the aforementioned adverse employment
actions.

The Clerk of the Court is directed to close out this
motion.

SO ORDERED.

S.D.N.Y.,2007.
Moore v. Consolidated Edison Co. of NY, Inc.
Slip Copy, 2007 WL 831807 (S.D.N.Y.), 100 Fair
Empl.Prac.Cas. (BNA) 474

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                 Page 1

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Moss v. Port Authority of New York and New
Jersey
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Sheila MOSS, Plaintiff,
v.
The PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, Defendant.
**No. 04 Civ. 9631(GEL).**

Nov. 20, 2006.

Sheila Moss, pro se, for Plaintiff.
Milton H. Pachter and Kathleen Gill Miller, New
York, New York, for Defendant.

**OPINION AND ORDER**
GERARD E. LYNCH, District Judge.
*1 Sheila Moss, an employee of the Port Authority
of New York and New Jersey ("PA"), brings this
action against her employer for discrimination and
retaliation pursuant to the Americans with
Disabilities Act, 42 U.S.C. §§ 12112-12117
(amended by the Civil Rights Act of 1991, Pub.L.
No. 102-166). Defendant moves for summary
judgment, which will be granted.

**BACKGROUND**

The following facts are drawn largely from
defendant's statement of undisputed facts, which
have not been directly challenged by plaintiff,
supplemented by undisputed portions of plaintiff's
deposition testimony and affidavit.

On September 11, 2001, Moss was employed by the
PA as a secretary, working at the World Trade
Center. Though she escaped without physical
injury, she was understandably deeply upset by the
tragic events of that day. The office in which she

worked was relocated to New Jersey, and for a time
Moss went to work there. Although she was placed
on restricted duty due to high blood pressure for
most of November and December, she worked in
New Jersey until February 22, 2002, when she was
diagnosed with Post-Traumatic Stress Disorder ("
PTSD") and began a long-term paid medical leave.

As required by PA sick-leave policy, Moss
regularly reported to the PA's Office of Medical
Services ("OMS") for evaluation of her fitness to
return to work. At OMS, she was seen by Jose
Hevia, a clinical social worker who had been hired
to assist in evaluating employees experiencing
psychological difficulties following the terrorist
attacks. On July 25, 2002, Hevia found Moss fit for
duty and cleared her to return to work on a
part-time basis. Moss, however, failed to report for
work, or to keep appointments with OMS, during
August 2002. Having been declared fit to work
part-time, she was declared absent without leave ("
AWOL") and not paid for her AWOL days, from
August 6 through September 4, 2002. Moss
returned to OMS on September 5, 2002, was found
unfit to work, and again received sick-leave pay,
from September 6 through December 20, 2002.

While not claiming she had followed official PA
sick-leave procedure, Moss contested the PA's
decision to treat her as AWOL during August 2002,
asserting that she had made adequate efforts to
make known the medical reason for her absence.
(Miller Reply Aff. Ex. 4.) In an October 30, 2002,
letter, her employer informed Moss that she could
receive back pay for the period of work she had
missed by signing a letter that set forth the PA's
sick-leave rules and acknowledging that future
failure to comply could result in formal disciplinary
action. Moss declined to sign, presumably in
objection to the letter's referencing of her AWOL
status as a matter of fact. Alluding to a "meeting,"
where she claimed it was "determined that the
AWOL status was made in error," she wrote the PA
on December 6, 2002, that "I followed the absence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                          Page 2

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

control guidelines and understand my responsibilities." (*Id.*)

Moss never returned to work in her secretarial position, which by that time had moved back to Manhattan from New Jersey. Instead, the PA offered her a position as a financial analyst at John F. Kennedy International Airport, near her home in Queens. She accepted the position and returned to work in December 2002. Sometime before January 31, 2003, Moss requested a hearing, although there is no evidence that such a procedure was normally available in such cases, to discuss receiving her August 2002 pay without having to sign an acknowledgment of the PA's absence rules. She was refused, for "lack of authority ... requiring such a hearing." (Miller Reply Aff. Ex. 5.) In an April 29, 2003, letter, Moss again requested a hearing, to protest her past AWOL designation as "without just cause." (Miller Reply Aff. Ex. 6.) Despite not denying that she had received the PA's October 2002 letter setting forth the absence policy, she claimed, "I have not received any documentation stating what [PA] procedure I did not follow in reporting my absence from work." (*Id.*) The second request for a hearing was also denied, because " there is no basis to change your pay status for the period." (Miller Reply Aff. Ex. 7.)

**\*2** After returning to work, Moss encountered difficulties regarding certain conditional benefits available to PA employees. The PA provides qualifying employees with "TransitCheks," a form of subsidy for employees who use New York public transportation to commute to work. Employees are only eligible for TransitCheks when they incur at least $65 in monthly commuting expenses. Because they are issued quarterly, Moss had received TransitCheks for March and April 2002, although as noted above she did not work, and thus did not commute to work, during those months. As a part-time worker in December 2002, Moss was not eligible for the program, and when she resumed full-time work, in January and February 2003, she was denied TransitCheks for having ineligibly received them in March and April 2002. Subsequently, Moss refused to pick up and sign for TransitCheks, a procedure required by the PA's accounting system, since the subsidies are considered to be the equivalent of cash. In any event, starting in April 2003, Moss drove to work for several months. (P. Dep. Tr. 138-39.)

In May 2003, Moss requested a tuition-assistance advance in connection with certain college courses she wished to take. The PA provides such a benefit, although approval of tuition assistance is in the discretion of the director of the employee's department. Ordinarily, the program apparently reimburses eligible tuition expenses; however, payment may be advanced on a showing of financial need. Moss submitted a request for an advance, which required the signature of her department director, Edward Jackson. Jackson noted that the request inaccurately stated that Moss had been denied salary in July and August 2002 and asked that the statement be deleted. When Moss refused, Jackson declined to sign the request, and tuition accordingly was not advanced.

On November 1, 2003, Moss filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC charge accused the PA of retaliation and harassment on the basis of mental disability and of failure to make reasonable accommodation of that disability. On April 14, 2004, after receiving a right to sue letter from the EEOC, Moss timely filed a complaint in this Court. The complaint charged discrimination on the basis of disability by failure to accommodate, retaliation, and "intimidation, harassment and intentional infliction of emotional and financial distress" during the period August 2002 through June 2003. (Compl.¶¶ 4, 5, 7.) [FN1] The complaint attached and incorporated the statement of facts provided in connection with the EEOC charge, which noted that plaintiff had been placed on AWOL status in August 2002 and been denied retroactive reinstatement when she refused to sign the letter acknowledging the PA's medical-leave rules. She also asserted that she had suffered additional discrimination upon returning to work, by being denied TransitCheks and tuition assistance and being subjected to "insulting [and] sarcastic remarks." (*Id.* at 3.)

       FN1. The Complaint expressly asserts that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                            Page 3

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

the discrimination was no longer occurring at the time plaintiff filed the complaint. (Compl.¶ 6.)

### DISCUSSION

#### I. *Legal Standards*

**\*3** Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." *Cifarelli v. Vill. Of Babylon,* 93 F.3d 47, 51 (2d Cir.1996). Moreover, the court is not to make any credibility assessments or weigh the evidence at this stage. *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Further, the supporting papers of a *pro se* litigant should be liberally interpreted "to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

The nonmoving party, however, may not rely on "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and rather indicate "significant, probative evidence" on which a reasonable factfinder could decide in its favor. *Anderson,* 477 U.S. at 247-48.

The substantive law applied to the case determines which facts are material for purposes of deciding a summary judgment motion. *Anderson,* 477 U.S. at 248. Here, plaintiff invokes federal law protecting those with covered disabilities from employment discrimination, including refusal of reasonable accommodation, harassment, and retaliation for engaging in a protected activity.

To state a claim of disability discrimination sufficient to survive summary judgment, a plaintiff must show evidence that: "(1) [her] employer is subject to the ADA; (2)[she] was disabled within the meaning of the ADA; (3)[she] was otherwise qualified to perform the essential functions of [her] job, with our without reasonable accommodation; and (4)[she] suffered an adverse employment action *because of [her] disability."* [FN2] *Cameron v. Community Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir.2003) (emphasis added). An adverse employment action is an action that causes a "material adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640. Such actions may include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (citations omitted).

> FN2. In this case, there is no dispute as to the first or third elements. The second element-whether Moss was disabled within the meaning of the ADA-on the other hand, is contested. Defendant vigorously argues that plaintiff's PTSD does not constitute a disability under the ADA. (D.Mem.3-4.) Moreover, the EEOC terminated its investigation on the ground that Moss's "allegations [do] not involve a disability as defined by the [ADA]." (Miller Aff. Ex. 8.) Nevertheless, the Court assumes, without deciding, that plaintiff has shown an ADA-covered disability, as its reasoning does not require resolving that issue.

**\*4** Once a plaintiff establishes a minimally sufficient case, the defendant must articulate a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 4

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

legitimate, nondiscriminatory reason for its actions. *See Heyman v. Queens Village Comm. for Mental Health,* 198 F.3d 68, 72 (2d Cir.1999) (explaining burden-shifting for ADA claims and noting it is the same as that for Title VII claims); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The determination whether or not the defendant has met this burden "can involve no credibility assessment." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993).

If the defendant does provide a legitimate reason, the plaintiff must then show evidence that the proffered reason is a pretext-that "the employer's proffered explanation is unworthy of credence." *Sista v. CDC Ixis North America, Inc.,* 445 F.3d 161, 169, 173 (2d Cir.2006) (internal quotation marks and citations omitted); *see also Huels v. Exxon Coal USA, Inc.* 121 F.3d 1047, 1050 (7th Cir.1997) (explaining that "pretext means a lie, spec ifically a phony reason for some action") (internal quotation marks and citation omitted). At the summary judgment stage, this step requires the plaintiff to cite "admissible evidence [showing] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003) (citation and internal quotation marks omitted).

Claims asserting the failure-to-accommodate theory of discrimination must satisfy a variation of the basic prima facie standard. While the ADA prohibits discrimination in the discharge and treatment of employees, it also defines "discriminate " to include "not making reasonable accommodations." 42 U.S.C. § 12112(a) & (b)(5)(A). To sustain such a claim, a plaintiff must point to evidence that: "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir.2004).

The minimal case for retaliation differs slightly from the claims previously discussed, both in elements and perspective. To survive summary judgment, a plaintiff must at least show evidence that "(1) [she] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002); *see, e.g., Weixel v. Bd. of Educ.,* 287 F.3d 138, 149 (2d Cir.2002) (good-faith request for accommodation is a protected activity, even if accommodation is not ultimately justified); *see, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223 (2d Cir .2001) (filing of a complaint with the EEOC is an activity protected by the ADA).

**\*5** The Second Circuit recently invoked the Supreme Court's decision in *Burlington Northern and Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405 (2006), to explain that the standard for determining an "adverse" action on a retaliation claim differs from that on a non-retaliation discrimination claim, because the prohibition against retaliation is intended generally to prevent employers' interference with enforcement of the law. *Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 208 (2d Cir.2006). Thus, what is "adverse " on this claim "is not limited to discriminatory actions that affect the [individual's] terms and conditions of employment," but also includes any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 207 (internal quotation marks and citations omitted).

Finally, the survival of plaintiff's harassment, or hostile work environment, claims, requires that she indicate evidence sufficient to prove that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006), quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks omitted); *see Fairbrother*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 5

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*v. Morrison,* 412 F.3d 39, 48, 50 (2d. Cir.2005). Factors to consider when determining whether an environment is "hostile" are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry,* 336 F.3d at 148, quoting *Harris,* 510 U.S. at 23 (internal quotation marks omitted). Isolated incidents typically will not suffice to demonstrate a hostile work environment unless they are sufficiently severe as to "alter the terms and conditions of employment." *Demoret,* 451 F.3d at 149 (internal quotation marks and citation omitted). Generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks and citation omitted). But the environment need not be "unendurable" or " intolerable," nor the case "the most egregious," to sustain a claim. *Terry,* 336 F.3d at 148 (internal quotation marks and citations omitted).

Because an employer's intent is ordinarily an issue in discrimination actions, the Second Circuit has instructed district courts in such cases to be " especially chary in handing out summary judgment." *Chertkova v. Conn. Gen. Life Ins.,* 92 F.3d 81, 87 (2d Cir.1996); *see also Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.2000). However, plaintiffs may not avoid summary judgment "by simply declaring that state of mind is at issue." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61-62 (2d Cir.1998). In other words, a discrimination plaintiff may not save her case merely by insistence, where there is no "concrete evidence from which a reasonable juror could return a verdict in [her] favor. " *Id.* at 62 (citation and internal quotation marks omitted).

**\*6** Moss's complaint charges four acts of discrimination: denial of salary for August 2002 due to her being designated AWOL, denial of TransitCheks in early 2003, denial of tuition assistance benefits, and harassment in the form of insulting and sarcastic remarks.

II. *Moss's AWOL Status in August 2002*

Moss's complaint about being designated AWOL and thus denied salary in August 2002 is time-barred. The ADA incorporates the administrative exhaustion requirements of Title VII, the federal statute prohibiting employment discrimination on the basis of race and other factors. 42 U.S.C. § 12117(a). Thus, an employee seeking to file a federal lawsuit under the ADA must first file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory practice. (*Id.*) Because New York's anti-discrimination law does not apply to the PA, an interstate agency, the extended 300-day period in situations where a state agency may address the charge does not apply. *Dezaio v. Port Authority of New York and New Jersey,* 205 F.3d 62, 65 (2d Cir.2000). Accordingly, since Moss filed her charge with the EEOC on November 1, 2003, her complaint is time-barred with respect to any alleged discriminatory action that occurred before approximately May 1, 2003.

Moss's salary claim concerns her designation as AWOL in August 2002. This action was taken when Moss failed to report for work on July 29, 2002, as directed by the PA's OMS. She thus complains of an action taken more than a year before she filed her charge. The claim is accordingly time-barred.

Moss argues that her claim is not time-barred, " because the discriminatory actions were continuous up to and including the filing date of the EEOC complaint in November 2003." (Moss Aff. ¶ 3.) [FN3] But "the courts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of compelling circumstances." *Falinski v. Kuntz,* 38 F.Supp.2d 250, 257 (S.D.N.Y.1999) (internal quotation marks omitted). Completed acts such as " a termination through discharge or resignation, a job transfer or discontinuance of a particular job assignment are not acts of a continuing nature." *Malarkey v. Texaco, Inc.,* 559 F.Supp. 117, 121 (S.D.N.Y.1982) (internal quotation marks and citation omitted), *aff'd,* 704 F.2d 674 (2d Cir.1983). This is so even where the employee continues to feel the effects of the time-barred discriminatory act in her on-going employment. *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 6

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

> FN3. This argument, it should be noted, is inconsistent with the Complaint in this action, which asserts that the discrimination stopped in June 2003, several months before the EEOC charge was filed. (Compl.¶ 5.)

Thus, where an employee is transferred or denied a promotion, such an act is a discrete adverse employment action, even though the employee continues to experience the same status caused by the adverse action. Here, the case for a continuing violation is even weaker. Moss was denied pay in August 2002. She then was restored to leave with pay status, and eventually to active duty, and received her pay regularly. Thus, the denial of pay for August 2002 was a discrete adverse action that occurred in August 2002 and that was effective only during that specific period.

**\*7** Moss's apparent claim that the denial effectively continued beyond August 2002, because she was thwarted in pursuing various remedies within the PA in an attempt to reverse it, is unavailing. There is no argument or evidence whatsoever that plaintiff raised any issue relating to discrimination in her requests for a PA hearing, or that by denying her these hearings the employer was somehow ignoring or perpetuating discrimination problems. If Moss believed that she was discriminated against by the AWOL designation and denial of pay, she was required to complain to the EEOC within 180 days of that denial. She did not, and her claim is therefore time-barred.

Even if the matter were not barred by the statute of limitations, moreover, summary judgment for the PA would be justified. Moss offers absolutely no evidence that the AWOL designation or the denial of pay was discriminatory. Further, passing all the other issues raised by the PA, and assuming without deciding that Moss could establish a prima facie case of discrimination, the PA has demonstrated a legitimate, nondiscriminatory reason for the denial, and Moss has presented no evidence whatsoever of pretext. It is undisputed that Moss did not report for work when found fit by the OMS. (P. Dep. Tr. 83.) Although she contends that she was unable to work, and notified OMS of that fact (*id.* 84-85), she did

not comply with the explicit requirements of the PA's sick leave policy. She did not advise OMS that she was supposed to report for work that day (*id.* 85); she did not seek to schedule an appointment with the social worker who was evaluating her (*id.* 86); she did not keep her next appointment with OMS (*id.* 90-92). She did not report either to work or to OMS at any time during August 2002. (*Id.* 91-92.)

Notwithstanding this breach, the PA offered to restore Moss's pay, contingent only upon her signing a document setting forth the rules governing her renewed medical leave. (Miller Aff. Ex. 1, EEOC Charge, 2; Miller Reply Aff. Ex. 3.) This was an entirely reasonable request. Moss had failed to comply with the plain requirements of the PA's leave policy, and the PA was entitled to make sure that Moss understood and acknowledged those rules going forward. Moss declined to sign the letter. (P. Dep. Tr. 99-101.) Although Moss testified that she " did not agree with ... everything contained in the letter" (*id.* 101), neither in her responsive letter (Miller Reply Aff. Ex. 4) nor in any testimony presented in connection with the present action does she identify any misstatement of the rules and procedures that she was asked to acknowledge. [FN4]

> FN4. Although Moss's responsive letter quibbled with the tone or implications of the letter, the PA's letter is crystal clear that the PA set only one condition for restoration of Moss's pay: that she " acknowledge in writing that you have read the absence control guidelines set forth above, that you have had the opportunity to make inquiries about your responsibilities, that you understand your responsibilities, and you acknowledge that your failure to abide by these absence control guidelines may affect your ability to receive pay and result in formal disciplinary action seeking a penalty up to and including termination." (Miller Reply Aff. Ex. 3 at 3-4.) The italicized block that Moss was asked to sign repeats this formulation virtually verbatim. (*Id.* at 4.) Moss essentially was asked only to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

acknowledge that she understood the rules and that future violations could have consequences, not to admit any particular account of her August absence. Even if the letter were construed as compelling Moss to admit her AWOL status as a condition of receiving back pay, and even if that status was substantively inaccurate, such facts would still not sustain a claim of discrimination, given the utter absence of discrimination-related evidence.

No reasonable factfinder could conclude that the refusal to restore Moss's pay unless she acknowledged the rules was a pretext for discrimination. Assuming without deciding that Moss's PTSD constituted a disability, the PA fully accommodated that disability, providing Moss with a reduced work schedule even before her diagnosis; providing a medical leave with full pay for five months from February 22 through July 29, 2002; returning her to medical leave status for another three months from September 5 through December 20, 2002; providing her with psychological counseling at no cost throughout these periods; offering her a job nearer her home that did not require her to return to Manhattan; and even offering to restore her missed pay in return for a simple acknowledgment that she would have to follow the same rules as any other employee on sick leave. Moss offers no evidence whatsoever that the PA was motivated by discriminatory animus, or that its actions were unreasonable in any way whatsoever. In this context, the notion that the PA's asserted reasons for designating plaintiff AWOL and denying her pay in August 2002 were a pretext for a discriminatory purpose is entirely without support.

### III. *TransitCheks*

*8 Moss's claims regarding the TransitCheks are no more persuasive. Moss acknowledges that she received TransitCheks for the months of February, March, and April 2002, as she must in light of documents showing that she signed for them, even though she did not work in March or April. (P. Dep. Tr. 131.) In light of her receipt of those unjustified

subsidies, she was not provided with TransitCheks in January and February 2003, her first eligible months after returning to work. (*Id.* 132.) Plaintiff identifies no rule or practice that would have entitled her to the withheld TransitCheks despite her acknowledged receipt of unjustified TransitCheks in the past.

TransitCheks were made available to her in April 2003, the only month during the period covered by the Complaint in which she was eligible to receive them; however, she failed to pick them up when provided. (P. Dep. Tr. 133-35.) Moss testified that she failed to pick them up because she "was not traveling into Manhattan." (*Id.* 134.) Reading the evidence with every inference drawn in favor of plaintiff, it can be inferred that Moss maintains that her PTSD disabled her from traveling to Manhattan; she complains that the PA "refused to make and/or adhere to alternate arrangements" for her to receive TransitCheks. (Moss Aff. ¶ 3(c).) Such allegations, however, do not create an issue of discrimination.

First, April 2003 is outside the limitations period for her EEOC charge, which extends for 180 days prior to November 1, 2003, and any claim regarding the failure to provide TransitCheks in that month is therefore time-barred.

Second, plaintiff's deposition testimony does not support her claim. Because TransitCheks function essentially as cash, per PA policy they cannot be mailed but must be picked up and signed for. Moss was clearly advised of this requirement. However (whether as a matter of general policy or as a special accommodation to Moss is unclear from the record), Moss was told that it was not required that she personally travel to Manhattan to pick up the TransitCheks. Rather, she was advised by email that "you *or someone from your group* will have to come in to sign for your [TransitCheks]." (Davidson Aff. Ex. L; emphasis added.) Moss acknowledged receiving that communication. (P. Dep. Tr. 129.) Her testimony discloses various failed efforts to get a colleague to pick up the TransitCheks (*id.* 133-36), and it indicates no formal request for any additional accommodation. Nor, for that matter, does plaintiff offer any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

evidence that the generally offered, conditional commuting subsidy was a "reasonable accommodation" necessary to her ability to " perform the essential functions of the job at issue," *Rodal,* 369 F.3d at 118, or that the offer to allow another employee to pick up the TransitCheks for Moss was not an adequate accommodation of her inability to travel to Manhattan.

Finally, Moss has acknowledged that she commuted by car for "two or three months" beginning in April 2003. (*Id.* 138.) She was thus not eligible to receive TransitCheks at any time covered by the Complaint and within the limitations period. The undisputed fact of plaintiff's substantive ineligibility to receive the subsidies not only negates any case for subjective discrimination, but it also makes it impossible for plaintiff to sustain a claim on the objective adverse-action element of retaliation.[FN5] The threat or fact of denial of travel subsidies for which one is otherwise ineligible is not an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Kessler,* 461 F.3d at 207, even assuming there were any evidence hinting at discrimination in the first place.

> FN5. Plaintiff does not explicitly allege retaliation in relation to the denial of Transitcheks, but such a charge could be implied from her papers. She broadly mentions that she complained within the PA that her supervisor, Jackson, was " retaliating against me" (P. Dep .153), without articulating any details about the purported retaliation.

### IV. *Tuition Assistance*

*9 Moss's complaint that she was denied tuition assistance due to discrimination or retaliation also lacks merit. Moss requested an advance on tuition benefits in May 2003. The request for advance payment of tuition benefits required a statement of financial need signed by the employee's supervisor, Edward Jackson. Jackson advised Moss that he would not sign the document drafted by Moss, because it included a statement that she had not

been paid in July 2002, which he believed was not accurate; Moss was paid for virtually all of that month, up to July 30, as she acknowledges. (P. Dep. Tr. 169-172.)

Whether Jackson's refusal to sign the letter on this basis was principled or pig-headed, and whether the letter was accurate or incorrect, are not the issues here. An employer's proffered legitimate reason for an adverse employment action need not be deemed correct or prudent or even, at this stage, credible, so long as it is not discriminatory. *See St. Mary's Honor Center,* 509 U .S. at 509. There is no question that Jackson's proffered reason for refusing to sign the letter is a nondiscriminatory reason, and that the refusal by the PA to advance tuition assistance was the inexorable result of that refusal. Once again, Moss offers no reason whatsoever to believe that the refusal was the result of bias against her on account of disability. By the time this incident occurred, Moss had been back at work for months, and she cites no statements or actions by Jackson or anyone else, apart from the already addressed dispute over her August 2002 pay status, that actually relate to her disability.

Nor is there any basis for a claim of retaliation. A retaliation claim under the ADA must be causally linked to some protected activity, meaning some complaint about discriminatory treatment. Although Moss vigorously protested her designation as AWOL in August 2002 and claims to have complained internally about Jackson, she references no complaint raising the issue of disability discrimination to anyone in the PA or to any governmental agency before her EEOC charge was filed in November 2003, long after the denial of a tuition advance. The record thus discloses no predicate protected activity on which a retaliation claim can be based.

### V. *Hostile Work Environment (Harassment)*

Moss provides no evidence of any acts of the " harassment" or "intimidation" alleged in the Complaint (Compl.¶ 4), or of the "insulting [and] sarcastic remarks" cited in the EEOC charge (EEOC Charge at 3). At her deposition, she

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 9

Slip Copy, 2006 WL 3392693 (S.D.N.Y.)
**(Cite as: Slip Copy)**

expressly denied having any other "claims or complaints" beyond the denial of pay for August 2002, TransitCheks, and tuition assistance. (P. Dep. Tr. 171-72.) Whether or not this constitutes "abandonment" of any hostile work environment claim, as argued by defendant (D.Mem.10), it certainly leaves the Court without any evidence sufficient to raise a genuine issue of material fact regarding this claim. Far from showing conduct that involved "discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe ... to ... create an abusive working environment" and "sufficiently continuous and concerted ... to be deemed pervasive, " *Demoret,* 451 F.3d at 149, Moss at most shows three completely discrete arguably adverse employment actions taken at widely separated times. Each on its own merits, as discussed above, cannot provide the basis for a claim of discrimination or retaliation. Together, they no better approach the minimum showing for sustaining a claim of discriminatory harassment.[FN6]

> FN6. To the extent that plaintiff's complaint of "discriminatory conduct" amounting to "intentional infliction of emotional distress" can be read as asserting a claim under state tort law, the Court declines to exercise supplemental jurisdiction over any such claim, the federal claims having been dismissed on summary judgment. 28 U.S.C. § 1367(c); *see also Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York,* 464 F.3d 255, 262-63 (2d. Cir.2006).

### CONCLUSION

**\*10** For the reasons stated above, the defendant's motion for summary judgment is granted, and plaintiff's claims are dismissed.

SO ORDERED.

S.D.N.Y.,2006.
Moss v. Port Authority of New York and New Jersey
Slip Copy, 2006 WL 3392693 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE



Cited
As of: Jun 26, 2007

ALICIA NICHOLLS, Plaintiff, -against- THE BROOKDALE UNIVERSITY HOS-
PITAL MEDICAL CENTER, DAVID ROSEN, LEWIS MARSHALL, KATHY
LIND, MICHAEL EPTER, and DANIELA NIEC, Defendants.

03-CV-6233 (JBW)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK

2004 U.S. Dist. LEXIS 12816

July 9, 2004, Decided

**DISPOSITION:**     [*1] Defendants' motions to dismiss
granted in part. Plaintiff granted leave to amend.

**COUNSEL:** For Alicia Nicholls, Plaintiff: Nadira S.
Stewart, LEAD ATTORNEY, Charmaine M. Stewart &
Associates, Rosedale, NY.

For Brookdale University Hospital and Medical Center,
David Rosen, Lewis Marshall, Kathy Lind, Michael Ep-
ter, Daniela Niec, Defendants: Mary T. Hart, Ricki E.
Roer, LEAD ATTORNEYS, Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP, New York, NY.

**JUDGES:** Jack B. Weinstein, Senior United States Dis-
trict Judge.

**OPINION BY:** Jack B. Weinstein

**OPINION**

MEMORANDUM & ORDER

Jack B. Weinstein, Senior United States District
Judge:

I. Introduction

Plaintiff Alicia Nicolls brought suit against her em-
ployer, Brookdale University Hospital and Medical Cen-
ter ("Brookdale"), and four individuals, David Rosen,
Lewis Marshall, Kathy Lind, Michael Epter, and Daniela
Niec for labor violations, discrimination, retaliation, and

other alleged wrongs. Defendants have moved to dismiss
the complaint pursuant to Rules 12(b)(1)and 12(b)(6) of
the Federal Rules of Civil Procedure. For reasons stated
below, the motion is granted in part and denied in part.

II. Facts

[*2]   The complaint was filed on December 10,
2003. It supports the following statement of facts:

Plaintiff is a black female from Barbados hired by
Brookdale as a full-time physician assistant in December
of 1993. She was the first black physician assistant in the
emergency medical department. During her training,
Brookdale officials "suggested that the Physician Assis-
tants ... note the doctor's name and/or code on patient
charts for the Hospital's administrative convenience."
Compl. at P 14. Plaintiff considered this training instruc-
tion distinct from Brookdale's policy that "doctors and
Physician Assistants 'co-sign' the charts for billing and
accountability purposes." *Id.* P 15. As a result of her
training, plaintiff "noted doctor names in her own hand-
writing for the Hospital's administrative convenience."
*Id.* at P 16.

Defendant Lind is the Director of Nursing. Soon af-
ter her hiring, she began supervising, disciplining and
terminating physician assistants. During plaintiff's ten-
ure, approximately 80 percent of the 20 physician assis-
tants in emergency medicine were black. Since Lind's
employment, Brookdale has, it is alleged, "wrongfully
terminated, demoted, and otherwise adversely [*3]   dis-
ciplined approximately 20 Physician Assistants of Plain-
tiff's race ...." *Id.* at P 28. Moreover, while Lind and de-

fendant Marshall supervised the emergency medicine department, black physician assistants were given, according to the complaint, unfavorable work schedules, discriminated against, a made to suffer other elements of a hostile work environment.

About April of 2001, Lind is said to have told plaintiff, "I have [an] eighteen-month goal to get rid of all of you." *Id.* at P 31. Plaintiff interpreted Lind's comment to refer to black physician assistants. Around that time, Lind began demoting black physician assistants and hiring predominantly white and Asian nurse practitioners. Plaintiff and other physician assistants, being concerned about the hospitals practices, decided to form a union. Since 2000, those in the position of physician assistant have become affiliated with Local 1199, New York's Health and Human Service Employee's Union, SEIU, AFL-CIO.

In September of 2001 plaintiff was elected union delegate. In both her union and personal capacity, she received complaints from other employees concerning Brookdale and Lind's discriminatory practices. She voiced [*4] the complaints of others, and her own complaints, to management.

On August 28, 2002, Brookdale accused plaintiff of improperly signing patient charts. The hospital alleged that she had "forged certain doctor's signatures, engaged in fraud, and falsified medical records although she had written their names in her own handwriting as previously instructed by the Hospital." *Id.* at P 45. She was suspended pending an investigation. Defendants Epter and Niec, doctors in the emergency medicine department, denied knowledge of the hospital's policy of authorizing physician assistants to note their codes on the charts. Plaintiff claims their statements are false.

She was terminated on September 6, 2002 and received notice of the termination on September 16, 2002. Plaintiff has lost her employment and union benefits. She has been unable to replace the lost income.

Plaintiff's grievance regarding the hospital's action is slated for arbitration. She has filed a charge with the National Labor Relations Board alleging that Brookdale has engaged in "union-busting." That investigation is stayed pending the resolution of the union's arbitration with the hospital.

III. Law and Application of Law [*5] to Facts

A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief may be granted." Defendant has the burden of proving "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

In reviewing a Rule 12(b)(6) motion, the task of the court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980). A court must accept the plaintiff's factual allegations as true, drawing all reasonable inference in plaintiff's favor. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996).

Materials *de hors* [*6] the complaint are generally not considered on a motion to dismiss unless the court treats it as one for summary judgment, giving all the parties a reasonable opportunity to present relevant evidence under Rule 56. See Fed. R. Civ. P. 12(b)(6); *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) ("The problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason-requiring notice so that the party against whom the motion to dismiss is made may respond-that Rule 12(b)(6) motions are ordinarily converted into summary judgement motions."); see also*Festa v. Local 3 International Brotherhood of Electrical Workers,* 905 F.2d 35, 38 (2d Cir. 1990) (court's consideration of affidavits filed with motion to dismiss was improper without converting motion to one for summary judgment). The purpose of this practice is to give the non-moving party proper notice, thus avoiding prejudice.

B. Discrimination Claims and Statute of Limitations

1. Law

a. Statute of Limitations

Plaintiff has brought suit [*7] under federal, state and city anti-discrimination laws. Defendants argue that the claims under Title VII, section 1981 and state laws are in part time-barred. Congress enacted a catchall four year statute of limitations for suits arising under federal statutes enacted after December 1, 1990. *See* 28 U.S.C. § 1658. Claims under section 1981 "are subject to the 4-year statute of limitations if they arose under an Act of Congress enacted after that date." *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 158 L. Ed. 2d 645, 124 S. Ct. 1836, 1839 (2004). As here, the plaintiffs in *Jones* claimed that they were subject to discrimination, wrongful termination and a hostile work environment under section 1981. The Court held that the action arose under portions of section 1981 that were added in 1991

so that the catchall four year statute of limitations applied. *See id.* at 1840.

The statute of limitations for claims under state and city anti-discrimination laws is three years. *See Murphy v. American Home Products,* 58 N.Y.2d 293, 307, 448 N.E.2d 86, 461 N.Y.S.2d 232, 239 (1983) ("The institution of civil actions to recover damages [*8] for unlawful discriminatory practices ... is governed by the three-year period of limitations ....").

Analysis of the statute of limitations governing suits under Title VII requires more than the application of a bright-line rule. Generally, if the discriminatory acts giving rise to the suit have occurred and ended more than three hundred days before plaintiff filed her Equal Employment Opportunity Commission (EEOC) charge, the action is time-barred. *See* 42 U.S.C. § 2000e-5(e)(1); *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir. 1993).

There is a "continuing discrimination" or "continuing violation" sub-rule: "If a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert,* 10 F.3d at 53. The continuing discrimination exception applies to cases "involving specific discriminatory policies or mechanisms such as discriminatory seniority lists, ... or discriminatory employment tests ...." *Id.* (citations [*9] omitted).

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *AMTRAK v. Morgan,* 536 U.S. 101, 114, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). Multiple, even similar, discriminatory incidents do not constitute continuing discrimination if they are not "the result of a discriminatory policy or mechanism." *Lambert,* 10 F.3d at 53; AMTRAK v. Morgan, 536 U.S. 101, 113, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002) ("Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). The prejudicial acts must be continuous in time. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir. 1998).

b. EEOC Time Requirements

Section 2000e-5 of title 42 of the United States Code requires claims to be filed within 300 days of the act, or last act in a series, relied upon by plaintiff.

2. Application of Law to Facts

First, plaintiff's claims under section 1981 [*10] are governed by a four year limitations period, and her claims under local anti-discrimination laws are governed by the three year limitations period. Any claims based solely on events occurring prior to December 10, 1999 (section 1981 claims) and December 10, 2000 (state and city claims) are barred by the statute of limitations. Plaintiff specifically alleges a pattern of continuing discrimination against black physician assistants in that a hospital supervisor informed her that there was "an eighteen-month goal to get rid of all of you [black physician assistants]." Compl. at P 31. Other than the discrete act of her own termination, plaintiff's allegations center on general continuing discriminatory practices and atmosphere.

Plaintiff filed her EEOC charge on July 2, 2003. Under the 300-day basic rule of section 2000e-5 of title 42 of the United States Code, claims based on acts occurring before September 5, 2002 are time-barred. She was terminated on September 6, 2002, and therefore EEOC claims arising from her termination are timely.

Under the liberal standards of Rule 12(b)(6) analysis, plaintiff has alleged continuing discrimination. A supervisor's assertion that there is [*11] a stated goal to eliminate all employees of a identifiable race may constitute a hospital "policy" or "mechanism." This discriminatory policy is alleged to have continued up to and beyond September 5, 2002. Accepting plaintiff's allegations as true, defendants' motion to dismiss plaintiff's federal, state and local discrimination claims as time-barred or based under the EEOC is denied.

C. New York State Labor Law

1. Law

Defendants argue that plaintiff has failed to state a claim for the violation of New York's Whistleblower Statute, retaliation and violation of wages and benefit provisions. The Whistleblower Statute states that:

> An employer shall not take any retaliatory personnel action against an employee because such employee does any of the following:
>
> (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety;

(b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation [*12] of a law, rule or regulation by such employer; or (c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

N.Y. Labor Law § 740(2)(a). The statute of limitations for such an action is "one year after the alleged retaliatory personnel action was taken." *Id.* at § 740(4)(a); *see, e.g., Feinman v. Morgan Stanley Dean Witter,* 193 Misc. 2d 496, 752 N.Y.S.2d 229, 232 (N.Y. Sup. Ct. 2002).

Section 215 of the New York Labor Laws prohibits discharging an employee for making a complaint about a violation of the Labor Law or participating in a proceeding relating to the Labor Law. N.Y. Labor Law § 215. To establish a claim under section 215, plaintiff "must show that she complained to [her employer] about its violations of the Labor Law and that she was terminated because of her complaints." *Jacques v. DiMarzio, Inc.,* 200 F. Supp. 2d 151, 162 (E.D.N.Y. 2002).

2. Application of Law to Facts

Plaintiff's claims under the Whistleblower Statute are time-barred. The alleged retaliatory action against plaintiff based on alleged complaints [*13] was her dismissal on September 6, 2002. Any alleged retaliatory action taken before that, such as demotion, mistreatment or pay reductions, necessarily occurred before plaintiff's termination. Having filed her complaint in December of 2003, plaintiff's claims fall outside the period of limitations. As to her claims under section 215, plaintiff has not pleaded with a level of specificity sufficient to support a cause of action. The court cannot determine what alleged violation of New York's Labor Law triggered plaintiff's claim under section 215. *See, e.g., Mack v. Transport Workers Union of Amer.,* 2002 U.S. Dist. LEXIS 5627, 2002 WL 500377, *5 (S.D.N.Y. 2002) ("As to her supposed claims under the New York Labor Law, plaintiff has failed even to specify which sections of that law she claims to apply ...."). Plaintiff's sixth cause of action is dismissed. Plaintiff may amend her complaint within thirty days to eliminate this defect.

D. Waiver under New York Labor Law § 740(7)

1. Law

Section 740(7) of New York's Labor Laws, the Whistleblower Statute, reads:

Existing rights. Nothing in this section shall be deemed to diminish the rights, privileges, [*14] or remedies of any employee under any other law or regulation or under any collective bargaining agreement or employment contract; *except that the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law.*

(Emphasis added). Defendant moves for dismissal of plaintiff's breach of contract claims and state and city discrimination claims, arguing that plaintiff has waived those causes of actions pursuant to the 740(7) waiver. *See, e.g., Bordan v. North Shore Univ. Hosp.,* 275 A.D.2d 335, 712 N.Y.S.2d 155, 157 (2d Dept. 2002) ("The plaintiff's cause of action against the hospital to recover damages for breach of contract arose from the Labor Law § 740 cause of action, and, therefore, was properly dismissed pursuant to Labor Law § 740(7).").

First, there is conflicting case law on what causes of action are deemed waived by section 740(7). Some courts have limited the waiver to all claims that arise out of the same course of conduct as the section 740 claim or relate to the [*15] retaliatory action on which the section 740 claim is based. *See Bordan,* 712 N.Y.S.2d at 157; Pipas v. Syracuse Home Ass'n, 226 A.D.2d 1097, 1097, 641 N.Y.S.2d 768 (N.Y. Sup. Ct. 1996) ("The tort causes of action, which relate to the retaliatory discharge, are barred by plaintiff's election to assert a Labor Law § 740 cause of action."). In *Collette v. St. Luke's Roosevelt Hospital,* however, the court ruled that the waiver provision applied "only to rights and remedies concerning whistleblowing as defined in the Act." 132 F. Supp.2d 256, 274 (S.D.N.Y. 2001); *see also Kraus v. Brandstetter,* 185 A.D.2d 302, 302-03, 586 N.Y.S.2d 269 (2d Dept. 1992) ("Although Labor Law § 740 provides that the institution of an action under the statute constitutes a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule, regulation, or remedy under the common law, the waiver only applies to those causes of action relating to retaliatory discharge."). The *Collette* court reasoned that "requiring the employee, as the price of asserting whistleblower protection, to waive any rights he might have under [*16] independent causes of action ... that may have arisen from the same course of employer conduct as the retaliatory firing, will create a disincentive to invoking the Act's protection, thus in turn deterring the very whistleblowing conduct that the Act intends to encourage." *Id.* at 271 (citing legislative history).

Second, since this court has dismissed plaintiff's cause of action under section 740 based on the statute of limitations, *see* Section III.I.2, *supra,* there is a question as to whether the dismissal revives plaintiff's claims, which would be otherwise dismissed under section 740(7). There is question about whether "a mere filing of a claim under this section constitutes an irrevocable waiver of [plaintiff's] right to seek relief under any other cause of action." *Clarke v. TRW, Inc.,* 1994 U.S. Dist. LEXIS 15423, 1994 WL 591677 (N.D.N.Y. 1994). *Compare Rotwein v. Sunharbor Manor Residential Health Care Facility,* 18 Misc. 2d 383, 181 N.Y.S.2d 476, 483 (N.Y. Sup. Ct. 1999) ("There is a waiver by the mere institution of an action containing a Labor Law § 740 claim."), *with Clarke,* 1994 U.S. Dist. LEXIS 15423, 1994 WL 591677 at *3 (a section 740(7) waiver "may be inapplicable where the [*17] Section 740 action is dismissed prior to judgment because it is not in accordance with the statutory requirements").

2. Application of Law Facts

This court is persuaded by the ruling in *Collette v. St. Luke's Roosevelt Hospital* that the section 740(7) waiver applies only to causes of action that arise from the same course of conduct as the retaliatory action. Judge Lynch's opinion expertly marshals and analyzes the evidence compelling this result. A literal reading of section 740(7) would dictate the absurd result that "when an employee brings a whistleblower suit, *all* concurrent or future lawsuits brought by that employee, in any capacity whatsoever, are waived." *Collette,* 132 F. Supp.2d at 262. This narrow interpretation of section 740(7) is supported by the Whistleblower Statute's legislative history and the practice commentaries provided by New York State. *See id.* The practice commentary stated explicitly that "'the 'rights and remedies' which are 'deemed' waived are those for retaliation *as such* rather than all rights arising out of the incident involved ....'" *Clarke,* 1994 U.S. Dist. LEXIS 15423, 1994 WL 591677 at *4 (quoting R. Givens, Practice Commentary [*18] to N.Y. Labor Law § 740 at 577-78 (McKinney 1998) (emphasis in original).

Holding that the waiver does not apply to claims under federal law, avoids serious federal constitutional problems, which would be raised were a state statute to nullify a federal provision. *See id.* at 266 ("Whenever possible, an ambiguous statute should be construed to avoid constitutional questions.") (citing *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159, 148 L. Ed. 2d 576, 121 S. Ct. 675, 683 (2001)).

To the extent that plaintiff's fifth cause of action alleges violations of the state Human Rights Law and the city's Administrative Code based on the alleged retaliation, the claims are dismissed. To bring suit under the state and local anti-discrimination laws, plaintiff is granted leave within thirty days to replead, basing her causes of action on "purposeful discrimination" and "hostile work environment" without reference to the defendants' alleged "retaliation." *See* Compl. at PP 87 & 89.

Plaintiff's seventh cause of action alleges that defendants have breached their contractual obligations pursuant to a collective [*19] bargaining agreement, government regulations and the "employee handbook." *See* Compl. at PP 99 & 100. To the extent that defendants' alleged breach of their contractual duties arise from the alleged retaliatory actions (termination), plaintiff has waived the right to bring suit pursuant to section 740(7). The seventh cause of action is dismissed. Plaintiff may replead within thirty days to demonstrate that the claims do not arise from defendants' alleged retaliatory actions.

As to the second issue of statutory interpretation, dismissal of plaintiff's whistleblower action does not negate the section 740(7) waiver. *See* Section III.I, *supra.* Plaintiff's claims based on conduct arising from defendants' retaliatory action cannot be revived merely because the collateral section 740 claims have been dismissed. The language of section 740(7) is clear and leads to a harsh result, but not an absurd one. It clearly states that the waiver applies when a plaintiff has *instituted* an action under section 740(7). *See* N.Y. Labor Law § 740(7); *see also* Webster's Third International Dictionary (Unabridged) 1171 (1966) (defining institute as "to originate" [*20] and "cause to come into existence"). The design of this austere measure is to require prospective plaintiffs to consider carefully potential whistleblower suits before commencing such an action. This plaintiff, having risked filing a time-barred whistleblower action, cannot revive her claims arising from her termination. The court will permit withdrawal of the whistleblower claims, or circumvention if that is possible, by amendment within thirty days. Withdrawal will be deemed the equivalent failing to file the claim.

E. 42 U.S.C. § 1981

1. Law

Defendants move to dismiss plaintiff's section 1981 claims on two grounds: 1) section 1981 does not provide for actions based on national origin discrimination and 2) the individual defendants cannot be held liable under the law.

First, section 1981 does not prohibit discrimination based on national origin. The Supreme Court has concluded that Congress intended to prohibit discrimination solely based on an individual's "ancestry or ethnic characteristics." *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 613, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987).

Although ethnicity may correspond to national origin, it [*21] is the former that matters under section 1981. *See id.* ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.").

Second, supervisors can be held liable under section 1981 if plaintiff can "demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'" *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir. 2000) (citations omitted). The claim must be based on the individual's personal involvement in discriminatory conduct. *Id.*

2. Application of Law to Facts

First, plaintiff's section 1981 claim is not entirely predicated on national origin discrimination. Although plaintiff does acknowledge that physician assistants "predominantly were black people from the West Indies," *see* Compl. at P 37, and that she is "a black female of West Indies ancestry and ethnicity," *see id.* at P 71, the national origin acknowledgments are merely descriptive. The section 1981 claims are, at bottom, based [*22] on plaintiff's ancestry and ethnicity and, more specifically, her racial identity. Defendants' motion to dismiss all of plaintiff's section 1981 claims is denied.

Second, defendants claim that the pleadings do not support section 1981 claims against the individual defendants. Defendants are in part correct. Defendants Rosen, Epter and Niec are not alleged to have been personally involved in discriminatory conduct. Defendants Lind and Marshall, however, are alleged to have discriminated against black physician assistants in their supervisory duties. *See* Compl. at P 38. Plaintiff voiced numerous complaints about defendant Lind. *See id.* at P 41. Lind and Marshall's hands-on supervisory roles and alleged behavior affirmatively link them to the to the alleged discriminatory actions.

Defendants motion is granted with respect to Rosen, Epter and Niec and denied with respect to Lind and Marshall. Plaintiff may amend within thirty days to avoid this conclusion.

F. State and City Claims Against Individual Defendants

1. Law

Defendants move to dismiss plaintiff's claims under New York State and City Human Rights Laws against the individual defendants. "For an individual to [*23] be liable for discriminatory conduct under the [Human Rights Laws], that individual must have actively participated in the discrimination." *Hirsch v. Columbia University, College of Physicians & Surgeons,* 293 F. Supp. 2d

372, 378 (S.D.N.Y. 2003); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir. 1995) (applying rule "that a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [Human Rights Laws]").

2. Application of Law to Facts

Defendants Epter and Niec merely denied knowledge of the hospital's alleged prior policy to allow physician assistants to note their codes on charts. *See* Compl. at P 47. Defendant Rosen only "engaged in business partnerships with Lind's relatives." *Id.* at P 7. Defendants Marshall and Lind are alleged to have personally participated in the discrimination through their roles as supervisors. *See* Section III.E.2., *supra.* Under the Rule 12(b)(6) standard, viewing the allegations as true, Marshall and Lind can be held personally liable.

The claims under New York State and City Human Rights Laws against Epter, Niec and Rosen [*24] are dismissed. Plaintiff may amend within thirty days to avoid this conclusion.

G. Labor Management Relations Act

1. Law

The Labor Management Relations Act (LMRA) defines certain unfair labor practices and mandates a procedure through the National Labor Relations Board (NLRB) to process and remedy the alleged improper practices. 29 U.S.C. § 141 et seq. "As a general rule, federal courts do not have jurisdiction over activity which 'is arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 83, 70 L. Ed. 2d 833, 102 S. Ct. 851 (1982) (citing *San Diego Bldg. Trades Counsel v. Garmon,* 359 U.S. 236, 245, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959)).

Section 7 of the LMRA states that "employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining ...." 29 U.S.C. § 157. Section 8 of the LMRA provides that "it [*25] shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the LMRA]," 29 U.S.C. § 158(a)(1), or "by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). "The NLRA preempts state and federal court jurisdiction of conduct which is arguably prohibited under either § 7 or § 8 of the [LMRA]." Commer v. AFSCME, 272 F. Supp. 2d 332, 339 (S.D.N.Y. 2003).

2. Application of Law to Facts

Plaintiff has alleged that defendants disciplined and terminated her "in part because of her unionization efforts, complaints, and whistleblowing" in violation of the LMRA. *See* Compl. at PP 77 & 78. A claim based on these allegations has been filed with the NLRB and is stayed pending resolution of the union's arbitration with the hospital. *See id.* at P 60. Plaintiff's claims are "arguably" within the purview of section 7and 8. The court lacks jurisdiction. Plaintiff's third cause of action [*26] is dismissed.

H. Fair Labor Standards Act

1. Law

Section 216 of the Fair Standards Labor Act (FSLA) creates a private cause of action for violation of sections 206, 207and 215(a)(3). 29 U.S.C. §§ 206,207,215 &216. Under section 215(a)(3) of the FSLA an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding ...." 29 U.S.C. § 215(a)(3). "The plain language of this provision limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 55 (2d Cir. 1993) (finding no claim under FSLA when employee merely complained to supervisor and did not file formal complaint); *Ahmed v. Gelfand,* 160 F. Supp.2d 408, 417 (E.D.N.Y. 2001) (same); *Booze v. Shawmut Bank,* 62 F. Supp.2d 593, 598 (D. Conn. 1999) (informal complaint does [*27] not satisfy FSLA).

Plaintiff's complaint may be construed to allege a cause of action for violation of either section 206or 207 of the FSLA. Section 206 governs the payment of the federal minium wage. 29 U.S.C. § 206 ("not less than $ 5.15 an hour"). Section 207 provides primarily that employees shall shall be compensated at a higher pay rate for work exceeding forty hours a week. 29 U.S.C. § 207 ("not less than one and one-half times the regular rate at which he is employed").

2. Application of Law to Facts

Plaintiff has not alleged that she filed a formal complaint, instituted proceedings or testified as to any actions taken by her employer in violation of the FSLA. Plaintiff has merely complained orally to co-workers and, perhaps, supervisors concerning her grievances. There is no action under section 215(a)(3) in the absence of formal procedures. To the extent that the court can construe plaintiff's pleadings as alleging a cause of action due to violations sections 206and 207 of the FSLA, plaintiff has

not alleged sufficient facts to support such a claim. She has not alleged any violations of the minimum wage laws, [*28] nor has she specifically alleged that she was not paid based on lawful overtime pay scales.

Plaintiff has failed to state a cause of action under the FSLA. The fourth cause of action is dismissed. Plaintiff may amend within thirty days to avoid this conclusion.

I. Defamation Claims

1. Law

"Under New York law, the plaintiff must establish four elements in order to prevail on a defamation claim: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff." *Kforce, Inc. v. Alden Personnel,* 288 F. Supp.2d 513, 516 (S.D.N.Y. 2003); *see also Town of Massena v. Healthcare Underwriters Mut. Ins. Co.,* 98 N.Y.2d 435, 779 N.E.2d 167, 171, 749 N.Y.S.2d 456 (N.Y. 2002). The fourth element is presumed when the statement takes the form of slander or libel per se. *Privitera v. Phelps,* 79 A.D.2d 1, 435 N.Y.S.2d 402, 404 (4th Dept. 1981).

A slanderous statement is actionable per se if it imputes: (1) the commission of a crime; (2) a loathsome disease; (3) unchaste behavior in a woman; (4) homosexual behavior; or (5) affects plaintiff in his trade, [*29] occupation, or business.*Id.* All other slander is only actionable upon allegation and proof of special damages. *Id.* Special damages include the loss of something of economic value which must flow directly from the injury to reputation caused by the defamation and not from the general effects of the slander. *Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998, 1001 (2d Dept. 1984).

To be actionable in libel, a statement must be false, defamatory, and injurious to a person's reputation and thereby expose him to public shame or contempt. *Christopher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.,* 129 A.D.2d 488, 514 N.Y.S.2d 239, 241 (1st Dept. 1987).

An employer "has the right, without judicial interference, to assess an employee's performance on the job ... since 'a communication made by one person to another upon a subject in which both have an interest is protected by a qualified privilege.'" *Williams v. Varig Brazilian Airlines,* 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dept. 1991) (citing *Stillman v. Ford,* 22 N.Y.2d 48, 238 N.E.2d 304, 290 N.Y.S.2d 893 (1968)). Moreover, "communications [*30] between a 'plaintiff's former employer ... [and] the plaintiff's prospective employer cannot support a cause of action to recover damages for

defamation' because New York recognizes a 'qualified privilege' with respect to communications between former and prospective employers 'as to the character of a former employee ... even though such information may prove ultimately to be inaccurate.'" *Cellamare v. Millbank, Tweed, Hadley & McCloy LLP*, 2003 U.S. Dist. LEXIS 22336, 2003 WL 22937683 (S.D.N.Y. Dec. 2, 2003) (citations omitted).

A qualified privilege "can only be overcome by a showing that the defamatory remarks 'were made with actual malice.'" 2003 U.S. Dist. LEXIS 22336, [WL] at *9. To show actual malice, a plaintiff must prove spite, ill will, or "such culpable recklessness or gross negligence as constitutes a wanton disregard of the rights of others." *Konowitz v. Archway School, Inc.*, 65 A.D.2d 752, 753, 409 N.Y.S.2d 757 (2d Dept. 1978). The Supreme Court has established an "actual malice" standard consistent with First Amendment principles: "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). [*31] New York recognizes the common law and constitutional standards for actual malice in defamation suits. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 438, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992).

2. Application of Law to Facts

Plaintiff complains of statements made by hospital employees concerning her alleged forgery of doctor's signatures. Specifically, plaintiff alleges that defendants said that she "forged doctor's signatures, engaged in fraud, and falsified medical records." *See* Compl. at P 104. Plaintiff has already admitted to noting the "doctor names in her handwriting." *Id.* at P 16. The court assumes that plaintiff merely takes issue with the word "forgery" and "fraud." Defendants argue that plaintiff has not plead the first element of defamation, that of a false statement of fact. But plaintiff does claim that the statements-- as plaintiff's acts are described by defendants-- are false. The court accepts this assertion as true.

Plaintiff has claimed that the alleged defamatory statements were published to third parties within the hospital. Statements about plaintiff's employment are of common interest to hospital employees and administrators, and are thereby protected by New York's qualified [*32] privilege. Plaintiff must also allege that the statements were made with actual malice. Plaintiff has alleged that the statements were made "knowingly", "recklessly," "intelligently," and "negligently." *Id.* at PP 103-06. Plaintiff also alleges that defendants "conspired to make the false statements." *Id.* at P 105. Taken as true, plaintiff's allegations support a claim that defendants acted with "reckless disregard for the truth." *Hellenic*

*Wiring Contracting Corp. v. Petracca & Sons, Inc.*, 307 A.D.2d 822, 763 N.Y.S.2d 301, 303 (1st Dept. 2003).

Injury to plaintiff is presumed when, as here, the alleged statements qualify as slander per se. Defendants' statements that she "forged doctor's signatures, engaged in fraud, and falsified medical records" affected plaintiff's ability to carry on her trade or occupation. The slander per se exception for statements affecting a plaintiffs "trade, occupation, or profession ... is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself." *Liberman*, 80 N.Y.2d at 436 (citations omitted). When one's profession is characterized primarily [*33] by service as an assistant to medical doctors, charges that one forges doctor's signatures and falsifies medical records are statements "of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Id.* (citations omitted). Plaintiffs cause of action is sustainable in the absence of special damages.

Finally, plaintiff alleges that these actions have continued to occur even after her termination. Moreover, the union and hospital continue to dispute the co-signature policy. The court cannot assume on the pleadings, as defendants have, that all of the alleged defamatory statements occurred prior to December 10, 2002. The defamation cause of action is not barred by the statute of limitations. *See* N.Y.C.P.L.R. § 215(3) (one year statute of limitations). Defendants' motion to dismiss the eighth cause of action is denied.

J. Contract Claims Against Individuals

1. Law

"To state a claim for breach of contract under New York law, a plaintiff must allege: (1) the existence of an agreement between plaintiff and defendant; (2) adequate performance of the contract by plaintiff; (3)    [*34] breach of contract by defendants, and (4) damages." *Coddington v. Adelphi Univ.*, 45 F. Supp.2d 211, 218 (E.D.N.Y. 1999); *see also First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998). "In order to recover on a claim for breach of contract, [plaintiff] must allege, among other elements, the existence of a valid contract" between herself and the individual defendants. G&R Moojestic Treats, Inc. v. Maggiemoo's Intern., LLC, 2004 U.S. Dist. LEXIS 8806, 2004 WL 1110423 (S.D.N.Y. May 19, 2004).

2. Application of Law to Facts

Nowhere in the complaint does plaintiff allege that there existed an agreement between herself and the individuals defendants. The employment contract-- if any-- existed only between the employee and employer. Plain-

tiff's seventh cause of action is dismissed as against defendants Lind, Marshall, Epter, Niec and Rosen.

### K. Individual Liability Under Title VII

#### 1. Law

Individual liability does not exist under Title VII. *See Tomka v. Seiler,* 66 F.3d 1295, 1313 (2d Cir. 1995) ("We now hold that individual defendants with supervisory control over a plaintiff may not be held personally [*35] liable under Title VII."); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir. 2000) ("We held that individuals may not be held personally liable under Title VII of the Civil Rights Act of 1964.").

#### 2. Application of Law to Facts

Plaintiff has brought suit against five individuals for violations under Title VII. These claims against individual defendants cannot stand. Defendants motion to dismiss with respect to individual liability under Title VII is granted.

### L. Violation of Company Policy

#### 1. Law

Defendants argue that since plaintiff conceded noting the doctor's names in her "own handwriting," she has conceded violating hospital policy, and, therefore, the firing was legitimate. "In a Title VII case the burden is on the plaintiff to establish a prima facie case of discrimination." *Shumway v. UPS,* 118 F.3d 60, 63 (2d Cir. 1997). "Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence." *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir. 1997). [*36]

One of the elements plaintiff must prove is that the circumstances under which she was terminated "give rise to an inference of discrimination on the basis of race." *Terry v. Ashcroft,* 336 F.3d 128, 139 (2d Cir. 2003); *see also Shumway,* 118 F.3d at 62 (nondiscriminatory reason

for termination where decision to discharge plaintiff was based on violation of company policy against inter-office fraternization); *Mangaroo v. Boundless Techs.,* 253 F. Supp. 2d 390, 398 (E.D.N.Y. 2003) ("Once an employer has put-forth nondiscriminatory reasons for its employment action, it is entitled to summary judgment 'unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'") (citations omitted); *Lugo v. Milford Mgmt. Corp.,* 956 F. Supp. 1120, 1129 (S.D.N.Y. 1997) (finding legitimate termination when plaintiff violated company policy).

#### 2. Application of Law to Facts

This ground for dismissal cannot be recognized on a motion to dismiss under Rule 12(b)(6). Plaintiff alleges that it was company policy-- taught in training-- that physician assistants note doctor's names [*37] in patient records. Accepting that allegation as true, plaintiff did not violate company policy, and her termination was not based on a violation of company policy. The complaint alleges sufficient facts to support an inference of discrimination on the basis of race through distortion of company policy to plaintiff's disadvantage. The motion is denied.

### IV. Conclusion

Defendants' motions to dismiss are granted in part, with leave to amend as indicated in this memorandum.

The parties will prepare promptly for trial. Discovery is to be expedited to be completed by September 15, 2004. A pre-trial conference will be held on October 12, 2004 at 10:00 a.m. Trial is set for October 18, 2004. Summary judgment motions, if any, must be made promptly so as not to delay trial.

SO ORDERED.

Jack B. Weinstein

Dated: July 9, 2004

Brooklyn, New York