LEXSEE 2005 U.S. DIST. LEXIS 14274



Analysis
As of: Jul 25, 2007

DOMINIC D'ASCOLI, Plaintiff, - v - ROURA & MELAMED, WALTER ROURA
and MARTIN MELAMED, Defendants.

02 Civ. 2684 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 14274

July 13, 2005, Decided
July 13, 2005, Filed

**PRIOR HISTORY:** *D'Ascoli v. Roura & Melamed, 2005 U.S. Dist. LEXIS 8351 (S.D.N.Y., May 5, 2005)*

**COUNSEL:** [*1] For Dominic D'Ascoli, Plaintiff: Gregory S. Antollino, Gregory Antollino, Attorney at Law, New York, NY.

For Roura & Melamed, Walter Roura, Martin Melamed, Defendants: Alan Serrins, Queller, Fisher, Dienst, Serrins, Washor & Kool, New York, NY.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

1.

The above action was brought under *42 U.S.C. § 1981* (and New York City Administrative Code *§ 8-107*) to recover damages for the termination of the employment of plaintiff, a white male trial lawyer, by the defendant law firm and its two partners, as a result of racial discrimination. Plaintiff claims that he was replaced by a black male. The case was tried to a jury which found for plaintiff, awarding him $ 96,800 for past lost earnings, nothing for emotional distress and humiliation, and $ 145,000 in punitive damages. By Memorandum and Order dated May 5, 2005, the Court awarded plaintiff $ 59,809.42 in attorney's fees and expenses. *See 42 U.S.C. § 1988(b)* and N.Y.C. Admin. Code *§ 8-502(f)*.

2.

Plaintiff moves for prejudgment interest. Defendants move pursuant to [*2] *Fed. R. Civ. P. 50* for (i) judgment as a matter of law, (ii) an order vacating the award of punitive damages, and (iii) an order reducing the award for lost back pay.

> The district court can grant [a *Rule 50(b)*] motion only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict. The district court cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to discredit.

*Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 119 (2d Cir. 2004)* (quoting and citing *Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001))*. [1]

[1] Defendants' *Rule 50(b)* motion is not untimely, as plaintiff appears to suggest. At trial, defendants moved for judgment at the end of

plaintiff's and the entire case on the ground of the argued "failure of plaintiff to satisfy the fourth prong of the *McDonnell [Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)]* standard. There is a total lack of evidence to show that [plaintiff] was replaced by a similarly situated individual from an unprotected class. In this case, the unprotected class is African-American, or black, and the class according to [plaintiff's] pleadings is white." (Transcript 416.) Defendants renewed the motion immediately after verdict. (*Id.* 508-509.) The Court noted that the motion was timely made and to be briefed, as it subsequently was. (*Id.* at 509.) The subsequent briefing does not render the oral motion untimely. *Casey v. Long Island Railroad Co., 406 F.3d 142, 148 (2d Cir. 2005).*

Plaintiff's motion for an order precluding defendants from making a *Rule 50* motion is denied.

[*3] 3.

The *McDonnell Douglas* standard for a *prima facie* case requires that a plaintiff show "1) that he belonged to a protected class; 2) that he was qualified for the positon he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)* (citation omitted). "The mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." *Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)* (citations omitted); *see also Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997)* (*en banc*) (citations omitted) (fourth prong "the ultimate filling of the position by a person not of the protected class"). [2]

> 2   The *McDonnell Douglas prima facie* case standard is applied in both Title VII and *42 U.S.C. § 1981* employment discrimination cases. *McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).*

[*4] The essence of defendants' motion (insofar as it is directed to the jury's findings that they were liable to plaintiff) is that there was no evidence that plaintiff was replaced by the black trial lawyer by whom plaintiff claims he was replaced.

There was evidence at trial, however, from which the jury could have inferred that defendant was replaced by Rudyard Whyte, a black trial lawyer.

Plaintiff's employment by defendant was terminated on or about March 15, 2000. Defendants had extended an offer to Mr. Whyte in January of 2000, and Mr. Whyte joined defendants shortly after plaintiff left. Mr. Whyte began at a salary of $ 150,000 a year; when he left, plaintiff was making $ 145,000 a year. Mr. Whyte, while with defendants, has tried cases in Queens and Staten Island and Brooklyn and Manhattan, and "in the Bronx, just as [plaintiff] had done." (Tr. 367.) While defendants offered testimony to the effect that plaintiff was fired for reasons unrelated to their hiring of Mr. Whyte, and that Mr. Whyte was not hired to replace plaintiffs but for other reasons (including "rainmaker" potential), it is not for the Court on this motion to decide this case. Rather,

> in ruling on [*5] a *Rule 50* motion, "the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give the party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."

*Jarvis v. Ford Motor Co., 283 F.3d 33, 43 (2d Cir.), cert. denied, 537 U.S. 1019, 154 L. Ed. 2d 427, 123 S. Ct. 539 (2002)* (quoting *Tolbert, 242 F.3d at 70*). Under that standard, defendants' motion, insofar as it is addressed to liability, must be denied.

4.

Defendants next argue that there was insufficient evidenced to support *any*[3] award of punitive damages.[4]

> 3   Defendants do not seek remittitur pursuant to *Fed. R. Civ. P. 59.*
>
> 4   Again, plaintiff argues that defendants' motion is untimely. According to plaintiff, "the question of the sufficiency of the evidence supporting the jury's punitive damage verdict is not properly before the Court" because it was not raised before the jury retired. But defendants did object, prior to the submission of the case to the jury, on the same ground on which they now object, the lack of evidence of wilfulness (Transcript 425-427), and plaintiff opted to put in no punitive damage-specific evidence. Defendants renewed the point in their oral *Rule 50* motion. (*Id.* 508.) *See* n.1, supra.

[*6] In *Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999)*, the Supreme Court -- after noting that *42 U.S.C. § 1981a(b)(1)* states (in part as relevant here) that: "A complaining party may recover punitive damages under this section . . . if the complaining party demonstrates that the respondent engaged in discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual" -- concluded that "Congress plainly sought to establish two standards of liability -- one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *527 U.S. at 534*. The Court found that the statutory "terms 'malice' or 'reckless indifference' pertain to an employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id. at 535*. "An employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id. at 535*.

Here, the [*7] record is devoid of evidence that, or from which it could reasonably be inferred that, defendants, or any of them, "perceived risk that [their] actions [in terminating plaintiff to replace him with Mr. Whyte would] violate federal law." *Kolstad, 527 U.S. at 536*.

The Second Circuit had said that, "as an alternative to proving that the defendant knew it was acting in violation of federal law, 'egregious or outrageous acts may serve as evidence supporting an inference of the requisite "evil motive",'" *Farias v. Instructional Sys., Inc., 259 F.3d 91, 101 (2d Cir. 2001)* (quoting *Kolstad, 527 U.S. at 538*). The record is also devoid of any egregious or outrageous actions toward plaintiff.

The award of punitive damages must, under *Kolstad*, be vacated. [5]

> 5 "The federal standard applies to claims for punitive damages under the [New York City] Administrative Code." *Farias, 259 F.3d at 101*. What is said above governs the punitive damage verdict to the extent it was awarded under the Administrative Code.

[*8] **5.**

Defendants also argue that the jury's award of compensatory damages should be reduced because plaintiff failed to mitigate his damages. [6]

> 6 It is not clear, indeed it is quite doubtful, that this argument was preserved for post-trial *Rule 50* consideration, as were the arguments previously considered. In any event, the Court considers the argument on the merits, and reaches the same result.

"A discharged employee must 'use reasonable diligence in finding other suitable employment,' which need not be comparable to their previous positions." *Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998)* (citing *Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32, 73 L. Ed. 2d 721, 102 S. Ct. 3057 & n.15 (1982))*. While generally the employer bears the burden of demonstrating the availability of work and the plaintiff's failure to make a reasonable effort to find it, in *Greenway* the Second Circuit modified the rule to the extent of holding that "an employer . . . is released from the duty to establish the [*9] availability of comparable employment if it can prove that the employee made no reasonable effort to seek such employment." *Id. at 54* (citations omitted). [7]

> 7 The Court did not charge the *Greenway* exception to the general rule allocating the burden of proof as to mitigation to the employer; it was not requested to do so nor has either side objected to the charge as given, or requested a new trial.

The evidence showed, in general, that, although fired in the middle of March 2000, plaintiff did not begin to look for a job until August 2000 (finding one by January 2001); in the March-August period he was uncommunicative, stayed home, and drank in uncharacteristic quantities, as a result, in his view, of shock and a lack of self-confidence as a consequence of being fired. The jury may have considered such evidence in deciding the issue of mitigation.

More importantly for present purposes, it is not clear how the jury calculated compensatory damages. Defendants claim that the award represents "roughly eight [*10] months of salary [at $ 145,000 a year], which is . . . proportionate to length of time Plaintiff was out of work and not receiving severance pay." (Def. Mem. at 29 (footnotes omitted).) Plaintiff points out that he received bonuses during each year in which he was employed by defendants and that it is possible it did not compensate him for the months in which he did not look for a job, but did add in bonuses. (Pl. Mem. at 28.) Neither side having requested any interrogatory to the jury the response to which might suggest how the jury computed compensatory damages, the Court will assume such damages to have been computed in accordance with facts properly found, following the Court's instructions.

**6.**

Plaintiff moves for prejudgment interest on the $ 96,800 in compensatory damages awarded by the jury (the amount in its entirety, there is no dispute, representing back pay). According to plaintiff, "interest should be

computed at the state rate of 9% per annum since plaintiff's claims arise under both federal and state law." (Pl. March 21, 2005 Mem. at 5.) Plaintiff proposes (*id.*), and defendants appear to accept, October 1, 2000 as an appropriate intermediate date from which [*11] to calculate prejudgment interest. Defendants dispute the plaintiff's position that the New York State 9% interest rate should apply.

"District courts are entitled to award pre-judgment interest on back pay awards in employment discrimination cases." *Greenway, 143 F.3d at 55* (citation omitted). "It is within the trial court's discretion to elect whether and how to compute prejudgment interest." *Id. at 56* (citing *Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 613-14 (2d Cir. 1994))*.

Here, the Court finds that prejudgment interest should be awarded, and concurs with Judge Spatt, in *Luciano v. Olsten Corp., 912 F. Supp. 663, 676-77 (E.D.N.Y. 1996), aff'd, 110 F.3d 210 (2d Cir. 1997)*, that interest should be calculated at the rate set forth in *28 U.S.C. § 1961(a) & (b)* (compounded annually), as applicable.

7.

In a Memorandum and Order dated May 5, 2005, the Court awarded plaintiff attorney's fees and expenses in the total amount of $ 59,809.42. Plaintiff seeks further fees and expenses relating to post-trial motion practice in the total sum of $ 11,783.80. (Specifics [*12] are contained in plaintiff's counsel's declarations of April 21, 2005 and June 17, 2005.) The application is granted. The Court finds the time accounting to be substantially accurate and the hourly rates utilized to be appropriate.

8.

Plaintiff seeks a correction of the trial transcript, *see* Antollino Declaration, June 17, 2005, P8, but without specifically identifying the page and line, and the word(s) or number(s) that require correction. The motion is denied without prejudice to renewal, if the parties are unable to stipulate to an appropriate correction.

* * *

Summarizing, the Court:

1. Denies defendants' motion pursuant to *Fed. R. Civ. P. 50(b)* insofar as it challenges the jury's finding that defendants are liable to plaintiff.

2. Grants defendants' motion pursuant to *Fed. R. Civ. P. 50(b)* insofar as it seeks to vacate the jury's award of punitive damages.

3. Denies defendants' motion pursuant to *Fed. R. Civ. P. 50(b)* insofar as it seeks to reduce the jury's award of compensatory damages.

4. Grants plaintiff's motion for prejudgment interest [*13] to the extent that plaintiff may have prejudgment interest calculated pursuant to *28 U.S.C. § 1961(a) & (b)*, to run from October 1, 2000 to the date of entry of judgment, but otherwise denies the motion.

5. Grants plaintiff's motion for a supplementary award of attorney's fees and expenses, in the total amount of $ 11,783.80.

6. Denies plaintiff's motion for correction of the record without prejudice to renewal.

The Clerk will enter judgment accordingly.

SO ORDERED.

Dated: July 13, 2005

Lawrence M. McKenna

U.S.D.J.

LEXSEE 2000 U.S. DIST. LEXIS 1221



Caution
As of: Jul 24, 2007

FOUR FINGER ART FACTORY, INC., Plaintiff, - AGAINST - RONALD A. DINICOLA, INTERNATIONAL MANAGEMENT INC., and GOAT, INC., Defendants.

99 Civ. 1259 (JGK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 1221*

February 5, 2000, Decided
February 9, 2000, Filed

**DISPOSITION:** [*1] Defendants' motions to dismiss the complaint granted in part and denied in part. Motion to dismiss the plaintiff's first cause of action for breach of contract denied. Plaintiff's fifth claim, for breach of fiduciary duty, dismissed with prejudice. Second, third, fourth, and sixth claims, for fraud, interference with contract, interference with economic advantage, and promissory estoppel respectively, all dismissed without prejudice to the plaintiff filing an amended complaint.

**COUNSEL:** For FOUR FINGER ART FACTORY, INC., plaintiff: Matthew D. Brinckerhoff, Emery, Cuti, Brinckerhoff & Abady P.C., New York, NY.

For INTERNATIONAL MANAGEMENT INC., defendant: John R. Sachs, Jr., Ohrenstein & Brown, New York, NY.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINION BY:** John G. Koeltl

**OPINION**

*OPINION AND ORDER*

**JOHN G. KOELTL, District Judge:**

This action arises out of a contract between the plaintiff, Four Finger Art Factory, Inc. ("Four Finger"), and defendant Greatest of All Times, Inc. ("GOAT"), pursuant to which Four Finger allegedly had rights to promote celebrity concerts related to the themes contained in a book co-authored by Muhammed Ali. The plaintiff alleges that GOAT [*2] and its attorney, defendant Ronald A. DiNicola, failed to comply with GOAT's obligations under the contract, including by failing to assist in arranging performers for the concerts and withholding approval for advertising and other promotions for the concerts, and that the concerts were canceled as a result. The plaintiff also alleges that shortly after the execution of the contract, GOAT and DiNicola granted to defendant International Management Inc. ("IMG") conflicting rights to represent Ali and use his persona. Four Finger brings claims for breach of contract and breach of fiduciary duty against GOAT; claims for fraud and misrepresentation and promissory estoppel against GOAT and DiNicola; and claims against all defendants for tortious interference with contract and interference with Four Finger's prospective economic advantage.

The defendants have moved to dismiss the complaint pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *9(b)*. For the reasons that follow, the motions to dismiss are granted in part and denied in part.

I.

On a motion to dismiss, the allegations in the complaint are accepted as true. *See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).* [*3] In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. *See Gant v. Wallingford*

*Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir. 1995); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the defendants' present motions should only be granted if it appears that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *Grandon,* 147 F.3d at 188; *see also Goldman,* 754 F.2d at 1065.

In deciding the motions, the Court may consider documents referenced in the complaint and documents that are in the plaintiff's possession or that the plaintiff knew of and relied on in bringing suit. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991); [*4] *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir. 1991); *Skeete v. IVF America, Inc.,* 972 F. Supp. 206, 208 (S.D.N.Y. 1997).

**II.**

For the purposes of the defendants' motions to dismiss, the following allegations made in the plaintiff's complaint are accepted as true.

In 1996, Muhammed Ali and Thomas Hauser published a book entitled "Healing: A Journal of Tolerance and Understanding." (*See* Compl. P 12.) In March 1997 Four Finger signed a contract with GOAT and Hauser to promote celebrity concerts as part of the Muhammed Ali World Healing Project, a project related to this book. (*See* Compl. PP 20, 29.) Some of the proceeds from these concerts were intended for charitable purposes. (*See* Compl. P 31.) The contract gave Four Finger promotional, broadcasting, merchandising, and other rights over as many as four such concerts (*see* Compl. P 32), and it also gave Four Finger exclusive rights to use the name and approved likeness of Ali in connection with its concert activities until February 24, 1999 (*see* Compl. P 34). At the same time as it signed the contract with GOAT, the plaintiff entered [*5] into a separate agreement with Hoffmann Concerts, Inc. ("Hoffmann") securing Hoffmann's participation in the production and promotion of the concerts. (*See* Compl. P 29.)

The plaintiff alleges that notwithstanding the contract with Four Finger, in April 1997 Ali or Goat, or both of them, entered into a representation agreement with IMG which gave IMG exclusive rights to use Ali's name, likeness, and image. (*See* Compl. PP 49, 50.) The plaintiff alleges that although IMG learned of Four Finger's own contractual rights, IMG represented that it was Ali's exclusive agent (*see* Compl. P 59). The plaintiff further alleges that IMG hired Hoffmann's Michael Sampliner to work for it. (*See* Compl. P 95.)

The plaintiff alleges a series of acts by the defendants following the agreement with IMG to undermine the celebrity concerts and Four Finger's promotion of them. The plaintiff alleges that in May 1997 DiNicola prohibited efforts by Hoffmann to obtain corporate sponsorship for the concerts. (*See* Compl. P 63.) GOAT and DiNicola, as well as Ali, refused all of Four Finger's requests for their assistance in promoting the first concert scheduled for the Fall of 1997. (*See* Compl. [*6] P 68.) Beginning in July 1997 IMG told individuals in the entertainment industry that the concert would not take place. (*See* Compl. P 69.). In July 1997 DiNicola refused approval of a promotional website for the concerts. (*See* Compl. P 70.) In August 1997 DiNicola and GOAT also withheld their approval of an arrangement with Christies to auction Ali memorabilia in connection with the concerts. (*See* Compl. P 72.) In the same month DiNicola ordered removal of information from concert promotional materials which provided contact information for GOAT and Ali. (*See* Compl. P 74.) In September 1997, after various celebrities were slated to attend the concert (*see* Compl. P 76), and after Nelson Mandela and others were advised they would be receiving an award (*see* Compl. P 77), DiNicola informed the plaintiff that Ali would not attend a pre-concert press conference (*see* Compl. P 79), DiNicola refused to approve concert advertisements (*see* Compl. P 81), and DiNicola told Four Finger and Hoffmann that GOAT would have no involvement at all with the Fall concert unless a television deal was secured (*see* Compl. P 86).

In September 1997 Hoffmann wrote DiNicola [*7] to advise him that it was terminating its promotion of the Fall concert. (*See* Compl. P 84.) DiNicola thereafter informed Four Finger that GOAT would not extend the December 1, 1997 deadline for staging the first concert contained in the contract. (*See* Compl. P 89.) The plaintiff alleges that it attempted until July 1998, to no avail, to stage the concerts and to revive the contract with GOAT. (*See* Compl. PP 98, 99.)

**III.**

(A)

Defendants GOAT and DiNicola argue on their present motion that the entire complaint must be dismissed because their conduct was not a sufficient cause of the plaintiff's alleged losses, given that promoting concerts is an uncertain enterprise and that it was the plaintiff's own inadequacies that caused the failure of the concerts and the losses the plaintiff alleges. The defendants are not entitled to dismissal of the complaint on this basis. The

Case 1:07-cv-05471-BSJ-KNF   Document 12-5   Filed 07/25/2007   Page 7 of 16

Page 3
2000 U.S. Dist. LEXIS 1221, *

defendants' assertions as to the cause of the plaintiff's alleged losses plainly raise issues of fact that can not be decided on a motion to dismiss. *See, e.g., Stagl v. Delta Airlines, Inc., 52 F.3d 463, 473-74 (2d Cir. 1995); Kwiatkowski v. Bear, Stearns & Co., 1999 U.S. Dist. LEXIS 19966*, No. 96 Civ. 4798, 1999 WL 1277245, [*8] at *14 (S.D.N.Y. Dec. 22, 1999); *John Street Leasehold LLC v. FDIC, 1996 U.S. Dist. LEXIS 19050*, No. 95 Civ. 10174, 1996 WL 737196, at *11 (S.D.N.Y. Dec. 24, 1996). The defendants' motion to dismiss the complaint on this basis is therefore denied.

**(B)**

The plaintiff's first claim for relief alleges that GOAT breached its contract with Four Finger by, among other things, refusing to allow contact with corporate sponsors, unreasonably withholding approval for concert advertising, refusing to assist in procuring talent for the concert, refusing to allow contact information in advertising, granting rights to IMG, refusing to approve the concert website, and refusing to participate in pre-concert publicity. (*See* Compl. P 102.) GOAT argues that the allegations are insufficient to support a claim for breach of contract and that the claim must be dismissed. GOAT argues that it was not required under the contract to permit contact of sponsors and that in any event it did not unreasonably withhold its authorization; that it did not unreasonably withhold its approval of concert advertising; that the plaintiff obtained sufficient talent for the concerts; that GOAT was not required to allow the [*9] use of contact information in promotional materials and that contact information was not necessary because of Ali's involvement in other ways; that GOAT did not grant any conflicting rights to IMG; that GOAT was not required to approve the concert website and that its withholding of approval was reasonable; and that participation in concert events was not necessary given that the concert did not take place.

GOAT is not entitled to dismissal of the claim on this basis. It is clear, and GOAT does not dispute, that the contract between GOAT and the plaintiff required GOAT to perform certain duties in connection with the plaintiff's promotion of the concerts, including making reasonable efforts in assisting with publicity and obtaining performers, providing Ali for appearances related to the concerts, and not unreasonably withholding consent for advertising. (*See* Contract PP 2(a), 2(b), 2(c), 2(d), 3(a)). It is also undisputed that the contract gave Four Finger certain rights over the use of Ali's persona, including the requirement that GOAT and Ali could not license the use of Ali's persona for the promotion of concerts by other entities until May 31, 1998 without Four Finger's prior [*10] written consent. (*See* Contract P 4(b)). The plaintiff's allegations sufficiently state a cause of action for breach of the contract. GOAT's arguments on its present motion to dismiss, such as that its actions were reasonable under the contract and that they did not interfere with the plaintiff's ability to promote the concerts, raise issues of fact as to whether GOAT met its obligations under the contract, which cannot be decided on the present motion. *See, e.g., Fulton Cogeneration Associates v. Niagara Mohawk Power Corp., 84 F.3d 91, 99-100 (2d Cir. 1996); Nash v. Coram Healthcare Corp., 1998 U.S. Dist. LEXIS 4592*, No. 96 Civ. 0298, 1998 WL 164822, at *1 (S.D.N.Y. April 7, 1998); *Ansari v. New York University, 1997 U.S. Dist. LEXIS 6863*, No. 96 Civ. 5280, 1997 WL 257473, at *4 (S.D.N.Y. May 16, 1997); *Telemedia Partners Worldwide Ltd., 1996 U.S. Dist. LEXIS 1118*, No. 95 Civ. 2452, 1996 WL 41818, at *12 (S.D.N.Y. Feb. 2, 1996). GOAT's motion to dismiss the claim for breach of contract is therefore denied.

**(C)**

The plaintiff's second claim is for fraud and misrepresentation. The plaintiff alleges that GOAT and DiNicola made material misrepresentations which induced Four Finger to enter [*11] the contract with GOAT. The alleged misrepresentations include that DiNicola and GOAT had informed the plaintiff of any conflicting agreements, representations as to the efforts GOAT would make in securing talent for the concerts, and representations that GOAT would act reasonably and in good faith in granting authorization for promotional activities. (*See* Compl. P 108.) The plaintiff alleges that if it had known that the defendants intended to break these promises, it would not have entered the contract. (*See* Compl. P 112.)

GOAT and DiNicola move to dismiss the claim on the ground that it is a restatement of the plaintiff's contract claim and that it therefore does not state a cause of action. A claim for fraud under New York common law based on false statements consists of the following elements: (1) a material false representation of an existing fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance; (5) and damages. *See New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995); Graubard Mollen Dannett & Horowitz v. Moskovitz, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995)*; [*12] see also *Sudul v. Computer Outsourcing Services, 917 F. Supp. 1033, 1043 (S.D.N.Y. 1996)*. The mere allegation that a party to a contract did not intend to perform an express contractual promise does not state a claim for fraud. *See, e.g., Village On Canon v. Bankers Trust Co., 920 F. Supp. 520, 531 (S.D.N.Y. 1996); PI, Inc. v. Quality Prods., Inc., 907 F. Supp. 752, 761-62 (S.D.N.Y. 1995)* (collecting New York cases). However, it is also true that "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement be-

tween the parties." *Graubard Mollen Dannett Horowitz, 86 N.Y.2d at 121.* "Any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely adopted by the state and federal courts, pursuant to which a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." *International CableTel Inc. v. Le Groupe Videotron Ltee, 978 F. Supp. 483, 487 (S.D.N.Y. 1997).* Accordingly, [*13] the Court of Appeals for the Second Circuit has recently stated that, "to maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract . . . ; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, *see Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986)* . . . ; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. " *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20 (2d Cir. 1996). See also Turnbull v. Kling, 1999 U.S. Dist. LEXIS 13056,* No. 98 Civ. 5925, 1999 WL 672561, at *4 (S.D.N.Y. Aug. 26, 1999); *Rays Trading (H.K.) Co. v. Judy-Philippine, Inc., 1998 U.S. Dist. LEXIS 9702,* No. 98 Civ. 0170, 1998 WL 355422, at *2 (S.D.N.Y. July 2, 1998); *Schare v. Six Flags Theme Parks, 1998 U.S. Dist. LEXIS 592,* No. 96 Civ. 9377, 1998 WL 24361, at *5 (S.D.N.Y. Jan. 23, 1998). Fraudulently inducing the plaintiff to enter into a contract or "engaging in conduct outside the contract but intended to defeat the contract, [*14] " are examples of conduct which is sufficiently collateral to state a proper claim in tort. *New York University v. Continental Ins. Co., 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995); see also Deerfield Communications Corp., 68 N.Y.2d at 956* (finding that "a representation of present fact, not of future intent" collateral to the contract which was the inducement for the contract stated a claim for fraudulent inducement (internal citation and quotation omitted)).

Here, it is clear that the plaintiff's claim for fraudulent inducement relies on allegations which are not collateral to the contract. The plaintiff's allegation that GOAT falsely warranted that there were no conflicting agreements with other parties is not collateral because the contract contains a specific provision under which GOAT warranted that it "is not and shall not be under any liability, restriction or prohibition with respect to its right to enter into this Agreement and to fully perform its terms." (Contract P 22(a).) There is nothing about the plaintiff's allegation with respect to GOAT's warranty which raises any alleged misrepresentation going beyond what is contained [*15] in this provision of the contract. Indeed, in its opposition to the defendants' motion to dismiss the claim, the plaintiff argues that the alleged false representations which induced it to enter the contract are those which are contained in P 22(a) of the contract. (*See* Plaintiff's Memorandum of Law in Opposition, at 5.) The allegation as to the false warranty is therefore plainly not collateral and it does not support a claim for fraud. *See Suzy Phillips Originals, Inc. v. Coville, Inc., 939 F. Supp. 1012, 1016 (E.D.N.Y. 1996)* (holding that fraud claim which duplicates breach of warranty of merchantability fails to state a cause of action), *aff'd, 125 F.3d 845 (2d Cir. 1997); J.E. Morgan Knitting Mills, Inc. v. Reeves Brothers, Inc., 243 A.D.2d 422, 663 N.Y.S.2d 211 (1st Dep't 1997)* (holding that claim that warranty as to liabilities on property was false does not state a cause of action for fraud).

Similarly, the plaintiff's allegations as to representations about GOAT's efforts to secure talent and its approval of promotional materials also concern matters which are specifically covered by the contract with Four Finger. The [*16] contract required GOAT to "make reasonable efforts in assisting with publicity and obtaining talent" (Contract P 2(d)), and under the contract GOAT agreed not to withhold its consent for advertising and promotions unreasonably (*see* Contract P 3). These allegations are therefore also not collateral. Accordingly, because it duplicates the breach of contract claim, the plaintiff's claim for fraud fails to state a claim, and it is dismissed. Since it cannot be said that the plaintiff would be unable to plead a claim for fraud, the claim is dismissed without prejudice. [1]

> 1   In light of the foregoing, it is not necessary to decide whether the fraud claim also fails because it fails to plead the elements of fraud with sufficient particularity under *Fed. R. Civ. P. 9(b).* It is also not necessary to decide at this time whether the claim for fraud is barred because the contract contains a sufficiently specific merger clause. Similarly, it is not necessary to determine at this time whether, as the defendants assert, the claim against DiNicola fails because he is not liable for actions in accordance with his duties as GOAT's attorney. Those issues may properly be addressed if the plaintiff repleads its claim in an amended complaint in this action.

[*17] **(D)**

The plaintiff's third claim, brought against all defendants, is for tortious interference with contract. The plaintiff alleges that "defendants IMG and DiNicola induced GOAT to breach its agreement with [Four Finger] and/or (in the case of all defendants) interfered with GOAT's, [Four Finger's], and Hoffman's performance under the GOAT Contract and Hoffmann Contract rendering such performance impossible." (Compl. P 119.)

Case 1:07-cv-05471-BSJ-KNF    Document 12-5    Filed 07/25/2007    Page 9 of 16

Page 5
2000 U.S. Dist. LEXIS 1221, *

The plaintiff alleges that "the defendants' acts of interference leading to the breach of the GOAT and Hoffmann Contracts included . . . (i) negotiating and cosummating a competing agreement between IMG and GOAT/Ali; (ii) touting IMG as the exclusive representative of Muhammad Ali; (iii) widely disseminating IMG's purported belief that the Muhammad Ali World Healing Project concert would not . . . occur; [and] (iv) hiring, or orchestrating the hiring of, Mr. Sampliner so as to nullify Hoffmann's interest in pursuing its rights as a third party beneficiary to the GOAT Contract." (Compl. P 120.)

The defendants argue that because this claim is based on alleged events which occurred more than one year before the filing of the complaint in this [*18] action on February 19, 1999, the claim is untimely. The argument is without merit. In New York, the statute of limitations for a tortious interference with contractual relations claim is three years. See N.Y. C.P.L.R. § 214(4); see also Norris v. Grosvenor Marketing Ltd., 803 F.2d 1281, 1287 (2d Cir. 1986); Meridien Int'l Bank Ltd. v. Government of the Republic of Liberia, 23 F. Supp. 2d 439 451 (S.D.N.Y. 1998); Union Carbide Corp. v. Montell, 1998 U.S. Dist. LEXIS 12228, No. 95 Civ. 0134, 1998 WL 474207, *2 (S.D.N.Y. Aug. 12, 1998); Kenneth D. Laub & Co. v. Bear Stearns Companies, Inc., 262 A.D.2d 36, 692 N.Y.S.2d 30, 32 (1st Dep't 1999). In arguing that a one-year statute of limitations applies, the defendants rely principally on this Court's decision in Rodriguez v. American Friends of the Hebrew University, Inc., 1998 U.S. Dist. LEXIS 3701, No. 96 Civ. 240, 1998 WL 146227, at *6 (S.D.N.Y. March 25, 1998). However, the application of a one-year statute of limitations in Rodriguez was based on the well-recognized principle that where a claim alleges injury to the plaintiff's reputation, rather than to its economic interests, the one-year statute of limitations [*19] under N.Y. C.P.L.R. P 215(3) applicable to defamation and slander claims applies, so as to prevent a plaintiff from bringing an untimely claim based on injury to reputation by labeling the claim as something else. See Riddell Sports Inc. v. Brooks, 872 F. Supp. 73, 76 (S.D.N.Y. 1995); Santagada v. Lifedata Medical Services, Inc., 1993 U.S. Dist. LEXIS 13093, No. 92 Civ. 6110, 1993 WL 378309, at *4 (S.D.N.Y. Sept. 22, 1993); Entertainment Partners Group, Inc., 198 A.D.2d 63, 603 N.Y.S.2d 439, 440 (1st Dep't 1993). In this action, there is no claim based on libel or slander and there are no allegations at all that the plaintiff's reputation was injured. The three-year statute of limitations therefore applies. See Classic Appraisals Corp. v. DeSantis, 159 A.D.2d 537, 552 N.Y.S.2d 402, 403 (2d Dep't 1990). It is not disputed that the plaintiff's claim is timely under the three-year statute of limitations. The defendants are therefore not entitled to dismissal of the claim on the ground that it is untimely.

The defendants also argue that the claim for tortious interference with contract must be dismissed because it fails to state a claim. Under New [*20] York law, the elements of a tortious interference with contract claim are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996) (citing Israel v. Wood Dolson Co., 1 N.Y.2d 116, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97 (1956)). The defendants argue that the plaintiff's claim is deficient because it fails to allege that a third party knew about the contracts with GOAT and Hoffmann and procured a breach of those contracts. It is plain that the complaint does not adequately plead the elements of a claim for tortious interference with contract. In the first place, with respect to the GOAT contract, it is not clear from the complaint which defendants the plaintiff alleges were the third parties which induced the breach of that contract. The claim for tortious interference is asserted against all defendants but it is evident that GOAT can not be both a party to the contract as well as the third, interfering, party. As to the [*21] other defendants, there are no specific allegations of actions taken by any specific defendant that caused the breach of the GOAT contract. With respect to the Hoffmann contract, the complaint does not contain any allegations as to what the breach of that contract was, which specific defendants are liable for tortious interference with that contract, or how the plaintiff has been injured by that breach such that it may assert this claim. In its response to IMG's motion to dismiss the claim for tortious interference with contract against it, the plaintiff states that there were in fact "concurrent breaches by both parties to the Hoffmann Contract" (Memorandum in Opposition, at 21). However, there are no allegations in the Complaint as to what those mutual breaches were, or how they were caused by IMG or any of the other defendants, or why the defendants are liable if, as the plaintiff's Memorandum suggests, Four Finger itself breached the Hoffmann contract. The plaintiff's claim is plainly defective because it does not plead with sufficient clarity allegations which would support a finding of tortious interference with contract. The claim is therefore dismissed. Since it cannot be said [*22] that the plaintiff could not replead its claim with sufficient particularity, the dismissal is without prejudice.

(E)

The plaintiff's fourth claim for relief alleges that all of the defendants interfered with the plaintiff's prospective economic advantages and business relations. The defendants argue that this claim is also untimely because it too is subject to a one-year statute of limitations. The defendants are not entitled to dismissal of the claim on

this basis. In New York, the statute of limitations for this claim is three years where, as here, the plaintiff alleges economic injury rather than reputational injury. *See Riddell Sports, 872 F. Supp. at 75-76.*

The defendants also assert that the plaintiff has failed to plead the necessary elements of the claim and that it must be dismissed on this basis. In order to state a claim for interference with prospective economic advantages and business relations, the plaintiff "must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury [*23] to the relationship." *Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994); see also Riddell Sports, 872 F. Supp. at 78 n.2.* It is clear that the plaintiff has failed to allege sufficient facts to meet these elements. The plaintiff alleges that the defendants "enticed Four Finger into expending considerable energy and resources into resuscitating the essence of the GOAT and Hoffmann Contracts in a new or modified deal between GOAT, IMG, Mr. Hauser and potential new parties" (Compl. P 123), in order "to distract [Four Finger] from forcefully asserting its legal rights so that IMG could continue to exploit the rights to Mr. Ali's name" (Compl. P 124), and that this scheme allowed "all the defendants [to] avoid[] . . . immediate litigation [by Four Finger]" (Compl. P 126). However, the complaint does not specify any business relations with third parties with which any of the defendants interfered, or any economic opportunities which were lost as a result of the defendants' conduct. The claim is therefore deficient. *See Riddell Sports, 872 F. Supp. at 78* ("In order to state such a claim, a plaintiff must allege that, but for defendant's [*24] conduct, his prospective relations would have coalesced into actual contracts."). Indeed, while the plaintiff alleges that the defendants themselves had no intention of entering into a new arrangement with the plaintiff (*see* Compl. P 123), the complaint fails to identify any other relationships with any other specific parties with which the defendants interfered. The complaint appears even to suggest that this very litigation is the economic advantage the plaintiff lost but plainly bringing a law suit against these defendants does not constitute a relationship with a third party with which these defendants have interfered. In its papers in opposition to the motion to dismiss, the plaintiff explains that the thrust of its claim is not that Four Finger refrained from litigation but that it lost opportunities to revive the concert project by way of a relationship with Frontier Media. (*See* Memo at 24). This, however, is not alleged in the Complaint as the relationship with which the defendants interfered, and in any event there are no allegations as to how the defendants interfered with a relationship with Frontier Media or any other entity. The plaintiff has failed to state a [*25] claim for interference with economic advantage and the claim is therefore dismissed without prejudice.

(F)

The plaintiff's fifth claim for relief alleges that GOAT breached fiduciary duties it owed to Four Finger as a result of GOAT's joint-venture with Four Finger to promote the concerts. (*See* Compl. P 130.) GOAT correctly argues that its contract with Four Finger specifically denies that there was a joint-venture or partnership between GOAT and Four Finger. (*See* Contract P 23.) The plaintiff does not respond to the defendants' motion to dismiss the claim on this basis, and the plaintiff has not alleged in the complaint any other basis to support a claim for breach of fiduciary duty. The claim is plainly abandoned and it is dismissed with prejudice.

(G)

The plaintiff's sixth claim is for promissory estoppel. Four Finger alleges that DiNicola and GOAT promised they would assist in procuring talent for the concert and that they would not unreasonably withhold their approval for advertising and production, and that Four Finger detrimentally relied on these promises. (*See* Compl. PP 134, 135.) GOAT and DiNicola argue that the plaintiff has failed to state a [*26] claim. The elements of a cause of action for promissory estoppel in New York are (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise was made, and (3) an injury to the party to whom the promise was made by reason of the reliance. *See Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995); Apsan v. Gemini Consulting, Inc., 1999 U.S. Dist. LEXIS 1104,* No. 98 Civ. 1256, 1999 WL 58679, at *4 (S.D.N.Y. Feb. 4, 1999); *Advanced Marine Technologies, Inc. v. Burnham Sec., Inc., 16 F. Supp. 2d 375, 381 (S.D.N.Y. 1998); Van Brunt v. Rauschenberg, 799 F. Supp. 1467, 1473 (S.D.N.Y. 1992).* Here, the contract between GOAT and Four Finger specifies the defendants' obligations with respect to procuring talent and approving advertising and promotions. (*See* Contract PP 2(d), 3(a).) The defendants therefore correctly argue that it was not reasonable for the plaintiff to rely on any contrary promises which the defendants allegedly made concerning additional efforts that they would make as to these very issues. *See Apsan,* 1999 WL 58679, at *5 (dismissing promissory [*27] estoppel claim based on promise of long-term employment where agreement provided that employment could be terminated at will); *Sanyo Elec., Inc. v. Pinros & Gar Corp., 174 A.D.2d 452, 571 N.Y.S.2d 237, 238 (1st Dep't 1991)* (dismissing promissory estoppel counterclaim where "the alleged promise . . . was completely contradicted shortly thereafter by written representations"); *see also Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 530-31*

*(S.D.N.Y. 1996)* (finding that the reasonable reliance element of a fraudulent concealment cause of action was not met where allegations of reliance on an oral promise were "flatly contradicted by [the] express terms" of a written agreement). And, to the extent that the plaintiff's claim for promissory estoppel is based on promises that are consistent with the undertakings contained in the contract, the claim is that the defendants did not perform their obligations under the contract and therefore the claim should be dismissed as duplicative of the breach of contract claim. *See A.I.A. Holdings, S.A. v. Lehman Brothers, Inc., 1998 U.S. Dist. LEXIS 4175*, No. 97 Civ. 4978, 1998 WL 159059, at *8 (S.D.N.Y. April 1, 1998). [*28] In light of the foregoing, it is unnecessary to address the defendants' contention that the alleged promises are too vague. The claim for promissory estoppel is dismissed without prejudice.

CONCLUSION

For all of the foregoing reasons, the defendants' motions to dismiss the complaint are granted in part and denied in part. The motion to dismiss the plaintiff's first cause of action for breach of contract is denied. The plaintiff's fifth claim, for breach of fiduciary duty, is dismissed with prejudice. The second, third, fourth, and sixth claims, for fraud, interference with contract, interference with economic advantage, and promissory estoppel respectively, are all dismissed without prejudice to the plaintiff filing an amended complaint in accordance with this opinion within thirty (30) days of the date of this opinion and order.

**SO ORDERED.**

**DATED: New York, New York**

*2/5/00*

**John G. Koeltl**

**United States District Judge**

LEXSEE 2000 U.S. DIST. LEXIS 11661


Cited
As of: Jul 24, 2007

STEVEN HAFFNER, Plaintiff, - against - BRYAN CAVE LLP, Defendant.

98 Civ. 0552 (DC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 11661*

August 14, 2000, Decided
August 15, 2000, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment denied in part and granted in part. Plaintiff's motion for sanctions and to compel discovery denied in part and granted in part.

**COUNSEL:** Robert D. Lipman, Esq., Lizabeth Schalet, Esq., David A. Robins, Esq., LIPMAN & PLESUR, LLP, Jericho, New York, for Plaintiff.

Darrell S. Gay, Esq., Sonya D. Johnson, Esq., GAY & HARDAWAY, New York, New York, for Defendant.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

CHIN, D.J.

Plaintiff Steven Haffner ("Haffner") joined the law firm Bryan Cave LLP ("Bryan Cave" or the "Firm") as an associate attorney in 1988. In 1994, while working at the Firm, Haffner began to experience personal problems that eventually led him to take a leave of absence for emotional distress. Haffner alleges that when he returned to work following his leave of absence, Bryan Cave refused to reinstate him and terminated his employment in violation of the Family and Medical Leave Act of 1993 ("FMLA"), *29 U.S.C. § 2601 et seq. (1999)*, and thereby also discriminating against him on the basis of an actual or perceived disability in violation of state and city [*2] Human Rights laws. Haffner further alleges that over the course of his employment, Bryan Cave breached the implied covenant of good faith and fair dealing, violated New York's Labor Law ("Labor Law"), *N.Y. Labor Law § 190 et seq.* (McKinney 1986 & Supp. 2000), and breached his employment contract by denying him bonuses, commissions, and reimbursement of out-of-pocket expenses.

Bryan Cave moves for summary judgment pursuant to *Fed. R. Civ. P. 56* contending that Haffner was discharged for poor performance and that he is not owed any bonuses, commissions, or reimbursements from the Firm. Haffner cross-moves for sanctions and to compel discovery pursuant to *Fed. R. Civ. P. 37*. For the reasons stated below, Bryan Cave's motion for summary judgment is denied as to the FMLA and Human Rights laws claims and granted as to all other claims. Haffner's cross-motion is denied in part and granted in part.

*BACKGROUND*

A. *Plaintiff's Employment with Bryan Cave*

On January 4, 1988, Bryan Cave offered Haffner an associate position in the litigation department of its New York office. (Affidavit of Darrell S. Gay, dated December 9, 1999, ("Gay Aff.") Ex. 25). Haffner accepted the [*3] offer and began work at Bryan Cave in February 1988; he was supervised primarily by partners Robert Dwyer ("Dwyer") and Michael Biggers ("Biggers"). (Def 56.1 PP 5-6; Pl. 56. 1 P 4; Deposition of Steven Haffner p. 34 ("Haffner Dep.") annexed to the Gay Aff. Ex. 3).

Case 1:07-cv-05471-BSJ-KNF   Document 12-5   Filed 07/25/2007   Page 13 of 16

Page 2
2000 U.S. Dist. LEXIS 11661, *

Each year the partners at Bryan Cave completed written evaluations of the associates. (Def. 56.1 PP 1-2). Over the years, Haffner's evaluations were generally good; many of his evaluations stated that his potential for partnership was "excellent," and for a period of time he was the highest paid associate in his class. (Affidavit of Steven R. Haffner, dated January 14, 2000, ("Haffner Aff.") P 5; Gay Aff. Ex. 15; Affidavit of Marian Freed, dated February 3, 2000 P 4). Haffner's evaluations also contained many negative comments regarding his timeliness and dependability, and his file includes memoranda detailing disputes between Haffner and Bryan Cave's support staff. (Gay Aff. Exs. 9-15; Haffner Aff. P 3). Despite the negative comments, Haffner claims that Dwyer assured him he "was on a partnership track." (Haffner Aff. P 6).

In January 1994, Haffner began to have marital problems that led to a [*4] separation from his wife and eventually divorce proceedings. (Haffner Aff. P 8; Haffner Dep. pp. 120, 165, annexed to the Affidavit of Robert D. Lipman, dated January 14, 2000, ("Lipman Aff.") Ex. N). Haffner claims that his marital problems "triggered the onset of a serious and debilitating depression" (Pl. 56. 1 P 12), and that "from the outset" -- as early as January 1994 -- the partners at Bryan Cave, including Biggers and Jody Pope ("Pope"), were "well aware" of his marital and psychological problems. (Pl. 56. 1 P 13; Haffner Dep. p. 165). Indeed, because of his "mental state and disability," in January 1994 Haffner requested that Bryan Cave lighten his workload. (Pl. 56. 1 P 15; Haffner Dep. pp. 164-65).

In April 1994, Biggers and partner Robert Lucy met with Haffner to discuss his evaluations and to inform him that his eligibility for partnership would be deferred for a year because some of his evaluations were unfavorable and because he needed to increase his billable hours. (Def. 56. 1 P 8; Pl. 56. 1 P 14; Haffner Dep. p. 171-73, 252). Haffner expressed concern about the deferral because of his "severe emotional [*5] and personal problems." (Haffner Dep. pp. 165-66, 172). In the summer of 1994, Haffner asked the Firm's health coordinator about the Firm's disability insurance and leave policies and visited therapists under the Firm's health plan. (Haffner Aff. P 10; Haffner Dep. p. 200).

Bryan Cave contends, and Haffner disputes, that in December 1994 Dwyer, Biggers, and Pope decided to terminate Haffner's employment. (Def. 56. 1 P 10; Deposition of Michael Biggers ("Biggers Dep.") pp. 105-06, annexed to the Gay Aff. Ex. 5). Dwyer testified, however, that he had no recollection of this meeting. (Dwyer Dep. pp. 248-49, annexed to Lipman Aff. Ex. P). Moreover, despite this purported decision, Bryan Cave called Haffner in late December while Haffner was on vacation and asked him to handle an emergency matter for a client. (Haffner Aff. P 11). On January 10, 1995, the entire New York partnership met and discussed Haffner; no one objected to Haffner's discharge. (Def. 56.1 PP 11-12; Biggers Dep. pp. 147-150; Gay Aff. Ex. 16). Bryan Cave contends that at the time the discharge decision was made, Haffner had not yet requested disability leave. (Biggers Dep. pp. 149-50). It is not clear from [*6] the record, however, exactly when Haffner requested disability leave. (Haffner Dep. pp. 152-53; Deposition of Sydell Sloan, p. 25, annexed to Gay Aff. Ex. 6; Def. 56. 1 P 13; Pl. 56. 1 P 22). Nor is it clear that Bryan Cave actually decided to discharge Haffner following the January 10, 1995 meeting. (Dywer Dep. pp. 334-35).

On January 25, 1995, Dwyer and Biggers met with Haffner. The substance of the conversation is disputed. Bryan Cave contends that Haffner was told he would not make partner and had no future at the Firm. (Def. 56.1 PP 14-15). Haffner concedes that he was told his future at the Firm was "bleak" but insists that he was not told that he would not make partner, that he had no future with the Firm, or that he was fired. (Pl. 56.1 PP 26-28). At the meeting, Dywer encouraged Haffner to take severance rather than disability; a contemporaneous memo indicates that Haffner was told the Firm had been "about to terminate him." (Gay Aff. Ex. 17; Pl. 56. 1 P 25).

From February 1, 1995 through April 24, 1995, Haffner took disability leave and received his full salary. (Def. 56. 1 P 16; Haffner Dep. pp. 216-17, 221; Gay Aff. Ex. [*7] 20). On April 24, 1995, Haffner told Biggers that he was ready to return to work. (Gay Aff. Ex. 20; Haffner Dep. pp. 216-17). Three days later, however, Haffner was discharged. (Haffner Dep. pp. 221-22; Gay Aff. Ex. 28). Haffner received severance payments through September 1995. (Haffner Dep. p. 225; Def. 56. 1 P 19).

**B. *Bryan Cave's Reimbursement and Bonus Policies***

In accordance with Bryan Cave's Associate Manual (which Haffner does not dispute receiving), local mileage, tolls, and parking expenses were reimbursable except those associated with "the initial trip between [the associate's] home and the first place of business and the last place of business and [the associate's] home each day - i.e. 'commuting expenses.'" (Gay Aff. Ex. 7, p. 38). All expenses above twenty-five dollars required a receipt for reimbursement. (*Id.*).

Bryan Cave's Associate Manual further provided:

> Fees received by the Firm in each calendar year as a result of profitable work for new clients brought to the Firm by an Associate will be shared between the Associate and the Firm on the following ba-

sis: the Associate will receive 50% of the first $ 5,000 of the fees [*8] received and 25% of the second $ 5,000 of the fees received, regardless of who actually performs the services, until the total amount paid or credited to the Associate in any one year reaches $ 3,750. Amounts received thereafter during that year from such business will be retained by the Firm.

When representation of a client or clients brought to the Firm by an Associate is particularly profitable to the Firm, a bonus may be paid to the Associate in recognition thereof.

(Gay Aff. Ex. 7, p. 18).

While at Bryan Cave, Haffner brought in two new clients, Victor and Joel Goldsmith. (Affidavit of Michael Biggers, dated December 9, 1999, ("Biggers Aff.") P 20). Bryan Cave billed these clients in excess of $ 30,000 but collected only $ 5,000 in fees from them. (*Id.*). The Goldsmiths were unhappy with Haffner's representation and demanded a refund. (*Id.*; Haffner Aff. P 22; Gay Aff. P 27; Deposition of Robert J. Dwyer ("Dwyer Dep.") p. 282, annexed to the Gay Aff. Ex. 4).

## DISCUSSION

### A. *Bryan Cave's Motion for Summary Judgment*

#### 1. *Summary Judgment Standards*

The standards governing motions for summary judgment are well settled. A court may grant summary [*9] judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See Fed R. Civ. P. 56(c)*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor. *See id.*

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586*. As the Supreme Court stated in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50*. The nonmoving party may not rest upon mere conclusory allegations or [*10] denials, but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989)* (quoting *R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984)* (internal quotations omitted)).

#### 2. *FMLA and Human Rights Law Claims*

Haffner claims that Bryan Cave refused to reinstate him and discharged him following his medical leave of absence in violation of the FMLA. He further contends that Bryan Cave discriminated against him in violation of the New York City Human Rights Law, New York City Administrative Code § 8-101 *et seq.*, and the New York State Human Rights Law, *N.Y. Exec. Law § 290 et seq.*, by (1) denying him partnership and discharging him because of his actual or perceived disability, and (2) failing to accommodate his disability -- depression -- by lightening his workload and permitting him to take a leave of absence. Bryan Cave contends that it is entitled to summary judgment on these claims.

Haffner has presented sufficient evidence, however, to raise genuine issues of material fact with respect to: (1) whether he was "disabled" or [*11] perceived as being disabled; (2) whether the Firm made the decision to discharge Haffner before or after he took a medical leave of absence; (3) whether the Firm was on notice or believed that Haffner was disabled at the time it made the decision discharge him; (4) whether the Firm was on notice that Haffner was disabled such that it could have provided reasonable accommodations; and (5) whether the Firm's articulated reasons for discharging Haffner are pretextual. Hence, summary judgment is not appropriate with respect to the FMLA and Human Rights laws claims.

#### 3. *Breach of the Implied Covenant of Good Faith and Fair Dealing Claim*

According to Haffner, when he was hired Bryan Cave agreed to pay him bonuses if he brought new business into the Firm and to follow "certain protocols regarding granting [him] partnership." (Compl. P 78). Haffner alleges that Bryan Cave failed to follow through on its promises and that by these failures Bryan Cave breached the covenant of good faith and fair dealing implicit in contracts under New York law. Bryan Cave argues that because Haffner was an at-will employee -- a fact Haffner does not contest -- he cannot assert a claim under the [*12] implied covenant of good faith and fair dealing.

It is "well-settled New York law [] that no implied covenant of good faith and fair dealing attaches to at-will

Case 1:07-cv-05471-BSJ-KNF   Document 12-5   Filed 07/25/2007   Page 15 of 16

Page 4
2000 U.S. Dist. LEXIS 11661, *

employment contracts." *Nunez v. A-T Fin. Info. Inc., 957 F. Supp. 438, 443 (S.D.N.Y. 1997); see Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 213, 506 N.E.2d 919, 922-23 (1987)* (implied covenant is inconsistent with employer's right to terminate at-will employee) (discussing prior decision in *Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983))*; *but see Wieder v. Skala, 80 N.Y.2d 628, 638, 609 N.E.2d 105, 110, 593 N.Y.S.2d 752, 756 (1992)* (professional ethical obligations implied in law firm-associate relationship). Haffner relies exclusively on the Second Circuit's decision in *Wakefield v. Northern Telecom., Inc., 769 F.2d 109 (2d Cir. 1985)*, for the proposition that Bryan Cave's "promises regarding the method and process for becoming a partner and obtaining bonuses created a right distinct from his employment relationship." (Opp. Mem. p. 29).

In *Wakefield*, the Second [*13] Circuit held that an at-will employee could recover under the covenant of good faith and fair dealing if the employee demonstrated that the employer fired him to avoid paying him earned commissions on completed sales. *Wakefield, 769 F.2d at 112.* In contrast, where, as here, the payment of a bonus or the promise of partnership [1] is discretionary such that "no fixed amount was due at the time of termination," the employee cannot state a claim under the implied covenant of good faith and fair dealing. *Plantier v. Cordiant PLC, 1998 U.S. Dist. LEXIS 15037*, No. 97 Civ. 8696, 1998 WL 661474, at *2 (S.D.N.Y. Sept. 24, 1998) (allegation that employer fired employee to avoid paying discretionary annual bonus does not state claim under implied covenant); *see Gallagher v. Lambert, 74 N.Y.2d 562, 565, 549 N.Y.S.2d 945, 946, 549 N.E.2d 136, 137 (1989)* (allegation that employer fired employee to avoid paying higher price for stock option does not state claim under implied covenant). Accordingly, Haffner's claim for breach of the implied covenant of good faith and fair dealing is dismissed. [2]

> 1 Haffner's offer letter from Bryan Cave provided that he would be "*considered* for partnership, together with other Associates in [his] class." (Gay Aff. Ex. 25) (emphasis added).

[*14]

> 2 Haffner does not clearly indicate what "bonus" he was denied. To the extent Haffner's claim for a bonus is based not on the discretionary bonus that "may be paid" for "particularly profitable" business, but rather on the non-discretionary "fee sharing" bonus consisting of a percentage of the first $ 10,000 in fees the Firm collects "as a result of profitable work for new clients brought to the Firm by an Associate," his claim fares no better. (Gay Aff. Ex. 7, p. 18). The record shows that the Firm did not profit from any client Haffner brought to the Firm; accordingly, no reasonable juror could find that Haffner is entitled to shared fees. (Biggers Aff. PP 5-6; Dwyer Dep. p. 282; Haffner Aff. P 20).

### 4. *Labor Law Claims*

Haffner asserts that Bryan Cave wilfully violated New York's Labor Law by requiring him to incur expenses without reimbursement and by failing to pay him wages in the form of a promised bonus or commission for bringing in new clients.

#### a. *Reimbursement of Expenses*

Bryan Cave argues that: (1) Haffner has no contractual right to reimbursement of his unreimbursed [*15] expenses and therefore cannot recover under the Labor Law; and (2) Haffner cannot assert a claim for reimbursement of expenses because as a professional earning over $ 600.00 per week, Haffner does not meet the statutory prerequisites of § 198-c(3) of the Labor Law.

According to Haffner, his unreimbursed expenses include both "parking expenses" he incurred in commuting to work and other expenses such as meals, taxis, and "perhaps some court fees" for which he neither submitted expense reports to Bryan Cave nor retained receipts. (Haffner Dep. pp. 478-81, 485, annexed to the Gay Aff. Ex. 3). Neither Haffner's opposition memorandum nor his Local Civil Rule 56.1 Statement points to any evidence of actual, identifiable expenses Haffner incurred that Bryan Cave failed to reimburse. Moreover, it is clear from Bryan Cave's Associate Manual that associates were not eligible for reimbursement of "commuting expenses." (Gay Aff. Ex. 7, p. 38). Absent an enforceable contractual right to wages, an employee cannot assert a statutory claim under the Labor Law. *See Tierney v. Capricorn Invs. LP, 189 A.D.2d 629, 631, 592 N.Y.S.2d 700, 703 (1st Dep't), leave to appeal denied,* [*16] *81 N.Y.2d 710, 599 N.Y.S.2d 804, 616 N.E.2d 159 (1993).* Because Haffner has not presented any evidence from which a reasonable jury could find a contractual right to reimbursement of any expenses, he cannot recover under the Labor Law and his claim is dismissed. I do not reach defendant's alternative argument.

#### b. *Unpaid Bonuses or Commissions*

In response to Haffner's second Labor Law claim, Bryan Cave argues that: (1) Haffner is not entitled to any bonuses because he did not bring in "profitable" new clients; and (2) the bonuses or commissions Bryan Cave pays to associates for bringing new clients to the Firm are "incentive" bonuses and therefore do not fall within the Labor Law's definition of "wages." *See* Labor Law § *190(1).* Haffner has not pointed to any evidence in the record that shows he is entitled to a bonus or commission for new clients he introduced to the Firm. Indeed, the

Case 1:07-cv-05471-BSJ-KNF   Document 12-5   Filed 07/25/2007   Page 16 of 16

Page 5
2000 U.S. Dist. LEXIS 11661, *

only evidence the record contains on the subject shows that the Firm did not earn a profit -- a necessary prerequisite to any bonus or commission under Bryan Cave's policy -- from any of Haffner's clients. (Biggers Aff. PP 5-6; Dwyer Dep. p. 282; Haffner Aff. P 20; Gay Aff. [*17] Ex. 7, p. 18). Because no reasonable juror could find that Bryan Cave violated New York's Labor Law by failing to pay Haffner a bonus or commission, his claim must be dismissed. I do not reach defendant's alternative argument.

### 5. Breach of Contract Claim

Haffner asserts that Bryan Cave breached its contract with him by failing to pay him a bonus or commission for new clients he brought to the Firm and failing to reimburse him for out-of-pocket expenses. As discussed above, Haffner has not pointed to any evidence in the record from which a reasonable juror could conclude that he is contractually entitled to a bonus, commission, or reimbursement of expenses. Accordingly, Haffner's breach of contract claim is dismissed.

### B. *Haffner's Motion for Sanctions and to Compel Discovery*

On June 7, 1999, I ordered that to the extent Bryan Cave was going to argue that Haffner performed poorly with respect to specific case matters, the case files for those matters had to be produced. I further allowed Haffner to take a four-hour deposition of Biggers and set a discovery deadline of July 30, 1999. On September 22, 1999, I extended the discovery deadline to October 29, 1999 and [*18] again ordered Bryan Cave to produce the case files and to make Biggers available for deposition. Bryan Cave did eventually make all the case files available for inspection. Many files, however, were not produced until October 27, 1999 and one file, Harris/Eastern Airlines, was not made available until November 2, 1999 -- after the discovery deadline -- and then only for a limited time. Bryan Cave-did not permit Haffner to depose Biggers following inspection of all the files, contending that the discovery deadline had elapsed.

Haffner now complains that Bryan Cave:

> unfairly and unreasonably delayed and then restricted the dates and times available for the case files inspection; failed to produce all of the ordered documents before the discovery cut-off and refused to set a date for the Biggers' deposition subsequent to plaintiff's review of the case files or under any circumstances on October 29, 1999.

(Pl. Mem. p. 7).

Accordingly, Haffner requests additional time to review the specific case matter files on which he worked while at Bryan Cave and the opportunity to depose Biggers regarding documents uncovered in the case files. In the alternative, Haffner requests [*19] both monetary and non-monetary sanctions, the latter in the form of an order precluding Bryan Cave from introducing evidence of Haffner's performance with respect to specific case matters and from relying on the case files or Biggers's testimony at trial. *See Fed. R. Civ. P. 37(b)(2)*. In opposition, Bryan Cave contends that: (1) Haffner was "extremely late to every case file review session"; (2) Haffner did not request the Harris/Eastern Airlines file until October 20, 1999; (3) Haffner waited until the day before the close of discovery to attempt to schedule Biggers's deposition; and (4) Haffner never indicated "that it was pertinent that the inspection of case files be completed before Michael Biggers was deposed." (Opp. Mem. p. 7).

Bryan Cave shall produce again for inspection by plaintiff and his counsel the case files that were not produced until October 27, 1999 or thereafter. In other words, plaintiff is to be given additional time to review these files, which are to be made available for review on or before August 28, 2000. Biggers is to be produced for deposition after the files are produced and before September 8, 2000 (unless the parties *agree* to another date). [*20] Plaintiff's request for sanctions is denied.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied in part and granted in part. Plaintiff's motion for sanctions and to compel discovery is denied in part and granted in part. The parties shall appear for a pretrial conference on September 8, 2000 at 10:30 a.m., United States Courthouse, Courtroom 11A, 500 Pearl Street, New York, New York 10007.

SO ORDERED.

Dated: New York, New York

August 14, 2000

DENNY CHIN

United States District Judge