Westlaw.

Slip Copy                                                                                                          Page 1
Slip Copy, 2007 WL 1577666 (E.D.Wis.)
**(Cite as: Slip Copy)**

Henry v. Milwaukee County
E.D.Wis.,2007.
Only the Westlaw citation is currently available.Ersol L. HENRY and Terri J. Lewis, Plaintiffs,
v.
MILWAUKEE COUNTY, Defendant.
No. 04-C-432.

May 31, 2007.

Sandra Graf Radtke, Gillick Wicht Gillick & Graf, Milwaukee, WI, for Plaintiffs.
Timothy R. Karaskiewicz, Milwaukee County Corporation Counsel, Milwaukee, WI, for Defendant.

### DECISION AND ORDER
RUDOLPH T. RANDA, Chief Judge.
*1 This matter was tried to the Court on March 19-21, 2007. The plaintiffs, Ersol Henry (" Henry") and Terri Lewis (" Lewis"), worked as Juvenile Correction Officers (" JCOs") at Milwaukee County's Juvenile Detention Center (" JDC"). Henry and Lewis allege that they were denied overtime assignments on third shift at the JDC because of their gender in violation of Title VII. Henry and Lewis also allege that they were subjected to a variety of other indignities (cf. " adverse employment actions") in the workplace on account of their gender. Finally, Henry and Lewis allege that they were retaliated against for filing complaints of discrimination.

The Court finds that: (1) plaintiffs were not affected in the terms and conditions of their employment; (2) plaintiffs were not subject to discrimination on account of their gender or in retaliation for filing discrimination complaints; and (3) gender was a Bona Fide Occupational Qualification (" BFOQ") for JCOs working third shift at the JDC.

Therefore, the plaintiffs are not entitled to relief and this matter is dismissed.

### FINDINGS OF FACT

Milwaukee County operates the JDC for the care, safety, security and rehabilitation of juvenile detainees entrusted to its care. The living areas of the JDC are organized into living units called " pods" which contain individual cells. Pods at the JDC can accommodate from 11 to 22 juveniles. The pods are segregated by gender so that the living areas of boys and girls are separated.

Each pod is separated by a series of security doors. Each cell contains a bed, a toilet, a desk, and a small storage area. All of the areas in each cell are visible from the outside of the cell through a window in the cell door. The cell doors are constructed in a way that allows the cell occupant to communicate through the door. Although the juveniles sleep in individual cells, they spend the majority of their daytime hours in a common room, classroom, or recreation room.

It is only on third shift (from the hours of 11:00 p.m. to 7:00 a.m.) that the juveniles are confined to their individual cells. On third shift, the JCOs are required to view each inmate at 15 and 30 minute intervals. There are no co-educational pods at the JDC.

In February 1997, Milwaukee County implemented a new policy where it would not allow women to work on third shift male pods. The change coincided with the JDC moving into a new detention facility. For many years prior to February 1997, women, including the plaintiffs, were allowed to work numerous hours of voluntary overtime on third-shift male pods. This occurred even if the woman was the only JCO assigned to that pod.

Most of the available overtime was on male pods because the facility contains many more male pods than female pods. Third shift overtime was more available than overtime on other shifts. Unlike the other two shifts, third shift overtime offered premium pay. After February 1997, plaintiffs were unable to work as much overtime as they previously worked.

*2 The JDC is required by both Wisconsin statute and regulation and its own mission statement and policies, to provide for the care and rehabilitation of juveniles in its custody. B. Thomas Wanta was appointed superintendent of the JDC in 1991. Superintendent Wanta is an experienced juvenile correctional institution administrator. Wanta adapted the theory of same-gender role modeling/mentoring programs for use at the JDC for the same reasons that such programs are used in other settings-to improve the chances that juveniles will not relapse into a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pattern of delinquent behavior.

Wanta also changed the supervision model used by staff members at the JDC to facilitate and further advance the benefits of a role-modeling/mentoring program. Previously, staff members followed an "indirect supervision" model where staff members observed juveniles from a distance without significant interaction. Wanta initiated a "direct supervision" model that brings staff members into close, direct contact with juveniles and facilitates role modeling/mentoring. Wanta's decision to employ the direct supervision model was based on his consultations with experts and colleagues and his review of the literature in the field of juvenile justice and detention and role modeling/mentoring.

It is generally accepted in the juvenile corrections field that juveniles require care and attention in excess of that provided to adults. An important consideration in caring for the juveniles entrusted to the care and custody of the JDC is to do no further harm (including sexual exploitation) to a population of children and juveniles who are already at risk for future delinquent or criminal behavior.

Same gender role modeling furthers the twin goals of rehabilitation and security in the juvenile detention setting. Research demonstrates that juveniles participating in same-gender role model/mentoring programs are significantly less likely to engage in anti-social activities or truancy. Research also demonstrates academic improvements and strengthening of family and peer relationships.

Accordingly, based on his education, experience, and independent research, Superintendent Wanta concluded and made a professional judgment that same-gender role modeling/mentoring at the JDC would have significant positive benefits for the children and juveniles detained at the Milwaukee County JDC. Wanta also concluded that this program would help him meet his statutory and regulatory obligations to engage in the care and rehabilitation of children and juveniles entrusted to the custody of the JDC.

Superintendent Wanta reasoned that in order to maintain a consistent program, same-gender role modeling/mentoring should be used on all three shifts, including overtime assignments, at the JDC. Therefore, he required that at least one same-gender JCO serve as pod supervisor on first and second shift.

Since there is only one staff member on third shift, that staff member would be required to be the same gender as the juveniles on the pod that the staff member supervised. Accordingly, Wanta developed a shift assignment policy that assigned same-gender staff members to certain posts-including each of the pods at the JDC on each of the three shifts. Thus, when a regularly assigned same-gender staff member on third shift was absent, the administration would make every effort to fill that specific post by another same-gender staff member.

**\*3** Same-gender shift assignments serve to protect the privacy interests of the juvenile detainees. On third shift, staff members have the opportunity to observe juveniles sleeping, toileting, acting out, engaging in sexual activity, or in various states of undress. Many of the JCOs who testified at trial indicated that they observed one or more of these activities during the course of their employment on third shift. Superintendent Wanta believes that nighttime observation by opposite-gender staff and other intrusions into privacy interferes with the juvenile rehabilitation process.

Same-gender shift assignments also serve the goals of risk management and security. Even though there is a security system in place at the JDC, staff members serve in geographically isolated cells/pods and may gain access to an individual juvenile cell by evading the existing security system. Actual as well as alleged heterosexual assaults and misconduct are statistically more likely than homosexual attacks. It is, therefore, inefficient from a risk management perspective to assign a staff member to an opposite gender living area on third shift. The alternative to protecting against this risk with same-gender staffing on third shift is to hire an additional staff member for each pod on third shift at an approximate cost of $750,000 per year.

Because the juveniles are normally sleeping and confined to their cells during third shift, there is less opportunity for role modeling than during the other shifts. Nonetheless, the opportunity for counseling arises from time to time even during third shift.

The plaintiffs filed EEOC complaints in May 1996 and October 1997 regarding harassment and discrimination in the workplace. On January 26, 1997, the plaintiffs were grievants regarding the gender-specific overtime assignments. Plaintiffs eventually transferred to jobs in different

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 3
Slip Copy, 2007 WL 1577666 (E.D.Wis.)
(Cite as: Slip Copy)

departments. The new jobs had a higher hourly rate of pay, but their overall income was less because of the loss of overtime.

After Henry and Lewis switched jobs, Milwaukee County abandoned same-gender JCO assignments for third shift.

## ANALYSIS

### I. Adverse Employment Action-Retaliation-Harassment

In order for an adverse employment action to be actionable under Title VII, it must " materially alter the terms and conditions of ... employment." Whittaker v. N. Ill. Univ., 424 F.3d 640, 648 (7th Cir.2005). While an adverse employment action is defined quite broadly, not everything that makes an employee unhappy suffices. *See* Traylor v. Brown, 295 F.3d 783, 788 (7th Cir.2002). If every minor change in working conditions or trivial action were a materially adverse action, then any " action that an irritable, chip-on-the shoulder employee did not like would form the basis of a discrimination suit." Williams v. Bristol-Meyer Squibb Co., 85 F.3d 270, 274 (7th Cir.1996). " Workplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse action." Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir.1996).

*4 Plaintiffs make a large number of complaints about " discrimination" and " harassment," none of which affected the terms and conditions of their employment.

For example, plaintiffs, who are friends, testified that they were not allowed to work together on the same shift. Plaintiffs have no federal right to work shift assignments in the company of friends. Plaintiffs testified that they were not assigned to work on the smaller pods or to " support positions," perceived as easier job assignments than being assigned to larger pods. There is no evidence suggesting that working on larger pods was so difficult or unpleasant that the terms and conditions of plaintiffs' employment were affected. Plaintiffs also complained that their time cards were periodically missing without explanation and that they were called regarding overtime very early in the morning on their vacation days. These trivial inconveniences simply do not rise to the level of an adverse employment action.

The inquiry with respect to plaintiffs' retaliation claims is slightly different. While the discriminatory acts proscribed by Title VII's anti-retaliation provision " are not limited to those that affect the terms and conditions of one's employment .... the employer's challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in protected activity." Roney v. Illinois Dept. of Transp., 474 F.3d 455, 461 (7th Cir.2007) (citing Burlington N. & Santa Fe Ry. Co. v. White, --- U.S. ----, 126 S.Ct. 2405, 2412-13, 2415 (2006)).

To put it mildly, Henry and Lewis found fault with numerous actions undertaken by management with respect to their employment. The Court finds that the vast majority of these actions (*e.g.* criticism for wearing a sweater to work, timecard written on with red ink, criticism for eating a sandwich at work) are not " materially adverse" such that a reasonable employee would be " dissuaded from engaging in protected activity."

Plaintiffs also argue that they were harassed because of their protected activities. In addition to the complaints noted above, Henry testified that she was periodically " intimidated" by head of shift Bobby Bell (" Bell" ). Bell told Henry on more than one occasion that he was going to " get her" or " take care of her." Also, Deputy Superintendent Mavis McCallum (" McCallum" ) slammed a door in Henry's face when she arrived late for a grievance meeting. None of these actions, taken separately or in combination, meet the objective standard set forth in *Burlington.* The anti-retaliation provision prohibits employer actions that are " likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally *petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.*" Burlington, 126 S.Ct. at 2415 (emphasis added).

Of course, the main thrust of plaintiffs' case is the denial of overtime assignments. Prior to the gender-specific overtime assignment policy on third shift, plaintiffs garnered a great deal of overtime. Subsequently, plaintiffs did not work as much overtime. However, plaintiffs were not denied the ability to work overtime assignments on other shifts, but expressed a preference for working overtime on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

third shift because it was a better fit for their personal schedules. Also, plaintiffs (and others) testified that working on third shift was easier because the juveniles were generally asleep, and there wasn't much to do but sit around.

*5 Furthermore, the gender-specific overtime policy for third shift was enacted pursuant to the management rights clause of the collective bargaining agreement. Accordingly, Milwaukee County had the discretion to distribute overtime assignments in a manner of their own choosing. The denial of a " monetary perk ... does not constitute an adverse employment action if it is *wholly within the employer's discretion to grant or deny and is not a component of the employee's salary."* Tyler v. Ispat Inland, Inc._ 245 F.3d 969, 972 (7th Cir.2001) (emphasis added); *see also* Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 979 (7th Cir.2004) (employer's denial of overtime pay is not an adverse employment action). Therefore, the denial of overtime on third shift was not an adverse employment action.

## II. Causation

Plaintiffs failed to demonstrate that they were discriminated against because of their gender or in retaliation for their complaints of discrimination. There is absolutely no evidence which suggests that any of the alleged " adverse employment actions" were visited upon plaintiffs because of their gender. FN1

> FN1. The denial of third shift overtime is the exception, but as noted above (section I), this denial does not rise to the level of an adverse employment action. Further, as discussed below (section III), gender is a Bona Fide Occupational Qualification (" BFOQ" ) for third shift guard duty at the JDC.

As for retaliation, plaintiffs argue that they were treated differently and were subject to a campaign of harassment only after they filed complaints of discrimination. This is not enough to establish, as a matter of law, that plaintiffs were harassed or retaliated against because of their protected activity. " The mere fact that one event preceded another does nothing to prove that the first event caused the second." Sauzek v. Exxon Coal USA, Inc._ 202 F.3d 913, 918 (7th Cir.2000); *see also* Bermudez v. TRC Holdings, Inc., 138 F.3d 1176, 1179 (7th Cir.1998) (" Timing may be an important clue to causation, but it doesn't eliminate the need to show causation" ).

Plaintiffs' only evidence of a causal link is that they were referred to as " trouble makers" by members of management. Given that plaintiffs were constantly lodging harassment complaints, filing memos, and generally complaining whenever any of their superiors attempted to correct their behavior, it is not surprising that they earned this moniker. The use of the phrase " trouble makers" in this context does not refer to any of plaintiffs' protected activities. Moreover, there is no evidence that plaintiffs were referred to as " troublemakers" in the context of an adverse employment action or that the reference dissuaded plaintiffs from " engaging in future protected activity."

## III. Bona Fide Occupational Qualification (" BFOQ" )

In *Leggett v. Milwaukee County,* Case No. 04-C-422 (E.D.Wis.2006), the Court considered the same evidence presented by Milwaukee County at trial with respect to Bona Fide Occupational Qualification. The Court held that " male gender is a BFOQ for JCOs working third shift in male pods at the [JDC][sic]." (*Id.,* Docket No. 26, p. 5). The Court decided *Leggett* in the context of an unopposed motion for summary judgment. The evidence and arguments presented by the plaintiffs in this case does not change the Court's view that gender is a BFOQ for third shift male pod assignments at the JDC.

*6 Title VII permits classifications based on gender where sex is a BFOQ " reasonably necessary to the normal operation of that particular business enterprise." Torres v. Wisconsin Dept. of Health & Social Servs., 859 F.2d 1523, 1527 (7th Cir.1988). To establish a BFOQ, the JDC must show that the essence of its business would be undermined without the gender-based qualification. *Torres,* 859 F.2d at 1531-32.

The essence of the JDC's business is to ensure and promote the care, rehabilitation, safety and security of the juveniles entrusted to its care. Superintendent Wanta concluded that same-gender role modeling/mentoring promoted these goals, whereas cross-gender role modeling/mentoring undermined them. He did so based upon his research and pursuant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to his expert professional opinion. More specifically, he concluded that consistency among all of the shifts would reinforce the benefits of the program. To the contrary, inconsistency would cause confusion and uncertainty amongst the juveniles, thereby reducing the positive impact across all of the shifts. Superintendent Wanta's conclusion is entitled to substantial weight and the Court finds it persuasive in this context. *See Torres,* 859 F.3d at 1532 (exercise of professional judgment is entitled to substantial weight); *see also* Everson v. Michigan Dep't of Corr., 391 F.3d 737, 750 (6th Cir.2004) (" reasoned decisions of prison officials are entitled to deference" ).

Moreover, as noted in *Leggett,* numerous courts have held that the goals of " security, safety, privacy, and rehabilitation can justify gender-based assignments in" correctional facilities. *See, e.g.,* Everson, 391 F.3d at 753 (" the exclusion of males from these positions is ' reasonably necessary' to the ' normal operations' of the [Department of Corrections'] female facilities" ); *Ribono v.* Iranon, 145 F.3d 1109, 1110-11 (9th Cir .1998); *Tharp v. Iowa Dep't of Corr.,* 68 F.3d 223, 226 (8th Cir.1995); *Torres,* 859 F.2d at 1532.

Plaintiffs argue that rehabilitation is not a legitimate goal for the JDC because it is a " detention center" with an average stay of only a few weeks. While it is true that the likelihood of full " rehabilitation" is minimal if the stay is short, this is not to say that efforts to rehabilitate the juveniles, for whatever time they are entrusted to the JDC's care, would be minimal or fruitless. Wanta and several JCOs testified about juveniles whose lives were impacted in a positive way during their stay at the JDC.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**
1. This matter is **DISMISSED** with prejudice; and
2. Judgment shall be entered in favor of the defendant Milwaukee County.

**SO ORDERED,**

E.D.Wis.,2007.
Henry v. Milwaukee County
Slip Copy, 2007 WL 1577666 (E.D.Wis.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2007 U.S. DIST. LEXIS 45543


Analysis
As of: Jul 25, 2007

IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABIL-
ITY LITIGATION; This document relates to: County of Suffolk and Suffolk County
Water Authority v. Amerada Hess Corp. et al., 04 Civ. 5424

Master File No. 1:00-1898, MDL 1358 (SAS), M21-88

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 45543

June 15, 2007, Decided
June 15, 2007, Filed

**PRIOR HISTORY:** *United Water of N.Y., Inc. v. Amerada Hess Corp. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.), 2007 U.S. Dist. LEXIS 40484 (S.D.N.Y., June 4, 2007)*

**COUNSEL:** [*1] Liaison Counsel for Plaintiffs and Counsel for Suffolk County Plaintiffs: Robin Greenwald, Esq., Robin Greenwald, Esq., Weitz & Luxenberg, P.C., New York, New York.

For Suffolk County Plaintiffs: Carla M. Burke, Esq., Scott Summy, Esq., Baron & Budd, P.C., Dallas, Texas; Samuel Issacharoff, Esq., New York, New York.

Liaison Counsel for Defendants: Peter John Sacripanti, Esq., James A. Pardo, Esq., McDermott Will & Emery LLP, New York, New York.

For Defendants ChevronTexaco Corporation (n/k/a Chevron Corporation), Chevron U.S.A. Inc., TRMI Holdings Inc., Texaco Inc., and Chevron Environmental Services Company: Robert E. Meadows, Esq., Charles C. Correll, Jr., Esq., King & Spalding LLP, Houston, Texas; Richard E. Wallace, Jr., Esq., William F. Hughes, Esq., Wallace King Domike & Branson PLLC, Washington, D.C.; Sheila L. Birnbaum, Esq., Barbara Wrubel, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

In 2002, two plaintiffs, the County of Suffolk and the Suffolk County Water Authority, sued various corporations for their use and handling of the gasoline additive methyl tertiary [*2] butyl ether ("MTBE"). [1] After defendants removed the action from state to federal court, the Judicial Panel on Multidistrict Litigation transferred it to this Court pursuant to *section 1407 of title 28 of the United States Code* as part of a large multi-district litigation ("MDL") involving MTBE.

> 1  The parties have engaged in extensive motion practice. This Opinion assumes the reader's familiarity with this Court's previous opinions, in which the facts underlying this and other related actions are more comprehensively discussed. For a thorough recitation of plaintiffs' fact allegations see, for example, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("In re MTBE"), 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005)*.

On March 12, 2007, plaintiffs moved to "Set Bellwether Trial of Ten Wells" in this action, which had been previously selected as one of several focus actions for early discovery and trial. After full briefing on the Mo-

tion, an oral argument was held on April 27, 2007.² Following oral argument, and at the Court's request, both plaintiffs and defendants submitted supplemental briefs on three issues. Finally, by stipulation dated June 13, 2007, the parties have resolved one of [*3] the issues raised by this Motion -- namely, the order in which the proof will be presented to a jury.³ With respect to the remaining issues, plaintiffs' Motion to Set Bellwether Trial of Ten Wells is granted in part and denied in part.

2  See April 27, 2007 Hearing Transcript ("4/27/07 Tr.") at 32-86. At oral argument, Samuel Issacharoff argued for plaintiffs and Sheila L. Birnbaum argued for defendants.

3  In the parties' Joint Proposal, defendants specifically preserved their objection to a trial of less than all of plaintiffs' claims and to a trial pertaining only to a subset of wells. See June 13, 2007 Joint Proposal Regarding Trial Plan at 1. Nonetheless, anticipating that the Court might overrule defendants' objection, the parties reached an agreement with respect to the phasing issue. The essence of their agreement is that "[t]he parties shall be allowed to present all admissible evidence on all issues regarding the claims for liability and compensatory damages . . . before the jury renders any findings, decision or verdict. The parties shall be allowed to present evidence on these issues in the order they deem appropriate." Id. at 2.

## I. Brief Background on Bellwether Trials

Rule 42(b) [*4] provides, in pertinent part, that a court "may order a separate trial of any claim . . . or any separate issue . . . always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution . . . ."⁴ Pursuant to this rule, federal courts have the authority to conduct a "bellwether trial." In In re Chevron ("Chevron"),⁵ the Fifth Circuit explained the function of such a trial in the context of a mass tort action:

> The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context.
>
> The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one . . . . The reason for acceptance [of bellwether trials] by the bench and bar are apparent. If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims [*5] by providing information on the value of the cases as reflected by the jury verdicts. Common issues or even general liability may also be resolved in a bellwether context in appropriate cases.⁶

4  Fed. R. Civ. P. 42(b)

5  109 F.3d 1016 (5th Cir. 1997).

6  Id. at 1019.

Over the last decade, bellwether trials have become more common in large actions, and, in particular, mass tort actions. For example, courts have held bellwether trials in actions involving the outbreak of Legionnaires' Disease on board a cruise ship, uranium contamination of a community, and the adverse effects of a prescription drug.⁷

7  See Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 359 (2d Cir. 2003); Dodge v. Cotter Corp., 203 F.3d 1190, 1194 (10th Cir. 2000); In re Vioxx Prods. Liab. Litig., 478 F. Supp. 2d 897, 906 (E.D. La. 2007).

The obvious justification for a bellwether trial is that "a consolidation or a multi-district transfer has the potential of overwhelming the resources of a particular court."⁸ "It is a fundamental principle of American law that every person is entitled to his or her day in court."⁹ However, if plaintiffs file hundreds or thousands of individual actions, the sheer volume of the proceeding [*6] may overwhelm a court's ability to provide *any* plaintiff with relief in a timely and efficient manner.

8  R. Joseph Barton, Utilizing Statistics and Bellwether Trials in Mass Torts: What do the Constitution and Federal Rules of Civil Procedure Permit?, 8 Wm. & Mary Bill Rts. J. 199, 202 (1999).

9  Tice v. American Airlines, Inc., 162 F.3d 966, 968 (7th Cir. 1998).

A bellwether trial also allows a court and jury to give the major arguments of both parties due consideration without facing the daunting prospect of resolving every issue in every action. It must be remembered that a defendant is not liable merely because it has been sued by a large group of plaintiffs. And every experienced litigator understands that there are often a handful of crucial issues on which the litigation primarily turns. A bellwether trial allows each party to present its best arguments on these issues for resolution by a trier of fact. Moreover, resolution of these issues often facilitates settlement of the remaining claims. [10]

  10  As the *Manual for Complex Litigation* explains: "Prior to recommending remand, the transferee court could conduct a bellwether trial of a centralized action or actions originally filed in [*7] the transferee district, the results of which (1) may, upon the consent of parties to constituent actions not filed in the transferee district, be binding on those parties and actions, or (2) *may otherwise promote settlement in the remaining actions.*" *Manual for Complex Litigation (Fourth)* § 20.132 (2004) (emphasis added).

Of course, bellwether trials cannot exceed the limits imposed by the Constitution, but they do not necessarily pose an uncommonly high risk of doing so. Judges are often called upon to protect litigants' rights in unusual circumstances. Indeed, at least two Courts of Appeal have found that a bellwether trial may be superior to other forms of adjudication without violating any party's substantive or procedural due process rights. [11]

  11  See *Hilao v. Estate of Marcos*, 103 F.3d 767, 771 (9th Cir. 1996); *In re Chevron*, 109 F.3d at 1017.

## II. A Trial on All Issues with Respect to a Limited Group of Representative Wells Shall Be Held, Commencing on March 3, 2008

### A. The Court's Order

The action before this Court, which is part of a larger MDL, involves 182 wells located in Suffolk County, New York. Plaintiffs have proposed a trial of a subset (approximately five percent) of their [*8] wells that have been allegedly impacted by MTBE. [12] The parties estimate that it will take at least three months to try ten to twelve wells. In contrast, if all 182 wells were tried before a single jury, this estimate might grow to two years or more. Such a trial would be untenable because, at the very least, it would be unreasonable to expect a jury to sit for this length of time, as well as strain limited judicial resources.

  12  Because of this, much of the precedent cited by the parties in their submissions is irrelevant. There is no effort here to extrapolate the judgments with respect to these representative wells to the remaining wells in this action. *See* Plaintiffs' Motion to Set Bellwether Trial of Ten Wells ("Pl. Mem.") at 8.

Thus, pursuant to *Rule 42(b)*, this Court finds that a trial on all issues with respect to a limited group of representative wells shall be held, commencing on March 3, 2008. Such a trial is warranted by the sheer size of this action, the need for expeditious resolution, judicial economy, and the convenience of the Court, the jury, and the parties. Trying a subset of the wells in this two-plaintiff action renders a massive, complex trial manageable.

### B. Defendants' [*9] Objections to the Bellwether Trial Are Meritless

Defendants oppose plaintiffs' Motion to try a group of representative wells by asserting that such trials are a disfavored procedure rife with dangers and pitfalls. While defendants may be correct that a bellwether trial raises certain problems, these problems are not so serious as to overcome the obvious advantages.

In arguing against plaintiffs' proposal, defendants rely heavily on the Fifth Circuit's decision in *Chevron*. In doing so, however, defendants fail to give sufficient weight to the fact that the *Chevron* court explicitly approved of bellwether trials. As the *Chevron* court explained, "[t]he notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar." [13]

  13  *109 F.3d at 1019*.

The question in *Chevron* was not whether a court could use a bellwether trial, but rather what preclusive effects would attach to findings resulting from that trial. The *Chevron* court concluded that unless the representative plaintiffs are selected by a statistically-valid, random [*10] method, the results of a trial of representative plaintiffs could not form the basis for a judgment affecting any action other than those brought by the representative plaintiffs. [14] Applying that conclusion, the Fifth Circuit found that the district court's selection method was not statistically valid and thus the first trial verdict would have no binding effect with respect to any other plaintiff. [15]

  14  *See id. at 1020*.

15 *See id. at 1021.*

The *Suffolk County* action does not raise the same concerns as those discussed in *Chevron*. *Chevron* involved approximately three thousand plaintiffs suing a single defendant for harm arising from its acts and omissions. Here, by contrast, only two plaintiffs -- Suffolk County and the Suffolk County Water Authority -- are suing more than fifty defendants for harm to approximately 182 wells owned or managed by these two plaintiffs. The extrapolation question in this action is thus quite different than the one addressed in *Chevron* -- in this action, there is no other plaintiff who will benefit from the trial, to the detriment of the defendants, from any verdict reached in the proposed trial of representative wells. [16]

> 16 As plaintiffs have argued, "[t]here [*11] is no suggestion that the Trial Wells be the basis for any extrapolated judgments to any parties or even to any wells that have not been submitted for trial." Pl. Mem. at 4. *See also* 4/27/07 Tr. at 35 (Mr. Issacharoff stating: "I think we should be absolutely clear, we do not intend to extrapolate . . .").

Moreover, even if a jury finds one or more of the defendants liable with respect to any of the representative wells, that finding would not establish that the particular defendant is responsible for the alleged harm to other wells. As explained below, the only preclusive effect would be with respect to common issues of tort liability. And such preclusion would attach only *if and when it is proven to a different jury that other wells in fact sustained any harm,* and even then, would only bind those defendants who were found to have caused harm to the two plaintiffs by virtue of their tortious conduct.

In short, because the results of the proposed trial of representative wells will *not* be extrapolated into a finding of liability with respect to any other well involved in this action, the proposed trial does not raise the same problems that the *Chevron* court faced. [17]

> 17 The proposal also [*12] avoids *Seventh Amendment* problems because all issues regarding the limited group of wells will be tried before a single jury. Finally, the Court should be able to direct the entry of a final judgment with respect to the jury's verdicts on claims relating to these wells, pursuant to *Rule 54(b)*, that can be reviewed by an appellate court. *See Fed. R. Civ. P. 54(b)* ("[T]he court may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.").

## C. Selection of Representative Wells

Plaintiffs propose a trial that includes a mix of wells from three categories, with each category defined by the causation evidence that is available for the wells in that category: (1) a "known-source" category of wells for which the evidence can likely identify a single defendant whose conduct allegedly caused the MTBE contamination of a particular well; (2) a "multiple-source" category of wells for which the evidence will likely show that more than one defendant contributed to the MTBE contamination of a well; and (3) an "unknown-source" category [*13] of wells for which no expert can identify the source of the MTBE contamination of a well. [18] Plaintiffs' plan for selecting representative wells from the three causation categories is tentatively approved because it is likely to provide useful guidance to the parties with respect to subsequent trials or the settlement of claims regarding the remaining wells. [19] As to the particular wells that will represent each category at trial, the final selection must be approved by the Court after hearing from all counsel. [20]

> 18 *See* Pl. Mem. at 8-9 and Appendix.
>
> 19 *See Manual for Complex Litigation (Fourth)* § 22.315 (2004).
>
> 20 Plaintiffs have already selected eleven wells for trial. *See* June 1, 2007 Letter from Robin L. Greenwald, plaintiffs' liaison counsel and counsel for plaintiffs, to the Court, at 2. These wells are mostly from the group of wells that were designated as "focus wells" for discovery purposes, because the focus wells are the only wells for which the parties have had full discovery. *See id.* at 2-3.

## D. Preclusion and Subsequent Trials for Remaining Wells

The verdict reached in this trial will only bind the parties who participate in the trial and then only if a verdict is reached as to [*14] that party. Because all issues will be tried as to the representative wells, issue preclusion will attach only as to those defendants against whom there is an adverse verdict and who will then have the opportunity for appellate review. [21] The Court envisions that the representative-well trial jury will be asked, for each well, to answer certain interrogatories on a special verdict form with respect to general liability, damages, and causation. For example, with respect to general liability, the jury might decide the following:

whether defendants could have provided feasible alternatives to MTBE;

whether defendants knew of the dangers of MTBE at various points in time;

whether defendants provided adequate warnings regarding the dangers of MTBE; and

whether water contamination was a foreseeable result of the use of MTBE-containing gasoline.

If general liability is established, the jury will likely be asked to decide, with respect to damages, whether a particular well suffered a compensable injury, and, if so, which defendants, if any, were specifically responsible for that injury.

21   Collateral estoppel as to those defendants is appropriate. Subsequent trials regarding the remaining wells will [*15] involve issues identical to those actually litigated and decided in the first trial, those defendants will have had a full and fair opportunity to litigate those issues, and the jury's findings on those issues will have been necessary to support a valid and final judgment on the merits. *See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979); Liona Corp., Inc. v. PCH Assoc. (In re PCH Assoc.), 949 F.2d 585, 593 (2d Cir. 1991).*

The jury's findings on general liability will only have preclusive effect in subsequent trials as to those defendants who are found liable to plaintiffs. If a jury finds that certain defendants were not liable, there is no adverse verdict as to that defendant, who therefore has no right to appeal. In the absence of a right to appeal, there can be no preclusive effect. 22 In short, there can be no liability without proof of injury. 23

22   *See Concerned Citizens of Cohocton valley, Inc., v. New York State Dep't of Envtl. Conservation, 127 F.3d 201, 205 (2d Cir. 1997); Ashley v. Boehringer Ingelheim Pharms. (In re DES Litig.), 7 F.3d 20, 23 (2d Cir. 1993). See also Warner/Elektra/Atl. Corp. v. County of Dupage, 991 F.2d 1280, 1282-83 (7th Cir. 1993)* ("an unappealable [*16] finding does not collaterally estop . . . . If an appellant is complaining not about a judgment but about a finding (here that the [appellant] was negligent and also an inverse condemnor) -- on the bottom line it prevailed -- the appeal does not present a real case or controversy. So it must be dismissed for want of jurisdiction, and the finding will thus have no collateral estoppel effect.").

23   *See* Defendants' Memorandum of Law Concerning the Three Issues Raised by the Court at the April 27, 2007 Oral Argument ("Def. Supp. Mem.") at 7-12.

If there are subsequent trials regarding the remaining wells in the *Suffolk County* action, there will be issue preclusion with respect to those defendants who suffered an adverse verdict in the first trial. Thus, a subsequent jury will not reexamine the findings of the first jury. However, with respect to a defendant as to whom there was no prior adverse verdict, the subsequent jury will be asked to make findings similar to those asked of a prior jury with respect to the liability of those defendants.

This procedure does not violate the *Seventh Amendment's* reexamination clause which forbids a subsequent jury from re-examining a matter already decided [*17] by a prior jury. 24 As defendants argued, if a defendant is not found liable for damages to a particular well, there can no "finding" of general liability as to that defendant. Thus, *a fortiori*, a subsequent jury would not be reexamining any matter that has already been decided as to that defendant since *no matter* has been decided as to that defendant.

24   *See Blyden v. Mancusi, 186 F.3d 252, 268 (2d Cir. 1999).*

### E. Punitive Damages

The final question is whether the Court will permit plaintiffs to seek an award of punitive damages during the trial of the representative wells. Plaintiffs argue, *inter alia*, that the same jury that considers defendants' alleged misconduct for the purpose of assessing liability and damages *must* consider the question of whether that conduct warrants an award of punitive damages. If a different jury was asked to make that assessment, then a subsequent jury might, in effect, be re-examining the conclusions of a prior jury, which is forbidden by the *Seventh Amendment*. 25 Plaintiffs also argue that the failure to present the request for punitive damages to the first jury would jeopardize the parties' ability to seek appellate review 26 because certification under [*18] *Rule 54(b)* requires that a judgment be final -- *i.e.*, that it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." 27

25   *See* Plaintiffs' Supplemental Submission Regarding Trial Plan at 8.

26 *See id.* at 10.

27 *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978). Accord *International Controls Corp v. Vesco*, 535 F.2d 742, 748 (2d Cir. 1976) (holding that a judgment "cannot be considered final as long as it leaves open the question of additional damages").

Defendants, in turn, argue that if each successive jury is permitted to award punitive damages, there is a real risk that these successive awards would unduly increase the amount of the total award of punitive damages. [28] Defendants make the related argument that a jury must know the total amount of compensatory damages before making a punitive damages award because such an award must bear a reasonable relationship to the total harm suffered by the plaintiff. [29]

28 *See* Def. Supp. Mem. at 3 (citing *King v. Macri*, 993 F.2d 294 (2d Cir. 1993)).

29 *See id.* (citing *Philip Morris U.S.A. v. Williams*, 127 S. Ct. 1057, 166 L. Ed. 2d 940 (2007); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)).

Finally, [*19] in yet another related argument, defendants contend that a punitive damages award must be "proportionate to the amount of harm to the plaintiff and to the general damages recovered." [30] Because the economic harm for a five-percent subset of wells (the number of wells proposed for the first trial), is far less than the possible total damages based on all of the wells, defendants fear that the jury will award a higher multiple of the compensatory damages than they might otherwise award if the total damages figure was significantly higher. [31] Thus, for example, if a jury believed that the total harm to plaintiffs was $ 200 million, it might award a punitive damages multiplier of 2:1. But if the same jury had realized that the total harm was twenty times that figure ($ 4 billion), it might only have awarded a punitive damages multiplier of 1:1.

30 *Campbell*, 538 U.S. at 426.

31 *See* Def. Supp. Mem. at 4-5.

Both sides make compelling arguments: there is no final judgment unless a punitive damages verdict is taken; yet if punitive damages are awarded, there is a risk that the award will not be proportionate to the total harm caused by defendants' alleged egregious conduct. After weighing all of [*20] the arguments, I conclude, for the following reasons, that plaintiffs must be allowed to seek, and possibly obtain, a punitive damages award at the close of the first trial.

*First,* it is axiomatic that punitive damages are based on a defendant's overall conduct as well as the harm to plaintiff. [32] Plaintiffs intend to present *all* of the evidence regarding defendants' alleged egregious conduct in the liability phase of the first trial. Such evidence is *not* well specific. Thus, the first jury will have a complete presentation as to the conduct allegedly engaged in by those defendants it finds liable for compensatory damages.

32 *See Campbell*, 538 U.S. at 425. *See also Philip Morris*, 127 S. Ct. at 1062-63 (explaining that whether a punitive damages decision is excessive depends upon (1) the reprehensibility of the defendant's conduct, (2) whether the award bears a reasonable relationship to the actual and potential harm caused by the defendant to plaintiff or plaintiffs, and (3) the difference between the award and sanctions imposed in comparable cases) (citing *BMW*, 517 U.S. at 575-85).

*Second,* each jury will be instructed that it is only hearing evidence as to a subset of the wells that plaintiffs [*21] allege have suffered damage as a result of MTBE contamination. Each jury will be further instructed that it cannot consider *damage* to wells other than those currently on trial because there will be no proof at that trial as to whether those other wells sustained any damage, nor proof of who is responsible for damage, if any, to the other wells. Nonetheless, the jury will know that it is trying only a subset of the potential claims.

Such a jury instruction is not unusual. For instance, it is no different from an action in which a plaintiff sues the manufacturer of Vioxx: the jury knows that there are other, similar actions pending. Indeed, the Supreme Court has made it clear "a plaintiff may show harm to others in order to demonstrate reprehensibility[,]" a "part of the punitive damages constitutional equation." [33] At the same time "a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." [34]

33 *Philip Morris*, 127 S. Ct. at 1063-64.

34 *Id.* at 1064.

Thus, a court must properly instruct a jury because "it is constitutionally important for a court to provide assurance that the jury will [*22] ask the right question, not the wrong one." [35] Yet, once the jury is properly instructed, plaintiffs are allowed to show alleged harm to others in order to demonstrate reprehensibility of defendants' conduct (which conduct plaintiffs will have al-

ready proved directly harmed them). As the Supreme Court recently stated:

> Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible -- although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. [36]

While there are no nonparties here, there are other wells that will not be considered at the first trial. By analogy, each jury may consider the alleged harms to other wells as evidence of reprehensibility, but may not directly punish defendants for such alleged harms.

35 *Id.*

36 *Id.*

Moreover, plaintiffs could have brought 182 separate lawsuits, each alleging damage to a single well. [37] While this would have created an administrative nightmare for the courts, it is unlikely that defendants would have (or could have) argued that [*23] each of these 182 actions would need to be tried before a jury could consider punitive damages. In the end, it makes little sense to reach a different result based on plaintiffs' pleading choices at the outset of this complex litigation -- choices that benefitted both the parties and the courts.

37 *See* 4/27/07 Tr. at 38.

*Finally,* each jury will only be permitted to award a ratio or multiplier, rather than any dollar figure. [38] If, at the end of the trials of all of the wells in the *Suffolk County* action, the Court concludes that the later punitive damages awards, if any, are disproportionate to the total harm, it can strike any later punitive damages award, leaving only the first, or the earliest, award(s). [39] For these reasons, plaintiffs may seek a punitive damages award at the trial of the representative wells against any defendant that is determined to be liable for compensatory damages.

38 *See id.* at 69-74.

39 *See Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 434-35, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994) (holding that the Constitution requires meaningful post-verdict judicial review in which the court has the power to reduce an excessive punitive damages award); *see also id.* at 421 ("Judicial review of the size of [*24] punitive damages awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded.").

For the foregoing reasons, plaintiffs' Motion to Set Bellwether Trial of Ten Wells is granted in part and denied in part. The Clerk of the Court is directed to close this Motion (document # 1359).

SO ORDERED:

Dated: New York, New York

June 15, 2007

Shira A. Scheindlin

U.S.D.J.

LEXSEE 2001 U.S. DIST. LEXIS 381


Cited
As of: Jul 25, 2007

**GLORIA JELKS, Plaintiff, -v.- CITIBANK, N.A., Defendant.**

99 Civ. 2955 (JSM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2001 U.S. Dist. LEXIS 381*

January 19, 2001, Decided
January 22, 2001, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted.

**COUNSEL:** For plaintiff: Roosevelt Seymour, Brooklyn, NY.

For defendant: Rory McEvoy, Littler Mendelson, P.C., New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

*OPINION and ORDER*

JOHN S. MARTIN, Jr., District Judge:

Gloria Jelks ("Plaintiff") brings this action claiming that Citibank, N.A. ("Defendant") fraudulently induced her into accepting a position as Technical Specialist in the Global Risk Reporting division and breached an implied contract of employment when it terminated her position. Defendant moves for summary judgment. For the reasons set forth below, Defendant's motion is granted.

I. BACKGROUND

In 1997, Plaintiff was happily employed as a Senior Analyst at a consulting firm called Automatic Data Concept ("ADC"). In August or September 1997, Plaintiff learned through a friend who worked at Citibank, Patricia Samuels ("Samuels"), of a job opening for a Technical Specialist in the Global Risk Reporting department. Pursuant to conversations with Samuels and her supervisor, Barbara Freitas ("Freitas"), Plaintiff "reluctantly" agreed to apply for the job in October 1997. In a telephone [*2] call with Plaintiff, Freitas discussed the terms of the position, which included an annual salary of $ 65,500, eligibility for annual bonuses, an Assistant Vice President title, a staff, an executive diner's card, and car service for the nights she worked late. Plaintiff formally interviewed for the job later that month.

In early December 1997, Plaintiff received an offer letter from Freitas. Plaintiff accepted the job in mid-December and informed Freitas that her start date would be January 12, 1998. On December 16, 1997, Plaintiff filled out an employment application; this application provided that it was not a contract of employment and indicated that Plaintiff would be an at-will employee who could be terminated for any reason. (McElvoy Aff., Jelks Dep. Ex. 2.) Plaintiff also received a Citibank Employee Guide ("Employee Manual") which indicated that she was employed at-will and could be terminated at any time "for any reason not expressly prohibited by law." (McElvoy Aff., Jelks Dep. Ex. 3.)

On January 12, 1998, Plaintiff began employment at Citibank. The Global Risk Reporting department maintains a data warehouse of credit risk information, collected from computer systems world-wide, [*3] that can be accessed by internal and external users. In her position as Technical Specialist, Plaintiff was responsible for maintaining a computer system called Hewlett Packard

Case 1:07-cv-05471-BSJ-KNF   Document 12-6   Filed 07/25/2007   Page 14 of 16

Page 2
2001 U.S. Dist. LEXIS 381, *

Information Manager, which was designed to eliminate the need for users seeking information about credit risk to speak with human employees. Plaintiff was charged with configuring and modifying the software to produce reports customized to reflect the user's requests. Plaintiff claims that upon her arrival at Citibank, her computer did not have the software she needed in order to perform her job, and that she was not given an appropriate computer until June 1998. Plaintiff was therefore forced to use Samuels' computer when it was available. Plaintiff also claims that she was not provided with a staff.

Because the Hewlett Packard system was performing poorly, Citibank's goal in early 1998 was to stabilize the program, and accordingly external users, as opposed to internal users, were instructed to refrain from making data requests until April 1, 1998. After reading a memo to this effect, Plaintiff questioned Freitas and Samuels about the freeze, apparently because she thought that the entire system had been [*4] frozen. She was told that enhancements would nevertheless continue, and Plaintiff acknowledges that she continued to make enhancements for internal users during that period. Requests from external users comprised only ten percent of Plaintiff's regular workload.

Defendant claims that it decided to halt further development of the Hewlett Packard program in July or August 1998. Defendant states that it made this decision due to the data warehouse's slow response time, the time and money spent on making changes to the system, frequent changes in vendors, and the current vendor's refusal to comply with Defendant's Y2K policies. As a result of this decision, all changes and modifications to the software were allegedly ceased, and the system was frozen in its present state. Defendant claims that in late 1998 or early 1999, the need for the system was eliminated altogether when users were able to directly connect to the information system.

The decision to freeze development of the Hewlett Packard program impacted on Plaintiff's job, as her primary responsibilities involved changing and modifying the data warehouse. Accordingly, in September 1998, Freitas informed Plaintiff that her job [*5] was being discontinued because there would be no further enhancements to the data warehouse. Later that same day, Plaintiff met with Koula Angelinas ("Angelinas"), Human Resources Specialist, regarding her severance package. Plaintiff was given a Notice of Job Discontinuance that described Plaintiff's separation benefits and options, including the ability to apply for relocation at Citibank. As to the latter option, Angelinas told Plaintiff to contact the Resource Center for assistance in finding another job within Citibank. Plaintiff never visited the Resource Center despite an initial telephone call for instructions on how to proceed.

Plaintiff brings this action claiming that Defendant never intended to employ her as a Technical Specialist, and that she gave up her prior job in reliance on Defendant's promise to do so. She also claims that her job was not terminated for a "business reason," and that she was therefore fired without cause in contravention of the employee manual. To this end, Plaintiff states that she continued to make the enhancements that had allegedly been halted up until the time she was told that her job was being discontinued, and she claims that Defendant still [*6] uses the Hewlett Packard software. Plaintiff also claims that Defendant fraudulently concealed from her the fact that the decision to eliminate the Hewlett Packard system had already been made when Defendant hired Plaintiff, and that it concealed this fact during her employment in order to induce her to stay. Plaintiff's allegations are utterly devoid of merit, and border on the frivolous.

II. DISCUSSION

A. Implied Breach of Employment Contract

Plaintiff first claims that her termination constituted a breach of an implied employment contract. In order to overcome the at-will employment doctrine, New York courts require an express limitation on an employer's ability to terminate the employee, such as a definite period of employment. *See, e.g. Wright v. Cayan, 817 F.2d 999, 1002-04 (2d Cir. 1987); Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 448 N.E.2d 86, 91-92, 461 N.Y.S.2d 232 (N.Y. 1983)*. An employee can also attempt to demonstrate that the employer's actions amounted to an express limitation that the employee relied upon in accepting the job. *See Murphy, 461 N.Y.S.2d at 237; Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 443 N.E.2d 441, 445, 457 N.Y.S.2d 193 (N.Y. 1982)*. [*7] Under the strict *Wiener* standard employed by New York courts, Plaintiff must show at a minimum that she relied upon an assurance that she could only be discharged for cause, and that this assurance was incorporated into the employment manual. *See De Petris v. Union Settlement Assoc., 86 N.Y.2d 406, 657 N.E.2d 269, 271, 633 N.Y.S.2d 274 (1995)*.

Both the job application that Plaintiff completed and Defendant's Employee Manual indicated that Plaintiff's employment was at-will. Plaintiff suggests that the Employee Manual contains limitations on Defendant's ability to terminate her because it states that employees can be terminated for failure to meet performance expectations, misconduct, and due to job discontinuance for "business reasons." This language only describes some scenarios in which an employee might be asked to leave Defendant's employ; it does not set forth any express limitation that an employee can only be terminated for

Case 1:07-cv-05471-BSJ-KNF   Document 12-6   Filed 07/25/2007   Page 15 of 16

Page 3
2001 U.S. Dist. LEXIS 381, *

one of these reasons. This allegation is therefore insufficient to sustain Plaintiff's claim. *See, e.g., Cucchi v. New York City Off-Track Betting Corp.,* 818 F. Supp. 647, 650 (S.D.N.Y. 1993); *Gmora v. State Farm Mut. Auto. Ins.,* 709 F. Supp. 337, 341 (E.D.N.Y. 1989), [*8] aff'd, 888 F.2d 1376 (2d Cir. 1989).

Plaintiff also points to her offer letter and her Notice of Job Discontinuance, received on her last day of employment, as evidence of an implied contract of employment. Neither of these documents contains express limitations on Defendant's ability to terminate Plaintiff. [1] Thus, Plaintiff has submitted absolutely no evidence of any limitation on Defendant's ability to terminate her employment, nor has she shown reliance upon any representation under the Weiner standard.

   1 Although the offer letter states that Plaintiff's salary will be paid annually, a salary measured by a certain time period does not bind the employer to an employment term of the same period. *See Chase v. United Hosp.,* 60 A.D.2d 558, 400 N.Y.S.2d 343, 344 (App. Div. 1977).

B. Fraudulent Inducement

Plaintiff next alleges that Defendant fraudulently induced her into leaving her position at ADC and accepting a job with Defendant. Under New York law, at-will employees cannot evade the [*9] bar against suing for wrongful termination by suing in tort. *See Murphy,* 461 N.Y.S.2d at 235-36; *Ullmann v. Norma Kamali, Inc.,* 207 A.D.2d 691, 616 N.Y.S.2d 583, 584 (App. Div. 1994). In addition, plaintiffs cannot masquerade a breach of contract claim as a fraud claim. *See Saleemi v. Pencom Sys., Inc.,* 2000 U.S. Dist. LEXIS 6645, No. 99 Civ. 667, 2000 WL 640647, at *4-5 (S.D.N.Y. May 17, 2000). Under very limited circumstances, however, at-will employees can recover for fraudulent statements that induce them into accepting positions of employment by showing: (1) a material false representation; (2) scienter; (3) reasonable reliance; (4) damages; and, relevant here, (5) that the fraudulent misrepresentation was collateral or extraneous to the employment agreement. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19-20 (2d Cir. 1996); *Stewart v. Jackson & Nash,* 976 F.2d 86, 88-90 (2d Cir. 1992). Since the Second Circuit's seminal decision in *Stewart v. Jackson & Nash,* courts have upheld claims for fraudulent inducement where the injury alleged stems from leaving a former place of employment or agreeing to remain [*10] in a compromised position at a current place of employment, rather than from the termination itself or failure to perform terms of the employment agreement. *See, e.g., Doehla v. Wathne Ltd.,* 2000 U.S. Dist. LEXIS 9913, No. 98 Civ. 6087, 2000 WL 987280, at *5-6 (S.D.N.Y. July 17, 2000); *Caron v. The Travelers Corp.,* 1998 U.S. Dist. LEXIS 10481, No. 96 Civ. 6236, 1998 WL 395319, at *3-5 (S.D.N.Y. July 15, 1998); *Kissner v. Inter-Continental Hotels Corp.,* 1998 U.S. Dist. LEXIS 9248, No. 97 Civ 8400, 1998 WL 337067, at *3 (S.D.N.Y. June 25, 1998); *Cole v. Kobs & Draft Adver., Inc.,* 921 F. Supp. 220, 224-26 (S.D.N.Y. 1996); *Garnier v. J.C. Penney Co.,* 863 F. Supp. 139, 140-41, 143 (S.D.N.Y. 1994); *see also Navaretta v. Group Health, Inc.,* 191 A.D.2d 953, 595 N.Y.S.2d 839, 841 (App. Div. 1993). Plaintiff cannot avail herself of these precedents, however, because she alleges no damages that result from being induced away from her prior position. She alleges only the damages relating to the termination of her employment with Defendant.

Plaintiff claims that Defendant hired her for a job that did not exist because Defendant had already frozen the information warehouse before she began work [*11] and because she was not given the appropriate computer when she arrived. However, Plaintiff has alleged no specific misrepresentation that was made to her prior to beginning her employment with Defendant. One would have to theorize broadly that the job offer alone was fraudulent because no such position existed, or if it did, was soon to be eliminated. However, a job offer is by definition central, not collateral, to the employment agreement itself, and accordingly a hidden intention not to perform gives rise to a breach of contract claim, not a fraud claim. *See Gruber v. Victor,* 1996 U.S. Dist. LEXIS 12567, 95 Civ. 2285, 1996 WL 492991, at *6-7 (S.D.N.Y. Aug. 28, 1996); *Sudul v. Computer Outsourcing Servs.,* 868 F. Supp. 59, 61-62 (S.D.N.Y. 1994). Moreover, Plaintiff was not promised employment for any specific period of time; as an at-will employee, she could not reasonably rely on a mere promise of employment. *See Garwood v. Sheen & Shine, Inc.,* 175 A.D.2d 569, 572 N.Y.S.2d 237, 237 (App. Div. 1991). Nor, as noted above, has Plaintiff specifically alleged any damages that are separate from the loss of a job, such as damage to career growth, loss of reputation, or loss of benefits [*12] and security.

In addition, Plaintiff performed her job for eight months, albeit with some difficulty until she obtained her new computer. Plaintiff has submitted no evidence to contradict Defendant's testimony that the decision to freeze further enhancements of the Hewlett Packard system was made in July or August 1998, several months after Plaintiff began work. Plaintiff has therefore failed to raise a question of fact on her fraudulent inducement claims. [2]

   2 Plaintiff also claims that the assurances of her supervisors in January 1998 that data enhancements would continue, despite a memo stating

Case 1:07-cv-05471-BSJ-KNF   Document 12-6   Filed 07/25/2007   Page 16 of 16

Page 4
2001 U.S. Dist. LEXIS 381, *

that enhancements were frozen until March 31, 1998, induced her to remain in her job. Plaintiff has not shown that these assertions are false, as she admitted in her deposition testimony that she continued to make enhancements from January through March. The only freeze was on external users' requests for information, which comprised only ten percent of Plaintiff's workload. Moreover, external users were reinstated in April.

[*13] Finally, Plaintiff charges that Defendant fraudulently concealed from her the fact that the information system was soon to be frozen, thus inducing her to accept and then to remain in her job. In order to sustain a claim for fraudulent concealment, Plaintiff must show that Defendant concealed material facts and that it owed a duty to disclose the information allegedly concealed. *See Nadal v. Otto Gerdau Co., 1992 U.S. Dist. LEXIS 292*, No. 90 Civ. 4173, 1992 WL 8346, at *5 (S.D.N.Y. Jan. 14, 1992). Even were Plaintiff able to establish the existence of a duty to disclose, she has submitted no evidence that the decision to freeze the data warehouse was made prior to July or August 1998. Nor has she alleged any conversations or statements from which a "concealment" might be implied. Plaintiff has therefore failed to raise an issue of fact regarding the existence of a concealment or Defendant's scienter. Because Plaintiff was employed at-will, Defendant had no duty, once the decision was made, to provide advance warning that Plaintiff's job might be terminated. Therefore, Plaintiff's fraudulent concealment claim also fails. [3]

3  Plaintiff alleges numerous other actions by Defendant that amounted to "fraud." For example, she claims that she did not receive all of the benefits that she was promised, such as a staff. This is merely a restatement or her breach of contract claim and is not cognizable as fraud in New York. *See Saleemi v. Pencom Sys., Inc., 2000 U.S. Dist. LEXIS 6645*, No. 99 Civ. 667, 2000 WL 640647, at *4-5 (S.D.N.Y. May 17, 2000). Plaintiff also claims that Defendant did not assist her in finding a new job as promised in the Notice of Job Discontinuance. This allegation has nothing to do with any fraudulent misrepresentation that induced her to accept a job with Defendant or with any limitation on Defendant's ability to terminate Plaintiff, nor does it constitute fraud in its own right.

[*14] III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

**SO ORDERED.**

Dated: New York, New York

January 19, 2001

JOHN S. MARTIN, JR., U.S.D.J.