LEXSEE 1998 U.S. DIST. LEXIS 15037


Cited
As of: Jul 24, 2007

**DENISE A. PLANTIER, Plaintiff, -v.- CORDIANT plc, CORDIANT HOLDINGS, INC., ROWLAND WORLDWIDE, INC., THE ROWLAND COMPANY, INC., THE ROWLAND COMPANY SA, and STEPHANIE MOLYNEUX and MARTIN FRANKEN, individually, Defendants.**

97 Civ. 8696 (JSM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1998 U.S. Dist. LEXIS 15037*

September 24, 1998, Decided
September 24, 1998, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss the complaint granted in part and denied in part.

**COUNSEL:** For plaintiff: Gail I. Auster, Auster & Arisohn, White Plains, NY.

For defendants: John B. Grant, Jr., Tal B. Martin, Camhy Karlinsky & Stein LLP, New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

**MEMORANDUM OPINION AND ORDER**

JOHN S. MARTIN, Jr., District Judge:

Plaintiff Denise A. Plantier filed a complaint on November 21, 1997, alleging breach of an employment agreement, breach of an implied obligation of good faith and fair dealing under the same agreement, and intentional infliction of emotional distress. Presently before this Court is a motion to dismiss the complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* filed by defendants Cordiant plc, Cordiant Holdings, Inc., Rowland Worldwide, Inc., the Rowland Company SA, and Martin Franken. For the reasons set forth below, the defendants' motion is granted in part and denied in part.

**1. Breach of Contract**

Under New York law, where an employment is for an indefinite term, it is presumed to be an employment at will which may be freely terminated by either party at any time [*2] for any reason or even for no reason. *See Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 300-01, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86 (1983)* (citations omitted). The Employment Agreement between Ms. Plantier and defendant Rowland Worldwide, Inc. ("Rowland") provides for an employment for an indefinite duration subject only to a three month notice period:

> 2. TERM OF EMPLOYMENT. The term of employment (the "Term of Employment") shall be for the period beginning on July 1, 1996, and continuing until such date, (the "Termination Date") as set forth in a written notice of termination (the "Termination Notice") given by one of the parties to the other party at least 3 months prior to the Termination Date.

Marnin Aff., Exh. A, P 2. Thus, Ms. Plantier was an employee-at-will.

However, Ms. Plantier alleges that there was a written employment agreement for a fixed term of thirty months based on the following paragraph in the Addendum I to Contract Dated 1 July 1996 ("Addendum I"):

> After 30 months, at your request, a new position will be sought within the Cordiant plc group. If no suitable position is available you may ask to be transferred to your home base, [*3] which is New York (travel and moving costs will be paid) and three months salary will be paid, for which there will be no requirement to work.

Marnin Aff., Exh. B, p. 2. Her allegation lacks merit, because the interpretation advanced by Ms. Plantier is not consistent with the plain meaning of this paragraph--that is, if Ms. Plantier is still working at Rowland after thirty months, she may request a new position within the Cordiant plc group. Moreover, her interpretation contradicts the terms of employment set forth in the Agreement and a preceding paragraph in the Addendum I. *See Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961)* (stating that an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect).

Ms. Plantier may not introduce extrinsic evidence to show that the parties orally agreed on a thirty-month employment period. Ms. Plantier alleges that defendants assured her that she would only be terminated for cause during a thirty-month employment period and this assurance was incorporated into the Agreement through [*4] the Addendum I. As stated in the previous paragraph, Ms. Plantier's reading of the Addendum I is not reasonable. Since the Agreement and two addenda are not ambiguous with respect to Ms. Plantier's status as an at-will employee, extrinsic evidence cannot be considered. *See Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993)* ("extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous contract."). Thus, the Court finds that Ms. Plantier was an at-will employee and defendants were free to terminate her subject only to a three-month notice period.

Finally, Ms. Plantier alleges that defendants breached the contract by failing to provide a full amount of her bonus and benefits during the three-month notice period. Specifically, she alleges that she did not receive: (i) her full three months' salary; (ii) a $ 6,000 initial relocation allowance; (iii) prorated housing and automobile allowances for the three-month period; (iv) travel and moving costs for relocation from Belgium to the United States; (v) her Belgian bonus; (vi) health insurance premiums for the three-month period; (vii) accrued vacation during the notice period; (vii) [*5] salary for five days worked in December 1996 during the notice period; (ix) an underpayment of $ 334.54 due to a mistake in calculating the exchange rate; and (x) reimbursement for tax preparation. Among these items, she may be entitled to the following items pursuant to the Addendum I: a $ 6,000 initial relocation allowance, three months' salary, [1] reimbursement for tax preparation for Belgium and for the United States, and travel and moving costs from Belgium to her home-base. She may have a valid claim of five-day salary for work she allegedly performed during the notice period. [2] In addition, she could recover for underpayment, if she shows that defendants used an exchange rate other than US$ 1=BF31.32 set forth in Addendum I in making payments for items to which she is entitled under the employment contract. Because Ms. Plantier's claim that she has not been fully paid under her employment contract has merit, the motion to dismiss the first count is denied with respect to her claim for these specific items of damages.

[1] Under the employment agreement, Ms. Plantier is entitled only to three months' salary during the notice period. Thus, she cannot recover housing and automobile allowances, health insurance premiums, or accrued vacation during that period. [*6]

[2] Defendants presented evidence showing that they paid Ms. Plantier for sixty nine days at her annual salary rate to cover three-months' salary and four days worked during the notice period, but admits that they have not paid a $ 6,000 relocation allowance.

**2. Breach of Implied Covenant of Good Faith and Fair Dealing**

Generally, under New York law, an employer's right at any time to terminate an employment at will is not subject to an implied obligation of good faith and fair dealing. *Murphy, 58 N.Y.2d at 304, 461 N.Y.S.2d at 237*. However, New York courts and the Second Circuit have restricted an employer's right to discharge an at-will employee in a few limited circumstances, and Ms. Plantier alleges that her case fits within those circumstances. Specifically, Ms. Plantier alleges that defendants breached an implied covenant of good faith and fair dealing because she was terminated for her refusal to participate in certain illegal business practices and to avoid paying her an annual bonus.

The New York Court of Appeals rejected an attempt to create an implied obligation under [*7] similar claims of impropriety. *Id. at 300-02, 461 N.Y.S.2d at 235-36;*

*see also Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). In *Murphy*, an at-will employee, who served in various accounting positions within a corporation, alleged that he was discharged because he exposed and refused to participate in certain accounting improprieties. *Murphy, 58 N.Y.2d at 297-98, 461 N.Y.S.2d at 233*. The court, in dismissing the plaintiff's claim based on implied obligation of good faith and fair dealing, stated that "under New York law as it now stands, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation on the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired." *Id. at 305, 461 N.Y.S.2d at 237*.

This case does not fall within a narrow exception to New York's strong at-will employment rule created by courts for employees in certain professional fields. *See, e.g., Wieder v. Skala*, 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992) (an associate in a law firm); *Mulder v. Donaldson, Lufkin & Jenrette*, 161 Misc. 2d [*8] 698, 611 N.Y.S.2d 1019 (N.Y. Sup. Ct. 1994) (an employee in a securities firm). Ms. Plantier is a certified public accountant and worked as Director of Finance and Administration. Thus, this case is governed by *Murphy* and *Sabetay*, not by *Wieder* and *Mulder*,[3] and Ms. Plantier's allegation that she was terminated for her refusal to commit certain improprieties cannot be used to limit defendants' right to terminate her.

>   3   *See Wieder*, 80 N.Y.2d at 635-36, 593 N.Y.S.2d at 755 (stating that an employment as a lawyer is unlike an employment in a financial department of a large corporation in *Murphy* and *Sabetay*).

Similarly, Ms. Plantier cannot rely on her allegation that she was terminated to avoid paying her an annual bonus. Ms. Plantier's bonus was at all time discretionary and none was due when she was terminated. In this sense, the case is unlike, *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109 (2d Cir. 1985), in which the Second Circuit held that an at-will employee could recover [*9] under a covenant of good faith and fair dealing, if she demonstrated that her employer fired her in order to avoid payment of *earned* commissions. In cases where no fixed amount was due at the time of termination, courts have refused to place a restriction on employer's unfettered discretion to fire an at-will employee at any time. *See, e.g., Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.Y.S.2d 945, 549 N.E.2d 136 (1989) (finding that an employer may fire at-will employee to avoid paying him a higher price for his stock option). Thus, Ms. Plantier's claim based on an annual bonus does not implicate a covenant of good faith and fair dealing.

Accordingly, the second cause of action is dismissed.

### 3. Intentional Infliction of Emotional Distress

Ms. Plantier's third cause of action is framed in terms of a claim for intentional infliction of emotional distress. "An action may lie for intentional infliction of severe emotional distress 'for conduct exceeding all bounds usually tolerated by decent society.'" *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992, 373 N.E.2d 1215 (1978) (quotation omitted). Clearly, the facts alleged by Ms. Plantier regarding the [*10] manner of her termination fall far short of this strict standard. Further, Ms. Plantier "should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting [her] cause of action in terms of a tort of intentional infliction of emotional distress." *Murphy, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236* (citation omitted). Consequently, the third cause of action is also dismissed.

### 4. Conclusion

The defendants' motion to dismiss is grated as to the second and third counts. As to the first count, the motion is denied.

**SO ORDERED.**

>   Dated: New York, New York
>
>   September *24*, 1998
>
>   JOHN S. MARTIN, JR., U.S.D.J.

LEXSEE 2000 U.S. DIST. LEXIS 12519


Analysis
As of: Jul 25, 2007

JOSEPH E. SCULLY, Plaintiff, - against - LAWRENCE H. SUMMERS, as Secretary of the Department of the Treasury, Defendant.

95 Civ. 9091 (PKL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 12519; 79 Empl. Prac. Dec. (CCH) P40,219

August 30, 2000, Decided
August 30, 2000, Filed

**COUNSEL:** [*1] For Plaintiff: Robert F. Hermann, Esq., of counsel, HERMAN & BATEMAN, Westfield, New Jersey.

For Defendant: Martin J. Siegel, Esq., of counsel, Lisa Zornberg, Esq., of counsel, MARY JO WHITE, Esq., United States Attorney, Southern District of New York, New York, New York.

**JUDGES:** Peter K. Leisure, U.S.D.J.

**OPINION BY:** Peter K. Leisure

**OPINION**

**OPINION AND ORDER**

LEISURE, District Judge:

Plaintiff Joseph E. Scully brings this action alleging that he was denied a promotion by the Internal Revenue Service (the "IRS") on the basis of age discrimination, in violation of the Age Discrimination in Employment Act (the "ADEA"), *29 U.S.C. § 633a*. From September 21, 1999 through September 23, 1999, the Court conducted a bench trial regarding the disputed issues in the case, and the parties subsequently submitted post-trial briefs further addressing those issues. Having considered the parties' post-trial submissions and the evidence presented at trial, the Court sets forth herein its findings of fact and conclusions of law, pursuant to *Rule 52(a) of the Federal Rules of Civil Procedure*.

**FINDINGS OF FACT**

[*2]

On or about December 3, 1990, the IRS, North Atlantic Region, issued an internal vacancy announcement for a GM-341-13 Administrative Officer position in the Office of the Regional Inspector. See Pre-Trial Order, Undisputed Facts ("PTO UF") P 5; Pl. Exh. 14, at 4. [1] For purposes of compensation, the position was at the GS-13 level. See Tr. at 299. The vacancy announcement solicited all eligible employees to apply for the position. See PTO UF P 5; Pl. Exh. 14, at 1.

   1   The Office of the Regional Inspector is an organizational component of the IRS's North Atlantic Region and was thus subject to civil service and IRS merit promotion rules and regulations, as well as all equal employment opportunity laws applicable to the federal government. See PTO UF P 4; Jt. Exh. 1, P 11, Jt. Exh. 3, P 6.

At the time of the announcement, plaintiff was employed as a GS-12 Management Analyst in the Facilities Management Branch of the Office of the Assistant Regional Commissioner for the IRS's [*3] North Atlantic Region. See PTO UF P 2; Jt. Exh. 6, at 200; Tr. at 298. Then 49 years old and with nearly 23 years of federal civil service experience, plaintiff had been employed by the IRS since 1978. See PTO UF P 3, Tr. at 293. He also had twelve years of managerial experience, including

Case 1:07-cv-05471-BSJ-KNF    Document 12-9    Filed 07/25/2007    Page 5 of 18

Page 2
2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

two years as chief of the IRS's Regional Operations Section. See Jt. Exh. 6, at 200.

Along with four other GS-12 employees in the North Atlantic Regional Office, plaintiff applied for the Administrative Officer position. See PTO UF P 6; Tr. at 298-99. The other candidates were Eugene Dougherty, age 38; Pat Toon, age 42; Dan Cincotta, age 57; and Kate Leff, who was over age 60. See PTO UF P 6; Jt. Exh. 6, at 104.

The applicable merit promotion plan required that pre-established ranking criteria and evaluation methods be utilized in the promotion process. See PTO UF P 7. The ranking criteria were appended to the promotion certificate and the evaluation methods were listed on the certificate. See id. Each candidate was required to submit an application (IRS Form 4536), a current performance appraisal (an "appraisal"), a report of managerial potential ("RMP") (IRS Form 6568), [*4] and a management career questionnaire ("MCQ") (IRS Form 5449). See id. P 8. [2]

> 2   Unfortunately, the Administrative Officer promotion package itself, which included all documentation underlying the entire promotion process, has been lost by the IRS and was therefore unavailable at trial. See Tr. at 131; Jt. Exh. 10A, at 2. Due to the loss of the promotion file, contemporaneous notes and other pieces of information that would have been probative of the IRS's treatment of plaintiff's application -- and certainly more edifying than the panel members' faint recollections from nine years ago -- were unavailable at trial. Because the IRS was obligated to preserve such records, cf. Jt. Exh 5, § 0335.2661(5), at 0300-291 (requiring the IRS to document practices that may create the appearance of merit violations in the promotion folder and notify all affected employees), its loss of the promotion package constitutes gross negligence. Accordingly, an adverse inference is warranted to the extent the file may have contained evidence potentially helpful to plaintiff. See *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing -- a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case."); *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) ("'The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference.'") (quoting 2 Wigmore, Evidence in Trials at Common Law § 291, at 228); *id. at 128* ("The prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.").

[*5] II. Preparation of the Discriminatory RMP

The document most critical to this case is plaintiff's RMP. IRS merit promotion procedures require that each candidate have an RMP prepared and submitted for the purpose of evaluating his or her managerial potential for the position sought. See id. P 9. The reviewer assesses the candidate's managerial potential on a scale of 1 (poor potential) to 5 (outstanding potential) in six categories: work accomplishment, interpersonal relations, analytical ability, decisiveness, development of subordinates, and EEO effectiveness. See id. P 10; Jt. Exh. 6, at 196-199. The Internal Revenue Manual (the "IR Manual") instructs reviewers to "assign the rating which most appropriately reflects the candidate's potential for managerial positions in general." Jt. Exh. 8, § 0335.125(7)(c)(3), at 0300-270.3; see also PTO UF P 11.

On December 17, 1990, at plaintiff's request, his most recent immediate supervisor, Charles Muzii, prepared an RMP on plaintiff (the "Muzii RMP"). See PTO UF P 12. Muzii had known plaintiff as a co-worker for over ten years and, as chief of the IRS's Regional Customer Service Section, had directly supervised [*6] him from July 1990 until October 1990. See Jt. Exh. 9, at 1. Muzii rated plaintiff outstanding (*i.e.*, 5) on each factor, together with narratives supporting each numerical rating. See PTO UF P 12; Jt. Exh. 9, at 1-3. Overall, Muzii rated plaintiff as having "outstanding potential" for the Administrative Officer position. See PTO UF P 12; Jt. Exh. 1, P 22; Jt. Exh. 9, at 4. These ratings were consistent with the outstanding ratings plaintiff had received on an RMP prepared by his prior manager, Ann Wango, in 1988. See Tr. at 342-43.

The IRS determined, however, that Muzii should not have completed plaintiff's RMP because he was no longer his current supervisor. See Pl. Exh. 1, at 2. Consequently, on January 7, 1991, plaintiff's second-level supervisor, John Ammerman, the Chief of the Regional Facilities Management Branch, approached plaintiff with a hand-written note and requested that plaintiff meet with him on January 9 to discuss his application. See PTO UF P 13; Tr. at 300-01. The note referenced plaintiff's application materials and asked plaintiff to answer the follow-

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 6 of 18

Page 3

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

ing questions: "How much useful organizational life is there? Consider potential retirement [*7] age? Age now? Years in?" Jt. Exh. 1, P 21; Jt. Exh. 3, P 11.

The next day, plaintiff brought Ammerman's questionnaire to the attention of Cozetta Green, then the Executive Assistant to the Regional Commissioner, who was responsible for equal employment opportunity matters throughout the IRS's North Atlantic Region, including the IRS's anti-discrimination policy, see Jt. Exh. 1, P 14; Jt. Exh. 3, P 7; Tr. at 268-69, 301. According to plaintiff, Green was "pretty shocked" by Ammerman's note. Tr. at 302. She concluded that Ammerman's questions were violative of the ADEA and not "normal, routine and proper" conduct within the IRS. See *id. at 269, 274-75*.

On January 9, 1991, plaintiff met with Ammerman privately to voice his objection to his supervisor's age-related questions. See Tr. at 302. Ammerman responded by advising plaintiff that these were the questions that IRS regional executives had asked him about plaintiff. See *id. at 302-03*. Two days later, Ammerman provided plaintiff with a handwritten draft of a new RMP, which he had prepared to replace the Muzii RMP. See *id. at 303-04*. The draft contained lower ratings of plaintiff's managerial potential in each category, [*8] as well as new narratives supporting the lowered ratings and an overall rating of "very good" potential. See Jt. Exh. 1, P 27; Jt. Exh. 3, P 14. Plaintiff again objected to Ammerman's draft RMP and asked that Ammerman reconsider it. See Tr. at 303. Plaintiff also apprised Green of the draft and provided her with a copy of the Muzii RMP. See Jt. Exh. 1, P 28; Jt. Exh. 3, P 15; Tr. at 305. Green told plaintiff that she would "check into" these matters. Tr. at 305.

Thereafter, Green spoke to Ammerman and instructed him to remove any age-related comments from plaintiff's file. See Tr. at 275, 283. Green testified that she accepted at face value Ammerman's statement that his age-related questions had nothing to do with the lower ratings he had assigned plaintiff on the new RMP. See *id. at 283-84*. Consequently, Green took no further steps to deal with the Ammerman RMP because "there was nothing else that needed to be done from [her] office." *Id. at 284*.

Prior to preparing his final assessment of plaintiff, Ammerman spoke with Elaine Goulbourne to inquire about the major job requirements of the Administrative Officer position. See Jt. Exh. 10, at 5; Tr. at [*9] 309. Goulbourne had previously held the position and subsequently chaired the panel convened by the IRS to rank the applicants. Although Goulbourne testified at trial that she could not recall having spoken to Ammerman, she acknowledged it was possible that she had. See Tr. at 137-38. The Court finds that such a conversation did indeed take place, although it will not speculate as to whether age-related factors were discussed.

On January 25, 1991, Ammerman provided plaintiff with a final copy of the new RMP (the "Ammerman RMP"), dated January 23, 1991, which was signed by both Ammerman and Virginia Grey, Executive Assistant to the Assistant Regional Commissioner. See PTO UF P 14; Jt. Exh. 6, at 196-199; Tr. at 304. Like the draft, the Ammerman RMP contained lower ratings of plaintiff's managerial potential in each category -- *i.e.*, "Very Good Potential" (4's) in all categories except "Development of Subordinates," in which plaintiff received a rating of "Good Potential" (3) -- as well as new narratives and an overall rating of "very good." See PTO UF P 14; Jt. Exh. 6, at 196-99. The Ammerman RMP also included the following recommendation for improvement: "Although [*10] [plaintiff's] career file shows a two year managerial assignment, this position is 50% Personnel related. Additional personnel experience would be desirable." PTO UF P 14; Jt. Exh. 6, at 198.

During this same period, Ammerman also prepared an RMP for Eugene Dougherty, who was eleven years younger than plaintiff and who was ultimately recommended by the panel and selected for the promotion. Ammerman generally gave Dougherty ratings of "4," with the exception of "Development of Subordinates" and "EEO Effectiveness," for which he rated him a "3." See Jt. Exh. 6, at 131-33. Ammerman commented that Dougherty's "interpersonal skills are excellent -- can deal successfully with personnel at various levels." *Id. at 131*. Nonetheless, as he did on plaintiff's RMP, Ammerman recommended that Dougherty acquire "additional Personnel Skills," because the "position is approximately 50% personnel related." Id.

Plaintiff was particularly perturbed by Ammerman's insinuation that he lacked personnel experience. During his two years as chief of the IRS's Operations Section, plaintiff supervised approximately 20 employees. See Tr. at 296. He also served a two month stint as acting chief [*11] of the IRS's Customer Service Section, during which he supervised 15 to 20 employees. See *id. at 295-96*. As section chief, plaintiff was responsible for evaluating his subordinates and designed an "individual development plan" for the Brooklyn district office. See *id. at 296*. Moreover, outside the IRS, he had been an assistant supervisor for Smith Barney for approximately eight years. See *id. at 297*. By contrast, to plaintiff's knowledge, Dougherty, who was formerly plaintiff's subordinate in the Operations Section, had no managerial experience whatsoever. See id. In fact, plaintiff believed that he was the only one of the five candidates who had the requisite personnel experience. See *id. at 343*.

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 7 of 18

Page 4
2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

Consequently, plaintiff declined Ammerman's request that he sign the Ammerman RMP, explaining that he "disagreed with it [and] preferred Mr. Muzii's evaluation." Tr. at 306-07. Thereafter, Ammerman wrote on the first page of the document: "Employee declined to sign." PTO UF P 15; Jt. Exh. 6, at 196; Tr. at 307. Yet, Ammerman did not include any explanation of the reason for plaintiff's refusal to sign the RMP. See Jt. Exh. 6, at 196.

Soon after receiving the final [*12] copy of the Ammerman RMP, plaintiff again met with Cozetta Green. See Jt. Exh. 1, P 31; Jt. Exh. 3, P 18; Jt. Exh. 10, at 3-4; Tr. at 307. Green advised plaintiff to meet with an EEO counselor to begin the process of filing an administrative complaint. See Tr. at 307-08. Based on Green's recommendation, on or about January 29, 1991, plaintiff contacted IRS EEO Counselor Howard Levy to initiate a formal complaint. See Jt. Exh. 1, P 32; Jt. Exh. 3, P 19; Tr. at 308.

### III. The Ranking Panel's Assessment of the Candidates

#### A. The Ranking Process

In February 1991, while plaintiff's EEO complaint was pending, the IRS convened a three-member ranking panel to evaluate and rank the applicants for the Administrative Officer position. See PTO UF P 16. Goulbourne chaired the panel, and was joined by IRS employees James Diercksen and Richard Dagliolo. See id. The panel was responsible for establishing standard ranking criteria based on the job-related knowledge, skills, and abilities required by the position. See id. P 17. It was then to utilize the designated evaluation methods to determine, based on the pre-established criteria, which candidates were [*13] "highly qualified" and which were "best qualified" for the position. See id.

Consideration of each candidate's RMP by the ranking panel was a mandatory evaluation method for determining the "highly qualified" and "best qualified" candidates. See id. P 18; Tr. at 30-31, 109-12, 206-09. According to the IR Manual, the RMP "provides the most directly related information" to the ranking panel responsible for evaluating the candidates, "since it provides the panel with the rater/reviewer's assessment of the applicants potential on each of the criteria." Jt. Exh. 8, § 0335.125(7)(c)(4), at 0300-270.3. [3] It is undisputed that the panel reviewed and considered the entire Ammerman RMP and used it to evaluate and rank plaintiff's candidacy. See PTO UF P 19.

---

3   However, the IR Manual also provides that "since [RMP] appraisals of 'potential' are not usually precise measurements or reports of actual or observed job performance, but are usually more judgmental and predictive in nature, care should be exercised in how they are used in the ranking process." Jt. Exh. 4, § 0335.262(3)(d)(5), at 0300-289. It therefore warns that "it may be desirable to get information about potential from several different sources rather than to rely solely on any one person's assessment." Id.

[*14]  On or about February 15, 1991, the panel ranked all of the candidates using the following criteria: (1) knowledge of administrative procedures; (2) knowledge of fiscal, facilities, and personnel procedures; (3) ability to communicate effectively (orally and in writing); (4) ability to plan, direct, monitor, and assign work; and (5) ability to collect and compile information. See id. P 20; Jt. Exh. 6, at 106. According to the IR Manual, these criteria were the "stated requirements of knowledges, skills, abilities and other personal characteristics necessary for superior performance in the position to be filled." Jt. Exh. 4, § 0335.262(1), at 0300-286. For each criterion, the panel assigned the individual candidates between four and ten points. See PTO UF P 20. Points were awarded based on the panel's review of each candidate's application, appraisal, RMP, and MCQ. See id. [4] In addition, candidates were given extra points for awards received. See id.

---

4   Again, the IR Manual emphasizes that the "highly qualified" determination is not intended to be "mechanical" or dependent on any single form, but rather should be "based on the judgment of the panel after considering all relevant information." Jt. Exh. 8, § 0335.125(7)(c)(4), at 0300-270.3. It goes on to explain that "giving appropriate consideration to all sources of information is particularly important since applicants receive consideration based on all relevant information." Id. Nonetheless, as discussed above, the same paragraph states that "the source which provides the most directly related information is [the RMP], since it provides the panel with the rater/reviewer's assessment of the applicant's assessment on each of the criteria." Id.

[*15]  In accordance with the IR Manual, the panel designated all five candidates, including plaintiff, as "best qualified" for the position. [5] It awarded plaintiff 41 out of a possible 50 points. See Jt. Exh. 6, at 195. Dougherty received the most points, 44, see id. at 123, while the other three candidates received 41, 42, and 43 points. See id. at 146, 173, 223; see also PTO UF PP 21-22. [6] According to the IR Manual, these "overall" promotion scores "should be indicative of the potential possessed by each candidate to perform the duties of the vacancy in a successful manner." Jt. Exh. 5, § 0335.265(4), at 0300-290. Nonetheless, because all five

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 8 of 18

Page 5
2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

candidates were certified as "best qualified," any of them could have been selected for the position. See PTO UF P 22; Jt. Exh. 5, § 0335.2661(2), at 0300-291 ("The selecting official may select any candidate . . . certified as best qualified, based on his/her judgment of how well each candidate is likely to perform in the particular position being fulfilled and, when relevant, what the individual's potential is for future advancement.").

  5  See Jt. Exh. 5, § 0335.265(7), at 0300-290 ("If the number of highly qualified is five or fewer, all of them may be certified as best qualified.").

[*16]

  6  The IR Manual requires that the names of eligible candidates be listed alphabetically on the Roster of Eligibles for Promotion Certificate, see Jt. Exh 5, § 0335.265(1), at 0300-290, and that the names of candidates deemed "best qualified" be listed in alphabetical order on Part II of Form 4537, see id. § 0335.265(7), at 0300-290. Plaintiff's name was not listed alphabetically, but rather last. Despite plaintiff's suggestion that this somehow indicates that his name was added after the rosters were originally compiled, see Pl. Supp. Prop. Findings of Fact P 27, the Court will not speculate as to the reason for the suspicious ordering of the names.

Clearly, the ranking panel relied upon Ammerman's assessment of plaintiff's potential to evaluate and rank plaintiff's application. See Jt. Exh. 10, at 2; Tr. at 145, 148-509; see also Jt. Exh. 10, at 4 (admitting that the panel "considered" the Ammerman RMP in ranking and evaluating plaintiff, but denying that it "relied" on the document). It is also evident that, when evaluating and ranking the applications of plaintiff's [*17] cohorts, the panel considered the ratings and comments that Ammerman contributed to the RMPs of Dougherty and the other candidates whose RMPs he prepared. See Tr. at 140-43.

Thus, the notation on the Ammerman RMP indicating that plaintiff had refused to sign the document may have played a role in determining plaintiff's overall promotion score. Defendant has failed to prove that this comment did not cause the panel to have a negative perception of plaintiff. To be sure, Goulbourne testified that although such a notation was very unusual, [7] it had no bearing on the panel's recommendation. See id. at 164-65. Notwithstanding her assertion, however, at trial, Dagliolo acknowledged that Ammerman's comment implied that plaintiff was disgruntled or dissatisfied, see id. at 88-89, and Diercksen stated that the comment was an indication that plaintiff disagreed with Ammerman's assessment or that "he may be looking for an award or something," id. at 232. Given the disparate interpretations of the individual panel members, the Court cannot say that the comment did not cast aspersions on plaintiff's application.

  7  In fact, Goulbourne later stated that she could not recall ever having seen such a notation on an RMP. See Tr. at 165.

[*18] Moreover, had the panel been presented with the Muzii RMP rather than the Ammerman RMP, the panel members would have assessed plaintiff on the basis of an outstanding evaluation, rather than Ammerman's tepid appraisal. Goulbourne conceded as much in opining that the narratives in the Muzii RMP supported a rating of "outstanding" in at least two categories, while those in the Ammerman RMP did not. See id. at 121, 155. While she refused to speculate as to whether plaintiff would have been ranked higher had the panel received the Muzii RMP, see Tr. at 154-55, both Dagliolo and Diercksen admitted that the panel might have rated plaintiff higher had the Muzii RMP been considered. See id. at 50, 88, 219. Furthermore, under such a hypothetical scenario, the panel members would not have seen Ammerman's notation regarding plaintiff's refusal to sign the discriminatory document and would never have reviewed the controversial comment regarding plaintiff's lack of personnel experience.

Therefore, the Court finds that, in all likelihood, had the discriminatory Ammerman RMP not been used, plaintiff would have received a higher overall promotion score -- an indication of greater potential [*19] to successfully perform the duties of the position. In fact, it is even possible that plaintiff's score would have been higher than Dougherty's. See Tr. at 88, 219. Had that been the case, plaintiff might have gone into his interview, as Dougherty did, having been designated by the panel as its leading candidate for the promotion.

**B. The Interviews**

Because all five candidates were found to be "best qualified," in accordance with IRS regulations and the vacancy announcement, the ranking panel decided to interview all of them. See Pl. Exh. 14, at 1; Jt. Exh. 5, § 0335.263(4)(c)(2), at 0300-287; Tr. at 32, 112-13, 208-90. These interviews, characterized as "meet and deal" assessments, were conducted on March 1, 1991. See PTO UF P 23.

The IRS interview forms (i.e., Form 3282) required each panel member to rate the candidates in specified sub-elements of four categories -- oral expression, presentation and delivery, interpersonal skills, and problem-solving -- with either a "+" for favorable observations, "0" for neither favorable nor unfavorable observations, or "-" for unfavorable observations. See id. P 24; Jt. Exh. 6,

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 9 of 18

Page 6

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

at 187-188. The forms also provided [*20] space for descriptive observations, as well as an summary rating of "+," "0," or "-" for each category. See PTO UF P 23; Jt. Exh. 6, at 188. Overall, the panel was required to grade each applicant's interview on a pass-fail basis. See PTO UF P 23; Jt. Exh. 6, at 188.

The panel's rating forms demonstrate that plaintiff "passed" the interview, see Jt. Exh. 10, at 3; Jt. Exh. 6, at 105, and received an overall rating of "passed" from each interviewer, see Jt. Exh. 6, at 188, 190, 192; Tr. at 93, 185, 228. [8] Of the three members of the panel, Goulbourne and Dagliolo gave plaintiff a "+" rating in all four categories, see Jt. Exh. 6, at 190, 192, while Diercksen rated him a "+" in three categories, except "problem-solving," in which he assigned plaintiff a "0," see id. at 188.

> 8 Dagliolo checked neither the "passed" nor the "failed" box on plaintiff's rating form. See Jt. Exh. 6, at 190. However, at trial, Dagliolo confirmed that there was "absolutely" no question in his mind that plaintiff passed the interview. See Tr. at 92.

[*21] Relative to Dougherty, however, plaintiff's interview was less impressive. Comparison of the rating forms reveals that Dougherty outperformed plaintiff on the oral interview. In particular, in the "problem-solving" category, Dougherty received consistent "+" ratings on all sub-elements. Compare Jt. Exh. 6, at 115-21, with Jt. Exh. 6, at 186-92. According to Goulbourne, Dougherty "had the edge in pass-fail. [Plaintiff] was A and [Dougherty] was A plus." Tr. at 187; see also id. at 168.

The rating forms and the testimony at trial reflect plaintiff's deficiencies in the oral interview. All three panel members rated plaintiff a "-" in at least one sub-element and gave him negative or lukewarm comments in the "problem-solving" category. See Jt. Exh. 6, at 187-92. Dagliolo testified that plaintiff "didn't knock us over, didn't do a great job or anything like that. He did okay . . . The reason I have him a minus [in problem-solving] is that in the element inquiry for pertinent facts, he did, to me, have a problem there and one of the questions I felt he did ramble on and didn't answer the question adequately and give us an answer that we were looking for." Tr. at [*22] 39. Goulbourne wrote on her rating form that plaintiff "clarified questions presented but did not adequately address solutions or compensation to situations." Jt. Exh. 6, at 191; see also Tr. at 116. Diercksen generally concurred, noting that plaintiff missed a problem and that several of his answers were basic and lacked further development. See Jt. Exh. 6, at 187; see also Tr. at 213. He also observed that plaintiff "did not appear at times to anticipate consequences." Jt. Exh. 6, at 187.

By contrast, all three panel members rated Dougherty a "+" in every sub-element and provided generally positive comments. See Jt. Exh. 6, at 116-21. Diercksen testified that he "thought [Dougherty] did very well in the interview," Tr. at 216, and Dagliolo, who characterized Dougherty's performance as "a very, very good job," id. at 119, apparently agreed. Dagliolo further stated that Dougherty's interview performance was "much higher, much better" than plaintiff's and that consequently Dougherty "appeared to be head and shoulders above the other applicants that [the panel] interviewed." Id.

In sum, while plaintiff "passed" the interview, his performance was not overwhelming. [*23] There is little doubt that based on interview performance alone, Dougherty was the superior candidate. Still, despite defendant's contention that the interview was the sole reason for plaintiff's nonselection, his "A" performance was certainly not so poor as to disqualify him for the promotion.

### IV. Selection of Dougherty

Following the interviews, the ranking panel members convened and unanimously agreed to recommend Dougherty for the Administrative Officer position. See Tr. at 43-44, 118, 217; see PTO UF P 25. Based entirely on the panel's recommendation, on March 8, 1991, IRS selecting official Joseph F. Reinbold chose Dougherty to fill the position. See PTO UF P 25. Although Reinbold did not testify at trial, his affidavit states he personally reviewed the promotion package materials and that "as far as I know the [panel's] initial ranking and subsequent recommendation was based on the materials submitted with each applicant." Pl. Exh. 7, at 1. The Court therefore concludes that Reinbold believed that the panel's recommendation of Dougherty was based on the entirety of the materials submitted, and not simply Dougherty's interview performance relative the [*24] other candidates.

At trial, the panel members attempted to justify their recommendation of Dougherty as, in Goulbourne's words, "basically based on the interview." Tr. at 118. For example, Dagliolo explained that the panel

> chose [Dougherty] because he appeared to have -- he did have during the interview [--] better interpersonal skills, in our opinion. He appeared to be somebody that would do whatever he could to please anyone who may have come to him and asked him for service. His demeanor -- again, his ability to please. He thought well on his feet during the interview. So it was clear to us that he was the person that we wanted for the job, knowing that who-

Case 1:07-cv-05471-BSJ-KNF     Document 12-9     Filed 07/25/2007     Page 10 of 18

Page 7

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

ever was selected would be dealing with many, many people on a day-to-day basis.

Id. at 44. Likewise, Diercksen stated his belief that Dougherty "came across as someone who would go above and beyond," id. at 217, and that "the interview is where, for lack of a better term, [plaintiff] lost the job," id. at 236.

Certainly, plaintiff's interview performance was a motivating factor in his nonselection for promotion. There is no evidence whatsoever to suggest that the panel members themselves took [*25] plaintiff's age into account in assessing his candidacy, see id. at 50, 125-26, 219, as plaintiff himself recognized, see *id. at 337-38* (Q: "None of the panel members did or said anything to you during the interview that led you to believe they were looking for younger people for the job? A: No they didn't."). Furthermore, the panel was apparently unaware that Ammerman had given plaintiff the note with the age-related questions in preparing his RMP, nor did any of its members see or otherwise consider the note in the course of making their recommendation. See id. at 50, 125-26, 219, 248.

Nevertheless, defendant's position is that the interview was the decisive factor and, ultimately, the only factor that contributed to the panel's decision to recommend Dougherty over plaintiff. Essentially, defendant maintains that the IRS employed a two-tiered selection process, with the RMPs, appraisals, and other materials used only to decide which applicants were "best qualified," while the interview alone determined who among the "best qualified" candidates was to receive the promotion. For two reasons, the Court cannot accept this assertion.

First, had the panel based its initial [*26] ranking of plaintiff on the Muzii ratings and narratives, its members might have gone into the interview with a more positive impression of plaintiff's potential. To be sure, Dagliolo testified that once plaintiff was found to be among the "best qualified," he could still have received the position notwithstanding the tainted evaluation because "at that point everybody was equal." Id. at 63. Yet, it improbable that the panel members would have -- or even could have -- completely disassociated their initial impressions of the candidates from their subsequent evaluations of the candidates' interview performances. As evidence, when asked at the March 10, 1992 EEOC hearing why the panel recommended Dougherty over the other candidates, Goulbourne replied that "besides having obtained the highest numerical rating, which was based on the narratives that supported the ratings that he received, especially his performance appraisal in his present position, which was excellent, the interview of Gene Dougherty, he was outstanding." Pl. Exh. 6, at 48. The implication of this statement is that Dougherty's position *via a vis* the other candidates was at the very least enhanced by his status [*27] as the frontrunner going into the interview. Again, plaintiff might have been the frontrunner had his candidacy been assessed based on the Muzii RMP. See supra at 12.

Likewise, had the panel been aware of Ammerman's discrimination towards plaintiff at the time of the ranking and interview, that would have influenced the manner in which the panel evaluated Ammerman's input not only with respect to plaintiff, but also his evaluations of Dougherty and the other applicants for whom he had prepared RMPs. The panel members agreed they would have sought counsel from personnel experts if they had suspected that plaintiff's RMP was based on a discriminatory evaluation. See Tr. at 63-64, 145, 236. Dagliolo even testified that had he known that Ammerman had given plaintiff a reduced evaluation on account of his age, that might have "tainted" Dagliolo's evaluation of the other candidates whom Ammerman reviewed. See id. at 64-65; see also *id. at 153-54* (testimony by Goulbourne in which she stated that she had no way of knowing how Ammerman's role would have impacted her ranking of other candidates had she known of the discriminatory RMP). In fact, Dagliolo admitted the possibility [*28] that he might have looked at anything that Ammerman touched as being somewhat tainted. See id. at 65.

Second, defendant's characterization of the interviews as entirely and exclusively determinative of the outcome of the panel's ranking process is inconsistent with the procedures established by the IRS for making such employment decisions. The IR Manual provides that "the final criterion to be applied in determining the eligibility of the candidate [following the interview] is whether the panel member would recommend with confidence the appointment of the applicant insofar as the qualities covered by the interview are concerned." Jt. Exh. 7, § 0331.1734(2), at 0300-212. Since all of the candidates passed the interview, the consensus was that the panel "would recommend with confidence" the appointment of any of them, including plaintiff, insofar as "meet and deal" qualities were concerned. By passing the interview, plaintiff was deemed an acceptable candidate, and thus the interview did not in any way preclude his selection.

Defendant exaggerates the importance of the "meet and deal" interviews. The Federal Personnel Manual, Pl. Exh. 13, and the IR Manual distinguish between [*29] "selection" interviews and standard "meet and deal" interviews, as each of the panel members testified. See Tr. at 83, 187, 227. The interviews at issue in this case were *not* selection interviews, see id. at 83, 187, 227, but

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 11 of 18

Page 8
2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

rather were "limited to consideration of the candidate's ability to deal with people effectively and whether from this standpoint he/she would likely succeed in a position requiring frequent personal dealings with the public." Jt. Exh. 7, § 0331.1732, at 0300-211, see also id. § 0331.1737, at 0300-213 ("The following factors will be measured in the standard interview: oral expression; presentation and delivery; interpersonal skills; problem-solving; and other job-related factors, where appropriate."). The purpose of such interviews is to verify the candidate's eligibility for appointment from a "meet and deal" perspective. "It is not used to measure work experience, educational background or technical competence, which are evaluated by other methods, such as written tests, rating of qualifications in relation to job requirements and work history investigation, etc." Id.

Finally, the IR Manual warns that "care should be taken not to attribute [*30] more precision to the interview than it warrants," since "distinguishing small differences among candidates on the basis of an interview is unlikely to be meaningful." Jt. Exh. 4, § 0335.263(3)(c)(3), at 0300-288. Accordingly, as Dagliolo conceded, the factors measured on the interview assessment form did not correspond with the overall evaluation criteria, see Tr. at 83-85, which the IR Manual characterizes as the "requirements . . . for superior performance in the position to be filled," Jt. Exh. 4, § 0335.262(1), at 0300-286. It would therefore violate IRS policy and federal law to make employment decisions solely on the basis of the candidates' relative performances in such interviews, just as it would offend common sense for any employer to promote its employees based entirely on their "meet and deal" qualities.

In sum, although the interviews were certainly a factor in the panel's decisionmaking process, they was not the only factor that contributed to its ultimate recommendation. The Ammerman RMP thus continued to infect the process even after plaintiff was deemed one of the "best qualified" candidates.

### V. Plaintiff's EEOC Complaint

On July 19, 1991, plaintiff [*31] filed and pursued a formal age discrimination complaint. On March 22, 1993, the EEOC ruled that Ammerman's "age-related comments . . . in relation to [plaintiff's] RMP constitute conclusory evidence of bias in regard to that document." Jt. Exh. 2, at 5; see also PTO UF P 27. It nevertheless found the evidence insufficient to adjudicate whether the Ammerman RMP "fatally tainted the selection process," since it was unclear whether plaintiff would have received the position had his RMP score been higher or had Ammerman's remarks been omitted. Jt. Exh. 2, at 6.

Accordingly, the EEOC remanded plaintiff's complaint for a supplemental investigation to determine whether the Ammerman RMP "discriminatorily tainted [plaintiff's] subsequent nonselection." Id. The investigation was to include "an analysis of the factors used by the selection panel to determine the impact of the RMP form on its selection through interviews with the selection panel and review of contemporaneous memoranda" in order aid the EEOC's determination of plaintiff's entitlement to the remedy of retroactive promotion. Id. at 6-7; see also PTO UF P 28. [9] The EEOC also ordered the IRS to direct Ammerman [*32] to refrain from further age-related inquiries, raise plaintiff's RMP rating to a 5 retroactively to its inception, eliminate Ammerman's comments from plaintiff's file, and post a notice acknowledging its violation of the ADEA. See id.; Jt. Exh. 2, at 6-7; Pl. Exh. 2, at 6-7.

> 9   On January 4, 1994, the EEOC denied the IRS's request for reconsideration and reiterated its previous order. See Pl. Exh. 1, at 5-7.

Pursuant to the EEOC's directive, the IRS instructed Ammerman to refrain from further age discrimination and posted the required notice. See PTO UF P 29. It also destroyed the Ammerman RMP and retained in plaintiff's file only the Muzii RMP. See id.

In conducting its investigation, the IRS gathered affidavits from the three members of the ranking panel. See PTO UF P 29. Each member stated unequivocally that notwithstanding the discriminatory RMP, plaintiff still would not have been selected for the position on account of his interview performance. See Pl. Exh. 3, at 1; Pl. Exh. 4, [*33] at 1-2; Pl. Exh. 5, at 1.

Yet, in its investigation, the IRS did not provide the panel members with the Muzii RMP, which the EEOC had retroactively restored to plaintiff and which the EEOC determined should have been before them in 1991. See Tr. at 180. Instead, according to Goulbourne, she simply hypothetically assessed plaintiff's candidacy assuming that Ammerman's ratings were replaced by all 5's. See *id. at 180-82*. Likewise, in his affidavit, Dagliolo stated that "had [plaintiff] received [an] all '5' evaluation on the RMP, this still would not have influenced the selection process," Pl. Exh. 3, at 1, as did Goulbourne, see Pl. Exh. 4, at 1-2 ("It would not have made a difference if [plaintiff] had received all 5's on the [RMP]."), and Diercksen, see Pl. Exh. 5, at 2 ("Our recommendation would not have been different if [plaintiff] had received all 5's because other factors such as evaluations [and] interviews were considered."). Thus, the panel members never got to read Muzii's narratives, nor were they asked to discount the narratives in the Ammerman RMP. This oversight renders the panel members' hypothetical assessment of plaintiff's application [*34] virtually mean-

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 12 of 18

Page 9

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

ingless, since, as Goulbourne so emphatically asserted, the narrative descriptions provided in RMPs generally carry much more weight with ranking panels than do numerical scores. See Tr. at 120-23; see also *id. at 156* ("The selection process is not a numbers game. It's a matter of judgment.").

Moreover, the affidavits of the panel members do not deny that the RMPs played a role in Dougherty's selection. Goulbourne's affidavit states that "the recommendation [of Dougherty] was based on the narratives of the evaluation, [RMP], awards, and the interview of all candidates." Pl. Exh. 4, at 2. Likewise, Dagliolo recalled that "the [RMP] did not hold any more weight in the selection process than other criteria, such as the interview. The impact of the RMP was no more significant than the other factors." Jt. Exh. 3, at 1. Thus, not only was Dougherty's candidacy supported by the RMP Ammerman prepared on him, it was bolstered by Ammerman's discriminatory lowering of plaintiff's ratings and narratives.

Nonetheless, based on its supplemental investigation, the IRS concluded that plaintiff would still not have been selected for the position even in the absence of [*35] the Ammerman RMP. See PTO UF P 30. It therefore informed plaintiff, in accordance with the EEOC's order, of his option to request a new final agency decision with or without a further hearing before an EEOC administrative judge. See id. After plaintiff requested a final agency decision without further hearing, see id. P 31, on June 21, 1994, the IRS issued its final decision, finding the evidence insufficient to support plaintiff's claim of age discrimination and denied plaintiff relief, see id. P 32. Plaintiff subsequently appealed to the EEOC, which, on August 11, 1995, affirmed the IRS's ruling. See id. P 33. Plaintiff then commenced this action, seeking *de novo* review of the EEOC's August 11, 1995 decision and enforcement of its March 22, 1993 decision and order. *See id.* P 34.

### VI. Plaintiff's Damages

Plaintiff spent almost six more years with the IRS after being turned down for promotion. From March 24, 1991 until February 28, 1997, when plaintiff retired from the IRS, he was compensated at the GS-12 level. See PTO UF P 2. During that time, he applied for three other jobs, two of which were GS-13 level supervisory management positions [*36] with the U.S. Customers Service and the Government Printing Office, see Tr. at 314, and one of which was as chief of security for the Whitney Museum, see *id. at 341*. However, in October 1991, during the pendency of plaintiff's EEOC complaint, his then-manager, Dervent Lee, discouraged him from seeking promotion within the IRS, advising him that his "chances of . . . getting a promotion in the IRS was like a snowball in July." *Id. at 314*; see also *id. at 340*.

The parties have stipulated that the gross difference between what plaintiff earned as a GS-12 employee during that period and what he would have earned as a GS-13 employee is $ 27,067.60. See Tr. at 289. They have also stipulated that the terminal annual leave payment that plaintiff received upon his retirement would have been $ 737.12 greater had he retired as a GS-13 employee. See Jt. Stip., dated Jan. 10, 2000, at 1. Finally, they have agreed that the gross monthly difference between the retirement annuity plaintiff is now receiving and the amount he would be collecting had he retired at the GS-13 level is $ 224.00 per month. See Jt. Stip., dated Aug. 28, 2000, at 1.

### CONCLUSIONS OF LAW

[*37] **I. Background**

The ADEA prohibits employment discrimination against employees or applicants for employment age 40 or older on the basis of age. See 29 U.S.C. § 6233a; *O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312, 134 L. Ed. 2d 433, 116 S. Ct. 1307 (1996)*. With regard to federal personnel management, *5 U.S.C. § 2301(b)(1)* provides that "selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." See also *5 U.S.C. § 2301(b)(2)* ("All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to . . . age . . . and with proper regard for their privacy and constitutional rights."); *United States Customs Serv. v. Federal Labor Relations Auth., 739 F.2d 829, 832 (2d Cir. 1984)* ("Advancement in federal service must be determined solely on the basis of relative ability, knowledge, and skill . . . ."); *Parola v. IRS, 1999 U.S. Dist. LEXIS 19367*, No. 98-CV-7179, 1999 WL 1215557, [*38] at *6 (E.D.N.Y. Dec. 15, 1999); Pl. Exh. 16, § 0335.211, at 0300-270.10 (IR Manual) ("All actions -- whether identification, qualification, evaluation, or selection of candidates -- will be made on a fair and equitable basis -- without discrimination for any non-merit reason, such as . . . age . . . and shall be based *solely* upon job-related evaluation procedures.") (emphasis in original).

"When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.' That is, the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 L.*

Case 1:07-cv-05471-BSJ-KNF    Document 12-9    Filed 07/25/2007    Page 13 of 18

Page 10

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

*Ed. 2d 105, 120 S. Ct. 2097, 2105 (2000)* (quoting *Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993)*). However, it is often difficult to discern direct evidence of discriminatory intent. See *Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)* ("Direct evidence of discrimination is not necessary, because proof is seldom available [*39] with respect to an employer's mental processes.") (citation omitted); *Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988)* ("The allocation of burdens and imposition of presumptions in . . . ADEA cases recognizes the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier."). Consequently, the Supreme Court has developed elaborate burden-shifting procedures designed to elicit evidence that will be helpful to the finder of fact. See *Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997)* (en banc) (stating that the purpose of burden-shifting is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent").

Cases brought under the ADEA are governed by the structures originally developed under Title VII. See *EEOC v. Ethan Allen, Inc., 44 F.3d 116, 119 (2d Cir. 1994)*. Thus, a plaintiff may [*40] prove his or her ADEA claim in one of two ways. The first is the three-step "pretext" or "single issue motivation" [10] analysis first enunciated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*; see also *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. To prevail under the McDonnell Douglas "pretext" rubric, "the plaintiff must first establish a *prima facie* case by showing membership in a protected class, qualification for the position, an adverse employment action, and circumstances that give at least minimal support to an inference of discrimination." *Fagan v. New York State Elec. & Gas Corp., 186 F.3d 127, 132 (2d Cir. 1999)*. Once the plaintiff has established a *prima facie* case, the employer to must "offer a legitimate, non-discriminatory reason for its employment decision." *Id.* "If the employer articulates this nondiscriminatory reason, the plaintiff must then show that the proffered reason was a pretext for age discrimination." *Id.* (citing *Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997)* [*41] (per curiam)). "The ultimate issue is whether the plaintiff has proved that the adverse employment action was motivated at least in part by age discrimination." *Id.* (citing *Stratton v. Department for the Aging, 132 F.3d 869, 878 (2d Cir. 1997)*; *Renz v. Grey Advertising, Inc., 135 F.3d 217, 222 (2d Cir. 1997)*).

10 "Cases in the first category are often called 'pretext cases,' because the plaintiff usually challenges the defendant's proffered assertion of a permissible reason as a pretext for the impermissible reason of discrimination. . . . However, it might be more useful to call such cases 'single issue motivation cases,' because the fact-finder must decide only the single issue of whether an impermissible reason motivated the adverse action. Cases in the second category are appropriately called 'dual issue motivation cases' because the fact-finder must decide both the issue of whether the plaintiff has proved that an impermissible reason motivated the adverse action and the additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason." *Fields v. New York State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119-120 (2d Cir. 1997)*.

[*42]

The second basis on which an ADEA plaintiff may prevail is known as the "mixed motives" theory, which originated in *Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*. Under this framework, "if the plaintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway." *Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997)*. The Price Waterhouse Court made it clear, however, that "the burden-shifting threshold a plaintiff must cross is proof that the forbidden animus was at least one of the 'motivating' factors in the employment decision; he or she need not show that it was the sole reason, or the 'true' reason, or the 'principal' reason." *Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 180 (2d Cir. 1992)* (citing *Price Waterhouse, 490 U.S. at 247; id. at 259* (White, J., concurring)). Hence, once the burden shifts, it is the employer who bears the risk that the finder of fact [*43] will be unable to separate its legitimate reasons from its discriminatory motivations. See *Price Waterhouse, 490 U.S. at 249-50*.

**II. Pretext Theory**

The Court can easily dispose of plaintiff's "pretext" argument. Defendant has offered plaintiff's interview performance, particularly in contrast to Dougherty's superior presentation, as "a 'legitimate, nondiscriminatory reason' for its employment decision." *Scaria, 117 F.3d at 654* (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*). On

Case 1:07-cv-05471-BSJ-KNF    Document 12-9    Filed 07/25/2007    Page 14 of 18

Page 11

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

account of on defendant's explication of this non-discriminatory reason for its decision not to promote plaintiff, "the presumption of discrimination is rebutted and it 'simply drops out of the picture.'" *Stratton, 132 F.3d at 879* (quoting *St. Mary's, 509 U.S. at 511*).

At this stage, the burden shifts back to plaintiff to prove that defendant's "proffered reason is in reality a pretext for unlawful discrimination, *i.e.*, that it is 'a mask for unlawful discrimination.'" *Stratton, 132 F.3d at 879* (quoting *Fisher, 114 F.3d at 1337*); [*44] see also *Henry v. Daytop Village, Inc., 42 F.3d 89, 93 (2d Cir. 1994)*. Thus, under a "pretext" analysis, plaintiff inherits the "'ultimate burden of persuasion' of proving that intentional discrimination, rather than the explanation offered by the employer, was the true reason for the termination." *Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 717 (2d Cir. 1994)* (quoting *St. Mary's, 509 U.S. at 511*).

As the Supreme Court has explained, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's, 509 U.S. at 515*; see also *Hollander v. American Cyanamid Co., 172 F.3d 192, 201 (2d Cir. 1999)*; *Austin v. Ford Models, Inc., 149 F.3d 148, 153 (2d Cir. 1998)*. There is overwhelming evidence to support defendant's assertion that Dougherty did indeed outperform plaintiff in the oral interview. See supra at 12-14. This Court has no doubt that plaintiff was not the best of the applicants insofar as "meet and deal" qualities were considered. Moreover, the characteristics measured [*45] by the "meet an deal" interviews were certainly relevant, albeit not exclusively so, to the panel's assessment of the candidates. See id. at 14. Therefore, as the Court has already found, plaintiff's interview performance was undoubtedly a motivating factor in his nonselection for promotion. See id. at 15. Hence, it cannot be said that defendant's proffered explanation was false. See *Mauro v. Southern New Engl. Telecomm., Inc., 208 F.3d 384, 388 (2d Cir. 2000)* (affirming summary judgment in defendant's favor where plaintiff "offered no evidence that these reasons were pretextual").

Since plaintiff cannot prove the falsity of defendant's explanation, he cannot succeed on a "pretext" theory. The Second Circuit has held that if a plaintiff "concedes the truth of the reasons offered by [his employer], he can still demonstrate pretext by providing either (1) evidence permitting the [factfinder] to believe that, even if true, [the employer's] proffered reasons played no role in its decision to discharge [the plaintiff], or (2) evidence permitting the jury to conclude that, even though the proffered reasons are true and played a role in [the plaintiff's] [*46] discharge, discrimination based on age was still a motivating factor behind that decision." *Mulqueen v. Daka, Inc., 1996 U.S. App. LEXIS 27328, at *3; 104 F.3d 351* (table), 1996 WL 545594, at *1 (2d Cir. 1996). The first option is unavailable to this plaintiff, for it is beyond cavil that his interview performance was an important factor in his nonselection. As for the second option, it remains viable, but essentially represents the burden required to prevail under a "mixed motives" theory. See *Fields, 115 F.3d at 121* ("Since a plaintiff prevails by showing that discrimination was a motivating factor, it can invite the jury to ignore the defendant's proffered legitimate explanation and conclude that discrimination was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind."); *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)* ("The plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.").

Finally, it should be [*47] noted that up until trial, the Court had always been under the impression that the parties were in agreement that a "mixed motives" analysis would govern this case. See *Scully v. Rubin, 1997 U.S. Dist. LEXIS 10484*, No. 95 Civ. 9091, 1997 WL 419414, at *5 (S.D.N.Y. July 22, 1997). While there is nothing to suggest that plaintiff has waived his "pretext" argument, it is clear that the case more properly fits the "mixed motives" paradigm. Moreover, "the mixed-motive issue does not arise unless [the factfinder] first determines that the plaintiff . . . has failed to prove that the employer's explanations were pretextual." *Ostrowski, 968 F.2d at 181*. Hence, while a party may submit a case on alternative theories, see *Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339, 343 (2d Cir. 1994)*, it is necessary to dispose of the "pretext" question in order to advance to plaintiff's chief argument. Thus, the Court rejects plaintiff's allegation of "pretext" and turns to his "mixed motives" theory of the case.

### III. Mixed Motives Theory

#### A. Motivating Factor

By its March 22, 1993 and January 4, 1994 decisions, the EEOC specifically found that [*48] the Ammerman RMP constituted conclusory evidence of discriminatory bias. See Jt. Exh. 2, at 5; Pl. Exh. 1, at 4-5. The parties agree that the EEOC's determination that the discriminatory factor played a motivating role in the IRS's decision is binding in this action and that defendant may not relitigate that finding. See Pl. Supp. Prop. Concl. of Law P 6; Def. Supp. Prop. Concl. of Law P 3; *Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996)*; *Girard v. Rubin, 62 F.3d 1244, 1247 (9th Cir. 1995)*; see also *Morris v. Rice, 985 F.2d 143, 145 (4th Cir. 1993)* ("The plaintiff may limit and tailor his request for *de*

Case 1:07-cv-05471-BSJ-KNF    Document 12-9    Filed 07/25/2007    Page 15 of 18

Page 12

2000 U.S. Dist. LEXIS 12519, \*; 79 Empl. Prac. Dec. (CCH) P40,219

*novo* review, raising questions about the remedy without exposing himself to a de novo review of a finding of discrimination."); *Haskins v. United States Dep't of the Army*, 808 F.2d 1192, 1200 (6th Cir. 1987) ("The factual findings underlying an administrative liability determination must be accepted by the district court if the plaintiff so requests . . . .").

Accordingly, the Court shall treat the EEOC's finding as having established a discriminatory "motivating" factor in the employment decision. [\*49] Under Price Waterhouse, this shifts the burden to defendant to produce evidence of a legitimate, nondiscriminatory reason for its decision. See *Ostrowski*, 968 F.2d at 180-81. Defendant must therefore prove, by a preponderance of the evidence, that even in the absence of the Ammerman RMP, plaintiff would not have received the promotion. See *Scully*, 1997 U.S. Dist. LEXIS 10484, at \*14, 1997 WL 419414, at \*5-\*6 (citing *Price Waterhouse*, 490 U.S. at 253); see also *Ostrowski*, 968 F.2d at 182. [11]

> 11 Although the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified in part as *42 U.S.C. S 2000e-2(m)*), may have limited an ADEA defendant's ability to use a "same decision" argument to avoid liability, defendant may rely on this defense because this case involves conduct that preceded the statute's effective date. See *Scully*, 1997 U.S. Dist. LEXIS 10484, at \*14, 1997 WL 419414, at \*5 n.3 (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 771 n.3 (3d Cir. 1994)).

[\*50] **B. Defendant's "Same Decision" Defense**

Defendant argues the RMP was not a "motivating factor" since the IRS would have selected Dougherty regardless of Ammerman's contribution to the process. It carries a substantial burden, however, for it is one of persuasion, not merely production. See *Stratton*, 132 F.3d at 878 n.4. Moreover, "proving 'that the same decision would have been justified . . . is not the same as proving that the same decision would have been made.'" *Price Waterhouse*, 490 U.S. at 252 (quoting *Givhan v. Western Line Consolid. School Dist.*, 439 U.S. 410, 416, 58 L. Ed. 2d 619, 99 S. Ct. 693 (1979)). "An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." Id. Nor may the employer "meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason." Id. Rather, the employer "must show that its legitimate reason, *standing alone*, would have induced it to make the same decision." Id. (emphasis [\*51] added).

"As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive." Id. In this case, the Court finds that defendant has failed to provide objective evidence to confirm that the oral interviews, standing alone, precluded plaintiff's selection. Defendant's evidence supporting its "same decision" defense consists primarily of after-the-fact statements by the panel members regarding their subjective evaluation of the candidates' interview performance. Such subjective evaluations of plaintiffs' interview performance must be carefully scrutinized for abuse on account of their potential to mask discrimination. See *Sweeney v. Research Found. of the St. Univ.*, 711 F.2d 1179, 1185 (2d Cir. 1983); *Nicholas v. NYNEX, Inc.*, 974 F. Supp. 261, 267 (S.D.N.Y. 1997); *Verdell v. Wilson*, 602 F. Supp. 1427, 1439 (E.D.N.Y. 1985) ("Objective criteria should be used to the maximum extent possible, and a subjective system must be carefully scrutinized for abuse."); see also *Ramirez v. Hofheinz*, 619 F.2d 442, 446 (5th Cir. 1980) [\*52] ("Courts must carefully scrutinize such subjective evaluations, which often appear to be arbitrary and are always susceptible to discriminatory application.").

What is more, it seems that panel members may have changed their stories as this litigation has progressed. For example, one year after the promotion action and prior to any EEOC finding of discrimination, Goulbourne admitted that Dougherty's numerical ranking, which was based on the narratives that supported his RMP ratings and his performance appraisal, played a role in his recommendation. See Pl. Exh. 6, at 48; supra at 16-17. Yet, at trial, Goulbourne and the other panel members insisted that once all five candidates were certified as "best qualified," the RMPs and the numerical ratings no longer played a role in the decisionmaking process See TR. at 118 ("It was basically based on the interview because they were all qualified as best and any one of the best qualified may be selected for the position.").

Although the interviews may have been a key factor in the panel's ultimate decision, the discrepancies between the panel members' trial testimony and their prior sworn statements suggests that their stories [\*53] have been tailored to comport with the Price Waterhouse defense. See *Ethan Allen*, 44 F.3d at 120 (finding a "legally sufficient evidentiary basis" from which a reasonable factfinder could have found age discrimination, based on evidence suggesting that the defendant provided inconsistent explanations for its employment decision); see also id. ("From such discrepancies a reasonable juror could infer that the explanations given by [the defendant] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination . . . ."). In establishing a "same decision" defense, only motivations

Case 1:07-cv-05471-BSJ-KNF    Document 12-9    Filed 07/25/2007    Page 16 of 18

Page 13

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

actually present "at the time of the decision" are relevant. See *Price Waterhouse, 490 U.S. at 252*. Defendant has certainly not shown that plaintiff's interview performance was so inferior that it was the dominant motivation at the time of the actual decision was made. Rather, the objective evidence suggests that the ranking and selection processes were supposed to be and were in fact integrated, such that the RMPs and the other application materials played an important role in the panel's ultimate recommendation.

Finally, in his [*54] 1991 affidavit, Selecting Official Reinbold stated that it was his understanding that the panel's recommendation was based on all of the materials in the promotion package, not merely the interviews. See Pl. Exh. 7, at 1. He also admitted to having "briefly paged through the package of applicants [materials] when it came in," and acknowledged that any RMPs "would have been considered by the panel in the ranking process." Id. at 1-2; see also Pl. Exh. 8, at 63. Thus, at the time he made the final selection decision, Reinbold apparently believed that the panel's recommendation -- and thus his selection of Dougherty -- was based upon all the materials reviewed in the ranking process, including the RMPs. Reinbold did not testify at trial, and defendant's failure to call him as a witness warrants an adverse inference. See *Sagendorf-Teal v. County of Rensselaer, 100 F.3d 270, 275 (2d Cir. 1996)*; *Estate of Fox v. Commissioner, 1996 U.S. App. LEXIS 3349, at \*2; 100 F.3d 945 (table), 1996 WL 85013, at \*1 (2d Cir. 1996)* ("When a potential witness, equally available to both parties, is not called to testify, a court may draw an inference against either party . . . ."). Moreover, [*55] defendant has failed to adduce any evidence to clarify what Reinbold would have done in 1991 had he known that plaintiff was competing with the handicap of a discriminatory RMP, or had he access to the Muzii RMP, with its outstanding ratings and superior narratives.

Based on the entirety of the evidence, the Court finds that defendant has failed to meet its burden of proving by a preponderance of the evidence that it would have made the same decision in the absence of the Ammerman RMP. "When the defendant has attempted to prove the existence of a nondiscriminatory reason for the failure to hire but it remains uncertain whether the plaintiff would have been hired in the absence of the discriminatory practice, and the uncertainty flows from that practice, the issue should be resolved against the defendant, the party responsible for the lack of certainty." *Cohen v. West Haven Bd. of Police Comm'rs, 638 F.2d 496, 502 (2d Cir. 1980)*. Thus, the employer "'bear[s] the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing." *Price Waterhouse, 490 U.S. at* 250 [*56] (quoting *NLRB v. Transportation Mgmt. Corp., 462 U.S. 393, 403, 76 L. Ed. 2d 667, 103 S. Ct. 2469 (1983))*.

The IRS has been aware of plaintiff's complaint since at least January 19, 1991, when plaintiff contacted IRS EEO Counselor Levy about the discriminatory RMP. See supra at 7. At that time, the IRS could have halted the promotion process to purge the discrimination and assure the integrity of the process. It chose not to do so. Accordingly, defendant is legally responsible for the lingering effect of Ammerman's evaluation on plaintiff's application for promotion.

Because defendant has failed to prove its "same decision" defense by a preponderance of the evidence, plaintiff has successfully shown that the discriminatory evaluation "actually played a role in [the decisionmaking] process and had a determinative influence on the outcome.'" *Hazen Paper, 507 U.S. at 610*. It is clear that the IRS's promotion procedure involved an integrated ranking and selection process. In light of the procedures set forth in the IR manual, the prior statements of its witnesses, and simple common sense, defendant's *post hoc* characterization of the selection [*57] process as two-tiered is simply disingenuous.

To be sure, plaintiff's less than superlative interview performance also contributed to his nonselection. However, "an ADEA plaintiff need not prove that age was the only or even the principal reason for the complained-of employment action. Rather, the plaintiff is entitled to prevail if [he] demonstrates that [his] age played a motivating role in, or contributed to, the employer's decision." *Renz, 135 F.3d at 221*; see also *Fields, 115 F.3d at 120* (holding that a plaintiff may prevail by proving that "an impermissible reason, even though not the only reason for an adverse employment decision, was a 'substantial' or 'motivating' factor, or 'made a difference' in the decision"). Due to its effect on plaintiff's initial ranking, which continued to reflect on plaintiff throughout the process, as well as its subsequent role in the panel's overall assessment of the candidates, the Ammerman RMP was "at least one of the 'motivating' factors" that influenced the IRS's decision to select Dougherty over plaintiff. *Cronin, 46 F.3d at 203*. Plaintiff is therefore entitled to be made whole, as if [*58] he had received the promotion he sought back in 1991.

### IV. Remedy

Where the EEOC makes a final determination, as it has here, see Jt. Exh. 2, at 5-6; Pl. Exh. 1, at 5-6, that an applicant has been the subject of discrimination in connection with a promotion action, "the agency shall offer the applicant the position that the applicant would have occupied absent discrimination or, if justified by the cir-

Case 1:07-cv-05471-BSJ-KNF   Document 12-9   Filed 07/25/2007   Page 17 of 18

Page 14
2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

cumstances, a substantially equivalent position unless clear and convincing evidence indicates that the applicant would not have been selected even absent the discrimination." *29 C.F.R. § 1614.501(b)(1)(i)*; see also id. *§ 1614.501(c)(1)* ("When [the EEOC] finds that an employee of the agency was discriminated against, the agency shall provide relief, [including] (1) Nondiscriminatory placement, with back pay . . . unless clear and convincing evidence contained in the record demonstrates that the personnel action would have been taken even absent the discrimination."). Plaintiff is therefore entitled to all compensation he would have received had he been elevated to the Administrative Officer position.

At trial, defendant argued that plaintiff failed to mitigate [*59] his damages by refusing to actively seek alternative employment. "A victim of employment discrimination has the same duty to mitigate his damages as any victim of a tort or breach of contract." *Clarke v. Frank, 960 F.2d 1146, 1152 (2d Cir. 1992)*. "This duty . . . requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982)*; see also *Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1258 (2d Cir. 1987)* (applying Ford Motor Co. rule to ADEA claims). Thus, the defendant has the "burden to demonstrate that suitable work existed in the marketplace and that its former employee made no reasonable effort to find it." *Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998)*.

Defendant has failed to satisfy this burden. First, defendant has not shown that work [*60] suitable for someone of plaintiff's skills and experience existed in the marketplace. Plaintiff explained that subsequent to 1991, although he was aware of available GS-13 positions, see Tr. at 340, he did not apply for any of them because "there [were] none that [he] felt suited [him]," *id. at 339*. Defendant has not identified a single position for which plaintiff was eligible that was "substantially equivalent to the one he was denied." *Ford Motor Co., 458 U.S. at 232*; see also *Padilla v. Metro North Commuter R.R., 92 F.3d 117, 125 (2d Cir. 1996)* (holding that the defendant failed to provide evidence that suitable work existed for the plaintiff). Second, plaintiff acted with reasonable diligence in seeking employment outside the IRS by applying for other jobs, both in and out of government. See supra at 22. While there were certainly some job openings for which he did not submit applications, there is certainly no requirement that an aggrieved employee inquire into every available position. Cf. *Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 696 (2d Cir. 1998)* ("A person need only make reasonable efforts to mitigate damages [*61] by seeking substantially comparable employment."). Third, plaintiff explained that his then-manager, Mr. Lee, characterized his chances of obtaining a promotion within the IRS as "like a snowball in July." Tr. at 314; see also *id. at 340*. Having received this official discouragement, it was entirely appropriate for plaintiff to remain in his GS-12 position and not seek promotion within the IRS. See *Padilla, 92 F.3d at 125* ("Given the lack of evidence of other opportunities available to [the plaintiff], his decision to assume the position of train dispatcher . . . after his demotion was reasonable mitigation. Accordingly, even though [he] did not actively seek alternative employment, he acted reasonably in mitigating his damages."). As defendant has failed to meet its burden, there is no basis for denying plaintiff the full relief to which he is entitled.

As a final matter, the Court declines plaintiff's invitation to award liquidated damages. Section 7(b) of the ADEA, *29 U.S.C. § 626(b)*, provides for liquidated damages, which essentially allow a plaintiff to recover double back pay, where the violation of the ADEA was "willful." The [*62] Supreme Court has defined a "willful" violation as one in which "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hazen Paper Co., 507 U.S. at 617*; see also *Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985)*; *McGinty v. New York, 193 F.3d 64, 69 (1999)*. "Once a 'willful' violation has been shown, the employee need not additionally demonstrate that the employer's conduct was outrageous, or provide direct evidence of the employer's motivation, or prove that age was the predominant, rather than a determinative, factor in the employment decision." *Hazen Paper, 507 U.S. at 617*. However, "if an employer incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision, then liquidated damages should not be imposed." *Id. at 616*.

The facts of this case clearly indicate that defendant's violation was neither knowing or reckless. The Supreme Court has equated the standard of willfulness with the criminal penalty provision of the Fair Labor [*63] Standards Act, which applies only when an employer "wholly disregards the law . . . without making any reasonable effort to determine whether the plan he is following would constitute a violation of the law." *Thurston, 469 U.S. at 126* (quoting *Nabob Oil Co. v. United States, 190 F.2d 478, 479 (10th Cir. 1951))*. Here, the IRS, and specifically Cozetta Green, took plaintiff's complaint very seriously. The IRS investigated plaintiff's allegations, acknowledged Ammerman's mistake, and made an effort to cure the violation. While it erred by

Case 1:07-cv-05471-BSJ-KNF    Document 12-9    Filed 07/25/2007    Page 18 of 18

Page 15

2000 U.S. Dist. LEXIS 12519, *; 79 Empl. Prac. Dec. (CCH) P40,219

permitting the promotion action to continue on the assumption that Ammerman's age-related questions would not permeate the ranking panel's decision, its decision was made in good faith. See Thurston, 469 U.S. at at 129; cf. *Padilla, 92 F.3d at 124*. The IRS reasonably believed that allowing the promotion action to continue was both fair to plaintiff and the other candidates and consistent with the ADEA. At most, its determination that it had cured the violation was negligent. Cf. *Hazen Paper, 507 U.S. at 615* ("'The word 'willful' . . . is generally understood to refer to conduct that [*64] is not merely negligent.'") (quoting *McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 100 L. Ed. 2d 115, 108 S. Ct. 1677 (1988))*. The violation was therefore nonwillful.

Plaintiff is entitled to be made whole, no more, no less. Accordingly, the Court orders plaintiff restored to the position he would have occupied had he been selected for the Administrative Officer position. Plaintiff is presumptively entitled to a retroactive promotion with full back pay in the amount of $ 27,067.60, see Tr. at 289, plus interest, for the period from March 1991 until his February 1997 retirement. See *Banks v. Travelers Cos., 180 F.3d 358, 364 (2d Cir. 1999)*; *Kirsch v. Fleet St. Ltd., 148 F.3d 149, 165-66 (2d Cir. 1998)*. He shall also receive $ 737.12, plus interest, to account for the difference between the terminal leave payment he received upon his retirement and the amount he would have collected had he retired at the GS-13 level. See Jt. Stip., dated Jan. 10, 2000, at 1. Finally, defendant shall increase plaintiff's retirement annuity by $ 224.000 per month to reflect his retirement at the GS-13 level, see Jt. Stip., dated Aug. 28, 2000, at [*65] 1, both retroactive to February 1997, with interest, and prospectively from the date of this Opinion and Order.

## CONCLUSION

For the reasons stated above, the Court finds defendant liable to plaintiff in the amount of $ 27,804.72, plus interest. Furthermore, defendant is HEREBY ORDERED to increase plaintiff's retirement annuity by $ 224.000 per month, both retroactively and prospectively. The Clerk of the Court shall enter judgment accordingly.

**SO ORDERED.**

New York, New York

August 30, 2000

Peter K. Leisure

U.S.D.J.