

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

C
Stillman v. Townsend
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Donald H. STILLMAN, Jr., Plaintiff,
v.
Carl TOWNSEND et al., Defendants.
**No. 05 CIV. 6612(WHP).**

July 26, 2006.

William James McMorris, Jr., Esq. Slutsky, McMorris and Meehan, LLP, New York, NY, for Plaintiff.
Marc Jonas Block, Rubin Bailin Ortoli Mayer & Baker LLP, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*
WILLIAM H. PAULEY III, District Judge.
**\*1** Plaintiff Donald H. Stillman, Jr. (" Plaintiff" or " Stillman" ) brings this action against Carl Townsend (" Townsend" ), InService America, Inc. (" ISA" ) and Wildfire Partners, Inc. (" Wildfire" ) (collectively, the " Defendants" ) alleging breach of a purported employment agreement between Stillman and Wildfire. Plaintiff also asserts claims for breach of the covenant of good faith and fair dealing, promissory estoppel, quantum meruit and fraud. Defendants move to dismiss the Complaint. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

*BACKGROUND*

Townsend is President and Chief Executive Officer of ISA, a company that provides call center services for Christian ministries. (Compl.¶¶ 8, 10.) Prior to 2004, Stillman worked as a consultant. (Compl.¶¶ 7, 12.) In November 2003, Stillman and Townsend agreed to collaborate on the promotion of the film " Passion of the Christ." (Compl.¶ 11.)

In March 2004, Stillman and Townsend discussed broadening their business relationship, and Townsend proposed that they start a company to provide marketing, consulting and call center services for " mainstream" market clients using ISA's databases. (Compl.¶¶ 13, 17.) ISA's advisory board approved

the formation of Wildfire to provide these services. (Compl.¶ 19.) The parties orally agreed that Stillman would become President of Wildfire pursuant to a three-year employment contract, but left open the majority of the terms that were material to Stillman's employment. (Comp.¶ 20.) ISA agreed to provide $1 million in initial financing for Wildfire. (Compl.¶¶ 23-24.)

Stillman wound down his activities as a consultant and began working on behalf of Wildfire. (Compl.¶¶ 26-27.) Defendants agreed to compensate him for these efforts. (Compl.¶ 29.) Through Stillman, Defendants conducted business with a variety of his former clients. (Compl.¶¶ 25, 31-32.)

At some point after Stillman began working for Wildfire, Defendants provided him with a proposed written employment agreement. (Compl.¶ 3-8.) This prompted further negotiations between the parties, which resulted in an oral agreement on all principal terms of Stillman's employment (the " Agreement" ). These terms included a base annual compensation of $125,000 for a three year term, revenue sharing for certain consulting and licensing opportunities, 25% equity ownership of Wildfire and employee benefits. (Comp.¶¶ 38, 47.) Because the terms of the Agreement differed from those set forth in Defendants' written proposal, Defendants promised to provide a revised writing for the parties to sign. (Compl.¶¶ 28, 39.) Two months later, however, Defendants notified Stillman that they had decided to terminate him. (Compl.¶ 41.)

To date, Defendants have paid Stillman $12,500 in consulting fees and $10,701 to reimburse his travel expenses. (Compl.¶ 45.) Stillman claims that in addition to these payments, he is owed: (1) his annual salary; (2) an ownership interest in Wildfire; and (3) employee benefits.

*DISCUSSION*

*I. Motion to Dismiss Standard*

**\*2** On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 2

Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

*v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless " it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); accord *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). Dismissal is proper when the plaintiff fails to plead the basic elements of a cause of action. See *Wright v. Giuliani*, No. 99 Civ. 10091(WHP), 2000 WL 777940, at *4 (S.D.N.Y.2000). The issue on a motion to dismiss " is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (citation omitted).

## II. *Breach of Contract*

Stillman had an oral employment agreement with Wildfire. Under New York's Statute of Frauds,[FN1] an oral agreement is void if, by its terms, " it is not to be performed within one year from [its] making." N.Y. Gen. Oblig. Law § 5-701(a)(1). Because the Agreement had a three year term, Defendants contend that the agreement is unenforceable under the statute of frauds. Plaintiff responds that: (1) an action may not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) on statute of frauds grounds; (2) the Agreement was a binding " agreement to agree" ; and (3) his employment was terminable prior to the three-year mark, meaning performance was possible within one year.

> FN1. It is undisputed that New York law governs Plaintiff's claims. " Where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Texaco A/S v. Commercial Ins. Co.*, 160 F.3d 124, 128 (2d Cir.1998) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997)).

### A. *Rule 12(b)(6) and the Statute of Frauds*

Plaintiff argues that consideration of the statute of frauds is inappropriate on a motion to dismiss. Yet courts routinely dismiss breach of contract claims on statute of frauds grounds. *See, e.g., Zaitsev v. Salomon Bros., Inc.*, 60 F.3d 1001, 1003-04 (2d Cir.1995); *Zeising v. Kelly*, 152 F.Supp.2d 335, 343

(S.D.N.Y.2001); *Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315(SAS), 2000 WL 351516, at *5 (S.D.N.Y. Apr. 5, 2000); *Rosbach v. Indus. Trading Co.*, 81 F.Supp.2d 522, 524 (S.D.N.Y.2000); *Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087(CSH), 1999 WL 566311, at *4 (S.D.N.Y. Aug. 3, 1999); *Keough v. Texaco Inc.*, No. 97 Civ. 5981(LMM), 1999 WL 61836, at *9 (S.D.N.Y. Feb. 10, 1999).

Plaintiff cites *Palmer v. A. & L. Seamon, Inc.*, No. 94 Civ. 2968(JFK), 1995 WL 2131 (S.D.N.Y. Jan. 3, 1995), in which the court declined to address the defendant's statute of frauds defense on a motion to dismiss. In that case, it appears to have been unclear from the pleadings whether the alleged agreement was written or oral and, consequently, it was impossible to determine whether the statute of frauds applied. Stillman, by contrast, does not dispute that the Agreement was oral. Since " the complaint itself [and] the parties' papers [leave] little question that the plaintiff [is] claiming the existence of a binding, oral contract," this Court is free to apply the statute of frauds at this procedural stage. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F.Supp.2d 228, 250 (S.D.N.Y.1999).

### B. *Agreement to Agree*

*3 Plaintiff contends that because the parties agreed to reduce the Agreement to a writing at a later date, the Agreement constitutes an oral " agreement to agree" that is sufficient to bind the parties.

Plaintiff assumes, without discussion, that an oral agreement to sign a written document may be valid even when the statute of frauds requires a writing. However, " [t]he law is well settled that an oral agreement to execute an agreement that is within the statute of frauds is itself within the statute, and unenforceable." *Backus Plywood Corp. v. Commercial Decal, Inc.*, 317 F.2d 339, 343 (2d Cir .1963); *see also Najjar v. Nat'l Kinney Corp.*, 96 A.D.2d 836, 456 N.Y.S.2d 590, 591 (2d Dep't 1983) (holding that the statute of frauds " may not be evaded by claiming that even though the agreement for the transfer of the property itself is unenforceable, the agreement to enter this business arrangement is valid" ); E. Allan Farnsworth, *Farnsworth on Contracts*, § 6.2 (2d ed. 2001) (" The statute of frauds may also apply to a promise to sign a writing. If an agreement is within the statute, a promise to sign a writing evidencing the agreement is also within the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3

Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

statute." ). Therefore, even if the Agreement constitutes an oral " agreement to agree," it remains subject to the statute of frauds.

### C. *Terminable Employment*

The Agreement contemplated a three year term of employment. (Compl.¶¶ 20, 47.) Plaintiff argues in his brief that " [a]lthough the term of [his] employment was for three years, the parties' agreement was terminable by either party prior to the expiration of that period." (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, dated Dec. 16, 2005 (" Pl.Opp.Mem." ) at 8.) Because such an agreement can be terminated at any time, it is capable of being performed within one year, thereby removing it from the statute of frauds. See *I.S. Sahni, Inc. v. Scirocco Fin. Group., Inc.,* No. 04 Civ. 9251(RMB), 2005 WL 2414762, at *6 (S.D.N.Y. Sept. 28, 2005); *Cron v. Hargro Fabrics, Inc.,* 91 N.Y.2d 362, 366 (1998); *Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 463 (1982).

Although this argument appears in Plaintiff's brief, the Complaint does not allege that the Agreement was terminable prior to the expiration of the three year period. " Factual allegations contained in legal briefs or memoranda are ... treated as matters outside the pleading for purposes of Rule 12(b)." *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988). It is " axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss," and this Court rejects allegations made for the first time in Plaintiff's brief. *O'Brien v. Nat'l Property Analysts Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989); *see also In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 432 (S.D.N.Y.2001) (" The complaint cannot, of course, be amended by the briefs in opposition to a motion to dismiss." )

*4 Therefore, the Agreement was for three years of employment, and a " [three]-year term, obviously, could not be performed within one year." *Chase v. United Hosp.,* 60 A.D.2d 558, 559, 400 N.Y.S.2d 343, 344 (1st Dep't 1977). The Agreement is unenforceable under the Statute of Frauds. N.Y. Gen. Obli. Law § 5-701(a)(1); *see also Doynow v. Nynex Pub. Co.,* 202 A.D.2d 388, 608 N.Y.S.2d 683, 684 (2d Dep't 1994) (" [T]he plaintiff alleged that there was an oral contract of five years' duration, and thus his claim is barred by the Statute of Frauds." ); *Cunnison v. Richardson Greenshields Sec., Inc.,* 107

A.D.2d 50, 52, 485 N.Y.S.2d 272, 275 (1st Dep't 1985) (" [T]o be enforceable, a promise or agreement of employment for five years-which by its terms cannot be performed within one year-must be memorialized in a writing ..." ).

### D. *Breach of Good Faith and Fair Dealing*

To invoke the covenant of good faith and fair dealing, Plaintiff must first allege an enforceable employment agreement. *Fasolino Foods Co. v. Banca Nazionale Del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992); *see also Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *5 (S.D.N.Y. Dec. 22, 2003) (" [T]here can be no breach of the duty of good faith and fair dealing when there is no valid and binding contract from which such a duty would arise" (internal quotation omitted).); *United Magazine Co. v. Murdoch Magazines Distrib., Inc.,* 146 F.Supp.2d 385, 405 (S.D.N.Y.2001) (holding that a cause of action for breaching covenant of good faith and fair dealing " is dependent upon the existence of an enforceable contract" ). Because no enforceable contract has been alleged, Plaintiff's good faith and fair dealing claim is also dismissed.

### II. *Promissory Estoppel*

Plaintiff must establish the following three elements to recover under the promissory estoppel doctrine: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) harm to the party asserting estoppel by reason of reliance. *Braun v. CMGI, Inc.,* No. 99 Civ. 12328(WHP), 2001 WL 921170, at *10 (S.D.N.Y. Aug. 14, 2001); *Steinborn v. Daiwa Sec. Am., Inc.,* No. 92 Civ. 0782(JES), 1995 WL 761286, at *20 (S.D.N.Y. Dec. 26, 1995). " The doctrine of promissory estoppel as a bar to assertion of a Statute of Frauds defense has been strictly construed to apply only in those rare cases where ' the circumstances [are] such as to render it unconscionable to deny the oral promise upon which the promisee has relied.' " *Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1125 (S.D. N.Y.1987) (quoting *Swerdloff v. Mobil Oil Corp.,* 74 A.D.2d 258, 263, 427 N.Y.S.2d 266, 269 (2d Dep't 1980)). As the Second Circuit has explained:
The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result. For this reason,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4

Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

the doctrine of promissory estoppel is properly reserved for that limited class of cases where the circumstances are such as to render it unconscionable to deny the promise ...

*5 *Philo Smith & Co. v. USLife Corp.,* 554 F.2d 34, 36 (2d Cir.1977) (internal quotation omitted).

Because the Complaint alleges no " unconscionable" conduct, Plaintiff's promissory estoppel claim fails. It is well-settled that " change of job or residence, by itself, is insufficient to trigger invocation of the promissory estoppel doctrine." *Rivera v.. City of New York,* 392 F.Supp.2d 644, 657 (S.D.N.Y.2005) (quoting *Cunnison,* 107 A.D.2d at 53, 485 N.Y.S.2d at 275); *see also Graff v. Enodis Corp.,* No. 02 Civ. 5922(JSR), 2003 WL 1702026, at *2 (S.D.N.Y. Mar. 28, 2003); *Cucchi v. New York City Off-Track Betting Corp.,* 818 F.Supp. 647, 658 (S.D.N.Y.1993). In the absence of " egregious circumstances," *Mobile Data Shred,* 2000 WL 351516, at *4, " the choice to forgo current employment because of rosy promises" of future employment is insufficient to claim promissory estoppel. *Ginsburg v. Fairfield-Noble Corp.,* 81 A.D.2d 318, 321, 440 N.Y.S.2d 222, 225 (1st Dep't 1981).

No " egregious circumstances" are present here. Contrary to Stillman's assertions, Defendants did not act " unconscionably" by terminating him after he introduced Defendants to his business contacts. In *Ginsburg,* the plaintiff alleged that " immediately upon beginning his employment he introduced the defendant to a large group of contractors ... and that he was discharged shortly thereafter, having served the defendant's purpose." 81 A.D.2d at 320, 440 N.Y.S.2d at 224. The First Department affirmed dismissal of the case, holding that " [t]here are no ... unconscionable circumstances here present as to warrant application of the doctrine of equitable estoppel ..." *Ginsburg,* 81 A.D.2d at 321, 440 N.Y.S.2d at 225. Nor is there anything egregious about being terminated after performing work for the new employer. *Sands v. Ge-Ray Fabrics, Inc.,* 203 A.D.2d 96, 97, 612 N.Y.S.2d 837, 838 (1st Dep't 1994) (" [T]he mere fact that plaintiffs voluntarily expended time and money obtaining customers for defendant" does not " entitle them to recovery on a theory of estoppel ..." ); *Swerdloff,* 74 A.D.2d at 264, 427 N.Y.S.2d at 270 (" Nor do we see the ' endless hours' of Mr. Swerdloff's work as making it unconscionable for defendants to assert the Statute of Frauds." )

New employees commonly work hard and use their preexisting business contacts at their new jobs. If terminating employees under such ordinary circumstances were sufficiently " unconscionable" to support a promissory estoppel claim, then promissory estoppel would not be " reserved for [a] *limited* class of cases" as the Second Circuit has required. *Philo Smith & Co.,* 554 F.2d at 36. Particularly for sophisticated businesspersons like the Plaintiff, *Ginsburg,* 81 A.D.2d at 321, 440 N.Y.S.2d at 225, promissory estoppel is unavailable absent more egregious allegations.

### III. *Quantum Meruit*

To state a quantum meruit claim, a plaintiff must allege: (1) that he rendered services to the defendant; (2) that he expected reasonable compensation for those services; (3) that the defendant accepted those services; and (4) the reasonable value of the services rendered. *Huntington Dental & Med. Co. v. Minn. Mining and Mfg., Co.,* No. 95 Civ. 10959(JFK), 1998 WL 60954, *7 (S.D.N.Y. Feb. 13, 1998). " If a plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result where the defendant received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them." *Rule v.. Brine,* 85 F.3d 1002, 1011 (2d Cir.1996) (internal citations and quotations omitted). " Where the Complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories." *Brine,* 85 F.3d at 1011, cf. *Grossberg v. Double H. Licensing Corp.,* 86 A.D.2d 565, 446 N.Y.S.2d 296 (1st Dep't 1982).

*6 Defendants argue that a quantum meruit award requires mutual assent to all material terms of a contract, and that quantum meruit is unavailable when an oral agreement is unenforceable under the statute of frauds. The thrust of these arguments is that Plaintiff must allege a valid, binding contract in order to receive quantum meruit. Defendants' notion flatly contradicts the well-settled principle that " quantum meruit *requires the absence* of a valid contract." *Aniero Concrete Co. v. New York City Constr. Auth.,* Nos. 94 Civ. 9111(CSH), 95 Civ. 3506(CSH), 2000 WL 863208, at *9 (S.D.N.Y. June 27, 2000) (emphasis added); *see also Hutner v. Greene,* 734

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 5

Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

F.2d 896, 900 (2d Cir.1984) (" Hutner's quantum meruit claim is not defeated by the absence of an enforceable contract; indeed, it proceeds on the assumption that Hutner lacks an enforceable contract." ); *Violette v. Armonk Assocs., L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995) (" A quasi contract only applies in the absence of an express agreement ..." ). Clearly, Stillman need not allege a binding contract in order to receive quasi-contractual relief such as quantum meruit. The motion to dismiss Plaintiff's quantum meruit claim is denied.

## IV. *Fraud*

Defendants contend that Plaintiff's fraud claim duplicates the breach of contract claim and is therefore not actionable. It is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims. *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 318 (1995); *River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.,* 295 A.D.2d 274, 275, 743 N.Y. S.2d 870, 871 (1 st Dep't 2002); *Caniglia v. Chi. Tribune-New York News Syndicate, Inc.,* 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 147 (1st Dep't 1994). Rather, to state a fraud claim co-existent with an alleged breach of contract, Plaintiff must: " (i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996) (citations omitted); *accord Great Earth Int'l Franchising Corp. v. Milks Dev.,* 311 F.Supp.2d 419, 425 (S.D.N.Y.2004); *Saleemi v. Pencom Sys.,* No. 99 Civ. 667(DLC), 2000 WL 640647, at *4 (S.D.N.Y. May 17, 2000). Plaintiff must make this showing regardless of whether the alleged contract is unenforceable under the statute of frauds. See *Mobile Data Shred,* 2000 WL 351516, at *5-6 (dismissing fraud claim when contract was invalid under the statute of frauds); *Alter v. Bogoricin,* No. 97 Civ. 0662(MBM), 1997 WL 691332, at *9 (S.D.N.Y. Nov. 6, 1997) (rejecting argument that " because the profit-sharing provision of the Employment Agreement is not enforceable, defendants' promises regarding profit sharing constitute a ' collateral oral agreement' that fraudulently induced him to enter into the Employment Agreement" ).

**\*7** Plaintiff identifies no separate legal duty or request for special damages to support his fraud claim. Instead, Plaintiff contends that the Complaint alleges misrepresentations extraneous to the contract. Plaintiff relies on the following allegation in the Complaint: " In reliance on the parties' agreement, and with Defendants' full knowledge and encouragement, Stillman began to wind down his activities as an independent consultant, and began to funnel future business opportunities through ISA and Wildfire." (Compl.¶ 26.) Yet Plaintiff fails to identify *any* misrepresentation, other than Defendants' promise to perform under the contract. A " contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." *Rocanova v. Equitable Life Assurance Soc'y of the United States,* 612 N.Y.S.2d 339, 343 (1994); *see also Colodney v. Continuum Health Partners, Inc.,* No. 03 Civ. 7276(DLC), 2004 WL 829158, at *9 (S.D.N.Y. Apr. 15, 2004). Unlike a misrepresentation inducing a party to enter a contract, a mere promise to perform under the contract is not actionable in fraud. See *Manning v. Util. Mut. Ins. Co., Inc.,* 254 F.3d 387, 401 (2d Cir.2001); *Deutsche Asset Mgmt., Inc. v. Callaghan,* No. 01 Civ.4426, 2004 WL 758303, at *10 (S.D.N.Y. Apr. 7, 2004); *Rolls-Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 123 (S.D.N.Y.1996). Because the alleged misrepresentation is not extraneous to the contract, Plaintiff's fraud claim is dismissed.

## V. *Individual Liability*

Defendants move to dismiss the claims against Townsend based on the absence of any allegation giving rise to personal liability. This Court agrees with Defendants that the Complaint does not adequately state a claim against Townsend. Because Plaintiff does not claim that Townsend was privy to the employment agreement, liability can arise only by piercing the corporate veil. *Sonnenblick-Goldman Co. v. ITT Corp.,* 912 F.Supp. 85, 88 (S.D.N.Y.1996). For a corporate officer to be held liable, " a plaintiff is required to allege specific facts or circumstances to show the actual domination needed to pierce the corporate veil." *Ingeniera y Representaciones Internacionales, S.A. v. Stone & Webster Int'l Projects Corp.,* No. 96 Civ. 7335(PKL), 1997 WL 529015, at *5 n. 8 (S.D.N.Y. Aug. 25, 1997) (internal quotations omitted). " The law is well settled that when a complainant seeks to pierce the corporate veil, [he] must prove that the individual defendant ' exercised complete domination of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

corporation in respect to the transaction attacked' and also that ' such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.' " *Triemer v. Bobsan Corp.,* 70 F.Supp.2d 375, 377 (S.D.N.Y.1999) (quoting *Morris v. New York State Dep't of Taxation and Fin.,* 82 N.Y.2d 135 (1993)). The Complaint fails to allege that Townsend dominated ISA or Wildfire, or that Plaintiff was injured as a result of such domination. Therefore, " Plaintiff's pleadings are insufficient to meet [his] burden to support a claim of piercing the corporate veil." *Sonnenblick-Goldman,* 912 F.Supp. at 89.

### CONCLUSION

**\*8** For the foregoing reasons, Defendants' motion to dismiss Plaintiff's breach of contract, breach of good faith and fair dealing, promissory estoppel and fraud claims is granted. Defendants' motion to dismiss Plaintiff's quantum meruit claim is denied. Plaintiff is granted leave to replead by August 25, 2006.

SO ORDERED.

S.D.N.Y.,2006.
Stillman v. Townsend
Not Reported in F.Supp.2d, 2006 WL 2067035 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**
Whitten v. Cross Garage Corp.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Julius WHITTEN, Plaintiff,
v.
CROSS GARAGE CORPORATION and Joseph
Vassallo, Defendants.
**No. 00 Civ.5333 JSM FM.**

July 9, 2003.

Former employee of parking garage sued former employers for alleged violations of his rights under Title VII, Civil Rights Act, Age Discrimination in Employment Act (ADEA), and state and local human rights and labor laws. Following entry of default judgment against former employers, the District Court, Maas, United States Magistrate Judge, recommended that: (1) former employee was entitled to award of back pay; (2) prejudgment interest at five percent interest rate was warranted with respect to back pay award; (3) award of six months' front pay was reasonably sufficient to make former employee whole; (4) compensatory damages award of $40,000 was appropriate; (5) punitive damages of $20,000 were warranted; and (6) former employee could recover attorney fees under Title VII.

Report and recommendation issued.
West Headnotes
[1] Civil Rights 78 1122

78 Civil Rights
   78II Employment Practices
      78k1122 k. Discharge or Layoff. Most Cited Cases

**Civil Rights 78 1204**

78 Civil Rights
   78II Employment Practices
      78k1199 Age Discrimination
         78k1204 k. Discharge or Layoff. Most Cited Cases
Former parking garage employee, who was African-American and who was over 50 years old when he was terminated, stated prima facie case of age and race discrimination under Title VII when he alleged that parking garage's principal owner made statements indicating intent to terminate or force retirement or transfer of garage's three over-50 African-American employees, that he was subjected to daily verbal abuse, including racially derogatory comments, after two coworkers retired and were replaced by younger workers, and that he was terminated and replaced by someone younger. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

[2] Civil Rights 78 1571

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1569 Monetary Relief; Restitution
         78k1571 k. Back Pay or Lost Earnings. Most Cited Cases

**Civil Rights 78 1574**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1569 Monetary Relief; Restitution
         78k1574 k. Measure and Amount. Most Cited Cases
Former employee who allegedly was terminated based on age and race discrimination, in violation of Title VII, was entitled to award of back pay for time period extending from date of discharge to date of entry of default judgment against former employers, plus amounts owed for unpaid vacation to which former employee was entitled and bonus that former employee would have earned had he not been terminated. Civil Rights Act of 1964, § 706(g)(1), as amended, 42 U.S.C.A. § 2000e-5(g)(1).

[3] Interest 219 31

219 Interest
   219II Rate
      219k31 k. Computation of Rate in General. Most Cited Cases

**Interest 219 39(2.45)**

219 Interest
   219III Time and Computation
      219k39 Time from Which Interest Runs in General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

219k39(2.5)   Prejudgment   Interest   in General
219k39(2.45)  k.  Civil  Rights  and Discrimination. Most Cited Cases
Prejudgment interest at five percent interest rate was warranted with respect to back pay awarded to former employee allegedly terminated in violation of Title VII, notwithstanding former employee's request for statutory rate of nine percent per year under state law, inasmuch as such rate was more than double the prevailing interest rates on conservative financial investments during the same period. Civil Rights Act of 1964, § 706(g)(1), as amended, 42 U.S.C.A. § 2000e-5(g)(1); McKinney's CPRL 5004.

**[4] Civil Rights 78 ⟨key⟩1574**

78 Civil Rights
 78IV  Remedies  Under  Federal  Employment Discrimination Statutes
  78k1569 Monetary Relief;  Restitution
   78k1574  k.  Measure and Amount. Most Cited Cases
Award of six months' front pay, amounting to $12,490.40, was reasonably sufficient to make whole parking garage employee who was awarded default judgment on his claims that he was terminated in violation of Title VII when, prior to his termination, employee began working second full-time job at higher wage in anticipation of his discharge. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[5] Civil Rights 78 ⟨key⟩1576(2)**

78 Civil Rights
 78IV  Remedies  Under  Federal  Employment Discrimination Statutes
  78k1569 Monetary Relief;  Restitution
   78k1576 Liquidated Damages
    78k1576(2) k. Age Discrimination. Most Cited Cases
Former employee of parking garage failed to demonstrate that garage's principal owner deliberately or purposefully discriminated against him on the basis of age, and thus was not entitled to doubling of his back pay award under Age Discrimination in Employment Act (ADEA) in action in which default judgment was entered in former employee's favor. Age Discrimination in Employment Act of 1967, § 7(b), 29 U.S.C.A. § 626(b).

**[6] Civil Rights 78 ⟨key⟩1574**

78 Civil Rights
 78IV  Remedies  Under  Federal  Employment Discrimination Statutes
  78k1569 Monetary Relief;  Restitution
   78k1574  k.  Measure and Amount. Most Cited Cases

**Civil Rights 78 ⟨key⟩1765**

78 Civil Rights
 78V State and Local Remedies
  78k1763 Monetary Relief
   78k1765  k.  Employment Practices. Most Cited Cases
Former employee of parking garage, who was granted default judgment on his claims for violations of federal, state, and local laws against former employers based on alleged race and age discrimination, was entitled to compensatory damages of $40,000 in light of Title VII's cap of $50,000 on former employee's compensatory and punitive damages award, former employee's testimony that constant racial epithets of garage's principal owner made him feel "belittled" and "angry," and testimony of former employee's wife that principal owner's derogatory remarks made former employee angry and affected his relationship with his children. Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981a(b)(3); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; McKinney's Executive Law § 296 et seq.; New York City Administrative Code, § 8-107.

**[7] Civil Rights 78 ⟨key⟩1575(2)**

78 Civil Rights
 78IV  Remedies  Under  Federal  Employment Discrimination Statutes
  78k1569 Monetary Relief;  Restitution
   78k1575 Exemplary or Punitive Damages
    78k1575(2) k. Measure and Amount. Most Cited Cases

**Civil Rights 78 ⟨key⟩1769**

78 Civil Rights
 78V State and Local Remedies
  78k1767 Exemplary or Punitive Damages
   78k1769  k.  Employment Practices. Most Cited Cases
Punitive damages of $20,000 were warranted with respect to age and race discrimination claims asserted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

by former employee of parking garage pursuant to federal, state, and local laws, on which default judgment against garage and its principal owner was entered, given that even if principal owner's racial epithets were viewed as "garden variety," deprivation of toilet facilities to which former employee was subjected would not be tolerated in a jail and was nothing short of shocking.   Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981a(b)(3); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; McKinney's Executive Law § 296 et seq.; New York City Administrative Code, § 8-107.

[8] Civil Rights 78 ⚷1593

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1585 Attorney Fees
            78k1593 k. Services or Activities for Which Fees May Be Awarded. Most Cited Cases

Civil Rights 78 ⚷1595

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1585 Attorney Fees
            78k1595 k. Time Expended;  Hourly Rates. Most Cited Cases
Attorney fees that were requested by counsel for former employee, who was granted default judgment on discrimination claims against parking garage and its principal owner, were reasonable and thus could be recovered under Title VII, except for those services that were billed at counsel's hourly rate but were more appropriately handled by paralegal, such as traveling to court to file papers, ensuring that service was effected, and forwarding copies of documents, for which recovery was available only at reduced rate of $75.00 per hour.  Civil Rights Act of 1964, § 706(k), as amended, 42 U.S.C.A. § 2000e-5(k).

[9] Civil Rights 78 ⚷1584

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1584 k. Costs. Most Cited Cases
Prevailing plaintiff in age and race discrimination action could not recover costs of message service and postage.  Age Discrimination in Employment Act of

1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.; 42 U.S.C.A. § 1981a(b)(3); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; U.S.Dist.Ct.Rules S.D.N.Y., Local Rule 54.1(c); McKinney's Executive Law § 296 et seq.; New York City Administrative Code, § 8-107.

*REPORT AND RECOMMENDATION TO THE HONORABLE JOHN S. MARTIN*
MAAS, Magistrate J.

I. *Introduction*

*1 In this action, plaintiff Julius Whitten ("Whitten") alleges that defendants Cross Garage Corporation ("Cross Garage") and Joseph Vassallo ("Vassallo") (together, the "defendants"), unlawfully terminated his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Civil Rights Act of 1991, 42 U.S.C. § 1981a; and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"). (Compl.¶ 1). Whitten also alleges that his unlawful termination violated certain state and city statutes, namely the New York Human Rights Law, N.Y. Exec. L. § 296, *et seq.,* and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107. (*Id.* ¶ 4). Finally, Whitten claims that he was unlawfully retaliated against, in violation of Section 740 of the New York Labor Law, for reporting health violations to the New York City Department of Health ("Department of Health"). (*Id.*).

Following the defendants' failure to answer or otherwise respond to the complaint, Your Honor entered a default judgment and referred the matter to me to conduct an inquest regarding the damages, if any, to be awarded to Whitten. (Docket Nos. 5-6). By order dated September 5, 2001, I directed Whitten to serve and file an inquest memorandum by October 2, 2001, setting forth his proof of damages, as well as proposed findings of fact and conclusions of law, and the defendants were given until October 16, 2001 to file opposition papers. (Docket No. 7). At Whitten's request, I later extended the time for both sides to make their submissions. (Docket Nos. 8-10). Although Whitten complied with my orders, I heard nothing from the defendants even though they were sent copies of my scheduling orders.

On January 17, 2003, I held an inquest hearing to determine the amount of compensatory and punitive damages, if any, that Whitten should be awarded. Two witnesses testified at that hearing: Whitten and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

his wife, Flora Whitten.

By letter dated February 11, 2003, Kevin A. Fox, Esq., of Tannenbaum Helpern Syracuse & Hirschtritt LLP, notified me that his law firm had just been retained by the defendants to represent them in this action. (Letter to the Court from Kevin A. Fox, Esq., dated February 11, 2003, at 1). Furthermore, he requested that I refrain from issuing my report and recommendation concerning damages until he had an opportunity to make a motion to vacate the default judgment and defend the action on the merits. (*Id.* at 1-2). That day, by memorandum endorsement, I advised counsel that because this case had been referred to me only for an inquest, that motion would have to be returnable before Your Honor. (Docket No. 15). I also delayed issuing my report and recommendation to permit Mr. Fox to make his motion, which I am advised, was first presented to the Court in the form of a proposed order to show cause on May 6, 2003. Although Your Honor permitted the defendants to make their motion, the order to show cause, which would have restrained me from proceeding, evidently was not signed.

**\*2** For the reasons set forth below, I recommend that unless the default judgment is vacated, Whitten be awarded judgment in the amount of $148,466.48, consisting of backpay and prejudgment interest in the amount of $57,702.67, front pay in the amount of $12,490.40, compensatory and punitive damages in the amount of $60,000, attorney's fees in the amount of $17,949.50, and costs in the amount of $323.91.

## II. *Facts*

In light of the defendants' default, Whitten's well-pleaded allegations concerning issues other than damages must be accepted as true. *See Cotton v. Slone,* 4 F.3d 176, 181 (2d Cir.1993); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992); *Time Warner Cable of New York City v. Barnes,* 13 F.Supp.2d 543, 547 (S.D.N.Y.1998).

On the basis of the complaint, the inquest papers, and the testimony given by Whitten and his wife at the inquest hearing, I find that the facts are as follows:

Whitten is a resident of the Bronx who was employed in Manhattan at all relevant times. (Compl.¶ 7). He is an African-American male, born on May 17, 1949. (*Id.*). Defendant Cross Garage is a corporation organized and existing under the laws of the State of New York, with its principal office located in Manhattan. (*Id.* ¶ 8). Defendant Vassallo is the principal owner of Cross Garage. (*Id.* ¶ 9).

Whitten was employed as a parking attendant at a garage located on 445 East 80th Street, New York, New York ("Garage"), for a period of approximately 28 years, commencing in 1971. (*Id.* ¶ 10). From 1971 until June 1995, the Garage was managed by Claremont South Garage Co. (*Id.* ¶ 11). In or around June 1995, management of the Garage was taken over by Cross Garage, which was owned or controlled by Vassallo, who owns or controls a number of other parking garages. (*Id.* ¶¶ 11-12).

When Cross Garage became the manager, Whitten was one of three Garage employees, all of whom were African-American, over fifty years of age, and members of Local 272 of the Garage Employees Union. (*Id.* ¶ 15). In or around July 1995, "Vassallo stated that he was going to terminate, force the retirement of, or transfer these employees, including [Whitten], to another location, and ... that if they did not like it, they could quit. (*Id.* ¶ 16). Whitten contacted his union regarding Vassallo's statements, and shortly thereafter, Vassallo confronted Whitten in the Garage. (*Id.* ¶ 17). He told Whitten that he did not want union workers and referred to Whitten under his breath as a "nigger." (*Id.*). As a result of Vassallo's statements and threats, the other two employees decide to retire, and Vassallo hired younger inexperienced employees. (*Id* ¶ 18; 1/27/03 Tr. at 13). Subsequently, Whitten became the target of daily verbal abuse, which included derogatory racial remarks, made in front of customers and employees. (Compl.¶ 21). Vassallo also refused to pay Whitten the salary increase to which he was entitled. (*Id.* ¶ 23).

**\*3** In 1997, Vassallo converted the employees' locker room and adjacent toilet at the Garage into his private office. (*Id.* ¶¶ 24-25; 1/27/03 Tr. at 10). Because the Garage employees had no available toilet facilities, they began using the Garage drains as urinals and putting human feces wrapped in newspaper in the garbage cans. (Compl. ¶ 26; 1/27/03 Tr. at 12-13). When Whitten complained to Vassallo about the conditions, Vassallo told him, "[H]ey, ... you nigger bastard, if you don't like it, ... you can just find yourself another job." (1/17/03 Tr. at 11).

In February 1999, Whitten called the Department of Health and reported the unsanitary conditions and lack of toilet facilities. (Compl.¶ 28). As a result of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

this complaint, inspectors from the Department of Health came to the garage, inspected the premises, and issued a Notice of Violation to Cross Garage and Vassallo. (*Id.* ¶¶ 29-30).

Whitten took a vacation from June 26 to July 18, 1999. (*Id.* ¶ 31). Upon his return to work on July 19, 1999, Vassallo told him, "You are terminated." (*Id.* ¶ 32). When asked the reason, Vassallo replied, "You nigger bastard, I know it was you who called the Department of Health, but I have you in black and white pissing on the floor." (*Id.*, *see* 1/27/03 Tr. at 15). Whitten was replaced by someone younger. (1/27/03 Tr. at 19).

On March 21, 2000, Whitten filed a timely Charge of Discrimination with the United States Equal Employment Opportunities Commission ("EEOC"). (Compl. ¶ 2 & Ex. 1). On May 31, 2000, the EEOC issued a written determination concluding that there was "reasonable cause to believe" that Whitten's allegations of race and age discrimination were true. (*Id.* ¶ 2 & Ex. 2). On June 9, 2000, the EEOC issued Whitten a "right to sue" letter. (*Id.* ¶ 3 & Ex. 3). This suit was timely filed on July 18, 2000. (Docket No. 1).

### III. *Discussion* [FN1]

> FN1. Although Whitten alleges that the defendants violated various federal, state, and local laws, for the purposes of determining damages, I have generally limited the discussion that follows to Title VII and the ADEA because the legal analysis and damages recoverable are for the most part, similar under the various statutes.

#### A. *Back Pay With Prejudgment Interest*

[1] Title VII makes it unlawful for an employer to discharge or discriminate against an employee because of that "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. To make out a *prima facie* case of unlawful employment discrimination under Title VII, Whitten must show that: (a) he is a member of a protected class; (b) he was performing his duties satisfactorily; (c) he was discharged; and (d) the circumstances of his discharge give rise to an inference of discrimination. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). Whitten's complaint and testimony establishes such a *prima facie* Title VII claim.

Moreover, the defendants failed to submit any evidence at the hearing suggesting a nondiscriminatory reason for Whitten's termination.

[2] A plaintiff successful in a Title VII suit is entitled to an award of back pay. *See* 42 U.S.C. § 2000e-5(g)(1). "An award of [back pay] is the rule, not the exception." *Carrero v. New York City Housing Authority*, 890 F.2d 569, 580 (2d Cir.1989). Title VII plaintiffs are entitled to back pay from the date of termination until the date of judgment, as well as prejudgment interest on the back pay award. *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144-45 (2d Cir.1993).

*4 When Whitten was terminated, he was working approximately 40 hours per week, at an hourly rate of $12.01 per hour, for a weekly gross wage of $480.40. (*See* Declaration of Julius Whitten, dated October 31, 2001 ("Whitten Decl."), Ex. 2). The default judgment was entered on July 31, 2001. (Docket No. 5). Thus, from the date of discharge to the date of judgment, 106 weeks and one day elapsed. Accordingly, Whitten should be awarded $51,018.48 in backpay ($480.40/week x 106 weeks + $12.01/hour x 8 hours).

At the time of his termination, the defendants also owed Whitten one week's pay of $480.40 for the last week in June and six days of vacation totaling $576.48 ($12.01/hour x 8 hours x 6 days). (Whitten Decl. ¶ 29). In addition, had he not been improperly terminated, Whitten would have earned a $300 bonus for 1999. (*Id.*). He therefore is entitled to an additional $1,356.88 through the date of judgment.

[3] The rate at which prejudgment interest is to be calculated is within the Court's discretion. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir.1995). In this case, Whitten has requested interest at the statutory rate of nine percent per year set forth in Section 5004 of the New York Civil Practice and Rules. (Mem. of L. at 15). This, however, is more than double the prevailing interest rates on conservative financial investments during the same period. (*See* http://www.federalreserve.gov/releases/h15/data/a/tcm6m.txt). Accordingly, I find that a five percent interest rate is more in accordance with reality. The per diem interest rate is therefore $7.17 ($52,375.36 x 0.05 / 365), and Whitten is entitled to prejudgment interest for a period of 743 days, for a total of $5,327.31.

#### B. *Front Pay*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

[4] Front pay is an equitable remedy available to prevailing Title VII plaintiffs, *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 160 (2d Cir.2000), and is generally understood to be an award for lost compensation for the period between judgment and reinstatement. *See Pollard v. E.I. duPont de Nemours & Co.,* 532 U.S. 843, 848, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Thus, front pay helps make a discharged employee whole. *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 729 (2d Cir.1984). However, such compensation is not mandatory, and it is within the court's discretion to "award front pay, reinstate the plaintiff's employment, or do nothing at all with regard to future employment." *Vernon v. Port Authority of N.Y. and N.J.,* 220 F.Supp.2d 223, 236 (S.D.N.Y.2002). Further, an award of front pay should be discounted to its present value. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1189 (2d Cir.1992).

In 1998, prior to his termination, Whitten began working part-time at another garage managed by Rudin Management ("Rudin"). (Whitten Decl. ¶ 30). In or around April 1999, Whitten began working full-time for Rudin in addition to his full-time position at Cross Garage. (*Id.* ¶ 31). At the inquest hearing, Whitten testified that the reason he began working two full-time jobs was that he knew "it wouldn't be long before Joseph [Vassallo], you know, let me go, so I just went on and prepared myself." (1/17/03 Tr. at 17).

**5** There is no need to consider reinstatement as a remedy in this case because Whitten's employment at Rudin actually pays him a higher wage. (Whitten Decl. ¶ 31; 1/17/03 Tr. at 17-18). Moreover, that employment is full-time. Had he not been summarily terminated on July 19, 1999, Whitten could theoretically have continued working two full-time jobs. It is more likely, however, that Whitten would have voluntarily left his job at Cross Garage before too long since he had a higher paying job at Rudin. In these circumstances, I find that six months of front pay, amounting to $12,490.40 ($480.40/week x 26 weeks), is reasonably sufficient to make Whitten whole. Although usually such an award should be discounted to present value, it is unnecessary to do so here because six months from the date of judgment has long since passed.

### C. Double Damages under the ADEA

[5] The ADEA allows a prevailing plaintiff to recover liquidated or double damages in an amount equal to his back pay and benefits where the statutory violation was "willful." *See* 29 U.S.C. § 626(b); *Vernon v. Port Authority of NY/NJ,* 2003 WL 1563219, at *12 (S.D.N.Y. Mar.26, 2003). Generally speaking, "a plaintiff's replacement by a significantly younger person is evidence of age discrimination." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.2000). Such discrimination is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 128, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)(quoting *Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940, 956 (2d Cir.1983)). Although proof of specific intent to violate the act is not required to show willfulness, *Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564, 1571 (2d Cir.1989), "double damages may properly be awarded when the proof shows that an employer was indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion." *Benjamin v. United Merchants and Mfrs., Inc.,* 873 F.2d 41, 44 (2d Cir.1989).

Although Whitten may be able to establish a *prima facie* case of age discrimination based on his testimony that he was replaced by someone younger, (1/17/03 Tr. at 19), he has not presented enough evidence to demonstrate that Vassallo deliberately or purposefully discriminated against him on the basis of age. Accordingly, Whitten is not entitled to a doubling of his back pay.

### D. *Nonpecuniary and Punitive Damages*

[6] Under Title VII, a court may also award a sum of money as compensation for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). A prevailing Title VII plaintiff may also recover punitive damages if he "demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference." *Id.* § 1981a(b)(1). However, Title VII imposes a cap on the maximum compensatory and punitive damage award that a plaintiff can recover which is based on the size of the employer's staff. Assuming that Cross Garage had more than 14, but fewer than 101 employees, as appears likely, Title VII places a cap of $50,000 on Whitten's compensatory and punitive damages. *See id.* § 1981a(b)(3)(A). Under the New York Human

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Rights Law, however, an award of compensatory damages is not subject to any limitation. Similarly, there is no statutory limitation on the maximum amount of punitive damages awardable under the New York City Human Rights Law.

*6 In cases involving "typical" emotional distress, some courts have remitted jury awards for emotional distress to between $5,000 and $30,000. *Kuper v. Empire Blue Cross & Blue Shield*, 2003 WL 359462, at *12 (S.D.N.Y. Feb.18, 2003)(collecting cases). In other similar cases, courts have remitted such awards to between $30,000 and $75,000, even though "the only evidence of emotional distress has been the plaintiff's testimony, [and] the plaintiff claims no physical manifestations." *Id.* at *13 (collecting cases). Here, Whitten testified that due to Vassallo's constant racial epithets, he felt "belittled" and "angry." (1/17/03 Tr. at 19). Whitten's wife also testified that the racial slurs made her husband "feel much less than human." (*Id.* at 23). She stated that Vassallo's constant derogatory remarks made Whitten feel "mad" and "angry," and that this affected his ability to have a relationship with the children. (*Id.*). In light of this testimony, I find that an award of $40,000 in compensatory damages is appropriate.

[7] Although there is no limit on an award of punitive damages under the New York City Human Rights Law, the $50,000 cap for compensatory *and* punitive damages under 42 U.S.C. § 1981a(b)(3) serves as a useful guidepost. Thus, if Section 1981a(b)(3) were controlling, Whitten would be entitled to a maximum of $10,000 in punitive damages ($50,000-$40,000). Under that statute, a plaintiff need not show that the defendants' conduct was "extraordinarily egregious" in order to recover punitive damages. *Luciano v. Olsten Corp.*, 110 F.3d 210, 220 (2d Cir.1997). Here, even if one were to find that Vassallo's racial epithets were garden variety (which I do not), the deprivation of toilet facilities to which he was subjected would not be tolerated in a jail, and is nothing short of shocking. For that reason, I find that he should be awarded an additional $20,000 in punitive damages.

### E. *Attorney's Fees and Costs*

[8] A plaintiff prevailing in a Title VII suit is entitled to recover his attorney's reasonable fees and costs. 42 U.S.C. § 2000e-5(k). Attorney's fees are determined using the lodestar method, which entails multiplying the number of hours reasonably spent by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In the

Second Circuit, a party seeking an award of attorney's fees must support that request with contemporaneous time records that show, "for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1154 (2d Cir.1983). Fee applications that do not contain such supporting data "should normally be disallowed." *Id.* at 1154. Furthermore, the Court has a great deal of discretion in awarding attorney's fees and can deduct hours from the lodestar calculation if it finds that the hours charged are superfluous or unreasonable. *See Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir.1997).

*7 In prosecuting this action, Whitten engaged the services of Daniel, Siegel & Bimbler LLP, which merged with the law firm of Cowan, DeBaets, Abrahams & Sheppard LLP in November 2002. At both firms, the attorney handling this matter was Al J. Daniel, Jr., who has submitted an affidavit and a supplemental declaration setting forth: (a) his professional experience; (b) the number of hours he devoted to this action and the nature of the work performed; and (c) the billing rate at which he seeks to be compensated. (*See* Affidavit of Al J. Daniel, Jr., Esq., dated Nov. 1, 2001 ("Daniel Aff."), Exs. 2-3; Supplemental Declaration of Al J. Daniel, Jr., Esq., dated Jan. 31, 2003). Based upon my review, both the number of hours expended and the hourly rates for these legal services generally seem reasonable. Mr. Daniel, however, also billed at his customary hourly rate for services more appropriately handled by a paralegal. I have therefore reduced his hourly rate to $75 for the approximately five hours that he spent performing such routine tasks as traveling to court to file papers, ensuring that service was effected, and forwarding copies of documents. Following that minimal adjustment, I recommend that Whitten be awarded attorney's fees in the amount of $16,392 for services rendered prior to the inquest hearing ($285/hour x 56.2 hours + $75/hour x 5 hours), plus an additional $1,557.50 for services rendered in connection with the hearing ($350/hour x 4.45 hours), for a total of $17,949.50.

[9] Whitten also seeks to recover $342.76 in costs, consisting of filing fees, process service fees, copying fees, messenger service fees, and postage. (Daniel Aff. Ex. 3). The costs for which a plaintiff may recover do not include messengers and postage. *See* Local Civ. R. 54.1(c). After making an adjustment for these items, Whitten is entitled to costs in the amount of $323.91.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

### V. *Conclusion*

For the reasons set forth above, I recommend that Whitten be awarded damages, including attorney's fees and costs, totaling $148,466.48.

### VI. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable John S. Martin, United States District Judge, at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Martin. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

S.D.N.Y.,2003.
Whitten v. Cross Garage Corp.
Not Reported in F.Supp.2d, 2003 WL 21744088 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 U.S. DIST. LEXIS 19311



Analysis
As of: Jul 25, 2007

KENNETH WYNDER, Plaintiff, -against- JAMES MCMAHON, DAVID SPAHL,
ROBERT JONES, LOUIS B. BARBARIA, CRAIG MASTERSON, JOSH KEATS,
Individually, and John Doe employees one through ten of the New York State Police,
Defendants.

99-CV-772 (ILG)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK

*2005 U.S. Dist. LEXIS 19311*

September 7, 2005, Decided

**PRIOR HISTORY:** *Wynder v. McMahon, 360 F.3d 73, 2004 U.S. App. LEXIS 3906 (2d Cir. N.Y., 2004)*

**DISPOSITION:** [*1] Plaintiff's motion for a default judgment denied.

**COUNSEL:** For Kenneth Wynder, Plaintiff: Richard J. Merritt, Lindenhurst, NY.

For James McMahon, David Spahl, Robert Jones, Louis B. Barbaria, Craig Masterson, individually, Josh Keats, Defendants: Susan Hull Odessky, NYS Office of the Attorney General, New York, NY.

For Marine Midland Bank, Defendant: Paul K. Holbrook, Scott D. Miller, Scott D. Miller and Paul K. Holbrook, Buffalo, NY.

**JUDGES:** I. Leo Glasser, United States District Judge.

**OPINION BY:** I. Leo Glasser

**OPINION**

*MEMORANDUM AND ORDER*

GLASSER, United States District Judge:

In this action, plaintiff, a former New York State Trooper, alleges principally that he was discriminated against in employment on the basis of race in violation of federal and state law. Pending before the Court are plaintiff's motion for a default judgment pursuant to *Federal Rule of Civil Procedure 55(b)* and defendants' motion to dismiss the complaint pursuant to *Rule 12(b)(6)*.

*FACTS*

Plaintiff commenced this action on February 9, 1999. At that time, the case was assigned to Judge Trager. Defendants moved to dismiss plaintiff's complaint and Judge Trager [*2] granted that motion on January 24, 2000, permitting plaintiff to amend his complaint withing 60 days. Plaintiff then filed a First Amended Complaint ("FAC") [1] on March 31, 2000 and, in October 2000, the defendants moved to dismiss that complaint on the same grounds asserted in their previous motion. In a Memorandum and Order dated December 18, 2000, Judge Trager granted the motion and dismissed the FAC, granting plaintiff leave to replead. On January 26, 2001, plaintiff filed a Second Amended Complaint ("SAC"). Having received permission from Judge Trager, defendants filed another motion to dismiss the SAC (the same motion submitted previously) in February 2002. In August 2002, Judge Trager granted that motion without prejudice pursuant to *Federal Rule of Civil Procedure 41(b)* [2] based on plaintiff's failure to comply with the Court's order that he particularize his allegations against each defendant and clearly state the nature of those allegations. *See* Docket Entry No. 64. Judge Trager did not grant plaintiff leave to replead.

2005 U.S. Dist. LEXIS 19311, *

1  According to defendants, the FAC was largely identical to the original complaint except that it asserted an additional claim of perjury against an additional defendant. *See* Def. Opp. at 3.

[*3]

2  That Rule permits involuntary dismissals "for failure of the plaintiff to prosecute or to comply with ... [an] order of court."

Plaintiff appealed from that order of dismissal. In a decision filed on March 1, 2004, the Second Circuit considered (1) whether the district court was correct in requiring that plaintiff's complaint meet a higher pleading standard than that set forth in *Rule 8(a)* on penalty of dismissal and (2) whether plaintiff's SAC satisfied the requirements of *Rule 8(a)*. *See Wynder v. McMahon, 360 F.3d 73* ("*Wynder I*"). The Second Circuit held that the district court erroneously ordered plaintiff, on penalty of dismissal pursuant to *Rule 41(b)*, to file a complaint that exceeded the notice pleading standard of *Rule 8(a)* and that the SAC satisfied the requirements of *Rule 8*. *Id.* at 10, 12. The Court concluded that plaintiff "should be permitted to proceed on his second amended complaint." *Id.* at 13. The Court also noted, however, that its holding did not mean "all aspects of the complaint will ultimately survive dismissal," given the distinction between the standards [*4] for *Rule 8(a)* and *Rule 12(b)(6)*, and left to the district court's discretion striking portions of the complaint pursuant to *Rule 12(f)*. *Id.* Accordingly, the Second Circuit vacated Judge Trager's decision granting defendants' motion to dismiss and remanded the case to the district court.

The mandate from the Second Circuit was entered on the docket on March 25, 2004. *See* Docket Entry No. 74. The parties met with Magistrate Judge Cheryl L. Pollak on May 5, 2004. At that meeting, Judge Pollak ordered plaintiff to file, if he so desired, a proposed amended complaint by May 24 and defendants to inform the court whether they would be answering the complaint or making a motion to dismiss the complaint at a conference to be held on June 3. Plaintiff then filed a Third Amended Complaint ("TAC") on May 28, 2004 (Docket Entry No. 79), which, following a conference with Judge Pollak, was deemed filed *nunc pro tunc* as of May 25, 2004. At a conference with Judge Pollak on January 7, 2005, defendants were ordered to serve any motion to dismiss by February 28.

On March 15, 2005, plaintiff moved for a default judgement under *Rule 55* based on defendants' failure to answer the complaint. [*5] For the fourth time in this litigation, defendants moved to dismiss plaintiff's complaint. The Court turns to the parties' arguments regarding those motions.

## DISCUSSION

In moving for a default judgment, plaintiff contends that defendants' failure to answer the complaint after they were served with the Second Circuit's decision in *Wynder I* in March 2004 constitutes a default. *See* Pl. Mem. at 4 P6. In opposition, defendants argue that they have not defaulted because they moved to dismiss the TAC pursuant to *Rule 12(b)(6)* in lieu of filing an answer to that pleading. Although defendants' motion to dismiss is dated February 28, 2005, they filed and served it on March 15, 2005. They concede that their motion was untimely according to Judge Pollak's order that such a motion be filed by February 28, 2005, but claim that their delay resulted from an inadvertent filing error. *See* Def. Opp. at 6 n.2. In a letter to the Court accompanying the motion when it was filed on March 15, defense counsel explained that although she thought the motion had been properly filed pursuant to the electronic case filing system, she realized on or around March 14 that it had not been filed. [*6] The Court considers that letter to be a motion under *Rule 6(b)* to enlarge the time by which to file the motion to dismiss. Accordingly, the Court deems the *Rule 12(b)(6)* motion to have been filed *nunc pro tunc* on February 28, 2005. Having found that defendants' motion to dismiss was timely filed, the Court also finds that defendants properly moved to dismiss plaintiff's complaint in lieu of filing an answer as *Rule 12(b)* plainly permits them to do. Accordingly, the Court denies plaintiff's motion for a default judgment against defendants.

## CONCLUSION

For the reasons stated above, the Court denies plaintiff's motion for a default judgment. In view of the Court's decision that defendants' motion to dismiss was timely filed, plaintiff will have the opportunity to oppose that motion if he wishes.

SO ORDERED.

Dated: September 7, 2005

Brooklyn, New York

I. Leo Glasser

United States District Judge