1. **Defendant's False Representations in the Text of its Position Statement**

96. Defendant made the following material representations to the EEOC, knowing that they were false:

    a.    That "Mr. Graves' accounts [were] never reassigned," defendant's Position Statement, p. 1;

    b.    That Mr. Graves "was the younger of two Managing Directors ("MD's) who specialized in television broadcasting," defendant's Position Statement, p. 2;

    c.    That defendant's choice of whom to lay off was restricted to Mr. Graves and Mr. Paul, defendant's Position Statement, pp. 2, 4, and 8;

    d.    That seniority was a substantial factor influencing defendant's layoff decisions, defendant's Position Statement, pp. 2, 6, and 8;

    e.    That Mr. Paul had experience outside of television and, by clear and necessary implication, that Mr. Graves did not have such experience, defendant's Position Statement, p. 2;

    f.    By clear and necessary implication, that defendant's choice of whom to lay off was restricted to Managing Directors, defendant's Position Statement, p. 2;

    g.    That Mr. Graves "focused primarily on television," defendant's Position Statement, p. 2;

    h.    That Mr. Graves lacked "cinema background," defendant's Position Statement, p. 2;

       i.     By clear and necessary implication, either that plaintiff was to blame, not market conditions, for a "soft financial 2003," or that plaintiff was unique in the Media Investment Banking Group in having a "soft financial 2003," defendant's Position Statement, pp. 3-4;

       j.     That Mr. Graves was limited to "the television broadcasting space" and "the television space," defendant's Position Statement, p. 4;

       k.     That there was "duplication" between Mr. Graves and Mr. Paul, defendant's Position Statement, p. 4;

       l.     That there was "duplication in the television broadcasting space," defendant's Position Statement, p. 4;

       m.     By clear and necessary implication, that there was no such "duplication" elsewhere in the Media Investment Banking Group, defendant's Position Statement, p. 4;

       n.     That "Mr. Graves never mentioned anything to Mr. Amling during the meeting (or at any time, for that matter) about accounts being transferred away from him," defendant's Position Statement, p. 4;

       o.     By clear and necessary implication, representing that plaintiff had complained that Cox Radio was a client that had been taken away from him, defendant's Position Statement, p. 5, where defendant well knew that it had taken from plaintiff the Cox Enterprises client and assigned it to J.L. Malcolm Morris in 2002, had taken away the Cox Communications client and assigned it to Mr. Morris in 2003, and had assigned Cox Radio as a client to plaintiff only in

mid-2003 and only orally, and delayed changing the Client Manager to assign proper credit to plaintiff for work for this client;

p.  By clear and necessary implication, representing that plaintiff had failed to handle the Cox Radio account and had blamefully failed to produce revenues from it, defendant's Position Statement, p. 5, where defendant well knew that it had assigned Cox Radio as a client to plaintiff only in mid-2003 and only orally, and had delayed changing the Client Manager to assign proper credit to plaintiff for work for this client;

q.  That "there was duplication in that space," referring to the "broadcasting industry," defendant's Position Statement at p. 6;

r.  That conditions were bad in the Media Group and that "no MD's were hired in 2003," and that "One director" "was hired in July 2003," defendant's Position Statement at p. 6, by clear and necessary implication representing that no other Directors had been hired or promoted or transferred into the Media Investment Banking Group in 2003;

s.  That Mr. Graves was "one of two MD's in the television broadcasting space," defendant's Position Statement at p. 6;

t.  By clear and necessary implication, that plaintiff was the only banker who "failed to meet his revenue targets," defendant's Position Statement at p. 6;

u.  That "Mr. Graves was one of two MD's in the television broadcasting space and the space could not support two MD's when market conditions changed for the worse in 2003," defendant's Position Statement at p. 7;

- 33 -

       v.       That "Mr. Paul had additional experience in cinemas, which Mr. Graves did not have," defendant's Position Statement at p. 8;

       w.       That plaintiff's calls on Cox Radio "in 2002 and 2003" "indicates that the account was not stolen from him," defendant's Position Statement, p. 8, where defendant well knew that this was a client only recently and incompletely given to plaintiff, and not the Cox Enterprises client taken away from him in 2002 or the Cox Communications client taken away from him in 2003;

       x.       That Adelphia produced only "little revenue' in 2004, defendant's Position Statement, p. 9, where Attachment J to defendant's Position Statement shows that the September 2004 YTD Franchise Revenues for Adelphia showed that it had produced 1,297,000 Euros in revenues for defendant on an exit financing deal for Senior Bank Debt, and had produced 779,000 Euros for defendant on takeout financing;

       y.       By clear and necessary implication, that there was little value to the Adelphia account, defendant's Position Statement, p. 9, where defendant well knew, from before plaintiff's firing to the public announcement of Adelphia's draft disclosure statement and proposed plan of reorganization on February 25, 2004 and the announcement on April 22, 2004, that Adelphia was exploring the possibility of being acquired, and that such knowledge and announcements would likely lead to significant opportunities for investment banking business;

z. That Charter produced only "little revenue" in 2004, defendant's Position Statement, p. 9, where Attachment J to defendant's Position Statement shows that Charter had produced 1,408,000 Euros in September 2004 YTD Franchise Revenues for a refinancing deal for Corporate High-Yield Bonds;

aa. By clear and necessary implication, that there was little value to the Charter account, defendant's Position Statement, p. 9, where defendant well knew, from before plaintiff's firing to the February 19, 2004, statement of Charter's CEO that Charter would "continue to evaluate opportunities to reduce debt and reduce intermediate term debt maturities and leverage" (Charter had over $18 billion of debt outstanding at the time), and the announcement reported on April 23, 2004, that Charter was exploring the possibility of going private, and well knew that such activities would likely lead to significant opportunities for investment banking business;

bb. By clear and necessary implication, that there was little value to the Charter account, defendant's Position Statement, p. 9, where defendant well knew that it had informed its employees that Charter was one of defendant's top 50 fee generators among Media companies; and

cc. By clear and necessary implication, that there was little value to the Cox account, defendant's Position Statement, p. 9, where defendant well knew that it had informed its employees that both Cox Enterprises and Cox Communications clients were, individually, among defendant's top 50 fee generators among Media companies.

## 2. Defendant's False Representations in Exhibit F to Its Position Statement

97. Exhibit F to defendant's Position Statement purports to be a January 8, 2004, document showing what each banker had achieved in 2003, and had in the pipeline for 2004. This document is dated six days before plaintiff was fired, and defendant treated it as a critical document, using it to represent that plaintiff's results for 2003 and his 2004 business prospects were poor compared to those who were not fired. Specifically, the Position Statement represents at p. 3, using the abbreviation "MD" for Managing Director:

> Of the 6 MD's, Mr. Graves had the lowest franchise revenue for 2003 and the lowest 2004 franchise pipeline (excluding Ms. Triffo who was still on extended leave). (The chart, attached hereto as Exhibit F, demonstrates franchise-revenue and pipeline by MD and Dir, in Euro thousands, for 2003.) Mr. Graves 2003 franchise revenue was 2,468 Euro thousand and his 2004 franchise pipeline was 983 Euro thousand - - well below DBSI's target.

### a. The Backdating of Exhibit F

98. Exhibit F appears to have been backdated:

   a. On January 8, 2004, plaintiff was in charge of a Salem Communications deal with an expected 2004 Franchise Pipeline of $1.8 million. The original structure of the deal was to do a secondary offering if the stock price reached Salem's target level of $30 a share. By 2003, it appeared that the stock would remain below that price for some time, so plaintiff and others at defendant recommended to Salem that a convertible bond deal, not a secondary offering, could achieve their price target goal. The reason is that, in a convertible bond deal, the implied "sale" price of Salem's equity would be 20% or more above the prevailing price at the time of the transaction. During 2003, plaintiff reported to defendant the switch to the more likely convertible bond deal for Salem, with a pipeline value of $1.8 million. As of January 8, 2004, Salem's stock price was

$27.21, and an accurate accounting of the then-current conversations with Salem would have reflected the greater potential of a Salem convertible bond deal with $1.8 million in the 2004 pipeline.

  b. Using the Federal Reserve Bank of New York's Foreign Exchange Rates Historical Search data for January 8, 2004, one Euro was worth 1.2772 U.S. dollars on that date. Using that value, the pipeline value for this deal on Exhibit F to defendant's Position Statement should have been 1,409,333 Euros. As of January 8, 2004, an accurate statement of plaintiff's pipeline would have reflected a convertible bond deal with 1,409,333 Euros in the 2004 Franchise Pipeline.

  c. Salem's stock price then generally declined further, reaching a low of $23.20 on February 25, 2004. Then it began to rise, and on March 30, 2004, it reached $27.50, a little above its price on January 8, 2004. On April 1, 2004, the price went to $29.50, very close to the target price. On April 13, 2004, it closed at $31.02, above the target price.

  d. With the increase in stock price substantially after the purported date of Exhibit F to Defendant's Position Statement before the EEOC, Salem elected to pursue a secondary offering, which they announced in a public filing on April 29, 2004.

  e. Exhibit F does not show the true acts known to defendant on January 8, 2004, but shows the changed situation that did not come into existence until substantially after January 8, 2004.

f.    The false statements in Exhibit F operated to the benefit of defendant by falsely depriving plaintiff of credit for the 2004 Franchise Pipeline value of 1,409,333 Euros, and using the later value of 983,000 Euros, for plaintiff's 2004 Franchise Pipeline.

g.    The 2004 Franchise Pipeline value for this deal was a material fact.

h.    Exhibit F falsely credits Elizabeth Chang (then age 34) with the same amount.

i.    Other parts of Exhibit F may also have been altered to show false information placing defendant in a better light and plaintiff in a worse light.

**b.    <u>Double- and Triple-Counting Achievements and Pipeline Values</u>**

99. Defendant's Exhibit F falsely inflates the 2003 achievements and 2004 Franchise Pipelines of other bankers, to mislead the EEOC into thinking that plaintiff was the least productive full-time banker:

a.    Nothing in defendant's Position Statement alerted the EEOC to the fact that defendant was giving multiple employees complete credit for the entire amount of every deal on which they were working, even if they were not the senior banker on the transaction and played only a small role in the acquisition and execution of the deal.

b.    Defendant was paid only once in the December 2003 YTD Franchise Revenues for each deal in Exhibit F, and did not receive an integer

multiple of that payment just for assigning each additional banker to work on the deal.

  c. Using the values in Exhibit F, defendant received only 115,014,000 Euros in December 2003 Year to Date Franchise Revenues.

  d. Exhibit F falsely makes it appear that defendant received a total of 197,874,000 Euros in December 2003 Year to Date Franchise Revenues. The nonexistent 82,860,000 Euros claimed by defendant for December 2003 Year to Date Franchise Revenues are 41.9% of the total claimed.

  e. Similarly, defendant could not expect to be paid more than once for each deal in the 2004 Franchise Pipeline in Exhibit F, and could not expect to be paid an integer multiple of that pipeline value just for assigning each additional banker to work on the deal.

  f. Using the values in Exhibit F, defendant's actual 2004 Franchise Pipeline was 45,039,000 Euros.

  g. Exhibit F falsely makes it appear that defendant expected 72,876,000 Euros in its 2004 Franchise Pipeline. The nonexistent 27,747,000 Euros claimed by defendant for its 2004 Franchise Pipeline are 38.1% of the total claimed.

  h. The only neutral means of allocation of revenues that is available within the four corners of defendant's Position Statement to the EEOC is assignment of the expected revenue from each deal to the senior banker involved. Any other means of allocation of revenues to avoid double- and triple-

- 39 -

counting of the same revenues requires information not available in that Position Statement

### c. The Use of Made-Up Figures

100. Exhibit F includes the same precise 2004 Franchise Pipeline value of 3,930,000 Euros for five very different transactions:

    a. the "AOL - monetisation of Time Warner Telecom stake (D034002)" deal described as an "Equity Follow-On," and credited to both Elizabeth Chang and JL Malcolm Morris for the 2004 Franchise Pipeline;

    b. the "Kim Magnes Estate - divestiture advisory (D033651)" deal described as "Divestiture Advisory," and credited to Jeffrey Amling for the 2004 Franchise Pipeline;

    c. the "Sinclair Broadcast - interest rate swap (4Q 2003) (D034325)" deal described as "Derivatives-Interest Rate," and credited to Blair Faulstich for the 2004 Franchise Pipeline;

    d. the "BusinessWire - general advisory (D005685)" deal described as "Divestiture Advisory," and credited to Dyan Triffo for the 2004 Franchise Pipeline; and

    e. the "Google - IPO (D031830)" deal described as "Equity-IPO," and credited to Zach Maurus for the 2004 Franchise Pipeline.

It is highly improbable that five such very different transactions should have precisely the same 2004 Franchise Pipeline value. These figures appear to be false.

101. Exhibit F includes the same precise 2004 Franchise Pipeline value of 786,000 Euros for two very different transactions:

      a.    the "Arturo Moreno - advisory for Anaheim Angels (D030970))" deal described as "Acquisition Advisory," with a 100% probability of occurring in 2004, and credited to Charles Carey for the 2004 Franchise Pipeline; and

      b.    the "Thomson - c/b general advisory (Project Hollywood - 2004) Hollywood2 (D032395)" deal described as "Acquisition Advisory," with a zero probability of occurring in 2004 and credited to Sun Yung for the 2004 Franchise Pipeline.

It is highly improbable that two such very different transactions should have precisely the same 2004 Franchise Pipeline value. These figures appear to be false.

    3.    **These Devices Placed Plaintiff's Performance in a False Light**

        a.    **2004 Franchise Pipeline Revenues**

102. When these double- and triple-counts of 2004 Franchise Pipeline Revenues are taken into account by assigning the expected revenue from each deal to the senior banker involved, as the only neutral means of allocation available within the four corners of defendant's Position Statement to the EEOC, disallowing the apparently made-up numbers of 3,930,000 Euros for all transactions using that number for the 2004 Franchise Pipeline, disallowing the apparently made-up numbers of 786,000 Euros for all transactions using that number for the 2004 Franchise, and reflecting plaintiff's true 2004 Pipeline, Exhibit F would show the following (younger bankers in bold):

- 41 -

| Banker | 2004 Pipeline in Euros, Shown in Exhibit F | 2004 Pipeline Corrected to Exclude Multiple Counts of Same Transactions, Apparently Made-up Figures, and Reflecting Plaintiff's Actual Pipeline | Rank from Data Shown on Exhibit F | True Rank if Corrections Had Been Made |
|---|---|---|---|---|
| Amling, Jeffrey | 3,930,000 | 0 | 4 (tied) | Last (tied) |
| Carey, Charles | 786,000 | 0 | 6 (tied) | Last (tied) |
| **Chang, Elizabeth (age 34)** | 27,746,000 | 0 | 1 | Last (tied) |
| **Dunn, David (age 35)** | 0 | 0 | Last (tied) | Last (tied) |
| **Faulstich, Blair (age 34)** | 0 | 0 | Last (tied) | Last (tied) |
| **Graves, Daniel (age 42)** | 983,000 | 16,567,491 | 5 | 2 |
| **Maurus, Eric Z. (age 34)** | 3,930,000 | 0 | 4 (tied) | Last (tied) |
| Morris, JL Malcolm | 26,135,000 | 22,205,000 | 2 | 1 |
| Paul, Gregory | 4,559,000 | 4,559,000 | 3 | 3 |
| **Triffo, Dyan (age 37)** | 3,930,000 | 0 | 4 (tied) | Last (tied) |
| Yung, Sun | 786,000 | 0 | 6 (tied) | Last (tied) |

103.    The effect of the tricks, devices, and stratagems used by defendant in Exhibit F to its Position Statement was to represent (a) that plaintiff's 2004 business prospects were poor compared to those who were not fired; (b) to conceal the fact that plaintiff had the second-

- 42 -

highest 2004 pipeline in the Media Investment Banking Group; and (c) that none of the bankers in their 30's had any 2004 pipeline.

### b.     December 2003 YTD Franchise Revenues

104.    When these double- and triple-counts of December 2003 YTD Franchise Revenues are taken into account by assigning the revenue from each deal to the senior banker involved, as the only neutral means of allocation available within the four corners of defendant's Position Statement to the EEOC, and correcting plaintiff's 2003 revenues for Allbritton Communications, Exhibit F would show the following. It is not possible from the Position Statement to say whether Zach Maurus or Dyan Triffo (ages 34 and 37, respectively, according to Exhibit B to defendant's Position Statement), would have received credit for a 37,000 Euro transaction in the December 2003 YTD Franchise Revenues entries. Each has been credited with half this amount. Younger bankers are in bold, in the following table:

| Banker | 2003 Franchise Revenues in Euros, Shown in Exhibit F | 2003 Franchise Revenues, Corrected to Exclude Multiple Counts of Same Transactions, and Reflecting Plaintiff's Actual Revenues | Rank from Data Shown on Exhibit F | True Rank if Corrections Had Been Made |
|---|---|---|---|---|
| Amling, Jeffrey | 48,164,000 | 48,164,000 | 1 | 1 |
| Carey, Charles | 30,657,000 | 27,026,000 | 3 | 2 |
| Chang, Elizabeth (age 34) | 11,884,000 | 3,181,000 | 6 | 8 |
| Dunn, David (age 35) | 25,398,000 | 800,000 | 4 | 9 |
| Faulstich, Blair (age 34) | 43,705,000 | 0 | 2 | Last |
| Graves, Daniel (age 42) | 2,468,000 | 5,436.860 | 10 | 4 |
| Maurus, Eric Z. (age 34) | 21,591,000 | 21,571,500 | 5 | 3 |
| Morris, JL Malcolm | 3,229,000 | 3,229,000 | 9 | 7 |
| Paul, Gregory | 7,139,000 | 4,559,000 | 7 | 5 |
| Triffo, Dyan (age 37) | 37,000 | 18,500 | 11 | 10 |
| Yung, Sun | 3,604,000 | 3,604,000 | 8 | 6 |

105.    The effect of the tricks, devices, and stratagems used by defendant in Exhibit F to its Position Statement was to conceal the fact that the revenues he obtained were greater than the revenues obtained by seven other bankers in the Media Investment Banking Group.

- 44 -

106. Defendant could have avoided the double- and triple-counts of December 2003 YTD Franchise Revenues and the December 2003 YTD Franchise Revenues by allocating such revenues according to any neutral means, including allocations in proportion to work done on the deals. Upon information and belief, any such neutral means would have substantially undercut defendant's argument that plaintiff was the least productive banker in the Media Investment Banking Group.

107. In a statement filed with the EEOC, plaintiff attempted to use a different neutral means of allocating revenues to avoid multiple counts of the December 2003 YTD Franchise Revenues, by relying on his personal knowledge of responsibilities for some of the transactions. Plaintiff informed the EEOC that the December 2003 YTD Franchise Revenues could be calculated at 26,616,000 Euros for Charles Carey, 3,181,000 Euros for Elizabeth Chang, zero for David Dunn, zero for Blair Faulstich, 21,553,000 Euros for Zachary Maurus, 3,375,000 Euros for J.L. Malcolm Morris, leaving the others unchanged. These are different from, but close to, and consistent with, some of the above results. However, plaintiff does not have the same knowledge for all of the deals in question.

### 4. Defendant's False Representations in Exhibit C to Its Position Statement

108. Exhibit C to defendant's Position Statement states that is a January 15, 2003, document showing what each banker had achieved in 2002, and had in the pipeline for 2003. Defendant treated it as a critical document, using it to represent that plaintiff's performance was the poorest in the group. Specifically, the Position Statement represents at p. 3, again using the abbreviation "MD" for Managing Director:

> Despite Mr. Graves' belief that his 2002 performance was the highest in the Group, his December 2002 year to date franchise revenues were actually lower than all of the other MD's, including Mr. Paul who had a 2002 franchise revenue of 15,117 Euro thousands compared to Mr. Graves' 13,544 Euro thousands. (See Exhibit C.)

a. **Double-Counting Achievements and Pipeline Values**

109. Defendant's Exhibit C also falsely inflates the 2002 achievements and 2003 Franchise Pipelines of other bankers, to mislead the EEOC into thinking that plaintiff was the least productive banker:

    a. Nothing in defendant's Position Statement alerted the EEOC to the fact that defendant was giving multiple employees complete credit for the entire amount of every deal on which they were working, even if they only handled a small amount of the deal.

    b. Defendant was paid only once in the December 2002 YTD Franchise Revenues for each deal in Exhibit C, and did not receive an integer multiple of that payment just for assigning each additional banker to work on the deal.

    c. Using the values in Exhibit C, defendant received only 89,607,000 Euros in December 2002 Year to Date Franchise Revenues.

    d. Exhibit C falsely makes it appear that defendant received a total of 174,018,000 Euros in December 2002 Year to Date Franchise Revenues. The nonexistent 84,411,000 Euros claimed by defendant for December 2002 Year to Date Franchise Revenues are 48.5% of the total claimed.

    e. Similarly, defendant could not expect to be paid more than once for each deal in the 2003 Franchise Pipeline in Exhibit C, and could not expect to be paid an integer multiple of that pipeline value just for assigning each additional banker to work on the deal.

    f. Using the values in Exhibit C, defendant's actual 2003 Franchise Pipeline was 131,402,000 Euros.

- 46 -

    g. Exhibit C falsely makes it appear that defendant expected 188,183,000 Euros in its 2003 Franchise Pipeline. The nonexistent 56,781,000 Euros claimed by defendant for its 2003 Franchise Pipeline are 30.2% of the total claimed.

    h. The only neutral means of allocation of revenues that is available within the four corners of defendant's Position Statement to the EEOC is assignment of the expected revenue from each deal to the senior banker involved. Any other means of allocation of revenues to avoid double-counting of the same revenues requires information not available in that Position Statement.

   b. **The Use of Made-Up Figures**

110. Exhibit C includes the same precise 2003 Franchise Pipeline value of 2,837,000 Euros for three very different transactions, each of which had a probability of occurring in 2003 that was stated as zero:

    a. the "Citadel Broadcasting - IPO (D023066)" deal described as "Equity-IPO" and credited to both Jeffrey Amling and Charles Carey;

    b. the "Sinclair Broadcasting - bank financing (3Q 02) (D021892)" deal described as "Senior Bank Debt," and credited to both Jeffrey Amling and Charles Carey;

    c. the "Young Broadcasting -general advisory (Kron Station) (D025304)," deal described as "Divestiture Advisory" and credited to Gregory Paul;

- 47 -

It is highly improbable that three such very different transactions, all with a zero probability of occurring in 2003, should have precisely the same 2003 Franchise Pipeline value. These figures appear to be false.

111.  Exhibit C includes the same precise 2003 Franchise Pipeline value of 3,310,000 Euros for two very different transactions, each of which had a probability of occurring in 2003 stated as 25%:

    a.  the "DirecTV USA - bridge financing (4Q 02) (D020076)" deal described as "Bonds-Corporate High Yield," and credited to Jeffrey Amling; and

    b.  the "Emmis Communications - acq of Fisher Communications (D027038)" deal described as "Acquisition Advisory," and credited to Jeffrey Amling.

It is highly improbable that two such very different transactions, each with a 25% probability of occurring in 2003, should have precisely the same 2003 Franchise Pipeline value. These figures appear to be false.

112.  Exhibit C includes the same precise 2003 Franchise Pipeline value of 9,547,000 Euros for three very different transactions, two involving the same deal number and client but with different products, and with different stated probabilities of occurring in 2003:

    a.  the "AOL TimeWarner - convertible offering (3Q 02) (D024044)" deal described as "Equity-Convertible Bonds," with a stated zero probability of occurring in 2003, and credited to J.L. Malcolm Morris for the 2003 Franchise Pipeline;

- 48 -

      b.    the "Vivendi Universal - disposal of US stakes (D025431)" deal described as "Block Trade," with a stated 25% probability of occurring in 2003, and credited to Dyan Triffo for the 2003 Franchise Pipeline; and

      c.    the "Vivendi Universal - disposal of US stakes (D025431)" deal described as "Divestiture Advisory," with a stated zero probability of occurring in 2003, and credited to Dyan Triffo for the 2003 Franchise Pipeline.

It is highly improbable that three such very different transactions with different probabilities of occurring in 2003, should have precisely the same 2003 Franchise Pipeline value. These figures appear to be false.

      5.    **These Devices Placed Plaintiff's Performance in a False Light**

           a.    **2003 Franchise Pipeline Revenues**

113.    When these double-counts of 2003 Franchise Pipeline Revenues are taken into account by assigning the expected revenue from each deal to the senior banker involved, as the only neutral means of allocation available within the four corners of defendant's Position Statement to the EEOC, and disallowing the apparently made-up numbers of 2,837,000 Euros, 3,310,000 Euros, and 9,547,000 Euros for all transactions using these figures, Exhibit C would show the following:

| Banker | 2003 Pipeline in Euros, Shown in Exhibit C | 2003 Pipeline Corrected to Exclude Multiple Counts of Same Transactions, Apparently Made-up Figures, and Reflecting Plaintiff's Actual Pipeline | Rank from Data Shown on Exhibit C | True Rank if Corrections Had Been Made |
|---|---|---|---|---|
| Amling, Jeffrey | 75,347,000 | 63,052,000 | 1 | 1 |
| Carey, Charles | 35,099,000 | 17,873,000 | 2 | 3 |
| Graves, Daniel (age 41) | 3,499,000 | 13,071,026 | 5 | 4 |
| Morris, JL Malcolm | 9,457,000 | 0 | 4 | Last (tied) |
| Paul, Gregory | 3,192,000 | 355,000 | 6 | 5 |
| Silver, Ellen | 0 | 0 | Last | Last (tied) |
| Triffo, Dyan (age 36) | 24,872,000 | 21,284,000 | 3 | 2 |
| Yung, Sun | 1,702,000 | 0 | 7 | Last (tied) |

114.  The net effect of the tricks, devices, and stratagems used by defendant in Exhibit C to its Position Statement was to conceal that plaintiff's 2003 pipeline was solidly in the middle of the group, and almost four times better than defendant had represented. Defendant's taking away almost $10 million from plaintiff's 2003 pipeline was important in creating a false confirmation of the false impression that plaintiff could not be expected to have good business prospects as of a year later, when he was fired.