## LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.

1150 CONNECTICUT AVENUE N.W. • SUITE 900 • WASHINGTON, DC 20036-4129
www.rickseymourlaw.com  FAX: (800) 805-1065 AND (202) 828-4130
RICHARD T. SEYMOUR, PRINCIPAL: (202) 862-4320, CELL: (202) 549-1454, Rick@RickSeymourLaw.net
ADELE RAPPORT*, SENIOR COUNSEL, (202) 862-4325, CELL: (202) 531-4477, Adele@RickSeymourLaw.net
JULLION R. TAYLOR, SENIOR PARALEGAL: (202) 862-4370, CELL: (202) 531-4039, Jullion@RickSeymourLaw.net

June 26, 2007

Cliff Fonstein, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Re: **Graves v. Deutsche Bank**

Dear Mr. Fonstein:

  Thank you for your June 25 letter. As I stated in my June 7 letter to Joanne Seltzer: "In the meantime, if your client thinks that anything in the draft Complaint is demonstrably wrong, as opposed to the general disagreements I assume it will have, we will be happy to evaluate any documents you send us and will take those into account." That offer still stands; it is not necessary to argue a Rule 11 violation in order to make us interested in curing any inaccuracy in our pleading.

  By way of background, I must say that I have seen a lot of position statements since I left the government in 1969, and am quite used to respondents attempting to put the best possible picture on events and argue the interpretations that best serve their interests. That is par for the course.

  The position statement at issue here is very unusual in my experience, went much farther than I have ever seen such a statement go, and under our view of the facts clearly crossed the line. That is why the Complaint herein includes allegations unlike those I have ever previously had occasion to make on behalf of a client.

  Plaintiff is responding in this full fashion to your letter, rather than waiting to file these statements in response to a pleading and thus undermine defendant's credibility. We are forsaking this litigation advantage as a sign of good faith, and as a professional courtesy responsive to yours in sending us your letter ahead of time.

  We are also responding in this relatively full manner because plaintiff still harbors the hope, after defendant has done an adequate investigation and come to realize it has substantial exposure, that this matter can be resolved quickly and quietly with the provision of substantial relief.

*ALSO ADMITTED IN ILLINOIS AND MICHIGAN

This letter discusses the applicable law in Part A, the facts in Part B, the relevance of the fraud allegations in Part C, and the way forward in the conclusion in Part D.

### A. The Law Governing the Adequacy of the Complaint

If plaintiff's understanding of the facts is correct, as must be assumed on a motion to strike for inadequacy, the law supports the adequacy of the Complaint.

We have examined the authorities you cited in your letter, but believe they stand for somewhat different principles. In *Ouaknine v. MacFarlane*, 897 F.2d 75, 79–80 (2d Cir. 1990), for example, the court said:

> To pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation. . . . Although scienter need not be alleged with great specificity . . . there must be some factual basis for conclusory allegations of intent. Allegations of scienter are sufficient if supported by facts giving rise to a "strong inference" of fraudulent intent.

(Citations omitted.)

Here, plaintiff has alleged "the time, place, speaker, and . . . even the content of the alleged misrepresentation" by specifying the particular statements within defendant's November 5, 2004, Position Statement to the EEOC that plaintiff contends were not correct. This document was submitted to a government agency in response to an investigation, and purported to represent the views of the organization. If there is a document that should be more binding on a defendant for purposes of Rule 9(b), I would like to know what it is. Defendant itself was the speaker, and the law is clear that allegations of corporate speakers satisfy the requirements of Rule 9(b). These allegations are similar to the allegations as to the offering statement that the Second Circuit found adequate in *Ouaknine*: "We have held that reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation where, as here, defendants are insiders or affiliates participating in the offer of securities." *Id.* at 80 (citations omitted).

*Ouaknine* also supports the adequacy of the allegations of fraud in the Complaint. It pointed out that Rule 9(b), Fed. R. Civ. Pro., states: "Malice, intent, knowledge and condition of mind of a person may be averred generally." The court added that Rule 9(b) "must be read together with rule 8(a) which requires only a 'short and plain statement' of the claims for relief." *Id.* at 79 (citations omitted). The court explained:

> Allegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud. They are sufficient where, as here, the allegations lie peculiarly within the opposing parties' knowledge and are


Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 3 of 11 —

accompanied by information that raises a strong inference of fraud.

*Id.* at 81 (citations omitted). The court then elaborated a series of allegations that are strikingly similar to the types of allegations made in the Complaint herein, and concluded: "It is difficult to imagine how such events could have occurred if the defendants who controlled them had not actually intended to defraud." *Id.*

The Second Circuit has similarly made clear that allegations of fraudulent intent can be based on information and belief where sufficient supporting facts are alleged to support the inference. *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir. 1986), stated:

> Allegations of fraud cannot ordinarily be based "upon information and belief," except as to "matters peculiarly within the opposing party's knowledge." ... To satisfy Rule 9(b) in the latter instance, the allegations must be accompanied by a statement of the facts upon which the belief is founded. . . .

(Citations omitted.) There, unlike here, the plaintiff did not provide the underlying facts. Similarly, *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987), stated: "There is a recognized exception to this rule, however, that fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." Citations omitted.

Turning to Rule 11 standards, I agree that an attorney cannot simply rely on the word of a client. That applies to us in the framing of the Complaint, and will apply to defendant in the framing of its Answer. Similarly, it is the job of higher-ranking officials within an organization to check on the statements and assurances of decisionmakers before authorizing a filing on behalf of the corporation. That is one of the aspects that makes the defendant's filing of its Position Statement so troubling.[1] The analysis we have done is one that should have been done by more senior officials of defendant before the document was filed. Its representations should have been checked against other documents. The most cursory check by defendant's higher-ranking officials would have revealed that plaintiff's pipeline had been made largely to disappear, and that the pipelines of younger bankers had been inflated like an inner tube on a hot summer day. We have known Epstein Becker to be a thoroughly responsible firm, with thoroughly responsible attorneys. We have no reason to doubt that they relied on the information that defendant gave them to prepare the position statement, and we assume that they also ran it by knowledgeable, higher-level officials of the defendant before it was filed.

To take another example, the Position Statement flatly represented that plaintiff had never complained about the reassignment of his accounts. The first page of the

---

[1] Rule 11 only applies in civil litigation, of course, not in administrative proceedings. That is one of the reasons why 18 U.S.C. § 1001 is so important here.

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 4 of 11 —

statement represented as follows: "Indeed, not only were Mr. Graves' accounts never reassigned, but the accounts Mr. Graves alleges were taken away from him, making it impossible for him to meet his 2003 revenue target, produced no revenue for anyone at DBSI in 2003. Further, DBSI denies that Mr. Graves complained to anyone at DBSI - prior to his termination - that his accounts were being transferred to younger bankers." Fortunately, plaintiff has e-mails demonstrating that defendant's representation was made up out of whole cloth. We also have documents demonstrating that the accounts taken away from him in fact produced revenue, making that allegation patently false as well.

Plaintiff's credibility has been shown to be pretty solid so far.

In any event, both sides agree on the principle that lawyers must take reasonable steps to check their clients' statements. I expect we also agree that it applies to both sides.

**B.     The Facts**

  **1.     Omissions from Your Letter**

I was struck by the fact that your letter did not attempt to challenge the accuracy of numerous allegations underlying our allegations of fraud.

The Complaint alleges that one of defendant's key exhibits, Attachment F to the Position Statement, seems to have been backdated, and alleged the specific facts that allow such an inference. This is sufficient, as the discussion in Part A shows. Your letter does not challenge the adequacy of our allegations or the accuracy of their factual underpinning.

The Complaint alleges that defendant's key exhibits, Attachments C and F, include numerous values that seem to have been made up, and alleged the specific facts of very different transactions having been assigned the same precise value. You must concede that the assignment of identical values to different transactions is odd, and at the very least entitles a fact-finder to draw the inference that the figures are patently false, and even that they were deliberately filed with knowledge of their falsity. In context, the false numbers repeated on several occasions, to plaintiff's detriment, suggest deliberate manipulation. That is not much of a stretch, and is certainly a permissible allegation under the case law cited in your letter and in this letter. Your letter challenges the conclusion, but does not challenge the adequacy of our allegations or the accuracy of their factual underpinning.

The Complaint alleges that defendant's key exhibits, Attachments C and F, exclude significant parts of plaintiff's true pipeline, about which defendant had knowledge. This is sufficient, as the discussion above shows. Your letter challenges the conclusion, but does not challenge the adequacy of our allegations or the accuracy of

their factual underpinning.

The Complaint alleges that defendant knowingly set plaintiff up for failure and eventual termination over a substantial period of time, by transferring his accounts to other bankers, and pressuring him to transfer accounts to younger bankers, both before and at his termination, and that defendant fraudulently failed to alert plaintiff to its plans so that it could avail itself of his services until it was ready to fire him. This is sufficient, as the discussion above shows. Your letter challenges the conclusion, but does not challenge the adequacy of our allegations or the accuracy of their factual underpinning.

As stated in my June 7 letter to Ms. Seltzer and repeated above, plaintiff does not need the threat of a Rule 11 motion to withdraw any pleading that you can show us is factually incorrect. If defendant can show us documents conclusively showing that these allegations are wrong, plaintiff will withdraw them without defendant having to file a motion.

It is quite another matter, however, to withdraw allegations when no supported objection has been made to their adequacy or accuracy.

We cannot help but think that, if defendant had support for its position as to these matters, it would have brought it forward in your letter. *Interstate Circuit v. United States*, 306 U.S. 208, 226, 59 S. Ct. 467, 83 L. Ed. 610 (1939), summed up the general inference to be drawn in this type of situation: "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. . . . Silence then becomes evidence of the most convincing character." The principle is widely recognized. JAMES H. CHADBOURN, II WIGMORE ON EVIDENCE (Little, Brown & Co., Boston, 1979), § 285 at 192: "The nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its *tenor is unfavorable to the party's cause*." (Emphasis in original). The principle is even recognized in literature. A dog's failure to bark in the night was the clue enabling Sherlock Holmes to solve a murder in Sir Arthur Conan Doyle's SILVER BLAZE.

Nevertheless, plaintiff remains open to reconsidering the fraud allegations, or any other part of the Complaint, if defendant can demonstrate to us that we cannot win these claims. There is no need for defendant to go to the time and expense of filing a motion.

2.      **The Apportionment of Revenue to Bankers**

The one factual matter raised substantively by your letter is its representation that "one issue in this case may be the method the Bank used to apportion revenue and expected revenue among the various bankers on a project." The word "apportion" is telling, because the word connotes that revenues are counted once and are divided among the bankers involved by some type of judgment or system. It is not consistent with multiple counting of revenues.

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 6 of 11 —

However, your point certainly deserves a response.

First, while I do not want to be argumentative, defendant's Position Statement nowhere explicitly informed the EEOC that defendant followed a standard, uniform practice of multiple-counting of the same revenues, so that all of the bankers involved in a project were given credit for the entire amount. Such a disclosure would have been highly relevant to the EEOC because it would have made clear that defendant's so-called uniform practice would, if accepted, provide any respondent with a foolproof means of making the object of its age-based or other animus falsely appear less productive than other employees, simply by assigning numerous employees (but not the charging party) to work with the head of the unit, as occurred here. The Position Statement simply used the unexplained, multiply-counted revenues to create the impression that, when each banker is considered in isolation, plaintiff was the lowest performer. Defendant made it appear to the EEOC that it was comparing apples to apples, when in reality it was doing something quite different.

See, *e.g.*, the backhanded criticism of plaintiff on pp. 1–2 of the Position Statement:

> DBSI terminated Mr. Graves' employment as a result of his failure to meet or even approach its target revenue in 2003 due more to a difficult market in television broadcasting than to Mr. Graves' poor performance.

See also the statement on p. 3 of the Position Statement:

> Despite Mr. Graves' belief that his 2002 performance was the highest in the Group, his December 2002 year to date franchise revenues were actually lower than all of the other MD's, including Mr. Paul who had a 2002 franchise revenue of 15,117 Euro thousands compared to Mr. Graves' 13,544 Euro thousands. (See Exhibit C.)

One can clearly see the impact on the EEOC if the backhanded reference to "Mr. Graves' poor performance" in the top line of p. 2 of the Position Statement had referred instead to "Deutsche Bank's decision not to add him to the list of younger bankers assigned to work on the unit head's accounts." A similar transformation would have occurred as to the above-quoted statement on p. 3 and other statements.

Similarly, Part C of the Position Statement, "The Decision to Terminate Graves' Employment," stated as defendant's first reason for firing plaintiff that he had failed to meet his target in 2003 and his 2004 outlook was poor. It goes on to say falsely that plaintiff was "in the television space" as if that was all he did. Those explanations would look quite different if defendant had said instead, "plaintiff failed to meet his target in 2003 and would not do so in 2004 because management decided to double-up younger bankers, not Mr. Graves, to work on senior management's accounts and limited Mr. Graves to the television space in which no growth was expected."

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 7 of 11 —

In evaluating its exposure, the defendant may wish to consider how much easier plaintiff's task of proving age discrimination and retaliation becomes if there indeed was a uniform practice of giving several bankers full credit for one transaction. Defendant would have to explain convincingly why it refused to give plaintiff an opportunity to do some work on transactions for other bankers, getting full credit for the transactions, while giving this opportunity to the younger bankers in order to save their jobs.

Defendant would also have to explain why it pigeon-holed plaintiff as being virtually exclusively "in the television space" in view of his much broader experience and assignments.

Second, plaintiff is not aware of any standard practice of uniformly allocating the revenue on a project to each participating banker. To be fair, your letter does not explicitly say that each participating banker, no matter how large or small a role he or she played in the transaction, was under standard practice uniformly "allocated" or "apportioned" the entire amount for performance purposes. I assume that is what you meant to convey, however, because otherwise there would not have been any factual point for the letter to make. As so understood, plaintiff is not aware of any such practice and does not understand how any such practice can be used to measure relative performance, the purpose for which it was used in the Position Statement.

Indeed, if there had been any such practice from 2002 through 2004, there would have been no need for defendant to have taken plaintiff's accounts away from him; it could simply have double-assigned them to younger bankers as well as plaintiff, and left him involved and gaining credit for the transactions. The availability of such an option would throw into sharp relief the question why defendant failed to do just that.

Third, you have represented that Mr. Berger "was unmistakably aware of this practice"— *i.e.*, the Bank-wide practice of allocating the entire amount of all transaction fees to each and every banker who worked on deals at the Bank—"from a prior case he brought against the Bank." Mr. Berger does not have such a recollection, but his firm has arranged to pull documents back from archives. Mr. Berger's recollection is that there was a confidentiality agreement with respect to all records in that case, so that whatever they contain could not be shared with plaintiff or with my office. I request a limited waiver of that confidentiality agreement, so that such records can be shared with plaintiff and with my office, and used in this litigation.

In any event, it is my understanding that you are referring to a case that involved facts and occurrences from 1999 and that did not involve the filing of any statements by the Bank with the EEOC or any other governmental agency, so I do not understand, even if you could establish a knowledge by Mr. Berger of a Bank-wide practice as you have alleged, how this would warrant a threat of Rule 11 sanctions given the different time periods and factual circumstances involved.

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 8 of 11 —

      Fourth, to set the record straight, the Complaint does not allege that assigning the revenue from a transaction only to the senior investment banker is the only neutral means of assigning revenue. It alleges that that is the only neutral means within the four corners of the Position Statement (¶¶ 99(h), 102, 104, 109(h), 113 and 115), and goes on to allege that other neutral means, going outside the four corners of the Position Statement, were available (¶¶ 106, 107, 117, and 118) but would have undercut defendant's position.

      Fifth, a document not highlighted at all in the text of the Position Statement,[2] Attachment E at pp. 3-4, credits individual bankers—not multiple bankers—with individual pipeline transactions except for three instances when bankers mentioned in Exhibit F are paired with bankers not mentioned at all in that exhibit: Dada, Schoen, and Hartka. The following instances show the reasonableness of plaintiff's allegations:[3]

> Exhibit F credits two bankers (Amling and Faulstich) for the Spanish Broadcasting pipeline deal, but Exhibit E at p. 3 credits only the senior banker;

> Exhibit F credits two bankers (Paul and Chang) for the Young Broadcasting pipeline deal, but Exhibit E at p. 3 credits only the senior banker;

> Exhibit F credits two bankers (Morris and Chang) for the AOL-TW pipeline deal, but Exhibit E at p. 3 credits only the senior banker;

---

[2] Attachment E is mentioned only in passing on p. 3 and at the end of footnote 3 on p. 4.

[3] Note that the credits shown on Exhibit E have been made more difficult to read because the spreadsheet from which the table in question was taken had multiple lines in some cells and defendant failed to calibrate the columns so that information relating to the same transaction would appear on the same line on the page. For example, the "DB Role" cell for "Spanish Broadcasting" takes four lines and the Client Name for "Spanish Broadcasting" and for "Young Broadcasting" each take two lines.
The first line for the client name for "Young Broadcasting" is one line below the data for Young Broadcasting (other than the date for "DB Role"), and is two lines above the DB Role for that transaction.
The client name for Loews Cineplex appears on the line showing data for the Comcast deal, and the actual data for the Loews Cineplex deal appears two lines above the Loews Cineplex client name, on what looks like the first line for Young Broadcasting.
While a proper reading of Exhibit E appears to us to shatter defendant's contention of a standard, uniform practice of multiple-counting, it would have been next to impossible for the EEOC to decipher this information. We were able to figure this out because of plaintiff's knowledge of the proposed deals in question, so that unless the different wording and confusing format in Exhibit E could be matched with the inconsistent representations in Exhibit F, the EEOC could not have understood this correctly.

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 9 of 11 —

> ➢ Exhibit F broadly multiple-counts pipeline revenues, but:
>
>> o Exhibit E at pp. 3–4 counts revenues only once per banker listed in Exhibit F, and in the infrequent instances of sharing in any degree simply credits one banker listed on Exhibit F and one banker not so listed, without saying who is credited with what; and
>>
>> o Exhibit E at p. 10[4] shows only one instance of giving co-credit to more than one banker on Exhibit F for any transaction.

Exhibit E raises questions even additional to those noted, because it includes bankers and transactions excluded from Exhibit F,[5] but is plainly consistent with plaintiff's allegations and is plainly inconsistent with the standard practice described in your letter.

Notwithstanding the fact that nothing in our possession indicates the accuracy of the representation we understand your letter as making, we will—if defendant is willing to lift confidentiality and allow us to examine the records of the old case you mentioned—examine that, and anything else you show us. We have no interest in pursuing any claim that we are persuaded we cannot win, and if we are so persuaded we will not make you go through the burden of filing a motion.

We need something more than what you have shown us to date, however.

C.  **Relevance**

Your letter asserts that there is no relevance to the fraud claims, and that they must therefore be intended only for improper purposes. That is a rather large conclusion to draw.

We do not wish to discuss all of our thoughts and plans, but in the exercise of good faith and professional courtesy it is fair to point out that the fraudulent Position Statement is part of the course of dealing underlying the age and retaliation claims. It is also fair evidence of pretext under numerous authorities from the Supreme Court on down. The fraudulent Position Statement is also highly relevant to the punitive-damages remedy we seek under New York common law and under the legislative anti-retaliation provisions applicable to this case.

It is also fair to point out that, as your own letter recognizes, plaintiff may not

---

[4] The problem described in footnote 3 above also occurred on p. 10 of Exhibit E, making entries below the one cited difficult to understand.

[5] In discovery, we will find out why they were excluded, and whether the effect of their exclusion was to buttress the arguments defendant was trying to persuade the EEOC to accept.

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 10 of 11 —

allege fraud claims against individual officials without showing their personal roles. Discovery will provide us with documents and testimony that we will consider, in terms of adding other potential claims or other potential defendants.

As you know, in addition to substantial monetary relief plaintiff is interested in reinstatement with protective provisions for a period of time, enabling him to get his career back on track either with defendant or elsewhere. In addition to the legal bar on adding individual defendants on our present state of knowledge, restricting the lawsuit to defendant at this stage may help avoid an emotional barrier to such relief, and may avoid an unfortunate hardening of positions.

### D.    Conclusion

Defendant had an opportunity to discuss the issues in this lawsuit, and any problems it saw with the pleadings, before we filed the case. To the extent that it wanted more time to consider the matter, which we could readily understand, we offered the option of a tolling agreement. In the press of the moment, our offer may have been misunderstood as plaintiff asking for something, instead of the reality of plaintiff offering something.

In any event, defendant saw fit to reject the offer. And truth to tell, there was not much point in agreeing to talk about a resolution if defendant was still under the impression that it had little exposure.

It would still have been useful, of course, to sort out any demonstrable inaccuracy in the draft pleadings.

Our position has not changed since June 7. We will still withdraw any allegation you persuade us cannot be won, and we will still consider any documents you provide that demonstrate an allegation is incorrect. This is as true for the standard uniform practice we understand your letter as describing—of crediting multiple bankers for the full amount of all transactions to which they are assigned, regardless of the degree of their role—as it is of any other claim.

Similarly, if you can show us documents that demonstrate we cannot win any of our fraud claims, or that in light of specific documents and information you provide they all have an inadequate factual basis, we will withdraw the fraud allegations without making defendant go to the time and expense of filing a motion. Mere argumentation will not do, however, as this response should make clear.

In the meantime, we request a waiver of the confidentiality requirement as to the old case, so that it can be seen and used in this litigation.

Finally, we are still willing to discuss substantial relief when and if the defendant

Cliff Fonstein, Esq.
Sidley Austin LLP
June 26, 2007
Page 11 of 11 —

wishes to do so.

Very truly yours,

Richard T. Seymour