2008 U.S. Dist. LEXIS 26181, *

GOWANUS INDUSTRIAL PARK, INC., Plaintiff, -against- ARTHUR H. SULZER ASSOCIATES, INC., Defendant.

06 CV 105 (SJ)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2008 U.S. Dist. LEXIS 26181

March 31, 2008, Decided
April 1, 2008, Filed

**COUNSEL:** [*1] James Klatsky, Esq., PAYKIN GREENBLATT LESSER & KRIEG, New York, New York, Attorneys for Plaintiffs.

JAMES M. MALONEY, New York, NY, Attorney for Defendants.

**JUDGES:** Sterling Johnson, Jr, Senior U.S.D.J.

**OPINION BY:** Sterling Johnson, Jr

**OPINION**

**MEMORANDUM AND ORDER**

JOHNSON, Senior District Judge:

Gowanus Industrial Park, Inc. ("Plaintiff"), a corporation organized under the laws of the state of New York, brings this action against Arthur H. Sulzer, Inc. ("Defendant"), a Pennsylvania corporation, alleging that Defendant is liable for expenses incurred as a result of services rendered by the Plaintiff from August 2003 to October 2005, in connection with the storage and maintenance of a barge (the "Barge ADA") owned by Defendant and located on the Plaintiff's property during the relevant timeframe. Defendant now moves for summary judgment dismissing the Plaintiff's claim and for partial summary judgment, with respect to the issue of liability only, as it relates to the Defendant's counterclaims against Plaintiff for allegedly withholding the Barge ADA to the Defendant's detriment. In addition, the Defendant moves for sanctions against the Plaintiff, pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"). [*2] For the reasons stated herein, the Defendant's motions for summary judgment, partial summary judgment, and for Rule 11 sanctions are hereby GRANTED.

**BACKGROUND**

The parties agree that on or about May 30, 2000, the Defendant leased the Barge ADA to CDS Marine Construction, LLC ("CDS"), pursuant to a demise charter party, at a rate of $ 3,100 per month. Ex. 1 to Def. Rule 56.1 Statement.¹ In April 2003, unbeknownst to the Defendant, CDS entered into a contract with the Plaintiff to repair the Plaintiff's dock and bulkhead facilities located at the Henry Street Basin. In order to carry out its work, CDS transported three barges to the work site, including the Barge ADA, which was still in the possession of CDS under the aforementioned demise charter party. Though CDS began work at the Plaintiff's facilities shortly thereafter, CDS failed to complete the job and abandoned the work site in August 2003, leaving all three barges unattended on the Plaintiff's property at the Henry Street Basin. Compl., p. 2.

1   The terms of the charter party suggest that, while the vessel was under charter, the Barge ADA was to be staffed and maintained exclusively by CDS. In addition, the charter party appears [*3] to include no restrictions with respect to where and for what purpose CDS used the Barge ADA during the term of the lease. In fact, there is no indication that CDS was under any obligation to keep the Defendant informed as to the usage or whereabouts of the Barge ADA while the vessel was in its possession.

Meanwhile, the Defendant commenced an action against CDS in the Eastern District of Pennsylvania in July 2003 on the grounds that, as of November 2002, the Defendant had stopped receiving monthly hire payments from CDS, as required under the demise charter party. Mem. in Supp. Def.'s Rule 56 Mot., p. 4. Specifically, the Defendant filed suit in order to recover the barge, the location of which was unknown to the Defendant at the time the action was commenced, and to recover the hire payments that should have been made by CDS between November 2002 and July 2003. Id.

On or about October 16, 2003, CDS filed for bankruptcy in the District of New Jersey and was subse-

quently discharged in bankruptcy in July 2004. Compl., p. 3; Mem. in Supp. Def.'s Rule 56 Mot., p. 5. Neither the Plaintiff nor the Defendant in this matter was aware that CDS had filed for bankruptcy until well after those [*4] proceedings had begun. In or about January 2004, the Plaintiff was contacted by representatives from CDS and informed that the company had filed for bankruptcy. Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 4. Plaintiff was further informed at that time that CDS intended to abandon all three barges left at the job site, including the Barge ADA. Id.

Also in January 2004, Defendant learned of the bankruptcy proceedings and that the Barge ADA was left unattended at the Plaintiff's dock. Tr. 45; Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 5. By all accounts, this was the Defendant's first indication that CDS had entered into a contract with the Plaintiff and subsequently abandoned the job prior to completing its work.

In a letter dated February 17, 2004, the Defendant informed the Plaintiff that it was the registered owner of the Barge ADA and that it was seeking to make arrangements to recover said barge from the Plaintiff's dock. Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 5. This letter constituted the first communication between the Plaintiff and the Defendant. Id.

On or about March 3, 2004, counsel for the Plaintiff responded to the February 17 letter by denying [*5] the Defendant's request to enter the Plaintiff's property to recover the barge, and noting that the Plaintiff had substantial and ongoing claims for the maintenance, repair, and storage of the Barge ADA dating back to the point at which CDS abandoned the job site. Id. at 6.

There is some dispute between the parties as to the timing and nature of their communications immediately following the Defendant's receipt of the Plaintiff's March 3 letter. However, the parties agree that, on or about May 14, 2004, Plaintiff's counsel sent another letter to the Defendant, indicating that the Plaintiff would consider the Barge ADA abandoned if Defendant did not advise the Plaintiff as to its intentions with respect to recovering the vessel and paying for the Plaintiff's maintenance, repair, and storage of the barge. Id. The Defendant responded in a May 19, 2004 letter stating unequivocally that it was not abandoning the Barge ADA and had only failed to recover the vessel because the Plaintiff had denied Defendant's previous requests for access to the dock. Ex. 9 Def. Rule 56.1 Statement as to Countercl.

More than a year later, on or about October 27, 2005, the Defendant resorted to self-help by securing [*6] a tugboat, entering the waters surrounding the Plaintiff's dock, and recovering the Barge ADA. Mem. in Supp. Def.'s Rule 56 Mot., p. 9. The Plaintiff then filed this suit in the Supreme Court of the State of New York, after which the Defendant removed the case to this Court. Id.

## JURISDICTION AND APPLICABLE LAW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the case involves complete diversity and an amount in controversy in excess of $75,000.

## STANDARD OF REVIEW

It is well-settled that a party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir.2003). Material facts are those that may affect the outcome of the case. See Anderson, 477 U.S. at 248. An issue of fact is considered "genuine" when a reasonable finder of fact could render a verdict in favor of the non-moving party. Id. When considering a motion for summary judgment, the Court must view the evidence, as well as any inferences that may be drawn [*7] from such evidence, in the light most favorable to the non-moving party. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

If the moving party discharges its burden of proof under Rule 56(c), the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading." Anderson, 477 U.S. at 256. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248.

In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 248). If the Court recognizes [*8] any material issues of fact, summary judgment is improper, and the motion must be denied. See Eastway Const. Corp. v. City of N.Y., 762 F.2d 243, 249 (2d Cir.1985).

## DISCUSSION

### A) Motion for Summary Judgment Dismissing Plaintiff's Claims

Although the Defendant has presented a number of arguments in support of its Motion for Summary Judgment, this Court need only address the issue of whether or not a valid demise charter party existed between Defendant and CDS in order to determine whether summary judgment is appropriate in this case. For, as noted below, the case law makes clear that where a demise charter party does indeed exist, the registered owner of the vessel in question cannot be held liable for injuries caused by the use or operation of said vessel by the charterer.

In addressing the issue of whether or not a demise charter exists in a given situation, the U.S. Supreme Court has noted that the evidence indicating that such an agreement was in place must be unmistakable, particularly where the owner is seeking to avoid *in personam* liability. See Guzman v. Pichirilo, 369 U.S. 698 (1962) (party seeking to be isolated from liability based on a demise charter has the heavy burden of [*9] proving the existence of such charter; the owner in this case was not able to do so because there was no formal charter in place). To facilitate the inquiry as to whether or not a demise charter existed under the particular facts in Guzman, the Court stated that "[t]o create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demise." Guzman, at 699-700. The Court added that such an arrangement "is therefore tantamount to, though just short of, an outright transfer of ownership." Id.

Lower courts have held that, where employees of the registered owner of a vessel continue to occupy and operate the vessel, a demise charter will not shield the owner from liability. See Walker v. Braus, 995 F.2d 77, 81 (5th Cir. 1993) ("Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability.")

Consistent with the U.S. Supreme Court's ruling in Guzman, federal district courts have gone to great lengths to ensure that a demise charter actually existed, even where the [*10] parties' written agreement expresses an intent to create a demise charter. See Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc., 711 F.2d 110, 112 (8th Cir. 1983) ("...the clear intent of the charter agreement was to create a 'demise charter' and to shift liability for the negligence of the M/V FT. PIERRE from SCNO to United.... Having found that the parties intended to create a 'demise charter' by their agreement, the district court then looked to their actions for evidence of inconsistency, and further found that 'there is no extrinsic evidence of *conduct* by the parties inconsistent with the expressed intent to create a demise.'")

The court's decision in Kerr-McGee v. Law, 479 F.2d 61 (4th Cir. 1973), provides further support for the notion that the owner's liability is limited where a valid demise charter exists. Citing a number of prior cases, including two from the Second Circuit [2], the court noted that "...the owner of a vessel under a demise charter is liable only for unseaworthiness or negligence that pre-exists the charter" (citations omitted). Kerr-McGee, 479 F.2d at 63. The court went on to explain that:

> ...when the owner of the vessel enters into a demise charter, he surrenders [*11] all possession and control of the vessel to the charterer. Since he no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of its ownership. Conversely, the demise charterer "becomes subject to the duties and responsibilities of ownership." (citing Leary v. United States, 81 U.S. (14 Wall.) 607, 610, 20 L. Ed. 756 (1872)) Id.

---

2   See In re New York Dock Co., 61 F.2d 777 (2d Cir. 1932); In re Marine Sulphur Queen, 460 F.2d 89, 100 (2d Cir. 1972) (dictum).

Given the facts of the case at bar, it is abundantly clear that a demise charter did, in fact, exist between the Defendant and CDS prior to the point at which the Plaintiff contracted with CDS to repair its dock. First, it should be pointed out that the Plaintiff has never questioned the validity of the agreement between the Defendant and CDS. Hence, the Plaintiff has failed to raise any issue of material fact with respect to whether or not a valid demise charter existed between the Defendant and CDS at the time of Plaintiff's alleged injuries.

Second, the supporting documentation filed by the Defendant, including a copy of the written contract entered into by the [*12] Defendant and CDS indicate a clear intent by the parties to create a demise charter party. Ex. 1 to Def.'s Rule 56.1 Statement as to Countercl. Moreover, the subsequent actions of the parties are not inconsistent with their expressed intent to create a demise charter. The evidence suggests that, as of May 2000, the Barge ADA was in the exclusive possession of CDS. The Defendant was in no way involved in the maintenance or operation of the vessel, and was not a party to CDS's contract with the Plaintiff. Indeed, the Plaintiff seems to concede that the Defendant was not

even aware of the location of the Barge until after the CDS bankruptcy proceedings were well under way. Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 5.

Third, the demise charter was never formally terminated by Defendant or CDS, as required by the contract. Ex. 1 to Rule 56.1 Statement. Therefore, despite the fact that CDS stopped making its hire payments in November 2002, thereby prompting the initiation of a lawsuit by the Defendant, the charter--and by extension, the rights and obligations arising out of the charter--was still in effect during much of the time period for which the Plaintiff now seeks compensation. [*13] In addition, even if the charter was rendered void following the close of the CDS bankruptcy proceedings in July 2005, from that point forward it was the Plaintiff who refused to allow the Defendant to remove the barge from its dock without payment. Dep. of John Quadrozzi, Jr., p. 51.

Given all of these circumstances, this Court finds that there exists no genuine issue of material fact with respect to whether or not CDS was in possession of the Barge ADA pursuant to a valid demise charter party during the timeframe in question. Hence, the Plaintiff's *in personam* claims would be cognizable solely against CDS, in its role as charterer of the Barge ADA, and not against the Defendant.

### B) Partial Motion for Summary Judgment

According to the pleadings currently before this Court, there appear to be no genuine issues of material fact regarding whether or not the Defendant was the registered owner of the Barge ADA. Indeed, the Plaintiff's claims against the Defendant are based in large part on its assertion that the Defendant owned the Barge and is therefore liable for the services rendered to the Barge while it was in the Plaintiff's possession. It is also undisputed that, after learning that [*14] Defendant was the registered owner of the Barge ADA sometime in early 2004, the Plaintiff refused to allow the Defendant to recover or even inspect the barge unless or until the Defendant paid the Plaintiff for the services rendered. Dep. of John Quadrozzi, Jr., pages 48-52. Particularly in light of the fact that the Plaintiff and Defendant never entered into any kind of contractual agreement, the Plaintiff has presented no legal justification for withholding the Defendant's property.

However, the extent to which the Defendant was harmed as a result of the Plaintiff's withholding of the Barge ADA involves numerous issues of fact that must be resolved in further proceedings.[3]

---

3 Such proceedings will also provide an opportunity to address the Defendant's act of "self-help" in recovering the Barge ADA, and the extent to which that act should impact the damages award, if at all.

---

### C) Motion for Rule 11 Sanctions

The Defendant also argues that the Plaintiff's claims in the instant case are frivolous and were filed in an effort to retaliate against the Defendant. Moreover, the Defendant argues that the Plaintiff made certain false representations to the Court in its Memorandum of Law in Opposition [*15] to Motions for Summary Judgment and For Sanctions. Hence, the Defendant has asked the Court to impose sanctions on the Plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"). For the reasons stated below, the Court finds that, with respect to the false representations apparently made by the Plaintiff, Rule 11 sanctions are appropriate in this case.

Fed. R. Civ. P. 11(b) states that whenever a signed pleading or "other paper" is submitted to the court, an attorney certifies that:

> (1) [the paper] is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, [*16] are reasonably based on a lack of information or belief. Fed. R. Civ. P. 11(b).

It should be noted that "only conduct explicitly referred to in the instrument providing notice is sanctionable." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 334 (2d Cir. 1999). In its motion for sanctions, the Defendant does not indicate which specific section of Rule 11 was allegedly violated by the Plaintiff. However, the Defendant's allegations suggest that the Plaintiff has run afoul of Fed. R. Civ. P. 11(b)(1), (2), and (3). In par-

Case 1:07-cv-05471-BSJ-KNF   Document 27-2   Filed 06/02/2008   Page 5 of 12

Page 5
2008 U.S. Dist. LEXIS 26181, *

ticular, the Defendant suggests that the Plaintiff 1) filed this lawsuit in an effort to retaliate against the Defendant for retrieving the Barge ADA from the Plaintiff's dock, thus presenting its claims to the court for an improper purpose, thereby violating Rule 11(b)(1); 2) filed frivolous claims, in violation of Rule 11(b)(2); and 3) made a number of false statements in its pleadings, particularly regarding the nature and content of certain correspondence between the parties prior to the commencement of these proceedings.

1) Rule 11(b)(1) -- Improper Purpose

First, with respect to the Defendant's claim that the Plaintiff filed this lawsuit for an improper purpose [*17] (i.e. as a retaliatory tactic), there is nothing in the record to support such a contention. Although the Plaintiff clearly was not happy with what it characterized as the Defendant's engagement in "illegal self-help" in connection with the retrieval of the Barge ADA, it does not necessarily follow that this action was commenced in retaliation. Indeed, the prior correspondence between the parties suggests that the Plaintiff filed this suit in an earnest attempt to recover the expenses to which it believed it was entitled. Although this Court has found the Plaintiff's arguments unpersuasive, there is simply no evidence in the record that would lead the Court to believe that retaliation was the Plaintiff's motivation for filing suit.

2) Rule 11(b)(2) -- Frivolous Claims

The Defendant also argues that the Plaintiff's claims for damages from the Defendant, as opposed to CDS, are frivolous, given that the parties to this lawsuit never entered into any contract whatsoever. The Plaintiff's only cognizable claims, the Defendant contends, were against CDS. The Defendant goes on to note that, despite the fact that CDS ultimately went into bankruptcy, the Plaintiff could have pursued an *in rem* [*18] action against the vessel itself, but failed to do so. Mem. in Supp. Def.'s Rule 56 Mot., p. 8. In addition, the Defendant points out that all of the Plaintiff's claims for services against Defendant were based either on events that occurred while the barge was in the custody and control of CDS, pursuant to a valid demise charter party, or after Plaintiff was made aware that the barge was owned by the Defendant, at which point the Plaintiff prevented the Defendant from inspecting and/or recovering the barge. The Defendant argues that these facts further demonstrate the frivolous nature of the Plaintiff's lawsuit.

When determining whether or not Rule 11(b)(2) has been violated, the court must decide whether the claims or legal arguments being advanced are "so untenable as a matter of law as to necessitate sanction." Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990). More specifically, "it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." Id. It also should be noted that, even if the court finds that a party's claims are frivolous, Rule 11(c)(2) specifically prohibits monetary sanctions [*19] for such a violation. Fed. R. Civ. P. 11(c)(2).

While the Plaintiff clearly made some strategic mistakes in its efforts to recover expenses for the services it provided in connection with the Barge ADA, such mistakes do not render the current suit frivolous, though perhaps ill-advised. Moreover, while this Court has granted the Defendant's Motion for Summary Judgment based on the fact that the Defendant had relinquished control of the Barge ADA to CDS under a valid demise charter party, it is at least arguable (though erroneous in the Court's view) that the Defendant, as the registered owner of the vessel, bears some responsibility for the costs incurred by the Plaintiff after the Defendant learned of the CDS bankruptcy, as well as the location and status of the Barge ADA. For "[a] distinction must be drawn between a position which is 'merely losing' and one which is both 'losing and sanctionable.'" Securities Industry Association v. Clarke, 898 F.2d 318, 321 (2d Cir. 1990) (reversed on other grounds). Moreover, the Second Circuit has held that "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable, . . .we have instructed district courts [*20] to resolve all doubts in favor of the signer" of the pleading. Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993).

The Court finds that the Plaintiff's legal arguments, while unconvincing and poorly crafted, can not be considered frivolous as that term is understood in the context of Rule 11(b)(2).

3) False Statements

Finally, and perhaps most troubling, the Defendant maintains, and the documentary evidence confirms, that the Plaintiff included false statements in its pleadings with respect to the content of the correspondence between the parties prior to the commencement of this action. Mem. of Law in Reply, p. 2-3. In particular, the Defendant points out that the Plaintiff made "several serious misstatements of fact" in its response to the Defendant's motion for summary judgment and sanctions, which could amount to a violation of Rule 11(b)(3). Id. at 2. However, the Court has identified only one of the cited statements as warranting sanctions. Specifically, the Plaintiff states that "[o]n May 19, 2004, Donna Adelsberger responded on behalf of the defendant in a letter instructing the plaintiff to continue to hold the Barge ADA." Mem. in Opp'n to Mot. for Summ. J. and Sanctions, [*21] p. 6. However, the letter, which the Defendant filed with the Court along with its Rule 56.1

Statement as to Counterclaims, says no such thing. In fact, Ms. Adelberger's letter makes it clear that the Defendant was requesting that the Plaintiff release the vessel as soon as possible. Ex. 9 to Def.'s Rule 56.1 Statement as to Countercl. Among other things, Ms. Adelberger's letter states that she considered the barge "as good as stolen by your client." Id. She goes on to state unequivocally, "UNDER NO CIRCUMSTANCES ARE YOU TO CONSIDER THE BARGE ADA ABANDONED." Id. Finally, Ms. Adelberger informed the Plaintiff that the Defendant had "retained a local attorney in New York who will be filing the appropriate papers, not only to retrieve the barge, but also for damages for the time that [the Defendant] has been deprived of the use of his barge." Id. It is difficult to imagine language more clearly at odds with the Plaintiff's claim that Ms. Adelberger asked the Plaintiff to remain in possession of the barge.

Given these facts, the Court finds that, by making factual contentions to the Court that are completely unsupported by the evidence, the Plaintiff did indeed violate Rule 11(b)(3) and [*22] should be sanctioned accordingly. Specifically, the Court hereby directs Plaintiff's counsel to pay a fine to the Court in the amount of $ 1,000.00, to be paid in full within 30 days of this order. In addition, pursuant to Rule 11(c)(1)(A), the law firm with whom Plaintiff's counsel is employed shall be held jointly responsible for the violation described above.

Finally, the Court notes that, in addition to violating Rule 11, Plaintiff's misrepresentation also runs afoul of the American Bar Association's Model Rules of Professional Conduct ("Model Rules"). In particular, counsel's conduct flies in the face of Model Rule 3.3, which states, *inter alia,* that an attorney shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Model Rule of Prof. Conduct 3.3(a)(1). This Court takes such violations quite seriously and hereby admonishes Plaintiff's counsel for what amounts to unsavory and unethical conduct in the practice of law.

## CONCLUSION

For these reasons, the Defendant's motion for summary judgment is hereby GRANTED. The Defendant's motion for partial summary judgment [*23] with respect to its counterclaims is also GRANTED. In addition, the Defendant's Motion for Rule 11 Sanctions is GRANTED. The Court refers this matter to Magistrate Judge James Orenstein to recommend a damages award with respect to the Defendant's counterclaims, and to conduct an inquest or make any findings of fact relevant thereto.

SO ORDERED.

Dated: March 31, 2008

Brooklyn, New York

/s/ Sterling Johnson, Jr

Senior U.S.D.J.

STAPLES, INC., Plaintiff, - against- W.J.R. ASSOCIATES, CARMINE EVANGELISTA, ROBERT H. KANE, PATRICIA A. REINHARDT as Executrix of the Estate of William J. Reinhardt, JAMES SLUYK and TIMOTHY D. KING, Defendants. W.J.R. ASSOCIATES and PATRICIA A. REINHARDT as Executrix of the Estate of William J. Reinhardt, Third-Party Plaintiffs, - against- REALTY EQUITY HOLDINGS 3820, LLC, NORSTRAND REALTY HOLDINGS, LLC, TIM ZISS, individually and in his capacity as Managing Member of Realty Equity Holdings 3820, LLC, MASSEY KNAKAL REALTY SERVICES, INC., and STATE STREET BANK & TRUST COMPANY, Third-Party Defendants.

04 CV 904 (SJ) (KAM)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2007 U.S. Dist. LEXIS 24770

March 30, 2007, Decided
March 30, 2007, Filed

**SUBSEQUENT HISTORY:** Magistrate's recommendation at Staples, Inc. v. W.J.R. Assocs., 2007 U.S. Dist. LEXIS 65211 (E.D.N.Y., Sept. 4, 2007)
Reconsideration denied by Staples, Inc. v. W.J.R. Assocs., 2007 U.S. Dist. LEXIS 67539 (E.D.N.Y., Sept. 7, 2007)

**PRIOR HISTORY:** Staples, Inc. v. W.J.R. Assocs., 2007 U.S. Dist. LEXIS 24769 (E.D.N.Y., Mar. 30, 2007)

**COUNSEL:** [*1] CERTILMAN, BALIN, ADLER & HYMAN, LLP, East Meadow, NY, By: Robert Connolly, Esq., Attorney for Third-Party Plaintiff.

ARONAUER, GOLDFARB, RE & YUDELL, LLP, New York, NY, By: John C. Re, Esq., Attorneys for Third-Party Defendant.

**JUDGES:** JOHNSON, Senior District Judge.

**OPINION BY:** JOHNSON

**OPINION**

**MEMORANDUM AND ORDER**

JOHNSON, Senior District Judge:

Plaintiff Staples, Inc. ("Staples"), a Delaware corporation that maintains its principal place of business in Massachusetts, brings this action against W.J.R. Associates ("WJR"), a New York-based partnership, and other New York residents alleging breach of commercial lease, breach of warranties, and unjust enrichment. In this third party action, WJR asserts that State Street Bank & Trust Company ("State Street"), inter alia, tortiously interfered with WJR's ability to perform on its contract with Staples and breached its contract with WJR. State Street now moves for summary judgment and sanctions. For the reasons stated herein, the motion for summary judgment is GRANTED and the motion for sanctions is GRANTED but only to the extent of costs incurred in filing the instant motions.

**I. BACKGROUND**

On or about April 27, 1998, WJR [*2] gave a mortgage on the property at 1740 Utica Avenue, Brooklyn, New York, to Citibank, which assigned the mortgage to State Street. In November 2000, WJR defaulted on the mortgage. State Street obtained a foreclosure judgment against WJR in 2002, but chose not to go forward with a foreclosure sale. WJR and State Street entered into a contract by which State Street would forbear on its right to sell the property until May 30, 2002, so that WJR could obtain the financing to purchase the loan documents.

WJR entered into a lease agreement with Staples for the property at 1740 Utica Avenue. WJR alleges that Staples was aware of the foreclosure judgment, and requested a Subordination and Non-Disturbance Agreement ("SNDA") in order to protect its rights as the lessee in the event that WJR lost its interest in the property. WJR furthers alleges that it was State Street's responsibility to provide the SNDA.

On May 30, 2003, WJR was set to close a financing deal with Banco Popular, but Timothy King, one of

Case 1:07-cv-05471-BSJ-KNF   Document 27-2   Filed 06/02/2008   Page 9 of 12

Page 2
2007 U.S. Dist. LEXIS 24770, *

WJR's partners and its representative for the financing deal, did not appear. The closing was rescheduled to June 2, 2003, and State Street agreed to continue to forbear on its right to [*3] conduct a foreclosure sale. On June 2, 2003, King again failed to appear at the closing. State Street had previously contracted to sell the property to Tim Ziss, managing member of Realty Equity, in the event that WJR was unable to obtain the financing necessary to purchase the loan documents. After June 2, 2003, State Street sold the property to Ziss in a foreclosure sale.

In its Third-Party Complaint, WJR alleges that State Street violated the terms of the forbearance contract and tortiously interfered with its dealings with Staples by failing to provide the SNDA and refusing to accept payment on June 2, 2003. State Street has moved for summary judgment on the grounds that: (1) by virtue of U.S. Bank National Association's ("U.S. Bank") acquisition of State Street's trust business in December 2002, State Street is the incorrect party for a claim based on a transaction that occurred in May and June of 2003 and (2) WJR's claims are contradicted by documentary evidence.

## II. JURISDICTION

This Court has jurisdiction over the original action between Staples and WJR because that case involves complete diversity and a demand in excess of $ 75,000. 28 U.S.C. 1332(a)(2) [*4] . Under 28 U.S.C. § 1367(a),

> [e]xcept as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. 1367(a). Accordingly, this Court asserts supplemental jurisdiction over the instant action.

## III. SUMMARY JUDGMENT

### A. STANDARD

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court views the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). [*5] If there is enough evidence such that a jury could return a verdict for the nonmoving party, then there is a genuine dispute as to a material fact. Id.

A party seeking summary judgment bears the initial burden of establishing the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant must identify the portions of the pleadings and discovery that demonstrate the absence of a genuine dispute of material fact. Id. When the movant's opponent will bear the burden of proof at trial, the movant can prevail merely by demonstrating a lack of evidence to support the opponent's claim. Id. at 325. If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

### B. DISCUSSION

#### 1. Is State Street the correct party?

Defendant State Street contends that, as a result of U.S. Bank's acquisition of State Street's trust business in December 2002, it cannot be held responsible for anything that occurred in April 2003. While Defendant State Street's argument seems correct, [*6] it is easy to see why there is considerable confusion as to whether State Street is the correct party. Based on the parties' exhibits, although U.S. Bank acquired State Street's trust business, it decided to retain not only State Street's business character, but also its legal counsel and personnel. See, e.g., Beard Aff. at P 1-2. By way of analogy, this is akin to a McDonald's changing its name to McDowell's, but having the same people continue to sell hamburgers. One could be excused for thinking that McDowell's and McDonald's were one and the same.

The only evidence of U.S. Bank's acquisition of State Street's trust business is provided in affidavits of representatives of State Street, and this Court is reluctant to rely on a party's self-serving statements in furtherance of a motion for summary judgment. The issue is complicated by a letter dated April 1, 2003, which indicates that State Street was still the trustee for WJR's mortgage. Defendant State Street passes this letter off as a simple drafting error. This Court is reluctant to accept such an explanation in deciding a motion for summary judgment.

However, even were this Court to decide that State Street is the incorrect [*7] party, WJR would presumably merely amend its Third Party Complaint to include U.S. Bank. In that situation, we would inevitably arrive

Case 1:07-cv-05471-BSJ-KNF   Document 27-2   Filed 06/02/2008   Page 10 of 12

Page 3
2007 U.S. Dist. LEXIS 24770, *

at the same point we are at now, that being a motion for summary judgment based on a lack of evidence to support the claim. Accordingly, we ignore the issue of whether State Street is the correct party to avoid this inevitable redundancy, and turn immediately to the question of whether there is any support for WJR's claims against the trustee for the mortgage.

**2. WJR has failed to produce any evidence to support its claims**

WJR's claims that the Trustee [1] breached its contract/fiduciary duty and tortiously interfered with WJR's business relationship. The Trustee moves for summary judgment on the grounds that WJR has failed to provide any evidence of its claims and that, in fact, WJR's claims are contradicted by the record. Celotex, 477 U.S. at 323.

> 1   Even though the issue of whether the proper party is State Street or U.S. Bank has not been decided, the parties agree that the entity that acted as the trustee for the mortgage was either State Street or U.S. Bank. Therefore, the entity that acted as the mortgagee is hereinafter referred to as "the Trustee."

[*8] **a. Breach of Contract/Fiduciary Duty**

As a matter of law, there is a breach of contract when one party to the contract performs its obligation but the other party wrongfully refuses to accept performance. See 1776 Assoc. Corp. v. Broadway West 57th Street Assoc., 181 A.D.2d 601, 585 N.Y.S.2d 316 (1st Dept. 1992). WJR claims that the breach of contract occurred when the Trustee constructively refused to accept payment from WJR's lender, Banco Popular, on June 2, 2003. However, this allegation is contradicted by the record. In a letter dated July 15, 2003, Ralph Bumbaca, vice president for Banco Popular, informed WJR that it was prepared to close on the refinancing loan, but it could not close the deal because King was absent and otherwise failed to "provide consent for the partnership to incur debt." Re Aff. Ex. Q. The same reason is given for the failure to close on June 2, 2003. Id. Nowhere in the letter does Mr. Bumbaca indicate that John Dinan, the Trustee's representative, refused to receive payment until after Dinan was able to confer with King.

WJR points to the affidavit of Mark Noto, senior vice-president at Banco Popular, as evidence that the Trustee refused to [*9] accept the payment. Specifically, WJR points to the portion of Mr. Noto's affidavit in which he asserts that he contacted "Mr. Dinan to reassure him that we would close today and make their deadline. He stated that first he needed to speak with King before any funds could be accepted." Noto Aff. at P 8. However, Noto also states that because "we were unable to reach Dinan or Mr. King the closing did not occur." Id. at P 9 (emphasis added). Even had Dinan faithfully returned each and every one of Noto's calls, the deal could not have closed because King was unavailable. And as the Trustee correctly points out, it would be absurd to assume that Banco Popular would loan millions of dollars to WJR without a representative of the partnership present at or consenting to the closing. The simple fact is that WJR was in no position to make payment on June 2, 2003, regardless of Banco Popular's willingness to aid it in that act. Accordingly, the Trustee cannot be held liable for a breach of contract for failing to accept proper performance because the undisputed record shows that WJR was unable to tender payment on June 2, 2003. [2]

> 2   WJR further contends that it was prepared to purchase the loan documents on June 2, 2003, but the Trustee prevented it from delivering payment because it refused to provide the necessary wire instructions. This, too, is contradicted by the record. In a letter dated May 20, 2003, the Trustee provided WJR's counsel with all the information necessary to wire the funds.

[*10] Further, WJR suggests that the Trustee breached the contract by refusing to accept performance after June 2, 2003. However, once the June 2, 2003, deadline had passed, the Trustee was no longer under any obligation to forbear on its right to sell the property. Therefore, even if WJR offered payment on June 4, 2003, which the record indicates it did not, [3] the Trustee had no obligation to accept payment because WJR had already failed to perform within the time limitations set by the contract.

> 3   Mr. Bumbaca's letter indicates that Banco Popular was prepared to close the refinancing loan on June 4, 2003, but King was not present on that day either.

Because there is no factual basis to believe that the Trustee breached a contract/fiduciary duty, the Trustee is entitled to summary judgment.

**b. Tortious Interference**

The Trustee contends that the evidence is insufficient to support a claim of tortious interference. In order to state a claim for tortious interference with prospective economic advantage, a [*11] plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted towards intentional, unjustified procurement of a breach of the third-party contract; and (4) injury to the relationship. See Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 646

N.Y.S.2d 76 (1996); see also Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir.1994).

In WJR's Third-Party Complaint, WJR claims that the Trustee tortiously interfered with its contract with Staples because the Trustee failed to provide the SNDA "so that the successor mortgagee [...] would not be bound or obligated under the existing lease with Staples." Compl. at P 51. It is now undisputed that the Trustee did, in fact, provide the SNDA. Re Aff. Exs. J and L. WJR admits that its claim for tortious interference for failing to provide the SNDA is factually invalid. WJR Mem. of Law at pp. 8-9.

WJR further contends that the Trustee was part of a conspiracy between King and Ziss to wrest control of the property from WJR in which King would willfully absent himself from the refinancing closing so that Ziss could purchase the property in a foreclosure [*12] sale. There are several problems with this accusation. First, even assuming that there was a conspiracy, there is absolutely no evidence that the Trustee was involved. Indeed, much of the evidence points to a contrary conclusion. For example, if the Trustee did have a hand in the conspiracy, there would be no reason for it to grant an extension from May 30, 2003, to June 2, 2003. Indeed, if the Trustee was complicit in the conspiracy, it would have anticipated King's absence on May 30, 2003, and would immediately move to strictly enforce the deadline.

Second, there is no evidence that the Trustee acted in bad faith. The Trustee had the authority to commence a foreclosure sale at any time it wished, and had no obligation to agree with WJR to delay that action. Connolly Decl. Ex. D. Even so, the Trustee entered into an agreement under which the Trustee agreed to sell the loan documents to WJR so long as payment was received before a certain deadline. Connolly Decl. Ex. M. WJR also suggests that the Trustee's negotiations with Ziss displayed bad faith because the Trustee already had an agreement in place with WJR. However, the Trustee's dealings with Ziss can only be described as a backup [*13] plan in the event that WJR would be unable to obtain the financing necessary to pruchase the loan papers. This is entirely consistent with the Trustee's eagerness to resolve the defaulted mortgage quickly and sell the property as soon as possible. Connolly Decl. Ex. K.

Third, WJR fails to point to any evidence that the Trustee had anything to gain from the conspiracy. Arguably, there is evidence of a conspiracy between King and Ziss, such as the check that Ziss made out to King in the amount of $ 215,000, but there is no indication that any payment was made to the Trustee or that the Trustee had anything to gain from selling the loan documents to Ziss instead of WJR.

Therefore, there is no evidence that the Trustee had any involvement in the failure to close the refinancing deal. In fact, it is clear from WJR's own exhibits that the failure to close the refinancing deal was not caused by the Trustee, but rather by the infighting between partners of WJR. Connolly Decl. Ex. R. As a result, no reasonable juror could conclude that the Trustee tortiously interfered with WJR's contract with Staples, and the Trustee is entitled to judgment as a matter of law.

## IV. SANCTIONS

State [*14] Street seeks an award of costs and counsel fees pursuant to Federal Rule of Civil Procedure 11 ("Rule 11"), 28 U.S.C. § 1927 and the Court's inherent power on the ground that WJR's counsel, by continuing with this third-party action, has maintained an action despite the fact that its claims have been refuted by documentary evidence.

The district court's power to impose sanctions, whether under § 1927 or pursuant to its inherent authority, is discretionary, and will only be reviewed for an abuse of discretion. See Di Silvestro v. United States, 767 F.2d 30, 32 (2d Cir.1985) (per curiam) (applying an abuse of discretion standard in reviewing district court's decision). However, under any rubric, courts should exercise great caution when determining whether sanctions are appropriate. See Knipe v. Skinner, 19 F.3d 72, 78 (2d Cir.1994) ("Rule 11 sanctions should be imposed with caution"); Mone v. Commissioner, 774 F.2d 570, 574 (2d Cir.1985) (§ 1927 "should be construed narrowly and with great caution"); Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (the inherent [*15] power of the federal courts "ought to be exercised with great caution").

Courts may impose sanctions pursuant to their inherent authority to punish "conduct which abuses the judicial process." Chambers, 501 U.S. at 44-45. Also, § 1927 permits attorneys who engage in reasonable or vexatious litigation to be held personally liable for the excess costs and attorneys' fees their conduct causes. However, in order to impose sanctions pursuant to § 1927 or the court's inherent authority, the movant must make a "clear showing of bad faith." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir.1986). State Street has failed to make such a showing and thus sanctions under § 1927 or pursuant to the Court's inherent authority would be inappropriate.

However, under Rule 11, sanctions *must* be awarded when a competent attorney could not have formed a belief after reasonable inquiry that the claims were "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Fed. R. Civ. P. 11(b)(2). Further, Rule 11 authorizes

Case 1:07-cv-05471-BSJ-KNF    Document 27-2    Filed 06/02/2008    Page 12 of 12

Page 5
2007 U.S. Dist. LEXIS 24770, *

sanctions for pleadings that are entirely frivolous [*16] or submitted "for any improper purpose, such as to harass or to cause unnecessary delay or *needless increase in the cost of litigation.*" Fed.R.Civ.P. Rule 11(b)(1) (emphasis added). Moreover, the objective inquiry required by Rule 11 does not require a finding of bad faith. See Eastway Constr. Corp. v. New York, 762 F.2d 243, 254 (2d Cir.1985).

It is patently clear that WJR had absolutely no chance of success once discovery had been completed because the documentary evidence clearly showed that the Trustee had delivered the SNDA, had given WJR the wiring information, and had honored its contract with WJR. In such a case, Rule 11 has been violated and sanctions are appropriate.

State Street requests sanctions in the amount of $ 72,085.05 for participating in this action, bringing the motion for summary judgment, and bringing the motion for sanctions. However, this request is excessive. Under Rule 11, sanctions should be "limited to what is sufficient to deter repetition of such conduct." Fed. R. Civ. P. 11(c)(2). This Court finds that WJR should not have pursued an action against State [*17] Street after it became clear that there was no factual basis for its claims. This should have been clear to WJR's attorneys on April 14, 2006, the date of a letter from State Street's attorney's to WJR's attorneys which included documentary evidence that contradicted the last of WJR's remaining claims. Therefore, sanctions are granted only for the attorney's fees incurred in bringing the motion for summary judgment and the motion for sanctions.

## V. CONCLUSION

For the forgoing reasons, State Street's motion for summary judgment is hereby GRANTED. State Street's motion for sanctions is also granted, but only as to costs incurred in filing the two instant motions.

SO ORDERED.

Dated: March 30, 2007

Brooklyn, New York