JUDGE JONES

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL B. GRAVES,<br><br>Plaintiff,<br><br>v.<br><br>DEUTSCHE BANK SECURITIES, INC.,<br><br>Defendant. | CIVIL ACTION NO. **07 CIV 5471**<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF<br><br>**Jury Trial Demanded** |

### A.    Jurisdiction and Venue

1.  This is an action to enforce the Age Discrimination in Employment Act of 1968 (hereinafter, "ADEA"), 29 U.S.C. §§ 621 *et seq.*, as amended, the anti-retaliation provision of that Act, 29 U.S.C. § 623(d), the anti-retaliation provision of the Fair Labor Standards Act of 1938 (hereinafter, "FLSA"), 29 U.S.C. § 215(a)(3), the additional remedies provided by 29 U.S.C. § 216(b), as amended, and the New York City Human Rights Law (hereinafter "City Human Rights Law"), Title 8 of the Administrative Code of the City of New York, §§ 8–101 *et seq.*

2.  Jurisdiction over this action is established under §§ 7(b) and (c) of the ADEA, 29 U.S.C. §§ 626(b) and (c); under §§ 16(b) and 17 of the FLSA, 29 U.S.C. §§ 216(b) and 217, and under 28 U.S.C. § 1331. Plaintiff also seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

3.  Plaintiff's claims under the City Human Rights Law arise from the same operative facts and involve the same legal analysis as plaintiff's claims under Federal law, and are so closely related to his claims under Federal law that they form part of the same case or

controversy. This Court has supplemental jurisdiction over plaintiff's claims under the City Human Rights Law by virtue of 28 U.S.C. § 1367(a).

4. Plaintiff is a resident of the State of New Jersey. Defendant Deutsche Bank Securities, Inc., is incorporated in Delaware, and its principal place of business is in New York. The amounts in controversy for plaintiff's City Human Rights Law claims and each of his State-law claims exceeds $75,000, exclusive of interest and costs. This Court also has jurisdiction over plaintiff's City Human Rights Law claims under 28 U.S.C. § 1332(a)(1).

5. The principal United States executive offices of defendant Deutsche Bank Securities, Inc., are located at 60 Wall Street, New York, New York, and are within the Southern District of New York. Plaintiff was employed in that office, and a substantial part of the actions and omissions giving rise to this suit occurred within the Southern District of New York. The appropriate venue for this action is the Southern District of New York, pursuant to 28 U.S.C. § 1391(b).

**B.** **Summary of the Case**

6. Plaintiff Daniel Graves was a senior investment banker who worked as a Managing Director, was successful on the job, had received excellent performance reviews by defendant and, those same performance reviews admit, was well-positioned to bring significant new transactions and significant new revenues into the Media Investment Banking Group where he worked. He was, however, more than 40 years old, having been born on February 28, 1962. Defendant wanted to reduce the age of its team, and engaged in a thorough and premeditated form of age discrimination.

7. First, it selected four younger replacements— Elizabeth Chang (age 33), David Dunn (age 34), Blair Faulstich (age 33), and Eric "Zach" Maurus (age 33)—and promoted them in late 2002 or early 2003 from Vice President to Director. As Vice Presidents, they had had no clients

- 2 -

of their own and no revenue targets. As Directors, they had revenue targets of $15 million a year and needed to develop clients. See ¶¶ 27–28 and 30–33 at pp. 10–11 below.

8.   Second, defendant fired a 41-year-old Director with such a target, making the additional revenue demand on the Group $45 million a year. See ¶¶ 29–30 at p. 10 below.

9.   Third, defendant considered which older employees the younger Directors would replace, focused on plaintiff and an even older employee, and ultimately decided to replace plaintiff in early 2004. See ¶¶ 32–33 at pp. 10–11 below.

10. Fourth, defendant engineered its future cover-up. The cover-up had several parts, all of which were geared to creating the appearance of age-neutral reasons for the discharge:

      a.     Defendant transferred some of plaintiff's clients to other bankers, over his protest and without any business reason. Each was a top fee-generating client, and their loss was intended to reduce his revenues and his business prospects. The first transfer was to a comparably-aged man, to make the appearances look better. The second was to a 36-year-old colleague. Plaintiff complained internally about this as soon as he found out, and for the first time went to persons with authority over his supervisor. He mentioned this and an earlier transfer. The third was shortly before plaintiff's discharge, and helped make his prospects look worse. Plaintiff complained internally about this as well. See ¶¶ 34–38 at pp. 11–12, and ¶¶ 45–51 at pp. 14–15, below.

      b.     Defendant asked 33-year-old Elizabeth Chang to talk to plaintiff to try to get his agreement to transfer some of plaintiff's clients to her. See ¶¶ 39 and 41–43 at pp. 12–13 below.

c.     Defendant asked another 33-year-old, Blair Faulstich, to talk to plaintiff to try to get his agreement to transfer at least one of plaintiff's clients to him. See ¶¶ 40–43 at pp. 12–13 below.

d.     Defendant refused to credit plaintiff with prospective deals, ignored requests to configure its Client Manager software to ensure that plaintiff would be able to receive credit for work he was doing developing transactions, and affirmatively configured its Client Manager software to ensure that plaintiff would not be able to receive credit for work he was doing developing transactions for one client. These actions were intended to make plaintiff's prospects look worse. See ¶¶ 66–73 at pp. 22–24 below, and subparagraphs (g) and (h) of this paragraph.

e.     Defendant violated its own rules by re-allocating 2003 revenue to 2002 (where plaintiff had already met his $10 million revenue target) to make it more difficult for plaintiff to meet his 2003 $15 million revenue target. See ¶¶ 52–55 and 57 at pp. 15–18 below.

f.     Defendant also refused to credit part of the 2003 revenue plaintiff had obtained for it, artificially reducing this measure of his performance. See ¶¶ 56–57 at pp. 17–18 below.

g.     Defendant refused to credit most of plaintiff's prospective transactions for his 2003 "pipeline," making his business prospects look worse. See ¶¶ 59–62 at pp. 18–20 below.

      b.     Defendant refused to credit most of plaintiff's prospective transactions for his 2004 "pipeline," making his business prospects look worse. See ¶¶ 63–65 at pp. 20–22 below.

11. Fifth, defendant fired plaintiff without cause on January 14, 2004, explaining to him that his clients were "needed for the younger bankers." Defendant also gave him the pretextual explanation the decision to let him go was based on a non-existent "last-in, first-out" policy. In fact, bankers in their early thirties with far less success were retained. This was done despite the fact that plaintiff's revenues and business prospects were among those in the top half of his Group. Plaintiff complained of age discrimination internally. See ¶¶ 74–77 at p. 24 below.

12. Defendant denied plaintiff the bulk of his annual compensation—the bonus he had earned for his work in 2003—having concealed its long-term plan to replace him with the younger bankers and inducing him to continue working by concealing its intent to deprive him of the bonus. This was both fraud by concealment and breach of the duty of good faith and fair dealing as to the bonus. Several days after plaintiff complained of age discrimination, defendant refused to reconsider this decision. This was retaliation. See ¶¶ 78–86 at pp. 24–28 below.

13. Defendant had no individualized reason to require plaintiff to leave immediately, gave him seventeen days' notice, delayed announcing the firing within the Group, and had him continue to work for clients in the interim before his scheduled ending date of January 31, 2004. Plaintiff's supervisor initially said he would back plaintiff's request to be allowed to stay on for several months at reduced pay or no pay, to give him an opportunity to have a "soft landing" by obtaining a comparable job elsewhere. Despite the demonstration of trust and confidence in giving plaintiff work to perform during the seventeen days, defendant refused to allow him this

opportunity for a "soft landing" because he had complained about age discrimination. This was retaliation. See ¶¶ 87–94 at pp. 28–30 below.

14. Sixth, after plaintiff filed his charge of age discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), defendant filed a Position Statement with the EEOC that attempted to continue the cover-up. It did so by the knowing presentation of untrue statements, including statements about plaintiff it knew to be false, statements about the nature of plaintiff's transactions it knew to be false, statements about the revenues plaintiff had obtained for defendant it knew to be falsely low, statements about plaintiff's "pipeline" business prospects it knew to be falsely low, statements about the revenues and business prospects of other bankers that it inflated by double- or triple-counting the same revenues, by the use of apparently made-up numbers, and by apparently back-dating a document. See ¶¶ 95–124 at pp. 30–53 below.

15. Plaintiff seeks reinstatement under protective conditions, a declaration of his rights and defendant's wrongs, back pay, liquidated damages, prejudgment interest where available, punitive damages where available, attorneys' fees and costs, and such other relief as may be proper.

C.    **Parties**

16. Plaintiff is a citizen of the United States and a resident of the State of New Jersey. He was born on February 28, 1962, and at all times since February 28, 2002, was 40 or more years old. During the period of his employment, plaintiff was an employee engaged in providing investment banking services to companies throughout the United States and abroad. At all times from 2002 to January 31, 2004, Plaintiff was working for defendant in New York City, was engaged in interstate and foreign commerce, and was covered by § 3(e)(1) of the FLSA, 29 U.S.C. §§ 203(e)(1).

- 6 -

17. Defendant Deutsche Bank Securities, Inc., is a wholly-owned subsidiary of Deutsche Bank, A.G. Deutsche Bank, A.G., is a global investment bank with more than 73,000 employees and more than 1,700 branches in 73 countries. It has nine branches in New York City alone.

18. Defendant Deutsche Bank Securities, Inc., has at all times from 2002 to the present provided investment banking services to companies throughout the United States and abroad. It has at all times from 2002 to the present been an enterprise engaged in commerce, had employees engaged in commerce (including plaintiff throughout his period of employment), and has had an annual gross volume of sales made or business done that is considerably in excess of $500,000. It has at all times from 2002 to the present had at least 20 employees within the United States for each working day in each week of the year. At all times from 2002 to the present, it has been an employer within the meaning of § 11(b) of the ADEA, 29 U.S.C. § 630(b), and within the meaning of § 3(d) of the FLSA, 29 U.S.C. § 203(d). At all times from 2002 to the present, it has been a covered enterprise within the meaning of § 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1).

19. Defendant Deutsche Bank Securities, Inc., has at all times from 2002 to the present had four or more employees within New York City, and is an employer within the meaning of the City Human Rights Law, § 8–102 of the New York City Administrative Code.

## D.     Statement of the Case

### 1.     Plaintiff's Education and Employment

20. Plaintiff graduated from the University of Maryland in December 1984, with the degree of Bachelor of Science in the dual majors of Finance and of Management Science and Statistics. He obtained his Master's of Business Administration degree from the University of Chicago Graduate School of Business in June 1990, with a major in Finance and a minor in Accounting.

21. Plaintiff worked for Arthur Andersen & Co., Inc., in Washington, D.C., from 1985 to 1988 as a Staff Consultant in the Information Consulting Division.

22. Plaintiff worked for Salomon Brothers Inc. in New York City as a Summer Associate, Associate and Vice President, primarily in the Media Investment Banking Group, from 1989 through 1994. In these positions, plaintiff executed a large number of investment banking transactions for broadcast, cable, cellular, and newspaper companies in the United States. During this time, he was also a core member of the investment banking team that completed the first initial public offering for a cable company, International CableTel, Inc., whose primary business operations were in the United Kingdom.

23. Plaintiff worked for Merrill Lynch & Co., Inc., in New York City, from 1994 to March 1999. He started as a Vice President and was promoted in 1998 to the position of Director. During his tenure, he spent all of his time working in the Telecommunications Media and Technology group or group with the same function and a similar name. In this capacity, he assisted Merrill Lynch's London-based personnel in forming a UK Cable practice domiciled in London and in developing relationships with companies whose primary business was providing cable television services in the UK. He was the principal New York-based employee responsible for executing investment banking transactions for Merrill Lynch's UK Cable clients. In addition, he assumed the start-up position of Head of Merrill Lynch's U.S. Broadcasting Practice in 1995, and spent three years overseeing all of Merrill Lynch's transactions in that area. In that capacity, he originated and executed transactions for both radio and television companies. In 1998, he was the Merrill Lynch investment banker chiefly responsible for executing Merrill's management of the initial public offering of the radio company Infinity Broadcasting Corporation, the largest initial public offering in the history (to that time) of a U.S. broadcasting company. Also in 1998,

Mr. Graves was the principal Media Investment Banking Group employee working on Merrill Lynch's refinancing of United Artists Theatre Circuit, Inc., the largest cinema operator in the United States at the time. During this transaction, Mr. Graves worked closely with Christopher Johnson, who later joined defendant as well.

24. Plaintiff began working for BT Alex Brown, Inc., a unit of Bankers Trust Co., on March 31, 1999, as a Principal, with a written agreement that he would be promoted to Managing Director during the next promotion cycle. Jeffrey Amling was his supervisor.

25. Bankers Trust and Deutsche Bank merged in 1999. Plaintiff's work unit, the Media Investment Banking Group, was transferred to defendant Deutsche Bank Securities, Inc., on June 14, 1999. Mr. Amling headed the Media Investment Banking Group, or group with the same function and a similar name. Plaintiff was promoted to Managing Director, as prescribed in his agreement, during his first promotion cycle at defendant at the end of 1999 or beginning of 2000. During his employment, plaintiff originated and executed investment banking transactions in the radio, television, cable, satellite radio, and newspaper industries. Plaintiff was the Senior Investment Banker ("SIB") for clients in all of these industries. In addition to working in many Media industries, plaintiff was also asked to assist other Media Investment Banking Group professionals as a mergers and acquisitions specialist. Within the Media Investment Banking Group, plaintiff rarely worked on the same transactions as Gregory Paul and worked most often with Elizabeth Chang. He worked on transactions involving every major investment banking product, across all types of media companies. He started new relationships for, and brought new clients to, defendant. He performed in accordance with the highest standards.

26. Mr. Amling was responsible for reviewing plaintiff's performance, and was responsible for aggregating the input of the other agreed-upon providers of plaintiff's

performance evaluation for defendant's standardized "upward and downward performance review" process. Mr. Amling reported to James DeNaut and Jacques Brand. Plaintiff had frequent interactions with Mr. DeNaut and Mr. Brand and these interactions at times involved plaintiff's performance and the performance of the Media Investment Banking Group. Mr. DeNaut and Mr. Brand reported to Richard Byrne and Thomas Gahan. Plaintiff had known both of these individuals as well as Christopher Johnson while at Merrill Lynch. Plaintiff had frequent interactions with Mr. Byrne and Mr. Johnson while executing transactions. Mr. Johnson was one of many providers of "upward and downward feedback" in plaintiff's annual performance reviews. Plaintiff's performance reviews while employed at defendant Deutsche Bank Securities, Inc., were all very good.

### 2.     The Promotion of Younger Bankers

27. At the end of 2002 or early 2003, defendant promoted four young Vice Presidents to positions as Directors in the Media Investment Banking Group: Elizabeth Chang (age 33), David Dunn (age 34), Blair Faulstich (age 33), and Eric "Zach" Maurus (age 33),

28. Vice Presidents did not have Franchise Revenue targets. Directors and Managing Directors alike had $10 million Franchise Revenue targets in 2002, and $15 million Franchise Revenue targets for 2003 and thereafter.

29. Defendant fired Ellen Silver, a Director in the Media Investment Banking Group, on January 30, 2003, at the age of 41.

30. The effect of the 2003 termination and four promotions for 2003 was an additional Franchise Revenue target burden of $45 million on the Media Investment Banking Group's existing client base.

31. Even if overall Media industry business activity had not slumped in 2003, making new client generation more demanding, it would have been difficult or impossible for the Media

Investment Banking Group as a whole to have added $45 million to its Franchise Revenue

targets from its existing client base.

32. On information and belief, defendant planned in 2002, in advance of these

promotions, to fire plaintiff or another older banker and to re-allocate the selected older banker's

clients so that the older banker would not be able to meet the $15 million Franchise Revenue

target for 2003 or have a good pipeline for 2004, providing an excuse for his or her termination.

33. In effect, younger investment bankers were hired and groomed as part of a plan to

replace plaintiff, and he was fired when defendant thought they were ready to take over his

business

### 3.    Defendant's Direct Reassignment of Plaintiff's Adelphia Client to a Younger Banker

34. On or before May 27, 2003, plaintiff's Adelphia client was transferred to Dyan Triffo,

who was 36 years old at the time. Plaintiff was 41.  Mr. Amling did not state that he had based

this decision on any problem in plaintiff's performance, but explained the transfer to plaintiff by

stating that Ms. Triffo had not met her 2002 targets while she took extended leave, and had no

hope of meeting her 2003 target while she was expecting to be on leave again. Mr. Amling

further told plaintiff that Adelphia was a good client for Ms. Triffo because it was likely to be

dormant in 2003 while she was on an expected maternity leave, but had potential for 2004 when

she was expected to be back full-time.  Adelphia was a valuable long-term client, ranking first on

defendant's list of the "Top 25 fee generators with fees in 2 of the past 3 years," as shown on p.

18 of defendant's "Business Planning & Development: Media Summary for all Americas As of

September 30, 2003."

35. Defendant's October 6, 2004, Franchise – Revenue Pipeline statement, provided to

the EEOC as Exhibit J to its Position Statement, admitted that Adelphia produced two deals that

- 11 -

had by September 2004 already resulted in 2004 revenue in the amount of 2,076,000 Euros.

Defendant's favoritism for a younger banker prevented plaintiff from booking that revenue.

36. On April 23, 2004, Adelphia announced that it was seeking to be acquired and the Wall Street Journal announced that this could be a $20 billion deal. But for defendant's favoritism for a younger banker, plaintiff could have tried to obtain that business for defendant.

37. There was no business justification for the transfer of this client. Plaintiff had worked on assignments for Adelphia prior to 1994, and Ms. Triffo had had no prior involvement with this client.

38. Plaintiff complained of this client transfer to Mr. Amling on May 28, 2003, after plaintiff learned of the transfer. Plaintiff also complained of this and an earlier client transfer to James DeNaut, one of Mr. Amling's superiors, on June 2, 2003.

### 4.   Defendant's Indirect Efforts to Transfer Plaintiff's Clients to Younger Bankers

39. During 2003, Elizabeth Chang (age 33), approached plaintiff and informed him that Mr. Amling had asked her to talk to plaintiff and suggest that he transfer some of his clients to her. She asked plaintiff for his XM Satellite Radio and other clients, including Salem Communications.

40. Blair Faulstich (age 33), also approached plaintiff and informed him that Mr. Amling had asked him to talk to plaintiff and suggest that he transfer his XM Satellite Radio client to him.

41. Defendant never explained to plaintiff why it wanted either of these younger bankers to replace him.

42. During 2003, plaintiff was working on two transactions involving XM Satellite Radio for an aggregate amount of $2,000,000 in the Franchise Revenues 2004 pipeline. Plaintiff did

not transfer the client. If he had, he would not have been given credit for these transactions in
the Franchise Revenues 2004 pipeline, or in subsequent Franchise Revenues received.

43. Even though plaintiff had not transferred the client to either of these younger bankers,
he was still not given credit for these prospective transactions in the Franchise Revenues 2004
pipeline shown in Exhibit F to defendant's Position Statement to the EEOC.

E.    **Exchange Rates**

44. Many of defendant's documents provided in its November 5, 2004, Position
Statement to the U.S. Equal Employment Opportunity Commission (hereinafter, "EEOC")
expressed results in Euros, particularly in Exhibit C (dated January 15, 2003), Exhibit F (dated
January 8, 2004), and Exhibit J (dated October 6, 2004).

a.    Using the Federal Reserve Bank of New York's Foreign
Exchange Rates Historical Search data for noon on January 15, 2003, one Euro
was worth 1.0576 U.S. dollars on that date.

b.    Using that value, the $10 million Franchise Revenues target
for 2002 was 9,455,371 Euros on January 15, 2003.

c.    Using the Federal Reserve Bank of New York's Foreign
Exchange Rates Historical Search data for noon on January 8, 2004, one Euro was
worth 1.2772 U.S. dollars on that date.

d.    Using that value, the $ 15 million Franchise Revenues
target for 2003 was 11,744,441 Euros on January 8, 2004.

e.    Using the Federal Reserve Bank of New York's Foreign
Exchange Rates Historical Search data for noon on October 6, 2004, one Euro
was worth 1.2298 U.S. dollars on that date.

f.    Using that value, the $ 15 million Franchise Revenues

target for 2003 was 12,197,105 Euros on October 6, 2004.

F.    **Defendant's Set-Up of Plaintiff for Eventual Termination**

1.    **Defendant's Transfers of Other Clients**

45. In the Spring of 2002, defendant transferred plaintiff's Cox Enterprises client to J.L.

Malcolm Morris. Mr. Amling did not state that he had based this decision on any problem in

plaintiff's performance, but explained the transfer to plaintiff by stating that Mr. Morris had

nothing to do. Cox Enterprises, itself a substantial privately held entity, was also the majority

owner of two publicly traded companies, Cox Communications (a cable company) and Cox

Radio (a radio company). Cox Enterprises was a valuable long-term client, ranking 42nd on

defendant's list of the "Top 50 fee generators with fees in each of the past 3 years," as shown on

p. 17 of defendant's "Business Planning & Development: Media Summary for all Americas As

of September 30, 2003."

46. In 2003, Jeffrey Amling transferred plaintiff's Cox Communications client to Mr.

Morris. Cox Communications was a valuable long-term client, ranking 25th on defendant's list

of the "Top 50 fee generators with fees in each of the past 3 years," as shown on p. 17 of

defendant's "Business Planning & Development: Media Summary for all Americas As of

September 30, 2003."

47. In December 2003, plaintiff's Charter Communications client was transferred to Sun

Yung. Mr. Amling did not state that he had based this decision on any problem in plaintiff's

performance, but explained the transfer to plaintiff by stating that Ms. Yung did not have enough

clients. Charter Communications was a valuable long-term client, ranking second on defendant's

list of the "Top 50 fee generators with fees in each of the past 3 years," as shown on p. 17 of

- 14 -

defendant's "Business Planning & Development: Media Summary for all Americas As of September 30, 2003.".

48. Defendant's October 6, 2004, Franchise – Revenue Pipeline statement, provided to the EEOC as Exhibit J to its Position Statement, admitted that the Charter client produced transactions that had by September already produced 2004 revenue in the amount of 1,408,000 Euros, with 132,000 Euros received that month, and the remainder having been received earlier. But for the transfer, plaintiff would have booked that revenue.

49. There was no business justification for the transfer of these clients. Plaintiff had met the principals at Cox and Charter during his time at Merrill Lynch. To the best of his knowledge, no other Media Group Managing Director with defendant had had any experience with these companies. Under normal business reasoning, plaintiff was the logical choice to cover these companies.

50. Defendant's transfer of plaintiff's "large wallet size" clients—a factor prized by defendant—set plaintiff up for later adverse action.

51. Plaintiff complained internally about the transfers of clients to Mr. Amling, and to Mr. Amling's supervisors, James DeNaut and Jacques Brand. They took no corrective action.

## 2. Defendant's Refusal to Credit Plaintiff Properly, with His Full Revenue Obtained for Defendant on the Allbritton High-Yield Bond Transaction

52. Plaintiff was the banker in charge of a High-Yield bond offering for Allbritton Communications that earned approximately $3,094,000 in fees for defendant, with the deal closing and the money wired to defendant on January 3, 2003.

    a.    Using the Federal Reserve Bank of New York's Foreign Exchange Rates Historical Search data for noon on January 3, 2003, one Euro was worth 1.0418 U.S. dollars on that date.

b.     Using that value, the entry for this deal in the December 2003 YTD Franchise Revenue in Exhibit F to defendant's Position Statement to the EEOC should have been 2,969,860 Euros;

c.     Using that value, the entry for this deal in the Franchise Revenues Pipeline for 2003 on defendant's January 15, 2003, Franchise – Revenue & Pipeline document provided to the EEOC as Exhibit C to its Position Statement should have been 2,969,860 Euros;

d.     Defendant booked 2,573,000 Euros of this amount in December 2002, when the deal had been priced, although the transaction did not close and the money was not received until January 3, 2003. Defendant reflected this reduced amount as 2002 YTD Franchise Revenue in Exhibit C to defendant's Position Statement to the EEOC.

e.     When the transaction was initiated, plaintiff specifically discussed, with Mr. Amling and Mr. Johnson, Allbritton's desire for the transaction to close in calendar year 2003. He pointed out at this time that a calendar 2003 closing would mean that the Franchise Revenues associated with the transaction would be credited toward 2003 targets. Both Mr. Amling and Mr. Johnson agreed. When the transaction closed on January 3, 2003, plaintiff reminded Mr. Johnson and Mr. Amling of the agreement that the revenues would be credited toward 2003 targets.

53. Under defendant's normal business practices as well as under the agreement, the January 2003 closing of the transaction and receipt of these funds should have been treated as

- 16 -

2003 revenues, not 2002 revenues. Plaintiff had already made his target for 2002 without these revenues.

54. The effect of defendant's failure to follow its own rules was to take that money out of plaintiff's Franchise Revenues Pipeline for 2003 in Exhibit C, falsely lowering that amount, and to take it out of plaintiff's December 2003 YTD Franchise Revenues in Exhibit F to its Position Statement, falsely lowering that amount.

55. These changes placed plaintiff's performance in a false light, degrading his performance when his performance counted most.

56. However, even if defendant had followed the correct practices, the amount of revenues credited to plaintiff was still 396,860 Euros short of the revenues plaintiff had obtained for defendant on this transaction. Plaintiff was not credited with the amount of the missing funds in any way: not in his December 2002 YTD Franchise Revenues, not in his Franchise Pipeline for 2003, and not in his December 2003 YTD Franchise Revenues.

57. When the error first came to his attention in the Fall of 2003, plaintiff complained internally about this error to his supervisor, Jeffrey Amling, to David Manlowe (the data coordinator for Mr. DeNaut and Mr. Brand), and to Susan Hoffman, and provided them with documentation that the erroneous booking had violated defendant's own procedures. Defendant's officials were extremely resistant to following their own rules, and plaintiff saw that the tensions were escalating. Plaintiff did not want to appear insubordinate and knew that the misrecording of revenues would not by itself have any material effect on defendant's parent company. Plaintiff tried to defuse the tensions, while protecting himself, by saying he would not press the matter unless the recording of the transaction would be used as a management tool. Upon information and belief, defendant already knew plaintiff would be fired shortly after the

end of the year, knew that this was a special situation, knew plaintiff would rely on these

officials' silence as an indication that this would not be used as part of any justification for any

personnel or compensation decision, remained silent, and then used this false recording of

revenues as part of the pretextual justification for firing plaintiff.

58. Defendant's knowing and deliberate mishandling of these revenues set plaintiff up for

firing.

### 3.    Defendant's Refusal to Recognize Most of Plaintiff's 2003 Pipeline

59. In the Fall of 2002, plaintiff provided defendant with an accurate statement of his

expected 2003 Franchise Revenue Pipeline.  These transactions should have all been included, in

full, in plaintiff's 2003 Franchise Revenue Pipeline reported in Exhibit C to defendant's Position

Statement to the EEOC.  These transactions, and their Euro equivalents as of noon on January

15, 2003, were as follows:

a.    A contract with Tribune Co. for the remaining value of the

Denver radio sale for $530,000 or 501.135 Euros.  Defendant never provided

plaintiff with an explanation for the omission of this transaction from the 2003

pipeline;

b.    An agreement with Allbritton Communications that

defendant would lead a bond transaction, discussed above, for $3,094,000 or

2,925,492 Euros.  Defendant never provided plaintiff with an explanation for the

omission of this transaction from his 2003 pipeline;

c.    An agreement with Salem Communications that defendant

would lead a bond transaction for $250,000 or 236,384 Euros.  Defendant never

provided plaintiff with an explanation for the omission of this transaction from the

2003 pipeline;

     d.    A contract with Raycom Media to handle a merger and acquisition transaction for $3,000,000 or 2,836,611 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline;

     e.    An agreement with Salem Communications for defendant to lead an equity transaction for $1,800,000 or 1,701,967 Euros. Defendant included this in the 2003 pipeline but valued it at 1,182,000 Euros. Defendant never provided plaintiff with an explanation for the reduction in value of this transaction in the 2003 pipeline;

     f.    An agreement with Susquehanna Media that defendant would participate in a bond transaction for $1,500,000 or 1,418,306 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline;

     g.    An agreement with Hearst-Argyle that defendant would participate in an equity transaction for $3,300,000 or 3,120,272 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline; and

     h.    An agreement with Crown Media that defendant would participate in an equity transaction for $1,600,000 or 1,512,859 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline.

60. Plaintiff was the Senior Investment Banker for each of these clients. None of these clients or transactions should be double-counted with any other banker.

61. If defendant had credited plaintiff with the parts of his 2003 Franchise Pipeline described in ¶ 59 above, plaintiff's 2003 Franchise Revenue Pipeline would have been increased by $15,074,000 or 14,253,026 Euros.

62. If defendant had credited plaintiff with the parts of his 2003 Franchise Pipeline described in ¶ 59 above, plaintiff's 2003 Franchise Revenue Pipeline in Exhibit C would have been $13,823,917, or 13,071,026 Euros, ranking him in the top half of the bankers in the Group.

### 4.    Defendant's Refusal to Recognize Most of Plaintiff's 2004 Pipeline

63. Plaintiff provided defendant with an accurate statement of his Fourth Quarter 2003 and 2004 Franchise Revenue Pipeline.  None of these transactions occurred in the fourth quarter of 2003, and they should have all been included in plaintiff's 2004 Franchise Revenue Pipeline reported in Exhibit F to defendant's Position Statement to the EEOC.  Apart from Salem Communications, discussed above, defendant did not include any of them in plaintiff's 2004 pipeline.  These transactions, and their Euro equivalents as of noon on January 8, 2004, were as follows:

a.      A contract with Raycom Media to handle a merger and acquisition transaction for $3,000,000 or 2,348,888 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

b.      A request for an amendment to defendant's outstanding line of credit from Allbritton Communications for $100,000 or 78,296 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

c.      An agreement with the shareholders of Freedom Communications for defendant to participate in the refinancing of the company

for $6,000,000 or 4,697,776 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

        d.     An agreement with Gannett Corporation for defendant to participate in a share buyback for $400,000 or 313,185 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

        e.     An agreement with Gannett Corporation for defendant to participate in a new line of credit for $80,000 or 62,637 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

        f.     An agreement with Crown Media for defendant to participate in the sale of its international assets for $2,000,000 or 1,565,925 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

        g.     An agreement with XM Satellite Radio for defendant to participate in a sale/leaseback transaction for $1,000,000 or 782,963 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

        h.     An agreement with XM Satellite Radio for defendant to participate in a bond transaction for $1,000,000 or 782,963 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

i.      An agreement with Gray Television for defendant to lead a convertible bond offering for $1,980,000 or 1,550,266 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

j.      An agreement with Hearst-Argyle for defendant to participate in a line of credit for $500,000 or 391,481 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline; and

k.      An agreement with Hearst-Argyle for defendant to participate in an equity offering for $3,300,000 or 2,583,777 Euros. Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline.

64. Plaintiff was the Senior Investment Banker for each of these clients. None of these clients or transactions should be double-counted with any other banker.

65. If defendant had credited plaintiff with the full amount of the Salem Communications pipeline and with the parts of his 2004 Franchise Pipeline described in ¶ 63 above, plaintiff's 2004 Franchise Revenue Pipeline would have been increased to $21,160,000 or 16,567,491 Euros, the second-highest in the Group. The four bankers in the Group who were in their early 30s had no real 2004 pipeline business prospects, and defendant had to use a lot of devices to make it appear that they had better prospects than plaintiff.

5.      **Defendant's Removal of Plaintiff's Gannett Corporation Client from the Client Manager**

66. Defendant's Client Manager is a software system by which bankers are recognized officially for their work on a client. Unless Mr. Amling entered a client and transaction in the

- 22 -

Client Manager and enter plaintiff as the Senior Investment Banker for plaintiff would not

be credited for any of the work he had done in obtaining revenues for defendant for that client,

67. Without communicating with plaintiff, defendant removed Gannett Corporation from

the Client Manager system. This was not a client that had been assigned to anyone else, and its

unavailability on the Client Manager system meant that plaintiff could not receive credit for any

transaction he brought into the firm involving Gannett Corporation.

68. Plaintiff requested that Mr. Amling correct this. He did not.

69. At the time of his discharge, plaintiff had been working on two deals for Gannett

Corporation with a combined Franchise Revenues 2004 pipeline of $480,000 or 375,822 Euros,

as stated above. These prospective transactions were excluded from his pipeline in Exhibit F to

defendant's Position Statement.

### 6.    Defendant's Refusal to Allow Plaintiff to Obtain New Clients

70. During 2003, plaintiff began to develop relationships with several potential new

clients, and already had a relationship with one existing client as to which there was no activity.

On several occasions, including but not limited to May and December 2003, plaintiff requested

defendant to set up the accounts for the potential new clients, and to transfer the existing client to

him, so that he could be officially recognized for his attempts to bring in new business.

71. Defendant's internal controls barred plaintiff from being recognized for developing

business with potential clients that had not been set up for him on defendant's Client Manager

system. Plaintiff could not set himself up as the Senior Investment Banker for these clients; only

Mr. Amling or his superiors could approve the transfer or allocation of previously unallocated

potential clients. Mr. Amling and his superiors never did so, and never explained why they did

not do so.

- 23 -

72. Defendant orally assigned Cox Radio as a client to plaintiff in June 2003, but did not set plaintiff up as the Senior Investment Banker for the client for months after the assignment.

73. Plaintiff does not know of any nondiscriminatory business reason why defendant ignored these opportunities, making it impossible for plaintiff to obtain additional revenues for defendant.

### G.    Plaintiff's Termination and its Aftermath

#### 1.    Defendant's Firing of Plaintiff

74. On January 14, 2004, plaintiff was notified that he was being fired, effective January 31, 2004. He had not received any earlier notice that his employment was in jeopardy. Plaintiff and Mr. Amling discussed the termination in other conversations and communications between January 14 and January 30, inclusive.

75. Mr. Amling stressed to plaintiff that the termination was not for performance reasons. He stated that the decision was honestly based on "LIFO," as if it were in part a seniority-based decision, and added that, besides, he needed plaintiff's accounts for "the younger bankers."

76. Less senior employees were not fired, and none of the four young Directors promoted a year earlier were fired.

77. On January 20, 2004, plaintiff complained about the firing and about Mr. Amling's admission of age discrimination to James DeNaut and Jacques Brand, who were Mr. Amling's supervisors. They expressed surprise at the admission, but let the decision stand.

#### 2.    Defendant's Denial of Plaintiff's Bonus for 2003

78. The bulk of plaintiff's compensation was in the form of a bonus, or incentive compensation. His salary was $200,000 a year, but bankers at his level expected to receive a bonus that would bring their annual compensation to at least $1.1 million a year, and which could exceed that amount. Defendant encouraged these expectations, although the final sizes of

the bonuses were not announced until the time of their award. Plaintiff's expectation and reliance on defendant's customary practices were reasonable.

79. Bonuses are normally awarded in February of the year following the calendar year in which they are accrued. Plaintiff expected to receive a bonus in February of 2004 for his work in 2003. Plaintiff was employed by defendant for all of 2003. It is usual and customary in the investment banking business to pay employees a bonus when they have worked the entire year. Defendant set plaintiff's last day of work to be sure that he was not employed on the day the awards of bonuses for 2003 took place. Plaintiff believes that bonuses were paid on February 4, 2004. There was no legitimate business reason to terminate plaintiff before the awards of bonuses for 2003, other than to save the money.

### 3. Defendant's Earlier Concealment of its Intent to Deny Plaintiff His Bonus

80. Defendant decided, at some time materially in advance of notifying plaintiff of his discharge on January 14, 2004, that it was going to fire plaintiff. This can reasonably be inferred from the following:

       a.     defendant's direct transfer of, and indirect attempts to, transfer plaintiff's clients to younger bankers in the period from 2002 through December 2003, as alleged in ¶¶ 34–43 at pp. 11–13 above;

       b.     defendant's transfers of other clients of plaintiff in 2002 and 2003, as alleged in ¶¶ 45–51 at pp. 14–15 above

       c.     defendant's refusals during the Fall of 2003 to correct its records to conform them to its own policies, so that plaintiff would be credited properly with the revenues and revenue pipeline for the Allbritton

Communications High-Yield Bond transaction described in ¶¶ ¶¶ 52–58 at pp. 15–18 above;

    d.    defendant's refusal, as of January 15, 2003, to recognize most of plaintiff's 2003 Franchise Revenues pipeline, as alleged in ¶¶ 59–62 at pp. 18–20 above;

    e.    defendant's refusal, as of January 8, 2004, to recognize most of plaintiff's 2004 Franchise Revenues pipeline, as alleged in ¶¶ 63–65 at pp. 20–22 above;

    f.    defendant's refusals during 2003 to allow plaintiff to develop new clients, by repeatedly refusing to set up accounts for the potential new clients and allocate them to plaintiff in defendant's Client Manager system, so that he could be officially recognized for successful efforts in developing new business and would be credited therewith, as alleged in ¶¶ 66–73 at pp. 22–24 above; and

    g.    on December 2, 2003, defendant's Human Relations Department printed out a summary of the restricted stock plaintiff owned, which was placed in plaintiffs severance package delivered to him on January 14, 2004. On information and belief, this was an unusual action that would make sense only in light of advance information about an impending termination.

81. Plaintiff would not have continued working for defendant in 2003 if he had known he would be denied his bonus, and would have sought comparable job opportunities while still employed and, therefore, still readily employable.

82. During 2003 and early January 2004, plaintiff did not pursue inquiries from those with potential jobs to offer, or follow up on leads with respect to such companies, because he expected to continue working for defendant until he retired.

83. Defendant was well aware that bonuses are very important to its Managing Directors, that the bonuses form the bulk of their compensation, and that they would not continue working for it if they were informed they would not receive a bonus.  Defendant's officials well knew plaintiff's expectations of a bonus, well knew that these expectations were both reasonable and standard in the field, and encouraged them throughout 2003 and in 2004 prior to January 14, 2004.

84. Plaintiff discussed his expectations of continued employment for defendant with James DeNaut and Jacques Brand, and told them that he hoped to spend the rest of his career there.  They, and Jeffrey Amling, knew that defendant intended to fire plaintiff and deny him his bonus for 2003, but concealed their knowledge in order to induce plaintiff to remain working with defendant until they were ready to fire him.  They did not inform plaintiff that his career with defendant was going to end, they did not inform plaintiff that they intended to deny him his bonus, and they did not discourage his expectations in any way.

85. Upon information and belief, all other bankers in the Media Investment Banking Group who had worked for defendant through the bulk of 2003 were paid bonuses in February 2004.

86. Defendant fired a number of these employees, or took actions leading to their transfer out of the Media Investment Banking Group or separation from employment, after it fired plaintiff.  Upon information and belief, none of these employees had complained of age

- 27 -

discrimination prior to the time of plaintiff's firing, and all of these employees were given a bonus for their work in 2003.

### 4.     Defendant's Infliction of Additional Injury on Plaintiff

87. Upon information and belief, the custom in the investment banking industry is to give senior investment bankers an extended period of time within which to line up alternative employment. Senior investment bankers at plaintiff's level or above are asked to leave immediately if there is a compelling business reason to do so in the individual instance, such as a resignation to work for a competitor, a risk of breach of confidentiality, or unlawful activity. Upon information and belief, defendant has given senior investment bankers at plaintiff's level or above an extended period of some months, at reduced pay or no pay, within which to line up alternative employment and thereby have a "soft landing."

88. Plaintiff asked Jeffrey Amling, James DeNaut, Jacques Brand, and others about the possibility of staying on at reduced or no pay for an additional six months to seek outside employment. Mr. Amling told plaintiff that he thought that was a reasonable request and would see if he could help make that happen. Mr. DeNaut and Mr. Brand did not respond directly to plaintiff about this during the January 20, 2004 meeting at which plaintiff complained about age discrimination, but promised to get back to him. Andrea Hazelwood from the Human Resources Department ultimately informed plaintiff that he would not be allowed to stay on past January 31, 2004. She did not provide a reason.

89. The seventeen-day notice period defendant gave plaintiff shows that there was no individualized need to terminate him immediately.

90. A period of some months within which to line up alternative employment is an important benefit of employment in jobs at plaintiff's level or above, and makes it much easier to obtain a comparable position elsewhere.

- 28 -

91. Plaintiff took the following internal steps:

      a.      Plaintiff requested Mr. Amling, Mr. Brand, and Mr. DeNaut to arrange a transfer to another part of Deutsche Bank, in lieu of termination, and sought their help in pursuing other jobs within Deutsche Bank.

      b.      They denied his requests, and gave him no assistance in lining up other jobs within Deutsche Bank.

      c.      Plaintiff asked Christopher Johnson to intercede on his behalf with Richard Byrne and Thomas Gahan, and Mr. Johnson agreed to speak to both of these officials.

      d.      Mr. Johnson reported to plaintiff that he had discussed the matter with Mr. Byrne and Mr. Brand.

      e.      Defendant's Position Statement submitted to the EEOC shows that Thomas Gahan, Head of Global Corporate Finance for the Americas, Marc Pfeffer, Chief Operating Officer of Global Corporate Finance for the Americas, Jacques Brand, Co-Head of Corporate Finance Coverage for the Americas, and James DeNaut, Co-Head of Corporate Finance Coverage for the Americas, were all involved in plaintiff's termination.

      f.      Plaintiff requested a meeting with Mr. Byrne within a few days after he was notified of his termination but before he complained internally of age discrimination, and a meeting was scheduled for January 30, 2004.

      g.      Plaintiff complained of age discrimination prior to this meeting.

      h.      Mr. Byrne canceled the meeting.

92. Upon information and belief, within the context of the investment banking industry, there was no business reason to allow plaintiff to remain on the job from his January 14, 2004 termination until January 31, 2004, and yet also to deny plaintiff the opportunity for a "soft landing" by granting his requests for an extended period of months to obtain employment elsewhere, or by transferring him to another part of Deutsche Bank or by helping him find other jobs within Deutsche Bank.

93. Upon information and belief, defendant was aware that the denial of these requests (a) would be likely to inflict substantial economic harm on plaintiff by making it much more difficult to find comparable employment, and (b) that plaintiff's lifetime earnings potential would be significantly reduced as a result.

94. As the foreseeable consequence of defendant's denial of these requests, despite diligent effort plaintiff has been unable to find comparable employment elsewhere, and the multi-year gap in his working for an investment banking firm as a registered representative may make it impossible for him ever to find comparable employment.

**H.    Defendant's Cover-Up**

95. On November 5, 2004, defendant filed its Position Statement with the EEOC, explaining why the EEOC should conclude that there was no merit in plaintiff's charge of age discrimination and retaliation. On information and belief, a further goal of the statement was to persuade plaintiff to drop the matter. On information and belief, defendant's deliberate resort to false information in a submission to a Federal investigative agency would only have been done to conceal its knowledge that the claims had merit.