IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL B. GRAVES,<br><br>                    Plaintiff,<br><br>        v.<br><br>DEUTSCHE BANK SECURITIES, INC.,<br><br>                    Defendant. | **CIVIL ACTION NO.**<br><br>**1:07-cv-05471-BSJ-KNF**<br><br>SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF<br><br>**Jury Trial Demanded** |

A.    <u>**Jurisdiction and Venue**</u>

1.    This is an action to enforce the Age Discrimination in Employment Act of 1968 (hereinafter, "ADEA"), 29 U.S.C. §§ 621 *et seq.*, as amended, the anti-retaliation provision of that Act, 29 U.S.C. § 623(d), the anti-retaliation provision of the Fair Labor Standards Act of 1938 (hereinafter, "FLSA"), 29 U.S.C. § 215(a)(3), the additional remedies provided by 29 U.S.C. § 216(b), as amended, and the New York City Human Rights Law (hereinafter "City Human Rights Law"), Title 8 of the Administrative Code of the City of New York, §§ 8–101 *et seq.*

2.    Jurisdiction over this action is established under §§ 7(b) and (c) of the ADEA, 29 U.S.C. §§ 626(b) and (c); under §§ 16(b) and 17 of the FLSA, 29 U.S.C. §§ 216(b) and 217, and under 28 U.S.C. § 1331.  Plaintiff also seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

3.    Plaintiff's claims under the City Human Rights Law arise from the same operative facts and involve the same legal analysis as plaintiff's claims under Federal law, and are so closely related to his claims under Federal law that they form part of the same case or

controversy.  This Court has supplemental jurisdiction over plaintiff's claims under the City

Human Rights Law by virtue of 28 U.S.C. § 1367(a).

4.    Plaintiff is a resident of the State of New Jersey.  Defendant Deutsche Bank

Securities, Inc., is incorporated in Delaware, and its principal place of business is in New York.

The amounts in controversy for plaintiff's City Human Rights Law claims and each of his State-

law claims exceeds $75,000, exclusive of interest and costs.  This Court also has jurisdiction

over plaintiff's City Human Rights Law claims under 28 U.S.C. § 1332(a)(1).

5.    The principal United States executive offices of defendant Deutsche Bank Securities,

Inc., are located at 60 Wall Street, New York, New York, and are within the Southern District of

New York.  Plaintiff was employed in that office, and a substantial part of the actions and

omissions giving rise to this suit occurred within the Southern District of New York.  The

appropriate venue for this action is the Southern District of New York, pursuant to 28 U.S.C.

§ 1391(b).

### B.    <u>Summary of the Case</u>

6.    Plaintiff Daniel Graves was a senior investment banker who worked as a Managing

Director, was successful on the job, had received excellent performance reviews by defendant

and, those same performance reviews admit, was well-positioned to bring significant new

transactions and significant new revenues into the Media Investment Banking Group where he

worked.  He was, however, more than 40 years old, having been born on February 28, 1962.

Defendant wanted to reduce the age of its team, and engaged in a thorough and premeditated

form of age discrimination.

7.    First, it selected four younger replacements— Elizabeth Chang (age 33), David Dunn

(age 34), Blair Faulstich (age 33), and Eric "Zach" Maurus (age 33)—and promoted them in late

2002 or early 2003 from Vice President to Director.  As Vice Presidents, they had had no clients

of their own and no revenue targets.  As Directors, they had revenue targets of $15 million a year and needed to develop clients.  See ¶¶ 27–28 and 30–33 at pp. 11–12 below.

8.   Second, defendant fired a 41-year-old Director with such a target, making the additional revenue demand on the Group $45 million a year.  See ¶¶ 29–30 at p. 11 below.

9.   Third, defendant considered which older employees the younger Directors would replace, focused on plaintiff, and ultimately decided to replace plaintiff in early 2004.  See ¶¶ 32–33 at p. 12 below.

10. Fourth, defendant engineered its future cover-up.  The cover-up had several parts, all of which were geared to creating the appearance of age-neutral reasons for the discharge:

    a.  Defendant transferred some of plaintiff's clients to other bankers, over his protest and without any business reason.  Each was a top fee-generating client, and their loss was intended to reduce his revenues and his business prospects.  The first transfer was to a comparably-aged man, to make the appearances look better.  The second was to a 36-year-old colleague.  Plaintiff complained internally about this as soon as he found out, and for the first time went to persons with authority over his supervisor.  He mentioned this and an earlier transfer.  The third was shortly before plaintiff's discharge, and helped make his prospects look worse.  Plaintiff complained internally about this as well.  See ¶¶ 34–38 at pp. 12–13, and ¶¶ 45–51 at pp. 15–16, below.

    b.  Defendant asked 33-year-old Elizabeth Chang to talk to plaintiff to try to get his agreement to transfer some of plaintiff's clients to her.  See ¶¶ 39 and 41–43 at pp. 13–14 below.

c.  Defendant asked another 33-year-old, Blair Faulstich, to talk to plaintiff to try to get his agreement to transfer at least one of plaintiff's clients to him.  See ¶¶ 40–43 at pp. 13–14 below.

d.  Defendant refused to credit plaintiff with prospective deals, ignored requests to configure its Client Manager software to ensure that plaintiff would be able to receive credit for work he was doing developing transactions, and affirmatively configured its Client Manager software to ensure that plaintiff would not be able to receive credit for work he was doing developing transactions for one client.  These actions were intended to make plaintiff's prospects look worse.  See ¶¶ 66–73 at pp. 23–24 below, and subparagraphs (g) and (h) of this paragraph.

e.  Defendant violated its own rules by re-allocating 2003 revenue to 2002 (where plaintiff had already met his $10 million revenue target) to make it more difficult for plaintiff to meet his 2003 $15 million revenue target.  See ¶¶ 52–55 and 57 at pp. 16–19 below.

f.  Defendant also refused to credit part of the 2003 revenue plaintiff had obtained for it, artificially reducing this measure of his performance.  See ¶¶ 56–57 at pp. 18–19 below.

g.  Defendant refused to credit most of plaintiff's prospective transactions for his 2003 "pipeline," making his business prospects look worse.  See ¶¶ 59–62 at pp. 19–21 below.

h.  Defendant refused to credit most of plaintiff's prospective transactions for his 2004 "pipeline," making his business prospects look worse.  See ¶¶ 63–65 at pp. 21–23 below.

11. Fifth, defendant fired plaintiff without cause on January 14, 2004, explaining to him that his clients were "needed for the younger bankers." Defendant also gave him the pretextual explanation the decision to let him go was based on a non-existent "last-in, first-out" policy. In fact, bankers in their early thirties with far less success were retained. This was done despite the fact that plaintiff's revenues and business prospects were among those in the top half of his Group. See ¶ 62 below. Plaintiff complained of age discrimination internally. See ¶¶ 74–77 at pp. 24-25 below.

12. Defendant denied plaintiff the bulk of his annual compensation—the bonus he had earned for his work in 2003—having concealed its long-term plan to replace him with the younger bankers and inducing him to continue working by concealing its intent to deprive him of the bonus. This was both fraud by concealment and breach of the duty of good faith and fair dealing as to the bonus. Several days after plaintiff complained of age discrimination, defendant refused to reconsider this decision. This was retaliation. See ¶¶ 78–86 at pp. 25–28 below.

13. Defendant had no individualized reason to require plaintiff to leave immediately, gave him seventeen days' notice, delayed announcing the firing within the Group, and had him continue to work for clients in the interim before his scheduled ending date of January 31, 2004. Plaintiff's supervisor initially said he would back plaintiff's request to be allowed to stay on for several months at reduced pay or no pay, to give him an opportunity to have a "soft landing" by obtaining a comparable job elsewhere. Despite the demonstration of trust and confidence in giving plaintiff work to perform during the seventeen days, defendant refused to allow him this opportunity for a "soft landing" because he had complained about age discrimination. This was retaliation. See ¶¶ 87–94 at pp. 28–30 below.

14. Sixth, after plaintiff filed his charge of age discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), defendant filed a Position Statement with the EEOC in the course of the EEOC's jurisdiction over the investigation of plaintiff's charge of age discrimination and retaliation.  Defendant's Position Statement attempted to continue the cover-up of age discrimination and retaliation by knowingly and willfully:

     a.  Making untrue material statements, as alleged in detail below;

     b.  Failing to make material statements it knew or should have known were necessary to avoid misleading the EEOC and manipulating or distorting the EEOC's investigation and decisions, as alleged in detail below;

     c.  Providing the EEOC with altered excerpts of "off the shelf" documents that it had compiled for other purposes, knew could not be relied upon to compare fairly the performance of individual bankers, and were altered to add totals for each banker and thus enhance the impression they could be relied upon for this purpose, as alleged in detail below;

     d.  Redacting from the documents provided to the EEOC those pages from the "off the shelf" documents that presented a more truthful view, as alleged in detail below.

See ¶¶ 95–124 at pp. 31–51 below.

15. Plaintiff seeks reinstatement under protective conditions, a declaration of his rights and defendant's wrongs, back pay, liquidated damages, prejudgment interest where available, punitive damages where available, attorneys' fees and costs, and such other relief as may be proper.

### C.    Parties

16. Plaintiff is a citizen of the United States and a resident of the State of New Jersey.  He was born on February 28, 1962, and at all times since February 28, 2002, was 40 or more years old.  During the period of his employment, plaintiff was an employee engaged in providing investment banking services to companies throughout the United States and abroad.  At all times from 2002 to January 31, 2004, Plaintiff was working for defendant in New York City, was engaged in interstate and foreign commerce, and was covered by § 3(e)(1) of the FLSA, 29 U.S.C. §§ 203(e)(1).

17. Defendant Deutsche Bank Securities, Inc., is a wholly-owned subsidiary of Deutsche Bank, A.G.  Deutsche Bank, A.G., is a global investment bank with more than 73,000 employees and more than 1,700 branches in 73 countries.  It has nine branches in New York City alone.

18. Defendant Deutsche Bank Securities, Inc., has at all times from 2002 to the present provided investment banking services to companies throughout the United States and abroad.  It has at all times from 2002 to the present been an enterprise engaged in commerce, had employees engaged in commerce (including plaintiff throughout his period of employment), and has had an annual gross volume of sales made or business done that is considerably in excess of $500,000.  It has at all times from 2002 to the present had at least 20 employees within the United States for each working day in each week of the year.  At all times from 2002 to the present, it has been an employer within the meaning of § 11(b) of the ADEA, 29 U.S.C. § 630(b), and within the meaning of § 3(d) of the FLSA, 29 U.S.C. § 203(d).  At all times from 2002 to the present, it has been a covered enterprise within the meaning of § 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1).

19. Defendant Deutsche Bank Securities, Inc., has at all times from 2002 to the present had four or more employees within New York City, and is an employer within the meaning of the City Human Rights Law, § 8–102 of the New York City Administrative Code.

**D.    Statement of the Case**

**1.    Plaintiff's Education and Employment**

20. Plaintiff graduated from the University of Maryland in December 1984, with the degree of Bachelor of Science in the dual majors of Finance and of Management Science and Statistics.  He obtained his Master's of Business Administration degree from the University of Chicago Graduate School of Business in June 1990, with a major in Finance and a minor in Accounting.

21. Plaintiff worked for Arthur Andersen & Co., Inc., in Washington, D.C., from 1985 to 1988 as a Staff Consultant in the Information Consulting Division.

22. Plaintiff worked for Salomon Brothers Inc. in New York City as a Summer Associate, Associate and Vice President, primarily in the Media Investment Banking Group, from 1989 through 1994.  In these positions, plaintiff executed a large number of investment banking transactions for broadcast, cable, cellular, and newspaper companies in the United States. During this time, he was also a core member of the investment banking team that completed the first initial public offering for a cable company, International CableTel, Inc., whose primary business operations were in the United Kingdom.

23. Plaintiff worked for Merrill Lynch & Co., Inc., in New York City, from 1994 to March 1999.  He started as a Vice President and was promoted in 1998 to the position of Director.  During his tenure, he spent all of his time working in the Telecommunications Media and Technology group or group with the same function and a similar name.  In this capacity, he assisted Merrill Lynch's London-based personnel in forming a UK Cable practice domiciled in

London and in developing relationships with companies whose primary business was providing cable television services in the UK. He was the principal New York-based employee responsible for executing investment banking transactions for Merrill Lynch's UK Cable clients. In addition, he assumed the start-up position of Head of Merrill Lynch's U.S. Broadcasting Practice in 1995, and spent three years overseeing all of Merrill Lynch's transactions in that area. In that capacity, he originated and executed transactions for both radio and television companies. In 1998, he was the Merrill Lynch investment banker chiefly responsible for executing Merrill's management of the initial public offering of the radio company Infinity Broadcasting Corporation, the largest initial public offering in the history (to that time) of a U.S. broadcasting company. Also in 1998, Mr. Graves was the principal Media Investment Banking Group employee working on Merrill Lynch's refinancing of United Artists Theatre Circuit, Inc., the largest cinema operator in the United States at the time. During this transaction, Mr. Graves worked closely with Christopher Johnson, who later joined defendant as well.

24. Plaintiff began working for BT Alex Brown, Inc., a unit of Bankers Trust Co., on March 31, 1999, as a Principal, with a written agreement that he would be promoted to Managing Director during the next promotion cycle. Jeffrey Amling in the Baltimore, Maryland, office was his supervisor.

25. Bankers Trust and Deutsche Bank merged in 1999.

      a. Plaintiff's work unit, the Media Investment Banking Group, was transferred to defendant Deutsche Bank Securities, Inc., on June 14, 1999.

      b. Mr. Amling headed the Media Investment Banking Group, or group with the same function and a similar name. It had offices in Baltimore, Maryland; San Francisco, California; and New York City,

c.  Plaintiff was promoted in name to Managing Director during his first promotion cycle at defendant at the end of 1999 or beginning of 2000.

d.  Unlike other Managing Directors, however, plaintiff was in some respects treated as if he were a Director rather than a Managing Director.  For example, he was never given managerial responsibilities over Directors and never evaluated them as a manager instead of a peer.

e.  Plaintiff was not aware that all other Managing Directors were Managers and Evaluating Managers over Directors until defendant produced documents so showing on February 28, 2008.

f.  During his employment with defendant, plaintiff originated and executed investment banking transactions in the radio, television, cable, satellite radio, and newspaper industries.  Plaintiff was the Senior Investment Banker ("SIB") for clients in all of these industries.

g.  In addition to working in many Media industries, plaintiff was also asked to assist other Media Investment Banking Group professionals as a mergers and acquisitions specialist.  Within the Media Investment Banking Group, plaintiff rarely worked on the same transactions as Gregory Paul and worked most often with Elizabeth Chang.  He worked on transactions involving every major investment banking product, across all types of media companies.  He started new relationships for, and brought new clients to, defendant.  He performed in accordance with the highest standards.

26. Mr. Amling was responsible for reviewing plaintiff's performance, and was responsible for aggregating the input of the other agreed-upon providers of plaintiff's

performance evaluation for defendant's standardized "upward and downward performance review" process. Mr. Amling reported to James DeNaut and Jacques Brand. Plaintiff had frequent interactions with Mr. DeNaut and Mr. Brand and these interactions at times involved plaintiff's performance and the performance of the Media Investment Banking Group. Mr. DeNaut and Mr. Brand reported to Richard Byrne and Thomas Gahan. Plaintiff had known both of these individuals as well as Christopher Johnson while at Merrill Lynch. Plaintiff had had frequent interactions with Mr. Byrne and Mr. Johnson while executing transactions. Mr. Johnson was one of many providers of "upward and downward feedback" in plaintiff's annual performance reviews. Plaintiff's performance reviews while employed at defendant Deutsche Bank Securities, Inc., were all very good.

### 2.    The Promotion of Younger Bankers

27. At the end of 2002 or early 2003, defendant promoted four young Vice Presidents to positions as Directors in the Media Investment Banking Group: Elizabeth Chang (age 33), David Dunn (age 34), Blair Faulstich (age 33), and Eric "Zach" Maurus (age 33),

28. Vice Presidents did not have Franchise Revenue targets. Directors and Managing Directors alike had $10 million Franchise Revenue targets in 2002, and $15 million Franchise Revenue targets for 2003 and thereafter.

29. Defendant fired Ellen Silver, a Director in the Media Investment Banking Group, on January 30, 2003, at the age of 41.

30. The effect of the 2003 termination and four promotions for 2003 was an additional Franchise Revenue target burden of $45 million on the Media Investment Banking Group's existing client base.

31. Even if overall Media industry business activity had not slumped in 2003, making new client generation more demanding, it would have been difficult or impossible for the Media

Investment Banking Group as a whole to have added $45 million to its Franchise Revenue targets from its existing client base.

32. On information and belief, defendant planned in 2002, in advance of these promotions, to fire plaintiff and to re-allocate his clients so that the older banker would not be able to meet the $15 million Franchise Revenue target for 2003 or have a good pipeline for 2004, providing an excuse for his or her termination.

33. In effect, younger investment bankers were hired and groomed as part of a plan to replace plaintiff, and he was fired when defendant thought they were ready to take over his business.

**3.      Defendant's Direct Reassignment of Plaintiff's Adelphia Client to a Younger Banker**

34. On or before May 27, 2003, plaintiff's Adelphia Communications client (a cable company) was transferred to Dyan Triffo, who was 36 years old at the time.  Plaintiff was 41.  Mr. Amling did not state that he had based this decision on any problem in plaintiff's performance, but explained the transfer to plaintiff by stating that Ms. Triffo had not met her 2002 targets while she took extended leave, and had no hope of meeting her 2003 target while she was expecting to be on leave again.  Mr. Amling further told plaintiff that Adelphia was a good client for Ms. Triffo because it was likely to be dormant in 2003 while she was on an expected maternity leave, but had potential for 2004 when she was expected to be back full-time.  Adelphia was a valuable long-term client, ranking first on defendant's list of the "Top 25 fee generators with fees in 2 of the past 3 years," as shown on p. 18 of defendant's "Business Planning & Development: Media Summary for all Americas As of September 30, 2003."

35. Defendant's October 6, 2004, Franchise – Revenue Pipeline statement, provided to the EEOC as Exhibit J to its Position Statement, admitted that Adelphia produced two deals that

had by September 2004 already resulted in 2004 revenue in the amount of 2,076,000 Euros.

Defendant's favoritism for a younger banker prevented plaintiff from booking that revenue.

36. On April 23, 2004, Adelphia announced that it was seeking to be acquired and the

Wall Street Journal announced that this could be a $20 billion deal.  But for defendant's

favoritism for a younger banker, plaintiff could have tried to obtain that business for defendant.

37. There was no business justification for the transfer of this client.  Plaintiff had worked

on assignments for Adelphia prior to 1994, and Ms. Triffo had had no prior involvement with

this client.

38. Plaintiff complained of this client transfer to Mr. Amling on May 28, 2003, after

plaintiff learned of the transfer.  Plaintiff also complained of this and an earlier client transfer to

James DeNaut, one of Mr. Amling's superiors, on June 2, 2003.

### 4. Defendant's Indirect Efforts to Transfer Plaintiff's Clients to Younger Bankers

39. During 2003, Elizabeth Chang (age 33), approached plaintiff and informed him that

Mr. Amling had asked her to talk to plaintiff and suggest that he transfer some of his clients to

her.  She asked plaintiff for his XM Satellite Radio and other clients, including Salem

Communications.

40. Blair Faulstich (age 33), also approached plaintiff and informed him that Mr. Amling

had asked him to talk to plaintiff and suggest that he transfer his XM Satellite Radio client to

him.

41. Defendant never explained to plaintiff why it wanted either of these younger bankers

to replace him.

42. During 2003, plaintiff was working on two transactions involving XM Satellite Radio

for an aggregate amount of $2,000,000 in the Franchise Revenues 2004 pipeline.  Plaintiff did

not agree to transfer the client.  If he had agreed, he would not have been given credit for these transactions in the Franchise Revenues 2004 pipeline, or in subsequent Franchise Revenues received.

43. Even though plaintiff had not agreed to transfer the client to either of these younger bankers, defendant treated these accounts as no longer plaintiff's accounts, in that he was still not given credit for these prospective transactions in the Franchise Revenues 2004 pipeline shown in Exhibit F to defendant's Position Statement to the EEOC, attached hereto as Exhibit 3.

**E.    Exchange Rates**

44. Many of defendant's documents provided in its November 5, 2004, Position Statement to the U.S. Equal Employment Opportunity Commission (hereinafter, "EEOC") expressed results in Euros, particularly in Exhibit C (dated January 15, 2003), Exhibit F (dated January 8, 2004), and Exhibit J (dated October 6, 2004).

a.  Using the Federal Reserve Bank of New York's Foreign Exchange Rates Historical Search data for noon on January 15, 2003, one Euro was worth 1.0576 U.S. dollars on that date.

b.  Using that value, the $10 million Franchise Revenues target for 2002 was 9,455,371 Euros on January 15, 2003.

c.  Using the Federal Reserve Bank of New York's Foreign Exchange Rates Historical Search data for noon on January 8, 2004, one Euro was worth 1.2772 U.S. dollars on that date.

d.  Using that value, the $ 15 million Franchise Revenues target for 2003 was 11,744,441 Euros on January 8, 2004.

e.  Using the Federal Reserve Bank of New York's Foreign Exchange Rates Historical Search data for noon on October 6, 2004, one Euro was worth 1.2298 U.S. dollars on that date.

f.  Using that value, the $ 15 million Franchise Revenues target for 2003 was 12,197,105 Euros on October 6, 2004.

**F.    Defendant's Set-Up of Plaintiff for Eventual Termination**

**1.    Defendant's Transfers of Other Clients**

45. In the Spring of 2002, defendant transferred plaintiff's Cox Enterprises client to J.L. Malcolm Morris.  Mr. Amling did not state that he had based this decision on any problem in plaintiff's performance, but explained the transfer to plaintiff by stating that Mr. Morris had nothing to do.  Cox Enterprises, itself a substantial privately held entity, was also the majority owner of two publicly traded companies, Cox Communications (a cable company) and Cox Radio (a radio company).  Cox Enterprises was a valuable long-term client, ranking 42nd on defendant's list of the "Top 50 fee generators with fees in each of the past 3 years," as shown on p. 17 of defendant's "Business Planning & Development: Media Summary for all Americas As of September 30, 2003."

46. In 2003, Jeffrey Amling transferred plaintiff's Cox Communications client to Mr. Morris.  Cox Communications was a valuable long-term client, ranking 25th on defendant's list of the "Top 50 fee generators with fees in each of the past 3 years," as shown on p. 17 of defendant's "Business Planning & Development: Media Summary for all Americas As of September 30, 2003."

47. In December 2003, plaintiff's Charter Communications client, a cable company, was transferred to Sun Yung.  Mr. Amling did not state that he had based this decision on any problem in plaintiff's performance, but explained the transfer to plaintiff by stating that Ms.

Yung did not have enough clients. Charter Communications was a valuable long-term client, ranking second on defendant's list of the "Top 50 fee generators with fees in each of the past 3 years," as shown on p. 17 of defendant's "Business Planning & Development: Media Summary for all Americas As of September 30, 2003.".

48. Defendant's October 6, 2004, Franchise – Revenue Pipeline statement, provided to the EEOC as Exhibit J to its Position Statement, admitted that the Charter client produced transactions that had by September already produced 2004 revenue in the amount of 1,408,000 Euros, with 132,000 Euros received that month, and the remainder having been received earlier. But for the transfer, plaintiff would have booked that revenue.

49. There was no business justification for the transfer of these clients. Plaintiff had met the principals at Cox and Charter during his time at Merrill Lynch. To the best of his knowledge, no other Media Group Managing Director with defendant had had any experience with these companies. Under normal business reasoning, plaintiff was the logical choice to cover these companies.

50. Defendant's transfer of plaintiff's "large wallet size" clients—a factor prized by defendant—set plaintiff up for later adverse action.

51. Plaintiff complained internally about the transfers of clients to Mr. Amling, and to Mr. Amling's supervisors, James DeNaut and Jacques Brand. They took no corrective action.

### 2. Defendant's Refusal to Credit Plaintiff Properly, with His Full Revenue Obtained for Defendant on the Allbritton High-Yield Bond Transaction

52. Plaintiff was the banker in charge of a High-Yield bond offering for Allbritton Communications that earned approximately $3,094,000 in fees for defendant, with the deal closing and the money wired to defendant on January 3, 2003.

a.  Using the Federal Reserve Bank of New York's Foreign Exchange Rates Historical Search data for noon on January 3, 2003, one Euro was worth 1.0418 U.S. dollars on that date.

b.  Using that value, the entry for this deal in the December 2003 YTD Franchise Revenue in Exhibit F to defendant's Position Statement to the EEOC (attached hereto as Exhibit 3) should have been 2,969,860 Euros;

c.  Using that value, the entry for this deal in the Franchise Revenues Pipeline for 2003 on defendant's January 15, 2003, Franchise – Revenue & Pipeline document provided to the EEOC as Exhibit C to its Position Statement (attached hereto as Exhibit 2) should have been 2,969,860 Euros;

d.  Defendant booked 2,573,000 Euros of this amount in December 2002, when the deal had been priced, although the transaction did not close and the money was not received until January 3, 2003.  Defendant reflected this reduced amount as 2002 YTD Franchise Revenue in Exhibit C to defendant's Position Statement to the EEOC.

e.  When the transaction was initiated, plaintiff specifically discussed, with Mr. Amling and Mr. Johnson, Allbritton's desire for the transaction to close in calendar year 2003.  He pointed out at this time that a calendar 2003 closing would mean that the Franchise Revenues associated with the transaction would be credited toward 2003 targets.  Both Mr. Amling and Mr. Johnson agreed.  When the transaction closed on January 3, 2003, plaintiff reminded Mr. Johnson and Mr. Amling of the agreement that the revenues would be credited toward 2003 targets.

53. Under defendant's normal business practices as well as under the agreement, the January 2003 closing of the transaction and receipt of these funds should have been treated as 2003 revenues, not 2002 revenues.  Plaintiff had already made his target for 2002 without these revenues.

54. The effect of defendant's failure to follow its own rules was to take that money out of plaintiff's Franchise Revenues Pipeline for 2003 in Exhibit C, falsely lowering that amount, and to take it out of plaintiff's December 2003 YTD Franchise Revenues in Exhibit F to its Position Statement, falsely lowering that amount.

55. These changes placed plaintiff's performance in a false light, degrading his performance when his performance counted most.

56. However, even if defendant had followed the correct practices, the amount of revenues credited to plaintiff was still 396,860 Euros short of the revenues plaintiff had obtained for defendant on this transaction.  Plaintiff was not credited with the amount of the missing funds in any way: not in his December 2002 YTD Franchise Revenues, not in his Franchise Pipeline for 2003, and not in his December 2003 YTD Franchise Revenues.

57. When the error first came to his attention in the Fall of 2003, plaintiff complained internally about this error to his supervisor, Jeffrey Amling, to David Manlowe (the data coordinator for Mr. DeNaut and Mr. Brand), and to Susan Hoffman, and provided them with documentation that the erroneous booking had violated defendant's own procedures. Defendant's officials were extremely resistant to following their own rules, and plaintiff saw that the tensions were escalating.  Plaintiff did not want to appear insubordinate and knew that the misrecording of revenues would not by itself have any material effect on defendant's parent company.  Plaintiff tried to defuse the tensions, while protecting himself, by saying he would not

press the matter unless the recording of the transaction would be used as a management tool.
Upon information and belief, defendant already knew plaintiff would be fired shortly after the
end of the year, knew that this was a special situation, knew plaintiff would rely on these
officials' silence as an indication that this would not be used as part of any justification for any
personnel or compensation decision, remained silent, and then used this false recording of
revenues as part of the pretextual justification for firing plaintiff.

58. Defendant's knowing and deliberate mishandling of these revenues set plaintiff up for
firing.

### 3.    Defendant's Refusal to Recognize Most of Plaintiff's 2003 Pipeline

59. In the Fall of 2002, plaintiff provided defendant with an accurate statement of his
expected 2003 Franchise Revenue Pipeline.  These transactions should have all been included, in
full, in plaintiff's 2003 Franchise Revenue Pipeline reported in Exhibit C to defendant's Position
Statement to the EEOC.  These transactions, and their Euro equivalents as of noon on January
15, 2003, were as follows:

    a.  A contract with Tribune Co. for the remaining value of the Denver radio
sale for $530,000 or 501.135 Euros.  Defendant never provided plaintiff with an
explanation for the omission of this transaction from the 2003 pipeline;

    b.  An agreement with Allbritton Communications that defendant would lead a
bond transaction, discussed above, for $3,094,000 or 2,925,492 Euros.  Defendant
never provided plaintiff with an explanation for the omission of this transaction from
his 2003 pipeline;

    c.  An agreement with Salem Communications that defendant would lead a
bond transaction for $250,000 or 236,384 Euros.  Defendant never provided plaintiff
with an explanation for the omission of this transaction from the 2003 pipeline;

d.  A contract with Raycom Media to handle a merger and acquisition transaction for $3,000,000 or 2,836,611 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline;

e.  An agreement with Salem Communications for defendant to lead an equity transaction for $1,800,000 or 1,701,967 Euros.  Defendant included this in the 2003 pipeline but valued it at 1,182,000 Euros.  Defendant never provided plaintiff with an explanation for the reduction in value of this transaction in the 2003 pipeline;

f.  An agreement with Susquehanna Media that defendant would participate in a bond transaction for $1,500,000 or 1,418,306 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline;

g.  An agreement with Hearst-Argyle Television that defendant would participate in an equity transaction for $3,300,000 or 3,120,272 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline; and

h.  An agreement with Crown Media that defendant would participate in an equity transaction for $1,600,000 or 1,512,859 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2003 pipeline.

60. Plaintiff was the Senior Investment Banker for each of these clients.

61. If defendant had credited plaintiff with the parts of his 2003 Franchise Pipeline described in ¶ 59 above, plaintiff's 2003 Franchise Revenue Pipeline would have been increased by $15,074,000 or 14,253,026 Euros.

62. If defendant had credited plaintiff with the parts of his 2003 Franchise Pipeline described in ¶ 59 above, plaintiff's 2003 Franchise Revenue Pipeline in Exhibit C would have been $13,823,917, or 13,071,026 Euros, ranking him in the top half of the bankers in the Group.

### 4.    Defendant's Refusal to Recognize Most of Plaintiff's 2004 Pipeline

63. Plaintiff provided defendant with an accurate statement of his Fourth Quarter 2003 and 2004 Franchise Revenue Pipeline.  None of these transactions occurred in the fourth quarter of 2003, and they should have all been included in plaintiff's 2004 Franchise Revenue Pipeline reported in Exhibit F to defendant's Position Statement to the EEOC.  Apart from Salem Communications, discussed above, defendant did not include any of them in plaintiff's 2004 pipeline.  These transactions, and their Euro equivalents as of noon on January 8, 2004, were as follows:

    a.  A contract with Raycom Media to handle a merger and acquisition transaction for $3,000,000 or 2,348,888 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

    b.  A request for an amendment to defendant's outstanding line of credit from Allbritton Communications for $100,000 or 78,296 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

    c.  An agreement with the shareholders of Freedom Communications for defendant to participate in the refinancing of the company for $6,000,000 or 4,697,776 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

d.  An agreement with Gannett Corporation for defendant to participate in a share buyback for $400,000 or 313,185 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

e.  An agreement with Gannett Corporation for defendant to participate in a new line of credit for $80,000 or 62,637 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

f.  An agreement with Crown Media for defendant to participate in the sale of its international assets for $2,000,000 or 1,565,925 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

g.  An agreement with XM Satellite Radio for defendant to participate in a sale/leaseback transaction for $1,000,000 or 782,963 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

h.  An agreement with XM Satellite Radio for defendant to participate in a bond transaction for $1,000,000 or 782,963 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

i.  An agreement with Gray Television for defendant to lead a convertible bond offering for $1,980,000 or 1,550,266 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline;

j.  An agreement with Hearst-Argyle Television for defendant to participate in a line of credit for $500,000 or 391,481 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline; and

k.  An agreement with Hearst-Argyle Television for defendant to participate in an equity offering for $3,300,000 or 2,583,777 Euros.  Defendant never provided plaintiff with an explanation for the omission of this transaction from the 2004 pipeline.

64. Plaintiff was the Senior Investment Banker for each of these clients.

65. If defendant had credited plaintiff with the full amount of the Salem Communications pipeline and with the parts of his 2004 Franchise Pipeline described in ¶ 63 above, plaintiff's 2004 Franchise Revenue Pipeline would have been increased to $21,160,000 or 16,567,491 Euros, the second-highest in the Group.  The four bankers in the Group who were in their early 30s had no real 2004 pipeline business prospects, and defendant had to use a lot of devices to make it appear that they had better prospects than plaintiff.

**5.      Defendant's Removal of Plaintiff's Gannett Corporation Client from the Client Manager**

66. Defendant's Client Manager is a software system by which bankers are recognized officially for their work on a client.  Unless Mr. Amling entered a client and transaction in the Client Manager and entered plaintiff as the Senior Investment Banker for it, plaintiff would not be credited for any of the work he had done in obtaining revenues for defendant for that client.

67. Without communicating with plaintiff, defendant removed Gannett Corporation from the Client Manager system.  This was not a client that had been assigned to anyone else, and its unavailability on the Client Manager system meant that plaintiff could not receive credit for any transaction he brought into the firm involving Gannett Corporation.

68. Plaintiff requested that Mr. Amling correct this.  He did not.

69. At the time of his discharge, plaintiff had been working on two deals for Gannett Corporation with a combined Franchise Revenues 2004 pipeline of $480,000 or 375,822 Euros,

as stated above.  These prospective transactions were excluded from his pipeline in Exhibit F to defendant's Position Statement.

### 6.    Defendant's Refusal to Allow Plaintiff to Obtain New Clients

70. During 2003, plaintiff began to develop relationships with several potential new clients, and already had a relationship with one existing client as to which there was no activity. On several occasions, including but not limited to May and December 2003, plaintiff requested defendant to set up the accounts for the potential new clients, and to transfer the existing client to him, so that he could be officially recognized for his attempts to bring in new business.

71. Defendant's internal controls barred plaintiff from being recognized for developing business with potential clients that had not been set up for him on defendant's Client Manager system.  Plaintiff could not set himself up as the Senior Investment Banker for these clients; only Mr. Amling or his superiors could approve the transfer or allocation of previously unallocated potential clients.  Mr. Amling and his superiors never did so, and never explained why they did not do so.

72. Defendant orally assigned Cox Radio as a client to plaintiff in June 2003, but did not set plaintiff up as the Senior Investment Banker for the client for months after the assignment.

73. Plaintiff does not know of any nondiscriminatory business reason why defendant ignored these opportunities, making it impossible for plaintiff to obtain additional revenues for defendant.

### G.    Plaintiff's Termination and its Aftermath

### 1.    Defendant's Firing of Plaintiff

74. On January 14, 2004, plaintiff was notified that he was being fired, effective January 31, 2004.  He had not received any earlier notice that his employment was in jeopardy.  Plaintiff

and Mr. Amling discussed the termination in other conversations and communications between
January 14 and January 30, inclusive.

75. Mr. Amling stressed to plaintiff that the termination was not for performance reasons.
He stated that the decision was honestly based on "LIFO," as if it were in part a seniority-based
decision, and added that, besides, he needed plaintiff's accounts for "the younger bankers."

76. Less senior employees were not fired, and none of the four young Directors promoted
a year earlier were fired.

77. On January 20, 2004, plaintiff complained about the firing and about Mr. Amling's
admission of age discrimination to James DeNaut and Jacques Brand, who were Mr. Amling's
supervisors.  They expressed surprise at the admission, but let the decision stand.

### 2.    Defendant's Denial of Plaintiff's Bonus for 2003

78. The bulk of plaintiff's compensation was in the form of a bonus, or incentive
compensation.  His salary was $200,000 a year, but bankers at his level expected to receive a
bonus that would bring their annual compensation to at least $1.1 million a year, and which
could exceed that amount.  Defendant encouraged these expectations, although the final sizes of
the bonuses were not announced until the time of their award.  Plaintiff's expectation and
reliance on defendant's customary practices were reasonable.

79. Bonuses are normally awarded in February of the year following the calendar year in
which they are accrued.  Plaintiff expected to receive a bonus in February of 2004 for his work in
2003.  Plaintiff was employed by defendant for all of 2003.  It is usual and customary in the
investment banking business to pay employees a bonus when they have worked the entire year.
Defendant set plaintiff's last day of work to be sure that he was not employed on the day the
awards of bonuses for 2003 took place.  Plaintiff believes that bonuses were paid on February 4,

2004. There was no legitimate business reason to terminate plaintiff before the awards of bonuses for 2003, other than to save the money.

### 3. Defendant's Earlier Concealment of its Intent to Deny Plaintiff His Bonus

80. Defendant decided, at some time materially in advance of notifying plaintiff of his discharge on January 14, 2004, that it was going to fire plaintiff. This can reasonably be inferred from the following:

a. defendant's direct transfer of, and indirect attempts to, transfer plaintiff's clients to younger bankers in the period from 2002 through December 2003, as alleged in ¶¶ 34–43 at pp. 12–14 above;

b. defendant's transfers of other clients of plaintiff in 2002 and 2003, as alleged in ¶¶ 45–51 at pp. 15–16 above;

c. defendant's refusals during the Fall of 2003 to correct its records to conform them to its own policies, so that plaintiff would be credited properly with the revenues and revenue pipeline for the Allbritton Communications High-Yield Bond transaction described in ¶¶ ¶¶ 52–58 at pp. 16–19 above;

d. defendant's refusal, as of January 15, 2003, to recognize most of plaintiff's 2003 Franchise Revenues pipeline, as alleged in ¶¶ 59–62 at pp. 19–21 above;

e. defendant's refusal, as of January 8, 2004, to recognize most of plaintiff's 2004 Franchise Revenues pipeline, as alleged in ¶¶ 63–65 at pp. 21–23 above;

f. defendant's refusals during 2003 to allow plaintiff to develop new clients, by repeatedly refusing to set up accounts for the potential new clients and allocate them to plaintiff in defendant's Client Manager system, so that he could be officially

recognized for successful efforts in developing new business and would be credited therewith, as alleged in ¶¶ 66–73 at pp. 23–24 above; and

      g. on December 2, 2003, defendant's Human Relations Department printed out a summary of the restricted stock plaintiff owned, which was placed in plaintiff's severance package delivered to him on January 14, 2004. On information and belief, this was an unusual action that would make sense only in light of advance information about an impending termination.

81. Plaintiff would not have continued working for defendant in 2003 if he had known he would be denied his bonus, and would have sought comparable job opportunities while still employed and, therefore, still readily employable.

82. During 2003 and early January 2004, plaintiff did not pursue inquiries from those with potential jobs to offer, or follow up on leads with respect to such companies, because he expected to continue working for defendant until he retired.

83. Defendant was well aware that bonuses are very important to its Managing Directors, that the bonuses form the bulk of their compensation, and that they would not continue working for it if they were informed they would not receive a bonus. Defendant's officials well knew plaintiff's expectations of a bonus, well knew that these expectations were both reasonable and standard in the field, and encouraged them throughout 2003 and in 2004 prior to January 14, 2004.

84. Plaintiff discussed his expectations of continued employment for defendant with James DeNaut and Jacques Brand in 2003, and told them that he hoped to spend the rest of his career there. They, and Jeffrey Amling, knew that defendant intended to fire plaintiff and deny him his bonus for 2003, but concealed their knowledge in order to induce plaintiff to remain

working with defendant until they were ready to fire him.  They did not inform plaintiff that his

career with defendant was going to end, they did not inform plaintiff that they intended to deny

him his bonus, and they did not discourage his expectations in any way.

85. Upon information and belief, all other bankers in the Media Investment Banking

Group who had worked for defendant through the bulk of 2003 were paid bonuses in February

2004.

86. Defendant fired a number of these employees, or took actions leading to their transfer

out of the Media Investment Banking Group or separation from employment, after it fired

plaintiff.  Elizabeth Chang was transferred to another unit of defendant and remained employed

by defendant, as plaintiff had unsuccessfully requested in an effort to remain employed by

defendant.  Upon information and belief, none of these employees had complained of age

discrimination prior to the time of plaintiff's firing, and all of these employees were given a

bonus for their work in 2003.

### 4.    Defendant's Infliction of Additional Injury on Plaintiff

87. Upon information and belief, the custom in the investment banking industry is to give

senior investment bankers an extended period of time within which to line up alternative

employment.  Senior investment bankers at plaintiff's level or above are asked to leave

immediately if there is a compelling business reason to do so in the individual instance, such as a

resignation to work for a competitor, a risk of breach of confidentiality, or unlawful activity.

Upon information and belief, defendant has given senior investment bankers at plaintiff's level

or above an extended period of some months, at reduced pay or no pay, within which to line up

alternative employment and thereby have a "soft landing."

88. Plaintiff asked Jeffrey Amling, James DeNaut, Jacques Brand, and others about the

possibility of staying on at reduced or no pay for an additional six months to seek outside

employment.  Mr. Amling told plaintiff that he thought that was a reasonable request and would

see if he could help make that happen.  Mr. DeNaut and Mr. Brand did not respond directly to

plaintiff about this during the January 20, 2004 meeting at which plaintiff complained about age

discrimination, but promised to get back to him.  Andrea Hazelwood from the Human Resources

Department ultimately informed plaintiff that he would not be allowed to stay on past January

31, 2004.  She did not provide a reason.

89. The seventeen-day notice period defendant gave plaintiff shows that there was no

individualized need to terminate him immediately.

90. A period of some months within which to line up alternative employment is an

important benefit of employment in jobs at plaintiff's level or above, and makes it much easier to

obtain a comparable position elsewhere.

91. Plaintiff took the following internal steps:

a.  Plaintiff requested Mr. Amling, Mr. Brand, and Mr. DeNaut to arrange a

transfer to another part of Deutsche Bank, in lieu of termination, and sought their help

in pursuing other jobs within Deutsche Bank.

b.  They denied his requests, and gave him no assistance in lining up other

jobs within Deutsche Bank.

c.  Plaintiff asked Christopher Johnson to intercede on his behalf with Richard

Byrne and Thomas Gahan, and Mr. Johnson agreed to speak to both of these officials.

d.  Mr. Johnson reported to plaintiff that he had discussed the matter with Mr.

Byrne and Mr. Brand.

e.  Defendant's Position Statement submitted to the EEOC shows that Thomas

Gahan, Head of Global Corporate Finance for the Americas, Marc Pfeffer, Chief

Operating Officer of Global Corporate Finance for the Americas, Jacques Brand, Co-Head of Corporate Finance Coverage for the Americas, and James DeNaut, Co-Head of Corporate Finance Coverage for the Americas, were all involved in plaintiff's termination.

      f.  Plaintiff requested a meeting with Mr. Byrne within a few days after he was notified of his termination but before he complained internally of age discrimination, and a meeting was scheduled for January 30, 2004.

      g.  Plaintiff complained of age discrimination prior to this meeting.

      h.  Mr. Byrne canceled the meeting.

92. Upon information and belief, within the context of the investment banking industry, there was no business reason to allow plaintiff to remain on the job from his January 14, 2004 termination until January 31, 2004, and yet also to deny plaintiff the opportunity for a "soft landing" by granting his requests for an extended period of months to obtain employment elsewhere, or by transferring him to another part of Deutsche Bank or by helping him find other jobs within Deutsche Bank.

93. Upon information and belief, defendant was aware that the denial of these requests (a) would be likely to inflict substantial economic harm on plaintiff by making it much more difficult to find comparable employment, and (b) that plaintiff's lifetime earnings potential would be significantly reduced as a result.

94. As the foreseeable consequence of defendant's denial of these requests, despite diligent effort plaintiff has been unable to find comparable employment elsewhere, and the multi-year gap in his working for an investment banking firm as a registered representative may make it impossible for him ever to find comparable employment.

H.    **Defendant's Cover-Up**

95. On November 5, 2004, defendant filed its Position Statement with the EEOC,
explaining why the EEOC should conclude that there was no merit in plaintiff's charge of age
discrimination and retaliation.

a.   The Position Statement consisted of a letter and Exhibits A through T.  The
letter is attached hereto as Exhibit 1.  Exhibit C to the Position Statement is attached
hereto as Exhibit 2.  Exhibit F to the Position Statement is attached hereto as Exhibit
3.

b.   The EEOC had jurisdiction over the investigation of plaintiff's July 22,
2004, charge of age discrimination and retaliation at the time defendant filed its
Position Statement, and defendant knew that the EEOC had such jurisdiction.

c.   The EEOC investigated plaintiff's charge of discrimination until issuing its
Notice of Right to Sue on March 9, 2007.  At that point, the EEOC had been
investigating plaintiff's charge of age discrimination and retaliation for more than
thirty-one months without reaching a conclusion whether there was reasonable cause
to believe the allegations of age discrimination and retaliation were true, and without
deciding to file suit on behalf of plaintiff.

d.   Defendant filed its Position Statement with the intent to manipulate or
pervert the EEOC's investigation and decision-making.

e.   Defendant's Position Statement either actually influenced the EEOC's
investigation and decisions or had a natural tendency or capacity to influence the
EEOC's investigation and decisions.

f.   On information and belief, a further goal of the statement was to persuade
plaintiff to drop the matter.

g.  On information and belief, defendant's deliberate resort to false information in a submission to a Federal investigative agency would only have been done to conceal its knowledge that the claims had merit.

### 1.    Defendant's False Representations and Omissions in the Text of its Position Statement

96. Defendant knowingly and willfully made the material false representations to the EEOC described in ¶¶ 97-122, and failed to provide the EEOC with affirmative information necessary to prevent its submissions from misleading and manipulating the EEOC's investigation and decision-making.

### a.    Defendant's False Representation that Plaintiff's Accounts Were Never Reassigned

97.  Defendant represented to the EEOC that  "Mr. Graves' accounts [were] never reassigned," defendant's Position Statement, p. 1, directly challenging plaintiff's credibility.

98. The statement described in ¶ 97 was a false statement:

a.  At the time of its representation, defendant knew that it had re-assigned the Adelphia Communications account from plaintiff to Dyan Triffo.  See ¶¶ 34-38 above;

b.  At the time of its representation, defendant knew that it had transferred the Cox Enterprises account from plaintiff to J.L. Malcolm Morris.  See ¶¶ 45 and 49-51 above;

c.  At the time of its representation, defendant knew that it had transferred the Cox Communications account from plaintiff to J.L. Malcolm Morris.  See ¶¶ 46 and 49-51 above;

d.  At the time of its representation, defendant knew that it had transferred the Charter Communications account from plaintiff to Sun Yung.  See ¶¶ 47-51 above;

e.  At the time of its representation, defendant knew that it had tried to arrange for the transfer of the XM Satellite Radio account from plaintiff to Elizabeth Chang and/or Blair Faulstich by instructing them to approach plaintiff and get his agreement to the transfer, and defendant knew that—despite plaintiff's failure to agree to the transfer—it thereafter treated the account as no longer plaintiff's account and thus as having been transferred from him.  See ¶¶ 39-41 and 43 above;

f.  At the time of its representation, defendant knew that it had tried to arrange for the transfer of the Salem Communications account from plaintiff to Elizabeth Chang by instructing her to approach plaintiff and get his agreement to the transfer. See ¶¶ 39, 41 and 43 above;

g.  At the time of its representation, defendant knew that its own performance evaluation of one employee for 2003 referred to the need to re-allocate accounts from others to her in order to give her an appropriate opportunity to develop her own practice; and

h.  At the time of its representation, defendant knew that its own performance evaluations of other employees referred to their having been given the accounts in question.

99. Defendant represented to the EEOC that "Mr. Graves never mentioned anything to Mr. Amling during the meeting (or at any time, for that matter) about accounts being transferred away from him," defendant's Position Statement, p. 4.

100.    The statement described in ¶ 99 was not correct, and was never corrected.  At the time of its representation, defendant knew that plaintiff had complained to Mr. Amling orally and in e-mails about the transfers of plaintiff's accounts to other bankers.

   **b.** **Defendant's False Representations that Bankers Were Confined to "Spaces," that There Were Only Two Bankers Working in the "TV Broadcasting" Space, and That Therefore the Only Two Bankers Who Could Be Considered for Layoff Were Plaintiff and Gregory Paul**

  101. Defendant made a number of material representations to the EEOC that bankers worked in "spaces," that there were only two bankers working in the "TV Broadcasting" space, and that therefore the only two bankers who could be considered for layoff were plaintiff and Gregory Paul:

   a. That Mr. Graves "was the younger of two Managing Directors ("MD's") who specialized in television broadcasting," defendant's Position Statement, p. 2;

   b. That defendant's choice of whom to lay off was restricted to Mr. Graves and Mr. Paul, defendant's Position Statement, pp. 2, 4, and 8;

   c. That Mr. Graves "focused primarily on television," defendant's Position Statement, p. 2;

   d. By clear and necessary implication, that other bankers were not involved in television;

   e. That Mr. Graves was limited to "the television broadcasting space" or "the television space," defendant's Position Statement, p. 4;

   f. That there was "duplication" between Mr. Graves and Mr. Paul, defendant's Position Statement, p. 4;

   g. That there was "duplication in the television broadcasting space," defendant's Position Statement, p. 4;

   h. By clear and necessary implication, that there was no such "duplication" elsewhere in the Media Investment Banking Group, defendant's Position Statement, p. 4;

i.  That "there was duplication in that space," referring to the "broadcasting industry" which here seems to mean the television broadcasting industry to which defendant was previously referring, defendant's Position Statement at p. 6.

j.  That Mr. Graves was "one of two MD's in the television broadcasting space," defendant's Position Statement at p. 6; and

k.  That "Mr. Graves was one of two MD's in the television broadcasting space and the space could not support two MD's when market conditions changed for the worse in 2003," defendant's Position Statement at p. 7.

102.    The statements described in ¶ 101 involved a series of false statements and omissions that would mislead and manipulate the EOC's investigation and decision-making.  At the time of these representations, defendant knew that:

a.  During his employment, plaintiff was the Senior Investment Banker ("SIB") for clients, and originated and executed investment banking transactions in, media industries other than TV Broadcasting, as the following deals shown on defendant's own Pipeline Franchise Revenue Reports for 2002 and 2003 show:

(1)      Radio (Salem Communications - HY Offering (4Q 02) (D027241)); (Salem Communications - secondary offering (3Q 02) (D024428)); (Tribune Co. - general advisory (radio assets) (D002234));

(2)      Satellite Radio (XM Satellite Radio - secondary offering (2Q 02) (D022418));

(3)      Cable TV systems and/or programming (Adelphia Communications - HY offering (2Q 01) (D013200)); Allbritton Communications - General Advisory (News Ch 8) (D020686)); Allbritton

- 35 -

Communications - HY (4Q 02) (D020406) (also listed under TV));

(Allbritton Communications - General Advisory (News Ch 8) (D020686)

(also listed under TV)); Allbritton Communications - HY (4Q 02)

(D020406)); (Allbritton Communications - HY Offering (1Q03)

(D030214));

      (4)     Diversified Media not including TV (Gaylord

Entertainment - Project Worship / Worship (D013127));

      (5)     Diversified Media including TV (Landmark

Communications - general advisory (Retainer 2001-02) (D014724));

(Tribune Co. - general advisory (radio assets) (D002234)); and

      (6)     TV (Allbritton Communications - HY (4Q 02) (D020406));

Allbritton Communications - HY Offering (1Q03) (D030214)); (Gray

Television - HY offering (4Q 02) (D025884)); (Gray Television -

bank/equity financing (4Q 02) (D022657));

    b.  As alleged in ¶ 59 above, defendant's 2003 Franchise Revenue Pipeline

reported in Exhibit C to defendant's Position Statement to the EEOC (attached as

Exhibit 2 to this Complaint) failed to list the bulk of plaintiff's actual 2003 pipeline,

and many of the omitted accounts were in Media industries other than TV

Broadcasting.  These include:

      (1)     Radio Industry: Plaintiff worked on a contract with Tribune

Co. for the remaining value of the Denver radio sale for $530,000 or 501.135

Euros; an agreement with Salem Communications that defendant would lead

a bond transaction for $250,000 or 236,384 Euros; and an agreement with

Susquehanna Media that defendant would participate in a bond transaction for $1,500,000 or 1,418,306 Euros. In addition, prior to 2002 plaintiff advised on behalf of defendant Raycom Media and Hearst-Argyle Television sell their Radio properties, which had the effect of making these two clients TV Broadcast clients;

(2)     Cable Systems and/or Programming: Plaintiff worked on an agreement with Allbritton Communications that defendant would lead a bond transaction, discussed above, for $3,094,000 or 2,925,492 Euros; an agreement with Susquehanna Media that defendant would participate in a bond transaction for $1,500,000 or 1,418,306 Euros; and agreement with Crown Media that defendant would participate in an equity transaction for $1,600,000 or 1,512,859 Euros;

(3)     Satellite Radio: Plaintiff worked on an agreement with XM Satellite Radio for defendant to participate in a sale/leaseback transaction for $1,000,000 or 782,963 Euros; and an agreement with XM Satellite Radio for defendant to participate in a bond transaction for $1,000,000 or 782,963 Euros;

(4)     Diversified Media Industry including but not limited to TV Broadcasting: Plaintiff worked on an agreement with Gannett Corporation for defendant to participate in a share buyback for $400,000 or 313,185 Euros; and on an agreement with Gannett Corporation for defendant to participate in a new line of credit for $80,000 or 62,637 Euros;

(5)     TV Broadcasting only because plaintiff advised the clients on behalf of defendant to sell their only remaining Radio Industry assets: Plaintiff worked on a contract with Raycom Media to handle a merger and acquisition transaction for $3,000,000 or 2,836,611 Euros; and an agreement with Hearst-Argyle Television that defendant would participate in an equity transaction for $3,300,000 or 3,120,272 Euros.

c.  Defendant knew, but failed to inform the EEOC, that other bankers in the Media Industry Group— Jeffrey Amling, Charles Carey, Elizabeth Chang, Blair Faulstich, Gregory Paul, and Ellen Silver—also did substantial work in the TV Broadcast Industry, and that the Franchise Revenue Reports it provided to the EEOC reflected their work without revealing that the accounts were TV Broadcast Industry accounts;

d.  Defendant knew, but failed to inform the EEOC, that prior to plaintiff's termination it had transferred a number of his cable, radio, and other non-television broadcasting clients to younger bankers and thus narrowed his then-current client base; and

e.  Defendant knew, but failed to inform the EEOC, that it was common for bankers in the Media Industry Group to work in numerous media industries, not just one, and that there was no "bright line" walling off bankers in particular "spaces."

c.    **Defendant's Failure to Inform the EEOC that Plaintiff Was the Only Managing Director Who Was Not a Manager of Directors, Was Not an Evaluating Manager of Directors, and that Plaintiff's Actual Competition for Layoff Was With Directors and Not with the Managing Directors Who Managed Directors and Evaluated Directors**

103.    Defendant represented to the EEOC that plaintiff was a peer of other Managing Directors, and their comparator, even to the extent that seniority was a factor in deciding whom to lay off.  These included the following statements:

a. That the selection of whom to lay off was limited to plaintiff and a Managing Director who worked in television broadcasting, without mentioning the Directors who worked in television broadcasting: "What Mr. Graves fails to mention is that he was the younger of two Managing Directors ("MD's") who specialized in ·television broadcasting and when the industry was suffering, with no hope of a near term turnaround, DBSI terminated Mr. Graves' employment because the other MD had 18 years more seniority and some experience outside of television."  Defendant's Position Statement at p. 2;

b. That the persons to be compared with plaintiff were Managing Directors: "DBSI's other Media MD's included Gregory Paul, Charles Carey, Malcolm Morris, and Dyan Triffo. (See Exhibit B.)"  Defendant's Position Statement at p. 2;

c. Throughout defendant's Position Statement, plaintiff was compared to Managing Directors, not to Directors;

d. That seniority was a substantial factor influencing defendant's layoff decisions, defendant's Position Statement, pp. 2, 6, and 8;

e. By clear and necessary implication, that defendant's choice of whom to lay off was restricted to Managing Directors, defendant's Position Statement, p. 2; and

f.  By clear and necessary implication, that there was no difference between plaintiff and other Managing Directors that could have made plaintiff not comparable with the other Managing Directors.

104.    At the time of the representations described in ¶ 103, defendant knew, but failed to inform the EEOC, that all of the other Managing Directors below Mr. Amling—Mr. Carey, Ms. Triffo, Mr. Paul, and Mr. Morris—were managers of Directors and Evaluating Managers over Directors, that defendant treated plaintiff as a competitor with Directors for accounts and a source of transfers of accounts to Directors, and that in these respects plaintiff was in competition with Directors, not Managing Directors, for retention in any layoff.  See ¶¶ 25(d) and (e) above.

105.    Defendant's failure to communicate to the EEOC the true status of Mr. Carey, Ms. Triffo, Mr. Paul, and Mr. Morris was even more misleading because the managers were the oldest employees in the Media Investment Banking Group.  Defendant's Exhibit B to its Position Statement contained the ages of these employees.  It shows the following as to these managers:

| Managing Directors and Directors Who Were Evaluating Managers of Managing Directors or Directors | Age Represented to the EEOC |
|---|---|
| Jeffrey Amling | 50 |
| Charles Carey | 41 |
| Gregory Paul | 46 |
| J.L. Malcolm Morris | 41 |
| Dyan Triffo | 37 |

Plaintiff was the only Managing Director who was not a manager of Directors, and was not an Evaluating Manager of Directors.  His true comparators with respect to this function thus may

have been Managing Directors and Directors who were not evaluating managers. Their age

information as reported by defendant to the EEOC is as follows:

| Managing Directors and Directors Who Were Not Evaluating Managers of Managing Directors or Directors | Age Represented to the EEOC |
|---|---|
| Dan Graves | 42 |
| Elizabeth Chang (not shown on Exhibit B to defendant's Position Statement, but shown with her birth date on Exhibit N to defendant's Position Statement) | 33 |
| William Detwiler (not included in defendant's Franchise Revenue Reports but retained in his job) | 34 |
| David Dunn | 35 |
| Blair Faulstich | 34 |
| Jason Hartka (not included in Franchise Revenue Reports but retained in his job) | 32 |
| Zachary Maurus | 34 |
| Sun Yung | 41 |

Plaintiff's real comparators from this perspective were therefore a much younger group of

Investment Bankers than defendant had led the EEOC to believe. The statements described in

¶ 103 thus involved a series of statements and omissions that would mislead and manipulate the

EOC's investigation and decision-making.

### d.     Defendant's Submission to the EEOC of Misleading Extracts from its Franchise Pipeline Reports

106.     Defendant implicitly represented to the EEOC throughout its Position Statement

that it was providing accurate figures that could fairly be used to compare the performance of

individual Managing Directors and Directors in its Media Industry Group:

       a. Defendant represented to the EEOC throughout its Position Statement that the figures in its "Franchise Revenue & Pipeline by MD and DIR" statement dated January 15, 2003, Exhibit C to its Position Statement and attached hereto as Exhibit 2, were an accurate reflection of the achievements and prospective achievements of each potential transaction, Director, or Managing Director listed.

       b. Defendant represented to the EEOC throughout its Position Statement that the figures in its "Franchise Revenue & Pipeline by MD and DIR" statement dated January 8, 2004, Exhibit F to its Position Statement and attached hereto as Exhibit 3, were an accurate reflection of the achievements and prospective achievements of each potential transaction, Director, or Managing Director listed.

       c. Defendant's Position Statement stated at p. 3, for example:

> Of the 6 MD's, Mr. Graves had the lowest franchise revenue for 2003 and the lowest 2004 franchise pipeline (excluding Ms. Triffo who was still on extended leave). (The chart, attached hereto as Exhibit F, demonstrates franchise-revenue and pipeline by MD and Dir, in Euro thousands, for 2003.) Mr. Graves 2003 franchise revenue was 2,468 Euro thousand and his 2004 franchise pipeline was 983 Euro thousand - - well below DBSI's target. Due to market conditions, Mr. Paul also had trouble meeting DBSI's target, but had a higher franchise revenue than Mr. Graves.  Mr. Paul's 2003 franchise revenue was 7,139 Euro thousand. and his 2004 franchise pipeline was 4,559 Euro thousand. Mr. Morris had a 2003 franchise revenue of 3,229 Euro thousand, but a 2004 franchise pipeline of 26,135 Euro thousand. Mr. Carey and Mr. Amling, as well as 3 out of 5 directors ("DR") in the Media Group, were well above DBSI's target.

107.    At the time of the representations described in ¶ 106, defendant knew that for at least some business purposes it did not rely on the figures in Exhibits C and F to its Position Statement, attached hereto as Exhibits B and C, as an accurate reflection of the achievements and prospective achievements of each potential transaction, Director, or Managing Director listed, and weighted the pipelines based on the stated probability of a deal occurring.

108.   Defendant deleted all pages from its January 15, 2003, franchise pipeline reports other than the 100% weighting pages, and never provided to the EEOC the pages showing that it weighted the potential transaction by the stated probability of a deal occurring, or otherwise informed the EEOC of this practice.

109.   Exhibit 4 to the Complaint is defendant's full January 15, 2003 Franchise Pipeline Revenues report produced by defendant in discovery on February 28, 2008.

110.   Exhibit 5 to the Complaint is defendant's full January 8, 2004 Franchise Pipeline Revenues report produced by defendant in discovery on February 28, 2008.

      a.   Its first page, DB 000837, shows a probability-weighted pipeline for the balance of the current year.

      b.   Its fifth page, DB 000841, shows a probability-weighted pipeline for the Time Warner Cable IPO (D026173) potential deal as not being worth a Euro, even though defendant's Exhibit F portrayed it as worth 20,833,000 Euros for J.L. Malcolm Morris.

      c.   The same page shows a probability-weighted pipeline for the Time Warner Telecom Bank/HY $500mm Q1 2004 (D034003) potential deal as not being worth a Euro, even though defendant's Exhibit F portrayed it as worth 1,572,000 Euros for J.L. Malcolm Morris.

      d.   The same page shows a probability-weighted pipeline for the AOL monetization of Time Warner Telecom stake (D034002) potential deal as not being worth a Euro, even though defendant's Exhibit F portrayed it as worth 3,930,000 Euros for J.L. Malcolm Morris.

e. The differences are clearly material, because Mr. Morris had no 2004 franchise revenues pipeline recognized by defendant as worth a single Euro, even though defendant's Position Statement stated: "Mr. Morris had a 2003 franchise revenue of 3,229 Euro thousand, but a 2004 franchise pipeline of 26,135 Euro thousand."

f.  When probability-weighted pipelines are taken into account, the effect on the 2004 franchise revenue pipelines is material:

| Managing Director or Director | Age Represented to the EEOC | 2004 Franchise Revenue Pipeline Stated to the EEOC, in Thousands of Euros | Actual Probability-Weighted 2004 Pipeline |
|---|---|---|---|
| Jason Hartka (not included in Franchise Revenue Reports but retained in his job as Director) | 32 | 0 | 0 |
| Elizabeth Chang | 33 | | |
| Blair Faulstich | 34 | 0 | 0 |
| William Detwiler (not included in defendant's Franchise Revenue Reports but retained in his job as Director) | 34 | 0 | 0 |
| Zachary Maurus | 34 | 3,930 | 983 |
| David Dunn | 35 | 0 | 0 |
| Dyan Triffo | 37 | 3,930 | 983 |
| Charles Carey | 41 | 786 | 786 |
| Sun Yung | 41 | 786 | 0 |

| Managing Director or Director | Age Represented to the EEOC | 2004 Franchise Revenue Pipeline Stated to the EEOC, in Thousands of Euros | Actual Probability-Weighted 2004 Pipeline |
|---|---|---|---|
| Daniel Graves | 42 | 983 | 0 |
| Gregory Paul | 46 | 4,559 | 2,319 |
| Jeffrey Amling | 50 | 3,930 | 0 |

111.    Notwithstanding the representations in defendant's Position Statement, plaintiff did not in fact stand out as having materially worse prospects for 2004 than the other bankers, whether or not one takes into consideration defendant's manipulation of his accounts, failure to consider the revenues he achieved, and failure to consider the prospects he had.

112.    The statements described in ¶ 106 thus involved a series of statements and omissions that would mislead and manipulate the EOC's investigation and decision-making.

> **e.    Defendant's Misrepresentations to the EEOC as to the Breadth of Plaintiff's and Gregory Paul's Experience**

113.    Defendant represented to the EEOC that Mr. Paul had had experience outside of television broadcasting, or had experience in the cinema industry, and, by clear and necessary implication, that Mr. Graves did not have experience outside of television broadcasting, defendant's Position Statement, pp. 2, 8.

114.    At the time of the representations described in ¶ 113, defendant was aware of the breadth of plaintiff's experience in other Media Industries. See ¶¶ 25(f) and (g), above, and the paragraphs referenced below.

115.    At the time of the representations described in ¶ 113, defendant was aware that some of plaintiff's accounts that it had transferred or attempted to transfer were in media industries other than television broadcasting.  See ¶¶ 34-43 and 45-51 above.

116.    At the time of the representations described in ¶ 113, defendant was aware that some of the accounts for which it had refused to give plaintiff franchise revenues and pipeline credit for 2003 and 2004 were in media industries other than television broadcasting.  See ¶¶ 57-65 above.

117.    At the time of the representations described in ¶ 113, defendant was aware that some of the accounts for which it had refused to place plaintiff on the Client Manager system were accounts in media industries other than television broadcasting.  See ¶¶ 66-73 above.

### f.    Defendant's Downplaying of the Value of The Accounts It took Away from Plaintiff

118.    Defendant represented to the EEOC that a number of the accounts it took away from plaintiff had little or no value.  These included the following:

a.    Defendant represented to the EEOC that Adelphia produced only "little revenue" in 2004, defendant's Position Statement, p. 9, although defendant knew otherwise.  Attachment J to defendant's Position Statement states that the September 2004 YTD Franchise Revenues for Adelphia were 1,297,000 Euros in revenues for defendant on an exit financing deal for Senior Bank Debt, and had produced 779,000 Euros for defendant on takeout financing;

b.    Defendant represented to the EEOC by clear and necessary implication that that there was little value to the Adelphia account, defendant's Position Statement, p. 9, where defendant well knew, from before plaintiff's firing to the public announcement of Adelphia's draft disclosure statement and proposed plan of

reorganization on February 25, 2004, and the announcement on April 22, 2004, that Adelphia was exploring the possibility of being acquired, and that such knowledge and announcements would likely lead to significant opportunities for investment banking business;

c.   Defendant represented to the EEOC that Charter produced only "little revenue" in 2004, defendant's Position Statement, p. 9, where Attachment J to defendant's Position Statement shows that Charter had produced 1,408,000 Euros in September 2004 YTD Franchise Revenues for a refinancing deal for Corporate High-Yield Bonds;

d.   Defendant represented to the EEOC, by clear and necessary implication, that there was little value to the Charter account, defendant's Position Statement, p. 9, where defendant well knew that Charter was exploring the possibility of going private, and well knew that such activities would likely lead to significant opportunities for investment banking business.  Charter had over $18 billion of debt outstanding at the time.   Defendant had such knowledge from before plaintiff's firing to the February 19, 2004, statement of Charter's CEO and an announcement reported on April 23, 2004, that Charter was evaluating opportunities to reduce debt and reduce intermediate term debt maturities and leverage.  In addition, defendant knew that it had informed its employees that Charter was one of defendant's top 50 fee generators among Media companies; and

e.   Defendant represented to the EEOC, by clear and necessary implication, that there was little value to the Cox account, defendant's Position Statement, p. 9, where defendant well knew that it had informed its employees that both Cox

Enterprises and Cox Communications clients were, individually, among defendant's top 50 fee generators among Media companies.

119.    The statements described in ¶ 118 thus involved a series of statements and omissions that were material and would be likely to mislead and manipulate the EOC's investigation and decision-making.

**2.    Defendant's Choice of Documents to Submit to the EEOC for Purposes of Comparing the Performance and Prospects of Individual Bankers**

120.    Defendant submitted to the EEOC altered and redacted excerpts from its Franchise Pipeline Reports as the only tool by which the performance and prospects of individual bankers could be compared.

a. Exhibit C to defendant's Position Statement (Exhibit 2 hereto) is an altered and redacted document dated January 15, 2003, purporting to show what each banker had achieved in 2002, and had in the pipeline for 2003. Defendant treated it as a critical document, using it to represent that plaintiff's performance was the poorest in the group. Specifically, the Position Statement represents at p. 3, again using the abbreviation "MD" for Managing Director:

> Despite Mr. Graves' belief that his 2002 performance was the highest in the Group, his December 2002 year to date franchise revenues were actually lower than all of the other MD's, including Mr. Paul who had a 2002 franchise revenue of 15,117 Euro thousands compared to Mr. Graves' 13,544 Euro thousands. (See Exhibit C.)

b. Exhibit F to defendant's Position Statement (Exhibit 3 hereto) is an altered and redacted document dated January 8, 2004, purporting to show what each banker had achieved in 2003, and had in the pipeline for 2004. This document is dated six days before plaintiff was fired, and defendant treated it as a critical document, using it to represent that plaintiff's results for 2003 and his 2004 business prospects were poor

compared to those who were not fired.  Specifically, the Position Statement represents

at p. 3, using the abbreviation "MD" for Managing Director:

> Of the 6 MD's, Mr. Graves had the lowest franchise revenue for 2003 and
> the lowest 2004 franchise pipeline (excluding Ms. Triffo who was still on
> extended leave). (The chart, attached hereto as Exhibit F, demonstrates
> franchise-revenue and pipeline by MD and Dir, in Euro thousands, for 2003.)
> Mr. Graves 2003 franchise revenue was 2,468 Euro thousand and his 2004
> franchise pipeline was 983 Euro thousand - - well below DBSI's target.

121.   Defendant used existing documents prepared in the ordinary course of business as

the starting source of these altered and redacted documents it provided to the EEOC.  However,

there is no indication that the statements of revenues achieved or pipelines in these documents or

redacted documents were ever used by defendant to compare the performance of individual

bankers for any personnel decisions such as promotions, terminations, selections for layoff, or

allocations of bonuses, and they contain flaws making them unsuitable for those purposes:

a. The altered and redacted excerpts of documents provided to the EEOC

inflate the achievements and prospects of younger bankers by giving each of them

separate credit for the full aggregate expected revenues for every actual or proposed

transaction on which they worked with a more senior banker.  These pages did not

inform the EEOC that the full value was being double-counted or triple-counted, and

these pages did not inform the EEOC that the full value had not been divided into

halves or thirds for the purpose of allocating credit.  The pages of these documents

that were not provided to the EEOC would have shown the EEOC that the full stated

value of the transaction was being allocated separately to each individual banker on

the team working on the transaction, and would have made the double-counting and

triple-counting clear to the EEOC.  Defendant's choice of providing only the redacted

excerpts of franchise pipeline reports to the EEOC had the effect of inflating the performance of younger bankers and putting plaintiff in a falsely poor light;

b.  Defendant's exclusion from its submission to the EEOC of the parts of its Franchise Pipeline reports making clear that, for at least some business purposes, it weighted pipelines by the probability of a potential transaction occurring, was an omission materially altering the import of the information provided, and put plaintiff in a falsely poor light.  See ¶¶ 107-112 above.

c.  Defendant did not provide the EEOC with the actual redacted excerpts of its Franchise Pipeline reports, which do not contain aggregate totals for each banker (see Exhibits 4 and 5 hereto), but provided altered forms of these pages with aggregate totals for each banker (see Exhibits 2 and 3 hereto).  The addition of totals for each banker would have furthered or enhanced the impression of the EEOC that these figures could fairly be used to compare the performance of individual bankers;

d.  Defendant's failure to note the fact or dates of the alterations, and defendant's continued use of the original, pre-alteration dates on the documents so that they appeared to precede the date of plaintiff's EEOC charge, would have furthered or enhanced the impression of the EEOC that these documents were exactly the same as defendant's regular business documents and predated the charge of discrimination;

e.  Defendant's failure to include some of plaintiff's clients, achievements, and pipelines in these types of documents materially lowered plaintiff's performance and prospects on these types of documents and put plaintiff in a falsely poor light;

f.  Defendant's failure to list plaintiff, or delay in listing plaintiff, in the Client Manager for some of his clients or proposed clients, and thus to enable plaintiff to

obtain any results that would appear on these types of documents, materially lowered plaintiff's performance and prospects on these types of documents and put plaintiff in a falsely poor light; and

g. Defendant's valuation of very dissimilar proposed transactions, for different clients, at the same odd numbers or at arbitrary numbers, may reflect a practice that serves some business interest of defendant's, but when used as an indicator of real pipeline values may overstate the prospective pipelines of other bankers and place plaintiff in a falsely poor light. For an illustrative example, Exhibit F to defendant's Position Statement to the EEOC (Exhibit 3 hereto) includes the same precise 2004 Franchise Pipeline value of 3,930,000 Euros for four very different transactions:

(1)     the "AOL - monetisation of Time Warner Telecom stake (D034002)" deal described as an "Equity Follow-On," and credited to both Elizabeth Chang and JL Malcolm Morris for the 2004 Franchise Pipeline;

(2)     the "Kim Magnes Estate - divestiture advisory (D033651)" deal described as "Divestiture Advisory," and credited to Jeffrey Amling for the 2004 Franchise Pipeline;

(3)     the "BusinessWire - general advisory (D005685)" deal described as "Divestiture Advisory," and credited to Dyan Triffo for the 2004 Franchise Pipeline; and

(4)     the "Google - IPO (D031830)" deal described as "Equity-IPO," and credited to Zach Maurus for the 2004 Franchise Pipeline.

122.    The problems with Exhibits C and F to defendant's Position Statement that are described in ¶¶ 120 and 121 thus involved a series of statements, omissions and devices that were material, and would be likely to mislead and manipulate the EOC's investigation and decision-making.

### 3.    Defendant's Duty to Provide Straightforward Information to the EEOC that is Not False or Misleading

123.    In filing its statement, defendant was under a statutory duty imposed by 18 U.S.C. § 1001 not to knowingly and willfully falsify, conceal, or cover up a material fact by any trick, scheme, or device, and was under a duty not to make a false, fictitious, or fraudulent statement or representation, or to use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry.

124.    Defendant breached this duty.

### I.    Administrative Exhaustion

125.    Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (hereinafter, "EEOC") on July 22, 2004, alleging that defendant Deutsche Bank Securities, Inc., had engaged in age discrimination and retaliation in violation of the ADEA, the New York State Human Rights Law (hereinafter, "State Human Rights Law"), and the City Human Rights Law.  The charge specified that it was to be filed with the New York State Division of Human Rights as well as with the EEOC.  The charge was sworn to, and notarized.  A copy of the charge is attached hereto as Exhibit 6.

126.    Plaintiff intended that his charge of discrimination be processed by the New York State Division of Human Rights with respect to his rights under the State Human Rights Law, as well as being processed by the EEOC with respect to his rights under the ADEA.

127.    On August 6, 2004, the EEOC notified plaintiff that his charge of age discrimination and retaliation was being sent to the New York State Division of Human Rights, and continued in part: "If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official.  Then the agency will investigate and resolve the charge under their statute."  A copy of the letter and its attachment is attached hereto as Exhibit 7.

128.    Plaintiff did not expect the New York State Division of Human Rights to ask to re-execute his charge because it had already been sworn and notarized, and both intended and expected that the New York State Division of Human Rights would investigate and process his charge under the State Human Rights Law.

129.    The New York City Commission on Human Rights is barred by the City Human Rights Law, § 8–109(f)(ii) and (iii) of the Administrative Code, from processing any complaint that has been filed with the New York State Division of Human Rights.

130.    The New York State Division of Human Rights never communicated with plaintiff, and on May 29, 2007, plaintiff informed the Division that he was planning on filing suit, and requested by facsimile transmission and by mail that the Division dismiss his charge for administrative convenience.  On July 9, 2007, the New York State Division of Human Rights issued its Notice of Dismissal for Administrative Convenience of plaintiff's charge of age discrimination and retaliation.  A copy of the Notice is attached hereto as Exhibit 8.

131.    Pursuant to the City Human Rights Law, § 8–502(d) of the Administrative Code, plaintiff's time for filing suit under the City Human Rights Law was tolled during the time his complaint was before the New York State Division of Human Rights, i.e., from August 6, 2004, through the July 9, 2007, dismissal of that complaint for administrative convenience.

132.     On March 9, 2007, the EEOC issued a Notice of Right to Sue to plaintiff, at his request.  A copy of the Notice is attached hereto as Exhibit 9.

133.     Plaintiff received the Notice on March 10, 2007, or a subsequent day.  This lawsuit was timely filed ninety or fewer days from his receipt of the Notice of Right to Sue.

**J.     Plaintiff's First Cause of Action: Discrimination Under the Age Discrimination in Employment Act**

134.     The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 27–94 at pp. 11–30 above, incorporated herein by reference, violated the ADEA by discriminating against plaintiff because of his age.

**K.     Plaintiff's Second Cause of Action: Discrimination Under the City Human Rights Law**

135.     The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 27–94 at pp. 11–30 above, incorporated herein by reference, violated the City Human Rights Law by discriminating against plaintiff because of his age.

**L.     Plaintiff's Third Cause of Action: Retaliation Under the Age Discrimination in Employment Act**

136.     The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 77–94 at pp. 25–30 above, incorporated herein by reference, violated the ADEA by retaliating against plaintiff for having opposed age discrimination by complaining internally about age discrimination against him.

**M.     Plaintiff's Fourth Cause of Action: Retaliation Under the Fair Labor Standards Act**

137.     The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 77–94 at pp. 25–30 above, incorporated herein by reference, violated the FLSA by retaliating against plaintiff for having opposed age discrimination by complaining internally about age discrimination against him.

**N.    Plaintiff's Fifth Cause of Action: Retaliation Under the City Human Rights Law**

138.    The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 77–94 at pp. 25–30 above, incorporated herein by reference, violated the City Human Rights Law, § 8–107(7) of the Administrative Code, by retaliating against plaintiff for having opposed age discrimination by complaining internally about age discrimination against him.

**O.    Plaintiff's Sixth Cause of Action: Fraudulent Concealment in Denying Plaintiff His Incentive Bonus for 2003**

139.    The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 78–86 at pp. 25–28 above, incorporated herein by reference, constituted the tort of fraudulent concealment of its intent not to pay plaintiff his incentive bonus for 2003, defendant knowingly induced plaintiff to continue working for it in reliance on receiving his 2003 incentive bonus, knew that plaintiff was continuing to work for defendant in reliance on the bonus, knew that plaintiff's expectation of the bonus was reasonable, had decided at some time materially before January 14, 2004, not to pay plaintiff's bonus to him, had a duty based on its special knowledge to communicate that change of position to plaintiff, and instead concealed and did not communicate this change of position to plaintiff before January 14, 2004, so that plaintiff would continue working for it until defendant was ready to fire him, and succeeded in that plaintiff continued working for defendant throughout 2003.

**P.    Plaintiff's Seventh Cause of Action: Breach of the Duty of Good Faith and Fair Dealing in Denying Plaintiff His Incentive Bonus for 2003**

140.    The actions of defendant Deutsche Bank Securities, Inc., described in ¶¶ 78–86 at pp. 25–28 above, incorporated herein by reference, breached defendant's duty of good faith and fair dealing with respect to its decision not to pay plaintiff his incentive bonus for 2003, in that defendant knowingly induced plaintiff to continue working for it in reliance on receiving his

2003 incentive bonus, knew that plaintiff was continuing to work for defendant in reliance on the bonus, knew that plaintiff's expectation of the bonus was reasonable, had decided at some time materially before January 14, 2004, not to pay plaintiff's bonus to him, had a duty based on its special knowledge to communicate that change of position to plaintiff, and instead concealed and did not communicate this change of position to plaintiff before January 14, 2004, so that plaintiff would continue working for it until defendant was ready to fire him, and succeeded in that plaintiff continued working for defendant throughout 2003.

**Q.    <u>Prayer</u>**

WHEREFORE, plaintiff respectfully requests that this Court grant the following relief:

1.    Declare that defendant's termination of plaintiff's employment, its insistence that his employment end so soon after notification, and its denial of his bonus for 2003, to have violated the prohibitions of discrimination and retaliation in the ADEA and the City Human Rights Law, and the prohibition of retaliation in the FLSA;

2.    Declare that defendant knowingly made false and misleading representations of material fact to the EEOC, for the purpose of attempting to persuade plaintiff and the EEOC that there was no merit in plaintiff's charge of discrimination, and for the purpose of persuading the EEOC not to file suit to enforce plaintiff's rights under the ADEA;

3.    Order defendant to reinstate plaintiff in the position of Managing Director, with salary, benefits, and incentive bonuses comparable to those of other Managing Directors but in no event lower than the salary, benefits, and incentive bonuses for any Managing Director in the Media Investment Banking Group, and with length of service and seniority for all purposes as if plaintiff had never been terminated and had continued to work for defendant from January 31, 2004, through the date of reinstatement;

4.   In the event reinstatement is granted, order defendant Deutsche Bank Securities, Inc., its senior officials, and Mr. Amling:

a.  not to take or omit any action, wholly or partially, in retaliation against plaintiff for having complained of client reassignments, and/or  of age discrimination, from 2002 to 2004, for filing his charge of discrimination with the EEOC, or for having filed this lawsuit, and

b.  in making future decisions on promotions, assignments, training, and compensation, not to consider plaintiff's absence from work since January 31, 2004, or his having complained of client reassignments and of age discrimination from 2002 to 2004, or his charge of discrimination with the EEOC, or this lawsuit;

5.   In the event reinstatement is granted, order defendant to facilitate the service required in this paragraph, and order the Marshal to make personal service of an Order entered pursuant to ¶ 3 of this Prayer on Mr. Amling if still employed by defendant at that time, on the new head of the Media Investment Banking Group if this is not Mr. Amling, on each of Mr. Amling's or the new head's superiors in the direct line of command in the United States, on defendant's Human Relations Director (or similar title) for the United States, and on the Human Relations official chiefly responsible for servicing the Media Investment Banking Group.

6.   Award back pay to plaintiff for his 2003 incentive bonus, calculated in the same manner as the incentive bonuses for other for other Managing Directors but in no event lower than the salary, benefits, and incentive bonuses for any Managing Director in the Media Investment Banking Group;

7.   Award back pay to plaintiff for the salary and incentive bonuses, less interim earnings,  he would have received if he had not been fired, for the period from January 31, 2004,

to the date of the verdict, with salary, benefits, and incentive bonuses calculated in the same manner as the salary, benefits, and incentive bonuses for other Managing Directors but in no event lower than the salary, benefits, and incentive bonuses for any Managing Director in the Media Investment Banking Group, and with length of service and seniority for all purposes as if plaintiff had never been terminated and had continued to work for defendant from January 31, 2004, through the date of reinstatement;

8.   To the extent that the back pay award includes awards of stock that plaintiff would have received if he had been employed in the year in question, the stock should be awarded at the same price in effect at the time other employees were awarded the stock, not its present value, and any period of restriction should be considered as satisfied by the passage of time;

9.   Award back pay to plaintiff for any employment benefits he lost because of his termination including, but not limited to, 401K, Pension Plan and gift matching as well as for the amount of health, dental and disability insurance paid by plaintiff for his coverage of his family since his termination;

10. Award back pay to plaintiff for the value of the appreciation of defendant's stock previously awarded to him that he could not enjoy because he sold the stock to meet his expenses and support his family;

11. Award liquidated damages to plaintiff in an additional amount equal to the amount of back pay awarded;

12. Award prejudgment interest to plaintiff, at the statutory New York rate of 9% per annum simple interest on State-law claims and such interest rate as the Court deems proper for claims under Federal law, from the date the payment should have been received to the date judgment is entered, for every element of his back pay award,

13. Award postjudgment interest to plaintiff;

14. In the event that the Court denies reinstatement, or in the event that reinstatement is delayed during the pendency of an appeal or for other reasons:

> a. award plaintiff front pay for the period from the date of the verdict until such time as Plaintiff is reinstated or can be expected to have obtained comparable employment;

> b. award plaintiff lost future earnings to compensate for the reduction in his lifetime earnings potential caused by defendant's actions, whether such lost future earnings are characterized as front pay or as compensatory damages;

15.  Award punitive damages to plaintiff, in an amount sufficient to deter defendant from engaging in future actions similar to those giving rise to this lawsuit, and sufficient to deter other similar employers from doing the same;

16. Award plaintiff reasonable attorneys' fees and the reasonable expenses of his charge of discrimination and retaliation and of this action; and

17. Grant such other and further relief as may be necessary or appropriate.

**R.     Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands trial by jury of all questions of fact, of all matters as to which the Seventh Amendment to the Constitution of the United guarantees the right of trial by jury, and of all matters as to which § 7(c)(2) of the ADEA, 29 U.S.C. § 626(c)(2), provides a right of trial by jury.

Respectfully submitted,

Richard T. Seymour (RS-8094)
rick@rickseymourlaw.net
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
    (202) 862-4320 – Telephone
    (202) 549-1454 – Cell
    (800) 805-1065 – Telecopier

Steven A. Berger (SB-2038)
sberger@bergerwebb.com
Jonathan Rogin (JR-9800)
jrogin@bergerwebb.com
Berger & Webb, LLP
1633 Broadway, 46th Floor
New York, N.Y. 10019
    (212) 319-1900 – Telephone
    (212) 319-2017 and -2018 – Telecopiers

By: ____/s/ Richard T. Seymour_____
    Richard T. Seymour (RS 8094)
    Attorneys for Plaintiff

Dated: June 16, 2008