# LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.

1150 CONNECTICUT AVENUE N.W. • SUITE 900 • WASHINGTON, DC 20036-4129
www.rickseymourlaw.com  FAX: (800) 805-1065 AND (202) 828-4130
RICHARD T. SEYMOUR, PRINCIPAL: (202) 862-4320, CELL: (202) 549-1454, Rick@RickSeymourLaw.net*
JULLION R. TAYLOR, SENIOR PARALEGAL: (202) 862-4370, CELL: (202) 531-4039, Jullion@RickSeymourLaw.net

May 9, 2008

**By E-Mail and Mail**

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Re: **Graves v. Deutsche Bank: Defendant's Rule 11 Motion and April 2 Demand**
**That Allegations Of a Fraudulent Response to the EEOC Be Withdrawn**

Dear Cliff and Joanne:

This letter follows up on your Rule 11 Motion and on your April 2 letter responding to my March 18 rejection of your March 12 demand that plaintiff withdraw the Complaint's allegations that defendant made a false filing to the EEOC, based on an August 2004 Sample Banker Report created or "Last Updated" after the filing of plaintiff's July 2004 EEOC charge, on the ground that this post-charge document is similar to the allegedly false filing three months later.

Your reference to motion practice regarding these allegations and detailed statement of the basis for your positions is noted. I believe this conforms to, and confirms the wisdom of, plaintiff's practice of laying out the bases of our positions and providing relevant authorities.

Now that defendant is poised on the brink of starting a round of motion practice by servings its Rule 11 Motion, plaintiff calls on it to step back from the brink, keep an open mind as it considers this letter, and withdraw any consideration of filing what this letter shows to be a baseless Motion.

Defendant should also consider whether the combination of a virtually total failure to comply with the discovery rules, combined with a baseless demand to withdraw supported allegations on pain of Rule 11 sanctions, and a demand that an individual plaintiff pay the attorneys' fees of an immense bank, may constitute retaliation in violation of Federal and New York law, adding materially to its existing exposure.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 2 of 32 —

Plaintiff hopes that it will never be necessary to explore such issues.

Plaintiff's allegations of fraud stand on several grounds, each of which has a sturdy basis. They are reinforced, not weakened, by defendant's failure to date to provide responsive discovery that would get to the truth of the matter and its insistence that its selective production of a few isolated documents proves that the allegations are baseless.

As I stated in my June 26, 2007, letter, *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939), sums up the general inference to be drawn in this type of situation: "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. . . . Silence then becomes evidence of the most convincing character." The principle is widely recognized. JAMES H. CHADBOURN, II WIGMORE ON EVIDENCE (Little, Brown & Co., Boston, 1979), § 285 stated at 192: "The nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its *tenor is unfavorable to the party's cause*." (Emphasis in original). A copy of the letter is attached hereto as Attachment A, for ease of reference.

**A.    Defendant's Assertion in its Rule 11 Memorandum that Plaintiff Made Accusations Against the Law Firm of Epstein, Becker and Green**

As plaintiff has pointed out every single time in which defendant has made this baseless statement, the Complaint did not allege that the firm of Epstein, Becker & Green engaged in any misconduct. The Complaint is quite clear that Deutsche Bank Securities, Inc., engaged in serious misconduct.

Clients lie to their lawyers, or knowingly provide misleading information to induce their lawyers to believe something that is not the case, fairly routinely. That is what plaintiff believes happened here. A lawyer who is misled by a client has not committed misconduct, the client has.

My June 26, 2007, letter to you, Attachment A hereto, stated the following on p. 3:

Turning to Rule 11 standards, I agree that an attorney cannot simply rely on the word of a client. That applies to us in the framing of the Complaint, and will apply to defendant in the framing of its Answer. Similarly, it is the job of higher-ranking officials within an organization to check on the statements and assurances of decisionmakers before authorizing a filing on behalf of the corporation. That is one of the aspects that makes the defendant's filing of its Position Statement so troubling.[FN 1] The analysis we have done is one that should have been done by more senior officials of defendant before the document was

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 3 of 32 —

        filed. Its representations should have been checked against other documents. The most cursory check by defendant's higher-ranking officials would have revealed that plaintiff's pipeline had been made largely to disappear, and that the pipelines of younger bankers had been inflated like an inner tube on a hot summer day. We have known Epstein Becker to be a thoroughly responsible firm, with thoroughly responsible attorneys. We have no reason to doubt that they relied on the information that defendant gave them to prepare the position statement, and we assume that they also ran it by knowledgeable, higher-level officials of the defendant before it was filed.

_____
      [FN 1] Rule 11 only applies in civil litigation, of course, not in administrative proceedings. That is one of the reasons why 18 U.S.C. § 1001 is so important here.

Defendant has never responded to the substance of this comment. Defendant's June 29, 2007, letter instead repeated the accusation, saying the plaintiff had made accusations against unspecified counsel. My July 2, 2007, response to you stated at p. 2-3:

        Second, I do not understand the statement in your letter suggesting we have made claims against unspecified counsel. The Complaint alleges only claims against the defendant corporation, and does not allege any claims against counsel. My June 26 letter to you specifically stated at p. 3:

            We have known Epstein Becker to be a thoroughly responsible firm, with thoroughly responsible attorneys. We have no reason to doubt that they relied on the information that defendant gave them to prepare the position statement, and we assume that they also ran it by knowledgeable, higher-level officials of the defendant before it was filed.

        The defendant is the only entity we have alleged responsible for its Position Statement.

My July 2, 2007, letter to you is attached as Attachment B for ease of reference.

        Again, defendant has never responded to the substance of this comment. Instead, its Memorandum in Support of its Rule 11 Motion has simply repeated its old canard.

        Defendant's attempt to wrap itself in the good name of its former counsel, and its false accusation of a representation plaintiff never made, is not a good way for defendant to begin a Rule 11 motion contending that there is no evidence it ever made a misleading misrepresentation.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 4 of 32 —

**B.      Defendant's Assertion to the EEOC that Plaintiff's Accounts Were
Never Reassigned Has Been Demonstrated to Be False**

Paragraph 96(a) of the Complaint stated that Defendant's November 5 Position
Statement to the EEOC knowingly made a false representation to the EEOC when it
stated on p. 1: "Indeed, not only were Mr. Graves' accounts never reassigned . . . ."

Defendant's statement to the EEOC was in fact untrue.  See the e-mails plaintiff
provided in his Reply Affidavit to the EEOC.  These were produced to you as plaintiff's
Documents 33 and 34, Bates-numbered Graves 207 to Graves 208 and Graves 209 to
Graves 210, respectively.  They are attached as Attachments C and D for ease of
reference.

**C.      Defendant's February 21 Production Shows Defendant Misled the
EEOC as to Plaintiff's Comparators, and Concealed Promotional
Discrimination Against Plaintiff**

Defendant's limited supplemental production on February 21, 2008, revealed for
the first time that defendant's older bankers, which it presented as comparators to the
EEOC, were in fact managers and not comparable to plaintiff.

Defendant's concealment of this information from its Position Statement, while
urging that these bankers were fair comparators, was materially manipulative and
misleading.

Defendant's misleading filing also concealed the fact that several other bankers
had been promoted to manager, leading plaintiff into not amending his charge of
discrimination to include a claim of promotional discrimination.  It is one thing to omit
information that would lead to an expanded charge, and quite another to make active
misrepresentations precluding any basis for an expanded charge.

**1.      The Older Bankers Were Non-Comparable Evaluating
Managers Empowered to Evaluate Directors or Managing
Directors**

Defendant's November 5 Position Statement to the EEOC represented that Mr.
Amling was the Manager of the Media Investment Banking Group, that all other
Directors and Managing Directors in that Group were comparators for purposes of
evaluating performance, and in particular that Gregory Paul was a comparator of plaintiff.
Not one word in the Position Statement suggested that any of the other Directors or
Managing Directors were anything but co-workers and therefore proper comparators.  A
copy of the Position Statement was produced as plaintiff's Document 8, Bates-numbered
as Graves 22 to Graves 32.  It is attached as Attachment E for ease of reference.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 5 of 32 —

*Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997), stated: "To be 'similarly situated,' the individuals with whom Shumway attempts to compare herself must be similarly situated in all material respects." (Citation omitted.) In *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001), the court found sufficient job similarity in the fact that plaintiff and her comparator were both executive-level employees.

Your February 21, 2008, production includes documents showing that Gregory Paul, Charles Carey, J.L. Malcolm Morris, and Dyan Triffo were evaluating managers for employees whom we think were Directors but whom you can confirm as either Directors or Managing Directors.

| Defense Doc. No. | Bates Numbers | Employee Evaluated | "Evaluating Manager" |
|---|---|---|---|
| D-00064 | DB 000926 to DB 000939 | Employee I Year End Evaluation 2003 | Charles Carey |
| D-00065 | DB 000940 to DB 000953 | Employee I Evaluation 2002 | Charles Carey |
| D-00066 | DB 000954 to DB 000963 | Employee F Year End Evaluation 2003 | Charles Carey |
| D-00067 | DB 000964 to DB 000981 | Employee F Evaluation 2002 | Charles Carey |
| D-00069 | DB 000996 to DB 001009 | Employee K Evaluation 2002 | Dyan Triffo |
| D-00073 | DB 001057 to DB 001071 | Employee J Evaluation 2002 | Dyan Triffo |
| D-00075 | DB 001073 to DB 001089 | Employee L Evaluation 2002 | Gregory Paul |
| D-00082 | DB 001165 to DB 001179 | Employee H Evaluation 2002 | Gregory Paul<br><br>Additional manager: J.L. Malcolm Morris |

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 6 of 32 —

        None of this was communicated to the EEOC.  The failure to communicate that
Mr. Carey, Ms. Triffo, Mr. Paul, and Mr. Morris were evaluating managers for
employees whom we think were Directors but whom you can confirm as either Directors
or Managing Directors was a material omission, because evaluating managers are not fair
comparators to those who are evaluated and managed.  In this instance, the barrier to
comparable status is even higher, because these evaluators were in direct competition
with non-evaluator Managing Directors and with Directors for the same accounts and
multiple-counting, and indeed for their very jobs.

        Defendant's failure to communicate to the EEOC the evaluating managerial status
of Mr. Carey, Ms. Triffo, Mr. Paul, and Mr. Morris was even more misleading because
the managers were the oldest employees in the Media Investment Banking Group.
Defendant's Exhibit B to its Position Statement contained the ages of these employees.
This document was produced to defendant as plaintiff's Document 10, Bates-numbered
Graves 38.  It is attached hereto as Attachment F for ease of reference.  It shows the
following as to these managers:

| Managing Directors and Directors Who **Were** Evaluating Managers of Managing Directors or Directors | Age Represented to the EEOC |
|---|---|
| Jeffrey Amling | 50 |
| Charles Carey | 41 |
| Gregory Paul | 46 |
| J.L. Malcolm Morris | 41 |
| Dyan Triffo | 37 |

Plaintiff was not an evaluating manager, and his true comparators were Managing
Directors and Directors who were not evaluating managers.  Their age information as
reported by defendant to the EEOC is as follows:

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 7 of 32 —

| Managing Directors and Directors Who Were **Not** Evaluating Managers of Managing Directors or Directors | Age Represented to the EEOC |
|---|:---:|
| Dan Graves | 42 |
| Elizabeth Chang (not shown on Exhibit B to defendant's Position Statement, but shown with her birth date on Exhibit N to defendant's Position Statement, produced to defendant as plaintiff's Document 22, Bates-numbered Graves 107, attached as Attachment G for ease of reference) | 33 |
| William Detwiler (not included in defendant's Franchise Revenue Reports but retained in his job) | 34 |
| David Dunn | 35 |
| Blair Faulstich | 34 |
| Jason Hartka (not included in Franchise Revenue Reports but retained in his job) | 32 |
| Zachary Maurus | 34 |
| Sun Yung | 41 |

Plaintiff's real comparators were therefore a much younger group of Investment Bankers than defendant led the EEOC to believe. After the Court decides defendant's Motion to Dismiss, plaintiff may well amend the Complaint to include this additional specification of fraud.[1]

---

[1] At the same time, plaintiff will amend the Complaint to delete ¶ 100(c), involving the "Sinclair Broadcast - interest rate swap (4Q 2003) (D034325)" deal described as "Derivatives-Interest Rate," and to correct the lead-in. Thank you for bringing this error to our attention.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 8 of 32 —

2.      **Defendant's Failures to Respond to Discovery Concealed Until
February 21, 2008, the Evaluating Managerial Status of the
Older Bankers**

a.      **The Identification of Evaluating Managers, and their
Noncomparability**

Plaintiff's Requests for Production 1 through 3 would—if defendant had provided
the requested discovery—have informed plaintiff as to these managerial relationships and
the authority exercised by the managers.  These requests asked for the following:

### 1. Job Descriptions and Organizational Chart

1.  A copy of every job description used by defendant from March 31,
1999, to the present, for the positions of Vice President, Director, or Managing
Director, or for any position filled by a Vice President, Director, or Managing
Director.

2.  A copy of every job description used by defendant from March 31,
1999, to the present, for employees in supervisory or managerial positions in the
Media Investment Banking Group, or in supervisory or managerial positions in a
direct reporting or managerial line above the Media Investment Banking Group.

3.  A copy of every organizational chart showing defendant's units and
reporting relationships within the United States.

Defendant has not yet produced any of this information.  Please produce all of these
documents, unredacted, by two weeks before filing defendant's Rule 11 motion, so that
plaintiff will have the benefit of this information and an opportunity to analyze it and
make decisions based upon it.

b.      **Progression to Evaluating Managerial Status and
Noncomparability**

Requests for Production 4 and 5 would—if defendant had provided the requested
discovery—have informed plaintiff as to the information in personnel folders, including
anything in those folders that might reveal how defendant made important employment
(including compensation and bonus) decisions, the specific decisions that were made as
to specific employees, and the dates of those decisions.  This too would have revealed
information on the secret managerial status of several employees in the Group, when and
how they became managers, and their noncomparability to Directors and Managing
Directors who were not managers.  These requests asked for the following:

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 9 of 32 —

## 2. <u>Personnel Files and Other Information on Employees</u>

4.  A copy of every policy containing information about the contents of personnel files and other information to be maintained as to employees or former employees.

5.  A copy of the complete personnel file, and of every other file of a type regularly maintained by defendant as to its employees, from March 31, 1999, through March 31, 2005, for each banker who worked in the Media Investment Banking Group at any time during that period. Documents relating to the health (other than dates and reasons for leaves), medical benefits, families, and investments (other than compensation information) of such bankers are excluded from this request.

Defendant has not yet produced any of this information.

This information is important. The exploration of why plaintiff was not promoted to managerial status, thereby gaining protection from termination, will shed light directly on several of his claims, including whether he was pre-selected for termination because of his age earlier than he knew and earlier than alleged in the Complaint. These documents may lead to an appropriate amendment of the Complaint.

These documents are also important because they will reveal the exact dates in 2003 on which defendant promoted numerous Vice Presidents to the level of Director, where they had responsibility for deals and became comparators to plaintiff. These dates will establish exactly how junior to plaintiff they were in seniority at the non-managerial deal-making level.

Please produce all of these documents, unredacted, by two weeks before filing defendant's Rule 11 motion, so that plaintiff will have the benefit of this information and an opportunity to analyze it and make decisions based upon it.

D.  <u>Defendant Did Not in Fact Engage in the Uniform Practices as to Multiple Deal-Counting and Probability-Weighting of Deals that its EEOC Position Statement, Letters, and Rule 11 Motion Represent</u>

1.  <u>The Multiple-Counting of Transactions</u>

Your Rule 11 Motion, your April 2 letter, and your July 20, 2007, letter all assert that defendant could not have made material misrepresentations to the EEOC in giving multiple bankers credit for the full value of the same transactions, because defendant has located a handful of internal documents that give multiple bankers credit for the full value of the same transactions. However, other documents of defendant show the exact

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 10 of 32 —

opposite of what defendant argues to be its uniform practice.

    Defendant's Memorandum in support of its Rule 11 Motion makes representations of a uniform practice that defendant's own records show is nonexistent. Plaintiff does not understand how such a representation can be made, or how defendant can portray plaintiff as obviously having knowledge of a practice defendant's own records-compilers show does not exist.

### 2.    Plaintiff's June 26, 2007, Response to Defendant on Multiple-Counting of Transactions

    As I pointed out in my July 23, 2007, letter to you responding to your July 20 letter, my June 26, 2007, letter had already addressed your point fully at pp. 4-9.  Here is what it said:

### 2.    The Apportionment of Revenue to Bankers

    The one factual matter raised substantively by your letter is its representation that "one issue in this case may be the method the Bank used to apportion revenue and expected revenue among the various bankers on a project." The word "apportion" is telling, because the word connotes that revenues are counted once and are divided among the bankers involved by some type of judgment or system.  It is not consistent with multiple counting of revenues.

    However, your point certainly deserves a response.

    First, while I do not want to be argumentative, defendant's Position Statement nowhere explicitly informed the EEOC that defendant followed a standard, uniform practice of multiple-counting of the same revenues, so that all of the bankers involved in a project were given credit for the entire amount.  Such a disclosure would have been highly relevant to the EEOC because it would have made clear that defendant's so-called uniform practice would, if accepted, provide any respondent with a foolproof means of making the object of its age-based or other animus falsely appear less productive than other employees, simply by assigning numerous employees (but not the charging party) to work with the head of the unit, as occurred here.  The Position Statement simply used the unexplained, multiply-counted revenues to create the impression that, when each banker is considered in isolation, plaintiff was the lowest performer.  Defendant made it appear to the EEOC that it was comparing apples to apples, when in reality it was doing something quite different.  See, *e.g.*, the backhanded criticism of plaintiff on pp. 1–2 of the Position Statement:

    DBSI terminated Mr. Graves' employment as a result of his failure to meet

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 11 of 32 —

or even approach its target revenue in 2003 due more to a difficult market in television broadcasting than to Mr. Graves' poor performance.

See also the statement on p. 3 of the Position Statement:

Despite Mr. Graves' belief that his 2002 performance was the highest in the Group, his December 2002 year to date franchise revenues were actually lower than all of the other MD's, including Mr. Paul who had a 2002 franchise revenue of 15,117 Euro thousands compared to Mr. Graves' 13,544 Euro thousands.  (See Exhibit C.)

One can clearly see the impact on the EEOC if the backhanded reference to "Mr. Graves' poor performance" in the top line of p. 2 of the Position Statement had referred instead to "Deutsche Bank's decision not to add him to the list of younger bankers assigned to work on the unit head's accounts."  A similar transformation would have occurred as to the above-quoted statement on p. 3 and other statements.

Similarly, Part C of the Position Statement, "The Decision to Terminate Graves' Employment," stated as defendant's first reason for firing plaintiff that he had failed to meet his target in 2003 and his 2004 outlook was poor.  It goes on to say falsely that plaintiff was "in the television space" as if that was all he did. Those explanations would look quite different if defendant had said instead, "plaintiff failed to meet his target in 2003 and would not do so in 2004 because management decided to double-up younger bankers, not Mr. Graves, to work on senior management's accounts and limited Mr. Graves to the television space in which no growth was expected."

In evaluating its exposure, the defendant may wish to consider how much easier plaintiff's task of proving age discrimination and retaliation becomes if there indeed was a uniform practice of giving several bankers full credit for one transaction.  Defendant would have to explain convincingly why it refused to give plaintiff an opportunity to do some work on transactions for other bankers, getting full credit for the transactions, while giving this opportunity to the younger bankers in order to save their jobs.

Defendant would also have to explain why it pigeon-holed plaintiff as being virtually exclusively "in the television space" in view of his much broader experience and assignments.

Second, plaintiff is not aware of any standard practice of uniformly allocating the revenue on a project to each participating banker.  To be fair, your letter does not explicitly say that each participating banker, no matter how large or

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 12 of 32 —

small a role he or she played in the transaction, was under standard practice uniformly "allocated" or "apportioned" the entire amount for performance purposes. I assume that is what you meant to convey, however, because otherwise there would not have been any factual point for the letter to make. As so understood, plaintiff is not aware of any such practice and does not understand how any such practice can be used to measure relative performance, the purpose for which it was used in the Position Statement.

Indeed, if there had been any such practice from 2002 through 2004, there would have been no need for defendant to have taken plaintiff's accounts away from him; it could simply have double-assigned them to younger bankers as well as plaintiff, and left him involved and gaining credit for the transactions. The availability of such an option would throw into sharp relief the question why defendant failed to do just that.

Third, you have represented that Mr. Berger "was unmistakably aware of this practice"— *i.e.*, the Bank-wide practice of allocating the entire amount of all transaction fees to each and every banker who worked on deals at the Bank— "from a prior case he brought against the Bank." Mr. Berger does not have such a recollection, but his firm has arranged to pull documents back from archives. Mr. Berger's recollection is that there was a confidentiality agreement with respect to all records in that case, so that whatever they contain could not be shared with plaintiff or with my office. I request a limited waiver of that confidentiality agreement, so that such records can be shared with plaintiff and with my office, and used in this litigation.

In any event, it is my understanding that you are referring to a case that involved facts and occurrences from 1999 and that did not involve the filing of any statements by the Bank with the EEOC or any other governmental agency, so I do not understand, even if you could establish a knowledge by Mr. Berger of a Bank-wide practice as you have alleged, how this would warrant a threat of Rule 11 sanctions given the different time periods and factual circumstances involved.

Fourth, to set the record straight, the Complaint does not allege that assigning the revenue from a transaction only to the senior investment banker is the only neutral means of assigning revenue. It alleges that that is the only neutral means within the four corners of the Position Statement (¶¶ 99(h), 102, 104, 109(h), 113 and 115), and goes on to allege that other neutral means, going outside the four corners of the Position Statement, were available (¶¶ 106, 107, 117, and 118) but would have undercut defendant's position.

Fifth, a document not highlighted at all in the text of the Position

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 13 of 32 —

    Statement,[2] Attachment E at pp. 3-4, credits individual bankers—not multiple bankers—with individual pipeline transactions except for three instances when bankers mentioned in Exhibit F are paired with bankers not mentioned at all in that exhibit: Dada, Schoen, and Hartka.  The following instances show the reasonableness of plaintiff's allegations:[3]

➢ Exhibit F credits two bankers (Amling and Faulstich) for the Spanish Broadcasting pipeline deal, but Exhibit E at p. 3 credits only the senior banker;

➢ Exhibit F credits two bankers (Paul and Chang) for the Young Broadcasting pipeline deal, but Exhibit E at p. 3 credits only the senior banker;

➢ Exhibit F credits two bankers (Morris and Chang) for the AOL-TW pipeline deal, but Exhibit E at p. 3 credits only the senior banker;

➢ Exhibit F broadly multiple-counts pipeline revenues, but:

        ■ Exhibit E at pp. 3–4 counts revenues only once per banker listed in Exhibit F, and in the infrequent instances of sharing in any degree simply credits one banker listed on Exhibit F and one banker not so

---

    [2] Attachment E is mentioned only in passing on p. 3 and at the end of footnote 3 on p. 4.

    [3] Note that the credits shown on Exhibit E have been made more difficult to read because the spreadsheet from which the table in question was taken had multiple lines in some cells and defendant failed to calibrate the columns so that information relating to the same transaction would appear on the same line on the page.  For example, the "DB Role" cell for "Spanish Broadcasting" takes four lines and the Client Name for "Spanish Broadcasting" and for "Young Broadcasting" each take two lines.

    The first line for the client name for "Young Broadcasting" is one line below the data for Young Broadcasting (other than the date for "DB Role"), and is two lines above the DB Role for that transaction.

    The client name for Loews Cineplex appears on the line showing data for the Comcast deal, and the actual data for the Loews Cineplex deal appears two lines above the Loews Cineplex client name, on what looks like the first line for Young Broadcasting.

    While a proper reading of Exhibit E appears to us to shatter defendant's contention of a standard, uniform practice of multiple-counting, it would have been next to impossible for the EEOC to decipher this information.  We were able to figure this out because of plaintiff's knowledge of the proposed deals in question, so that unless the different wording and confusing format in Exhibit E could be matched with the inconsistent representations in Exhibit F, the EEOC could not have understood this correctly.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 14 of 32 —

listed, without saying who is credited with what; and

- Exhibit E at p. 10[4] shows only one instance of giving co-credit to more than one banker on Exhibit F for any transaction.

Exhibit E raises questions even additional to those noted, because it includes bankers and transactions excluded from Exhibit F,[5] but is plainly consistent with plaintiff's allegations and is plainly inconsistent with the standard practice described in your letter.

Notwithstanding the fact that nothing in our possession indicates the accuracy of the representation we understand your letter as making, we will—if defendant is willing to lift confidentiality and allow us to examine the records of the old case you mentioned—examine that, and anything else you show us. We have no interest in pursuing any claim that we are persuaded we cannot win, and if we are so persuaded we will not make you go through the burden of filing a motion.

We need something more than what you have shown us to date, however.

Defendant has never responded to the substantive discussion in this letter, but simply reiterates, <u>ten and a half months later</u>, a position its own records disprove, where plaintiff put defendant on notice that its own records disprove the representations.

This handling of multiple-counting vs. single-counting of deals was clearly material; it sometimes accounted for the bulk of the pipeline values set forth for individual younger bankers.

### 3. <u>Defendant's Inaccuracy on Deal Weighting in its Rule 11 Motion</u>

Defendant's Rule 11 motion asserts a common practice of Deutsche Bank, proven by its handful of selected documents and such a matter of common knowledge that plaintiff must have known of it, that projected deal values are multiplied by probability and the product is used to measure franchise revenue pipelines. See the Memorandum in support of the Motion at pp. 2-3.

---

[4] The problem described in footnote 3 above also occurred on p. 10 of Exhibit E, making entries below the one cited difficult to understand.
[5] In discovery, we will find out why they were excluded, and whether the effect of their exclusion was to buttress the arguments defendant was trying to persuade the EEOC to accept.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 15 of 32 —

        This assertion, like the others in the Rule 11 Motion and Memorandum, is
demonstrably wrong.

        Any number multiplied by zero equals zero.  A deal that has a 0% probability
should have a 0% value in a franchise pipeline.  If any deals with 0% probability have a
nonzero value in a franchise pipeline, then defendant's characterization of its process is
dead wrong and plaintiff is quite entitled to claim it is inaccurate and misleading and
should never have been represented to the EEOC.

        Exhibit C to defendant's Position Statement to the EEOC, produced in discovery
as Doc. 11, Graves 39 to Graves 41, shows six bankers with deals with 0% probabilities
for their 2003 pipelines.  Every last such deal has a nonzero value stated for the 2003
pipeline.  The highest such value was 11,490 Euros, and that zero-probability deal was
counted twice at that value.  I think we can agree that 11,490 Euros is not pocket change.
A copy is attached hereto as Attachment H for ease of reference.

        Exhibit F to defendant's Position Statement to the EEOC, produced in discovery
as Doc. 14, Graves 74 to Graves 77, shows five bankers with deals with 0% probabilities
for their 2004 pipelines.  Four of these bankers had nonzero values stated for their 2004
pipeline and one, Blair Faulstich, had a zero value stated.  The highest value stated for a
zero-probability deal was 20,633 Euros, and that zero-probability deal was counted twice
at that value.  I think we can agree that 20,633 Euros is not pocket change.  A copy is
attached hereto as Attachment I for ease of reference.

        This handling of zero-probability deals was clearly material; it was sometimes the
bulk of the pipeline values set forth for individual younger bankers.

        Plaintiff does not understand how he can be expected to know of an assertedly
uniform practice when defendant's own records show it does not exist.  Nor does plaintiff
understand how defendant can represent to the Court a uniform practice its own records
show does not exist.

        Moreover, defendant's clear failure to follow anything like its representations of
probability-weighting when the probability is weighted at zero brings into question all of
its weightings at other probabilities as well.

        4.    **Plaintiff's Discovery Requests That Would Have Shed Light on
              Multiple-Counting and Probability-Weighting**

        On October 31, 2007, plaintiff served Requests for Production 21 through 29.  If
defendant had provided this discovery, it would have shed light on whether defendant
multiple-counted the same revenue from different bankers when making important
employment decisions such as the fixing of compensation, the award of bonuses, and

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 16 of 32 —

selections for termination.

Defendant has not provided the discovery sought, and plaintiff does not understand how defendant can, consistently with Rule 11, represent that there are uniform practices explaining all the specific points plaintiff raised in the Complaint, when its own documents disprove the practices and when defendant refuses to produce information that goes directly to the heart of the matters in question.

Plaintiff requests that defendant comply in full with these discovery requests at least two weeks before it files its Rule 11 motion, to enable plaintiff to have the benefit of this discovery.

Plaintiffs' Requests for Production 21 through 29 asked for the following information:

### 7. Policies on Evaluations of Performance, Abilities, and Prospects

21. A copy of every policy about evaluating the performance, abilities, or prospects of individual employees, including but not limited to the matters to be considered, the persons from whom input should be sought, and the consideration of such input.

22. A copy of every policy about:

a. Media Bankers working in units outside the Media Investment Banking Group providing information on the performance of any bankers who worked in the Media Investment Banking Group; or

b. any bankers who worked in the Media Investment Banking Group providing information on the performance of any Media Bankers working in units outside the Media Investment Banking Group.

23. A copy of every policy about comparing the performance, abilities, or prospects of different employees.

### 8. Actual Evaluations of Performance, Abilities, and Prospects

24. A copy of all documents containing information about any draft or final performance evaluations, input on performance evaluations, and e-mails or other documents discussing the performance, abilities, or prospects of any individual banker or group of bankers who worked in the Media Investment Banking Group at any time from March 31, 1999, through the present.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 17 of 32 —

      25.  A copy of all documents containing information about any comparison of the performance, abilities, or prospects of different bankers or groups of bankers, where any banker included in the comparison worked in the Media Investment Banking Group at any time from March 31, 1999, through the present.

### 9.  Policies on Franchise Revenue Achievements, Targets, and Pipelines

      26.  A copy of every policy containing information about recognition of Franchise Revenue achievements for individual Directors or Managing Directors (or groups of Directors or Managing Directors), or the allocation of such achievements among individual Directors or Managing Directors (or groups of Directors or Managing Directors) within an Industry Group, or among Industry Groups.

      27.  A copy of every policy containing information about Franchise Revenue targets for Directors or Managing Directors.

      28.  A copy of every policy containing information about Franchise Revenue pipelines, the recognition of individual bankers' descriptions of prospective business in their pipelines, or the allocation of such pipelines, among individual Directors or Managing Directors (or groups of Directors or Managing Directors) within an Industry Group, or among Industry Groups.

      29.  A copy of every policy containing information about the use of Franchise Revenue pipelines in determining compensation and retention.

Defendant has not yet produced any of this information.  The closest defendant has come is defendant's Documents 34 and 35, Bates-numbered DB 407 to DB 410, which are simply two-page memoranda on deal logging that do not respond to the requests made.

      Plaintiffs also requested information on the specific deals or transactions that were singled out in the Complaint as indicative of fraud because they were quite dissimilar but had identical values suggesting arbitrary entries.  Plaintiffs' Requests for Production 98 through 103 asked for the following information:

### 19.  <u>Defendant's Position Statement to the EEOC</u>

*              *              *

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 18 of 32 —

### a.    Attachment C to the Position Statement

98.  A copy of all documents containing information about the following potential transactions referenced in Attachment C to defendant's Position Statement as having identical 2003 Franchise Pipeline values of 2,837,000 Euros each, with identical probabilities of zero that revenues would be received in 2003, including but not limited to the valuation of the 2003 Franchise Revenues Pipeline for each potential transaction, the dates of changes in that valuation, the ultimate Franchise Revenue amounts received for each, and the dates of such receipts:

    a.  the "Citadel Broadcasting - IPO  (D023066)" deal described as "Equity-IPO" and credited to both Jeffrey Amling and Charles Carey with a probability of zero;

    b.  the "Sinclair Broadcasting - bank financing (3Q 02) (D021892)" deal described as "Senior Bank Debt," and credited to both Jeffrey Amling and Charles Carey with a probability of zero; and

    c.  the "Young Broadcasting -general advisory (Kron Station) (D025304)," deal described as "Divestiture Advisory" and credited to Gregory Paul with a probability of zero.

99.  A copy of all documents containing information about the following potential transactions referenced in Attachment C to defendant's Position Statement as having identical 2003 Franchise Pipeline values of 3,310,000 Euros each, with identical 25% probabilities that revenues would be received in 2003, including but not limited to the valuation of the 2003 Franchise Revenues Pipeline for each potential transaction, the dates of changes in that valuation, the ultimate Franchise Revenue amounts received for each, and the dates of such receipts:

    a.  the "DirecTV USA - bridge financing (4Q 02) (D020076)" deal described as "Bonds-Corporate High Yield," and credited to Jeffrey Amling; and

    b.  the "Emmis Communications - acq of Fisher Communications (D027038)" deal described as "Acquisition Advisory," and credited to Jeffrey Amling.

100.  A copy of all documents containing information about the following potential transactions referenced in Attachment C to defendant's Position Statement as having identical 2003 Franchise Pipeline values of 9,547,000 Euros each, with identical 25% probabilities that revenues would be received in 2003, including but not limited to the valuation of the 2003 Franchise Revenues Pipeline

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 19 of 32 —

for each potential transaction, the dates of changes in that valuation, the ultimate Franchise Revenue amounts received for each, and the dates of such receipts:

      a.   the "AOL TimeWarner - convertible offering (3Q 02) (D024044)" deal described as "Equity-Convertible Bonds," with a stated zero probability of occurring in 2003, and credited to J.L. Malcolm Morris for the 2003 Franchise Pipeline;

      b.   the "Vivendi Universal - disposal of US stakes (D025431)" deal described as "Block Trade," with a stated 25% probability of occurring in 2003, and credited to Dyan Triffo for the 2003 Franchise Pipeline; and

      c.   the "Vivendi Universal - disposal of US stakes (D025431)" deal described as "Divestiture Advisory," with a stated zero probability of occurring in 2003, and credited to Dyan Triffo for the 2003 Franchise Pipeline.

### b.    <u>Attachment F to the Position Statement</u>

101. A copy of all documents containing information about the "Salem Communications secondary offering (3Q 02) (D024428)" transaction referenced on pp. 2 and 3 of Attachment F to defendant's Position Statement, including but not limited to the valuation of the Franchise Revenues pipeline and dates of changes in that valuation.

102. A copy of all documents containing information about the following potential transactions referenced in Attachment F to defendant's Position Statement as having identical 2004 Franchise Pipeline values of 3,930,000 Euros each, including but not limited to the valuation of the 2004 Franchise Revenues Pipeline for each potential transaction, the dates of changes in that valuation, the ultimate Franchise Revenue amounts received for each, and the dates of such receipts:

      a.   the "AOL - monetisation of Time Warner Telecom stake (D034002)" deal described as an "Equity Follow-On," and credited to both Elizabeth Chang and JL Malcolm Morris for the 2004 Franchise Pipeline;

      b.   the "Kim Magnes Estate - divestiture advisory (D033651)" deal described as "Divestiture Advisory," and credited to Jeffrey Amling for the 2004 Franchise Pipeline;

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 20 of 32 —

   c. [Withdrawn];

   d. the "BusinessWire - general advisory (D005685)" deal described
     as "Divestiture Advisory," and credited to Dyan Triffo for the
     2004 Franchise Pipeline; and

   e. the "Google - IPO (D031830)" deal described as "Equity-IPO,"
     and credited to Zach Maurus for the 2004 Franchise Pipeline.

   103. A copy of all documents containing information about the following
potential transactions referenced in Attachment F to defendant's Position
Statement as having identical 2004 Franchise Pipeline values of 786,000 Euros
each, including but not limited to the valuation of the 2004 Franchise Revenues
Pipeline for each potential transaction, the dates of changes in that valuation, the
ultimate Franchise Revenue amounts received for each, and the dates of such
receipts:

   a. the "Arturo Moreno - advisory for Anaheim Angels (D030970))"
     deal described as "Acquisition Advisory," with a 100% probability
     of occurring in 2004, and credited to Charles Carey for the 2004
     Franchise Pipeline; and

   b. the "Thomson - c/b general advisory (Project Hollywood - 2004)
     Hollywood2 (D032395)" deal described as "Acquisition
     Advisory," with a zero probability of occurring in 2004 and
     credited to Sun Yung for the 2004 Franchise Pipeline.

Defendant has not provided any of this information, and needs to do so now, in time for
plaintiff to consider this information and whether to amend their pleadings, before
defendant files its Rule 11 motion.

  **E.**  **Defendant's Rule 11 Motion is Based on a _Non Sequitur_: That
    Occasional Multiple-Counting of Accounts Means it Was Used for
    Personnel Decisions**

   While this point has been made repeatedly in prior letters to you quoted above, it
is critical to focus separately on this issue.

   Defendant has not presented any information whatsoever that would back up its
representation to the EEOC that it performed comparative evaluations of bankers based
upon multiply-counted transactions.

   All defendant has shown is that sometimes, but not all times, it credits multiple

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 21 of 32 —

bankers for the same transactions.  It has not even admitted a fact it cannot dispute—that it does not always multiple-count transactions—let alone explain when it gives multiple credit and when it does not, how it breaks apart the multiple credits or aggregates single credits.  It has not produced a single page from a personnel manual or any other document showing what kind of credit—single or multiple—is used for important personnel decisions.

Defendant's unadmitted gap in its logic bars any reasonable contention that any inference can be drawn from the handful of hand-selected records defendant has produced.

**F.**     **Defendant Has Failed to Comply with Discovery Requests on How Defendant Actually Made its Employment Decisions, Compared to its Representations to the EEOC**

**a.**     **The Manner in Which Defendant Made Important Personnel Decisions**

Requests for Production 6 through 10 and 21 through 29 would—if defendant had provided the requested discovery—have informed plaintiff as to the manner in which defendant made many of its most important employment decisions, including selections for termination in a lay-off, and what defendant considered proper comparators.

These requests are intended to shed light on the representations defendant made to the EEOC, and are central to the issues to be resolved in this lawsuit.

These requests asked for the following:

**3.  Banker Personnel and Staffing Levels**

6.  A copy of every policy containing information about the recruitment, hiring, transfer, lay-off, termination, or retention of bankers.

7.  A copy of every policy limiting consideration for lay-off to persons in the same job category, so that only Managing Directors would be compared to each other for purposes of layoff, or only Directors would be compared to each other for purposes of layoff, or only Vice Presidents would be compared to each other for purposes of lay-off.  See the Position Statement, p.2.

8.  A copy of all documents containing information about the role of Franchise Revenue Pipelines in selecting bankers for lay-off.

9.  A copy of all documents containing information about the planned or actual staffing levels, recruitment, hiring, transfer, lay-off, termination, or

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 22 of 32 —

retention of bankers within the Media Investment Banking Group, from March 31, 1999, to the present.

10.  A copy of all documents containing information about the planned or actual staffing levels, recruitment, hiring, transfer, lay-off, termination, or retention of Media Bankers outside the Media Investment Banking Group, from March 31, 1999, to the present.

*         *         *

**7.  Policies on Evaluations of Performance, Abilities, and Prospects**

21.  A copy of every policy about evaluating the performance, abilities, or prospects of individual employees, including but not limited to the matters to be considered, the persons from whom input should be sought, and the consideration of  such input.

22.  A copy of every policy about:

   a.  Media Bankers working in units outside the Media Investment Banking Group providing information on the performance of any bankers who worked in the Media Investment Banking Group; or

   b.  any bankers who worked in the Media Investment Banking Group providing information on the performance of any Media Bankers working in units outside the Media Investment Banking Group.

23.  A copy of every policy about comparing the performance, abilities, or prospects of different employees.

**8.  Actual Evaluations of Performance, Abilities, and Prospects**

24.  A copy of all documents containing information about any draft or final performance evaluations, input on performance evaluations, and e-mails or other documents discussing the performance, abilities, or prospects of any individual banker or group of bankers who worked in the Media Investment Banking Group at any time from March 31, 1999, through the present.

25.  A copy of all documents containing information about any comparison of the performance, abilities, or prospects of different bankers or groups of bankers, where any banker included in the comparison worked in the

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 23 of 32 —

Media Investment Banking Group at any time from March 31, 1999, through the present.

### 9.  Policies on Franchise Revenue Achievements, Targets, and Pipelines

26.  A copy of every policy containing information about recognition of Franchise Revenue achievements for individual Directors or Managing Directors (or groups of Directors or Managing Directors), or the allocation of such achievements among individual Directors or Managing Directors (or groups of Directors or Managing Directors) within an Industry Group, or among Industry Groups.

27.  A copy of every policy containing information about Franchise Revenue targets for Directors or Managing Directors.

28.  A copy of every policy containing information about Franchise Revenue pipelines, the recognition of individual bankers' descriptions of prospective business in their pipelines, or the allocation of such pipelines, among individual Directors or Managing Directors (or groups of Directors or Managing Directors) within an Industry Group, or among Industry Groups.

29.  A copy of every policy containing information about the use of Franchise Revenue pipelines in determining compensation and retention.

Plaintiff is not required to believe in defendant's good faith in selecting him for termination, and is not required to believe that defendant's failure to produce this information is innocent.  A jury can reasonably determine that the failure to produce this information means that no employment decisions of significance were ever previously made on the basis of crediting multiple Investment Bankers with the same revenues, and that defendant's reliance on this approach now is simply a pretextual cover-up.  There has to be a strong reason why defendant has ignored its discovery obligations.  However, plaintiff would prefer to have the hard facts than to rely on a discretionary inference.

Please produce all of these documents, unredacted, by two weeks before filing defendant's Rule 11 motion.

### b.  <u>Defendant's Claimed Reliance on Seniority</u>

Defendant's Position Statement represented to the EEOC at p. 2 that defendant relied in part on seniority in deciding to select plaintiff for termination in a lay-off: "What Mr. Graves fails to mention is that . . . the other MD had 18 years more seniority and some experience outside of television."  See Attachment E hereto, at Graves 23.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 24 of 32 —

Plaintiff notes that William Detwiler had been hired as a Director in 2003.  See Exhibit B to defendant's Position Statement to the EEOC, Attachment F hereto.  Mr. Detwiler had accomplished nothing shown on the Franchise Revenue Reports by January 2004, was very much junior to plaintiff, and as a non-manager was a comparator to plaintiff.  Similarly, the young Vice Presidents defendant promoted to Director in 2003 were less senior than plaintiff at the non-managerial deal-making level to which plaintiff belonged.   See Exhibit F to defendant's Position Statement to the EEOC.

Requests for Production 11 through 13 would—if defendant had provided the requested discovery—have informed plaintiff as to the extent to which defendant actually relied on seniority and the type of seniority on which it relied.

These requests asked for the following:

### 4. Age and Seniority

11.  A copy of every policy containing information about the use of seniority in lay-offs of bankers.  See the Position Statement, pp. 2, 6, and 8.

12.  A copy of every policy about the type of seniority—companywide including predecessors, companywide excluding predecessors, major business unit (Global Markets, Corporate Finance, etc.), type of client or industry, or supervisory unit, or other—to be used in layoff decisions, and the means of calculating seniority for use in lay-off decisions.  See the Position Statement, pp. 2, 6, and 8.

13.  A copy of all documents, other than individual personnel records, mentioning the age or seniority of bankers in connection with the staffing levels of, or the planned or actual recruitment, hiring, transfer, lay-off, termination, and retention of bankers within, any Industry Group.  See the Position Statement, pp. 2, 6, and 8.

Defendant has not yet produced any of this information.

Given defendant's failure to produce this information and the examples cited above, a jury could infer that defendant simply made up its claim of reliance on seniority. However, plaintiff would prefer to have the hard facts than to rely on a discretionary inference.

Please produce all of these documents, unredacted, by two weeks before filing defendant's Rule 11 motion.

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 25 of 32 —

### c.     Defendant's Nationwide Showings to the EEOC

When it suited its own purposes, defendant chose to produce to the EEOC handpicked nationwide information about investment bankers in all Groups and business units.  Defendant's Position Statement to the EEOC represented at p. 2: "In 2002, DBSI set the revenue target at $10 million for all of its investment bankers, including bankers outside of the Media Group."  See Attachment E hereto, at Graves 23.  It is surely relevant to find out whether this in fact occurred across the board, whether such goals were met in other units subject to the line of supervision of the persons defendant asserted to the EEOC were the decisionmakers herein, and what happened to the employees.  Such information will bear on the question whether defendant's representations to the EEOC were correct or, if incorrect, knowingly false.

The Position Statement represented at p. 3: "In 2003, DBSI increased its targets for all bankers from $10 million to $15 million per banker."  See Attachment E hereto, at Graves 24.  It is surely relevant to find out whether this in fact occurred across the board, whether such goals were met in other units subject to the line of supervision of the persons defendant asserted to the EEOC were the decisionmakers herein, and what happened to the employees.  Such information will bear on the question whether defendant's representations to the EEOC were correct or, if incorrect, knowingly false.

The Position Statement represented at p. 4, n.3:

Senior management was not singling out the Media Group. In response to tough market conditions in 2002, DBSI cut costs by eliminating about 445 investment banking positions in 2002 and 221 positions in 2003. Mr. Graves' termination was after a two year period of downsizing at DBSI. (Attached as Exhibits R and S are charts demonstrating DBSI investment banking employees whose employment was voluntarily or involuntarily terminated in 2002 and 2003, respectively.)  The Media Group, in particular, had a difficult year in 2003, primarily due to the downturn in television broadcasting, which is why Mr. Amling received the directive from senior management to eliminate duplications in the Group. (See Exhibit E.)

See Attachment E hereto, p. Graves 25 n.3.  It is obviously relevant to see whether these assertions of global or nationwide eliminations of positions are a fair description of the underlying facts.  If not, depending on the circumstances plaintiff may consider amending the Complaint to add new specifications of fraud.

Requests for Production 14 and 15 would—if defendant had provided the requested discovery—have enabled plaintiff to start performing this analysis.  These requests asked for the following:

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 26 of 32 —

### 5. <u>Computer-Readable Database of Information on Bankers</u>

14. A copy of defendant's computer-readable personnel database or databases, containing records on Directors and Managing Directors, showing for each year any of the following information: names, dates of birth, dates of employment, date notified of end of employment, reason for any end of employment, groups in which employed, compensation received in that year, compensation rates, amounts and dates of changes in compensation rates, incentive bonuses received, retention bonuses received, signing bonuses received, cash bonuses received, stock bonuses received, dates of award of bonuses, dates of receipt of bonuses, all other computer-readable information helping to show whether the Directors or Managing Directors who had ended their employment were awarded and received a bonus for the preceding year, whether they were allowed to continue working for some period of time at the same pay without duties, or with reduced duties, or at reduced or no pay, and the duration of that period of time, and any other information on the database as to Directors and Managing Directors.

15. A copy of all documents containing information about any codes and explanations of codes used in any computer-readable database produced by defendant.

Defendant has not yet produced any of this information.

Given defendant's failure to produce this information and the examples cited above, a jury could infer that defendant simply made up its assertions to the EEOC. However, plaintiff would prefer to have the hard facts than to rely on a discretionary inference.

Please produce all of these documents, unredacted, by two weeks before filing defendant's Rule 11 motion.

### d. <u>Defendant's Representations to the EEOC That It Was Trying to Save Money by Firing Plaintiff</u>

Defendant's Position Statement to the EEOC represented that it fired plaintiff in order to save money. It stated at p. 4 that "the television broadcasting space could no longer support two MD's when the revenue that was being generated was so low." See Attachment E, at Graves 25. On the same page, defendant stated: "While Mr. Amling believed Mr. Graves was a hard worker, the revenues just were not there to retain him."

Controlling case law makes clear that information on compensation can show that such a stated reason is pretextual. *Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129,

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 27 of 32 —

136 (2d Cir.), *cert. denied*, 530 U.S. 1261 (2000), found that the plaintiff had produced
adequate evidence of pretext, and reversed the grant of summary judgment to the ADEA
RIF defendant. The defendant's explanation for firing the plaintiff was that a decline in
business required a RIF, and that plaintiff's job performance was poor. This sounds
familiar. The court found problems with the RIF explanation, in part because the plaintiff
was replaced three months after the RIF with a person who was 25 years younger, and in
part because of their comparative salaries. "And, defendant achieved relatively
insignificant savings as a result of Carlton's termination. While Carlton had received
$57,200 per year, Oravets was paid $46,800 per year. All of which suggests that perhaps
some other motive—beyond the company's finances—motivated Carlton's dismissal."

The transfer of plaintiff's accounts to younger bankers is adequate evidence of
replacement. Indeed, the promotions of young Vice Presidents to Director may also be
found to have been a replacement in advance of a planned but unannounced termination
of plaintiff. *Cf. Lettieri v. Equant Inc.*, 478 F.3d 640, 648-49 (4th Cir. 2007) (temporary
assignment of duties to a male employee is enough to show replacement).

Requests for Production 16 through 20 would—if defendant had provided the
requested discovery—have enabled plaintiff to determine whether defendant saved a
significant amount of money by firing plaintiff. These requests asked for the following:

### 6. Compensation of Bankers

16. A copy of all documents containing information about compensation
contracts of any Media Bankers from March 31, 1999, through the present.

17. A copy of all documents containing information about the
compensation amounts, levels, or ranges of compensation, of Media Bankers from
March 31, 1999, through the present. Defendant may respond to any part of this
request by referring to the database produced in response to Request No. 14, to
the extent that plaintiff can obtain the same information from that database.

18. A copy of all documents containing information about the importance
of annual incentive bonuses to defendant's ability to attract and retain good
bankers, or about the importance of such bonuses to the bankers it employed.

19. A copy of every policy about the manner in which bonus pools were
to be allocated to individual Media Bankers, or to individual bankers in the Media
Investment Banking Group, from March 31, 1999, through the present.

20. A copy of all documents containing information about the decisions to
award bonuses, or about the decisions to award a particular amount of bonus,
from March 31, 1999, through the present, to any Media Banker at any time from

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 28 of 32 —

March 31, 1999, through March 31, 2005. Defendant may respond to any part of this request by referring to the database produced in response to Request No. 14, to the extent that plaintiff can obtain the same information from that database.

Defendant has not yet produced any of this information.

Given defendant's failure to produce this information, a jury could infer that defendant simply made up its assertions to the EEOC. However, plaintiff would prefer to have the hard facts than to rely on a discretionary inference.

Please produce all of these databases, codes, and documents, unredacted, by two weeks before filing defendant's Rule 11 motion.

**G.      Defendant's June 25, June 29, and July 20, 2007 Demands for Withdrawal of the Fraud Allegations**

Each of these letters demanded the withdrawal of the allegations in the Complaint asserting that defendant had engaged in fraudulent, deceptive, or misleading representations.

In keeping with the requirements of *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), however, plaintiff's Complaint laid out the specific bases on which these allegations were based, and drew each specific allegation as to defendant's Position Statement to the EEOC from the text of the Position Statement itself.

Plaintiff's June 26, 2007, response to your June 25 demand for withdrawal was the definitive response: defendant has never responded to its specific points. See Attachment A hereto. For example, as I pointed out in my July 23, 2007, letter to you responding to your July 20 letter, my June 26, 2007, letter had already addressed your point fully at pp. 4-9. Here is what it said on those pages, excluding subpart 2 on "The Apportionment of Revenue to Bankers," which is already quoted above:

**H.      The Facts**

**1.      Omissions from Your Letter**

I was struck by the fact that your letter did not attempt to challenge the accuracy of numerous allegations underlying our allegations of fraud.

The Complaint alleges that one of defendant's key exhibits, Exhibit F to the Position Statement, seems to have been backdated, and alleged the specific facts that allow such an inference. This is sufficient, as the discussion in Part A shows. Your letter does not challenge the adequacy of our allegations or the

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 29 of 32 —

accuracy of their factual underpinning.

The Complaint alleges that defendant's key exhibits, Exhibits C and F, include numerous values that seem to have been made up, and alleged the specific facts of very different transactions having been assigned the same precise value. You must concede that the assignment of identical values to different transactions is odd, and at the very least entitles a fact-finder to draw the inference that the figures are patently false, and even that they were deliberately filed with knowledge of their falsity. In context, the false numbers repeated on several occasions, to plaintiff's detriment, suggest deliberate manipulation. That is not much of a stretch, and is certainly a permissible allegation under the case law cited in your letter and in this letter. Your letter challenges the conclusion, but does not challenge the adequacy of our allegations or the accuracy of their factual underpinning.

The Complaint alleges that defendant's key exhibits, Exhibits C and F, exclude significant parts of plaintiff's true pipeline, about which defendant had knowledge. This is sufficient, as the discussion above shows. Your letter challenges the conclusion, but does not challenge the adequacy of our allegations or the accuracy of their factual underpinning.

The Complaint alleges that defendant knowingly set plaintiff up for failure and eventual termination over a substantial period of time, by transferring his accounts to other bankers, and pressuring him to transfer accounts to younger bankers, both before and at his termination, and that defendant fraudulently failed to alert plaintiff to its plans so that it could avail itself of his services until it was ready to fire him. This is sufficient, as the discussion above shows. Your letter challenges the conclusion, but does not challenge the adequacy of our allegations or the accuracy of their factual underpinning.

As stated in my June 7 letter to Ms. Seltzer and repeated above, plaintiff does not need the threat of a Rule 11 motion to withdraw any pleading that you can show us is factually incorrect. If defendant can show us documents conclusively showing that these allegations are wrong, plaintiff will withdraw them without defendant having to file a motion.

It is quite another matter, however, to withdraw allegations when no supported objection has been made to their adequacy or accuracy.

We cannot help but think that, if defendant had support for its position as to these matters, it would have brought it forward in your letter. *Interstate Circuit v. United States*, 306 U.S. 208, 226, 59 S. Ct. 467, 83 L. Ed. 610 (1939), summed up the general inference to be drawn in this type of situation: "The production of

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 30 of 32 —

weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. . . . Silence then becomes evidence of the most convincing character." The principle is widely recognized. JAMES H. CHADBOURN, II WIGMORE ON EVIDENCE (Little, Brown & Co., Boston, 1979), § 285 at 192: "The nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its *tenor is unfavorable to the party's cause*." (Emphasis in original). The principle is even recognized in literature. A dog's failure to bark in the night was the clue enabling Sherlock Holmes to solve a murder in Sir Arthur Conan Doyle's SILVER BLAZE.

Nevertheless, plaintiff remains open to reconsidering the fraud allegations, or any other part of the Complaint, if defendant can demonstrate to us that we cannot win these claims. There is no need for defendant to go to the time and expense of filing a motion.

I.      **Defendant's Accusations of Plaintiff's Nonresponsiveness, and Plaintiff's Record of Responsiveness**

Given the amount of effort plaintiff has expended in a so-far unrealized hope that defendant would respond to the facts and the law as to these allegations, and as to the defendant's failure to meet its initial disclosure obligations, and as to the defendant's failure to comply with the discovery rules, it is surprising that defendant complains plaintiff has been non-responsive.

To reiterate, plaintiff (1) proposed to defendant on June 1 that plaintiff send defendant a draft of the Complaint prior to its filing, with an offer to withdraw any draft allegation if defendant would produce documents and information showing that it was not well-taken; (2) sent defendant a copy of the draft Complaint on June 7, shortly before it had to be filed, explaining that the filing deadline was driven by the ninety-day suit-filing period after receipt of a Notice of Right to Sue issued by the EEOC, (3) repeated plaintiff's offer to withdraw any draft allegation if defendant would produce documents and information showing that it was not well-taken, and (4) offered to delay the filing to give defendant more time to consider the matter and produce such documents and information, if defendant would simply stipulate to toll the suit-filing period for a week. Defendant was not interested.

Plaintiff's offer to withdraw any allegation, if defendant would produce documents and information showing that it was not well-taken, was once again repeated in my June 26 letter. Let me repeat it again here.

It is not proper to accuse plaintiff of having known along that our allegations of a false filing were incorrect, where all of the information available

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 31 of 32 —

to plaintiff supports the accuracy of the allegations and defendant has rejected numerous offers to show plaintiff real information bearing on the allegations, with the promise that the allegations would be withdrawn if we are shown that they have no merit.

Defendant's cases make our point.  Unlike the sanctioned parties in those cases, defendant has not even approached making an indisputable showing of any of its points. Instead, it has presented a handful of its hand-selected favorites, questionable documents out of context or explanation and often contradicted by other documents as shown above or in other letters, and simply pronounced them undisputed.

The defendant's slow and partial response to discovery has not produced any documents that would even be probative of the issue whether defendant presented plaintiff in a false light to the EEOC as alleged.

Plaintiff has sought information on the proposed transactions at issue.  Such information would show whether the identical values for different transactions with different levels of probability, in defendant's submission to the EEOC, have an innocent explanation.  Defendant has objected and refused to produce the information.

Plaintiff has also sought information on defendant's comparisons among bankers for purposes of compensation and personnel decisions.  Such information would show whether in this context defendant chose among bankers for favorable or unfavorable employment-related decisions based on multiply-counted transactions, as defendant represented to the EEOC that it did in connection with plaintiff's termination.  Defendant has objected and refused to produce the information.

Defendant's unwillingness to produce information that would be probative of these allegations has reinforced our belief that the allegations are correct.

It is not relevant that defendant used identical transaction values for different transactions with different levels of probability, or that defendant multiply-counted and multiply-credited transactions, where defendant was not choosing among bankers for favorable or unfavorable treatment.  A company can put whatever it wants in isolated sample reports or isolated internal reports, without necessarily paying any attention to it in choosing among bankers for favorable or unfavorable employment-related treatment.

With this explanation, I am sure you can understand our inability to draw any conclusions as to defendant's practices from the partial and out-of-context information defendant has produced to date.

Plaintiff again requests defendant to produce all requested documents, unredacted, by two weeks before filing defendant's Rule 11 motion, so that plaintiff will have the

Cliff Fonstein, Esq.
Joanne Seltzer, Esq.
Sidley Austin LLP
May 9, 2008
Page 32 of 32 ——

benefit of this information and an opportunity to analyze it and make decisions based upon it.

Very truly yours,

Richard T. Seymour

Cc: Jonathan Rogin, Esq.