**Westlaw.**

Not Reported in F.Supp.2d                                                                                                                                               Page 1
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))**

**H**Hewlett Packard Co. v. Factory Mut. Ins. Co.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
HEWLETT-PACKARD COMPANY, Plaintiff,
v.
FACTORY MUTUAL INSURANCE COMPANY,
Defendants
No. 04 Civ. 2791 TPG/DF.

June 28, 2006.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.
*1 As described in this Court's prior Order of January 5, 2006, there are two motions currently pending before this Court: (1) a motion by plaintiff Hewlett-Packard Company ("HP") to amend its Complaint, and (2) a motion by defendant Factory Mutual Insurance Company ("FM") to strike the supplemental Rule 26(a) damages disclosures of plaintiff HP. For the reasons set forth below, HP's motion to amend is granted, on the condition that HP agree to pay the reasonable fees and costs associated with any depositions that FM will need to re-take as a result of HP's substantial delay in seeking the amendment, and FM's motion to strike is denied.

BACKGROUND

This case involves an insurance claim by HP for businesses interruption losses resulting from a former employee's acts of sabotage. In its Complaint, HP alleges that, commencing on or about on January 18, 2001, the employee, Hock-Beng Lim ("Lim"), sabotaged a database that HP was planning to use to conduct "benchmark" testing on its new high-end Unix-based computer server (the "Superdome"). (Complaint, dated April 9, 2004 ("Compl.") (Dkt.1), ¶ 4.)

HP had planned to test the Superdome's performance utilizing industry-standard guidelines established by the Transaction Processing Performance Council-so-called "TPC-C" benchmark testing. (See id. ¶ 3;see also Declaration of William H. Stanhope in Support of FM's Memorandum of Law in Opposition To HP's Motion To Amend the Complaint, sworn to Nov. 26, 2005 ("Stanhope Decl.") (Dkt.29), ¶ 4.) The Superdome was designed to be extremely fast, with the ability to process hundreds of thousands of online transactions per minute. (See Notice of Motion and Motion To Amend Complaint; HP's Memorandum of Points and Authorities, dated Nov. 9, 2005 ("HP Mem.") (Dkt.27), at 1.) HP essentially contends that potential customers for this product would have compared the Superdome to other high-end Unix-based servers on the market, and would have based their purchasing decisions on the results of the TPC-C benchmark testing for the number of transactions per minute that the server could process.

By sabotaging HP's database in January 2001, Lim allegedly made it impossible for HP to run its tests on schedule and achieve, by March 1, 2001, the benchmark of 235,000 ("235k") transactions per minute that HP believes it would otherwise have been able to achieve by that date. Similarly, HP asserts that, as a result of the sabotage, it was not able to achieve projected benchmarks in August and October 2001 of 275,000 ("275k") and 389,000 ("389k") transactions per minute, respectively. HP claims that, because it could not achieve and publicize its projected benchmarks for March, August, and October 2001, it lost customers to its competitors for a period of months, and this business interruption loss was covered under its insurance policy with defendant FM. In its initial Rule 26(a) disclosures, HP identified a loss period of April through December 2001 (see Stanhope Decl., Ex. A at 6; Affidavit of David B. Goodwin in Support of HP's Motion for Leave To Amend Its Complaint, sworn to Nov. 9, 2005 ("Goodwin Aff.") (Dkt.27), Exs. F, G, H), and estimated its damages for that period as "in excess of $77 million" (i.e., in excess of $87 million, less a $10 million deductible under the policy) (see Compl. ¶ 5 and p. 8.).

*2 By way of both its supplemental Rule 26(a) disclosures and its proposed amendment to the Complaint, HP now wishes to expand that damages claim, by asserting that, in the months prior to January 18, 2001, Lim committed additional acts of sabotage, resulting in additional lost sales, for a perior prior to

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 2 of 15

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

April 2001. Specifically, HP now contends that, as a result of earlier sabotage, the Superdome was also unable to meet HP's projected benchmark of 197,000 ("197k") transactions per minute for the product's initial launch, in September 2000. (*See* Supplemental Affidavit of Russell P. Cohen in Support of HP's Motion for Leave To Amend Its Complaint, sworn to Dec. 9, 2005 ("Supp. Cohen Aff.") (Dkt.30), ¶ 6.) According to HP, by the time it achieved that 197k benchmark (which, in September 2000 would have been the highest test result in the market), it was already December 2000, and, in the interim, IBM had publicized a benchmark test result of 220,000 ("220k") transactions per minute for its competing product. (*Id.*) Thus, instead of being able to launch the product with the leading test result in the industry, HP was forced, from the outset, to take a back seat to a competitor.

Based on this, HP seeks to add a claim seeking insurance coverage for sales it purportedly lost from December 1, 2000 to April 1, 2001. In addition, it now appears that HP also wishes to alter the methodology by which it calculated its initial claim for the loss period commencing in April 2001. As noted above, HP originally estimated its business loss as "in excess of $87 million." Based on its current methodology, however, HP is now seeking approximately $108 million for the loss period it originally identified (*i.e.,* the period commencing April 1, 2001), plus approximately $70 million for the earlier period, for a total of approximately $178 million-more than twice the figure stated in the Complaint. (*See* Expert Report of William D. O'Connell, CPA, dated Feb. 3, 2006 ("O'Connell Rpt."), at 4.)

In order to determine whether HP should be permitted to amend its Complaint at this juncture, and to alter its damages disclosures so as to more than double the size of its claim, it is necessary to review the history of HP's disclosures regarding its claimed loss. That history is summarized below:

A. *HP's Initial Damages Computation*

1. *The Claim for Loss Presented by HP to FM, During the Insurance Claim Adjustment Process*

In early December, 2001, HP retained the services of a consultant, George Magula ("Magula") of Claims Accounting and Preparation Services ("CAPS"), to quantify the business interruption losses that HP had suffered as a result of Lim's sabotage. (Supplemental Affidavit of Martin D. Katz in Support of HP's Motion for Leave To Amend Its Complaint, sworn to Dec. 9, 2005 ("Supp. Katz Aff.") (Dkt.30), ¶ 5.) Although Magula apparently looked back as far as August 2000 at early system failures that may have been attributable to Lim's conduct, Magula focused his analysis-at HP's instruction-on an act of sabotage that Lim was known, for certain, to have committed on January 18, 2001, and on HP's resulting failure to achieve its projected March 2001 benchmark and subsequent benchmarks. (*Id.* ¶¶ 7-10.)

*3 On February 28, 2002, HP presented to FM an initial quantification of HP's claimed losses. (Supp. Katz Aff., Ex. B.) In connection with this presentation, HP provided FM with a "timeline" of internal system failures that may have been caused by Lim's sabotage, and the TPC-C benchmark test results that HP had expected to achieve by certain dates. (*Id.*) This timeline showed system errors as early as August 2000. (*See id.*)HP states that, at the time it presented this timeline to FM in February 2002, it believed that Lim had, in fact, committed acts of sabotage prior to January 18, 2001. (Supp. Katz Aff. ¶ 10.) Nonetheless, Magula's report, which accompanied the timeline, quantified only losses purportedly resulting from Lim's January 18, 2001 confirmed act of sabotage, and specifically described the claimed loss period as a nine-month period following the first missed benchmark that would otherwise have been met, had it not been for that particular act by Lim:

The loss is related to delays in announcing transactional benchmarks for Superdome[,] a high-end Unix-based computer system. HP believes that an employee's sabotage for test results delayed the benchmark announcement from April 2001 to December 2001. As a result, HP lost sales to competitors during a nine-month period.

(Supp. Katz Aff., Ex. B (2/28/02 CAPS Report).) No claim was presented for any earlier loss period, although HP did state, in a cover letter to the report, that it "reserve[d] the right to update and revise the listing [of system failures] if additional facts are discovered," and that it further "reserve[d] the right to modify this report as necessary in the future."(*Id.* (Letter to Erik R. Lonson from Burton D. Endsley, dated Feb. 28, 2002).)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 3 of 15

Not Reported in F.Supp.2d                                                                                     Page 3
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

Subsequent to its initial submission to FM, HP provided FM with revised reports from Magula, including a report dated March 11, 2002. (Supp. Katz Aff. ¶ 10.) The March 2002 report again measured only HP's purported losses for a nine-month period, commencing April 2001, and did not suggest that HP was seeking to recover for any earlier losses, resulting from any acts of sabotage that predated January 18, 2001. (*See id.; see also* Goodwin Aff., Ex. G (3/11/02 CAPS Report).)

On June 13, 2002, in the course of investigating HP's claim, FM asked James O. Hays ("Hays"), the senior HP manager of the department responsible for the benchmark testing of the Superdome, about additional losses that HP may have suffered in the fall of 2000. (Goodwin Aff. ¶ 13.) Based on a transcript of Hays' unsworn statement, it appears that HP, while cognizant of the fact that it may have suffered business losses in 2000, made a conscious decision not to press a claim with FM for coverage for such losses:

Would we have, if not for the sabotage of Hock-Beng Lim, gotten that number [a benchmark] out before 12-00 and been able to meet the launch of September, October? Potentially so.

Should we have asked for that as part of the damages? Probably so.

*4 But we decided we weren't going to do that. We were going to focus on the events from January '01 forward in terms of the financial impact and we weren't really trying to go back to the previous year, even though once we had gone further into the analysis, we realized that, in fact, the damage he did extended back into '00 and actually likely would have impacted or did impact that 12-00 disclosure.

(Goodwin Aff., Ex. I (Unsworn Statement of James O. Hays, dated June 13, 2002), at 274-75.) [FN1] The fact that HP deliberately chose to focus on a loss period commencing with Lim's January 2001 act of database sabotage was later confirmed by another HP witness, Vish Mulchand ("Mulchand"), the marketing manager for Superdome (*see* Supp. Cohen Aff. ¶ 14), who testified at a deposition in this action that HP made a decision to "go with" the 2001 loss period in making its insurance claim. (Stanhope Decl., Ex. G (excerpt of deposition testimony of Vish Mulchand, dated Sept. 15, 2005), at 110-11.) Specifically, Mulchand testified as follows:

> FN1. After brief comments by counsel for both parties as to whether, by then, it was (or was not) too late for HP to assert a claim for the earlier period (*see id.* at 275), Hays reiterated: "... in terms of what I believe they are doing is looking at what happened from [the] beginning of '01 forward, not looking so much at what happened ... in the second half of '00"(*id.*).

Q. So it's fair to say that you, Mr. Magula, the others involved in trying to define the parameters-

A. Right.

Q. -considered a time frame earlier than April [2001]?

A. Yes, I think we did.

Q. But then ultimately decided to start in April as the time frame for the loss?

A. Yes.

(*Id.* at 111-12.)

On July 12, 2002, FM responded to HP's presented claim, by providing HP with a preliminary coverage analysis, which indicated that FM had a number of coverage defenses. (Supp. Katz Aff. ¶ 12.) Despite this, the parties continued to discuss the matter (*see id.* ¶ 13), and FM continued to investigate the claim (*see* Compl. ¶ 22). In August 2002, HP provided FM with another revised report by Magula, which again presented a computation of damages for the period commencing April 2001. (Supp. Katz Aff. ¶ 10; *see also* Goodwin Aff., Ex. H (8/2/02 CAPS Report).)

In October 2002, HP deposed Lim in connection with a lawsuit brought by HP against Lim. (Supp. Katz Aff. ¶ 11.) At his deposition, Lim admitted that he had committed acts of sabotage in the year 2000. (*See id.* and Ex. C thereto (excerpts of Lim Dep. Tr.).) At no time, however-and even though HP understood that FM was still investigating the claim-did HP ask Magula to revisit his damages analysis, so as to consider whether, as a result of those earlier acts by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 4 of 15

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

Lim, HP suffered business interruption losses prior to April 2001. (*See id.* ¶ 12 ("Mr. Magula was not asked to undertake efforts to measure this additional loss.").) According to HP, the reason for this was that, in view of FM's preliminary position on coverage issues, the parties' relationship had, by then, become "less collaborative." (*Id.*) In April 2003, however, six months after Lim's deposition, it appears that HP provided FM with a CAPS presentation that incorporated Magula's last report, *again* showing HP's loss as having been incurred for the period commencing April 2001. (*See* Supplemental Affidavit of William H. Stanhope in Support of FM's Sur-Reply Memorandum in Opposition To HP's Motion To Amend the Complaint, sworn to Dec. 16, 2005 ("Supp. Stanhope Aff.") (Dkt.35), ¶ 34 and Ex. M thereto (April 2003 CAPS presentation).)

*5 On June 30, 2003, FM denied HP's claim for coverage. (Supp. Katz Aff. ¶ 14.) At that point, HP instructed Magula to stop performing any further analyses of HP's claim. (Supp. Cohen Aff. ¶ 15 and Ex. I thereto (excerpt of Magula Dep. Tr.).)

2. *HP's Claim as Pleaded in the Complaint*

In April 2004, HP commenced this litigation. By that time, based on its own statements, HP had believed for more than two years that Lim had committed acts of sabotage as early as August 2000. Further, by the time HP filed suit in this Court, HP had known for a year-and-a-half of Lim's sworn admissions in this regard. Apparently, however, HP commenced this action without ever performing an analysis to determine whether it had suffered any business losses as a result of those early acts of sabotage. (*See* Supp. Katz Aff. ¶ 16.) As HP had not conducted the requisite analysis, it states that it had no basis for asserting a claim for such losses in its Complaint, and it therefore confined its pleaded claim to the losses allegedly caused by Lim's January 18, 2001 act of sabotage. (*See id.*)In other words, having failed to perform the additional work necessary to determine whether it also had a viable claim to insurance coverage for business losses incurred prior to the spring of 2001, HP commenced this lawsuit by pleading only a claim for the same losses that it had sought from FM during the claim adjustment process, where it had submitted and relied on the Magula reports.

In the words of HP's counsel:

In April 2004, HP filed this lawsuit. Although HP was aware that Dr. Lim's sabotage began as early as August 2000, at that time it had not engaged Mr. Magula or any other consultant to analyze the extent to which the delay in publishing the initial benchmark from September to December 21, 2000 caused a business interruption loss. Therefore, when the complaint in this matter was filed, HP was not in a position to file a pleading in which it alleged damage resulting from Dr. Lim's sabotage in 2000 (although FM[ ] had been apprised of that sabotage). Thus, HP confined its initial complaint to allegations of sabotage in 2001, and specifically referenced the January 18, 2001 destruction of the TPC-C database.

(Supp. Katz Aff. ¶ 16.)

3. *HP's Initial Disclosure of Its Damages Computation, Pursuant to Rule 26(a)*

On September 24, 2004, more than five months after commencing this suit, HP served its initial disclosures under Fed.R.Civ.P. 26(a)(1). Apparently, by that time, HP still had not performed an analysis as to any damages it might wish to claim for any period prior to April 2001. Thus, with respect to its computation of the damages it claimed to be seeking in this case, HP merely stated the following:

HP seeks recovery in excess of $77 million in damages, plus interest thereon, in excess of the applicable deductible. CAPS has provided details of its initial calculation of its damage claim to FM's adjusters and accountants. HP will supplement this disclosure if and when appropriate, as provided for in the Federal Rules of Civil Procedure 26(a) and (e).

*6 (Stanhope Decl., Ex. A at 6.) According to HP, Magula's "initial calculation" was, even by September 2004, the only computation "reasonably available" to HP. (Supp. Katz Aff. ¶ 17.)

The parties then engaged in further discovery, during which FM actively sought disclosure, both through document discovery and witness testimony, regarding the underpinnings of the CAPS analysis on which HP appeared to be relying for its claimed damages (net of the deductible) of "in excess of $77 million."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF    Document 39-6    Filed 06/30/2008    Page 5 of 15

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

B. *The Parties' Dispute Regarding the Adequacy of Damages Discovery Provided by HP*

1. *The Anderson Deposition*

In June 2005, nearly a year into the discovery process, HP designated Thomas G. Anderson ("Anderson"), a former marketing director for Superdome, as a Rule 30(b)(6) deposition witness to testify as to aspects of HP's business interruption claim. In meeting with Anderson prior to his deposition, HP's counsel apparently realized that Anderson would be able to testify-at least to some extent-that HP had suffered business losses in 2000, attributable to Lim's earlier acts of sabotage. (*See* Supp. Cohn Aff. ¶¶ 5-7.) Although counsel does not contend that it previously lacked access to Anderson, or that the information he provided was not previously available, counsel nonetheless asserts that HP "learned new information" from Anderson in the course of his deposition preparation. (*Id.* ¶ 5.) The crux of this purportedly "new" information was that the September 2000 launch of the Superdome "was a highly publicized event," at which "HP promised to deliver unmatched performance," *i.e.*, the "highest benchmark result in the high-end UNIX server market"(*id.*), but that HP was not even able to publish its initial benchmark until December 2000, well after the product launch, and after IBM had published a higher benchmark result for a competing product (*id.* ¶ 6).

At his deposition, Anderson testified that HP's inability, in 2000, to publicize a benchmark result that was higher than IBM's result "caused tremendous problems with [HP's] sales force."(Anderson Dep. Tr. at 89.) When FM's counsel then started to question Anderson about his understanding of the time frame covered by HP's claim in this case, HP's counsel objected, asserting, "HP hasn't submitted its damages report in this case at this time, and it's not required to do so under Rule 26."(*Id.* at 90.)Further, although Anderson was designated as a witness to testify as to the "causal connection between the alleged delays and/or cancellations with respect to TPC-C benchmarks in 2001 for HP's Superdome Product and HP's claim for damages in excess of $77 million" (Goodwin Aff., Ex. Q (FM's Second Amended Notice of Taking Rule 30(b)(6) Depositions of Plaintiff HP), at 3), HP's counsel made clear at the deposition that Anderson was not prepared to testify as to how Lim's activities caused HP to suffer any particular amount of damages. (*See* Anderson Dep. Tr. at 97-100.)

*7 Following the Anderson deposition, FM expressed concerns to HP as to whether HP had adequately disclosed its damages theory, damages computation, and claimed loss period. In a letter to HP dated July 11, 2005, FM took the position that Anderson was an inadequate Rule 30(b)(6) witness, and that it needed to be able to depose an HP witness as to the factual "nexus" between Lim's acts of sabotage and the specific loss claimed. (*See* Supp. Cohen Aff., Ex. C (Letter to Russell Cohen, Esq., from Patrick E. Shipstead, Esq., dated July 11, 2005 ("7/11/05 Shipstead Ltr.")), at 2.) According to HP, however, any inquiry by FM as to the "measure" or "quantification" of damages was properly the subject of expert testimony. Thus, in response to FM's letter, HP merely informed FM that it would provide "a full quantification of its damages and the expert opinion supporting that claim when ... required to do so under the Federal Rules."(Supp. Cohen Aff., Ex. C (Letter to Patrick E. Shipstead, Esq., from Russell P. Cohen, Esq., dated July 15, 2005 ("7/15/05 Cohen Ltr.")), at 2.)

In light of Anderson's testimony, FM also expressed concern as to whether HP was planning to alter the damages theory contained in the Magula reports, and/or to extend its damages claim to encompass losses incurred prior to April 2001. (*See* Supp. Cohen Aff., Ex. C (7/11/05 Shipstead Ltr.), at 2-3.) On these points, FM noted that, during the Anderson deposition, HP "sent strong indications that the $77 million figure [was] subject to change, and that HP might in fact intend to abandon that number for another...." (7/11/05 Shipstead Ltr. at 3.) FM continued:

Conducting further discovery on the cause of and/or scope of damages will be fruitless if some later change in position by HP requires new discovery to be taken on expanded or changed claims. Accordingly, as with the case of the period of recovery for which HP makes claim, please advise immediately if HP intends to abandon the $77 million figure and the basis for doing so.

(*Id.*)

In response to FM's concerns as to whether HP was intending to alter its initial damages computation, HP again asserted that it was premature to expect it to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 6
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

provide its "precise claim for damages." (7/15/05 Cohen Ltr. at 2.) HP also noted that a "plain reading of HP's complaint makes it clear that the $77 million ... was derived from an estimate," and informed FM that the $77 million figure "[was] not HP's damages claim for purposes of trial."(*Id.*) HP did inform FM, however, of its current view that "Lim's conduct *may* have caused the publication of the 197K Tpmc benchmark to be delayed [in 2000]" and that, "[a]ccordingly, *there is a question* whether losses were incurred earlier than indicated by CAPS in its initial assessments."(*Id.* at 3 (emphasis added).) HP added that it had "continued to investigate and analyze these issues" in the course of the litigation. (*Id.*)

2. *The Court's Instruction to HP to Provide the Requested Discovery*

*8 Not satisfied with HP's responses to its concerns, FM wrote to the Court on July 19, 2005 to request a pre-motion discovery conference. (Letter to the Court from Patrick E. Shipstead, Esq., dated July 19, 2005 ("7/19/05 Shipstead Ltr.").) In its submission to the Court, FM argued that "there is no other issue that is more important or central to this type of litigation" than the causal connection between the claimed sabotage and the claimed loss. (*Id.* at 5.) FM further argued that it was "entitled to immediate confirmation of the timeline scope of [HP's] claim," asserting that such information was "fundamental" to its ability to understand the claim and to take discovery as to the bases of the claim. (*Id.*) In FM's view, HP's "denial of fundamental factual information [would not] be cured by expert reports or testimony given *after* factual discovery is closed."(*Id.* (emphasis in original).)

On July 28, 2005, the Court held a telephone conference with all counsel to address the issues raised by FM. At that conference, HP informed the Court that it was indeed considering changing its damages methodology from that used in its initial Rule 26(a) disclosures, and that it was also considering asserting a claim for losses incurred during an earlier period than that identified in the Complaint. The Court directed HP to confirm the loss period for which it was claiming damages in this litigation, to provide a meaningful damages computation as required by Rule 26(a), and to produce a Rule 30(b)(6) witness who could testify, to the best of HP's knowledge and understanding, on the question of how Lim's conduct had caused HP's monetary losses. The Court further cautioned HP that proposed amendments to the Complaint should not be left for the "eleventh hour." FN2

> FN2. No transcript was made of the July 28, 2005 telephone conference.

On September 3, 2005, HP's counsel wrote to FM, plainly suggesting-although still not definitively confirming-that it intended to claim monetary damages in this litigation as a result of acts of sabotage that occurred in 2000. (Supp. Cohen Aff., Ex. F.) In this regard, HP stated:

Although you have had adequate notice of the potential lost sales during this early period, we are prepared to amend our complaint to make clear that Dr. Lim's acts of sabotage began in August 2000 and that sabotage prevented the publication of a benchmark result at the time of the launch. We are also prepared to amend our Rule 26 disclosures to make clear what we believe is obvious and has been explained to FM many times, namely, that the CAPS reports [ ] were initial estimates of HP's damages based on the information available at the time; do not address lost sales prior to April 2001; do not address lost sales or sales of related products experienced by HP after December 2001, which are also covered under the policy; and *do not necessarily reflect* the damages methodology that HP will present at trial.

(*Id.* at 2 (emphasis added).)

C. *HP's Revised Claim and Damages Computation*

1. *HP's Supplemental Rule 26(a)(1) Disclosure and Motion to Amend the Complaint*

*9 On October 31, 2005, a year-and-a-half after filing suit, HP "supplemented" its Rule 26(a) disclosures. Rather than provide any revised damages computation, however, HP stated only the following:

In its Rule 26 disclosures, HP identified the preliminary assessment of its covered loss, which HP provided to FM and its adjusters and accountants in connection with the adjustment of its insurance claim between December 2001 and June 30, 2003. That preliminary assessment was for the loss period from April to December 2001. During the adjustment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF    Document 39-6    Filed 06/30/2008    Page 7 of 15

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

Page 7

process and this litigation, HP notified FM that further investigation and analysis could lead to an expanded loss period and an upward or downward revision of its claimed loss. *See, e.g.,* Statement of Jim Hays (June 13, 2002) at 275:12-14; Letter from Russell Cohen to William Stanhope and Patrick Shipstead (Sept. 3, 2005). Based upon further investigation, HP believes that Mr. Lim's sabotage also *may have* resulted in lost sales beginning as early as September 2000. HP has not yet completed the quantification of the loss but expects to do so in connection with its expert witness disclosures. HP will further supplement this disclosure if and when appropriate, as provided for in Federal Rules of Civil Procedure 26(a) and (e).

(HP's First Supplemental Disclosures Pursuant to F.R.C.P. 26(a)(1) and 26(e), dated Oct. 31, 2005 ("HP Supp. Discl."), at 3-4 (emphasis added).) Shortly after serving these "supplemental" disclosures, HP also filed a motion for leave to amend its Complaint to add an allegation that Lim committed acts of sabotage "[c]ommencing as early as August 2000."(Proposed Amended Complaint, dated Nov. 9, 2005, attached to Goodwin Aff. as Ex. A ("Prop.Am.Compl."), ¶ 4 (Dkt.27).)

On November 17, 2005, FM sought a conference with the Court, so that the Court could consider a request by FM to strike HP's supplemental damages disclosures as "deficient, untimely and prejudicial." (Letter to the Court from William H. Stanhope, Esq., dated Nov. 17, 2005 ("11/17/05 Stanhope Ltr."), at 1.) In its letter, FM argued:

All of FM[ ]'s discovery into HP's claim has been based on HP's assertions that the major initiating event occurred on January 18, 2001, that the loss period was April-December 2001 and that the amount and reasoning of the damages claim was as set forth in the CAPS report. HP's attempt to change these assertions at this late date without disclosing reasoning, methodology or any calculation of damages, is improper, defeats the purpose of both Fed.R.Civ.P. 1 and 26(a)(1), and destroys any orderly process of discovery in this matter. As such, it should not be allowed.

(*Id.* at 6.) FM also opposed HP's motion to amend the Complaint. (*See* FM's Memorandum of Law in Opposition to HP's Motion to Amend Complaint, dated Nov. 28, 2005 ("FM Opp. Mem.") (Dkt.28).)

On November 30, 2005, the Court held another telephone conference with all counsel. At that conference, the Court observed that FM's application to strike HP's supplemental Rule 26(a) damages disclosures was closely related to HP's motion to amend, and informed counsel that the Court would likely consider the applications together. (*See* Transcript of Conference, dated Nov. 30, 2005 ("11/30/05 Tr."), at 4.)

*10 With respect to both applications, the Court noted that HP had argued in its motion to amend that, while its original Complaint only claimed that Lim's sabotage "from January 2001 forward contributed to its losses," its "further investigation during the course of discovery in this case ... revealed that Lim's sabotage may have caused HP to suffer losses a few months before that time."(HP Mem. at 1-2.) Given these statements in HP's papers, the Court questioned HP as to what facts it had learned during the course of discovery, that it did not, and could not, have known earlier. (*See* 11/30/05 Tr. at 4-5.) HP's counsel responded to the Court's questions in this regard by identifying two areas in which it purportedly learned new information during the course of the litigation. First, HP stated that it did not originally have confirmation that events in 2000 "were attributable to Lim." (*Id*. at 6.) Second, HP stated that it was not until "the last six months" that it had learned information about the market, including "how this market worked, and who the players were in the market, and what their sales were," and that this market information led HP to conclude, after consultation with its "fairly recently" retained expert witnesses, that "the damage period runs probably not from January-beginning in January of 2001 but, rather, a few months earlier."(*Id.* at 6-7.)[FN3] After hearing these general statements from HP, the Court requested that HP provide a supplemental written submission, providing the specifics of the new information that had supposedly come to light during discovery and that could not have been anticipated earlier. (*See id.* at 12.)

> FN3. HP's counsel further stated, "In particular, we've obtained data, market share data, market statistics. We have been consulting with our expert witnesses ... [and] they have been advising us that the effects of Lim's sabotage in the year 2000 are quantifiable and are ... potentially

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 8 of 15

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

significant."(*Id.* at 7-8.)

In addition, the Court questioned HP as to why, if it now believed it should be claiming for an earlier loss period, it had still not provided FM with any new damages computation, under Rule 26(a)(1). On this point, HP first seemed to suggest that it still did not know if it actually suffered lost sales in 2000 as a result of Lim's early acts of sabotage (*see id.* at 21),[FN4] but counsel then stated that, while he did not have HP's "month-by-month breakdown" in front of him (*see id.* at 22 ("[W]e have one. I just don't have it in front of me.")), he "would imagine that we're looking at ... at least ten or twenty million dollars in additional damages for that period"(*id.*). When the Court pressed as to why HP had not provided its new computation to FM, HP responded by arguing that its damages computation constituted attorney or expert work product, and that, in any event, "FM has never asked us-has never sent us an interrogatory that says what are your damages."(*Id.* at 23.)

> FN4. HP argued as follows to the Court:
>
> MR. GOODWIN: ... [W]hat we are being advised by our accountants is that ... there may have been lost sales in December of 2000 rather than beginning in-
>
> THE COURT: You still don't know?
>
> MR. GOODWIN: Well, Your Honor, if Your Honor's ever dealt with expert witnesses, you know, they-they're always saying well, we're still tinkering. And then-and refining.
>
> (*Id.* at 21.)

In December 2005, the Court received supplemental submissions from both parties. In its submission, in response to the Court's inquiry as to what new facts it had learned during the course of discovery, HP pointed to its preparation for the Anderson deposition in June 2005, at which time it supposedly first learned of HP's inability to deliver "the highest benchmark result" in the market at the time of the Superdome's launch in September 2005. (*See* Supp. Cohen Aff. ¶ 5.) Further, HP stated that the litigation consultants it hired in 2005 "had access to information learned through discovery in this case and from other sources, e.g., industry analysts, that was not available to Mr. Magula at the time he prepared his analyses in 2002."(*Id.* ¶ 7.)

2. *The Court's Order That HP Produce Its Damages Expert's Report*

*11 On January 5, 2006, after having reviewed all of the parties' submissions to date on both the motion to amend and FM's application to strike HP's supplemental damages disclosures, this Court issued an Order, finding that "HP's purported supplemental Rule 26(a) damages disclosures [were] insufficient on their face," in that they contained "no computation whatsoever," despite the stated disclosure requirement of Rule 26(a). (Order dated Jan. 5, 2006 ("1/5/06 Order") (Dkt.39), at 2.) The Court further noted:

> Not only does this purported "disclosure" identify an additional loss period of prior to April 2001, for which HP has never provided *any* damages computation, but it also suggests that HP may be intending to revise the only computation that it *did* initially provide-*i.e.*, its "preliminary assessment of its covered loss" for the period from April to December 2001. Yet HP does not provide even a clue as to what its current damages computations are, for either of the two identified portions of its putative loss period. This contravenes both the letter and spirit of Rule 26(a), which is intended to provide an opposing party with an early understanding of the basis and amount of any damages claim it is facing, so that it may conduct meaningful discovery as to the underpinnings of such a claim. Here, HP is unquestionably hiding the ball as to the calculations that will form the heart of its insurance claim.

(1/5/06 Order at 3 (emphasis in original).)

The Court, however, also recognized that HP was planning to rely on expert testimony to establish the amount of its claimed damages, and understood HP's reluctance to offer Rule 26(a) disclosures on damages when its computation would necessarily be the subject of expert disclosures. (*See id.*)Given the difficulty faced by FM with continuing in discovery without knowing the current parameters or scope of HP's damages claim, and given HP's desire to present its damages analysis only through the vehicle of an expert report, the Court dealt with the situation by requiring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 9 of 15

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

HP to produce, within 30 days, a report from its damages expert(s), even though fact discovery was not yet complete. In this way, the Court reasoned, HP would be able to present its damages calculation by its preferred means, and FM would finally understand the nature of the claim it was defending. The Court noted that, as it had "the inherent authority to manage the timing and sequence of discovery," there would be "no reason why additional fact discovery, if necessary, [could not] follow HP's expert disclosure."(*Id.* at 4.)

3. *HP's Expert Report*

On February 3, 2006, in compliance with the Court's Order, HP produced an expert report on damages. The report of William D. O'Connell, CPA ("O'Connell") concludes that, as a result of Lim's acts of sabotage, HP suffered total losses, exclusive of interest, of $178,128,377 for the period from December 1, 2000 through November 30, 2001. (O'Connell Rpt. at 4.) Of those losses, O'Connell concludes that $70,207,224 is attributable to the period prior to April 1, 2001 (*i.e.*, prior to HP's previously claimed loss period), and $107,921,153 is attributable to the period commencing on April 1, 2001.(*Id.*)

*12 The methodology used in the O'Connell report to compute HP's damages is similar to, but is not the same as, the methodology used in the Magula reports, in that it relies on a different internal HP sales forecast, and adjusts the forecast results based on different factors and data. (*See id.* at 3;*see also* Transcript of Conference, dated Mar. 1, 2006 ("3/1/06 Tr."), at 8-11, 49-51.) The O'Connell report, however, does not appear to rely on any information that would not have been available to HP at the time it commenced this litigation in April 2004. For example, HP bases its new damages calculation on the December 2000 internal HP forecast for the period from December 2000 to November 2001 (*see* O'Connell Rpt. at 11-12), and makes adjustments to this forecast using industry data for the period from 2000 to 2001 (*see id.* at 12-13 and Schedule A-7), and forecasting accuracy data for the period from January 2002 to October 2003, (*see id.* at 12-13 and Schedule A-8).

D. *FM's Claim of Prejudice*

On March 1, 2006, after FM had an opportunity to review HP's expert report, the Court held another conference with counsel. At that conference, counsel for FM argued that the O'Connell report represented a "complete rejection of the forecast methodology" that had been used by Magula, as well as a "complete rejection of the valuation methodology" that HP had originally used to compute HP's claimed damages. (3/1/06 Tr. at 35.) According to FM, all of the work it had done since 2002, on "both forecasting and valuation," was "out the window." (*Id.*) Nonetheless, FM's counsel indicated to the Court that the most prejudicial aspect of HP's new damages computation was the extension of the loss period back to 2000-in other words, the extension of the claim, as pleaded in the proposed Amended Complaint. Thus, FM informed the Court that, if the Court were to deny HP's motion to amend, but merely permit HP to proceed with its revised methodology for calculating damages for the loss period originally pleaded, then FM would require "much more limited" additional discovery than it would need if the Court were to grant the proposed amendment. (*See id.* at 69.)

On March 13, 2006, FM advised the Court of its position as to the additional fact discovery it would need if the Court granted HP's Motion to Amend, as well as the more limited discovery it would need if the Court permitted HP to supplement its Rule 26 damages calculation for the original claimed period. (Letter to the Court from William H. Stanhope, Esq., dated Mar. 13, 2006 ("3/13/06 Stanhope Ltr.").) According to FM, if the proposed amendment were permitted, FM would need to take several additional 30(b)(6) depositions, would need to re-take the depositions of the seven technical witnesses and three damages and marketing witnesses that it had previously deposed, and would require a period of approximately six months for additional fact discovery.(*Id.* at 4-8.)In its letter to the Court, FM also requested that, if HP's motion to amend were granted and FM's motion to strike were denied, HP be compelled (1) to pay FM's costs and attorney fees for the additional discovery and document review associated with HP's Amended Complaint and supplemental disclosures, (2) to reimburse FM for the costs and attorney fees associated with responding to HP's Motion to Amend, and (3) to reimburse FM for its experts' fees and costs associated with the review and analysis of the CAPS damages report and analysis during the litigation. (*Id.* at 8-9.)

*13 In response to FM's submission to the Court, HP contends that "no justification exists for even a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 10 of 15

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

fraction of the discovery that FM[ ] seeks."(Letter to the Court from David B. Goodwin, Esq., dated Mar. 20, 2006 ("3/20/06 Goodwin Ltr."), at 1.) HP argues that, in contrast to the extensive additional discovery that FM claims would be required, it would be sufficient for HP to produce one additional technical witness and one additional marketing witness to testify regarding events in 2000. (*Id.* at 2.) According to HP, aside from those two depositions, and the two Rule 30(b)(6) depositions that FM has already noticed, but not yet taken, no further fact discovery should be allowed. (*Id.*) HP further argues that HP should only be required to bear costs or fees associated with additional discovery if FM can demonstrate "that it in fact incurred duplicative costs as a result of having to take additional discovery and that HP acted in bad faith."(*Id.*)

DISCUSSION

I. *APPLICABLE LEGAL STANDARDS*

A. *Motion To Amend*

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires."Fed.R.Civ.P. 15(a). A motion to amend a pleading under Rule 15(a) should be denied, however, "if there is an 'apparent or declared reason-such as undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment." ' *Dluhos v. Floating and Abandoned Vessel,* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)); *accord Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (citation omitted).

While mere delay, or the adverse party's burden of undertaking discovery, are generally insufficient, standing alone, to warrant denial of leave to amend, [FN5] courts have recognized that "[p]rejudice is particularly likely where the amendment raises new theories of recovery or would require additional discovery."*Roe v. City of New York,* 151 F.Supp.2d 495, 508 (S.D.N.Y.2001). In determining what constitutes undue prejudice, the court must consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."*Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993).

> FN5.*See Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234-35 (2d Cir.1995) (delay alone insufficient to deny leave); *United States v. Continental Ill. Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir.1989) (burden of discovery does not warrant denial of motion); *see also A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 299 (S.D.N.Y.2000) ("Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute undue prejudice.").

Under Rule 15(a), the court may use its discretion to impose conditions on the grant of leave to amend. *Hayden v. Feldman,* 159 F.R.D. 452, 454 (S.D.N.Y.1995) (citing *Parissi v. Foley,* 203 F.2d 454, 455 (2d Cir.1953)). The ability of the Court to impose conditions allows the court to balance the interests of the party seeking the amendment against those of the party objecting to it. *See Hayden,* 159 F.R.D. at 454;6 Charles A. Wright et al., *Federal Practice & Procedure* § 1486 (2005)."The most common condition imposed on an amending party is costs."*Polycast Tech. Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926, 939 (S.D.N.Y.1989) (citations omitted) (imposing on the amending party the costs of any duplicative discovery necessitated by the amendment); *see also Mohideen v. American Airlines, Inc.,* No. 99 Civ. 0016(HB)(FM), 1999 U.S. Dist. LEXIS 13978, at *9-10 (S.D.N.Y. Sept. 14, 1999) (conditioning amendment upon plaintiffs' agreement to pay fees and costs associated with defendant's answer to amended complaint and continuation of deposition); *Xpressions Footwear Corp. v. Peters,* Nos. 94 Civ. 6136(JGK), 95 Civ. 8242(JSM), and 95 Civ. 8243(JSM), at *15-17, 1995 U.S. Dist. LEXIS 19122 (S.D.N.Y. Dec. 22, 1995) (defendants' motion to amend granted upon the condition that they bear costs incurred by plaintiffs in taking discovery on the additional issues raised by the amendment); *Hayden,* 159 F.R.D. at 454-55 (further amendment conditioned on payment of fees and costs associated with defendants' motion to dismiss prior legally insufficient complaint).

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 11 of 15

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

Page 11

B. *Rule 26(a)*

*14 Rule 26(a) of the Federal Rules of Civil Procedure requires, in relevant part, that each party provide "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered."Fed.R.Civ.P. 26(a)(1)(C). The primary purpose of Rule 26(a) is to accelerate the exchange of information about the case so that parties may effectively engage in discovery and prepare for trial. *See*Fed.R.Civ.P. 26(a) advisory committee's note (1993 Amendments). Thus, Rule 26(a)"imposes on parties a duty to disclose, without awaiting formal discovery requests, certain basic information that is needed in most cases to prepare for trial or make an informed decision about settlement."*Id.* As this Court stated in its January 2006 Order, such early disclosure of a party's damages computation "provide[s][the] opposing party with an early understanding of the basis and amount of any damages claim it is facing, so that it may conduct meaningful discovery as to the underpinning of such a claim."(1/5/06 Order at 3); *see also Krause v. Buffalo & Erie County Workforce Dev. Consortium, Inc.,* No. 03-CV-0730A(F), 2005 U.S. Dist. LEXIS 41632, *50-51 (W.D.N.Y. Sept. 29, 2005) (explaining that the purpose of mandatory disclosure pursuant to Rule 26 is to enable the parties to more efficiently formulate discovery requests); *City & County of San Francisco v. Tutor-Saliba Corp.,* 218 F.R.D. 219, 221 (N.D.Cal.2003) ("[E]arly disclosure also functions to assist the parties in focusing and prioritizing their organization of discovery.").

Although a party is not excused from the duty of disclosure just because its factual investigation is incomplete, *see*Fed.R.Civ.P. 26(a) advisory committee's note (1993 Amendments), a party does have an obligation to make a reasonable inquiry into the facts of the case before making its disclosures pursuant to Rule 26(a)(1),*See*Fed.R.Civ.P. 26(g)(1). The Advisory Committee Notes to Rule 26(a) explain that the rule "does not demand an exhaustive investigation at this stage of the case, but one that is reasonable under the circumstances...."Fed.R.Civ.P. 26(a) advisory committee's note (1993 Amendments). The type of investigation that is reasonable "will vary based upon such factors as the number and complexity of the issues; the location, nature, number, and availability of potentially relevant witnesses and documents; the extent of past working relationships between the attorney and the client, particularly in handling related or similar litigation; and of course how long the party has to conduct an investigation, either before or after filing of the case."*Id.*

Further, while a party is under a duty to supplement its Rule 26(a) disclosures "if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing,"Fed.R.Civ.P. 26(e)(1), the rule requiring supplementation cannot be used as a justification for the belated assertion of new damages theories that could have been raised earlier, *see Oceans Cuisine, Ltd. v. Fishery Prods. Int'l, Inc.,* No. 05-CV-3613 (DRH)(AKT), 2006 U.S. Dist. LEXIS 22133, at *14-15 (E.D.N.Y. Apr. 21, 2006) (finding that plaintiff had not properly invoked Rule 26(e) to "supplement" initial disclosures, where the plaintiff "did not 'learn' that its prior disclosure was 'incomplete or incorrect,' " but rather belatedly consulted with an expert and then attempted to use the supplementation rule to justify the untimely assertion of new damages theories).

*15 In order to ensure parties' compliance with the mandatory disclosure requirements of Rule 26, Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1)... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."Fed.R.Civ.P. 37(c)(1). The purpose of this rule is to prevent the practice of "sandbagging" an adversary with new evidence. *Ebewo v. Martinez,* 309 F.Supp.2d 600, 607 (S.D.N.Y.2004). Nonetheless, despite the apparently "self-executing" nature of the preclusion sanction, *see*Fed.R.Civ.P. 37(c) advisory committee's note (1993 Amendments), courts in this Circuit have noted that the imposition of the preclusion sanction is a matter within the trial court's discretion, *see Design Strategies, Inc. v. Davis,* 367 F.Supp.2d 630, 634 (S.D.N.Y.2005) (explaining that trial courts have discretion to determine whether or not a substantial justification exists and whether or not a

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 12 of 15

Not Reported in F.Supp.2d                                                                                     Page 12
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

failure to disclose is harmless), and preclusion of evidence is generally a disfavored action, *American Stock Exch., LLC v. Mopex, Inc.,* 215 F.R.D. 87, 93 (S.D.N.Y.2002); *see also Houlihan v. Invacare Corp.,* No. CV 2004-4286(NGG)(MDG), 2006 U.S. Dist. LEXIS 32980, at *2 (E.D.N.Y. May 24, 2006) ("Notwithstanding the mandatory language of the rule, courts in the Second Circuit have viewed the imposition of sanctions under the rule as discretionary and have generally not ordered preclusion."); *Ebewo,* 309 F.Supp.2d at 607 ("Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution.").[FN6]

> FN6. Some courts in this Circuit have also read a bad-faith requirement into Rule 37(c)(1), finding that preclusion is only appropriate "in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." *Ward v. Nat'l Geographic Soc'y,* No. 99 Civ. 12385(LAK), 2002 U.S. Dist. LEXIS 310, at *8 (S.D.N.Y. Jan. 11, 2002) (quotation marks and citations omitted). The Second Circuit has not yet addressed this question. *See Hein v. Cuprum, S.A.,* 53 Fed. Appx. 134, 137 n. 1 (2d Cir.2002) (declining to express an opinion as to whether a showing of bad faith is required for preclusion under Rule 37(c)(1)).

Rule 37(c)(1) also provides that "the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions [such as] requiring payment of reasonable expenses, including attorney's fees, caused by the failure [to disclose]...."Fed.R.Civ.P. 37(c)(1); *see also Oceans Cuisine,* 2006 U.S. Dist. LEXIS 22133 (approving, under Rule 37(c)(1), the imposition on plaintiff of all reasonable legal fees and costs incurred by defendants in connection with additional discovery, where plaintiff had failed to timely disclose information required by Rule 26(a)).

II. *THE PENDING MOTIONS*

A. *HP'S Motion To Amend the Complaint*

HP has moved, pursuant to Rule 15(a), to amend the Complaint, primarily to add the allegation that "[c]ommencing as early as August 2000, Lim destroyed HP's data and its databases built to conduct benchmark tests for Superdome."(Prop. Am. Compl. ¶ 4; *see* HP Mem. at 1-2.) HP's original Complaint alleged that HP's losses stemmed from the January 18, 2001 destruction of a database by Lim and Lim's acts of sabotage subsequent to that date. (*See* Compl. ¶ 4.) Thus, by moving to amend its Complaint, HP seeks to allege that acts of sabotage occurred at an earlier date than the acts originally pleaded, thereby enlarging the loss period for which it claims damages. (*See* background *supra* at Section C.) FM argues that HP's motion to amend should be denied because (1) HP unreasonably delayed in seeking the amendment, and (2) the amendment would be unduly prejudicial to FM. (*See* FM Opp. Mem.; FM's Sur-Reply Memorandum in Opposition to HP's Motion to Amend Complaint, dated Dec. 16, 2005 ("FM Sur-Reply") (Dkt.34).)

*16 FM first contends that HP should not be allowed to amend its Complaint "because HP has known since well before the filing of its Complaint and Disclosure the allegations on which it now seeks to rely."(FM Opp. Mem. at 10.) Indeed, HP acknowledges that, at the time it drafted its original Complaint, it was aware that Lim had committed acts of sabotage "as early as August 2000." (*See* HP Mem. at 5.) Despite this knowledge, HP waited over a year-and-a-half before moving to amend its Complaint. Under Rule 15(a)'s liberal standard, however, delay alone, absent a showing of bad faith or undue prejudice, does not usually warrant denial of leave to amend. *Rachman Bag Co.,* 46 F.3d at 234-35. While HP attempts to justify its substantial delay by claiming that it "was uncertain that the sabotage in 2000 affected the amount of its loss" (HP Mem. at 5), HP offers no adequate explanation as to why it was unable to determine the impact of this sabotage at an earlier date. Nonetheless, given that HP did inform FM, from the outset, that Lim's sabotage may have begun as early as August 2000 (*see* Goodwin Aff. ¶ 10), and given HP's repeated statements to FM that further investigation could lead to an expanded loss period for its claim (*see* Goodwin Aff. ¶ 23), the Court declines to find that HP has acted in bad faith.

The Court, however, must also consider whether allowing HP to amend its Complaint would cause FM to suffer undue prejudice. FM argues that it will be unduly prejudiced by the new allegations of earlier sabotage because its discovery throughout the

Not Reported in F.Supp.2d                                                                                                    Page 13
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

litigation "has been based on the specified initiating event (the January 18, 2001 destruction of a database) causing HP to miss specific 2001 benchmarks which in turn caused the specified amount of claimed damages ($87 million) over a specified time period (April-December 2001)." (FM Opp. Mem. at 12.) According to FM, it has been analyzing the CAPS methodology since at least August 2002 and has focused its discovery efforts on the reports prepared by Magula, which did not quantify any losses prior to April 2001. (FM Sur-Reply at 16.) FM argues that, if HP's motion to amend is granted, FM "will be required to have its experts totally redo the work they have performed to date, and to conduct additional depositions to cover not only [the] new loss period, but the technical underpinnings surrounding HP's TPC-C benchmark efforts in 2000."(*Id.* at 17.)

Although, like delay, the burden of undertaking additional discovery is itself insufficient to warrant denial of a motion to amend a pleading, *see Continental Ill. Nat'l Bank & Trust Co.,* 889 F.2d at 1255, it is appropriate for the Court to consider, as a factor in a "prejudice" analysis, whether granting the proposed amendment would require FM to expend significant additional resources to conduct discovery and prepare for trial. *See Block,* 988 F.2d at 350. Here, it is evident that much of the discovery undertaken by FM was premised upon representations by HP that its losses arose from acts of sabotage commencing in January 2001, and that the loss period for which it sought damages was April-December 2001. While FM may have taken some discovery related to events in 2000 (*see* 3/20/06 Goodwin Ltr. at 3-5; Letter to the Court from William H. Stanhope, Esq., dated Mar. 28, 2006 ("3/28/06 Stanhope Ltr."), at n. 1), it is undisputed that, if the Court were to grant HP's proposed amendment, FM would need at least some additional discovery to explore the new bases for HP's claims (*see id.* at 2).

*17 Although HP argues that any additional discovery that FM may need as a result of the amendment would be minor and brief, HP appears to underestimate the extent to which its amendment would not only lead to new discovery requests by FM, but would also require FM to re-examine several witnesses it previously deposed, prior to being informed that HP was claiming damages for losses purportedly incurred during the earlier time period. Even if HP did not act in bad faith, it is apparent that HP's decision as to how to plead its claim in its original Complaint caused FM to have a seriously misguided notion as to how it should focus its discovery efforts for the bulk of the discovery period. As a result of HP's delay in seeking leave to amend, FM conducted most of its discovery, including depositions, without accurate knowledge of the scope of HP's claim. While FM may be overestimating the extent to which prior discovery would have to be revisited based on the proposed amendment, much of what FM argues in this regard is persuasive.

Indeed, HP's substantial delay in seeking leave to amend, when combined with the extent of the discovery that FM may have to re-conduct because of that delay, may be reason enough for the Court to deny the proposed amendment. Nonetheless, the Federal Rules and the law of this Circuit recognize a strong policy in favor of allowing the amendment of pleadings to facilitate resolution of disputes on the merits. Further, while fact discovery was scheduled to close on December 9, 2005, the Court informed the parties that, should it decide to allow the amendment, it would also consider FM's need for additional fact discovery, including any need to recall deposition witnesses who have already testified. (*See, e.g.,* 1/5/06 Order at 4 (noting that the Court had the inherent authority to manage the timing and sequence of discovery).) As no trial date has yet been set, accommodating FM in this regard is certainly possible, and would serve to prevent FM from being prejudiced in its ability to prepare the case for trial. *See Xpressions Footwear Corp.,* 1995 U.S. Dist LEXIS 19122, at *10.

For these reasons, rather than deny HP's request to amend, it appears to the Court that the better option is to permit the late amendment, conditioned on HP's agreement to pay the costs occasioned by its dilatory conduct. As explained above, the Court has broad authority under Rule 15(a) to impose conditions on the grant of leave to amend, the most common of which is the imposition of costs. (*See* discussion *supra* at Section I.A.) "Granting conditional leave allows a court to prevent prejudice, and at the same time, to freely allow amendments in accordance with the spirit of Rule 15." 3 Moore's Federal Practice § 15.17[2] (3d ed.2005); *see also Mohideen,* 1999 U.S. Dist. LEXIS 13978, at *9-10 (imposition of conditions on proposed amendment allows court to " 'take into account any prejudice that the opposing party will suffer as a result of the amendment' ") (quoting *Hayden,* 159 F.R.D. at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-05471-BSJ-KNF   Document 39-6   Filed 06/30/2008   Page 14 of 15

Not Reported in F.Supp.2d                                                                                                                Page 14
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

454)). The imposition of costs as a condition of allowing an amendment is particularly appropriate where the amendment would otherwise force the opposing party to incur the costs of re-deposing witnesses, or otherwise engaging in "duplicative" discovery. See *Polycast,* 728 F.Supp. at 943-44.

*18 Accordingly, HP may proceed with its Amended Complaint, provided it agrees to pay all reasonable attorney's fees and other costs incurred by FM in connection with recalling previously-deposed witnesses to give new deposition testimony regarding any acts of sabotage that were committed by Lim prior to January 18, 2001 and/or any losses incurred by HP as a result of such acts of sabotage. Such costs would include reasonable preparation time, deposition time, travel time, travel expenses, and reporter fees. As the proposed amendment will be disallowed unless HP agrees to pay such fees and costs, HP is directed to notify FM and the Court promptly if it accepts the condition that has been imposed by the Court. If HP agrees to the condition, then any disputes as to the reasonableness of FM's fees and costs in this regard shall be submitted to the Court at the conclusion of fact discovery.

B. *FM'S Motion To Strike HP's Supplemental Rule 26(a) Disclosures*

In addition to challenging HP's proposed amendment, FM argues that the Court should strike HP's supplemental damages disclosures as insufficient, untimely, and prejudicial to FM. (*See* 11/17/05 Stanhope Ltr.; FM Sur-Reply, at 8-12.) HP asserts that, even if its supplemental disclosures were insufficient when made, any inadequacy has now been "cured" by the expert report that the Court required it to produce. (*See* 3/1/06 Tr. at 52-54.) FM, however, argues that the expert report itself (and the late timing of the damages disclosures contained therein) gives rise to substantial prejudice, as the report reveals significant changes in the methodology provided in the final Magula report, which was originally put forward by HP as its Rule 26(a) damages computation. (*See* 3/28/06 Stanhope Ltr. at 3-4.)

While the Court understands FM's frustration, the question of whether HP's expert report should be stricken is not before the Court. Further, as recounted above, FM conceded in oral argument on March 1, 2006 that the issue of HP's changed computational methodology, as reflected in its expert report, was a lesser issue in terms of potential "prejudice" than the extension of HP's claimed loss period. (*See* 3/1/06 Tr. at 69; *see also* background *supra* at Section D.) While FM may need additional fact discovery to explore the factual basis of HP's new methodology, FM itself recognized that this additional discovery would be considerably more modest in scope than the discovery that it would need to explore the events of the earlier claimed loss period. (*See id.*)

While Rule 37(c)(1) provides for the preclusion of evidence not properly disclosed pursuant to Rule 26(a), courts in this Circuit have recognized that preclusion of evidence is a disfavored remedy that should be exercised with discretion and caution. (*See* discussion *supra* at Section I.B.) Here, even though-as the Court has already found-HP's so-called "supplementation" of its Rule 26(a) disclosures was plainly inadequate, the prejudice caused by HP's failure to come forward sooner with a revised damages computation for losses purportedly caused by Lim's 2001 acts of sabotage can be alleviated by permitting FM to conduct the modest additional fact discovery that it would need to understand the facts supporting HP's new computation of those losses. As for the earlier claimed loss period, it would be inappropriate for the Court to deny HP the opportunity to produce a damages computation to accompany the amendment of the Complaint that the Court has conditionally allowed. With respect to that earlier loss period, HP's expert report now satisfies the requirement that HP make FM aware of the damages it is seeking. Further, to the extent that FM would suffer prejudice from having to re-examine previously-deposed witnesses regarding that earlier loss period, the Court has already addressed that issue by the conditional nature of its grant of HP's motion to amend. *Cf. Oceans Cuisine,* 2006 U.S. Dist. LEXIS 22133, at *12 (imposing fees and costs "that never would have been incurred absent Plaintiff's dilatory actions" where plaintiff belatedly sought to advance a new damages theory in a supplemental Rule 26(a) disclosure). If HP does not accept the condition imposed by the Court, then HP's expert report will necessarily be stricken to the extent it sets forth purported damages for losses arising from acts of sabotage committed prior to January 18, 2001.

III. *EXTENSION OF PERIOD FOR FACT DISCOVERY*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d																																																Page 15
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.))

*19 As discussed above, FM will need to conduct potentially significant additional fact discovery as a result of HP's belated amendment and revised damages disclosures. Accordingly, the Court hereby extends the deadline for fact discovery in this case to October 31, 2006, to allow for this additional discovery.[FN7] Both parties are expected to make good faith efforts to comply with this schedule, and any request by FM for a further extension must be accompanied by a showing of good cause.

> FN7. This schedule assumes that HP will accept the Court's conditional grant of its motion to amend. Should HP decide that, in light of the condition set by the Court, it will not go forward with the amendment, then the Court will expect the parties to discuss the matter and propose to the Court a modified extension of the fact discovery period.

As for the number of additional or resumed depositions that FM may seek during this period in order to address HP's changed damages claim, the Court declines at this point to set a limit, but cautions both parties to approach the matter reasonably. The additional fact discovery period should be viewed as an opportunity for FM to supplement the discovery it previously conducted, so as to prepare an adequate defense to HP's new allegations. It should not be viewed as a door for FM to re-litigate anything and everything that came before, or to expand discovery substantially beyond the limits envisioned by the Federal Rules. The Court expects the parties to work together to negotiate a rational deposition schedule under the circumstances.

The parties are also directed to discuss a schedule for remaining expert discovery, including the production of any additional expert reports by HP (on any subject other than damages), the production of any expert reports by FM, and the depositions of any expert witnesses. The Court anticipates that this discovery will follow the conclusion of fact discovery, unless the parties agree that a different approach would be more efficient.

Finally, once the parties have had an opportunity to confer regarding all discovery matters, counsel are directed to contact chambers to schedule a telephone status conference with the Court, to address any outstanding discovery issues.

## CONCLUSION

For all of the foregoing reasons, HP's motion to amend its Complaint is granted, conditioned on HP's agreement to pay the reasonable fees and costs associated with any depositions that FM will need to re-take as a result of HP's substantial delay in seeking the amendment. FM's motion to strike HP's supplemental Rule 26(a) damages disclosures is denied. Other than the above, FM's request that HP be required to pay costs is denied. The deadline for fact discovery is extended to October 31, 2006.

SO ORDERED

S.D.N.Y.,2006.
Hewlett Packard Co. v. Factory Mut. Ins. Co.
Not Reported in F.Supp.2d, 2006 WL 1788946 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.