LEXSEE


Cited
As of: Jun 30, 2008

**JILL RAPPAPORT, Plaintiff, v. AMY BUSKE, ED MANSFIELD and MANSFIELD PRODUCTIONS, INC., Defendants.**

**98 Civ. 5255 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2000 U.S. Dist. LEXIS 12325**

**August 24, 2000, Decided**
**August 29, 2000, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment GRANTED and complaint dismissed in its entirety.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant television producers moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing plaintiff's diversity suit alleging breach of contract, fraud, and violation of N.Y. Civ. Rights Law § 51.

**OVERVIEW:** Plaintiff contended that defendant television producers breached an oral employment agreement that plaintiff host a television series. The court concluded that the oral agreement was a type II preliminary agreement because, based on an analysis of the four factors to determine the existence of a contract and the evidence adduced, the parties did not intend a contractual obligation to exist between them before a signed writing existed. Thus, no reasonable factfinder could have concluded that the parties agreed on all material elements of the transaction, intended to be fully bound when they concluded a meeting, and considered the formal, written contract to be an unnecessary formality. Plaintiff's fraud claim was dismissed because plaintiff had adduced no evidence that she suffered an out-of-pocket loss. Plaintiff's claim under N.Y. Civ. Rights Law § 51 was dismissed because a single utterance of plaintiff's name over the telephone to a production company did not constitute use. Even if the single utterance did constitute use, such use was not for purposes of trade because plaintiff could not show that defendants had generated any revenue through the one-time use of her name.

**OUTCOME:** Motion for summary judgment dismissing claims granted because parties did not intend a contractual obligation to exist before signed writing existed, plaintiff had adduced no evidence that she suffered out-of-pocket loss, and single utterance of plaintiff's name over telephone did not constitute use of plaintiff's name.

**CORE TERMS:** preliminary agreement, oral agreement, host, negotiated, binding, summary judgment, negotiation, written contract, employment contract, finalized, purposes of trade, partial performance, deposition, oral contract, good faith, reduced to writing, citations omitted, material terms, good faith, advertising, declaration, negotiate, material facts, out-of-pocket, television, responded, ambiguity, omission, custom, television series

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN1]See Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2]In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. Nonetheless, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN3]When determining whether an oral contract exists, courts must heed the admonition that while parties must retain the freedom to enter into oral contracts, freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings. The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing.

*Contracts Law > Types of Contracts > Oral Agreements*
[HN4]Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. In some circumstances, however, the Second Circuit Court of Appeals has recognized that preliminary agreements can create binding obligations.

*Contracts Law > Types of Contracts > Oral Agreements*
[HN5]Binding preliminary agreements fall into one of two categories. Type I is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation, including whether to be bound, but agree to memorialize their agreement in a more formal document. Such an agreement is fully binding; it is preliminary only in form, only in the sense that the parties desire a more elaborate formalization of the agreement. Despite the anticipation of further formalities, a party to this first type of preliminary agreement may demand performance of the transaction even though the parties fail to produce the more elaborate formalization of the agreement.

*Contracts Law > Types of Contracts > Oral Agreements*
[HN6]A Type II preliminary agreement is binding only to a certain degree. It is created when the parties agree on certain major terms, but leave other terms open for further negotiation. The parties accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement. In contrast to a Type I preliminary agreement, a Type II preliminary agreement does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework. A party to a Type II preliminary agreement has no right to demand performance of the transaction. Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary agreement.

*Contracts Law > Types of Contracts > Oral Agreements*
[HN7]When confronted with the issue of determining whether a preliminary agreement is binding, the courts must keep two competing interests in mind. First, courts must be wary of trapping parties in surprise contractual obligations that they never intended to undertake. Second, courts must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation, for it is the aim of contract law to gratify, not to defeat, expectations.

*Contracts Law > Types of Contracts > Oral Agreements*
[HN8]The key to determining whether a preliminary agreement is binding, of course, is the intent of the parties, whether the parties intended to be bound, and if so, to what extent. To discern that intent a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances. Subjective evidence of intent, on the other hand, is generally not considered.

*Contracts Law > Performance > Partial Performance > General Overview*
*Contracts Law > Types of Contracts > Oral Agreements*

*Labor & Employment Law > Employment Relationships > General Overview*
[HN9]The Second Circuit Court of Appeals has identified four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument, (1) whether there has been an express reservation of the right not to be bound in the absence of a writing, (2) whether there has been partial performance of the contract, (3) whether all of the terms of the alleged contract have been agreed upon, and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Contracts Law > Types of Contracts > Oral Agreements*
[HN10]The first factor identified by the Second Circuit Court of Appeals in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of an executed final instrument is typically an analysis of the language of the preliminary agreement and is the most important.

*Contracts Law > Performance > Partial Performance > Preparation*
*Contracts Law > Performance > Substantial Performance*
[HN11]For there to be partial performance of a preliminary agreement, the plaintiff must confer something of value on the defendants, which they accept. Mere preparatory acts are not partial performance.

*Contracts Law > Formation > Meeting of Minds*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN12]Agreement on terms does not become binding until there is agreement on all terms as to which agreement was anticipated.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN13]In an action to recover damages for fraud under New York law, the plaintiff must prove (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*

*Torts > Damages > Compensatory Damages > General Overview*
[HN14]New York follows the out-of-pocket rule of damages for fraud. The true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule. Under this rule, damages are to be calculated to compensate a plaintiff for money she actually lost because of the fraud, not to compensate her for what she might have gained.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN15]See N.Y. Civ. Rights Law § 51.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN16]An isolated use of plaintiff's name cannot support a claim under N.Y. Civ. Rights Law § 51.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN17]In the context of a claim under N.Y. Civ. Rights Law § 51, the term purposes of trade is not susceptible to ready definition. The fact that the publication or use of a name or picture is spurred by a profit motive or included to encourage sales or distribution of the publication is a necessary, but hardly a sufficient, ingredient in determining the existence of a trade purpose.

**COUNSEL:** For JILL RAPPAPORT, plaintiff: James P. Cinque, Cinque & Cinque, P.C., New York, NY.

**JUDGES:** Barbara S. Jones, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

**OPINION & ORDER**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Defendants Amy Buske, Ed Mansfield and Mansfield Productions, Inc., move pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing Jill Rappaport's diversity suit alleging breach of contract, fraud and violation of New York Civil Rights Law § 51. For the reasons set forth below, defendants' motion is granted, and the complaint is dismissed.

BACKGROUND

The following facts are undisputed or as alleged by plaintiff.[1] Plaintiff Jill Rappaport is a New York citizen, and for the past eight years has worked as the entertainment reporter for NBC's "Today" show. Defendant Ed Mansfield ("Mansfield"), a Florida citizen, is a television producer. His production company, defendant Mansfield Productions, Inc., is a Georgia corporation. Defendant Amy Buske, a New Jersey citizen, is a self-employed television, motion picture, music and theater producer [*2] and composer. In early 1998, Buske and Mansfield teamed up to produce a television series Buske had developed called "Fabulously Fit and Famous" (the "series"). The series was similar to "Lifestyles of the Rich and Famous," but with a focus on fitness; Buske and Mansfield planned to have a host travel to the homes of celebrities and spend a day working out with them and interviewing them about their fitness and beauty habits. In the only promotional flyer they used, Buske and Mansfield pitched the series as "Fabulously Fit and Famous," with no mention of a specific host, from February to August 1998, when Buske and Mansfield abandoned the development and production of the series.

> 1   In setting forward the facts in this Opinion, the Court has relied on the parties' Rule 56.1 Statements and the citations to the record contained in those Statements. Where there are no citations or where the cited materials do not support the factual assertion in the Statements, the Court has disregarded the assertion. See Local Civil Rule 56.1(d). Local Rule 56.1 provides that "all material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Plaintiff contests only 17 of the 56 paragraphs in the defendant's 56.1 Statement. However, the Court has made a thorough review of the record and presents all facts in the light most favorable to the plaintiff, notwithstanding the shortcomings of plaintiff's 56.1 Statement.

[*3] In February 1998, Mansfield telephoned Rappaport at NBC in New York to tell her of his interest in hiring her as the host of the series. In the number of conversations that followed between Mansfield and Rappaport, Mansfield described the series, emphasized that the host would be required to travel and interview celebrities, and told Rappaport that there would be vitamin and other merchandise tie-ins. Rappaport expressed concerns regarding the travel and wanted assurances that the series would not interfere with her commitments with NBC. In addition, Mansfield proposed that the series title be changed to "Fabulously Fit and Famous with Jill Rappaport."

On March 20, 1998,[2] Rappaport met with Mansfield and Buske at the American Festival Cafe in New York City. This was the first face-to-face meeting between the parties. According to plaintiff's 56.1 statement, at this meeting the parties "reached a firm oral understanding pursuant to which Ms. Rappaport would be hired as host of the 13-program series, at a per program salary of $ 10,000.00 . . . subject to plaintiff's commitments to NBC." (Pl.'s 56.1 Statement PP15, 20.).[3]

> 2   Defendants contend that this meeting took place on or about April 3, 1998.
>
> [*4]
>
> 3   Notably, this version of the oral understanding at issue in the lawsuit bears little resemblance to the detailed oral understanding plaintiff originally alleged in her complaint. See, infra, p. 6.

It is this alleged oral agreement that plaintiff contends was breached by the defendants. Though not explicitly proffered as an argument in the alternative, implicit in plaintiff's brief is the contention that an exchange of letters between the parties in May 1998 created a binding preliminary commitment.[4] On May 14, 1998, Mansfield sent Rappaport's agent, Babette Perry, a "letter of intent," which stated in relevant part:

> As per your request, here is our letter of intent to retain Jill Rappaport as the host of the thirteen-week television series, 'The Fit & Famous.'
>
> As we discussed, Jill will be paid $ 10,000/episode for a total of $ 130,000. The official contracts are being drawn up at this time and when they are ready, we will send them to you for your approval and signature.

(Perry Decl., Ex. A.)

> 4   Needless to say, the defendants contend that at no time was a final agreement ever reached, either in writing or orally.

[*5] Perry responded by letter dated May 18, 1998, which stated in relevant part:

> This letter is to confirm that Jill Rappaport will be the host of the thirteen-week television series, "The Fit & Famous."

> The other terms and conditions will
> be negotiated in good faith.

(Perry Decl., Ex. B.)

It is undisputed that Defendants, at plaintiff's explicit instructions, sent a draft of a written employment contract (the "employment contract") to Rappaport's agent, Babette Perry, on June 4, 1998. The contract covered not only Ms. Rappaport's commitment to act as series' host for thirteen (13) episodes, subject to her professional commitments at NBC, and Ms. Rappaport's base salary for her professional services, but also the timing of how the base salary would be paid; payment of Ms. Rappaport's travel and hotel expenses, and the payment of a per diem; Ms Rappaport's percentage of net profits from the program and net merchandising revenue; Ms. Rappaport's obligation to make personal appearances related to the advertising of the program and its merchandising products; and Ms. Rappaport's assignment of all right, title and interest in her program-related services to the program's production [*6] company.

In her deposition, Rappaport testified that there were several terms in the employment contract to which she objected because those terms differed from her understanding of the alleged oral agreement. These terms included: (1) that the employment contract did not state that the series "was based in New York;" (2) that it was drafted in the name of the defendants' newly-formed corporation Fitfam Productions, Inc.; (3) that it provided for profit-sharing with the plaintiff which in her view she could not accept because she is a "newsperson;" (4) that it required plaintiff to make personal appearances in connection with "the series and products" which again she felt she could not do because of her position as a journalist; (5) that it described plaintiff's duties as not just hosting the series but interviewing as well, which plaintiff considered an additional job that merited a higher salary. (Rappaport Dep. at 99-115.)

Specifically, plaintiff testified that she could not agree to the employment contract so long as it contained a profit-sharing provision or required her to make any endorsements, and that such provisions were not part of the alleged oral agreement. This testimony [*7] is completely at odds with plaintiff's complaint, however, in which she specifically alleges that the oral agreement itself provided that "plaintiff would receive ten percent of the profits derived from the exploitation of the . . . Series . . . plus ten percent of merchandising revenues received from exploitation of any products associated with the Series . . . ." (Compl. P10.) The plaintiff offers no explanation for this serious discrepancy between her complaint and her sworn testimony. For the purposes of this motion, the Court will simply deem the description of the oral agreement in plaintiff's 56.1 statement, which does conform to her deposition testimony, to amend P10 of the complaint.

Based upon her myriad objections, Rappaport telephoned Buske in late June or early July and told her that the employment contract was unacceptable. Faced with plaintiff's unwillingness to accept the employment contract, the defendants withdrew the offer and placed an ad in a trade publication for a new host.

In July 1998, plaintiff filed the instant action for breach of contract, fraud, and violation of the New York Civil Rights Act. Believing the series to be irreparably tainted by the lawsuit, [*8] the defendants abandoned all production and development of the series.

DISCUSSION

I. Summary Judgment Standard

[HN1]Summary judgement may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994). [HN2]In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn [*9] in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

II. Breach of Contract

Plaintiff's primary contention is that the parties reached a final oral employment agreement. While I do not think the plaintiff has properly framed the contract issue presented by this case, see infra, I will briefly address her principal argument.

[HN3]When determining whether an oral contract exists, courts must heed the Second Circuit's admonition that while parties must retain the freedom to enter into oral contracts, "freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings . . . . The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked [*10] out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75 (2d Cir. 1984).

In her brief, plaintiff argues that there was an oral agreement as "to all the material terms of the contract, with nothing left for negotiation," as of the March 20, 1998 meeting. However, taking all inferences in plaintiff's favor, the letter from Rappaport's agent leaves no room for doubt that this is not a case about a final oral contract, but, rather, one about a preliminary agreement. Rappaport's agent wrote on May 18, 1998: "This letter is to confirm that Jill Rappaport will be the host of the thirteen-week television series, 'The Fit & Famous.' The other terms and conditions will be negotiated in good faith." (Perry Decl., Ex. B) (emphasis added).) Plaintiff does not allege that there were any further conversations--let alone negotiations--after this date that finalized the agreement. Therefore, though the plaintiff briefs the case as presenting the issue of whether there was a final oral contract in March (or in May), the [*11] case is properly analyzed under the rubric of preliminary agreements. [5]

---

5   Indeed, plaintiff cannot even give a clear answer as to exactly when the alleged final oral contract was formed, that is, when it was allegedly finalized. As noted above, plaintiff contends in her brief that there was an oral agreement as "to all the material terms of the contract, with nothing left for negotiation," as of the March 20, 1998 meeting. Confronted at her deposition with her complaint that alleges the deal was finalized in May, not March, 1998, Rappaport testified, "Well, in May it was finalized to the extent in which I put in for the vacation [from NBC, to shoot the series], that's why I think it was listed [in the complaint] as May. . . . But in March is when we finalized what the show was going to be, where I was going to shoot it, and what my job responsibilities were. But in May, it was a final deal in terms of me actually taking off time to shoot the shows." (Rappaport Dep. at 47.) When asked again to clarify when the alleged oral contract was finalized, in March or in May, Rappaport testified, "Well, I think the roadwork was set in March, and the finalization was in May." (Rappaport Dep. at 48 (emphasis added).)

---

[*12]  Parties to proposed commercial transactions often enter into preliminary agreements that may provide for the execution of more formal agreements. Adjustrite Systems v. GAB Business Services, 145 F.3d 543, 547 (2d Cir. 1998). When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree. Id.

[HN4]Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. See Adjustrite, 145 F.3d at 548 (citing Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996)); see also R.G. Group, 751 F.2d at 74 ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs."). In some circumstances, however, the Second Circuit has recognized that preliminary agreements can create binding obligations.

[HN5]These "binding preliminary agreements fall into one of two categories." Adjustrite, 145 F.3d at 548. Type 1 is a fully binding [*13] preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. Id. Such an agreement is fully binding; it is "'preliminary only in form--only in the sense that the parties desire a more elaborate formalization of the agreement.'" Id. (quoting Teachers Insurance & Annuity Association v. Tribune, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). Despite the anticipation of further formalities, a party to this first type of preliminary agreement may demand performance of the transaction even though the parties fail to produce the "more elaborate formalization of the agreement." Id.

[HN6]A Type II preliminary agreement is binding only to a certain degree. "It is created when the parties agree on certain major terms, but leave other terms open for further negotiation." Id. The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." Id. (citations omitted). In contrast to a Type I preliminary agreement, a Type II preliminary agreement "does not commit the parties to [*14] their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." Id. (citations omitted). A party to a Type II preliminary agreement "has no right to demand performance of the transaction." Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the

deal and have not insisted on conditions that do not conform to the preliminary agreement. Id.

[HN7]When confronted with the issue of determining whether a preliminary agreement is binding, the Court must keep two competing interests in mind. "First, courts must be wary of 'trapping parties in surprise contractual obligations that they never intended' to undertake . . . . Second, 'courts [must] enforce and preserve agreements that were intended [to be] binding, despite a need for further documentation or further negotiation,' for it is 'the aim of contract law to gratify, not to defeat, expectations.'" Id. (citations omitted).

[HN8]The key, of course, is the intent of the parties: whether the parties intended to be bound, and if [*15] so, to what extent. See Adjustrite, 145 F.3d at 548-49. "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1986) (citations omitted). Subjective evidence of intent, on the other hand, is generally not considered. See Rule v. Brine, Inc., 85 F.3d 1002, 1010 (2d Cir. 1996).

In the instant action, plaintiff contends only that the agreement was a Type I preliminary agreement. Plaintiff alleges that all of the material terms of the transaction were negotiated during the March 20, 1998, meeting and that there was "nothing left for negotiation." (Pl. Mem. of Law at 7.) Hence, as in Adjustrite, the instant case need only be analyzed as a Type I preliminary agreement. [6]

> 6   As in Adjustrite, the parties in the instant action did not explicitly discuss the differences between the two types of preliminary agreements, even though the plaintiff relied upon Adjustrite in her opposition papers. Like the Circuit in Adjustrite, I note that the facts arguably could give rise to a claim by plaintiff that the alleged oral agreement was a Type II preliminary agreement, that the defendants were obligated to make a good faith effort to reach a final agreement, and the defendants breached that obligation. Again, as in Adjustrite, plaintiff made no such argument in her opposition papers, and the complaint does not allege the existence of a Type II preliminary agreement or the breach of any duty to negotiate in good faith. "Hence, such a claim is not before [the Court] now." Adjustrite, 145 F.3d at 549 n.9.

[*16]   The issue thus presented is whether, when the parties reached the alleged oral agreement in March 1998, they had negotiated all the terms of the employment contract and intended to be bound even if a written contract was never executed. See Adjustrite, 145 F.3d at 549. [HN9]The Second Circuit has identified four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. Id. (citing Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985)).

[HN10]The first factor, typically an analysis of the language of the preliminary agreement, is the most important. See, e.g., Adjustrite, 145 F.3d at 549 (analyzing the language of the written agreement [*17] for the first factor). Because in this case the preliminary agreement was not in writing, the Court cannot examine the "language" of that agreement. Instead, the Court will consider the admissions of the plaintiff and the conduct of the parties, which together support only one conclusion: that the alleged oral agreement was not a fully binding, or Type I, agreement.

The following testimony from plaintiff's own deposition testimony is enlightening.

> Q: Was there an understanding between you, on the one hand, and the individual Defendants on the other, that there would be a written agreement drafted that would formalize your relationship on the show?
>
> A: Uh-huh, yes.
>
> Q: There was?
>
> A: Uh-huh.
>
> Q: Am I correct in assuming that the understanding further was this agreement was to be sent to your agent, Babette Perry, for review.
>
> A: Yes.
>
> Q: And presumably, Babette Perry, upon receipt of that agreement, would review it, discuss it with you, and contact would be made with the Defendants as to what you thought of the agreement, what further negotiations, if any, would have to made? Am I correct there?
>
> A: In most cases, that's how it's done. But we pretty [*18] much had our ideas and stipulations for this show finalized well. This was just the paperwork.

> Q: You did, in fact, instruct the Defendants to submit the written contract to your agent, Ms. Perry, correct?
>
> A: That's how it's done. Because I have a contract with my agent, that's just the final thing that you do, yes.
>
> Q: And you specifically told the Defendants to do that, correct?
>
> A: Yes.
>
> Q: . . . When you got to the point where the agreement was being drafted, did you ever say to Mr. Mansfield or Ms. Buske, you don't need to send it to my agent, I want you to send it to me, we can do this ourselves?
>
> A: No. Mr. Mansfield kept saying that to me. That, you know, we really don't need an agent, do we. I said, well, as nice as that would sound if we could do the deal between us, because he and I at that point, that's when we discussed it would be nice. But legally, I have to send the contract to them. Mr. Mansfield's [sic] really didn't want to deal with my agent.

(Rappaport Dep. at 48-50.) The question for the Court is: was plaintiff's insistence that the defendants send the "paperwork" to her agent an express reservation of the right not to be [*19] bound absent a writing? The plaintiff's own conduct after the March 20 meeting unequivocally answers that question in the affirmative: the plaintiff expressly reserved the right not to be bound.

When asked at her deposition what purpose her agent served, plaintiff testified as follows:

> Q: Do you accept any deals without your agent's involvement?
>
> A: I'm allowed to talk to anybody I want and then tell them about that, but I would always run it past them for the final say.
>
> Q: Before you have a final deal, you run it past your agent, would that be a fair statement?
>
> A: I would just ask them their opinion on something, but no, I mean, I can make decisions for myself as well as--as long as they negotiate the deal.

(Rappaport Dep. at 18-19). Given that Rappaport's agent has the "final say" and will "negotiate the deal" even when Rappaport makes a decision for herself as to whether to take on a job, I find that Rappaport's insistence that the defendants send a written contract to her agent constituted an express reservation not to be bound absent a writing. Moreover, Perry's May 18, 1998, letter supports this conclusion. It is clear from the letter that Rappaport [*20] and the defendants had reached agreement on some of the terms, but the "other terms" still needed to "be negotiated in good faith." Perry's letter evidences her role as the ultimate negotiator for Rappaport's services, just as Rappaport testified. Clearly, the alleged oral agreement was expressly contingent on Perry's having the "final say" on a written contract.[7]

> 7   The plaintiff's statements to non-party Scott Sassa, while not necessary to the Court's determination, further support the conclusion that plaintiff herself had expressly reserved the right not to be bound absent a writing. On June 9, 1998, two and a half months after the March 20 meeting and several days after receiving a draft of the written employment contract from the defendants, plaintiff told Sassa, then the head of programming at NBC, that she was "thinking about being the talent in the show." Sassa, left unimpressed by the defendants after meeting with them, told plaintiff, "It's my feeling I would get out of [the series] as fast as I could." Asked at his deposition if he had the impression from his conversation with the plaintiff that she had a "firm deal" to do the series, Sassa testified, "No, I didn't have that impression . . . . I think she characterized it to me that she was talking to them about being involved in the show." (Sassa Dep. at 9, 16.)

[*21] The second factor, partial performance, has not been satisfied in this case. [HN11]As an initial matter, for there to be partial performance, Rappaport must have conferred something of value on the defendants, which they accept. See, e.g., R.G. Group, 751 F.2d at 75. Mere preparatory acts are not partial performance. See id. at 76 (forming a partnership in order to facilitate the transaction is not partial performance).

Plaintiff's putting in for vacation time from NBC to shoot the series did not confer a benefit upon the defendants. Nor did introducing the defendants to plaintiff's industry contacts--Scott Sassa of NBC--or contacting celebrities to interview for the show confer benefits upon the defendants that they accepted. None of these acts satisfied (even partially) obligations imposed on plaintiff by the alleged employment contract. Instead, they are paradigmatic examples of preparatory acts. Therefore, these acts are not evidence of partial performance.

"The third factor is the existence of open terms, i.e., whether any terms of the contract remained open to be negotiated. Adjustrite, 145 F.3d at 551." This factor, too, weighs [*22] strongly in favor of the defendants for there remained numerous open items, as unequivocally demonstrated by the May 18, 1998, letter from Rappaport's agent to Mansfield. Though plaintiff argues that no material terms remained open, [8] this argument does not survive scrutiny.

> 8   Again, as of what date, the Court cannot be certain, given that the plaintiff's own papers and testimony at times say March and at other times say May.

On May 14, 1998, Mansfield sent Perry a "letter of intent" to hire Rappaport at $ 10,000 per episode. Perry responded that Rappaport would do the series and that "the other terms and conditions will be negotiated in good faith." In fact, because Rappaport does not allege that there were any negotiations after May 18, 1998, that finalized the deal, this letter on its own provides incontrovertible support for the conclusion that the alleged oral agreement was a Type II agreement. [9]

> 9   Remarkably, plaintiff submits a declaration by Perry in which Perry testifies that as of May 1998 there "were no other material terms to be negotiated." (See Perry Decl. P4.) Perry gives this testimony notwithstanding her own May 18 letter--attached as an exhibit to the declaration--that explicitly states that having agreed on Rappaport's compensation, the "other terms and conditions will be negotiated in good faith." In light of the written record, I am not bound to credit Perry's conclusory declaration.

[*23] As noted in R.G. Group, "the actual drafting of a written instrument [frequently] will . . . reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution." 751 F.2d at 75. In this case, plaintiff reviewed a draft of the employment contract in June 1998, became concerned about a number of the terms, and then discussed those concerns with defendants in late June or early July. "These concerns were not chimerical." Shearson Lehman CMO, Inc. v. TCF Banking & Savings, F.A., 710 F. Supp. 67, 72 (S.D.N.Y. 1989) (granting summary judgment dismissing breach of contract claim under the four-factor Winston test). Indeed, Rappaport indicated that she could not accept a number of the terms in the written employment contract. Therefore, well after mid-May 1998, terms that both sides understood were crucial to the agreement were still being negotiated. Under these conditions, there is no ambiguity about whether there has been a meeting of the minds. See Shearson Lehman, 710 F. Supp. at 72. That agreement may have been reached as to Rappaport's compensation does not change the result. [HN12]Agreement on terms [*24] does not become binding until there is agreement on all terms as to which agreement was anticipated. See Winston, 777 F.2d at 82-83; See R.G. Group, 751 F.2d at 76-77.

Finally, the fourth factor is whether the agreement is the type of contract that is usually reduced to writing. Adjustrite, 145 F.3d at 551. Plaintiff asserts that in circumstances such as these, the custom in the entertainment industry is to conclude deals orally, not in writing. Plaintiff rests her entire argument on the declaration of her agent Babette Perry in which Perry stated, "It is the custom in the industry that, for individuals and small companies, a formal written agreement is unnecessary and a letter of employment suffices." (Perry Decl. P5.) Perry further declared that when production is on a tight schedule, as it would have been for the series, written contracts "are dispensed with." (Id.) [10] However, plaintiff's contentions are unavailing.

> 10   This is, of course, the same declaration in which Perry testified that there were no open terms as of May 1998.

[*25] Even accepting Perry's testimony about industry custom as true, there can be no doubt that in this instance the parties intended for their agreement to be reduced to writing, and, therefore, Perry's testimony about custom is irrelevant. The plaintiff's own conduct in this transaction conclusively establishes that this agreement was to be reduced to writing. It was the plaintiff who insisted that the defendants send a written contract to her agent. Moreover, the defendants' May 14 "letter of intent" stated that "the official contracts are being drawn up at this time and when they are ready, we will send them to you for your approval and signature." Perry responded that Rappaport would do the series and "the other terms and conditions will be negotiated in good faith." It is telling that in this correspondence, Perry never expressed any surprise that "official contracts" were being prepared. Nor did Perry reply by telling the defendants that "official contracts" were unnecessary under the circumstances. [11]

> 11   Even if the fourth factor were relevant to this case, it would not accrue to the plaintiff's benefit. Indeed, the evidence is clear that this was the kind of agreement where it would have been unusual to rely on an oral understanding. Rappaport herself testified that her employment agreements with every other employer for whom she has worked were in fact reduced to writing, though she sometimes began a project while the written contract "was pending." (Rappaport Dep.

at 22-24.) Scott Sassa, now the head of entertainment at NBC, testified that he had no knowledge of talent at NBC ever working without a written contract. (Sassa Dep. at 28.) NBC News Vice-President David Corvo, who has negotiated contracts with on-air talent at NBC, testified that hosts of television programs normally work with written contracts and that it would be "unusual" for on-air talent to work based only on an oral agreement. (Corvo Dep. at 24-25.) In addition, as explained supra, the conduct of the parties conclusively establishes that the parties to this particular agreement fully intended to reduce the agreement to writing. Therefore, were the Court to engage in an analysis of the fourth factor, the inescapable conclusion would be that the alleged oral agreement is the type of contract that is usually reduced to writing.

[*26] An analysis of the four factors used to determine the existence of a contract, and the evidence adduced in support of the parties' positions, shows beyond dispute that the parties did not intend a contractual obligation to exist before a signed writing existed. Therefore, even taking all inferences in plaintiff's favor as I must, I find that the alleged oral agreement was a Type II agreement. That is, no reasonable factfinder could conclude, based on this record, that the parties agreed on all material elements of the transaction, intended to be fully bound when they concluded their March 1998 meeting, and considered the formal, written contract that plaintiff herself demanded to be an unnecessary formality. See Adjustrite, 145 F.3d at 551 (affirming grant of summary judgment dismissing breach of contract action even though the partial performance factor favored the plaintiff, where the rest of the factors showed that the parties did not intend to be bound until a final contract was signed). Accordingly, defendants' motion for summary judgment dismissing Rappaport's first claim, alleging breach of contract, is GRANTED.

III. Fraud

The complaint alleges that when the [*27] defendants represented that they wanted to hire the plaintiff as host of the series, they never intended to do so, but, rather, merely intended to use plaintiff's "industry contacts to generate interest in the Series." (Compl. P22.) [HN13]In an action to recover damages for fraud under New York law, the plaintiff must prove (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury. See Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 668 N.E.2d 1370, 1373, 646 N.Y.S.2d 76 (N.Y. 1996). Even assuming for the purposes of this motion that plaintiff has adduced sufficient evidence to create genuine issues of material fact on the first three elements, plaintiff's claim does not satisfy the fourth element.

[HN14]New York follows the "out-of-pocket" rule of damages for fraud. "'The true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong'" or what is known as the 'out-of-pocket' rule. Lama, 668 N.E.2d at 1373 [*28] (emphasis added) (citing cases); see also Lehman v. Dow Jones & Co., Inc., 783 F.2d 285, 296 (2d Cir. 1986) (same). Under this rule, damages are to be calculated to compensate a plaintiff for money she actually lost because of the fraud, not to compensate her for what she might have gained. Lama, 668 N.E.2d at 1373.

Accepting all of plaintiff's factual allegations as true, there is no actionable fraud. In the complaint, plaintiff alleges damages from the fraud in the amount of $ 130,000.00. (Compl. P26.) This amount does not reflect any out-of-pocket pecuniary loss, but rather is the amount plaintiff stood to gain if the parties had gone forward with the series. In her brief, plaintiff contends that she seeks "damages for the fraudulently induced introduction of defendants to her contacts in the industry." (Pl.'s Mem. of Law at 12). Simply put, there was no pecuniary loss to the plaintiff. Because plaintiff has adduced no evidence that she suffered an out-of-pocket loss, defendants' motion for summary judgment dismissing the fraud claim is GRANTED.

IV. New York Civil Rights Law § 51

Lastly, plaintiff alleges that defendants violated New York Civil [*29] Rights Law § 51 by "utilizing plaintiff's name with potential advertisers and sponsors to solicit interest for the series." (Pl.'s Mem. of Law at 10.) [HN15]Section 51 provides a cause of action for injunctive relief and damages by "any person whose name, portrait, picture or voice is used within [New York] state for advertising purposes or for the purposes of trade without [] written consent." N.Y. Civ. Rights Law § 51. To state a claim under § 51 based on unauthorized use of a person's identity, the plaintiff must prove that (1) defendants used her name within the state, (2) for purposes of trade or advertising, (3) without her written consent. See Titan Sports, Inc. v. Comics World Corp., 870 F.2d 85, 87 (2d Cir. 1989); Cerasani v. Sony Corp., 991 F. Supp. 343, 356 (S.D.N.Y. 1998). Section 51 must be construed narrowly. See Rand v. Hearst Corp., 31 A.D.2d 406, 298 N.Y.S.2d 405, 410 (N.Y. App. Div. 1969), aff'd, 26 N.Y.2d 806, 257 N.E.2d 895, 309 N.Y.S.2d 348 (N.Y. 1970).

Here, there is no dispute that plaintiff has satisfied the third element. However, there is no evidence that defendants ever used plaintiff's [*30] name for advertising purposes. It is undisputed that defendants produced and disseminated a single promotional flier for the series, and this flier made no mention of the plaintiff. (See Mansfield Aff., Ex. A.) Therefore, plaintiff's claim turns on whether defendants violated § 51 by using plaintiff's name within New York "for purposes of trade."

Taking all inferences in favor of the plaintiff, Mansfield "used" plaintiff's name with Castle Hill Productions when he responded to Caste Hill's question as to who would be the host of the series. [12] Mansfield telephoned Castle Hill--presumably in New York, but there is no evidence of that in the record--and told them that "discussions were underway with Jill Rappaport." (Mansfield Aff. P11). In response, a Castle Hill vice president wrote to Mansfield on March 19, 1998, "We are very excited about your new series for both for [sic] US and international television sales. Jill Rappaport and Bill Grant are a good team of hosts. They will attract the stars that can give us a hit like 'Lifestyles of the Rich and Famous.' I look forward to the availability of the show." (Mansfield Aff., Ex. D.) [HN16]However, such an isolated use of plaintiff's [*31] name cannot support a § 51 claim. See, e.g., Man v. Warner Bros., Inc., 317 F. Supp. 50, 53 (S.D.N.Y. 1970) (citing Damron v. Doubleday, Doran & Co., 133 Misc. 302, 231 N.Y.S. 444 (N.Y. Sup. Ct. 1928), aff'd, 226 A.D. 796, 234 N.Y.S. 773 (N.Y. App. Div. 1929) ("It is well established that every incidental mention of some person's name in connection with advertising or trade does not constitute a violation of [§ 51]. The single appearance of plaintiff's name in this book is clearly not a use prohibited by the statute. Were we to take any other view, it is apparent that consequences never contemplated would follow from its enactment.") The diligent efforts of the parties, as well as the Court's own research, has not uncovered a single case in which an analogous isolated use of a complainant's name has been found to be sufficient to state a claim under § 51. Moreover, as § 51 is to be narrowly construed, I will not expand § 51 to prohibit the conduct alleged here.

12   The allegations and evidence regarding Mansfield's alleged use of Rappaport's name with MedGen Nutrition and Alliance Press do not support a claim that plaintiff's name was used in New York with those defendants. Therefore, the allegations regarding Mansfield's contact with these two companies do not raise issues of material fact.

[*32]   Even assuming arguendo that Mansfield's single utterance of Rappaport's name over the telephone to a production company located in New York constituted "use" under § 51, such use would not satisfy the "for the purposes of trade" element. As the caselaw reveals, [HN17]the term "purposes of trade" is "not susceptible to ready definition." Cerasani, 991 F. Supp. at 357 (citations omitted). The fact that the publication or use of a name or picture is spurred by a profit motive or included to encourage sales or distribution of the publication is a necessary, but hardly a sufficient, ingredient in determining the existence of a trade purpose. Id. While there can be no doubt that defendants sought to produce the series to make a profit, Mansfield used plaintiff's name for a much more limited purpose, namely to obtain a preliminary response from Castle Hill to the series and its prospects for syndication. See, e.g., Cerasani 991 F. Supp. at 357 (pre-release screening of movie was to assess the quality of the film, not for "purposes of trade" because plaintiff could not allege that defendants charged any fee or generated any revenue through the pre-release [*33] screening). As in Cerasani, notwithstanding defendants' ultimate profit motive, the plaintiff in the instant action cannot allege that defendants generated any revenue through the one-time use of plaintiff's name to Castle Hill. Thus, Mansfield's use of plaintiff's name was not "for the purposes of trade" under the statute, and, therefore, such use is not within the statute's prohibitive provisions. Accordingly, defendants' motion for summary judgment dismissing the New York Civ. Rights Law § 51 claim is GRANTED.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED and the complaint is dismissed in its entirety. The Clerk shall mark this action as closed.

SO ORDERED:

Barbara S. Jones

UNITED STATES DISTRICT JUDGE

New York, New York

August 24, 2000