IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| DANIEL B. GRAVES, Plaintiff, v. DEUTSCHE BANK SECURITIES, INC., Defendant. | CIVIL ACTION NO. 1:07-cv-05471-BSJ-KNF |
|---|---|

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS

A.  **Introduction**

Defendant's Motion is based on three asserted improprieties in plaintiff's original Complaint, all of which are based on defendant's November 7, 2004 Position Statement to the EEOC, and Exhibits C and F to the Position Statement. Defendant provided these documents to the EEOC in response to plaintiff's EEOC charge of age discrimination and retaliation, and used them to try to show to the EEOC that plaintiff's individual performance was worse than that of other Directors and Managing Directors, that he and another Managing Director had "duplication" in the "television broadcasting" space, that one of them had to be laid off, and that his poor individual performance as shown by Exhibits C and F, and his low seniority, provided a nondiscriminatory reason for selecting him for layoff.

B.  **The Statutory Language in Effect at the Time of the Position Statement**

The version of 18 U.S.C. § 1001 that was in effect from October 11, 1996 to December 16, 2004, provided:

### § 1001. Statements or entries generally

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

**(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

**(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

**(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title or imprisoned not more than 5 years, or both.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

\*     \*     \*

*Brogan v. United States,* 522 U.S. 398, 401-04 (1998), affirmed convictions for false statements to Federal investigators by a union official who denied receiving an unlawful payment from a company. The Court emphasized the important of providing a broad reading to the statute, and rejected the argument that there could be case-by-case exceptions where application of the statute seemed harsh. The Court held that a person may lawfully remain silent when asked a question, but may not make a false denial. It also held that a false denial tends to pervert government functions, and that the statute applies even where the investigator does not believe the denial.

*United States v. Diogo,* 320 F.2d 898, 902 (2d Cir. 1963), stated:

> It is well established that this section encompasses within its proscription two distinct offenses, concealment of a material fact and false representation. . . . The objective of both offenses may be the same, to create or foster on the part of a Government agency a misapprehension of the true state of affairs. . . . What must be proved to establish each offense, however, differs significantly. False representations,

like common law perjury, require proof of actual falsity; concealment requires proof of wilful nondisclosure by means of a 'trick, scheme or device.'

(Citations omitted.)

### C. Application of § 1001 to This Case

The knowing presentation to the EEOC of documents that may have been created in good faith for other business purposes, for the stated purpose of supporting defendant's statements as to the comparative performance of individual bankers, can thus violate § 1001 where defendant knows the documents cannot accurately be used to compare the performance of individual bankers and fails to inform the EEOC they cannot be used for that purpose.

Plaintiff has moved today for leave to file his Second Amended and Supplemental Complaint (docs. ## 29-31), in light of defendant's February 2008 production of documents. The problems with defendant's Position Statement and Exhibits C and F thereto are detailed in ¶¶ 95-123 of the proposed Second Amended and Supplemental Complaint, Seymour Dec., Attachment A, but are summarized in ¶¶ 120-121:

> 2. **Defendant's Choice of Documents to Submit to the EEOC for Purposes of Comparing the Performance and Prospects of Individual Bankers**
>
> 120. Defendant submitted to the EEOC altered and redacted excerpts from its Franchise Pipeline Reports as the only tool by which the performance and prospects of individual bankers could be compared.
>
>> a. Exhibit C to defendant's Position Statement (Exhibit 2 hereto) is an altered and redacted document dated January 15, 2003, purporting to show what each banker had achieved in 2002, and had in the pipeline for 2003. Defendant treated it as a critical document, using it to represent that plaintiff's performance was the poorest in the group. Specifically, the Position Statement represents at p. 3, again using the abbreviation "MD" for Managing Director:
>>
>>> Despite Mr. Graves' belief that his 2002 performance was the highest in the Group, his December 2002 year to date franchise revenues were actually lower than all of the other MD's, including Mr. Paul who had a 2002 franchise revenue of 15,117 Euro

thousands compared to Mr. Graves' 13,544 Euro thousands. (See Exhibit C.)

b. Exhibit F to defendant's Position Statement (Exhibit 3 hereto) is an altered and redacted document dated January 8, 2004, purporting to show what each banker had achieved in 2003, and had in the pipeline for 2004. This document is dated six days before plaintiff was fired, and defendant treated it as a critical document, using it to represent that plaintiff's results for 2003 and his 2004 business prospects were poor compared to those who were not fired. Specifically, the Position Statement represents at p. 3, using the abbreviation "MD" for Managing Director:

> Of the 6 MD's, Mr. Graves had the lowest franchise revenue for 2003 and the lowest 2004 franchise pipeline (excluding Ms. Triffo who was still on extended leave). (The chart, attached hereto as Exhibit F, demonstrates franchise-revenue and pipeline by MD and Dir, in Euro thousands, for 2003.) Mr. Graves 2003 franchise revenue was 2,468 Euro thousand and his 2004 franchise pipeline was 983 Euro thousand - - well below DBSI's target.

121. Defendant used existing documents prepared in the ordinary course of business as the starting source of these altered and redacted documents it provided to the EEOC. However, there is no indication that the statements of revenues achieved or pipelines in these documents or redacted documents were ever used by defendant to compare the performance of individual bankers for any personnel decisions such as promotions, terminations, selections for layoff, or allocations of bonuses, and they contain flaws making them unsuitable for those purposes:

a. The altered and redacted excerpts of documents provided to the EEOC inflate the achievements and prospects of younger bankers by giving each of them separate credit for the full aggregate expected revenues for every actual or proposed transaction on which they worked with a more senior banker. These pages did not inform the EEOC that the full value was being double-counted or triple-counted, and these pages did not inform the EEOC that the full value had not been divided into halves or thirds for the purpose of allocating credit. The pages of these documents that were not provided to the EEOC would have shown the EEOC that the full stated value of the transaction was being allocated separately to each individual banker on the team working on the transaction, and would have made the double-counting and triple-counting clear to the EEOC. Defendant's choice of providing only the redacted excerpts of franchise pipeline reports to the EEOC had the effect of inflating the performance of younger bankers and putting plaintiff in a falsely poor light;

b. Defendant's exclusion from its submission to the EEOC of the parts of its Franchise Pipeline reports making clear that, for at least some business purposes, it weighted pipelines by the probability of a potential transaction

occurring, was an omission materially altering the import of the information provided, and put plaintiff in a falsely poor light. See ¶¶ 107-112 above.

  c. Defendant did not provide the EEOC with the actual redacted excerpts of its Franchise Pipeline reports, which do not contain aggregate totals for each banker (see Exhibits 4 and 5 hereto), but provided altered forms of these pages with aggregate totals for each banker (see Exhibits 2 and 3 hereto). The addition of totals for each banker would have furthered or enhanced the impression of the EEOC that these figures could fairly be used to compare the performance of individual bankers;

  d. Defendant's failure to note the fact or dates of the alterations, and defendant's continued use of the original, pre-alteration dates on the documents so that they appeared to precede the date of plaintiff's EEOC charge, would have furthered or enhanced the impression of the EEOC that these documents were exactly the same as defendant's regular business documents and predated the charge of discrimination;

  e. Defendant's failure to include some of plaintiff's clients, achievements, and pipelines in these types of documents materially lowered plaintiff's performance and prospects on these types of documents and put plaintiff in a falsely poor light;

  f. Defendant's failure to list plaintiff, or delay in listing plaintiff, in the Client Manager for some of his clients or proposed clients, and thus to enable plaintiff to obtain any results that would appear on these types of documents, materially lowered plaintiff's performance and prospects on these types of documents and put plaintiff in a falsely poor light; and

  g. Defendant's valuation of very dissimilar proposed transactions, for different clients, at the same odd numbers or at arbitrary numbers, may reflect a practice that serves some business interest of defendant's, but when used as an indicator of real pipeline values may overstate the prospective pipelines of other bankers and place plaintiff in a falsely poor light. For an illustrative example, Exhibit F to defendant's Position Statement to the EEOC (Exhibit 3 hereto) includes the same precise 2004 Franchise Pipeline value of 3,930,000 Euros for four very different transactions:

    (1)  the "AOL - monetisation of Time Warner Telecom stake (D034002)" deal described as an "Equity Follow-On," and credited to both Elizabeth Chang and JL Malcolm Morris for the 2004 Franchise Pipeline;

    (2)  the "Kim Magnes Estate - divestiture advisory (D033651)" deal described as "Divestiture Advisory," and credited to Jeffrey Amling for the 2004 Franchise Pipeline;

(3) the "BusinessWire - general advisory (D005685)" deal described as "Divestiture Advisory," and credited to Dyan Triffo for the 2004 Franchise Pipeline; and

(4) the "Google - IPO (D031830)" deal described as "Equity-IPO," and credited to Zach Maurus for the 2004 Franchise Pipeline.

Defendant's explanation of the "two common practices for attributing pipeline revenue" in its Motion at p.2 is extraordinary. First, defendant says it attributes full pipeline revenue to each banker involved in a transaction, "to foster a sense of collaboration." Thus, a senior banker can work with two young bankers on a transaction and "foster a sense of collaboration" by giving the young bankers full credit for what he or she does, regardless of their level of contribution or responsibility. That is the practice of double- and triple-counting revenues. Plaintiff has no objection to any collaboration or morale-building exercise in which defendant wants to engage, but does object to defendant then trying to pass off this practice on the EEOC as an accurate measure of individual achievements and prospects whereby the young bankers keep their jobs and he loses his job. "Loading the dice" would be an accurate way of putting it.

Defendant never disclosed to the EEOC this asserted practice of fostering a sense of collaboration, but presented the morale-building figures as if they were real.

Defendant never disclosed in discovery this asserted practice of fostering a sense of collaboration.[1]

---

[1] Defendant's response to Plaintiff's First Request for Production No. 26, for example, was as follows:

**9. Policies on Franchise Revenue Achievements, Targets, and Pipelines Document Request No. 26:**
A copy of every policy containing information about recognition of Franchise Revenue achievements for individual Directors or Managing Directors (or groups of Directors or Managing Directors), or the allocation of such achievements among individual Directors or Managing Directors (or groups of Directors or Managing Directors) within an Industry Group, or among Industry Groups.

Second, defendant represents for the first time in its Motion that it basically pulls some numbers out of the air ("because of the uncertain status of pipeline deals, DBSI accords a formulaic, round-number revenue value to pipeline deals based on projected size . . . ."). That is exactly what plaintiff feared was occurring, and has to be the reason why very dissimilar transactions wind up with the identical values.

Again, defendant can follow whatever approach it wants for its own internal purposes, but when it presents figures to the EEOC as accurately representing individual bankers' prospective deals, in order to justify the firing of plaintiff based on performance, it has a duty not to provide made-up figures, at least without explaining to the EEOC that they are "formulaic," not real. Defendant's Position Statement represented these figures as real, and defendant is apparently still doing so because it is seeking sanctions for plaintiff's calling them unreal.

Third, defendant represents for the first time in its Motion that it follows a practice of weighting the value of transactions by the probability of their occurring. It never revealed such a practice before the EEOC, and instead presented figures that vastly overstated the pipelines of younger bankers by giving full value to pipelines of zero probability or only partial probability,

---

**Response:**

    BSI objects to Request No. 26 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiffs claims, and is not likely to lead to the discovery of relevant information. For example, policies in effect at any time other than the relevant period and which were not applicable to the Media Group are not relevant to Plaintiff's claims in this action.

    Without waiving the foregoing objection, and to the extent not objected to therein, DBSI responds: DBSI will produce responsive policies, if any, it may have relating to the allocation of franchise revenue to MDs and Directors in the Media Group for the relevant period.

Seymour Dec., Exhibit 8. Defendant has not yet produced any information.

while redacting pages in the Franchise Revenues and Pipeline Reports showing that the pipelines should be reduced to take probability into account.

Plaintiff's proposed Second Amended and Supplemental Complaint puts this practice into context:

### d. Defendant's Submission to the EEOC of Misleading Extracts from its Franchise Pipeline Reports

106. Defendant implicitly represented to the EEOC throughout its Position Statement that it was providing accurate figures that could fairly be used to compare the performance of individual Managing Directors and Directors in its Media Industry Group:

> a. Defendant represented to the EEOC throughout its Position Statement that the figures in its "Franchise Revenue & Pipeline by MD and DIR" statement dated January 15, 2003, Exhibit C to its Position Statement and attached hereto as Exhibit 2, were an accurate reflection of the achievements and prospective achievements of each potential transaction, Director, or Managing Director listed.
>
> b. Defendant represented to the EEOC throughout its Position Statement that the figures in its "Franchise Revenue & Pipeline by MD and DIR" statement dated January 8, 2004, Exhibit F to its Position Statement and attached hereto as Exhibit 3, were an accurate reflection of the achievements and prospective achievements of each potential transaction, Director, or Managing Director listed.
>
> c. Defendant's Position Statement stated at p. 3, for example:
>
>> Of the 6 MD's, Mr. Graves had the lowest franchise revenue for 2003 and the lowest 2004 franchise pipeline (excluding Ms. Triffo who was still on extended leave). (The chart, attached hereto as Exhibit F, demonstrates franchise-revenue and pipeline by MD and Dir, in Euro thousands, for 2003.) Mr. Graves 2003 franchise revenue was 2,468 Euro thousand and his 2004 franchise pipeline was 983 Euro thousand - - well below DBSI's target. Due to market conditions, Mr. Paul also had trouble meeting DBSI's target, but had a higher franchise revenue than Mr. Graves. Mr. Paul's 2003 franchise revenue was 7,139 Euro thousand. and his 2004 franchise pipeline was 4,559 Euro thousand. Mr. Morris had a 2003 franchise revenue of 3,229 Euro thousand, but a 2004 franchise pipeline of 26,135 Euro thousand. Mr. Carey and Mr. Amling, as well as 3 out of 5 directors ("DR") in the Media Group, were well above DBSI's target.

107. At the time of the representations described in ¶ 106, defendant knew that for at least some business purposes it did not rely on the figures in Exhibits C and F to its Position Statement, attached hereto as Exhibits B and C, as an accurate reflection of the achievements and prospective achievements of each potential transaction, Director, or Managing Director listed, and weighted the pipelines based on the stated probability of a deal occurring.

108. Defendant deleted all pages from its January 15, 2003, franchise pipeline reports other than the 100% weighting pages, and never provided to the EEOC the pages showing that it weighted the potential transaction by the stated probability of a deal occurring, or otherwise informed the EEOC of this practice.

109. Exhibit 4 to the Complaint is defendant's full January 15, 2003 Franchise Pipeline Revenues report produced by defendant in discovery on February 28, 2008.

110. Exhibit 5 to the Complaint is defendant's full January 8, 2004 Franchise Pipeline Revenues report produced by defendant in discovery on February 28, 2008.

   a. Its first page, DB 000837, shows a probability-weighted pipeline for the balance of the current year.

   b. Its fifth page, DB 000841, shows a probability-weighted pipeline for the Time Warner Cable IPO (D026173) potential deal as not being worth a Euro, even though defendant's Exhibit F portrayed it as worth 20,833,000 Euros for J.L. Malcolm Morris.

   c. The same page shows a probability-weighted pipeline for the Time Warner Telecom Bank/HY $500mm Q1 2004 (D034003) potential deal as not being worth a Euro, even though defendant's Exhibit F portrayed it as worth 1,572,000 Euros for J.L. Malcolm Morris.

   d. The same page shows a probability-weighted pipeline for the AOL monetization of Time Warner Telecom stake (D034002) potential deal as not being worth a Euro, even though defendant's Exhibit F portrayed it as worth 3,930,000 Euros for J.L. Malcolm Morris.

   e. The differences are clearly material, because Mr. Morris had no 2004 franchise revenues pipeline recognized by defendant as worth a single Euro, even though defendant's Position Statement stated: "Mr. Morris had a 2003 franchise revenue of 3,229 Euro thousand, but a 2004 franchise pipeline of 26,135 Euro thousand."

   f. When probability-weighted pipelines are taken into account, the effect on the 2004 franchise revenue pipelines is material:

| Managing Director or Director | Age Represented to the EEOC | 2004 Franchise Revenue Pipeline Stated to the EEOC, in Thousands of Euros | Actual Probability-Weighted 2004 Pipeline |
|---|---|---|---|
| Jason Hartka (not included in Franchise Revenue Reports but retained in his job as Director) | 32 | 0 | 0 |
| Elizabeth Chang | 33 | | |
| Blair Faulstich | 34 | 0 | 0 |
| William Detwiler (not included in defendant's Franchise Revenue Reports but retained in his job as Director) | 34 | 0 | 0 |
| Zachary Maurus | 34 | 3,930 | 983 |
| David Dunn | 35 | 0 | 0 |
| Dyan Triffo | 37 | 3,930 | 983 |
| Charles Carey | 41 | 786 | 786 |
| Sun Yung | 41 | 786 | 0 |
| Daniel Graves | 42 | 983 | 0 |
| Gregory Paul | 46 | 4,559 | 2,319 |
| Jeffrey Amling | 50 | 3,930 | 0 |

111. Notwithstanding the representations in defendant's Position Statement, plaintiff did not in fact stand out as having materially worse prospects for 2004 than the other bankers, whether or not one takes into consideration defendant's manipulation of his accounts, failure to consider the revenues he achieved, and failure to consider the prospects he had.

112. The statements described in ¶ 106 thus involved a series of statements and omissions that would mislead and manipulate the [E]EOC's investigation and decision-making.

### D. The Previously-Withdrawn Backdating Allegations of ¶ 98 of the Complaint

Defendant has chosen as the first of its alleged improprieties a backdating allegation it knew a day prior to the filing was being withdrawn in light of defendant's February 2008 production of documents. See Seymour Dec., Exhibit 7.

The allegation in ¶¶ 98(a) through (f) of the original Complaint set out the basis for the allegation of backdating: that as of January 8, 2004, the proposed transaction with Salem Communications was structured in a manner that would cause a much higher value than that shown in Exhibit F to defendant's Position Statement, that changes in the stock price would cause the deal to be restructured in a certain way, that those changes did not happen until well after January 8, 2004, and that the value for this prospective "pipeline" deal on the January 8, 2004 report was consistent with the later events, not with the information in hand on January 8, 2004. Such allegations met the requirements for fraud allegations.

Rule 9(b), Fed. R. Civ.Pro., states:

> (b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The Second Circuit's classic formulation of the requirement of the rule is:

> To pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation. . . . Although scienter need not be alleged with great specificity . . . there must be some factual basis for conclusory allegations of intent. Allegations of scienter are sufficient if supported by facts giving rise to a "strong inference" of fraudulent intent. . . .

*Ouaknine v. MacFarlane*, 897 F.2d 75, 79–80 (2d Cir. 1990) (citations omitted).

This does not necessarily require a great deal of pleading. WRIGHT & MILLER, 5A FEDERAL PRACTICE AND PROCEDURE § 1298 (West Group, 2007). The Second Circuit has cited this section and agreed: "Rule 9(b), however, must be read together with rule 8(a) which requires only a 'short and plain statement' of the claims for relief." *Ouaknine v. MacFarlane*, 897 F.2d at 79, and cases there cited; *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993), *cert. denied*, 513 U.S. 822 (1994).

The specificity requirements of Rule 9(b) are relaxed where the cause of action involves a form of fraud in which the facts are peculiarly within defendants' possession. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101-02 (2d Cir. 2007); *Rombach v. Chang*, 355 F.3d 164, 175 n.10 (2d Cir. 2004). 2 MOORE'S FEDERAL PRACTICE, 3D ED. § 9.03[1][g] at p. 9-24 (Matthew Bender, 2003), stated: "However, when the facts constituting fraud are particularly within the adverse party's knowledge or are otherwise inaccessible to the pleader, Rule 9(b) may be satisfied by pleading fraud on information and belief, if the pleader identifies the available information on which the allegation of fraud is founded, as well as the efforts made to obtain additional information." (Footnote omitted.) The Second Circuit approved the version of this formulation in an earlier edition of the treatise: "While the rule is relaxed as to matters peculiarly within the adverse parties' knowledge, the allegations must then be accompanied by a statement of the facts upon which the belief is founded." *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972) (footnote omitted). *Accord, DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("There is a recognized exception to this rule, however, that fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the

facts upon which the belief is based."), and cases there cited; *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir. 1986) ("Allegations of fraud cannot ordinarily be based "upon information and belief," except as to "matters peculiarly within the opposing party's knowledge." . . . To satisfy Rule 9(b) in the latter instance, the allegations must be accompanied by a statement of the facts upon which the belief is founded. . . ."), and cases there cited.

The original allegation was adequately founded. Given defendant's refusal to produce in discovery information on the actual process it used to value this transaction,[2] defendant's February 2008 production of additional pipeline reports provided the first information available to plaintiff other than Exhibit F itself. Because pipeline reports in the months prior to January 8, 2004, also showed a lower value for the transaction, plaintiff withdrew the allegation.

---

[2] Defendant's response to Plaintiff's First Requst for Production 35(d) was as follows:

**Document Request No. 35(d):**

A copy of all documents containing information about:

d. DBSI's decision not to credit plaintiffs 2003 pipeline with only 1,182,000 Euros for an agreement with Salem Communications for DBSI to lead an equity transaction, instead of the approximately $1,800,000 or 1,701,967 Euros estimated by plaintiff;

**Response:**

DBSI objects to Request No. 35(d) to the extent it is vague, ambiguous, overly broad,
unduly burdensome, argumentative, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. DBSI further objects to Request No. 35(d) because it assumes the existence of facts and circumstances that did not or do not exist.

Without waiving the foregoing objections, and to the extent not objected to therein, DBSI responds: DBSI will produce non-privileged, responsive documents, if any, relating to the attribution of pipeline revenue to Plaintiff for an equity transaction for Salem Communications.

Defendant never produced any information on the value of this transaction, other than Franchise Revenue Pipeline Reports.

If defendant had cooperated with discovery, the withdrawal could have occurred earlier.

E.   **Other Matters**

Defendant makes a number of representations that are incorrect. First, plaintiff has never ascribed any blame to the firm of Epstein, Becker & Green. Second, defendant has never agreed to lift confidentiality so that the undersigned may see any documents in a case against defendant handled by Mr. Berger. Third, defendant has omitted a great deal of information on its motion. See the undersigned's March 18, 2008, and May 9, 2008, letters to counsel for defendant, Seymour Dec., exhibits 9 and 10.

WHEREFORE, plaintiff prays that Defendant's Motion be denied and that the Court award reasonable attorneys' fees for the defense of this Motion.

>                         Respectfully submitted,
>
>                         Richard T. Seymour (RS-8094)
>                         rick@rickseymourlaw.net
>                         Law Office of Richard T. Seymour, P.L.L.C.
>                         1150 Connecticut Avenue N.W., Suite 900
>                         Washington, D.C. 20036-4129
>                             (202) 862-4320 – Telephone
>                             (202) 549-1454 – Cell
>                             (800) 805-1065 – Telecopier
>
>                         Steven A. Berger (SB-2038)
>                         sberger@bergerwebb.com
>                         Jonathan Rogin (JR-9800)
>                         jrogin@bergerwebb.com
>                         Berger & Webb, LLP
>                         1633 Broadway, 46th Floor
>                         New York, N.Y. 10019
>                             (212) 319-1900 – Telephone
>                             (212) 319-2017 and -2018 – Telecopiers
>
>
>                   By:   /s/ Richard T. Seymour
>                         Richard T. Seymour (RS 8094)
>                         Attorneys for Plaintiff

Dated: June 16, 2008

**Certificate of Service**

I certify that I have, this 16th day of June, 2008, served a true and correct copy of Plaintiff's Opposition to Defendant's Motion for Sanctions on counsel of record for defendant by e-mail and by use of the Court's ECF system).

        /s/ Richard T. Seymour
Richard T. Seymour (RS-8094)
rick@rickseymourlaw.net
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
    (202) 862-4320 – Telephone
    (202) 549-1454 – Cell
    (800) 805-1065 – Telecopier