# Exhibit 1 to Second Amended and Supplemental Complaint

# EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW

250 PARK AVENUE
NEW YORK, NEW YORK 10177-1211
212.351.4500
FAX: 212.661.0989
EBGLAW.COM

LAUREN MALANGA CASEY
212.351.3729
LMALANGA@EBGLAW.COM

November 5, 2004



EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
NEW YORK DISTRICT OFFICE
ENFORCEMENT UNIT – E1
NOV 0 5 2004
DATE RECEIVED

**VIA HAND DELIVERY**
Ms. Esther Gutierrez
Senior Investigator
EEOC New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

Re: Dan Graves v. Deutsche Bank
    Charge Number 160-2004-02829

Dear Ms. Gutierrez:

Deutsche Bank Securities, Inc. ("DBSI"), by its attorneys Epstein Becker & Green, P.C., submits this Statement of Position in response to the Charge brought against it by Dan Graves on July 22, 2004 (the "Charge").[1]

Mr. Graves, age 42, claims that, beginning in 2002, his supervisor, Jeff Amling, age 50, began transferring a few of his accounts away from him to younger bankers. He alleges that the loss of these accounts made it difficult for him to meet the firm's revenue targets in 2002 and 2003, about which he allegedly complained to Mr. Amling and others. He also claims that Mr. Amling terminated his employment in early 2004 because of his age and allegedly told him that his accounts were needed for younger bankers.

Mr. Amling never told Mr. Graves that his accounts were needed for younger bankers. Indeed, not only were Mr. Graves' accounts never reassigned, but the accounts Mr. Graves alleges were taken away from him, making it impossible for him to meet his 2003 revenue target, produced no revenue for anyone at DBSI in 2003. Further, DBSI denies that Mr. Graves complained to anyone at DBSI – prior to his termination – that his accounts were being transferred to younger bankers. DBSI terminated Mr. Graves' employment as a result of his failure to meet or even approach its target revenue in 2003 due more to a difficult market in

---

[1] A copy of the Charge is attached as Exhibit A. To the extent not specifically admitted or denied, hereinafter, the allegations of the Charge are generally denied.

Ms. Esther Gutierrez
November 5, 2004
Page 2

television broadcasting than to Mr. Graves' poor performance. What Mr. Graves fails to mention is that he was the younger of two Managing Directors ("MD's") who specialized in television broadcasting and when the industry was suffering, with no hope of a near term turnaround, DBSI terminated Mr. Graves' employment because the other MD had 18 years more seniority and some experience outside of television. Thus, Mr. Graves' claim that he was discriminated against due to his age falls flat since the person who terminated his employment and the MD who was retained were both older than him.

**Statement of Facts**

Mr. Graves joined Bankers Trust Alex Brown Inc. ("BTAB") in March 1999 and was, in accordance with the terms of his offer letter, promoted to MD within the first year of his employment. He became an employee of DBSI after the merger of BTAB and Deutsche Bank AG, DBSI's parent, in 1999. He worked in the Media Group of the Investment Banking Division for his entire employment with BTAB and DBSI under Mr. Amling, focusing primarily on the television industry. DBSI's Media Group had about 29 active employees, including Mr. Graves, at the time of his termination. (A chart of active Media employees as of May 2004, including 2004 terminations through April 2004, is attached as Exhibit B.) Mr. Amling was 8 years older than Mr. Graves, and the average age of the 6 MD's in the Media Group at or around the time Mr. Graves' employment was terminated was 42.8. (See Exhibit B.) Mr. Graves was 42 years of age at the time DBSI terminated his employment. (See Exhibit B.)

DBSI's other Media MD's included Gregory Paul, Charles Carey, Malcolm Morris, and Dyan Triffo. (See Exhibit B.) Mr. Paul was the only other MD that, like Mr. Graves, focused primarily on television. Mr. Paul also did some cinema work. Mr. Paul was four years older than Mr. Graves and had significantly more seniority at DBSI and BTAB as he had been hired in July 1981. (See Exhibit B.) Mr. Carey and Mr. Morris were both merely one year younger than Mr. Graves, but they had 6 and 7 years more seniority, respectively. Ms. Triffo was 5 years younger than Mr. Graves, with 3 years more seniority. Ms. Triffo, however, was on an extended leave of absence commencing October 2002. Neither Mr. Carey, Mr. Morris, Ms. Triffo, or Mr. Amling focused primarily on television as did Mr. Graves and Mr. Paul. In determining to terminate Mr. Graves' employment, DBSI retained the older, more experienced Mr. Paul, who also had cinema background which Mr. Graves lacked.

A.   Graves' 2002 Performance

In 2002, DBSI set the revenue target at $10 million for all of its investment bankers, including bankers outside of the Media Group. Mr. Graves met his target in 2002, as did the other MD's in the Media Group, except for Ms. Triffo who went out on leave. (The chart, attached hereto as Exhibit C, demonstrates franchise-revenue and pipeline[2] by MD and Director ("DR"), in Euro thousands, for 2002.) Despite Mr. Graves' allegation in his Charge that

---

[2] "Pipeline" refers to deals that are being worked on and expected to generate revenue the following year.

Mr. Amling began transferring his accounts in 2002 making it hard to meet his 2002 target, his self-evaluation for 2002 reveals no such suspicion. Mr. Graves positively described his 2002 performance as follows: "As in 2001, my financial performance has once again exceeded expectations. Specifically, transactions have been completed for Tribune, Landmark, Allbritton, Gray and XM Satellite. . . . I believe my revenue performance is the highest in the group . . ." (A copy of Graves' 2002 Performance Management Report, containing his self-evaluation, is attached as Exhibit D.) No where in his self-evaluation did Mr. Graves mention any accounts being transferred or difficulty meeting the Firm's targets. Despite Mr. Graves' belief that his 2002 performance was the highest in the Group, his December 2002 year to date franchise revenues were actually lower than all of the other MD's, including Mr. Paul who had a 2002 franchise revenue of 15,117 Euro thousands compared to Mr. Graves' 13,544 Euro thousands. (See Exhibit C.)

      B.    The 2003 Market

In 2003, DBSI increased its targets for all bankers from $10 million to $15 million per banker. At the same time, however, market conditions in Media changed. 2003 "was lackluster" for the Media Group, with "M&A activity and new capital formation soft." (A copy of the "Media Group 2004 Outlook and individual banker highlights" addressing 2003 performance is attached hereto as Exhibit E.) The outlook for 2004 was also weak. (See Exhibit E.) Indeed, Mr. Graves referred to the "difficult" 2003 market conditions in his Charge. (Exhibit A, ¶ 11.) Mr. Amling met with Mr. Graves in late Summer/early Fall 2003 to discuss Mr. Graves' business plan. Mr. Amling and Mr. Graves discussed the fact that the business Mr. Graves saw coming in - - the business in his "pipeline" - - did not meet the guidelines.

Of the 6 MD's, Mr. Graves had the lowest franchise revenue for 2003 and the lowest 2004 franchise pipeline (excluding Ms. Triffo who was still on extended leave). (The chart, attached hereto as Exhibit F, demonstrates franchise-revenue and pipeline by MD and Dir, in Euro thousands, for 2003.) Mr. Graves 2003 franchise revenue was 2,468 Euro thousand and his 2004 franchise pipeline was 983 Euro thousand - - well below DBSI's target. Due to market conditions, Mr. Paul also had trouble meeting DBSI's target, but had a higher franchise revenue than Mr. Graves. Mr. Paul's 2003 franchise revenue was 7,139 Euro thousand and his 2004 franchise pipeline was 4,559 Euro thousand. Mr. Morris had a 2003 franchise revenue of 3,229 Euro thousand, but a 2004 franchise pipeline of 26,135 Euro thousand. Mr. Carey and Mr. Amling, as well as 3 out of 5 directors ("DR") in the Media Group, were well above DBSI's target.

In Mr. Graves' 2003 Performance Management Report, Mr. Amling wrote, "Dan [Graves] had a soft financial 2003." (A copy of Mr. Graves' 2003 Performance Management Report is attached as Exhibit G.) Despite the lengthy positive comments Mr. Graves wrote about his own performance in his 2003 Performance Management Report, he did not offer any explanation for his "soft financial 2003" and offered no excuse, such as accounts being taken away from him. In addition, in the section of his 2003 Performance Management Report where he lists his "clients that have paid fees to the firm through October 2003," he never mentioned

Ms. Esther Gutierrez
November 5, 2004
Page 4

any of the accounts he claims were "taken away from him" in his Charge. (See Exhibit G.) Further, Mr. Graves was certainly aware that having a soft year was problematic at an investment bank focused on revenues. As Mr. Graves states in his Charge, "the potential 'wallet' size of [a banker's] portfolio" is "a figure of some significance at Deutsche Bank." (Exhibit A, ¶ 8.)

      C.    The Decision to Terminate Graves' Employment

At the end of a difficult 2003, DBSI's senior management, including Jacques Brand (age 44), Jim DeNaut (age 42), Mark Pfeffer (age 38) and Tom Gahan (age 42) - - Mr. Amling's superiors - - discussed with Mr. Amling the fact that he needed to eliminate the redundancy in the television broadcasting space.[3] (A copy of a chart demonstrating the ages and titles of Mr. Amling's superiors is attached hereto as Exhibit T.) They felt that capital formation in the television broadcasting space was soft and more importantly, was not going to pick up. Therefore, the television broadcasting space could no longer support two MD's when the revenue that was being generated was so low.

Mr. Amling decided Mr. Graves' employment should be terminated for three main reasons: 1) he did not meet DBSI's target in 2003 and his 2004 outlook was poor; 2) there was duplication in the television space at DBSI and thus, with the downturn in the market, the space could no longer support two MD's; and 3) he had 18 years less seniority than Mr. Paul. (See Exhibits B, E, F.)

Mr. Amling discussed with Mr. Brand, by telephone, whether to terminate Mr. Graves' employment since Mr. Amling thought he was a good banker and did not want to see him go. While Mr. Amling believed Mr. Graves was a hard worker, the revenues just were not there to retain him. Mr. Amling ultimately decided that it was necessary to streamline the Group where there was duplication.

On January 14, 2004, Mr. Amling met with Mr. Graves to advise him that his employment was being terminated due to duplication in the television broadcasting space. Mr. Amling told Mr. Graves that he thought he was a good banker and did not want to terminate his employment, but his termination was dictated by the difficult market. (A copy of Mr. Graves' proposed separation agreement is attached as Exhibit H.) During the meeting, Mr. Graves reacted very calmly and told Mr. Amling that he would leave peacefully if he was paid well, but it was all about the money. Mr. Amling told him that his severance was a matter for the human resources department. Mr. Graves never mentioned anything to Mr. Amling during the meeting (or at any time, for that matter) about accounts being transferred away from him.

---

[3] Senior management was not singling out the Media Group. In response to tough market conditions in 2002, DBSI cut costs by eliminating about 445 investment banking positions in 2002 and 221 positions in 2003. Mr. Graves' termination was after a two year period of downsizing at DBSI. (Attached as Exhibits R and S are charts demonstrating DBSI investment banking employees whose employment was voluntarily or involuntarily terminated in 2002 and 2003, respectively.) The Media Group, in particular, had a difficult year in 2003, primarily due to the downturn in television broadcasting, which is why Mr. Amling received the directive from senior management to eliminate duplications in the Group. (See Exhibit E.)

### D. Graves' Alleged Transferred Accounts Produced No Revenue for DBSI

Mr. Graves' post-termination explanation for his poor 2003 performance has no merit because the "transferred" accounts he lists in his Charge - - Cox Radio, Charter, and Adelphia - - were never taken away from him and in any event, produced no revenue for DBSI in 2003. (Exhibit A, ¶ 9.)

Cox Radio was never taken away from Mr. Graves. It appears as if Mr. Graves simply stopped calling the Cox Radio management team as evidenced by his own call reports.[4] (Attached as Exhibit I is a document demonstrating that Mr. Graves called on Cox Radio just 5 times in a two year period.) In addition, Cox Radio earned no revenue for DBSI in 2003 or 2004 and thus would not have affected Mr. Graves' revenues for either year. (See Exhibit F.) (A chart, attached as Exhibit J, demonstrates franchise-revenue and pipeline by MD and DR, in Euro thousands, for year to date September 2004.) (A chart demonstrating Mr. Graves' franchise revenue for the years 2002 – 2004 is attached as Exhibit K.)

Mr. Graves also stopped calling the Charter management team when some of those members resigned and the company became subject to an SEC investigation. Mr. Graves himself admits that he stopped contacting Charter on his brag sheet (i.e., a sheet prepared by a banker containing his strategic contributions and financial achievements for a given year): "Only one account (Charter) with no activity. The Company is currently being restructured and its former executives were indicted for fraud." (A copy of Mr. Graves' 2003 brag sheet is attached as Exhibit L.)[5] In any event, Charter, like Cox Radio, did not generate any revenue for DBSI in 2003. (See Exhibit F.) Mr. Morris, a MD, and Sun Yung, a DR, both age 41, and Christopher Johnson, MD age 49, only recently began calling Charter's new management and have begun to generate a bit of revenue in 2004.[6] (See Exhibits J, N.)

Like Cox and Charter, Mr. Graves stopped calling Adelphia because the management team with whom he had a relationship was being investigated by the SEC. The team was eventually replaced by new managers. DBSI generated no revenue from Adelphia in 2003. (See Exhibit F.) Mr. Johnson, age 49, and Ms. Yung, age 41, only recently began calling Adelphia's new management and have begun to generate a small amount of revenue in 2004. (See Exhibit J.)

Finally, while not alleging that the Tribune and Salem accounts were ever taken away from him, Mr. Graves alleges that DBSI generated significant revenue from these two accounts in 2004. (Exhibit A, ¶ 17.) Tribune generated no revenue for DBSI in 2004. (See

---

[4] Call reports contain entries made by a banker indicating when he makes a telephone call or visit to a particular client.

[5] In fact, Mr. Graves does not refer to Adelphia anywhere on his brag sheet, nor does he refer to Cox Radio as a source of revenue, other than where he admits that he called Cox Radio just 3 times throughout 2003. (See Exhibit L.)

[6] Christopher Johnson, a MD, age 49, transferred into the Media Group in September 2004 - - 8 months after the termination of Mr. Graves' employment - - as the new Media Group Head. (See Exhibit N.)

Exhibits J and K.) Salem generated 898 thousand euros in April 2004, much less than the amount claimed by Graves. The revenue DBSI generated from Salem was mainly due to the work of Mr. Amling, age 50, and Mr. Carey, age 41.

### E. Other Media Group Employees Were Adversely Affected by the Difficult Market

Mr. Graves was not the only Media Group employee to be affected by the difficult 2003 market. Some of the DR's -- younger than Mr. Graves and outside the protected class -- saw the compression of the Group and voluntarily left in 2004. Eric Zachary Maurus, age 34, left in March 2004; David Dunn, age 35, left in April 2004 and Blair Faulstitch, age 34, left in June 2004. (A chart showing Media 2004 voluntarily and involuntary terminations is attached hereto as Exhibit M.) Liz Chang, age 35, transferred out of the Media Group to Leveraged Finance in April 2004. (A chart showing Media Group transfers in 2004 is attached hereto as Exhibit N.) In addition, a number of analysts, all well below age 40, were involuntarily terminated in 2003. (A chart showing 2003 terminations in the Media Group is attached hereto as Exhibit O.)

Mr. Graves was the only MD of the 6 Media MD's whose employment was terminated because the broadcasting industry was suffering and there was duplication in that space. No one replaced Mr. Graves. (A chart showing 2004 Media Group hires through October 2004 is attached hereto as Exhibit P.) Moreover, no MD's were hired in 2003 - - the year preceding Mr. Graves' termination. One director, William Detweiler, was hired in July 2003 - - before a decision was even made to terminate Mr. Graves' employment - - for his specific knowledge of advertising/marketing services and publishing. Mr. Detweiler was 39 years old at the time of hire. (A chart of 2003 New Hires in the Media Group is attached hereto as Exhibit Q.)

### Argument

### POINT I

### DBSI Did Not Discriminate Against Mr. Graves

DBSI did not discriminate against Mr. Graves by eliminating one of two MD's in the television broadcasting space of the Media Group in order to cut costs in a difficult market. DBSI selected Mr. Graves because he failed to meet his revenue targets and because he had 18 years less seniority than Mr. Paul - - the 46 year old gentleman whom DBSI retained.

### A. Mr. Graves cannot establish a prima facie case of age discrimination.

In order to establish a prima facie case of age discrimination, Mr. Graves must demonstrate that: (1) he is a member of a protected group (i.e., over 40 years of age); (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the employment action give rise to an inference of age discrimination. See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.), cert. denied, 534 U.S. 993 (2001).

Even assuming Mr. Graves can meet the first three elements of a prima facie case, the circumstances surrounding his termination, do not give rise to an inference of age discrimination and thus Mr. Graves cannot establish his prima facie case. In order to set forth an inference of discrimination, Mr. Graves must set forth some direct evidence of discrimination or show either that he was replaced by someone younger or the majority of those terminated were over age 40. See Krystek v. University of S. Miss., 164 F.3d 251 (5th Cir. 1999).

The only alleged evidence that Mr. Graves offers in support of his prima facie case is that Mr. Amling allegedly told him during the termination meeting that his Cox, Charter and Adelphia accounts were needed for "younger bankers." (Exhibit A, ¶¶ 9, 13.) Mr. Amling never made such a statement, and it is unreasonable to think he might have made such a statement since (1) Mr. Graves, himself, admitted on his 2003 brag sheet that he stopped calling Charter because the management team was indicted; (2) Mr. Graves was the only one who called on Cox Radio and it was only 5 times in two years as demonstrated by his call reports; (3) Mr. Graves never made any reference to accounts being taken away in his voluminous 2003 self-evaluation; and (4) most importantly, the referenced accounts produced no revenue for anyone at DBSI so the accounts would hardly be needed for "younger bankers" as Mr. Graves alleges. (See Exhibits G, I, J, K, L.)

### B. DBSI terminated Graves' employment for legitimate, non-discriminatory business reasons.

In any event, even if one were to assume that Mr. Graves could set forth a prima facie case simply by alleging, without one shred of proof, that Mr. Amling referred to younger bankers, DBSI has overwhelming evidence, which Mr. Graves cannot rebut, that it terminated Mr. Graves' employment for legitimate non-discriminatory business reasons. See Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 43 (1st Cir. 2002) (holding that defendant clearly met its burden of setting forth a legitimate, non-discriminatory reason for plaintiff's termination.)

Mr. Graves was one of two MD's in the television broadcasting space and the space could not support two MD's when market conditions changed for the worse in 2003. The evidence clearly indicates that 2003 was a difficult market for Media, and that Mr. Graves was well below the revenue target set by DBSI due to those poor market conditions. (See Exhibits C, F, K.)

DBSI chose to terminate Mr. Graves over Mr. Paul because: (1) Mr. Paul had 18 years more seniority than Mr. Graves, (2) Mr. Paul had additional experience in cinemas, which Mr. Graves did not have, and (3) Mr. Graves had both a lower 2003 franchise revenue and 2004 franchise pipeline than Mr. Paul. (See Exhibits B and F.) "A company has the right to make decisions in its own financial interest without taking into account the age of the employee or employees terminated." Patterson v. J.P. Morgan Chase & Co., No. 01 Civ. 7513, 2004 WL 1920215, at *5 (S.D.N.Y. Aug. 26, 2004)(citing Maresco v. Evans Chemetics, 964 F.2d 106, 113 (2d Cir. 1992)).

Mr. Graves' cannot satisfy his burden of proving that DBSI's proffered reason for his termination was pretextual and that the true reason for his termination was discrimination. See Id. Most importantly, Mr. Graves' age discrimination claim falls flat when the person who was retained over him - - Mr. Paul - - was not only in the age protected group, but was 4 years older than Mr. Graves. See Hanebrink v. Brown Shoe Co., 110 F.3d 644 (8th Cir. 1997) (no inference of discrimination where employer retained 2 employees older than plaintiff). In fact, the average age of all 6 MD's in the Media Group at the time of Graves' termination was 42.8 – clearly within the protected group. (See Exhibit B.) See Wolfe v. Time, Inc., 702 F. Supp. 1045 (S.D.N.Y. 1989) (discrimination claim weakened where retained employees, even if younger than terminated employee, are protected employees under the ADEA).

Mr. Graves cannot show age discrimination when the person who terminated his employment was older than he was. Mr. Amling, the person responsible for terminating Mr. Graves' employment, was 50 years of age – 8 years older than Mr. Graves. (See Exhibit B.) See Strohmeyer v. International Bhd. of Painters and Allied Trades, 989 F. Supp. 455 (W.D.N.Y. 1997) (the fact the individual responsible for termination is within the age protected group "'enhances the inference that age discrimination was not the motive behind plaintiff's termination.'") (quoting Brown v. McDonnell Douglas Corp., 936 F. Supp. 665, 674 n.6 (E.D. Mo. 1996), aff'd, 113 F.3d 139 (8th Cir. 1997)), aff'd mem., 164 F.3d 619 (2d Cir. 1998).

Additional proof that DBSI's reason for terminating Mr. Graves' employment was legitimate is that no one replaced Mr. Graves. See Wolfe, 702 F. Supp. at 1045; Exhibit P. Moreover, no MD's were even hired in 2003 – the year preceding Graves' termination. (See Exhibit Q.) In fact, the Media Group did not have a new MD until Christopher Johnson transferred into the Group eight months after Graves (and 5 others) left. (See Exhibit N.) Johnson was 49.2 years of age -- 7 years older than Graves. These facts belie any inference that DBSI or Mr. Amling did not want older MD's in their group - - they were populated with them and added another.

Finally, as noted above, Mr. Graves' allegations that Mr. Amling told him that he needed his Cox, Charter and Adelphia accounts for younger bankers is not credible. Mr. Graves called Cox Radio in 2002 and 2003 which indicates that the account was not stolen from him. (See Exhibit I.) Mr. Graves admitted that he stopped calling Charter because "its former executives were indicted for fraud." (See Exhibit L.) With respect to Adelphia, Mr. Graves again stopped calling because the management team with whom he had a relationship was being investigated by the SEC. Neither Cox, Charter, nor Adelphia produced any revenue for DBSI in

Ms. Esther Gutierrez
November 5, 2004
Page 9

2003. (See Exhibit F.) The little revenue Adelphia and Charter produced in 2004 – months after Graves' employment was terminated – was due to relationships with the new management teams all built by MD's within the age protected group, either older than Graves or no more than one year younger. (See Exhibits B, J.) Thus, any claim by Graves that DBSI needed his accounts for younger bankers is belied by Mr. Graves' own admissions and the fact that the accounts did not produce any revenue.

      C.    Mr. Graves' discrimination claim fails even
           if analyzed outside the McDonnell-Douglas framework.

A plaintiff who believes he has direct evidence of discrimination could choose to pursue his claim outside of the burden-shifting framework set forth above whereby the plaintiff has to prove a prima facie case, the defendant has to articulate a legitimate business reason, and plaintiff has to show pretext. See EEOC v. Clay Printing Co., 955 F.2d 936 (4th Cir. 1992). The plaintiff simply sets forth his direct evidence and the employer must deny the validity or sufficiency of the evidence. See Id. Mr. Amling's alleged remark that Mr. Graves "was being fired because [Amling] needed [his] accounts for 'younger bankers'" is insufficient to constitute direct evidence of age discrimination by Mr. Amling.

First, Mr. Amling denies making any such comment, and Mr. Graves has set forth no evidence other than his own bare assertion. Second, as discussed above, Mr. Graves' assertion is simply not credible based on his brag sheet, call reports, and self-evaluation. (See Exhibits G, I, L.) Third, the individuals who eventually took over the alleged "transferred" accounts were over age 40 and thus in the protected group themselves. Mr. Johnson, age 49, and M. Yung, age 41, began calling Adelphia's new management in 2004. (See Exhibit N.) Mr. Morris and Ms. Yung, both age 41, and Mr. Johnson, age 49, began calling Charter's new management in 2004. Further, Mr. Amling himself, age 50, and Mr. Carey, age 41, took over the Salem account in 2004. Thus, Mr. Graves' allegation that his accounts were transferred to younger bankers is false.

In addition, Mr. Graves alleges that Mr. Amling referred to "younger bankers," but does not quote the rest of the alleged comment. Thus, if Mr. Graves was certain of Mr. Amling's words, he would have quoted the entire alleged statement. Even if Mr. Amling referred to "younger bankers," which he did not, such a reference is entirely insufficient to unambiguously display an age-based animus and thus constitute direct evidence of discrimination. "Younger bankers" could mean more junior and less experienced bankers as opposed to younger in age. Mr. Amling could have meant that because specific accounts were small and not very lucrative, they were more appropriate for a junior banker as opposed to a MD. See Vesprini, 315 F.3d at 42 ("inherently ambiguous assertions normally do not constitute 'direct evidence' of an age-based animus.") (citation omitted). Since Mr. Amling was 8 years older than Mr. Graves, any reference by Mr. Amling to "younger bankers," which is denied, would more likely be a reference to experience rather than age. See Vesprini, 315 F.3d at 42 (As 57 year old supervisor was within the age protected class, it is just as likely that his comments to plaintiff were simply "commiserative" and observing a fact of life.); Birkbeck v. Marvel Lighting Corp,

Ms. Esther Gutierrez
November 5, 2004
Page 10

30 F.3d 507, 509-12 (4th Cir. 1994) (statement by 52 year old supervisor that "there comes a time when we have to make way for younger people" creates no inference of age bias); see Clay Printing Co., 955 F.2d at 942 (same).

Thus, Mr. Graves sets forth no direct evidence of age discrimination, nor could Mr. Graves prove discrimination by showing pretext under the burden shifting paradigm set forth above.

## POINT II

### DBSI Did Not Retaliate Against Mr. Graves

While it is not entirely clear whether Mr. Graves is alleging retaliation, he does state that he "repeatedly objected to Jim DeNaut, Jacques Brand . . . Mr. Amling, and others as [his] accounts were transferred to other, less busy, and younger bankers" throughout a two year period. (Exhibit A, ¶10.) In order to set forth a prima facie retaliation claim, Mr. Graves must demonstrate that he (1) engaged in a protected activity, (2) DBSI was aware of the activity, (3) DBSI took adverse action against him, and (4) there was a causal connection between the protected activity and the adverse action which gives rise to an inference of retaliatory intent. See Walker v. Access Agency, No. 3:02CV199, 2004 WL 2216526 (D. Conn. Aug. 31, 2004). Because Mr. Graves cannot show any of the 4 requirements except that his employment was terminated, he fails to make out a prima facie case of retaliation.

DBSI disputes that Mr. Graves complained to anyone at DBSI - prior to his termination - that his accounts were being transferred to younger bankers or that Mr. Amling, Mr. DeNaut, or Mr. Brand were aware of any such complaints. The absence of any detail in the Charge as to when Mr. Graves' allegedly complained - - including the year - - is telling and makes it impossible for Mr. Graves to establish his prima facie case. In addition, DBSI has presented evidence that the accounts were never transferred. Even more telling is that Mr. Graves never mentioned his accounts being transferred away in either of his lengthy 2002 or 2003 self-evaluations or 2003 brag sheet. (See Exhibits D, G, L.) Finally, the evidence clearly demonstrates that Mr. Graves' employment was terminated only after a difficult market in 2003 and his failure to even come close to meeting DBSI's target revenue. (See Exhibits E, F.)

In any event, even if Mr. Graves had set forth a prima facie retaliation claim, DBSI has set forth unrebuttable evidence that it had legitimate business reasons for terminating Mr. Graves' employment and thus Mr. Graves cannot establish a retaliation claim.

Ms. Esther Gutierrez
November 5, 2004
Page 11

## Conclusion

Based on the foregoing, Deutsche Bank Securities, Inc. respectfully requests that Mr. Graves' charge be dismissed in its entirety.

Respectfully submitted,

Lauren Malanga Casey

Attachments

cc:  Peter L. Altieri, Esq.
     William J. Milani, Esq.