UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

DANIEL B. GRAVES,

                             :

               Plaintiff,         07 Civ. 5471 (BSJ)

                             :

        - against -

                             :

DEUTSCHE BANK SECURITIES INC.,

                             :

               Defendant.

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT'S STATEMENT OF MATERIAL
## UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1

        Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendant Deutsche Bank Securities Inc. ("DBSI") hereby sets forth material facts as to which it contends there exists no genuine issue to be tried.

       1.     Detusche Bank is located at 60 Wall Street, New York, New York.  (Complaint dated August 4, 2008 (the "Complaint") ¶ 5 (a copy of the Complaint is annexed as Exhibit A to the Affirmation of Nicholas H. De Baun dated May 24, 2012 (the "De Baun Aff."); Answer dated April 23, 2010 (the "Answer") ¶ 5 (a copy of the Answer is annexed as Exhibit B to the De Baun Aff.).)

       2.     In March 1999, when he was 37 years old, Graves was hired by Bankers Trust to work in its Media Investment Banking Group under the direction of Jeffrey Amling.  (Complaint ¶¶ 24; Answer ¶¶ 24.)

       3.     In June 1999, as a result of the merger between Bankers Trust and Deutsche Bank, the Media Investment Banking Group became part of DBSI.  Graves continued to report to

Amling and was promoted to Managing Director ("MD") at the end of 1999 or the beginning of 2000.  (Cmpl. ¶ 25; Answer ¶ 25.)

4.      When he was hired by Banker's Trust, Graves received an offer letter containing the initial terms of his employment.  (De Baun Aff., Exh C.)

5.      In addition to setting forth Graves's annual compensation, the letter provided for a guaranteed minimum bonus for 1999 of $675,000.  (De Baun Aff. Exh. C, ¶ 5.)  Other than this guarantee, Graves never received any writing from DBSI promising him a bonus for any particular year.  (Transcript of the Deposition of Daniel Graves ("Pl. Tr.") p. 44;  De Baun Aff. Exh. D.)

6.      At the time Graves was employed by DBSI, the Bank issued Human Resources Policies governing aspects of his employment.  The Pay and Reimbursement procedure, in particular, set forth the terms under which incentive compensation, or bonuses, would be paid. In pertinent part, the policy provided: "To receive a bonus, you must be employed with Deutsche Bank on the day the bonus is paid out."  (De Baun Aff., Exh. E, p. DB000189.)

7.      In 2002, Jacques Brand and James DeNaut became Co-Heads of Corporate Finance for the Americas at DBSI, and were given a mandate to grow revenues, profitability and market share for the industries under their control, including the Media Group.  (Transcript of the Deposition of James DeNaut Tr. (the "DeNaut Tr.") pp. 17, 26-27; De Baun Aff. Exh. L.)

8.      After analyzing the Media Group, Brand and DeNaut concluded that the group was underperforming and top-heavy.  (DeNaut Tr., pp. 84, 89-90.)

9.      In July 2003, DeNaut and Brand and other members of the Business Planning and Development Committee, or BPAD, met to formulate a plan for improving the performance of the Media Group.  (De Baun Aff., Exh. G, pp. DB001204 - 001247.)

10.     BPAD recognized that the Media Group had experienced one of the more severe fee declines over the past three years – 33% per year.  The group listed as open issues the fact that the group was overstaffed and top heavy, and the need to reconsider the reassignment of underperforming accounts, including Gannett Corporation, to other bankers.  (De Baun Aff. Exh. G, pp. DB001205-06, DB001224.)

11.     The materials BPAD reviewed as of January 2003 reflected that Graves was the MD with the lowest revenue for the period of 2001 to 2002 and the lowest market share.  (De Baun Aff. Exh. G, p. DB001229.)

12.     In 2003, Amling met with Graves to advise him that his 2002 revenue was substantially below the target set for MDs and that, should this trend continue in 2003, Graves's job might be in jeopardy.  (Transcript of the Deposition of Jeffrey Amling (the "Amling Tr.") pp. 117-20; De Baun Aff. Exh. H.)

13.     In May 2003, Amling was approached by senior management to clarify whether he intended to continue employing both Graves and Gregory Paul, another MD who, like Graves, worked for broadcasting clients.  Amling advocated retaining both bankers.  (Amling Tr., p. 235-239.)

14.     Graves's revenues continued to decline throughout 2003 so that, by December 2003, DBSI's records showed that he had the lowest actual and projected revenue of any MD in the Media Group.  (De Baun Aff., Exh. J, pp. DB070617 – 070624; Exh. K, pp. DB000117 - 000129.)

15.     In a meeting of the Promotion and Performance Committee in November 2003, Graves was ranked sixth of the seven Media MDs, last in the Corporate Finance MD ranking;

second to lowest and lowest for quality, quantity and culture;  and lowest in the overall regional ranking.  (De Baun Aff., Exh. J, pp. DB070617 - 070624; Exh. K, pp. DB000117 - 000129.)

16.     Towards the end of 2003, Amling and Brand discussed downsizing the Media Group, specifically eliminating either Graves's or Paul's position.  Both Amling and Brand believed that the broadcasting sector, in which both Graves and Paul has a number of significant client relationships, was no longer able to support two MDs.  (Amling Tr., pp. 81-82.)

17.     In late December, early January 2004, a Amling and Brand decided that, as the MD with the lowest actual and projected revenue in the Media Group, Amling would be laid off, and his responsibilities divided among the remaining staff. (Transcript of the Deposition of Jacques Brand (the "Brand Tr.") p. 36; De Baun Aff., Exh. M, pp. DB 046494 - 046497; De Baun Aff. Exh. J, pp. DB 070616 - 070624; De Baun Aff., Exh. K, pp. DB 000117 - 000129.)

18.     At the time of the decision, Graves was 41 years old and Paul was 46. (De Baun Aff. Exh. N, pp. DB 046520 - 046523; Exh. O, p. Graves000038; Pl. Tr., p. 289.)

19.     Prior to communicating the termination decision to Graves, his supervisors inquired whether it might be possible to transfer of Graves to another group.  Specifically, Amling, as well as Brand and DeNaut, approached Ben Griswold, the head of the Large Cap Group to see if there might be an opportunity for Graves there.  That opportunity did not materialize.  (Amling Tr., p. 79-80.)

20.     Graves's employment was terminated on January 30, 2010, as was the employment of all of the employees whose positions were selected for that reduction in force ("RIF").  (De Baun Aff., Exh. R, p. DB000044.)

21.     Graves, like all of the other selected employees, was offered a severance package in exchange for a release of claims against the Bank.  (De Baun Aff., Exh. R, pp. DB000044 - 000049.)

22.     Under the terms of the DBSI bonus plan, Graves did not receive a bonus in 2004 because he was not actively employed on the date such bonuses were paid out. (De Baun Aff., Exh. E, pp. DB 000189-000191.)

23.      No employee who was selected for termination in the January 2004 RIF received a "soft landing" (De Baun Aff. Exh. N, pp. DB046520 - 046523.)

Dated:  New York, New York
        May 24, 2012

                              SEYFARTH SHAW LLP


                              By:   /s/ Nicholas H. De Baun
                                    Cliff Fonstein
                                    Nicholas H. De Baun
                                    620 Eighth Avenue
                                    New York, New York 10018
                                    (212) 218-5500

                              Attorneys for Defendant
                              Deutsche Bank Securities Inc.