IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL B. GRAVES,<br><br>        Plaintiff,<br><br>    v.<br><br>DEUTSCHE BANK SECURITIES, INC.,<br><br>        Defendant. | **CIVIL ACTION NO.**<br>**1:07-cv-05471-BSJ-KNF**<br><br>    **ECF Case** |

# PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT

### Table of Contents

Introduction…………………………………………………………………………………. 1
A.    Plaintiff's Response to Defendant's Statement of Undisputed Facts……………. 1
        1. Defendant's Statement # 1……………………………………………………. 1
            Plaintiff's Response……………………………………………………. 1
        2. Defendant's Statement # 2……………………………………………………. 1
            Plaintiff's Response……………………………………………………. 1
        3. Defendant's Statement # 3……………………………………………………. 2
            Plaintiff's Response……………………………………………………. 2
        4. Defendant's Statement # 4……………………………………………………. 2
            Plaintiff's Response……………………………………………………. 2
        5. Defendant's Statement # 5……………………………………………………. 3
            Plaintiff's Response……………………………………………………. 3
        6. Defendant's Statement # 6……………………………………………………. 4
            Plaintiff's Response……………………………………………………. 4
        7. Defendant's Statement # 7……………………………………………………. 5
            Plaintiff's Response……………………………………………………. 5
        8. Defendant's Statement # 8……………………………………………………. 6
            Plaintiff's Response……………………………………………………. 6
        9. Defendant's Statement # 9……………………………………………………. 9
            Plaintiff's Response……………………………………………………. 9
        10. Defendant's Statement # 10…………………………………………………. 9
            Plaintiff's Response……………………………………………………. 10
        11. Defendant's Statement # 11…………………………………………………. 13
            Plaintiff's Response……………………………………………………. 13
        12. Defendant's Statement # 12…………………………………………………. 15
            Plaintiff's Response……………………………………………………. 15

i

13. Defendant's Statement # 13………………………………………………   19
    Plaintiff's Response………………………………………………………   19
14. Defendant's Statement # 14………………………………………………   20
    Plaintiff's Response………………………………………………………   20
15. Defendant's Statement # 15………………………………………………   22
    Plaintiff's Response………………………………………………………   22
16. Defendant's Statement # 16………………………………………………   25
    Plaintiff's Response………………………………………………………   25
17. Defendant's Statement # 17………………………………………………   26
    Plaintiff's Response………………………………………………………   26
18. Defendant's Statement # 18………………………………………………   28
    Plaintiff's Response………………………………………………………   28
19. Defendant's Statement # 19………………………………………………   28
    Plaintiff's Response………………………………………………………   29
20. Defendant's Statement # 20………………………………………………   31
    Plaintiff's Response………………………………………………………   31
21. Defendant's Statement # 21………………………………………………   34
    Plaintiff's Response………………………………………………………   34
22. Defendant's Statement # 22………………………………………………   35
    Plaintiff's Response………………………………………………………   35
23. Defendant's Statement # 23………………………………………………   36
    Plaintiff's Response………………………………………………………   36


B.   Plaintiff's Statement of Material Facts in Dispute…………………………   37
    1.  Whether Defendant Had the Power to Deny a Bonus
        Simply Because the Employee Was Not Employed
        on the Date the Bonuses Was Paid Out………………...........................   37
    2.  Whether Defendant's Failure to Provide Discovery on
        the Arbitration Awards, or on Bonus Awards for Directors
        and Managing Directors Outside the Media Group, Creates
        a Material Dispute…………………………………………………   38
    3.  Whether DeNaut Had Sufficient Knowledge About the
        Media Group to Be Able to Testify About It...………………………   40
    4.  Whether There Were Any Problems with the Media
        Group Different or More Serious Than Those of Any
        Other Product or Industry Group within Corporate
        Finance for the Americas…………………………………………..   41
    5.  Whether There Was Anything Unique About the
        Mandate of DeNaut and Brand That Would Support
        Any Inference as to the Media Group………………………………   43
    6.  Whether DeNaut Admitted Age Discrimination in Layoffs……………   43
    7.  (a) Whether the Media Group Was Top-Heavy, So As to
        Justify Graves' Termination, and (b) Whether the Promotion
        Of Four Vice Presidents to Directors Was What Made the
        Media Group Top-Heavy ……………………………………………… 45

8.  Whether Defendant's Transfers of Plaintiff's Accounts with
    Wallet Size, Fee-Paying Clients, and Prospects of Revenue to
    the Young Directors Promoted in April 2003, or to Other
    Managing Directors, Set Plaintiff Up to Fail…………………………….   53
9.  Whether Defendant Set Plaintiff Up to Fail by Refusing to Set
    Plaintiff Up as Senior Investment Banker on Gannett and Other
    Important Accounts………………………………………………………….   54
10. Whether Plaintiff's Performance in 2003 Was Good, and Whether
    Defendant's Criticisms Were Pretexts for Age Discrimination..…………   55
11. Whether Defendant's Failure to Produce "Business Planning &
    Development" Documents Prior to July 2003, and its Failure to
    Produce Staffing-Level and Layoff Documents, Allows the Inference
    That Defendant Was Cherry-Picking Documents to Support its
    Theory and Refusing to Produce Documents That Undermined its
    Theory, Thus Barring Consideration of the Document…………………...   56
12. Whether the Individual Earnings Figures on p. DB 1229 of the
    July 2003 Business Planning & Development Document Relied
    on by Defendant Are Correct, or Are a Pretext for Age
    Discrimination……………………………………………………………….   58
13. Whether Defendant Evaluated Graves in February 2002 (for
    the 2001Performance Year) and February 2003 (for the 2002
    Performance Year) as a Better Banker Than Managing Directors
    and Directors Who Were Not Laid Off……………………………………   60
14. Whether Brand's Memory Was So Poor that a Jury Would Not
    Be Required to Believe His Testimony as to Graves Being a
    Low Performer, or the Lowest Performer in the Media Group………..   63
15. Whether Defendant's Officials Altered the Relative Rankings
    of Bankers to Justify the Firing of Graves, and to Create a
    Pretext for Age Discrimination……………………………………………   65
16. Whether Defendant Could Have Transferred Graves to a Position
    in its Leveraged Finance Unit, or to a Position in its Mergers &
    Acquisitions Unit, or to Another Unit, and Failed or Refused to
    Do So, or to Reconsider its Decision, or to Give Him a "Soft
    Landing," because of Age Discrimination and in Retaliation
    for Graves' Internal Complaint to DeNaut and Brand about
    Amling's Remark that Amling Needed Graves' Accounts for
    Younger Bankers……………………………………………………..…   68
17. Whether, Prior to the Final Decision to Fire Graves, Defendant
    Expected the Business and Fees of the Media Group to Increase
    Substantially………………………………………………………………..   79
18. Whether, Prior to the Final Decision to Fire Graves, Defendant
    Expected the Business and Fees of the Broadcasting "Space" in
    the Media Group to Increase Substantially………………………………   81
19. Whether Amling's Memory is Too Poor to Be Reliable…………………   82

20. Whether Any Inference as to Graves' Credibility Can Be Drawn from Graves' Handwritten Notes…………………………………….. 83
21. Who the Decisionmakers on Graves' Termination Were………………. 85

C. Plaintiff's Statement of Undisputed Material Facts…………….. ……………… 87
1.  Defendant Has Admitted Lying to the Government in Order to Further Mortgage and Tax Fraud………………………………….... 87
2. Defendant Transferred Accounts from Graves to Younger Bankers and Other Bankers, and Falsely Represented to the EEOC That It Did Not……………………………………………………………… 89
3. DBSI's Representation that Graves' EEOC Charge Complained of the Transfer of Cox Radio, as Opposed to Cox Communications and Cox Enterprises……………………………………………………… 93
4. DBSI's Representation that the Accounts, Which Graves Complained to the EEOC Had Been Reassigned, Produced No Revenue for DBSI and Were of Little Value…………………………………………… 94
a. DBSI's Representations as to the Accounts………………………… 94
b. Graves' Former Adelphia Account……………………………….. 96
c. Graves' Former Charter Communications Account………………… 98
d. Graves' Former Cox Communications and Cox Enterprises Accounts.. 99
5. DBSI's Representation that Graves Never Complained to DBSI About Account Transfers……………………………………………………… 101
6. DBSI's Representations that the Younger Bankers Did Not Need Mr. Graves' Accounts…………………………………………………… 104
7. DBSI's Representations that Graves Was Confined to the "Television Broadcasting Space," and Therefore Only He and Gregory Paul, Who Was Older than Graves and the Only One of the Two Who Had Cinema Experience, Could Be Considered for Layoff………………………… 106
a. DBSI's Representations………………………………………… 106
b. Graves Worked at DBSI in Many Areas Other Than Television Broadcasting…………………………………………………… 109
c. Graves Had Cinema Experience……………………………….. 111
d. Graves Had Other Types of Experience……………………….. 113
e. Other Bankers Had Television Broadcasting Clients……….…….. 113
f. Amling Disavowed the "Television Broadcasting Space" Criterion, and Claimed it Was Radio and TV Broadcasting Space ………..….. 114
g. Layoff Possibilities Included the Younger Directors, Not Just the Older Managing Directors………………………………….…..... 115
8. DBSI Had No Seniority System……………………………………… 115
9. DBSI's Representations That Franchise Revenues and Pipelines Objectively Determined Relative Success as a Banker………………… 118
a. DBSI's Representations…………………………………………… 118
b. The Uncertainty of Pipeline Figures………………………………. 119
c. The Lack of Use of Pipeline Information in Making Decisions……… 119
d. Amling's Ability to Change Pipelines……………………………... 122

e.  Blocking Graves From Achieving Fees or Pipelines………………… 122

f.  DBSI Altered Pipeline Documents Submitted to the EEOC,
   to Create a False Impression of Their Utility………………………… 123

10.  The EEOC's Action………………………………………………… 126

# Introduction[1]

Plaintiff makes the following responses to Defendant's Rule 56.1 statement (Doc. # 142.

This response is in three parts.   Part A responds to Defendant's Statement of Undisputed Facts.

Part B sets forth Plaintiff's Statement of Material Facts in Dispute.   Part C sets forth Plaintiff's

Statement of Undisputed Material Facts.

### A.   Plaintiff's Response to Defendant's Statement of Undisputed Facts

#### 1.   Defendant's Statement # 1:

1. Detusche [sic] Bank is located at 60 Wall Street, New York, New York. (Complaint dated August 4, 2008 (the "Complaint") ¶ 5 (a copy of the Complaint is annexed as Exhibit A to the Affirmation of Nicholas H. De Baun dated May 24, 2012 (the "De Baun Aff."); Answer dated April 23, 2010 (the "Answer") ¶ 5 (a copy of the Answer is annexed as Exhibit B to the De Baun Aff.).)

**Plaintiff's Response to Defendant's Statement # 1:**

1.   Disputed, in that the name of the Defendant stated in the referenced pleadings is

"Deutsche Bank Securities Inc.," not "Detusche Bank," and that its "principal United States

executive offices," not the place where it is "located," are at 60 Wall Street, New York, New

York.

#### 2.   Defendant's Statement # 2:

2. In March 1999, when he was 37 years old, Graves was hired by Bankers Trust to work in its Media Investment Banking Group under the direction of Jeffrey Amling. (Complaint ¶¶ 24; Answer ¶¶ 24.)

**Plaintiff's Response to Defendant's Statement # 2:**

1. Admitted.  Defendant is correct in substance but erroneous as to its cited sources.

Paragraph 24 of the Complaint says only:

24. Plaintiff began working for BT Alex Brown, Inc., a unit of Bankers Trust Co., on March 31, 1999, as a Principal, with a written agreement that he would be promoted to

---

[1] TEST-DELETE

Managing Director during the next promotion cycle.  Jeffrey Amling in the Baltimore, Maryland, office was his supervisor."

There was no mention of Plaintiff's age in this paragraph.  Paragraph 24 of Defendant's Answer denied knowing enough to respond, except to say that an offer was made to Graves on March 23, 1999, and to the offer of a promotion to Managing Director.

2. However, the De Baun Affirmation, Exhibit O, a DBSI document attached to its November 5, 2004 Position Statement to the EEOC, shows that Graves' "Latest Hire Date" was March 31, 1999.  Paragraph 6 of the Complaint alleged that Graves was born on February 28, 1962, and ¶ 6 of Defendant's Answer admitted that much.  As a matter of arithmetic, Graves was 37 years old at the time of his hire by BT Alex Brown, Inc., a unit of Bankers Trust Co.

### 3.   Defendant's Statement # 3:

3. In June 1999, as a result of the merger between Bankers Trust and Deutsche Bank, the Media Investment Banking Group became part of DBSI.  Graves continued to report to Amling and was promoted to Managing Director ("MD") at the end of 1999 or the beginning of 2000. (Cmpl. ¶ 25; Answer ¶ 25.)

**Plaintiff's Response to Defendant's Statement # 3:**

1.  Admitted, except that ¶ 25 of Defendant's Answer represented that Graves was promoted to Managing Director in April 2000.  Graves does not dispute that.

### 4.   Defendant's Statement # 4:

4.  When he was hired by Banker's [sic] Trust, Graves received an offer letter containing the initial terms of his employment. (De Baun Aff., Exh C.)

**Plaintiff's Response to Defendant's Statement # 4:**

1. Admitted, except that:

(a) The initial offer letter in the De Baun Affirmation, Exhibit C, was dated March 23, 1999, eight days before Graves' March 31, 1999 hire date.  The word "When" in Defendant's Statement #4 must be changed to read "Before" if it is to be made accurate;

- 2 -

(b) The initial offer letter in the De Baun Affirmation, Exhibit C, was not the offer letter governing Graves' employment.  The letter governing his employment is the April 16, 1999 revision of the March 23, 1999, offer letter.  Seymour Dec., ¶ 3, Exhibit 2, DB 303 - DB 305.

### 5.  <u>Defendant's Statement # 5</u>:

5. In addition to setting forth Graves's annual compensation, the letter provided for a guaranteed minimum bonus for 1999 of $675,000. (De Baun Aff. Exh. C, ¶ 5.) Other than this guarantee, Graves never received any writing from DBSI promising him a bonus for any particular year. (Transcript of the Deposition of Daniel Graves ("Pl. Tr.") p. 44; De Baun Aff. Exh. D.)

**Plaintiff's Response to Defendant's Statement # 5:**

1. Disputed.  The March 23, 1999 offer letter (De Baun Affirmation, Exhibit C, Doc. 138-1, Acrobat pp. 94-96), which is not the offer letter pursuant to which Graves was hired, states in ¶¶ 6 and 7:



*Id.*, p. 1, Acrobat p. 94.

2. The March 23, 1999 offer letter was revised for the last time on April 16, 1999. Seymour Declaration, ¶ 3, Exhibit 2, DB 303 - DB 305.  The statements in ¶¶ 6 and 7 above were reproduced in ¶¶ 5 and 6 of the March 30, 1999 revision.  *Id.*

3. On September 17, 1999, DBSI guaranteed in writing that Graves would receive a

██████████████████████████ Seymour Declaration, ¶ 4, Exhibit 3, Graves 215-

Graves 217.

4. Graves' deposition also does not support Defendant's statement.  Defendant showed

him the April 16, 1999 revision to the offer letter (Dep. Exhibit 3, Seymour Declaration, ¶ 3,

Exhibit 2), Excerpts from Graves' January 10, 2011 deposition, Tr. 36 lines 2-21 (Seymour

Declaration, ¶ 5, Exhibit 4).  Graves then testified at Tr. 43 line 18 to Tr. 44 line 8 (De Baun

Affirmation, Exhibit D, Doc. 138-1, Acrobat p. 99):

> 18 Q. Now, you -- you were guaranteed a
> 19 bonus for the performance year 1999 in this offer
> 20 letter, correct?
> 21 A. According to Paragraph 5, yes.
> 22 Q. At -- at any other point in your
> 23 employment with Bankers Trust Deutsche Bank, did
> 24 you have any other writing that guaranteed you a
> 25 bonus for any particular year other than the 1999
> 1 - DANIEL B.  GRAVES –
> 2 performance year?
> 3 A. There are payments in Number 6 which
> 4 are guaranteed payments during the course of a
> 5 three-year period, and there was a retention bonus
> 6 that was paid for employees of Deutsche Bank after
> 7 Deutsche Bank bought Bankers Trust Alex Brown.
> 8 That was a guaranteed amount.

**6.  Defendant's Statement # 6:**

6. At the time Graves was employed by DBSI, the Bank issued Human Resources
Policies governing aspects of his employment. The Pay and Reimbursement procedure, in
particular, set forth the terms under which incentive compensation, or bonuses, would be paid.
In pertinent part, the policy provided: "To receive a bonus, you must be employed with Deutsche
Bank on the day the bonus is paid out." (De Baun Aff., Exh. E, p. DB000189.)

**Plaintiff's Response to Defendant's Statement # 6:**

1.  Admitted as to the accuracy of the quotation from the cited document.

- 4 -

2.  Plaintiff objects to the relevance of the statement because the case involves allegations of age discrimination in his termination, and of age discrimination and retaliation as to the timing of his termination so as to prevent his being at work on the day the bonus was paid out.

3.  There is a material dispute of fact as to whether the defendant's condition on eligibility for bonuses, and as to whether its assertion of absolute over the awarding of bonuses and their amounts, are valid or controlling.  See Part B(1) hereto at pp. 37-38 below.  This discussion is incorporated by reference herein.

4.  There is also a material dispute of fact as to whether Defendant's failure to provide discovery on bonus awards and their connection with termination dates, for anyone outside the Media Group, creates a material dispute of fact as to whether it actually followed such a condition.  See Part B(2) hereto at pp. 38-39 below.  This discussion is incorporated by reference herein.  Its response is tantamount to no response at all.

### 7.  Defendant's Statement # 7:

7. In 2002, Jacques Brand and James DeNaut became Co-Heads of Corporate Finance for the Americas at DBSI, and were given a mandate to grow revenues, profitability and market share for the industries under their control, including the Media Group. (Transcript of the Deposition of James DeNaut Tr. (the "DeNaut Tr.") pp. 17, 26-27; De Baun Aff. Exh. L.)

### Plaintiff's Response to Defendant's Statement # 7:

1.  Admitted as to substance, but Defendant has cited the wrong exhibit to the De Baun Affirmation.  Exhibit L to the De Baun Affirmation (Doc.  138-2, Acrobat pp. 68-70), consists of excerpts from the deposition of Jacques Brand, not the deposition of James DeNaut, and in any event does not contain any transcript page before Tr. 33.  Excerpts from the deposition of James DeNaut appear in Exhibit F to the De Baun affirmation (in Doc.  138-1, Acrobat pp. 108-115), not Exhibit L (in Doc.  138-2).  Defendant has failed to cite line numbers, so one has to work out the exact passages on which it relies.

2.  Disputed as to any inference that there were any problems with the Media Group different or more serious than those of any other product or industry group within Corporate Finance for the Americas, with its very broad range of industry groups.  There is a disputed issue of material fact as to such an inference.  See Part B(4) at pp. 41-43 below.  This discussion is incorporated by reference herein.

3.  There is a disputed issue of material fact as to whether DeNaut had sufficient knowledge about the Media Group to be able to testify about it.  See Part B(3) at p. 40 below. This discussion is incorporated by reference herein.

4.  There is a disputed issue of material fact whether there was anything unique about the mandate of DeNaut and Brand that would support any inference as to the Media Group.  See Part B(5) at p. 43 below.  This discussion is incorporated by reference herein.

5.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**8.  Defendant's Statement # 8:**

8. After analyzing the Media Group, Brand and DeNaut concluded that the group was underperforming and top-heavy. (DeNaut Tr., pp. 84, 89-90.)

**Plaintiff's Response to Defendant's Statement # 8:**

1.  Objection: the cited passage stops in the middle of a sentence on Tr. 84, with relevant information excluded in the carryover sentence on Tr. 85.  Defendant has failed to cite line numbers, so it is impossible to tell for certain the exact passage on which it relies.

2.  Admitted that DeNaut stated: "The Media Group was viewed as an underperforming group, as other groups were in that time period," DeNaut Tr. 84, lines 14-15,  and that he also stated in a sentence fragment on Tr. 84, lines 20-22:  "So media would have been thought of in

the same as other – other underperforming groups and of the nine or ten groups that were in the Americas . . . ."

3. Disputed as to any conclusion that the Media Group was "top-heavy", because nothing in the cited materials supports that part of the statement.

4. Disputed as to what Brand concluded, because nothing in the cited materials provide any information on that.

5. To the extent that the Media Group was ever considered top-heavy, there is a disputed issue of material fact whether it was the promotion of four young Vice Presidents to Directors that made the Media Group top-heavy.  See Part B(7) at pp. 45-53 below.  This discussion is incorporated by reference herein.

6. There is a disputed issue of material fact as to whether DeNaut had sufficient knowledge about the Media Group to be able to testify about it.  See Part B(3) at p. 40 below. This discussion is incorporated by reference herein.

7. There is a disputed issue of material fact whether there were any problems with the Media Group different or more serious than those of any other product or industry group within Corporate Finance for the Americas, with its very broad range of industry groups.  See Part B(4) at pp. 4-43 below.  This discussion is incorporated by reference herein.

5. There is a disputed issue of material fact whether there was anything unique about the mandate of DeNaut and Brand that would support any inference as to the Media Group.  See Part B(5) at p. 43 below.  This discussion is incorporated by reference herein.

6. To the extent that Defendant seeks to draw any inference from the cited document as to Graves in particular, there is a disputed issue of material fact, as to any inference from the cited transcript pages going beyond the wording of Defendant's Statement #8, that Plaintiff did

not have adequate wallet size, fee-paying clients, or prospects of revenue, in that it is undisputed that Defendant transferred Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors.  See Parts C(2) through C(6) hereto, at pp. 89-106 below.  This discussion is incorporated by reference herein.

7.  To the extent that Defendant seeks to draw any inference from the cited document as to Graves in particular, there is also a disputed issue of material fact, as to any inference from the cited transcript pages going beyond the wording of Defendant's Statement #8, whether Defendant's transfers of Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors, set Plaintiff up to fail.  See Part B(8) at pp. 53-54 below.  This discussion is incorporated by reference herein.

8.  Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

9.  There is a disputed question of material fact whether, Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

10.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**9.** **Defendant's Statement # 9:**

9. In July 2003, DeNaut and Brand and other members of the Business Planning and Development Committee, or BPAD, met to formulate a plan for improving the performance of the Media Group. (De Baun Aff., Exh. G, pp. DB001204 - 001247.)

**Plaintiff's Response to Defendant's Statement # 9:**

1. Disputed.  The cited document (Doc. 138-2, Acrobat pp. 1-45), is simply a document entitled "Business Planning & Development / Industry Group Strategic Summary: Media / July 2003."  It does not reflect any meeting.  There is no associated e-mail attaching this document and mentioning a meeting.  Defendant did not produce any e-mail attaching this document and mentioning a meeting.  Seymour Declaration, ¶ 15.

2. There is a disputed issue of material fact as to whether Defendant's failure to produce the complete set of documents requested in Plaintiff's 2007 RFPs 9 and 10 for any period earlier than July 2003, when they were requested in discovery, would allow the inference that Defendant was cherry-picking documents to support its theory of the case, and failing to produce documents undermining its theory of the case.  See Part B(11) at pp. 56-58 below.

3. There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**10.**  **Defendant's Statement # 10:**

10. BPAD recognized that the Media Group had experienced one of the more severe fee declines over the past three years – 33% per year. The group listed as open issues the fact that the group was overstaffed and top heavy, and the need to reconsider the reassignment of underperforming accounts, including Gannett Corporation, to other bankers. (De Baun Aff. Exh. G, pp. DB001205-06, DB001224.)

**Plaintiff's Response to Defendant's Statement # 10:**

**(a).  First part of statement:** "BPAD recognized that the Media Group had experienced one of the more severe fee declines . . . ."

**Response:**

1.  Disputed.  Nothing on the cited pages says anything about the Media Group having a fee decline, or about the decline in the Media Group being worse than the decline in any other group, or about the severity of the decline.

**(b).  Second part of statement:** "BPAD recognized that the Media Group had experienced one of the more severe fee declines *over the past three years* . . . ."  (Emphasis added.)

**Response:**

1.  Disputed.  Nothing on the cited pages says anything about the Media Group having a fee decline over three years, or about the three-year decline in the Media Group being worse than the three-year decline in any other group, or about the severity of the three-year decline.

2.  An uncited page, DB 1209 (Doc.  138-2, Acrobat p. 7), states:  These figures are contradicted by the remainder of the document.  Page DB 1211 (Doc.  138-2, Acrobat p. 9), entitled

3.  The fee decline in Defendant's statement has nothing to do with Deutsche Bank revenue.  Page DB 1211 (Doc.  138-2, Acrobat p. 9), entitled " " says:



reasonable inference from these figures in Defendant's own document is that Defendant's Media Group was doing quite well from 2000 through the first quarter of 2003, and was on track to do even better.

**(c). Third part of statement:** "BPAD recognized that the Media Group had experienced one of the more severe fee declines over the past three years – 33% per year."

**Response:**

1. Disputed.  Nothing on the cited pages says anything about the Media Group having a 33% fee decline, or a 33% fee decline over three years, or about a 33% three-year fee decline in the Media Group being worse than the three-year percentage decline in any other group.

**(d). Fourth part of statement:** "The group listed as open issues the fact that the group was overstaffed and top heavy . . . ."

**Response:**

1. Disputed.

2. There is a disputed issue of material fact as to whether the Media Group was "top heavy," so as to justify Graves' termination in whole or in part.  There is also a disputed issue of material fact whether it was the promotion of four young Vice Presidents to Directors that made

---

[2] Calculation of counsel.
[3] Calculation of counsel.

the Media Group top-heavy.  See Part B(7) at pp. 45-53 below.  This discussion is incorporated by reference herein.

**(e).  Fifth part of statement:** "The group listed as open issues . . . the need to reconsider the reassignment of underperforming accounts, including Gannett Corporation, to other bankers."

**Response:**

1.  Disputed.  Page DB 1206 (Doc.  138-2, Acrobat p. 4) states: "██████████████████
████████████████████████████████████████ Page DB 1224 (Doc.  138-2, Acrobat p. 22) contains the identical statement.

2.  There is no support for the statement that Gannett Corporation is an "underperforming account," and the document shows that the opposite is true.

3.  There is no support for the statement that there was a "need to reconsider the reassignment of underperforming accounts".

4.  To the extent that Defendant seeks to draw any inference from the cited document as to Graves in particular, it is undisputed that Defendant transferred Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors.  See Parts C(2) through C(6) hereto at pp.89-106 below.  This discussion is incorporated by reference herein.

5.  There is a disputed question of material fact whether, Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

6.  There is a disputed question of material fact whether, prior to Defendant's final decision to fire Graves, Defendant expected the business and fees of the Media Group to grow, instead of decreasing, and whether Defendant's explicit and implicit representations to the contrary were pretexts for age discrimination.  See Part B(17) at pp. 79-80 below.  This discussion is incorporated by reference herein.

7.  There is a disputed question of material fact whether, prior to Defendant's final decision to fire Graves, Defendant expected the business and fees of the broadcasting "space" in the Media Group to grow, instead of decreasing and whether Defendant's explicit and implicit representations to the contrary were pretexts for age discrimination.  See Part B(18) at p. 81 below.  This discussion is incorporated by reference herein.

8.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**11.  Defendant's Statement # 11:**

11. The materials BPAD reviewed as of January 2003 reflected that Graves was the MD with the lowest revenue for the period of 2001 to 2002 and the lowest market share. (De Baun Aff. Exh. G, p. DB001229.)

**Plaintiff's Response to Defendant's Statement # 11:**

1.  Admitted that page DB 1229 in the referenced document, ███████████████

███████████████████████████████████████████████████

███████████████████████

2.  Admitted that it represents that Graves had ██████████████████████████

3.  Admitted that Amling, Carey. Morris and Paul are stated as having had higher ████████

████████████  Disputed, in that Maurus is stated as having had had ████████████████

██████████.”  Disputed, in that the young Directors—which they were, by July 2003—have

█████ in the column for '█████████████████████

    4.  Admitted that it represents that Graves had a '███████████████████

    5.  Admitted that Amling, Carey. Morris and Paul are stated as having had higher '████

█████████

    6.  The figures for '█████████████' are simply the result of dividing the figures for

████████████████████' by the figures for '██████████████████' [4]  Any error in either

of these latter two columns will produce an error in the column for '████████████ ”

    7.  Disputed as to the accuracy of the statement.  The statement represents that Graves

had only ██████████████████████████.”  There is no testimony explaining the

information on this page.

    8.  There is a disputed issue of material fact whether the comparison should be limited to

Managing Directors alone.  None of the younger Vice-Presidents promoted to Director in April

2003, and retained in their jobs when Plaintiff was terminated, earned any revenues for

Defendant in 2001-2002.  Maurus and Triffo, who were younger Directors, are both stated as

having had had '██████████████████ ”

    9.  There is a disputed issue of material fact whether any of the individual figures on p.

DB 1229 of this document are correct.  See Part B(12) on pp. 58-59 below.  This discussion is

incorporated by reference herein.

    10.  There is a disputed issue of material fact whether Defendant's assessment of

Plaintiff's performance as of February 2002 for the performance year 2001, and whether

Defendant's assessment of Plaintiff's performance as of February 2003 for the performance year

---

[4] Calculation of counsel.

2002, were sufficiently superior to its assessment of other Managing Directors' and Directors'

performance in those periods that Defendant's many assertions that Graves' performance was

poor, and that Graves' performance was the worst of all the Managing Directors or of all bankers

in the Media Group, were false.  See Part B(13) on pp. 60-63 below.  This discussion is

incorporated by reference herein.

    11.  There is a disputed issue of material fact whether Defendant's officials were

contemplating firing Graves a year before the January 14, 2004 meeting at which Amling

informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion

is incorporated by reference herein.

    12.  It is undisputed that Defendant transferred Plaintiff's accounts with wallet size, fee-

paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to

other Managing Directors.  See Parts C(2) through C(6) hereto at pp. 89-106 below.  This

discussion is incorporated by reference herein.

    13.  There is a disputed issue of material fact whether DeNaut admitted age

discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part

B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

    **12.  Defendant's Statement # 12:**

    12.  In 2003, Amling met with Graves to advise him that his 2002 revenue was
substantially below the target set for MDs and that, should this trend continue in 2003, Graves's
job might be in jeopardy. (Transcript of the Deposition of Jeffrey Amling (the "Amling Tr.") pp.
117-20; De Baun Aff. Exh. H.)

    **Plaintiff's Response to Defendant's Statement # 12:**

    **Part (a)**

    1. Disputed.  Nothing in the cited source states that Amling told Graves "that his 2002

revenue was substantially below the target set for MDs . . . ."

2. Defendant's Franchise Revenue & Pipeline Report for January 15, 2003, which Defendant altered (by adding lines for totals) prior to producing it to the EEOC as Attachment C to its November 5, 2004 Position Statement, shows ███████████████████████ ████████████████ Seymour Declaration, ¶ 35, Exhibit 32.

3. Directors and Managing Directors has the same revenue target.  January 10, 2011 Deposition of Daniel Graves, Seymour Declaration ¶ 5, Exhibit 4, Tr. 55, lines 15-21.

4. In 2002, the revenue target was $10 million.  In 2003, the revenue target was increased to $15 million.  *Id.*, Tr. 163 line 16 to Tr. 164 line 6.

**Part (b)**

1. The cited source does not say that Graves was ever told his job might be in jeopardy.

2. However, Amling clearly stated that he did not recall whether he ever gave Graves a specific warning:

```
17      Q.   Okay.  Now my question that I had asked
18   you before you started talking about being a softie and
19   all that --
20      A.   Yeah.
21      Q.   -- my question was had you ever thought
22   of giving Mr. Graves a more specific heads up so that
                           120
 1   he could start looking for a job at another bank?
 2      A.   Can't recall.
 3      Q.   Do you think you might have but --
 4      A.   Well, I testified that I had a specific
 5   discussion with him about what the bank's guidelines
 6   were for managing director revenue targets, advised him
 7   that his targets were below that, materially below that
 8   level, and that his results were materially below that
 9   target level, and it looked to me like the landscape
10   occurring within the media practice was a continuing
11   one of deterioration, so that he might, he needs to be
12   advised that if trends continue and his own performance
13   continued between 2003, 2002 and 2003, that he should
14   be aware of that likelihood.
```

- 16 -

January 14, 2011 Deposition of Jeffrey Amling, Tr. 119 line 17 to Tr. 120 line 14.

      3.  Graves' testimony was that Amling never had a conversation with him in which

Amling warned him he would be fired if he did not meet his 2003 target:

> 3 Q. The -- was the $15 million target
> 4 explained to you? Was it articulated to you that
> 5 you had a $15 million target?
> 6 A. Yes.
> 7 Q. And did you understand that if you
> 8 didn't hit that $15 million target, you'd be
> 9 canned?
> 10 A. I don't think there was a direct link
> 11 between if you didn't hit the $15 million target,
> 12 you would be canned. In fact, I don't ever recall
> 13 having a conversation with my supervisor, Jeff
> 14 Amling, that if I didn't do this or this or this,
> 15 I would be canned.

January 10, 2011 Deposition of Daniel Graves, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 164

lines 3-15.

      4. Graves further testified:

> 17 Q. You say in -- in your complaint that
> 18 you "didn't have any earlier notice that your
> 19 employment was In jeopardy."
> 20 Is is that true? You -- you had
> 21 no knowledge that you might be terminated prior to
> 22 Mr. Amling telling you you were terminated on
> 23 Jan- January 14th?
> 24 A. That's true.
> 25 Q. And -- and Mr. Amling never spoke to
>           236
> 1 - DANIEL B. GRAVES -
> 2 you in either in a performance review or when
> 3 you got your bonus communication about your
> 4 prospects for further employment?
> 5 A. We never discussed that I would be
> 6 terminated.
> 7 Q. Did he tell you at any point in
> 8 either late 2002 or early 2003 that there was a
> 9 a large contraction in the media business, and
> 10 that because your revenue was below expected

11 levels that you might be let go?
12 A. No.
13 Q. Never had that conversation with
14 Mr. Amling?
15 A. That I can recall.

*Id.*, Tr. 235 line 17 to Tr. 236 line 15.

5.   Based on ¶¶ 2-4 above, there is a disputed issue of material fact whether Amling ever gave Graves a warning "that his job might be in jeopardy."

6.   There is a disputed issue of material fact whether Defendant's assessment of Plaintiff's performance as of February 2002 for the performance year 2001, and whether Defendant's assessment of Plaintiff's performance as of February 2003 for the performance year 2002, were sufficiently superior to its assessment of other Managing Directors' and Directors' performance in those periods that Defendant's many assertions that Graves' performance was poor, and that Graves' performance was the worst of all the Managing Directors or of all bankers in the Media Group, were false and a pretext for age discrimination.  See Part B(13) on pp. 60-63 below.  This discussion is incorporated by reference herein.

7.   It is undisputed that Defendant transferred Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors.  See Parts C(2) through C(6) hereto, at pp. 89-106 below.  This discussion is incorporated by reference herein.

8.   Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

9.   There is a disputed issue of material fact whether Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment

Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to

recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were

intended to create pretexts for age discrimination.

**13.  Defendant's Statement # 13:**

13. In May 2003, Amling was approached by senior management to clarify whether he
intended to continue employing both Graves and Gregory Paul, another MD who, like Graves,
worked for broadcasting clients. Amling advocated retaining both bankers. (Amling Tr., p. 235-
239.)

**Plaintiff's Response to Defendant's Statement # 13:**

1.  Agreed as to the second sentence, that Amling wanted to keep both Graves and Paul in

the Media Group.  Amling Tr. 238 lines 1-21, Seymour Declaration, ¶ 50, Exhibit 46.  See also

the May 23, 2003 E-Mail from Felicia Ivey, Vice President Human Resources, to Marc Pfeffer,

Brand, and DeNaut, Amling Dep. Exh. 37, DB102351 to DB102352, Seymour Declaration, ¶ 53,

Exhibit 49, stating in part:



2.  Disputed in part, because nothing in this passage states that there was any discussion

about broadcasting clients or who worked on broadcasting clients.

3.  Disputed, in that Exhibit K[5] to the De Baun Affirmation, although incomplete, shows

the following:

---

[5] Filed under seal by Defendant without authorization of the Court, in violation of ¶ 6 of
the November 19, 2007 Stipulation of Confidentiality entered by the Court (Doc.  22).



4.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**14.  Defendant's Statement # 14:**

14.  Graves's revenues continued to decline throughout 2003 so that, by December 2003, DBSI's records showed that he had the lowest actual and projected revenue of any MD in the Media Group. (De Baun Aff., Exh. J, pp. DB070617 – 070624; Exh. K, pp. DB000117 – 000129.)

**Plaintiff's Response to Defendant's Statement # 14:**

1.  Disputed.

2.  Exhibit J does not contain any information on projected revenue.

3.  Exhibit J shows that Triffo had lower figures than Graves in all four columns of revenue data.  Pages DB 70623 and DB 70624, lines 84 for Triffo and 86 for Graves.

4.  Exhibit J shows that the figures for Malcom Morris and for Graves were virtually identical in the four columns of revenue data:

| Name | Source | Controlling FV @ Oct 31 | Controlling FV @ Sept 30 | P&S FV @ Sept 30 | P&S GCF @ Sept 30 |
|---|---|---|---|---|---|
| Morris | DB 70621-DB 70622, line 37 | 2,497 | 2,493 | 845 | 422 |
| Graves | DB 70623-DB 70624, line 86 | 2,468 | 2,468 | 403 | 403 |

5.  Defendant did not produce any information in discovery showing that the small differences shown in ¶ 4 above were material to Defendant in making personnel decisions.

6.  There is a disputed issue of material fact whether Defendant's officials altered the relative rankings of bankers and lowered Graves' ranking, to justify the firing of Graves, and to create a pretext for age discrimination.  See Part B(15) on pp. 65-67 below.  This discussion is incorporated by reference herein.

7.  There is a disputed issue of material fact whether Defendant's assessment of Plaintiff's performance as of February 2002 for the performance year 2001, and whether Defendant's assessment of Plaintiff's performance as of February 2003 for the performance year 2002, were sufficiently superior to its assessment of other Managing Directors' and Directors' performance in those periods that Defendant's many assertions that Graves' performance was poor, and that Graves' performance was the worst of all the Managing Directors or of all bankers in the Media Group, were false and a pretext for age discrimination.  See Part B(13) on pp. 60-63 below.  This discussion is incorporated by reference herein.

8.  It is undisputed that Defendant has admitted lying to the U.S. Government in order

to further mortgage fraud and tax fraud.  See Part C(1) on pp. 87-89 below.  This discussion is incorporated by reference herein.

9. Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

10.  It is undisputed that Defendant transferred Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors.  See Parts C(2) through C(6) hereto, pp. 89-106 below.  This discussion is incorporated by reference herein.

11.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

### 15.  **Defendant's Statement # 15:**

15.  In a meeting of the Promotion and Performance Committee in November 2003, Graves was ranked sixth of the seven Media MDs, last in the Corporate Finance MD ranking; second to lowest and lowest for quality, quantity and culture; and lowest in the overall regional ranking. (De Baun Aff., Exh. J, pp. DB070617 - 070624; Exh. K, pp. DB000117 - 000129.)

**Plaintiff's Response to Defendant's Statement # 15:**

1.  Disputed, in that Exhibit J to the De Baun Affirmation is a draft document as of November 14, 2003, not a final document.  Exhibit J, p. 1 (DB 70616, Doc.  138-2, Acrobat p. 58).

2.  Admitted that this draft document and ▇▇▇▇▇▇▇ listed Graves as having a Group Head ranking of 5th of the 6 Managing Directors in the Media Group as of November 14, 2003, DB 70623, because this reflects Amling's juggling of the rankings to increase Paul's ranking

from 6th to 3rd while leaving Graves at 5th.[6]   Amling changed his ranking *one day* after another

e-mail listed Graves as a pending termination.[7]

     3.   Disputed that Graves was "last in the Corporate Finance MD ranking," because

Exhibit J is a draft document, not a final document, and because Exhibit J stated only that

"Jacques, Jim & Monte"—not an entity called "Corporate Finance"—rated Graves as 41st, and

the redactions of names make it impossible to determine whether this document included all

Managing Directors or not.

     4.   Disputed that Graves was "second to lowest and lowest for quality, quantity and

culture" because this follows the reference to Corporate Finance MD Rankings, and:

        (a) Graves was ranked C for Quality, one other was ranked D, and nine others

were ranked C;

        (b) Graves was ranked C for "Quant," nine others were ranked D, and ten others

were ranked C;

        (c) Graves was ranked D for "Culture," and three others were ranked D.

     4.   Exhibits J and K were created *after* the decision to terminate Graves had already been

made, and thus could not have been used to make the decision.[8]



5.  Exhibit K[9] to the De Baun Affirmation does not cure the deficiencies of Exhibit J except that it does not seem on its face to be a draft. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

6.  There is a disputed issue of material fact whether Defendant's assessment of Plaintiff's performance as of February 2002 for the performance year 2001, and whether Defendant's assessment of Plaintiff's performance as of February 2003 for the performance year 2002, were sufficiently superior to its assessment of other Managing Directors' and Directors' performance in those periods that Defendant's many assertions that Graves' performance was poor, and that Graves' performance was the worst of all the Managing Directors or of all bankers in the Media Group, were false and a pretext for age discrimination.  See Part B(13) on pp. 60-63 below.  This discussion is incorporated by reference herein.

7.  It is undisputed that Defendant transferred Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors.  See Parts C(2) through C(6) hereto, at pp. 89-106 below.  This discussion is incorporated by reference herein.

8.  There is a disputed issue of material fact whether Defendant's officials altered the relative rankings of bankers and lowered Graves' ranking, to justify the firing of Graves, and to create a pretext for age discrimination.  See Part B(15) on pp. 65-67 below.  This discussion is incorporated by reference herein.

---

[9] Filed under seal by Defendant without authorization of the Court, in violation of ¶ 6 of the November 19, 2007 Stipulation of Confidentiality entered by the Court (Doc. 22).

9.   There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

### 16.   **Defendant's Statement # 16:**

16.  Towards the end of 2003, Amling and Brand discussed downsizing the Media Group, specifically eliminating either Graves's or Paul's position. Both Amling and Brand believed that the broadcasting sector, in which both Graves and Paul has [sic] a number of significant client relationships, was no longer able to support two MDs. (Amling Tr., pp. 81-82.)

### **Plaintiff's Response to Defendant's Statement # 16:**

1.  Disputed, in that the cited transcript states that this discussion occurred at the end of 2002 or the beginning of 2003.

2.  It is undisputed that Defendant's assertions that Graves was confined to the "television broadcasting space," and therefore only he and Gregory Paul, who was older than Graves and the only one of the two who had Cinema experience, could be considered for layoff, were untrue. See Part (C)(7) at pp. 106-115 below.  This discussion is incorporated herein by reference.

3. It is undisputed that Graves worked at DBSI in many areas other than television broadcasting.  See Part (C)(7)(b) at pp. 109-111 below.  This discussion is incorporated herein by reference.

4. It is undisputed that had Cinema experience.  See Part (C)(7)(c) at pp. 111-113 below. This discussion is incorporated herein by reference.

5.  It is undisputed that Graves had other types of experience.  See Part (C)(7)(d) at p. 113 below.  This discussion is incorporated herein by reference.

6.  It is undisputed that other bankers had television broadcasting clients.  See Part (C)(7)(e) at pp. 113-114 below.  This discussion is incorporated herein by reference.

7.  It is undisputed that layoff possibilities included the younger Directors, not just the older Managing Directors.  See Part (C)(7)(g) at p. 115 below.  This discussion is incorporated herein by reference.

8. Defendant's officials were contemplating firing Graves a year or more before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

9. There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**17.  Defendant's Statement # 17:**

17. In late December, early January 2004, a [sic] Amling and Brand decided that, as the MD with the lowest actual and projected revenue in the Media Group, Amling would be laid off, and his responsibilities divided among the remaining staff. (Transcript of the Deposition of Jacques Brand (the "Brand Tr.") p. 36; De Baun Aff., Exh. M, pp. DB 046494 - 046497; De Baun Aff. Exh. J, pp. DB 070616 - 070624; De Baun Aff., Exh. K, pp. DB 000117 - 000129.)

**Plaintiff's Response to Defendant's Statement # 17:**

1.  Disputed.  None of the cited materials discuss Amling's layoff.

2.  Plaintiff provides the following on the assumption that Defendant intended to refer to Graves' layoff, not Amling's layoff.

3.  Admitted that all of Graves' accounts that had not previously been re-assigned to younger bankers or other bankers were re-assigned to them as a result of his termination, as alleged in the Complaint.

4.  Disputed as to timing. A final decision to terminate Graves had been made by or before December 8, 2003.  ███████████████████████████████████

███████████████████████████████████████████████████, Seymour

Declaration, ¶ 59, Exhibit 55.

5. Disputed as to Graves having the lowest actual and projected revenue in the Media Group.  The cited testimony from Brand does not say that.  Plaintiff's Response to Defendant's Statement #15 discusses the showings in the draft document subject to change in Exhibit J and the incomplete document that is Exhibit K, and is incorporated herein by reference.  Exhibit M to the De Baun Affirmation contains no data on revenue, so it does not contradict the showings in that Response.  Exhibit M is an April 8, 2003 Human Resources document of unknown reliability showing rankings from an unknown source, without any statement as to whether they were draft or final, and in any event shows that Morris was rated below Graves.

6. There is a disputed issue of material fact whether Brand's memory was so poor that a jury would not be required to believe his assertion that Graves was the lowest performer in the Media Group.  See Part B(14) on pp. 63-65 below.  This discussion is incorporated by reference herein.

7. There is a disputed issue of material fact whether Defendant's assessment of Plaintiff's performance as of February 2002 for the performance year 2001, and whether Defendant's assessment of Plaintiff's performance as of February 2003 for the performance year 2002, were sufficiently superior to its assessment of other Managing Directors' and Directors' performance in those periods that Defendant's many assertions that Graves' performance was poor, and that Graves' performance was the worst of all the Managing Directors or of all bankers in the Media Group, were false and a pretext for age discrimination.  See Part B(13) on pp. 60-63 below.  This discussion is incorporated by reference herein.

8. There is a disputed issue of material fact whether Defendant's officials altered the relative rankings of bankers and lowered Graves' ranking, to justify the firing of Graves, and to

create a pretext for age discrimination.  See Part B(15) on pp. 65-67 below.  This discussion is incorporated by reference herein.

9.  Defendant's officials contemplated firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

10.  There is a disputed issue of material fact whether Defendant's transfers of Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors, set Plaintiff up to fail.  See Part B(8) at pp. 53-54 below.  This discussion is incorporated by reference herein.

11.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

### 18.  Defendant's Statement # 18:

18.  At the time of the decision, Graves was 41 years old and Paul was 46. (De Baun Aff. Exh. N, pp. DB 046520 - 046523; Exh. O, p. Graves000038; Pl. Tr., p. 289.)

### Plaintiff's Response to Defendant's Statement # 18:

6..  Conditionally admitted.  If the undefined "time of the decision" refers to "late December, early January 2004," a period referenced in Defendant's Statement #17, Graves was just a month short of his 42nd birthday.

### 19.  Defendant's Statement # 19:

19. Prior to communicating the termination decision to Graves, his supervisors inquired whether it might be possible to transfer of [sic] Graves to another group. Specifically, Amling, as well as Brand and DeNaut, approached Ben Griswold, the head of the Large Cap Group to see if there might be an opportunity for Graves there. That opportunity did not materialize. (Amling Tr., p. 79-80.)

**Plaintiff's Response to Defendant's Statement # 19:**

1. Disputed.  Brand sent a December 9, 2003 e-mail to Thomas Gahan, stating in part 

 Seymour Declaration, ¶ 60, Exhibit 56.

(See below.)

2. This creates a disputed issue of material fact whether Brand tried in good faith to explore such a transfer, or effectively blocked such a transfer.

3. Other e-mails from Brand dispute the substance of his December 9, 2003 e-mail to Thomas Gahan:

(a) 

DB 71042, Seymour Declaration, ¶ 61, Exhibit 57.

(b)  DB 71045-71046, Seymour Declaration, ¶ 62, Exhibit 58.

(c) On December 8, 2003, Kerri Donovan forwarded a message from Brand to DeNaut, DB 71049-71050, Seymour Declaration, ¶ 63, Exhibit 59, stating in part:



(d) On December 8, 2003, Brand sent an e-mail to Elizabeth Lieberman and to DeNaut, stating in part: ███████████████████████████ ███████████████████ DB 71052, Seymour Declaration, ¶ 64, Exhibit 60.

4. Defendants' own documents thus raise disputed questions of material fact (a) whether Brand lied to Gahan and told the truth to DeNaut, Kerri Donovan and Elizabeth Lieberman (thus supporting Defendant's Statement # 19), or (b) whether Brand told the truth to Gahan and lied to DeNaut, Kerri Donovan and Elizabeth Lieberman (thus refuting Defendant's Statement # 19).

5. In addition, Brand's December 9, 2003 e-mail to Gahan stated in part:



December 9, 2003 e-mail to Thomas Gahan, DB 71054, Seymour Declaration, ¶ 60, Exhibit 56.

6. Brand stated to Elizabeth Lieberman on December 9, 2003:



December 9, 2003 e-mail thread from Kerri Donovan to Brand, and from Brand to Elizabeth Lieberman with cc to Donovan, on firing Graves, DB 71058, Seymour Declaration, ¶ 59, Exhibit 55.

7. There is a disputed issue of material fact whether Brand actually held the views about Graves expressed in his December 9, 2003 e-mail to Gahan, since he says he was seeking a transfer that would have kept Graves working for Defendant.

8. There is also a disputed question of material fact whether Defendant could have transferred, but failed or refused to transfer, Graves to a position in its Leveraged Finance unit, or to a position in its Mergers & Acquisitions unit, or to another unit, and failed or refused to reconsider its decision, or to give him a "soft landing," because of age discrimination and in

retaliation for Graves' having internally complained to DeNaut and Brand about Amling's remark that Amling needed his accounts for younger bankers.  See Part B(16) at pp. 68-79 below.  This discussion is incorporated herein by reference.

9.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

### 20.  **Defendant's Statement # 20:**

20. Graves's employment was terminated on January 30, 2010, as was the employment of all of the employees whose positions were selected for that reduction in force ("RIF"). (De Baun Aff., Exh. R, p. DB000044.)

### **Plaintiff's Response to Defendant's Statement # 20:**

1.  Disputed in every respect.

2. Plaintiff was terminated in 2004, not 2010.

3. Plaintiff's last day on payroll was January 31, 2004.  De Baun Affirmation, Exh, R (an unaccepted draft severance agreement), p. DB 44.

4. The cited document is only Defendant's offer of a severance agreement to Graves.  It shows no information about any others.

5. Graves was the only banker in the Media Group terminated in January 2004, so there are no other terminations from the Media Group.

6. Defendant refused to provide discovery on the termination of bankers from parts of Defendant outside the Media Group.  See Plaintiff's Response to Defendant's Statement # 19 at pp. 29-31 above, setting forth Defendant's refusal to provide discovery in response to Plaintiff's First Request for Production No. 6.  See also Part B(11) at pp. 56-58 below, setting forth Defendant's refusal to provide discovery in response to Plaintiff's First Request for Production Nos. 9 and 10.

7. Having refused to produce discovery on the subject, Defendant cannot be allowed to contend that what happened to Graves is also what happened to others.

8. Also disputed because Elizabeth Chang had been scheduled to leave the Media Group and transfer to the Leveraged Finance group, and this was being arranged at the same time as Graves' termination was being arranged.  December 8, 2003 e-mail from Elizabeth Lieberman to Brand and DeNaut ███████████████████████████████, DB 106206, Seymour Declaration, ¶ 66, Exhibit 62.

9. ███████████ was allowed to transfer out of the Media Group on ███████, not January 31, 2004.  "███████████████████████████████████ ███████ Seymour Declaration, ¶ 17, Exhibit 16.  In this respect, she was treated more favorably than Graves.

10. ██████ was still employed by Defendant on the date bonuses were declared in 2004 for the performance year 2003, and ███████████ ████████████████████ Seymour Declaration, ¶ 24, Exhibit 21, p. DB 108269.  In this respect, she was treated more favorably than Graves.

11. ██████████ was allowed to transfer out of the Media Group on ███████ not January 31, 2004.  "Media 04 Transfers," Attachment N to Defendant's Position Statement to the EEOC, Seymour Declaration, ¶ 17, Exhibit 16.  In this respect, she was treated more favorably than Graves.

12. ██████ was still employed by Defendant on the date bonuses were declared in 2004 for the performance year 2003, and ███████████████████████████ Seymour Declaration, ¶ 30, Exhibit 27, p. DB 108291.  In this respect, she was treated more favorably than Graves.

13. ███████████████████████████  ███████████. "Media 04 Terms," Attachment M to Defendant's Position Statement to the EEOC, Seymour Declaration, ¶ 16, Exhibit 15.  In this respect, he was treated more favorably than Graves.

14. █████ was still employed by Defendant on the date bonuses were declared in 2004 for the performance year 2003, and █████████████████████████████████ Seymour Declaration, ¶ 22, Exhibit 19, p. DB 108273.  In this respect, he was treated more favorably than Graves.

15. ███████████████████████████. "Media 04 Terms," Attachment M to Defendant's Position Statement to the EEOC, Seymour Declaration, ¶ 16, Exhibit 15.  In this respect, he was treated more favorably than Graves.

16. ██████ was still employed by Defendant on the date bonuses were declared in 2004 for the performance year 2003, and ████████████████████████ ████ Seymour Declaration, ¶ 23, Exhibit 20, p. DB 108277.  In this respect, he was treated more favorably than Graves.

17. █████████████████████████████████ "Media 04 Terms," Attachment M to Defendant's Position Statement to the EEOC, Seymour Declaration, ¶ 16, Exhibit 15.  In this respect, he was treated more favorably than Graves.

18. ██████ was still employed by Defendant on the date bonuses were declared in 2004 for the performance year 2003, and █████████████████████████████████ Seymour Declaration, ¶ 25, Exhibit 22, p. DB 108283.  In this respect, he was treated more favorably than Graves.

19.  Graves appealed the amount of his severance payment offered by Defendant, and the appeal was denied.  January 10, 2011 Deposition of Daniel Graves, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 278, lines 9-14:

>  9 And because of that, I did not hear
> 10 back from Mr. Brand within 48 hours of the meeting
> 11 that I had; I did not get a transfer; I did not
> 12 get the capability to stay on; I did not get a
> 13 bonus; I did not get my appeal of severance
> 14 proposal. It was denied; I did not get that.

20. Chang, by contrast, was allowed to negotiate the amount of her severance payment and benefits.  January 28, 2011 Deposition of Elizabeth Chang, Seymour Declaration, ¶ 67, Exhibit 63, Tr. 35 line 21 to Tr. 39 line 14.  Mr. Miller, who interposed numerous objections, was hired by Defendant at the suggestion of in-house counsel to "represent" Ms. Chang in her deposition, although she had no personal interest in the case, she had not been employed by Defendant for years, she did not know those attorneys, they had not previously represented her, she paid no fees to them, and she did not expect to receive a bill form them.  Previously, the Sidley Austin firm had offered to "represent" her, at the expense of the Defendant.  *Id.*, Tr. 23 line 9 to Tr. 33 line 9.

21.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp. 43-45 below.  This discussion is incorporated by reference herein.

**21.  Defendant's Statement # 21:**

21. Graves, like all of the other selected employees, was offered a severance package in exchange for a release of claims against the Bank. (De Baun Aff., Exh. R, pp. DB000044 - 000049.)

**Plaintiff's Response to Defendant's Statement # 21:**

1.  Admitted that Graves was offered a severance plan.

- 34 -

2.  Disputed that Graves was treated like other employees.

3.  Plaintiff adopts his response to Defendant's Statement # 20, ¶¶ 4-20, and incorporates it herein.

**22.  Defendant's Statement # 22:**

22.  Under the terms of the DBSI bonus plan, Graves did not receive a bonus in 2004 because he was not actively employed on the date such bonuses were paid out.  (De Baun Aff., Exh. E, pp. DB 000189-000191.)

**Plaintiff's Response to Defendant's Statement # 22:**

1.  Admitted that Graves did not receive a bonus for his work in 2003.

2.  Disputed that the denial of the bonus was because of the "terms of the DBSI bonus plan."  There is a disputed material issue of fact as to whether defendant's condition on eligibility for bonuses, and its assertions of absolute discretion over the issuance of bonuses and their amounts, are correct.  This condition and these assertions have been found not to be controlling in binding arbitrations by other former employees of Defendant.  See Part B(1) on pp. 37-38 below.  This discussion is incorporated by reference herein.

3.  There is a disputed issue of material fact as to whether defendant's failure to produce documents on its actual bonus practices as applied to employees in 1999-to-present time period, and its failure to produce documents on the arbitration awards discussed Part B(1) below, mean that its condition was not followed in practice.  See Part B(2) on pp. 38-39 below.  This discussion is incorporated by reference herein.

4.  Further, Defendant's effort to draw an inference of non-existence from its own failure to produce documents, where its response to discovery did not assert that no such documents existed and merely asserted that defendant should not have to go to the bother of producing the documents, is impermissible.  See Part B(2) on p. 38-39 below.  This discussion is incorporated by reference herein.

5.  There is a disputed issue of material fact whether DeNaut admitted age discrimination in layoffs.  The evidence of record is subject to different inferences.  See Part B(6) at pp.43-45 below.  This discussion is incorporated by reference herein.

**23.  <u>Defendant's Statement # 23</u>:**

23. No employee who was selected for termination in the January 2004 RIF received a "soft landing" (De Baun Aff. Exh. N, pp. DB046520 - 046523.)

**Plaintiff's Response to Defendant's Statement # 23:**

1.   Disputed.  Exhibit N is a document never explained in a deposition, has no supporting materials, and what it purports to state is not self-evident.  Exhibit N is of unknown reliability.  It states, for example that Graves was off payroll on December 31, 2003, and was off premises on the same date.  Everything in the record shows those statements are wrong.

2. Exhibit N states that Graves was to receive 15 weeks of severance, but also shows that one employee received 33 weeks of severance, and another received 36 weeks of severance. Page DB 046521.  This is consistent with the monetary part of a "soft landing."

3.  Exhibit N does not show that any banker was denied a bonus for 2003.

4.  Exhibit N does not show whether any banker was denied the use of an office or a phone number for a period of months, to help them obtain other employment.

5.  Plaintiff adopts his response to Defendant's Statements # 20, ¶¶ 4-21, at pp. 31-34 above, 2, 9, and 22 as to the failure to produce documents, and incorporates them herein.

3.  Each of the younger bankers who was transferred to another part of Defendant, or who was allowed a period of time after January 31, 2004 before leaving the Defendant's employment, received a soft landing.

4.  A reasonable jury could from the above information that Graves was treated differently and less favorably than the younger bankers.

- 36 -

**B.      Plaintiff's Statement of Disputed Material Facts**

> **1.      There is a Material Dispute Over the Defendant's Power to Deny a Bonus Simply Because the Employee Was Not Employed on the Date the Bonuses Were Paid Out, and Over the Defendant's Assertions of Absolute Control Over the Issuance of Bonuses and Their Amount**

1. There is a disputed issue of material fact as to whether defendant's condition on eligibility for bonuses, and its assertions of absolute discretion over the issuance of bonuses and their amounts, are correct.  This condition and these assertions have been found not to be controlling in binding arbitrations by other former employees of Defendant.  See the following documents:

(a) *Galati v DBSI*, the September 8, 2004 NYSE Arbitration  Award, Doc 28017, Graves 110402-110403, finding that Mr. Galati's bonus was improperly set too low and awarding him an additional $42,200 in additional bonus.  Seymour Declaration, ¶ 6, Exhibit 5.

(b) *Johnston v DBSI*, the December 26, 2000 NASD Arbitration Award, Doc, 28018, Graves 110404-Graves 110409, of $2.9 million to Mr. Johnston, a former employee.  Seymour Declaration, ¶ 7, Exhibit 6.

(c) *Katz v DBSI*, the June 15, 2000 NASD Arbitration Award, Doc.  28020, Graves 110412-Graves 110419, of $72,500 on wrongful termination and bonus claims.  Seymour Declaration, ¶ 8, Exhibit 7.

(d) *Stoops v. DBSI*, the February 19, 2004 NYSE Arbitration Award, Doc.  28021, Graves 110420- 110421, finding that DBSI misconstrued the reason for the termination of Mr. Stoops to deny his bonus, and awarding him $114,211.39.  Seymour Declaration, ¶ 9, Exhibit 8.

(e) *Williams v. DBSI*, the April 12, 2001 NASD Arbitration Award, Doc.  28022, Graves 110422-110428, ordering that DBSI pay the claimant the unvested shares he was denied because he was no longer employed on the vesting date.  Seymour Declaration, ¶ 10, Exhibit 9.

(f) *Young v DBSI*, the November 19, 2002 NASD Arbitration Award, Doc. 28023, Graves 110429-110436, ordering that DBSI vest Plaintiff's pension and 401(k) benefits, pay claimant $52,506, pay claimant the benefits he was due under the GEP 1999 and 2000, pay claimant the nominal value of the note plus interest and pay claimant $50,000 in attorney's fees. Seymour Declaration, ¶ 11, Exhibit 10.

(g) *Zames v. DBSI*, the March 17, 2005 NYSE Arbitration Award, Doc. 28024, Graves 110437, ordering DBSI to pay $1,076,250.00 to claimant on claims of "breach of employment agreement, failure to pay compensation, defamation on his U-5 form, wrongful termination, violation of New York Labor Law, tortuous [sic] interference with prospective economic advantage and injurious falsehood." Seymour Declaration, ¶ 12, Exhibit 11.

2. There are thus disputed issues of material fact whether (1) that Defendant did not have the power to deny a bonus simply because a former employee was not employed on the date the bonuses were paid out; (2) that Defendant did not have unlimited discretion to deny a bonus; and (3) that Defendant did not have unlimited discretion over the amount of the bonus awarded.

## 2. Defendant's Failure to Provide Discovery on the Arbitration Awards, or on Bonus Awards for Directors and Managing Directors Outside the Media Group, Creates a Material Dispute of Fact

1. Plaintiff's First Set of Discovery Requests to Defendant requested documents such as the above arbitration awards and their underlying documents, as well as about the connection between bonus awards and termination dates, in Request for Production 56:

> 56.   A copy of all documents containing information about the bonus, date of defendant's notice of termination or of defendant's suggesting that the employee resign, transfer if any, transferee position and assignment and rate of pay if any, need for immediate departure if any, date(s) and amount(s) by which the employee's pay was changed, date the employee left the payroll if applicable, and date the employee no longer had office space and telephone service as if an employee of defendant if applicable, for any Director or Managing Director whose employment ended by termination, or resignation following a suggestion of resignation, on or after March 31, 1999, and who:
> >       a.  was or was not awarded a bonus for his or her last full year of work;

> b.  was or was not awarded a bonus for his or her current partial year of
> work;
>
> c.  sought review of the denial of a bonus; or
>
> d.  was or was not allowed to continue working, or using defendant's
> offices as if still an employee, at the same pay without duties, or with reduced
> duties, or at reduced or no pay, for any period of time.
>
> Defendant may respond to any part of this request by referring to the database produced
> in response to Request No. 14, to the extent that plaintiff can obtain the same information
> from that database, and should respond to this request to the extent that that data base
> does not contain the requested information.

Seymour Declaration, Exhibit 12, p. 27.  Defendant objected, and refused to produce such

documents.  Its responses to Requests 56(a), (b), and (c) were identical:

> DBSI objects to Request No. 56(a) to the extent it is vague, ambiguous, overly
> broad, unduly burdensome, calls for the production of numerous documents which have
> no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant
> information. For example, documents containing information regarding bonuses paid to
> employees other than the Directors and MDs in the Media Group during the relevant
> period are not relevant to Plaintiff's claims in this action. DBSI further objects to Request
> No. 56(a) because disclosure of such information would invade the privacy interests of
> current or former employees of DBSI who are not parties to this action.

Defendant's Objections and Responses to the Document Requests in Plaintiff's First Requests for

Discovery, dated December 10, 2007, Seymour Declaration, Exhibit 13, pp. 66-68.  Defendant's

response is tantamount to no response at all.  Defendant has never supplemented this response.

3. Finally, in connection with Defendant's Statement of Undisputed Facts No. 6,

Defendant is seeking an inference of non-existence from its own failure to produce documents,

but its response to discovery did not assert that no such documents existed, and merely asserted

that defendant should not have to go to the bother of producing the documents.  This raises a

disputed issue of material fact whether Defendant's refusal to produce these documents was an

attempt to conceal adverse information, and whether the inference should be drawn that the

unproduced documents would have defeated its contention.

**3.   Whether DeNaut Had Sufficient Knowledge About the Media Group to Be
Able to Testify About It**

1. Defendant seeks to draw the implicit inference that DeNaut was knowledgeable about
the Media Group, such that his testimony should be given weight.  Defendant's Statement Nos. 7
and 8 at pp. 5-8 above.

2. There is a material issue of fact as to whether DeNaut had any particular knowledge
about the Media Group, thus making his testimony as to the Media Group inadmissible under
FRE 602.

3. DeNaut testified that Brand had "day-to-day responsibility for the Media Group,"
among other industry areas.  Tr. 26 lines 18-19, Exhibit F to De Braun Affirmation, Acrobat p.
110.  "Once again, just to reiterate, J would be very detailed around my groups, which did not
include the media group." *Id.*, Tr. 70 lines 4-6, Acrobat p. 111.  "Media was part of Jack's day-
to-day responsibility.  So when -- when I have poor recollection of some of these events, it's in
the context of I was managing a very large business that was away from the media practice.  I
hope that helps."  DeNaut Tr. 24 lines 4-8, Seymour Declaration, ¶ 17, Exhibit 14.  "So my
recollection is in context of not being very interested in the day-to-day operations of the media
group because I had a lot of responsibility to do other things." *Id.*, lines 19-22.  "In my groups,
which would not be media, I would meet with the group heads often." *Id.*, Tr. 68, lines 4-5.
DeNaut did not remember meetings with Amling, the head of the Media Group, he "would
assume" there were annual meetings, but sometimes he went and sometimes he did not.  He did
not remember any other meetings. *Id.*, Tr. 68 line 9 to Tr. 69 line 1.

4. A reasonable jury could find from this testimony that DeNaut had no particular
knowledge as to the Media Group, and that it was not required to believe anything he said.

**4.** **Whether There Were Any Problems with the Media Group Different or More Serious Than Those of Any Other Product or Industry Group within Corporate Finance for the Americas**

1. Defendant seeks to draw the implicit inference that there were problems with the Media Group, that were different or more serious than that of any other product or industry group within Corporate Finance for the Americas, which covered a very wide range of industries. Defendant's Statement Nos. 7 and 8 at pp. 5-8  above.

2.  There is a material issue of fact as to any inference that there were any problems with the Media Group that were different or more serious than that of any other product or industry group within Corporate Finance for the Americas, which covered a very wide range of industries. DeNaut Tr. 84 line 6 to Tr. 85 line 13; Tr. 89 line 22 to Tr. 91 line 14, Seymour Declaration, ¶ 17, Exhibit 14.  The transcript states at Tr. 84-85:

```
 6      Q.    In early 2003 were there any
 7   conversations by e-mail, in person or telephonic with
 8   Mr. Amling of which you're aware that the media group
 9   should be downsized?
10            MS. SELTZER:  Objection.
11      1.    You know, I just don't recollect.  I'm --
12      Q.    Do you remember any conversations at any
13   time in 2003 about the downsizing of the media group?
14      1.    I can talk generally.  The media group
15   was viewed as an underperforming group, as other
16   groups were in that time period.  In those -- those
17   situations downsizings were common, group head
18   changes were probable and hiring was done to improve
19   the quality and the performance of the business.
20            So media would have been thought of in
21   the same as other -- other underperforming groups and
22   of the nine or ten groups that were in the Americas
                          85
 1   corporate finance, the majority of the group heads
 2   were replaced during this time period, during a broad
 3   time period of several years around this time.
 4      Q.    Were the majority of groups downsized?
 5      1.    Once again, in 2004, in January, the
 6   world's coming out of a recession and the quality of
 7   our people, we felt, needed to be improved to address
```

8  the next cycle.  So groups were -- at this time it
9  was common for groups, meaning more than a majority
10  of groups, would shrink first and then grow later
11  with the result being a higher quality team and
12  high -- higher quality bankers.  And that's what we
13  found through that cycle.

The transcript continued at Tr. 89-91:

22      Q.    Was there a target for managing directors
                                  90
1  in 2003 with respect to revenues?
2      1.    Yeah.  We -- we would do two things, one
3  of which was to make sure that a managing director
4  had to cover a certain amount of wallet, meaning
5  opportunity, meaning street -- street opportunity,
6  fees paid to the street, and that number was $200
7  million.  From that we would expect fully functioning
8  managing directors to approach $20 million of
9  franchise revenues and those that were developing a
10  business would have lower targets, maybe $10 million.
11  The reason why -- can I finish or --
12      Q.    Mm-hmm.
13      1.    The reason why I say this is when we took
14  over the business, we discovered that managing
15  directors in aggregate had client lists whereby 30
16  percent, roughly, of their clients that they
17  represented were their clients hadn't paid a fee to
18  the street for three years.  So the vast
19  underperforming parts of the business, including the
20  media group, were based on not effectively targeting
21  the opportunity and having poor performance against
22  that opportunity.  And it played out throughout the
                                  91
1  media group, including in Mr. Graves' case.
2      Q.    Was Mr. Graves the only person that you
3  thought had a low wallet size?
4      1.    I -- once again, with -- with 30 percent
5  of the whole platform not covering a client that paid
6  a fee to the street for three years, I mean, you just
7  have to really soak that concept and --
8      Q.    Can --
9      1.    -- it was common across the platform and
10  that's why six or seven group heads were replaced
11  over this time period.
12      Q.    By platform you mean all of the industry

- 42 -

13  groups?
14      1.    All of the industry groups.

3.  From this testimony, there is a disputed issue of material fact whether there was anything unique about the Media Group, compared to the very broad range of other industry groups in Corporate Finance Americas, over which DeNaut and Brand had supervision.

4.  From this testimony, there is a disputed issue of material fact whether there was anything unique as to Graves, compared to all other investment bankers working in the very broad range of other industry groups in Corporate Finance Americas, over which DeNaut and Brand had supervision.

5.  **Whether There Was Anything Unique About the Mandate of DeNaut and Brand That Would Support Any Inference as to the Media Group**

1.  Defendant seeks to draw the implicit inference that the mandate of DeNaut and Brand was unique, and that it suggested problems with the Media Group.  Defendant's Statements Nos. 7 and 8 at pp. 5-8  above.

2.  There is a material issue of fact as to whether there was anything different about the mandate of DeNaut and Brand than the standard mandate any new manager in any line of business in any kind of company would have.  DeNaut Tr. 25 line 1 to Tr. 28 line 11, Attachment F to De Braun Affirmation (Doc. 138-1, Acrobat p. 110).

3.  From this testimony, there is a disputed issue of material fact whether there was anything unique DeNaut's and Brand's mandate, and whether any inference should be drawn as to the Media Group from their having had this mandate.

6.  **Whether DeNaut Admitted Age Discrimination in Layoffs**

1.  Defendant did not cite the discussion in DeNaut's deposition in which he and Brand, by 2010 when DeNaut left, got rid of 60% to 70% of the people that were "on our platform" when they took over the business, and that this was "viewed very successfully."  De Baun

- 43 -

Affirmation, Exhibit F, Tr. 27 lines 3-21.  Defendant also did not cite the discussion in which

DeNaut testified that he and Brand "changed out leadership of the majority of the groups" and

"From that changed out the senior personnel in most of the groups . . . ."  *Id.*, Tr. 27 line 21 to Tr.

28 line 11.

     2.  Only two inferences are possible: that by the term "senior" DeNaut meant he and

Brand had gotten rid of the "personnel" who had been employed longest by Defendant, or that by

this term he was referring to his and Brand's getting rid of older employees.

     3.  Defendant represented to the EEOC in its November 5, 2004 Position Statement to the

EEOC, Graves 22-32,  that Graves was laid off instead of Gregory Paul because he had *less*

seniority than Paul.  Seymour Declaration, ¶ 37, Exhibit 34, p. 2, Graves 23 (". . . DBSI

terminated Mr. Graves' employment because the other MD had 18 years more seniority and some

experience outside of television.").  The letter went on to state:

> Mr. Paul was four years older than Mr. Graves and had significantly more seniority at
> DBSI and BTAB as he had been hired in July 1981. (See Exhibit B.) Mr. Carey and Mr.
> Morris were both merely one year younger than Mr. Graves, but they had 6 and 7 years
> more seniority, respectively. Ms. Triffo was 5 years younger than Mr. Graves, with 3
> years more seniority.

The letter stated at p, 4, Graves 25:

> Mr. Amling decided Mr. Graves' employment should be terminated for three main
> reasons: 1) he did not meet DBSI's target in 2003 and his 2004 outlook was poor; 2) there
> was duplication in the television space at DBSI and thus, with the downturn in the
> market, the space could no longer support two MD's; and 3) he had 18 years less seniority
> than Mr. Paul.  (See Exhibits B, E, F.)\

The letter stated at p. 6, Graves 27: "DBSI selected Mr. Graves because he failed to meet his

revenue targets and because he had 18 years less seniority than Mr. Paul - - the 46 year old

gentleman whom DBSI retained."  The letter stated at p. 8, Graves 29:

> DBSI chose to terminate Mr. Graves over Mr. Paul because: (1) Mr. Paul had 18
> years more seniority than Mr. Graves, (2) Mr. Paul had additional experience in cinemas,

which Mr. Graves did not have, and (3) Mr. Graves had both a lower 2003 franchise revenue and 2004 franchise pipeline than Mr. Paul. (See Exhibits B and F.)

4. Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

5. There is a disputed issue of material fact whether Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

6. Based on this, and on DeNaut's testimony and on Defendant's Position Statement to the EEOC, there is a disputed issue of material fact whether DeNaut was bragging about his and Brand's getting rid of older employees, instead of his bragging about his and Brand's getting rid of the personnel who had been employed by Defendant the longest.  If the jury draws the latter inference, this is an admission of liability.

7. **(a) Whether the Media Group Was Top-Heavy, So As to Justify Graves' Termination, and (b) Whether the Promotion of Four Young Vice Presidents to Director Was What Made the Media Group Top-Heavy**

1. There is a disputed issue of material fact as to whether the Media Group was "top heavy," so as to justify Graves' termination in whole or in part.  There is also a disputed issue of material fact whether it was the promotion of four young Vice Presidents to Directors was what made the Media Group top-heavy.

2.  As shown below, the bulk of Directors' and Managing Directors' compensation was in the form of bonuses.  Defendant did not save the amount of a bonus when it terminated a Director or Managing Director and denied his or her bonus for the prior year of performance,

- 45 -

because it re-allocated that person's bonus to other bankers. ███████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ DB048621 to DB048623, Seymour

Dec., ¶ 29, Exhibit 26 to Seymour Declaration.

    3.  Defendant promoted four Vice-Presidents to Directors in April 2003.  Plaintiff's

Second Amended Complaint (Doc.  56), ¶ 7 at pp. 2-3, Exhibit A to De Baun Affirmation (Doc.

138-1), Acrobat pp. 3-4; Defendant's Answer to Second Amended Complaint, Doc.  74, ¶ 7 at p.

3, Exhibit B to De Baun Affirmation (Doc.  138-1), Acrobat p. 66.

    4. The four Vice-Presidents who were promoted to Directors in April 2003 were all

substantially younger than Graves, who was 41 at the time. █████████████████

████████████████████████ "Media 04 Terms," Exhibit M to Defendant's

November 5, 2004 Position Statement to the EEOC, Graves 107, Seymour Declaration, ¶ 18,

Exhibit 15. ██████████████████████████████████████

██████████ *Id.* ████████████████████████████████████

*Id.* ███████████████████████████████████████

"Media 04 Transfers," Exhibit N to Defendant's November 5, 2004 Position Statement to the

EEOC, Graves 107, Seymour Declaration, ¶ 19, Exhibit 16.

    5. In addition, Defendant hired William Detwiler as a Director in the Media Group

effective July 9, 2003, making it even more top-heavy.  Exhibit Q to Defendant's November 5,

2004 Position Statement to the EEOC, "Media 03 Hires," Graves 110, Seymour Declaration, ¶

20, Exhibit 17.

6. The four young Vice-Presidents who were promoted to Directors in April 2003 either had the same levels of compensation of some of the Managing Directors, or their compensation increased after their promotions to that of some of the Managing Directors.  The compensation documents defendant produced in discovery show the following,[10] exclusive of Ellen Silver[11] and exclusive of the "Standard/Statutory" lines in the last year of employment.

---

[10] Calculation of counsel adding salary to total bonus figures.

[11] ████████████████████████ Exhibit O to Defendant's November 5, 2004 Position Statement to the EEOC, entitled "Media 03 Terms," Graves 108, Seymour Declaration, ¶ 21, Exhibit 18).









7.  Page DB 1205 (Doc.  138-2, Acrobat p. 3), says in the column for "Issues Raised by 2002 BPaD Analysis"—the 2002 BPaD Analysis was never produced in discovery—"A) Overstaffed/top heavy" and it shows in the column for "Steps taken to address issues" the information "A) M&A Integrated."  Nothing on this page or the cited pages says, or allows the inference, that this issue was still "open."  Instead, the only fair inference is that it appears to be resolved.

8.  In addition, p. DB 1219 (Doc.  138-2, Acrobat p. 17) shows that "Four VP's were promoted to Directors".  Page DB 1220 (Doc.  138-2, Acrobat p. 18) shows that Defendant planned to hire another Managing Director and another Director.  Page DB 1213 (Doc.  138-2, Acrobat p. 11), states: "Post four promotions to Director, group appears headcount top heavy".  It also states:

> **Alignment and productivity**
> **Global Corporate Finance as of January 2003**
>
> • Post four promotions to Director, group appears headcount top heavy
> • Resources are allocated appropriately with the fee pool distribution on a macro
> level. On a micro level, substantial improvement appeared possible
> • Prior to the recent promotions, banker productivity was solid
>   - $10m in revenues and $190m of wallet per Calling Officer
> • Post promotions:
>   - $6.4m in revenue and $120m of wallet per Calling Officer

The only reasonable inference to be drawn from Defendant's own document is that the promotion of four young Vice Presidents to Director is what made the Media Group top-heavy.

9.  Another document produced by defendants in discovery, heavily redacted to obliterate information about other industry groups, showed that defendant ██████████████████████████ ████████████████.  Seymour Declaration, ¶ 46, Exhibit 43, "████████████████████████████ ██████████████████████████████████████████████████████████" DB 1262 to DB 1275, page DB 1273.

10.  There is a dispute of material fact whether Defendant's references to the Media Group as being top-heavy have nothing to do with the decision to fire Graves, and whether Defendant's use of such references in connection with the firing of Graves are simply pretexts for discrimination.

### 8. Whether Defendant's Transfers of Plaintiff's Accounts with Wallet Size, Fee-Paying Clients, and Prospects of Revenue to the Young Directors Promoted in April 2003, or to Other Managing Directors, Set Plaintiff Up to Fail

1.  There is a disputed issue of material fact whether Defendant's transfers of Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors, set Plaintiff up to fail.

2.  It is undisputed that Defendant did in fact transfer Plaintiff's accounts with wallet size, fee-paying clients, and prospects of revenue to the young Directors promoted in April 2003, or to other Managing Directors.  See Parts C(3) through C(5) at pp. 93-104 below.

3.  Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

4.  There is thus a dispute of material fact whether Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

5.  There is also thus a dispute of material fact whether these actions were intended to set Plaintiff up to fail, and whether Defendant's asserted nondiscriminatory explanations for Plaintiff's termination, the timing and circumstances of his termination, the denial of his bonus

for work in 2003, and the failure to reconsider these actions, were pretexts for age discrimination and retaliation.

> **9.  Whether Defendant Set Plaintiff Up to Fail By Refusing to Set Plaintiff Up as Senior Investment Banker on Gannett and Other Important Accounts**

1.  There is a disputed issue of material fact whether Defendant set Plaintiff up to fail by refusing to set plaintiff up as Senior Investment Banker on Gannett and other important accounts until it was too late.

2.  It is undisputed that Defendant did in fact refuse to set Plaintiff up as Senior Investment Banker on Gannett and other important accounts until it was too late.  See Part C(9)(e) at pp. 122-123 below.

3.  Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

4.  A reasonable jury could infer from this that Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

5.  A reasonable jury could draw the inference that these actions were intended to set Plaintiff up to fail, and that Defendant's asserted nondiscriminatory explanations for Plaintiff's termination, the timing and circumstances of his termination, the denial of his bonus for work in 2003, and the failure to reconsider these actions, were pretexts for age discrimination and retaliation.

### 10. <u>Whether Plaintiff's Performance in 2003 Was Good</u>

1.   There is a disputed issue of material fact as to whether Plaintiff's performance in 2003 was good, notwithstanding all of Defendant's criticisms.

2.   Amling considered ████████████████████████████. May 23, 2003 E-Mail from Felicia Ivey, Vice President Human Resources, to Marc Pfeffer, Brand, and DeNaut, Amling Dep. Exh. 37, DB102351 to DB102352, Seymour Declaration, ¶ 53, Exhibit 49.

3.   ████████████████████████████████████████████

████████████████████████████████ 14, 2003 e-mail thread, with the top e-mail from Susan Hoffman (Amling's assistant) to DeNaut and others on Amling's changed rankings of bankers, Amling Dep. Exh. 39, DB 48127 to DB 48128, Seymour Declaration, ¶ 54, Exhibit 50.

4.   ████████████████████████████████████████████

December 8, 2003 E-Mail thread from Kerri Donovan on behalf of Brand to Carol Sugrue for DeNaut, on Amling's suggested bonuses for the performance year 2003 and his reactions, DB 71049-71050, Seymour Declaration, ¶ 49, Exhibit 45.

5.   Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

6.   There is a dispute of material fact whether Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

7.  There is thus also a dispute of material fact whether Plaintiff's performance in 2003, to the extent Defendant allowed him to perform, was good and that Defendant's criticisms were pretexts for age discrimination.

### 11. **Whether Defendant's Failure to Produce "Business Planning & Development" Documents Prior to July 2003, and its Failure to Produce Staffing Level or Layoff Documents, Allows the Inference That Defendant Was Cherry-Picking Documents to Support its Theory and Refusing to Produce Documents That Undermined its Theory, Thus Barring Consideration of the Document**

1. Plaintiff had requested in discovery all documents since March 31, 1999 containing information about staffing recruitment, hiring, transfer, lay-off, termination, or retention of bankers both within and outside the Media Investment Banking Group.  Plaintiff's First Requests for Production Nos. 9 and 10, and defendants' responses stated:

**Document Request No. 9:**

A copy of all documents containing information about the planned or actual staffing levels, recruitment, hiring, transfer, lay-off, termination, or retention of bankers within the Media Investment Banking Group, from March 31, 1999, to the present.

**Response:**

DBSI objects to Request No.9 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. For example, documents relating to personnel actions other than the termination and retention of Directors and MDs in the Media Group during the reduction in force that affected Plaintiff's employment are not relevant to Plaintiff's claims in this action.

Without waiving the foregoing objections, and to the extent not objected to therein, DBSI responds: DBSI will produce non-privileged, responsive documents, if any, it may have regarding the reduction in force which affected Plaintiff's employment.

**Document Request No. 10:**

10. A copy of all documents containing information about the planned or actual staffing levels, recruitment, hiring, transfer, lay-off, termination, or retention of Media Bankers outside the Media Investment Banking Group, from March 31, 1999, to the present.

**Response:**

DBSI objects to Request No. 10 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. For example, documents relating to personnel actions other than the termination and retention of Directors and MDs in the Media Group during the reduction in force that affected Plaintiff's employment are not relevant to Plaintiff's claims in this action.

Defendant's Objections and Responses to the Document Requests in Plaintiff's First Requests for Discovery, dated December 10, 2007, Seymour Declaration, ¶ 14, Exhibit 13, pp. 9-10.

2.   With the exception of its attachments to its November 5, 2004 Position Statement to the EEOC, Defendant never produced any documents on the lay-off or reduction in force of any Directors or Managing Directors other than Plaintiff, and a few 2004 and later severance agreements it was compelled to produce.  Seymour Declaration, ¶ 16.  Defendant has never supplemented this response.  Its response is tantamount to no response at all.

3.   Defendant produced documents with "Business Planning & Development" as part of the title for September 10, 2003 and October 2003, but for no dates earlier than July 2003 and no dates later than October 2003 other than an undated 2004 document.  Seymour Declaration, ¶ 46. ███████████████████████████████████████████████████ Seymour Declaration, ¶ 47, Exhibit 43, "███████████████████████████████████████ ███████████████████████████," DB 1262 to DB 1275.  Defendant's own Rule 56.1 statement's attachments shows that there was a 2002 "BPaD Analysis." Page DB 1205 (Doc. 138-2, Acrobat p. 3).  This was never produced in discovery.  Defendant has never supplemented the response quoted above.  Its response is tantamount to no response at all.

4.   There is a dispute of material fact whether Defendant was cherry-picking documents to support its theory, refusing to produce documents that undermined its theory, and thus that the July 2003 document should not be given any weight.

### 12. __Whether the Individual Figures on p. DB 1129 of the July 2003 Business Planning & Development Document Relied on by Defendant Are Correct, Or Are a Pretext for Age Discrimination__

1.   Page DB 1129 in the document, "Business Planning & Development / Industry Group Strategic Summary: Media / July 2003" is labeled "Banker activity / As of January 2003."  De Baun Affirmation, Exhibit G.  (Doc. 138-2, Acrobat p. 27).  It represents that Graves had $2.7 million in "2001-2002 DB revenues."

2.   Defendant's Franchise Revenue & Pipeline Report for January 15, 2003, which Defendant altered (by adding lines for totals) prior to producing it to the EEOC as Attachment C to its November 5, 2004 Position Statement, ██████████████████████████████ ███████████████   Seymour Declaration, ¶ 35, Exhibit 32.  The revenues Defendant stated that Graves actually earned for Defendant in 2002 alone were more than five times the amount stated on DB 1229 for 2001 and 2002 combined.  If this figure is true, the information in Defendant's Exhibit G cannot be true.

3.   Dyan Triffo, a Managing Director, earned ███████████████   for Defendant in 2002.  Id.  However, the inaccurate Exhibit G has her down as earning nothing in 2001 and 2002 combined.  If this figure is true, the information in Defendant's Exhibit G cannot be true.

4.   Sun Yung, a Director, earned ██████████████.  *Id.*  However, the inaccurate Exhibit G has her down as earning nothing in 2001 and 2002 combined.  If this figure is true, the information in Defendant's Exhibit G cannot be true.

5.   Defendant produced a document, "███████████████████████████ ████████████████████████████████████████████████ " DB 047851 to DB 047879,

Seymour Declaration, ¶ 36, Exhibit 33.  Page 25 of this document, DB047877, shows that

Graves had ████████████████████████████████,[12] and that this was the

████████████████████████████████████████████████████████

████████████ Amling, the head of the Media Group and a Managing Director, ████████

████████████ Dyan Triffo, a Managing Director, ████████████████████████

████████ All of the young Directors had revenues in this column lower than those of

Graves.

6.  The same page shows in the 2003H1 column that Graves had ████████████

████████████████, and that this was the ████████████████████████

████████████████████████████ Jeffrey Amling, the head of the Media

Group and a Managing Director, ████████████████████.  Charles Carey, a Managing

Director, ████████████████████████ Dyan Triffo, a Managing Director,

████████████████████████ Elizabeth Chang, David Dunn, and Zach

Maurus, who were young Directors, had lower revenues in this column.

7.  The figures for "████████████" are simply the result of dividing the figures for

"████████████████" by the figures for "████████████████"  Any error in either

of these latter two columns will produce an error in the column for "████████████"[13]

8.  There is a dispute of material fact whether any of the individual figures on p. DB 1229

are correct, and that Defendant's assertion of these figures is a pretext for age discrimination.

---

[12] "H1" refers to the first half of the year, ending June 30.  January 27, 2011 deposition of
Michael Vigliotti, Seymour Declaration, ¶ 51, Exhibit 47, Tr. 136, lines 6-12.
[13] Calculation of counsel.

**13. Whether Defendant Evaluated Graves in February 2002 (for the 2001 Performance Year) and February 2003 (for the 2002 Performance Year) as a Better Banker Than Managing Directors and Directors Who Were Not Laid Off**

1. Defendant assessed the performance of bankers by placing persons of approximately equal ability in the same "performance bucket."  Michael Vigliotti testified: "Q.  What is a performance bucket?  A.  Depending on the year or what you tend to rank them with, this is four buckets.  So A being – my assumption for this is -- A being top performers, B being the next one down, and so forth and so on down."  January 27, 2011 deposition of Michael Vigliotti, Tr. 100, lines 1-5, Seymour Declaration, ¶ 51, Exhibit 47.  Vigliotti was a Managing Director and Chief Operating Officer or Chief Administrative Officer of the Investment Banking Group in the 2002-2004 time frame.  *Id.*, Tr. 6, lines 7-21.

2. Jacques Brand testified that the "OpCo regional bucket" was the "overall grade" for "quantity, quality and culture".  January 25, 2011 deposition of Jacques Brand, Seymour Declaration, ¶ 52, Exhibit 48, Tr. 179, lines 11-14.  After defense counsel objected, he stated: "I am speculating, so I am not a hundred percent sure."  *Id.*, lines 17-21.  In preparation for his deposition, Brand had spent three or four hours with defense counsel, and had reviewed documents of the promotion and compensation committee.  *Id.*, Tr. 10, line 3 to Tr. 11 line 8.  In late 2002, Brand "responsible, together with Jim DeNaut, for all of the industry groups within the Americas," was "co-head of something," but did not remember what, did not remember when in late 2002 he acquired this responsibility, but remembered that it lasted until 2006 or 2007, when his responsibilities broadened.  *Id.*, Tr. 17 line 15 to Tr. 18 line 18.

3. Brand and DeNaut were members of the Operations Committee and of the promotion and compensation committee or the performance and promotion committee, as it is variously

called.  January 27, 2011 deposition of Michael Vigliotti, Tr. 100, lines 1-22; Tr. 113, lines 16-21, Seymour Declaration, ¶ 51, Exhibit 47.

     4.  Defendant's compensation and promotion committee ranked bankers, and awarded bonuses based on the rankings.  January 21, 2011 Deposition of James DeNaut, Tr. 64 line 14 to Tr. 65 line 6, Seymour Declaration, ¶ 17, Exhibit 14.  "Compensation would come in and be allocated to the people based on those rankings.  Those people at the bottom of the rankings would be put in for either very low bonus numbers or zero bonus numbers."  *Id.*, Tr. 65, line 2-6.

     5.  Defendant's bonus allocations for the performance year 2001, made in February 2002, are sorted by bonus amount in the following table, based on the chart set out at pp. 53-56 above.

| Seymour Declaration, Exhibit No. | Name of Banker | Performance Year (Bonuses Awarded in February 2002 | Total Bonus Awarded, Sorted From High to Low Amounts | Total Compensation |
|---|---|---|---|---|
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |

(Information for Graves emphasized in bold characters.)  Defendant valued Graves' abilities and value to Defendant at almost twice the value of Paul to Defendant, and as much higher than the value of all of the younger bankers who retained their jobs when he was fired.  Graves is in the same performance bucket as Charles "Chip" Carey and Malcolm Morris, with only three Managing Directors being in a higher "bucket."

6.  Defendant's bonus allocations for the performance year 2002, made in February 2003, are sorted by bonus amount in the following table, based on the chart set out at pp. 53-56  above.

| Seymour Declaration, Exhibit No. | Name of Banker | Performance Year (Bonuses Awarded in February 2003) | Total Bonus Awarded, Sorted From High to Low Amounts | Total Compensation |
|---|---|---|---|---|
| ██████ | ██████ | ██████ | ██████ | ██████ |

(Information for Graves emphasized in bold characters.)  Defendant valued Graves' abilities and value to Defendant as greater than the value of Managing Directors Gregory Paul and Malcolm Morris to Defendant, perhaps in the same "bucket," as being much higher than the value of Sun Yung, and as being much higher than the value of all of the younger bankers who retained their jobs when he was fired.  Only two Managing Directors were in a higher "bucket."

7.  Defendant's officials were contemplating firing Graves a year before the January 14, 2004 meeting at which Amling informed Graves of his termination.  See Part B(15), ¶¶ 6-8, at pp. 66-67 below.  This discussion is incorporated by reference herein.

8.  A reasonable jury could infer from this that Defendant's actions in transferring Graves' accounts to younger bankers and others, refusing to make Graves the Senior Investment Banker on accounts, refusing to set Graves up on the Client Manager system, refusing to recognize his 2003 revenues, and refusing to recognize his 2003 and 2004 pipelines, were intended to create pretexts for age discrimination.

7. A reasonable jury could find from this information that Defendant's many assertions that Graves' performance was poor, and that Graves' performance was the worst of all the Managing Directors or of all bankers in the Media Group, was false and a pretext for age discrimination.

### 14. <u>Whether Brand's Memory Was So Poor that a Jury Would Not Be Required to Believe His Testimony as to Graves Being a Low Performer, or the Lowest Performer in the Media Group</u>

1. Brand testified that Graves "was a low performer and that he was the lowest performer in the Media Group."  January 25, 2011 deposition of Jacques Brand, Seymour Declaration, ¶ 52, Exhibit 48, Tr. 36, lines 9-16.  He testified that Amling told him this, at some time he did not remember, but before Graves' termination date.  *Id.*, lines 17-22.

2.   Brand did not remember whether he and DeNaut had allocated responsibilities for specific industry groups.  *Id.*, Tr. 27, lines 13-20.  Brand did not remember when he took primary responsibility for the Media Group, and did not remember if it was after 2004.  *Id.*, Tr. 27 line 22 to Tr. 28, line 6.  He did not remember if he had primary responsibility for the Media Group at any time while Graves was employed at Deutsche Bank.  *Id.*, Tr. 28, lines 7-12.  He did not remember if DeNaut had primary responsibility for the Media Group at any time while Graves was employed at Deutsche Bank.  *Id.*, lines 13-16.  He did not remember the first time he met Graves.  *Id.*, Tr. 18-19.  He did not remember any meeting with Graves prior to the January 2004 meeting after Graves had been informed of his termination.  *Id.*, Tr. 29, line  to Tr. 30 line 5.  He did not remember what he said at that meeting, or what DeNaut said, or what Graves said.  *Id.*, Tr. 30 lines 3-15.

3. Brand testified that he spent three or four hours with defense counsel preparing for the deposition, the most recent having been the morning of the deposition.  *Id.*, Tr. 10 lines 3-16.  He stated that in preparation he had reviewed "several dozen" short documents.  *Id.*, Tr. 11, line 1 to Tr. 12 line 9.  He testified that some of the documents were "used in promotion and compensation committees seven years ago."  *Id.*, Tr. 11, lines 4-8.  However, he said he did not remember if there was more than one promotion and compensation committee.  *Id.*, lines 9-12.  He stated that he did not remember any specific document.  *Id.*, Tr. 12, lines 8-9.  He remembered reviewing e-mails, but did not remember any specific e-mail.  *Id.*, lines 10-15.  He believed that one or more were from DeNaut, and he thought that one or more were from Amling.  *Id.*, lines 18 to 21.  He stated unequivocally that one of more were from Christopher Johnson.  *Id.* Tr. 12 line 22 to Tr. 13 line 1.  He stated that he did not remember any specific e-mail from any of them, or what they said.  *Id.*, Tr. 13 lines 2-15.

4.  Brand worked for BT Securities and testified that the "BT" stood for Bankers Trust. *Id.*, Tr. 15 line 21 to Tr. 16 line 9.  However, he was uncertain whether Bankers Trust merged with Alex Brown.  *Id.*, Tr. 16 lines 2-9 ("Q.  It's not controversial, but just to set the stage:  Did Bankers Trust at some point merge with Alex Brown?  A.  Yes, I believe it did.  I can't remember.  Q.  Did you then, at that time did you then work for Bankers Trust Alex Brown?  A. I think it was DB Alex Brown.  It might have been BT Alex Brown.  BT Alex Brown first I think.").

### 15.  Whether Defendant's Officials Altered the Relative Rankings of Bankers to Justify the Firing of Graves, and to Create a Pretext for Age Discrimination

1.  A May 23, 2003 E-Mail from Felicia Ivey, Vice President Human Resources, to Marc Pfeffer, Brand, and DeNaut, Amling Dep. Exh. 37, DB102351 to DB102352, Seymour Declaration, ¶ 53, Exhibit 49, stated that, ██████████████████████████ ████████████████████████████████████

2.  ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████  See Part B(13) above, incorporated herein by reference.

3.  By at least November 2003, Defendant had decided to terminate Graves.  November 13, 2003 E-Mail from Felicia Ivey, Vice President of Human Resources, to Elizabeth Newman, with the subject stated as "██████████" listing ████████████████████████, Amling Dep. Exh. 38, DB 46542 to DB 46543, Seymour Declaration, ¶ 55, Exhibit 51.

4.  One day later, Amling reversed his original ranking of Graves above Paul for his 2003 performance.  November 14, 2003 e-mail thread, with the top e-mail from ████████████

████████████████████████████████████████████████ Amling

Dep. Exh. 39, DB 48127 to DB 48128, Seymour Declaration, ¶ 54, Exhibit 50.

    5.  Consistent with that reversal, ███████████████████████

████████████████████████████████████████████████████

████████████████████   December 8, 2003 E-Mail thread from Kerri Donovan on

behalf of Brand to Carol Sugrue for DeNaut, on ██████████████████

████████████████, DB 71049-71050, Seymour Declaration, ¶ 49, Exhibit 45.

    6.  Amling testified in his January 14, 2011 deposition that the decision to terminate

Graves was made only a few days before the January 14, 2004 meeting at which Amling notified

Graves of the termination.  Amling Tr. 117, lines 2-6, Seymour Declaration, ¶ 50, Exhibit 46:

```
2      Q.   When was the ultimate decision made on
3  his termination?
4      A.   Just a few days before it occurred.
5      Q.   In early January, 2004?
6      A.   Yes.
```

Amling also testified:

```
1      Q.   You referred to a number of conversations
2  about firing employees in order to, as you describe it,
3  rightsize the group, and you talked about a number of
4  employees that were under consideration for transfer
5  out or for firing.  When was the decision made that the
6  one change to be made in January of 2004 was going to
7  be Mr. Graves' firing?
8      A.   I think I already testified that it was
9  most likely a few days or a week before it occurred.
10      Q.   But that was, but you also testified that
11  was not your decision, it was a joint consensus reached
12  with Mr. Brand.
13      A.   Correct.
14      Q.   Do you remember testifying at the EEOC
15  that it was not your decision, that you were --
16          MS. SELTZER:  Objection.
17  BY MR. SEYMOUR:
18      Q.   -- informed that others were making the
19  decision?
```

```
20     A.   I can't recall.
21     Q.   You might have said it, you might not,
22  but you can't remember?
                              129
1          MS. SELTZER:  Objection.
2     A.   Yeah.
```

*Id.*, Tr. 128 line 1 to 129 line 2.  The term "rightsizing" means firing people.  "17 Q.  By

rightsizing, you mean firing people?  18 A.  Yes."  *Id.*, Tr. 116 lines 17-18.

7.  Amling also testified in his deposition that he had been discussing Graves' termination

with Brand for a year before the termination took place.  Amling Tr. 100, lines 14-22, Seymour

Declaration, ¶ 50, Exhibit 46.

```
14     Q.   Did you discuss Mr. Graves' termination
15  with any managing directors in the Media Group before
16  you informed Mr. Graves?
17     A.   I had discussed it obviously for over a
18  year with Jacques Brand, may have discussed it with
19  other product heads and I may have discussed it with
20  Drew Marcus, who was the research head of media.
21     Q.   When you say product heads, what do you
22  mean?
```

Amling testified further:

```
19     Q.   Who made the decision that Mr. Graves
20  should be the person to be terminated?
21     A.   I would say ultimately Jacques and I did.
22     Q.   As between the two of you, who made the
                              102
1   decision to terminate Mr. Graves?
2          MS. SELTZER:  Objection to form.
3     A.   I would say it was a mutual decision.
```

*Id.*, Tr. 101 line 19 to Tr. 102 line 3.

8.  Based on this information and the information above, there is a disputed issue of

material fact whether Defendant's officials lowered his rankings in light of the pending

termination, to create a pretext for age discrimination.

**16. Whether Defendant Could Have Transferred Graves to a Position in its Leveraged Finance Unit, or to a Position in its Mergers & Acquisitions Unit, or to Another Unit, and Failed or Refused to Do So, or to Reconsider its Decision, or to Give Him a "Soft Landing," because of Age Discrimination and in Retaliation for Graves' Internal Complaint to DeNaut and Brand about Amling's Remark that Amling Needed Graves' Accounts for Younger Bankers**

1.  There is a disputed question of material fact whether Defendant could have, but failed or refused to, transfer Graves to a position in its Advertising unit, or to a position in its Leveraged Finance unit, or to a position in its Mergers & Acquisitions unit, or to another unit, and failed or refused to reconsider its decision, or to give him a "soft landing," because of age discrimination and in retaliation for Graves' having internally complained to DeNaut and Brand about Amling's remark that Amling needed his accounts for younger bankers.

2.  During Graves' January 12, 2011 deposition, he identified other open positions to which he could have been transferred:

> 25 Q. Was there an open job -- do you have
> 339
> 1 - DANIEL B. GRAVES -
> 2 an open job -- do you know of an -- any open
> 3 position you could have done in other parts of the
> 4 bank?
> 5 A. Sure. I -- I was an investment
> 6 banker who had worked ln a number of dist- --
> 7 different industries. I had a number of different
> 8 skills. I -- I was never offered a transfer to
> 9 M&A, for example, and there's a -- a -- a series
> 10 of e-mails in the production that said I was a
> 11 a ver- -- "M&A" is mergers and acquisitions --
> 12 that I was a -- a -- a -- a -- a -- a good M&A
> 13 banker.
> 14 I was never offered, or as far as I
> 15 know from the production, discussed that I was
> 16 offered or even discussed as a possibility to
> 17 transfer there. I was never -- it's not in the
> 18 production and I was never offered a transfer to
> 19 leverage finance, even though I had worked with
> 20 Mr. Johnson for a number of years at previous
> 21 firms.

January 12, 2011 Deposition of Daniel Graves, Seymour Declaration, ¶ 65, Exhibit 61, Tr. 338

line 22 to Tr. 339 line 21.

    3.  Amling testified in his January 14, 2011 deposition:

> 3   BY MR. SEYMOUR:
> 4      Q.   Did you view Mr. Graves as having
> 5   substantial expertise in mergers and acquisitions?
> 6      A.   Dan, Dan was a knowledgeable mergers and
> 7   acquisitions banker, yeah.
> 8      Q.   Did Deutsche Bank have a mergers and
> 9   acquisitions unit?
> 10      A   Yes.

Amling January 14, 2011 Deposition, Seymour Declaration, ¶ 50, Exhibit 46, Tr. 129, lines 3-10.

    4.  Amling gave as one of his reasons for failing to take any steps to see whether Graves

could be transferred into the Mergers & Acquisitions unit that the group was intended to be

downsized and pushed into the industry groups:

> 11      Q.   Did you take any steps to see if Mr.
> 12   Graves could be transferred into that unit?
> 13      A.   At the time, just the opposite was
> 14   happening at Deutsche Bank.  Deutsche Bank was taking
> 15   its merger, merger and acquisition professionals who
> 16   were cordoned off in a unit and actually pushing those
> 17   professionals into the groups, the industry groups.
> 18   So, it was the, the strategy was to get those bankers
> 19   closer to the SIB coverage bankers in the industry
> 20   groups.  So what was happening at Deutsche Bank was
> 21   just the opposite from that, to the extent that an M&A
> 22   group existed, it was going to be just a small cadre of
>                            130
> 1   people who were sort of seasoned and very knowledgeable
> 2   execution people as opposed to M&A coverage people and
> 3   new business people.  So the trend within the firm was
> 4   just the opposite from what was happening, so it
> 5   wouldn't have been likely for me to suggest that a
> 6   banker who could have done some M&A work actually go
> 7   into the M&A group, because the M&A group was going to
> 8   be a downsized cadre of execution professionals who
> 9   would work with the lawyers to document transactions.

*Id.*, Tr. 129 line 11 to Tr. 130 line 9.

5.  For two reasons, Defendant will not be able to rely on this testimony at trial.  *First*, Amling could not remember when this move began, or even the year when it began:

```
10      Q.   And when did that move begin?
11      A.   Can't remember.
12      Q.   Do you remember the year in which it
13  began?
14      A.   No.
15      Q.   Can you state with certainty that this
16  occurred before Mr. Graves' termination as opposed to a
17  year or two later?
18      A.   No. . . .
```

*Id.*, Tr. Tr. 130 lines 10-18.

6. The second reason Defendant will not be able to rely on Amling's testimony about this supposed plan is that Defendant refused to provide discovery that would have shown whether Amling's assertions were true, false, incomplete, misleading, or involved an irrelevant time frame.

7. Plaintiff sought discovery of Defendant's policies on transfers of bankers, but Defendant refused to provide information about transfers outside the Media Group:

### 3. Banker personnel and Staffing Levels

**Document Request No. 6:**

A copy of every policy containing information about the recruitment, hiring, transfer, layoff, termination, or retention of bankers.

**Response:**

DBSI objects to Request No.6 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. For example, policies in effect at any time other than the relevant period and which were not applicable to the Media Group are not relevant to Plaintiff's claims in this action. Further, as Plaintiff sets forth no claims relating to recruitment, hiring or transfer, policies relating to these personnel actions are not relevant to his claims.

Without waiving the foregoing objections, and to the extent not objected to therein, DBSI responds: DBSI will produce non-privileged, responsive documents, if any,

it may have relating to the lay-off, termination or retention of MDs and Directors in the Media Group during the relevant period.

Defendant's Objections and Responses to the Document Requests in Plaintiff's First Requests for Discovery, dated December 10, 2007, Seymour Declaration, Exhibit 13, p. 8.  Defendant never moved for a protective order.

8.  See also the discussion of Defendant's refusals to produce discovery as to transfers in response to Plaintiff's First Requests for Production Nos. 9 and 10, discussed in Part B(11) above.  In each response, Defendant stated: "documents relating to personnel actions other than the termination and retention of Directors and MDs in the Media Group during the reduction in force that affected Plaintiff's employment are not relevant to Plaintiff's claims in this action." Defendant never moved for a protective order.

9.  Defendant's responses to these discovery requests are tantamount to no response at all. Defendant has never supplemented this response.  The jury can be informed of this failure.  See Rules 26(e), 37(c)(1)(B), and 37(d), Fed, R. Civ. Pro.

10.  Amling's second reason for failing to make any effort to transfer Graves into the Mergers & Acquisitions unit is that Graves was not at the same level of proficiency in Mergers & Acquisitions as the bankers who were in that unit:

```
18   . . . But at the same time -- let me
19   complete my thought -- it was my view that while Dan
20   was an experienced coverage banker in media, his M&A
21   skills did not rise to the technical proficiency that
22   he would have been one who would have typically been
                          131
1   resident in our M&A group.
2       Q.   Didn't other bankers in the Media Group
3   try to bring -- I apologize for that.  Didn't other
4   bankers in the Media Group try to bring Mr. Graves in
5   when they had complicated merger and acquisition
6   transactions in order to get the benefit of his
7   expertise?
8       A.   I don't recall that.  We had --
```

```
 9      Q.   Was that something that was -- there were
10   a lot of things that somebody as a group head may be
11   able to notice and some things that he may not be able
12   to notice.  Would that be the kind of thing that would
13   certainly have come to your notice, or is it the kind
14   of thing that might have escaped your notice?
15      A.   That would have come to my notice because
16   we had, either they had moved into the group at the
17   time or subsequently, we had two or three dedicated M&A
18   professionals who were assigned to media, including
19   Shazad Dada.
20      Q.   When did Shazad Dada enter the group?
21      A.   Don't remember.
```

Amling January 14, 2011 Deposition, Seymour Declaration, ¶ 50, Exhibit 46, Tr. 130 line 18 to

Tr. 131 line 21.

11.  When Amling was in the process of hiring Graves, he expressed interest in Graves'

mergers and acquisitions experience.  January 10, 2012 deposition of Daniel Graves, Seymour

Declaration, ¶ 5, Exhibit 4, Tr. 32, lines 6-12.  Gregory Paul was the Senior Investment Banker

on the Lin TV account, but he asked Graves to work on the mergers and acquisitions aspects of

the deal, including bringing Graves to a meeting with executives of Lin TV.  Graves received no

revenue credit for this work.  January 12, 2012 deposition of Daniel Graves, Seymour

Declaration, ¶ 65, Exhibit 61, Tr. 436 line 22 to Tr. 437 line 17.

12.  Jacques Brand stated in an October 26, 2003 e-mail to Kerri Donovan, with a cc to

Monte Koch, ███████████████████████████████████████████████

██████████████████████".  October 26, 2003 e-mail from Brand to Kerri Donovan, cc Monte

Koch re Media, DB098373 to DB098375, Johnson Deposition Exh. 6, Seymour Declaration

¶ 69, Exhibit 65.  Monte Koch was the head of the Mergers & Acquisitions unit of Defendant.

January 25, 2011 deposition of Jacques Brand, Seymour Declaration, ¶ 52, Exhibit 48, Tr. 20,

lines 19-20.

13.  Defendant's then counsel, Sidley & Austin, attempted to "represent" Christopher

Johnson at his deposition, although he was no longer employed by Defendant.  After Plaintiff

objected, Deutsche Bank arranged to have the Seyfarth Shaw firm "represent" Johnson.  January

26, 2011 Deposition of Christopher Johnson, Seymour Declaration, ¶ 70, Exhibit 66, Tr. 11 line

12 to Tr. 13 line 10.

14.  Johnson initially denied that Graves had "really good mergers and acquisitions

expertise," and described his expertise as "average at best".  *Id.*, Tr. 30 line 20 to Tr. 31 line 9.

15.  Johnson also initially stated:

```
18      Q.  Do you remember ever telling any managers at
19   Deutsche Bank that you thought that Mr. Graves had
20   really good mergers and acquisitions expertise?
21      A.  No.  I don't remember.
```

*Id.*, Tr. 31, lines 18-21.

16.  When confronted with Brand's e-mail described in ¶ 13 above, introduced as Exhibit

6 to his deposition, Exhibit 65 to the Seymour Declaration, however, Johnson testified:

```
 6      Q.  Now, with respect to Dan Graves, the first line
 7   states, "Really good M and A banker in broadcasting
 8   space."
 9         Do you remember that that is what you thought at
10   the time?
11            MR. CHYLINSKI:  Objection.
12            You can answer.
13            THE WITNESS:  I thought at the time Dan was
14   a good industry banker.  I did not think M and A banker,
15   but clearly I -- if this is what represented that I
16   said, but I thought he was more of an industry banker.
17   BY MR. SEYMOUR:
18      Q.  Do you have any doubt that you told Mr. Brand
19   that Mr. Graves was a really good M and A banker?
20      A.  I have no doubt that I told Mr. Brand that if my
21   superior put this in an e-mail.
22      Q.  Do you know of any reason why you would have said
                           103
 1   that Mr. Graves was a really good M and A banker in a
 2   broadcasting space if you did not think so?
```

      3   A. No.

January 26, 2011 Deposition of Christopher Johnson, Seymour Declaration, ¶ 70, Exhibit 66, Tr.

102 line to 6 to Tr. 103 line 3.

     17.  Graves testified that, at the January 14, 2004 meeting at which Amling told him he

was being fired, Amling said three things about the termination.  January 10, 2012 deposition of

Daniel Graves, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 245 line 18 to Tr. 246 line 4.  Graves

then testified:

> 12 Q. You said you remember three things he
> 13 told you?
> 14 A. Well, he -- I'd said that he told me
> 15 he was going to terminate me. He told me that the
> 16 three things were -- that it was not performance
> 17 related, that it was honestly a LIFO decision,
> 18 L-I-F-O, and besides, that he needed my accounts
> 19 for the younger bankers.
> 20 And those are the three things that I
> 21 remember from that meeting.

*Id.*, Tr. 246, lines 12-21.  Graves was cross-examined further on the subject.  *Id.*, Tr. 247 line 9 to

Tr. 248 line 21.

     18.  Amling stated that he did not remember making this remark, Amling January 14,

2011 Deposition, Seymour Declaration, ¶ 50, Exhibit 46, Tr. 136, lines 7-12.  This created a

disputed issue of material fact.

     19.  Graves testified that he did not complain about this remark to Andrea Hazelwood of

Human Relations because she was a relatively junior person there, and did not ask to speak to a

senior person in Human Relations, but decided to bring this to the attention of Amling's

superiors, DeNaut and Brand.  January 10, 2012 deposition of Daniel Graves, Seymour

Declaration, ¶ 5, Exhibit 4, Tr. 254 line 14 to Tr. 256 line 9.

20.  Graves testified that he met with DeNaut and Brand together in January 20, 2004.

*Id.*, Tr. 266 line 16 to Tr. 267 line 6.

21.  Graves testified further about the January 20 meeting with DeNaut and Brand:

> 7 Q. And what was said between you and
> 8 Mr. Brand and Mr. Denaut in -- in that meeting?
> 9 A. My remembering, what I remember from
> 10 that meeting is a -- is a few things. The first
> 11 is that I remember telling them about Mr. Amling's
> 12 remark about the younger bankers, and that
> 13 Mr. Denaut said in a surprised voice, He -- He
> 14 said that?
> 15 And I remember that because it was
> 16 surprise as opposed to consternation over the fact
> 17 that it was said. It was surprise over the fact
> 18 that he said it. I remember --
> 19 And -- and -- and the reason I -- one
> 20 of the reasons I met with Mr. Denaut and Mr. Brand
> 21 was they had the power to overturn a decision. So
> 22 I asked them if they would consider overturning
> 23 the decision to terminate me, and if they wouldn't
> 24 do that, that they would consider transferring me
> 25 to another part of the bank because I wanted to
> 269
> 1 - DANIEL B. GRAVES -
> 2 stay employed at the bank.
> 3 I asked them if -- if that wasn't
> 4 available whether it was possible for me to stay
> 5 on for a period of time so that I could find a
> 6 job.
> 7 I also asked them about getting a
> 8 bonus for the year because the severance package
> 9 that I had did not have a bonus.
> 10 And my recollection is that Mr. Brand
> 11 said to me, I'll get back to you in 48 hours.
> 12 Q. Did -- did he say he'd get back to
> 13 you in 48 hours about the bonus?
> 14 A. About the topics of the meeting.
> 15 Q. Oh, okay. So not just the bonus but
> 16 staying on or being transferred?
> 17 A. All -- all of the topics of the
> 18 meeting.

*Id.*, Tr. 268 line 7 to Tr. 269 line 18.  Plaintiff's cross-examination on this subject continued:

> 22 Q. You -- you chose not to tell
> 23 Mr. Johnson or Mr. Marcus about Mr. Amling's
> 24 supposed comment about younger bankers.
> 25 Why -- why did you decide to tell
> 270
> 1 - DANIEL B. GRAVES -
> 2 Mr. Brand and Mr. Denaut about that comment?
> 3 A. Mr. Brand and Mr. Denaut were
> 4 Mr. Amling's direct supervisor, and I felt that
> 5 that was the appropriate avenue to describe the
> 6 conversation I had with Mr. Amling.
> 7 Q. Did you tell Mr. Brand or Mr. Denaut
> 8 that you thought you were being selected for
> 9 termination because of your age?
> 10 A. I don't recall saying those words.
> 11 Q. In -- in your complaint you -- you
> 12 say that "Mr. Brand and Mr. Denaut expressed
> 13 surprise when you conveyed Mr. Amling's statement
> 14 about needing the accounts for younger employees."
> 15 Was there anything else other than
> 16 Mr. Denaut's comments that indicate to you that
> 17 they expressed surprise?
> 18 A. I seem to remember somebody pushing
> 19 their chair back away from the table, but -- but I
> 20 don't remember which person did that.
> 21 Q. Did you think that that expression of
> 22 surprise and that Mr. Denaut made or the
> 23 pushing away from the table was significant?
> 24 A. I believe Mr. Denaut's comment was
> 25 significant because it expressed, again, surprise
> 271
> 1 - DANIEL B. GRAVES -
> 2 that he had said it, not in -- in my opinion any
> 3 consternation over the fact that he had said it.
> 4 It was the surprise that he said it.

*Id.*, Tr. 269 line 22 to Tr. 271 line 4.

22.  Graves was then cross-examined as to his understanding of Defendant's motive:

> 21 Q. Why do you think they targeted for
> 22 your age rather than some other reason? For

23 example, maybe they just didn't like you or maybe
24 they didn't like Pisces or maybe they, you know --
25 why -- why do you believe it was because of age?
278
1 - DANIEL B. GRAVES -
2 A. Well, one factor that would lead me
3 to believe that it was because of age is because I
4 told Mr. Denaut and Mr. Brand about Mr. Amling's
5 comment. And it would be reasonable to infer that
6 they -- that they would infer that I would
7 potentially file a lawsuit for age discrimination
8 based on that comment.
9 And because of that, I did not hear
10 back from Mr. Brand within 48 hours of the meeting
11 that I had; I did not get a transfer; I did not
12 get the capability to stay on; I did not get a
13 bonus; I did not get my appeal of severance
14 proposal. It was denied; I did not get that.

*Id.*, Tr. 277 line 21 to Tr. 278 line 14.  *See* also *id.*, Tr. 279 line 4 to Tr. 280 line 10.

23.  Graves also testified to his belief that the only reason he could see for

Defendant's filing misleading and incorrect information with the EEOC was to cover up

age discrimination.  *Id*., Tr. 278 line 15 to Tr. 280 line 10.

24.  Graves testified that DeNaut and Brand never got back to him on any of the

topics they discussed at the January 20, 2004 meeting.  *Id.*, Tr. 279 line 4 to Tr. 280 line

10.

25.  After Amling informed Graves in January 14, 2004, that he was being fired,

Graves went on the same day to see Christopher Johnson, because he knew that Johnson

knew officials of Defendant above Amling's level, and that this might help get the

decision overturned.  *Id.*, Tr. 250 line 22 to Tr. 251 line 20.  Graves continued:

25 Q. What did you say to Mr. Johnson and
252

1 - DANIEL B. GRAVES -
2 what did he say to you in that conversation?
3 A. I believe I asked him to go see or
4 or -- or to -- to intervene on my behalf with
5 Mr. Byrne and Mr. Gahan. And he said he would.

*Id.*, Tr. 251 line 25 to Tr. 252 line 5.

26.  On the evening of January 21, 2004, ███████████████████████

███████████████████████████████████████████ January 21,

2004, evening e-mail thread, Johnson Dep. Exh. 9, DB 71417, Seymour Declaration,

¶ 71, Exhibit 67.

27.  On January 26, 2004, ██████████████████████████████

████████████████████████████████████████████.

January 26, 2004 e-mail thread between Johnson and Graves, Johnson Dep. Exh. 10, DB

12371, Seymour Declaration, ¶ 72, Exhibit 68.

28.  On January 30, 2004, Johnson sent an e-mail to Brand, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ Johnson Dep. Exh. 12, DB 71421, Seymour Declaration, ¶ 72, Exhibit 69.

29.  Johnson testified in his deposition that he did not remember anything about this, and

when confronted with these e-mails admitted as little as possible.  January 26, 2011 Deposition

of Christopher Johnson, Seymour Declaration, ¶ 70, Exhibit 66, Tr. 124 line 15 to Tr. 144 line

12.

30.  There is a dispute of material fact whether Defendant could have transferred Graves

to a position in its Leveraged Finance unit, or to a position in its Mergers & Acquisitions unit, or

to another unit, and whether its failure or refused to do so, or to reconsider its decision, or to give him a "soft landing," because of age discrimination and in retaliation for Graves' having internally complained to DeNaut and Brand about Amling's remark that Amling needed his accounts for younger bankers.

### 17. Whether, Prior to the Final Decision to Fire Graves, Defendant Expected the Business and Fees of the Media Group to Increase Substantially

1. There is a disputed question of material fact whether, prior to the final decision to fire Graves, Defendant expected the business and fees of the Media Group to increase substantially.

2. Excerpts from a document Defendant produced in discovery a document entitled "Media / Industry Batch / CIB / October 2003," pp. 1-15, DB 48073 to DB 48087, Seymour Declaration, ¶ 68, Exhibit 64, .

    (a)  The ███████████████" section of the "████████████████" of the report states in part:

The global media and entertainment industry has begun to recover from 2001's





Exhibit 64, p. 6, DB 48078 (emphasis in original).

(b)  Referring to both the United States and Europe, the document stated: "

*Id.*, p. 13, DB 48085.

(c)  The document stated:



*Id.* (emphasis in original).

3.  There is thus a dispute of material fact whether Defendant's assertions that it fired Graves because the business and fees generated by the media industry were declining, with the implicit or explicit expectation they would continue to decline, was a pretext for age discrimination.

**18. Whether, Prior to the Final Decision to Fire Graves, Defendant Expected the Business and Fees of the Broadcasting "Space" in the Media Group to Increase Substantially**

1.  There is a disputed question of material fact whether, prior to the final decision to fire Graves, Defendant expected the business and fees of the Broadcasting "Space" in the Media Group to increase substantially.

2.  Excerpts from a document Defendant produced in discovery a document entitled

███████████████████████████████████ " pp. 1-15, DB 48073 to DB 48087, Seymour Declaration, ¶ 68, Exhibit 64, state:

████████████████████████████████████████████
████████████████████████████████████████████
████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████
████████████████████████████████████████████
████████████████
████████████████████████████████████████████
████████████████████

3.  A reasonable jury could find from this material that Defendant's assertions that it fired Graves because the business and fees generated by the broadcasting "space" within the media industry were declining, with the implicit or explicit expectation they would continue to decline, was a pretext for age discrimination.

### 19. __Whether Amling's Memory is Too Poor to Be Reliable__

1. Amling's statements in his deposition that he did not remember something do not mean that the event in question never occurred.  He testified he could not remember which documents defense counsel gave him to review the day before the deposition, although there were only about ten.  Amling Dep., Exh. 25, Tr. 10 line 17 to Tr. 11 line 9.  He could not remember whether he stopped being the head of the Media Investment Banking Group in 2004, 2005, or 2006.  *Id.*, Tr. 15 lines 2-5.  He could not remember within a couple of years when his personal assistant, Susan Hoffman, left DBSI.  *Id.*, Tr. 19 line 16 to Tr. 20, line 8.  He could not remember the scope of her authority over the bank's systems for tracking call reports and client assignments as Senior Investment Banker while she worked for him.  *Id.*, Tr. 20 line 17 to Tr. 21 line 12.  Even after defense counsel identified the Client First system as tracking call reports and the Client Manager system as "the one where the accounts get entered and an SIB is assigned," *id.*, Tr. 21 line 18 to Tr. 22, line 6, he did not remember what systems the bank used during the five-year period in which both he and Graves worked for DBSI.  *Id.*, Tr. 22 lines 8-11.  The initials "SIB" mean "Senior Investment Banker."  *Id.*, Tr. 24, lines 12-15.  After he was again prompted about the Client Manager system and the Client First system, he stated that he remembered the names but could not remember the differences between them.  *Id.*, Tr. 22, lines 12-19.  He did not remember whether Ms. Hoffman had any authority, without his approval, to add any account to the Client Manager system.  *Id.*, Tr. 23, lines 16-19; Tr. 24, lines 7-11.

2. Although Graves did not make any claims against Amling in this lawsuit, Defendant arranged to have Sidley Austin "represent" Amling in his deposition.  Sidley Austin's November 14, 2010 letter to Amling containing the terms of the "representation" but not providing for payment or setting forth written information about a third-party payor was signed by Amling on December 29, 2010.  Seymour Declaration, ¶ 77, Exhibit 73.

3.  In his deposition taken *sixteen days* after he signed the retainer agreement, Amling testified he did not remember if he signed the retainer agreement, or when he would have signed it:

```
20        Q.   Did you sign a retainer agreement with
21   Sidley Austin to represent you?
22        A.   I don't recall.
                           169
 1        Q.   The subpoena calls for a retainer
 2   agreement.  Did you see that, in paragraph two?
 3        A.   Yes.
 4        Q.   Do you know if you signed a retainer
 5   agreement?
 6        A.   If, if I did sign a retainer agreement,
 7   which I may have, I assume that counsel would provide
 8   it to you to the extent it doesn't violate
 9   attorney-client.
```

January 14, 2011 Deposition of Jeffrey Amling, Seymour Declaration ¶ 50, Exhibit 46, Tr. 168 line 20 to Tr. 169 line 9.

4.  There is thus a disputed issue of material fact whether Amling's memory is too poor to be reliable.

## 20.  <u>Whether Any Inference as to Graves' Credibility Can Be Drawn from Graves' Handwritten Notes</u>

1.  Defendant's Memorandum states without citation that Graves' handwritten notes of his January 14, 2004 meeting with Amling were contemporaneous, and that the omission in those notes of Amling's remark about Amling's needing Graves' accounts for younger bankers renders "the allegation unworthy of belief."  Deft. Mem. at 6.

2.  Graves' notes were not contemporaneous.  He testified that he did not remember when he made the notes and that it may or may not have been that week, but he was certain he made the notes within a few weeks of the January 14 meeting.  January 10, 2011 Deposition of Daniel

Graves, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 236 line 16 to Tr. 237 line 11.  There is no evidence to the contrary.

3.  Graves testified that he made the notes because he had spoken with an attorney, Eric Seiler, and that he created the notes after he spoke with Seiler.  *Id.*, Tr. 237 line 22 to Tr. 239 line 3.  There is no evidence to the contrary.

4.  Graves testified that he made the notes to prepare for a meeting with Seiler and with his partner, Ed Friedman.  Mr. Seiler had previously helped Graves in the negotiation of his hiring agreement in 1999.  *Id.*, Tr. 239 line 4 to Tr. 240 line 8.

5.  Graves had the handwritten notes with him when he met with Seiler and Friedman, but does not remember if he gave the notes to them.  *Id.*, Tr. 241 line 3 to Tr. 242 line 7.

6. Graves testified that he tried to be accurate as to the notes, but the notes were prepared in relation to what he had already told Seiler:

> 5 Q. When -- when you created those notes,
> 6 did you try your best to honestly convey what was
> 7 said ln the conversations?
> 8 A. I -- I created the notes based on the
> 9 conversation that I'd had with Eric about the
> 10 issues. And they were a reflection of what I
> 11 could remember in relation to what I had already
> 12 told Eric about the issue at hand.
> 13 Q. So you -- you you tried to be
> 14 accurate ln your descriptions of the conversation?
> 15 A. I -- the answer is "try to be
> 16 accurate," yes.

*Id.*, Tr. 243 lines 5-16.

7. There is no evidence that Graves had a habit of making notes.  He testified that he did not make notes of his January 20, 2004 meeting with DeNaut and Brand.  *Id.*, Tr. 267, lines 5-22; Tr. 271 lines 5-22.  Graves had a meeting with Brand and DeNaut on September

16, 2003, to discuss the assignment of accounts, and Graves did not take notes.  January 12,

2011 Deposition of Graves, Seymour Declaration, ¶ 65, Exhibit 61, Tr. 433 line 9 to Tr. 434

line 8.

     8.  At their January 20, 2004 meeting, Graves informed DeNaut and Brand of Amling's

remark about needing Graves' accounts for other bankers.  See Part B(16), ¶¶ 19-24, at pp. 74-77

above.

     9.  On February 6, 2004, just six days after Graves had gone off payroll, he sent a letter to

DeNaut and Brand protesting Defendant's treatment of him.  It stated in part:

> On January 14, 2004, without warning or cause, I was told by Jeff Amling that my
> employment was being terminated. Jeff told me - as I reported to you on January 20 - that
> I was the one Managing Director in our group selected for termination because my client
> relationships and accounts were needed for "younger bankers."

February 6, 2004, letter from Graves to DeNaut and Brand, Graves 1118 to Graves 1119,

Seymour Declaration, ¶ 78, Exhibit 74.

     10.  On March 31, 2004, Bernadette Whitaker, a Managing Director and the HR Director

for the Americas Region, wrote to Graves to ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████.  Seymour Declaration, ¶ 79,

Exhibit 75.

     11.  On April 30, 2004, Steven Berger, one of the attorneys for Plaintiff in this action,

sent a letter to DeNaut and Brand outlining Plaintiff's wrongful termination. Graves 1135-1137,

Seymour Declaration, ¶ 80, Exhibit 76.  This letter referred to Amling's remark about needing

Graves' accounts for younger bankers, and referred to DeNaut's and Brand's shock and dismay

when Graves informed them of the remark.

12.  From this evidence, there is a disputed issue of material fact as to whether an adverse interest can be drawn against Graves from the omission in his notes of a mention of Amling's remark that Graves' accounts were needed for younger bankers.

### 21.  Who the Decisionmakers on Graves' Termination Were

1.  Defendant's November 5, 2004 Position Statement to the EEOC represented at p. 4, Graves 25, that ' (Footnote omitted.)  Seymour Declaration, ¶ 37, Exhibit 34, Graves 22 to Graves 32.

2.  Defendant's October 2, 2009 Responses & Objections to Plaintiff's Reformulated Interrogatories stated in response to Interrogatory 9, at pp. 13-14: "The individuals who were primarily responsible for selecting Plaintiff's position for elimination were Jacques Brand and Jeffrey Amling."  Seymour Declaration, ¶ 81, Exhibit 77.

3.  Defendant's December 9, 2010 Revised Objections and Answers to Plaintiff's First Interrogatories changed its answer to Interrogatory 9, at pp. 13-14, to state: "The individuals who were involved in selecting Plaintiffs position for elimination were James DeNaut, Jacques Brand and Jeffrey Amling."

4.  Defendant's three different positions raise a disputed question of material fact as to the identities of the decisionmakers on Graves' termination.

C.    **Plaintiff's Statement of Undisputed Material Facts**

1.    **Defendant Has Admitted Lying to the Government in Order to Further Mortgage and Tax Fraud**

1.  On May 10, 2012, Judge Kaplan of this Court entered a Stipulation and Order of Settlement and Dismissal in *United States of America v. Deutsche Bank AG, DB Structured Products, Inc., Deutsche Bank Securities, Inc., and MortgageIT, Inc.*, No. 11 Civ. 2976 (LAK) (Doc.  # 48 in that case), Graves 110468 to Graves 110486, Seymour Declaration, ¶ 83, Exhibit 79.  The case was brought under the False Claims Act, 31 U.S.C.  §§ 3729 *et seq.*, and the common law theories of breach of fiduciary duty, gross negligence, negligence, and indemnification.  *Id.*, p. 2, Graves 110469.  The Terms and Conditions part of the Stipulation and Order, pp. 3-13, Graves 110470 to Graves 110480, set forth the stipulated actions of MortgageIT in ¶¶ 2(a) through 2(j) on pp. 3-4, Graves 110470 to Graves 110471.  After discussing the false certifications submitted by Mortgage IT in ¶¶ 2(a) through 2(h), *id.*, ¶¶ 2(i) and 2(j) stated at p. 4, Graves 110471:

> (i) As a result, MortgageIT submitted to HUD-FHA certifications stating that certain loans were eligible for FHA mortgage insurance when in fact they were not; FHA insured certain loans endorsed by MortgageIT that were not eligible for FHA mortgage insurance; and HUD consequently incurred losses when some of those MortgageIT loans defaulted.

> (j) MortgageIT became a wholly-owned, indirect subsidiary of DBSP and DBAG in January 2007.  During the period when MortgageIT was a wholly-owned, indirect subsidiary of DBSP and DBAG, one or more of the annual certifications was signed by an individual who was also an officer of certain of the DB Defendants.

Paragraph 3 on p. 5, Graves 110472, sets forth the other stipulated actions of the "DB Defendants":

> 3. The DB Defendants admit, acknowledge, and accept responsibility for the fact that after MortgageIT became a wholly-owned, indirect subsidiary of DBSP and DBAG in January 2007, the DB Defendants were in a position to know that the operations of MortgagcIT did not conform fully to all of HUD-FHA's regulations, policies, and handbooks; that one or more of the annual certifications was signed by an individual who

was also an officer of certain of the DB Defendants; and that, contrary to the
representations in MortgageIT's annual certifications, MortgageIT did not conform to all
applicable HUD-FHA regulations.

The Terms and Conditions further stated that the defendants in that action "shall pay to the

Government $202.3 million within thirty days of the Effective Date . . . ." *Id.*, ¶ 4, p. 5, Graves

110472.

2.  Deutsche Bank AG entered into a Non-Prosecution Agreement with the Office of the

United States Attorney for the Southern District of New York on December 21, 2010.  Seymour

Declaration, ¶ 84, Exhibit 80, Graves 110438-110467.  The Non-Prosecution Agreement stated:

"Deutsche Bank AG refers to Deutsche Bank AG, Taunus Corporation, and their respective

subsidiaries, affiliates, and related entities."  Page 1 n.2, Graves 110438 n.2.  The Agreement

stated:

> On the understandings specified below, the Office of the United States Attorney
> for the Southern District of New York (the "Office"), and with respect to tax offenses, the
> Tax Division, Department of Justice ("DOJ Tax"),[1] will not criminally prosecute
> Deutsche Bank AG ("Deutsche Bank")[2] for any crimes related to its participation in a
> conspiracy in violation of 18 U.S.C. § 371 to (a) defraud the United States and its
> agency, the Internal Revenue Service (hereinafter "IRS"); (b) commit tax evasion in
> violation of 26 U.S.C. § 7201; and (c) make and subscribe false and fraudulent tax
> returns, and aid and assist in the preparation and filing of said tax returns in violation of
> 26 U.S.C. § 7206, to the extent Deutsche Bank has disclosed such participation to this
> Office as of the date of this Agreement. Specifically, during the period between
> approximately 1996 and 2002, through the conduct of certain Deutsche Bank employees,
> Deutsche Bank participated in and implemented fraudulent tax shelters. In doing so and
> through other actions, Deutsche Bank assisted high net worth United States citizens, who,
> through 2005, reported approximately $29.3 billion in bogus tax benefits on their tax
> returns, mainly losses, resulting in the evasion of approximately $5.9 billion in U.S.
> individual income taxes on capital gains and ordinary income.
>
> _____
> [1] The protection against prosecution with respect to tax offenses set forth herein
> has been approved by DOJ Tax.
>
> [2] Deutsche Bank AG refers to Deutsche Bank AG, Taunus Corporation, and their
> respective subsidiaries, affiliates, and related entities.

*Id.* Deutsche Bank AG and its affiliates agreed to pay the U.S. Government $553,633,153 as part of the Agreement. *Id.*, p. 3, Graves 110440.

### 2. Defendant Transferred Accounts from Graves to Younger Bankers and Other Bankers, and Falsely Represented to the EEOC That It Did Not

1. Graves alleged in the Affidavit attached to his EEOC charge: "In 2002, I became suspicious of possible discrimination when a significant number of accounts that I had brought to Deutsche Bank and cultivated on my own were transferred to younger bankers in my group. . . ." Plaintiff's EEOC July 22, 2004 Charge of Discrimination and Retaliation, ¶ 4, pp. 3-4 of Charge, (pp. 1-2 of Affidavit), Seymour Declaration, ¶ 58, Exhibit 54.

2. Graves further alleged:

> 8.  Beginning in 2002, Mr. Amling began slowly siphoning accounts away from me and giving them to other bankers in the group, the majority of whom are younger than me. This made it increasingly difficult for me, through no fault of my own, to hit the firm's target for fees generated of $10 million. The siphoned accounts were either brought from Merrill Lynch, or cultivated by me during my employment at Deutsche Bank. When the firm raised the fee target to $15 million in 2003, these account transfers by Mr. Amling became even more harmful to me.  Moreover, as a result of losing these accounts, the potential "wallet" size of my portfolio—a figure of some significance at Deutsche Bank—decreased drastically, as well.

> 9.  Specifically, I had taken from me the Cox, Charter and Adelphia accounts (among others), all of which represented a very significant percentage of my business and potential "wallet".

*Id.*, ¶¶ 8-9, pp. 4-5 of Charge, (pp. 2-3 of Affidavit).

3.  DBSI represented to the EEOC ███████████████████████████████████
████████████████████████████████████████████████████████████████
Statement, Seymour Declaration, ¶ 37, Exhibit 34, Graves 22 to Graves 32, p. 1.

4.  DBSI represented to the EEOC, ████████████████████████████████████
████████████████████████████████████████████████████████████



10.  Amling helped to write the document entitled Amling Deposition Exhibit 6,

' █████████████████████████████████████████████████████████ January 14, 2011

Deposition of Jeffrey Amling, Seymour Declaration, ¶ 50, Exhibit 46, Tr. 56 line 20 to Tr. 57,

line 12.  Amling referred to the document in his January 14, 2011 deposition, and to the fact that

the data did not lineup properly.  *Id.*, Tr. 67 lines 7-17.  Amling testified that he did not recall the

transfer of the Adelphia account from Graves to Dyan Triffo, but the information showing the

transfer was probably correct:

15    Q.  If you turn towards the end, to page
16  DB025937.
17    A.  Yes.
18    Q.  Do you see that the penultimate entry on
19  the page is for Adelphia, and that the SIB name is
20  Triffo?
21    A.  Yes.
22    Q.  Do you recall having transferred Adelphia
              174
1  to Dyan Triffo at or before 8:59 a.m. on Tuesday, May
2  27th, 2003?
3    A.  I agree that this information is probably
4  correct, but no, I don't recall having done that.

*Id.*, Tr. 173 line 15 to Tr. 174 line 4.

    11.  A May 28, 2003 e-mail from Graves to Amling stated in relevant part:



OC, Exhibit 2 - May 28, 2003 E-Mail from Graves to Amling
on Adelphia with earlier thread, Graves 206-208, Seymour Declaration, ¶ 89, Exhibit 85.

    12.  Amling admitted the transfer of the Adelphia account in his January 14, 2011

deposition:

11    Q.  Okay, but it's, Adelphia has an estimated
12  $6 million of revenue and it's Triffo and Hartka as the
13  persons responsible, is that right?
14    A.  Correct.
15    Q.  Adelphia had been Mr. Graves' account,
16  hadn't it, before it was moved to Dyan Triffo?
17    A.  I think that's right, yes.

Amling Dep., Seymour Declaration, ¶ 50, Exhibit 46, Tr. 65 lines 11-17.

      13.  As of May 27, 2003, Graves ████████████████████

████████████████ Amling Deposition Exhibit 28, May 27, 2003 E-Mail Thread

between Graves and Amling, with Amling's e-mail and its transmitted MEDIABOOK_FV.xls,

entitled "DRAFT / Project Linkage Phase III / Client Re-tiering / Media Group / 28-May-03,"

DB 25976 to DB 26008, Seymour Declaration, ¶ 38, Exhibit 35, p. DB 25981, top part of chart,

fourth line of data.

      14.  As of December 2003, Charter was listed on a DBSI document ████████████

████████████████████████████████████████████

██████████ M&A media-strategic planning presentation / Discussion materials / December

2003," DB 48564 to DB 48607, Seymour Declaration, ¶ 91, Exhibit 87 to the Seymour

declaration, at p. DB 48584.

      15.  A December 2, 2003 e-mail from Graves to Amling stated in relevant part:



Exhibit 3 to Graves Reply Affidavit, Seymour Declaration, ¶ 90, Exhibit 86.

      16.  A December 15, 2003 e-mail from Graves to Amling, referring to the December 2,

2003 e-mail quoted above, stated in relevant part:

*Id.*

      17.  Amling's document entitled "Media Group / 2004 Outlook and individual banker

highlights / October 20, 2003," Seymour Declaration, ¶ 86, Exhibit 82, Amling Dep., Seymour

Declaration, ¶ 50, Exhibit 46, Tr. 56 line 20 to Tr. 57, line 12, was referenced in Amling's deposition, and to the fact that the data did not lineup properly.  He admitted that Graves had been the Senior Investment Banker on the Bull Run account, and that the account had been transferred to Sun Yung.  *Id.*, Tr. 67 line 18 to Tr. 69 line 3.

18.  Graves had been Senior Investment Banker on the Cox Communications account, and Amling admitted in his deposition that that account was transferred to Malcolm Morris.  See the next section.

**3.      DBSI's Representation that Graves' EEOC Charge Complained of the Transfer of Cox Radio, as Opposed to Cox Communications and Cox Enterprises**

1.  Graves' Affidavit incorporated in his EEOC charge stated in ¶ 9:

9. Specifically, I had taken from me the Cox, Charter and Adelphia accounts (among others), all of which represented a very significant percentage of my business and potential "wallet".

Seymour Declaration, ¶ 58, Exhibit 54, ¶ 9 at p. 4.

2.  DBSI represented to the EEOC ███████████████████████████████

████████████████████████████████████ Position Statement, Seymour

Declaration, ¶ 37, Exhibit 34, Graves 22 to Graves 32, p. 5:

███████████████████████████████████████████████████
███████████████████████████████████

3.  DBSI represented to the EEOC that ████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████ (Footnote omitted.)  *Id.*

4.  Amling had transferred the Cox Communications account, not the Cox Radio account, from Graves to Malcolm Morris.  Graves had been the Senior Investment banker on that account. Amling Dep., Exh. 25, Tr. 200 line 7 to Tr. 201 line 9; Tr. 202, lines 12-20.

5.  Graves was formerly Senior Investment Banker for Cox Enterprises.  His Reply Affidavit to the EEOC, Graves 129-141, Seymour Declaration, ¶ 87, Exhibit 83, stated:

> 23. My accounts were reassigned, beginning in 2002. In the spring, Mr. Amling informed me that Cox Enterprises (DB has confused this with Cox Radio) was being transferred to Mr. Morris. At the time, I was 40 and Mr. Morris was 39. The reason given to me was that "Malcolm has nothing to do". Indeed, in Spring 2002, Mr. Morris had no hope of meeting the 2002 target. He did not meet the 2002 target, nor did he meet the 2003 target, and, it appears he will not make the 2004 target. I complained that this was unfair, and even asked why Mr. Morris was not terminated. Mr. Amling dodged by stating that he had tried to terminate Ms. Yung, who also had no hope of meeting the 2002 target, but "HR would not let me" because of her status as a pregnant, Asian woman. Clearly, at least in that instance, DB was sensitive to discrimination issues. Ms. Yung also did not meet the 2002 target, nor did she meet the 2003 target, and, it appears, will not make the 2004 target.

Graves 135-Graves 136. ███████████████████████████████████
███████████████████████████. "Americas Tier1A/1 July 2, 2003," p. DB46544,
Seymour Declaration, ¶ 92, Exhibit 88, "Americas Tier1A/1 July 2, 2003."

6. At the time of its Position Statement, DBSI knew or should have known, and was charged with the knowledge, that Graves was complaining that his Cox Communications and Cox Enterprises accounts had been taken away from him and transferred to Malcolm Morris.

### 4.   DBSI's Representation that the Accounts, Which Graves Complained to the EEOC Had Been Reassigned, Produced No Revenue for DBSI and Were of Little Value

#### a.   DBSI's Representations as to the Accounts

1.  DBSI represented to the EEOC: "█████████████████████████████
███████████████████████████████████████████████████████████████



10.

███████████████████████████████████████████████████

████████████████████

### b.   Graves' Former Adelphia Account

1.  As stated in ¶ C(2)(10) on p. 90 above, Amling helped to write the document entitled "Media Group / 2004 Outlook and individual banker highlights / October 20, 2003," referred to the document in his January 14, 2011 deposition, and testified in his January 14, 2011 deposition that the document showed $6 million in revenue for Graves' former Adelphia account, credited to Dyan Triffo and Jason Hartka.  Amling Dep., Seymour Declaration, ¶ 50, Exhibit 46, Tr. 65 lines 11-17.

2.  Further as to Graves' former Adelphia account, the performance evaluation for Dyan Triffo for 2003 stated in the self-assessment portion:

████████████████████████████████████████████████████

Excerpts from "Performance Management Report . . . Year End Evaluation 2003" for Dyan Triffo, p. 6, DB 46169 (top of page), Seymour Declaration, ¶ 93, Exhibit 89.  Amling was the reviewing manager, and made no comments.  *Id.*

3.  A DBSI document entitled "Business Planning & Development, Media Summary for all Americas, As of September 30, 2003," Graves' Reply Affidavit to EEOC, Exhibit 1, Graves 142-205, Seymour Declaration ¶ 88, Exhibit 84, stated at p. 14, Graves 156, entitled

"████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  are not fees earned by Deutsche Bank, but fees earned by all its banks.

4.  This document stated on p. 18, Graves 160, that ██████████████████████
████████████████████████████████████████████████████

5.  As of July 2, 2003, DBSI listed ██████████████████████████████████████
████████████████████████.  "Americas Tier1A/1 July 2, 2003," p. DB
46548, Seymour Declaration, ¶ 92, Exhibit 88.

6.  A DBSI document entitled "M&A media-strategic planning presentation /
Discussion materials / December 2003," DB 48564 to DB 48607, Seymour Declaration ¶ 91,
Exhibit 87, states on p. 35 of the document, DB 48600, ████████████████████████
█████████████████████  That prospect was to the credit of Dyan Triffo.  *Id.*

7.  The same document shows on p. 37, DB 48602, that ██████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████

8.  Defendant's documents produced in discovery show that as of January 23, 2004,
before Graves' last day of work, ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████  January 23, 2004 e-mail thread containing an
article on the Dow Jones News Wire, DB 46795 to DB 46798, Seymour Declaration, ¶ 94,
Exhibit 90, page DB 46796.  ████████████████████████████████
████████████████████████████████████████████████████

*Id.*, DB 46795

c.      **Graves' Former Charter Communications Account**

1. As to Graves' former Charter account, the performance evaluation for Sun Yung for

2003 stated in the self-assessment portion:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████

Excerpts from "Performance Management Report . . . Year End Evaluation 2003" for Sun Yung,

DB 46134-DB 46148, Seymour Declaration, ¶ 95, Exhibit 91, p. 12, DB 046145 (near top of

page).  Amling gave the final evaluation in this section ████████████████████████████

*Id.*

2. A DBSI document entitled "Business Planning & Development, Media Summary

for all Americas, As of September 30, 2003," Seymour Declaration ¶ 88, Exhibit 84, stated at p.

13, Graves 155, entitled "████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████   These are not fees earned by Deutsche Bank,

but fees earned by all its banks.

3. Exhibit 84 stated on p. 14, Graves 156, that ████████████████████████

████████████████████████   These are not fees earned by Deutsche Bank, but fees

earned by all its banks.

4. Exhibit 84 stated on p. 19, Graves 000161, that ████████████████████

███████████████████████████████████████████

5. Exhibit 84 stated on p. 45, Graves 187, that ███████████████████
████████████████████████████████████████████████████████████
██████

6. Exhibit 84 stated on p. 48, Graves 190, that ██████████████████
███████████████████████████████████████████████████████████.

### d.     Graves' Former Cox Communications and Cox Enterprises Accounts

1.   As to Graves' former Cox Communications and Cox Enterprises accounts, the

performance evaluation for Elizabeth Chang for 2003 stated in the self-assessment portion, pp.

10 and 11, DB 46276 and DB 46277:



Excerpts from "Performance Management Report . . . Year End Evaluation 2003" for Elizabeth

Chang, Seymour Declaration, ¶ 96, Exhibit 92, DB 46267-DB 46279, pp. 10-11, DB 46276 and

DB 46277.  Gregory Paul gave the final evaluation in this section and ████████████████

██████  *Id.* at p. 11, DB 46277.

2.   A DBSI document entitled "Business Planning & Development, Media Summary

for all Americas, As of September 30, 2003," Seymour Declaration ¶ 88, Exhibit 84, stated at p.

17, Graves 159, that ████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████

3.  Exhibit 84 also stated on p. 17, Graves 159, that ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████

4.  Exhibit 84 stated on p. 20, Graves 162, that ████████████████████

████████████████████████████████████████████

5.  As of July 2, 2003, DBSI listed ████████████████████████

████████████████████ "Americas Tier1A/1 July 2, 2003," Seymour Declaration, ¶

92, Exhibit 88, p. DB 46548.

6.  As of July 2, 2003, DBSI listed ████████████████████████████

███████████████████, p. DB 46545.

7.  A DBSI document entitled "M&A media- strategic planning presentation / Discussion

materials / December 2003," DB 48564 to DB 48607, Seymour Declaration ¶ 91, Exhibit 87,

shows on p. 19, DB 48584, that ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

8.  The same document shows on p. 19, DB 48584, that ███████████████████

████████████████████████████████████████████

███████████████████

9.  The same document shows on p. 21, DB 48586, a page entitled: '████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**5.      DBSI's Representation that Graves Never Complained to DBSI About Account Transfers**

1. DBSI represented to the EEOC: ██████████████████████████

████████████████████████████████████████████████████████████████

███████████████   Position Statement, Seymour Declaration, ¶ 37, Exhibit 34, Graves 22 to

Graves 32, p. 1.

2. DBSI represented to the EEOC:



*Id.*, p. 10.

3. DBSI admitted in its Answer that Graves complained about some account transfers:

10.  Denies all of the allegations contained in Paragraph 10 of the Complaint, including each of its subparts (10(a) through and including 10(h)), except avers that DBSI, for business reasons, at times transferred clients from one banker to another, including Plaintiff, and *admits that Plaintiff complained about certain of those transfers.*

Answer, De Baun Affirmation, Exhibit B, ¶ 10 on p. 3 (emphasis supplied).

4. Graves' Reply Affidavit to the EEOC, Graves 129 to Graves 141, Seymour

Declaration, ¶ 87, Exhibit 83, ¶¶ 23-28 at pp. Graves 135 to Graves 137, described Graves'

various complaints to Amling about the transfer of his accounts to other bankers.

5. During his deposition, Amling was shown the May 27, 2003, 8:59 A.M., e-mail from

Graves to Amling, Amling Dep. Exhibit 26, Seymour Declaration, ¶ 85, Exhibit 81, which stated

in relevant part: "███████████████████████████████████████

███████████████████   Amling Dep., Seymour Declaration, ¶ 50, Exhibit 46, Tr. 172, lines 7-22.

6. Amling testified that he did not remember receiving it, that he assumed he received it,

and that it could have been a complaint or could have been just an attempt to discuss the transfer:

1    Q.   Okay.  Do you remember receiving this
2  e-mail?
3    A.  No.
4    Q.   You see in the first lines of the e-mail
5  that Mr. Graves is complaining about the movement of
6  Adelphia to Dyan Triffo?
7    A.   I can see that he is e-mailing me wanting
8  to discuss the movement of the account.  I don't see
9  that he's complaining.
10    Q.   Would you have understood this as other
11  than a complaint at the time?
12    A.   I, I, I don't recall what I understood
13  when I received this.  It could have been a complaint,
14  it could have been a, a request to discuss it.

*Id.*, Tr. 173 lines 1-14.

7.  After Mr. Graves' 8:59 A.M. e-mail to Amling on May 27, 2003 about ██████████

██████████████████████████████████████████████████████

Confronted with a document showing ████████  Amling Dep. Exhibit 28, Seymour

Declaration, ¶ 38, Exhibit 35, Amling agreed that this is what the document showed but said he

did not remember the transfer.

11        MR. SEYMOUR:  I ask the reporter to mark
12        the next exhibit as Exhibit 28, and then I'll
13        describe it.
14           (A document numbered DB025976 through
15           DB026008, was marked as Amling Exhibit No. 28
16           for identification.)
17  BY MR. SEYMOUR:
18    Q.   Exhibit 28 is an e-mail from Daniel
19  Graves to Sue Hoffman, subject, forward, client tiering
20  draft, with attached mediabook_FV.xls, and this was
21  sent on Tuesday, May 27th, 2003, at 4:16 p.m.  Do you
22  see that at the top of the page, the first page?
                              176
1    A.  Yes.
2    Q.   The document starts with DB025976, and at
3  the end of the attachments says DB026008.  Do you see
4  that?
5    A.  Yes.
6    Q.   And this is 4:16 p.m., the same day.
7  Please turn to the page Bates numbered DB025981, and

8   right about the middle of the first group of companies,
9   do you see the reference to Adelphia?
10       A.   Yes.
11       Q.   And do you see that the Senior Investment
12   Banker is now Sun Yung?
13       A.   Yes.
14       Q.   Does this refresh your recollection as to
15   your transferring the Adelphia account to Sun Yung that
16   same day that Dan Graves raised the question?
17       A.   No, it does not.

Amling Dep., Seymour Declaration, ¶ 50, Exhibit 46, Tr. 175 line 11 to Tr. 176 line 17.

8.  Amling was primarily responsible for account transfers within the Media Investment

banking Group.  October 2, 2009 Defendant's Responses and Objections to Plaintiff's

Reformulated Interrogatories, Seymour Declaration, ¶ 85, Exhibit 81, Answer to Interrogatory 3

at p. 7.

9.  Triffo was 37 years old, and Yung was 41 years old.  Exhibit B to Position Statement,

Exhibit O to De Baun Affirmation.

10.  ███████████████████████████████  A DBSI

document entitled "M&A media- strategic planning presentation / Discussion materials /

December 2003," DB 48564 to DB 48607, Seymour Declaration ¶ 91, Exhibit 87, shows on p.

35 of the document, DB 48600, that ████████████████████████████

*Id.*

11.  Graves asked DBSI for "A copy of every document containing any information for

any period of time, as to any banker or group of bankers who worked in the Media Investment

Banking Group at any time from March 31, 1999, through March 31, 2005, as to any of the

following . . . (c) the actual assignments of clients to one or more bankers; . . . (i) any assignment

or change in the assignment of the Adelphia Communications client to any banker . . . ."

December 7, 2009 Defendant's Objections and Responses to the Document Requests in Plaintiff's

First Requests for Discovery, Seymour Declaration, ¶ 14, Exhibit 13, Response to Requests 47(c)

at p. 54 and 47(i) at p. 57.  DBSI responded: "Without waiving the foregoing objection, and to

the extent not objected to therein, DBSI responds: DBSI will produce non-privileged, responsive

documents, if any, it may have reflecting the assignments of clients to MDs and Directors in the

Media Group during the relevant period."  *Id.* p. 54 and p. 57 (incorporating response at p. 54).

12.  DBSI never produced an explanation ███████████████████████████████████

███████████████████████████████████ Seymour Declaration, ¶ 97 at

p. 15.

13.  DBSI never produced an explanation ███████████████████████████████

███████████████████████████████████████████ Seymour

Declaration, ¶ 98 at p. 15.

### 6. DBSI's Representations that the Younger Bankers Did Not Need Mr. Graves' Accounts

1.  DBSI repeatedly represented to the EEOC that the "younger bankers" did not need

Mr. Graves' accounts since they produced no revenue and were essentially without value:





2.  The contention that these accounts were never transferred, and the contention that these accounts produced no revenue and were without value, have been discussed adequately above.

3.  The 2003 performance evaluation for Elizabeth Chang, Seymour Declaration, ¶ 96, Exhibit 92, DB 46267-DB 46279, age 34 at the time, 

4.  A Relationship Manager ("RM") at Merrill Lynch is comparable to a Senior Investment Banker at DBSI.  January 26, 2011 deposition of Christopher Johnson, Seymour Declaration, ¶ 65, Exhibit 61, Tr. 26 line 21 to Tr. 27 line 2.

5.  Ms. Chang's reviewing manager in 2003, Gregory Paul, stated on p. 10 of the evaluation form, DB 46276, in relevant part:



6.  Ms. Chang stated in her 2003 evaluation at p. 11, DB 46277, that ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████

████████████████████████████████████████████████████████

7.  The 2003 performance evaluation for Blair Faulstich, Seymour Declaration, ¶ 99,

Exhibit 93, DB 46034-DB 46047, age 34 at the time, ██████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

8.  The 2003 performance evaluation for David Dunn, Exh. 45, DB 46062-DB 46074,

Seymour Declaration, ¶ 100, Exhibit 94, age 35 at the time, █████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████

9.  Dunn's evaluating manager, ████████████ stated: "████████████████████████

████████████████████████████████████████████████████" *Id.*, p. 11, DB

46072.

**7.   DBSI's Representations that Graves Was Confined to the "Television Broadcasting Space," and Therefore Only He and Gregory Paul, Who Was Older than Graves and the Only One of the Two Who Had Cinema Experience, Could Be Considered for Layoff**

**a.   DBSI's Representations**

1.  DBSI represented that:



Position Statement, Seymour Declaration, ¶ 37, Exhibit 34, Graves 22 to Graves 32, pp. 1-2,

Graves 22-Graves 23 (emphases supplied).

2. DBSI represented that: "█████████████████████████

████████████████████████████████████████████████████

████████████████ *Id.*, p. 2, Graves 23.

3. DBSI represented that: "█████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (emphases supplied).

4. DBSI represented that: "█████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████" *Id.* (emphases supplied).

5. DBSI represented that:





*Id.*, p. 4, Graves 25 (emphases supplied).

    6.  DBSI represented that:



*Id.*

    7.  DBSI represented that: " ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id.* (emphasis supplied).

    8.  DBSI represented that: " ████████████████████████████

████████████████████████████████████████████████

██████████████████ *Id.*

    9.  DBSI represented that: " ████████████████████████████

████████████████████████████████████████████████████

██████████████████ *Id.* at p. 6, Graves 27 (emphasis supplied).

    10.  DBSI represented that:



*Id.*

11.  DBSI represented that: '███████████████████████████

███████████████████████████████████████████████████

███████████████ *d.* at p. 7, Graves 28.

12.  DBSI represented that:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

*Id.* at p. 8, Graves 29.

13.  DBSI represented that: ".███████████████████████████

███████████████████████████████████████████████

██████████████████████ . . ." *Id.*

### b.  Graves Worked at DBSI in Many Areas Other Than Television Broadcasting

1.  DBSI admits that Graves "worked on transactions in media industries other than TV broadcasting".  Complaint, De Baun Affirmation, Exhibit A, ¶ 102 at pp. 35-39; Answer, De Baun Affirmation, Exhibit B,  ¶ 102 at p. 19.

2.  One of Graves' clients at DBSI was the ███████ which was in Business and Professional Publishing.  Excerpts from spreadsheet, Seymour Declaration, ¶ 102, Exhibit 96, pp. 1 and 2, DB 46583-DB 46584, line 23 on each page. ████████████████████ ███████████████████████████████████████Seymour Declaration, ¶ 101, Exhibit 95, DB 46571.

3.  One of Graves' clients at DBSI was ████████████████ which was in Newspapers and Broadcasting.  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, pp. 1 and 2, DB 46583-DB 46584, line 32 on each page.  The spreadsheet was attached to Sue

Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

    4.  One of Graves' clients at DBSI was ███████████████, which was in Cable Programming.  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, pp. 1 and 2, DB 46583-DB 46584, line 39 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

    5.  One of Graves' clients at DBSI was ███████████ which was in Publishing.  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, pp. 1 and 2, DB 46583-DB 46584, line 48 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

    6.  One of Graves' clients at DBSI was ███████████████ which was in radio broadcasting and cable systems.  Graves January 10, 2011 Deposition, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 112 line 23 to Tr. 113 line 4.

    7.  One of Graves' clients at DBSI was ██████████████████ *Id.*, Tr. 113 lines 8-10.  This company was in radio broadcasting and cable systems.  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, pp. 1 and 2, DB 46583-DB 46584, line 32 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

    8.  ██████████████████████████████████████████ ████████████████████████████████████████

Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, pp. 1 and 2, DB 46583-DB 46584, line 26 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

9.  One of the clients taken away from Graves was ████████  This company was in Sports Marketing.  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, former pp. 7 and 8, DB046589-DB046590, line 73 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

10.  One of the clients taken away from Graves was ██████████████. ████  ██████████████████  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, former pp. 7 and 8, DB 46589-DB 46590, line 94 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

11.  Attachment C to DBSI's November 5, 2004 Position Statement, Graves 39 to Graves 41, Seymour Declaration, ¶ 35, Exhibit 32, is a franchise revenue and pipeline report dated January 15, 2003.  ████████████████████████████████ ████████████████████████████████████ ████████  Graves 000040.

12.  Gaylord Entertainment was a mixture of media industries.  Amling Dep., Exhibit 46 to Seymour Declaration, Tr. 83, lines 14-15.

13.  Landmark Communications was in publishing and TV broadcasting.  *Id.*, lines 17-18.

14.  Salem Communications was in radio broadcasting.  *Id.*, lines 19-20.

15.  XM Satellite Radio was obviously in satellite radio.

### c.  Graves Had Cinema Experience

1.  Graves had experience with cinema.  The document, "Dan Graves Merrill Lynch Account Universe," Graves 000211, Amling Dep. Exh. 22, Seymour Declaration, ¶ 103, Exhibit 97, shows that Graves had experience with AMC, a cinema company.  Amling testified that he

did not remember Graves giving the document to him when Graves was discussing the possibility of employment at BT Alex Brown, but that it was something Graves could have given him at that time.  Amling Dep., Exhibit 46 to the Seymour Declaration, Tr. 104 line 8 to Tr. 105 line 10.  Amling identified AMC on the document as a cinema company.  *Id.*, Tr. 105 lines 11-13.

2.  Amling then stated that it was common for jobseekers to overstate their experience, and he did not see how one person could have had experience as broad as Graves' experience.  *Id.*, Tr. 105 line 14 to 106 line 22.

3.  Amling did not testify to any specific reason he had during his employment at DBSI for thinking that Graves had not worked on deals involving any specific company listed on the "Dan Graves Merrill Lynch Account Universe," Exhibit 97, Graves 211.  He was asked if he thought anything on that list was not real, and his basis for it, but he reverted to his general suspicion.  Amling Dep., Exhibit 46 to the Seymour Declaration, Tr. 105 lines 5-22.

4.  Carmike is another company on which Graves worked.  "Dan Graves Merrill Lynch Account Universe," Graves 211, Exhibit 97.  Christopher Johnson testified that he worked on that account with Graves, and that it was a cinema company.  January 26, 2011 deposition of Christopher Johnson, Seymour Declaration, ¶ 65, Exhibit 61, Tr. 24, lines 7-19.

5.  Cinemark is another company on which Graves worked.  "Dan Graves Merrill Lynch Account Universe," Graves 211, Exhibit 97.

6.  Cinemark is a cinema company.  Excerpts from spreadsheet, Exhibit 96 to Seymour Declaration, pp. 1 and 2, DB 46583-DB 46584, line 41 on each page.  The spreadsheet was attached to Sue Hoffman's January 9, 2004 e-mail to a number of bankers, including Graves, Exhibit 95, DB 46571.

7. ███████████████████████████████████████ *Id.*

8. Graves worked on United Artists when he was at Merrill Lynch.  "Dan Graves Merrill Lynch Account Universe," Graves 211, Exhibit 97.  This was "the largest theater company in the country at the time."  He worked on the restructuring and the recapitalization of that.

### d.        Graves Had Other Types of Experience

1. Before coming to DBSI, Graves had worked in a number of media industries.  Both at Salomon Brothers and at Merrill Lynch, he worked on U.K. Cable, a cable industry in the United Kingdom.  Graves January 10, 2011 Deposition, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 22 line 18 to Tr. 23 line 6.

2. At Merrill Lynch, Graves was the head of the U.S. Broadcasting Practice, handling both radio and television broadcasters.  *Id.*, Tr. 23 line 25 to Tr. 24 line 19.

3. Two of his clients at Merrill Lynch were Clear Channel Communications and Infinity Broadcasting.  "Dan Graves Merrill Lynch Account Universe," Graves 211, Exhibit 97.  These were primarily radio broadcasting companies.  Graves January 10, 2011 Deposition, Seymour Declaration, ¶ 5, Exhibit 4, Tr. 24 line 20 to Tr. 25 line 2.

### e.        Other Bankers Had Television Broadcasting Clients

1. Attachment C to DBSI's November 5, 2004 Position Statement, Graves 39 to Graves 41, Exhibit 32 to the Seymour Declaration, is a franchise revenue and pipeline report dated January 15, 2003. ████████████████████████████████████████

████████████████████████████████████

        ██████████████████████████████████████

██████████████████████████████████████████

        ███████████████████████████████████████

██████

███████████████████████████████████

5.  Attachment F to DBSI's November 5, 2004 Position Statement to the EEOC and also

Exhibit 3 to the Complaint, Graves 74 to Graves 77, Seymour Declaration, ¶ 104, Exhibit 98, is a

franchise revenue and pipeline report dated January 8, 2004.  ██████████████████████████

████████████████████████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████

             **f.**      **Amling Disavowed the "Television Broadcasting Space"**
                     **Criterion, and Claimed it Was Radio and TV**
                     **Broadcasting Space**

1.  Amling testified that he was concerned about the combined TV and radio broadcasting

space, not the television broadcasting space:

```
 7     Q.   Did you make any reference to LIFO?
 8     A.   I may have made that reference.  It, it
 9   makes sense that I could have because Dan was the last
10   managing director who had joined the group in the, in
11   the broadcasting space, and in my view also had the,
12   the fewest number of key incremental relationships for
13   TV and radio broadcasting.
14     Q.   You mentioned again the broadcasting
15   space.  Did you ever tell anybody at Deutsche Bank that
16   you were considering the broadcasting space as being
17   relevant as opposed to the television broadcasting
18   space?
19     A.   No, when I use the term broadcasting it
20   means both TV and radio.
21     Q.   When you use the term broadcasting.  I
22   asked you a different question.  Did you ever tell
                         134
 1   anybody at Deutsche Bank that you were considering the
 2   broadcasting space -- that's your phrase -- as opposed
 3   to the television broadcasting space?
 4     A.   No.
 5     Q.   Did you ever see any document prepared by
 6   Deutsche Bank in connection with Mr. Graves' claim of
```

7  discrimination that referred to the television
8  broadcasting space?
9     A.   Not that I can recall.

Amling Dep., Exhibit 46 to Seymour Declaration, Tr. 133 line 7 to Tr. 134 line 9.

2.  Expanding the area of the claimed "niche" to cover radio as well as television broadcasting would create substantial overlap among most of the Directors and Managing Directors in the Media Group, and preclude any contention that the layoff decision was just between Graves and Gregory Paul.  See Exhibit 96, attached to the January 9, 2004 e-mail from Sue Hoffman, Exhibit 95.  This document alone lists 20 broadcasters, with the following account breakdowns: Paul (6 accounts), Amling (4 accounts), Carey (4 accounts), Graves (3 accounts), Faulstich (1 account), Ormsbee (1 account), and Yung (1 account).

3.  Other broadcasters are not named in Exhibit 96, but it is clear that the broadening of the definition, as Amling walked away from the repeated assertions in the Position Statement, produced a much more numerous group of persons with the relevant accounts.

### g.     Layoff Possibilities Included the Younger Directors, Not Just the Older Managing Directors

1.  The compensation for the younger Directors was comparable to the compensation for the older Managing Directors.

2.  The layoff of a Director would have saved just as much money as the layoff of a Director.

### 8.     DBSI Had No Seniority System

1.  DBSI repeatedly represented that it laid off Graves because he had less seniority at DBSI than other Managing Directors.

2.  Graves' Requests for Production Nos. 11, 12, and 13, asked for information about defendants' use of seniority.  The requests and DBSI's response are as follows:

**Document Request No. 11**:

A copy of every policy containing information about the use of seniority in lay-offs of bankers. See the Position Statement, pp. 2, 6, and 8.

**Response**:

DBSI objects to Request No. 11 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. For example, documents other than those relating to the lay-offs of Directors and MDs in the Media Group during the reduction in force that affected Plaintiff's employment are not relevant to Plaintiff's claims in this action.

Without waiving the foregoing objections, and to the extent not objected to therein, DBSI responds: DBSI will produce non-privileged, responsive documents, if any, it may have regarding the reduction in force which affected Plaintiff's employment.

**Document Request No. 12**:

A copy of every policy about the type of seniority - companywide including predecessors, company wide excluding predecessors, major business unit (Global Markets, Corporate Finance, etc.), type of client or industry, or supervisory unit, or other - to be used in layoff decisions, and the means of calculating seniority for use in lay-off decisions. See the Position Statement, pp. 2, 6, and 8.

**Response**:

DBSI objects to Request No. 12 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. For example, documents other than those relating to the lay-offs of Directors and MDs in the Media Group during the reduction in force that affected Plaintiff's employment are not relevant to Plaintiff's claims in this action. Further, DBSI objects to Request No. 12 to the extent it is duplicative of Request No. 11.

Without waiving the foregoing objections, and to the extent not objected to therein, DBSI responds: DBSI will produce non-privileged, responsive documents, if any, it may have regarding seniority policies applied to the reduction in force which affected Plaintiff's employment.

**Document Request No. 13**:

A copy of all documents, other than individual personnel records, mentioning the age or seniority of bankers in connection with the staffing levels of, or the planned or actual recruitment, hiring, transfer, lay-off, termination, and retention of bankers within, any industry Group. See the Position Statement, pp. 2, 6, and 8.

**Response**:

DBSI objects to Request No. 13 to the extent it is vague, ambiguous, overly broad, unduly burdensome, calls for the production of numerous documents which have no bearing on Plaintiff's claims, and is not likely to lead to the discovery of relevant information. For example, documents relating to the ages of individuals other than MDs and Directors in the Media Group during the relevant period are not relevant to Plaintiff's claims in this action. DBSI further objects to Request No. 13 to the extent it seeks information regarding confidential communications between attorney and client or materials prepared by counselor on counsel's behalf in anticipation of litigation, which contain the mental impressions, legal theories or conclusions of DBSI's counsel on the grounds that said information is protected from disclosure by the attorney-client privilege, the work-product privilege, or by any other privilege recognized by statute, at common law or by the Federal Rules of Civil Procedure or the Local Rules of this Court.

Without waiving the foregoing objections and to the extent not objected to therein, DBSI responds: DBSI will produce documents sufficient to reflect the ages of the Directors and MDs in the Media Group during the relevant period.

December 7, 2009 Defendant's Objections and Responses to the Document Requests in Plaintiff's First Requests for Discovery, Exhibit 13 to the Seymour Declaration, pp. 10-12.

3.  DBSI has not produced any documents about seniority policies, or types of seniority, or about the use of seniority in selecting bankers for layoff.  Declaration of Richard Seymour, ¶ 105 at p, 16.

4.  Amling testified that he "may have made" a reference to LIFO when telling Graves he was being laid off.  Amling Dep., Seymour Declaration, ¶ 50, Exhibit 46, Tr. 133 lines 7-13.

5.  Amling admitted that the Directors were "by nature" junior to Graves, but said he could not recall whether they were junior in time.  *Id.*, Tr. 134 line 10 to Tr. 135 line 6.

6.  Amling admitted that he did not rely on any bank policy with respect to seniority.  *Id.*., Tr. 135 lines 17-19.

7.  At the end of the discussion of this topic during his deposition, Amling was not sure that he mentioned seniority to Graves in the termination meeting.  *Id.*, Tr. 135 line 20 to Tr. 136 line 3.

8. Attachment B to DBSI's November 5, 2004 Position Statement to the EEOC is a list of employees in Media and their ages and tenures, Graves 38, De Baun Affirmation, Exhibit O.

9. Exhibit O shows a tenure date of March 31, 1999 for Graves, and the following tenure dates for Directors who were *junior* to Graves:

a. William Detwiler, a Director with a tenure date of July 9, 2003; and

b. Sun Yung, a Director with a tenure date of February 10, 2000.

10. Jacques Brand, one of Amling's two bosses, testified that seniority was not involved in the decision to fire Graves:

```
5          When you assessed bankers as part of this
6   performance assessment in the fall of 2003, and decided
7   who should be retained and who should be terminated, did
8   you take their seniority into account?
9      A.  We took their performance into account.
10    Q.  Not seniority?
11    A.  No.
```

January 25, 2011 Deposition of Jacques Brand, Seymour Declaration, ¶ 52, Exhibit 48, Tr. 108 lines 5-11.

### 9.   DBSI's Representations That Franchise Revenues and Pipelines Objectively Determined Relative Success as a Banker

#### a.   DBSI's Representations

1. DBSI repeatedly represented to the EEOC ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Position Statement,

Seymour Declaration, ¶ 37, Exhibit 34, Graves 22 to Graves 32, *passim*.

### b.      The Uncertainty of Pipeline Figures

1.  Amling testified that the pipeline reports were guesses "based on weighted

probabilities of something that might happen in the future":

```
 5  BY MR. SEYMOUR:
 6      Q.   If you turn to page Graves 65 --
 7      A.   By the way, just, just so that everyone
 8  knows, this is a pipeline report.
 9      Q.   Yes.
10      A.    So this is an estimate of revenue.  In
11  many of these instances, no revenue ever occurred,
12  because this was a banker's best guess based on
13  weighted probabilities of something that might happen
14  in the future, and much of the time, more likely than
15  not, these estimates never proved to be accurate.
```

Amling Dep., Exhibit 46, Tr. 76 lines 5-15.

### c.      The Lack of Use of Pipeline Information in Making Decisions

1.  In addition, Amling was unwilling to say that pipelines were ever taken into account

in deciding which bankers to retain and which to fire, and would only say that they "could have

been" taken into account:

```
16      Q.   Was pipeline taken into account in
17  deciding which bankers to retain and which bankers to
18  fire?
19      A.   It could have been.
```

*Id.*, Tr. 76 lines 16-19.

2.  In addition, Amling was unwilling to say that pipelines were ever taken into account

in deciding compensation, and would only say that they were "not necessarily" considered, but

"could have been" taken into account:

```
20      Q.   Was pipeline taken into account in
21  deciding compensation?
22      A.   Not necessarily, but it could have been.
```

*Id.*, Tr. 76 lines 20-22.

- 119 -

3.  Brand agreed with Amling.  He testified about the process used in evaluating bankers, and stated: "We were having conversations with many of Mr. Graves' partners as well as other members of the media group and every other group in order to form an assessment of their absolute and relative value to their clients and to the franchise."  January 25, 2011 deposition of Jacques Brand, Seymour Declaration, ¶ 52, Exhibit 48, Tr. 60, lines 1-5.  He did not remember exactly when the assessment process took place, but it was "prior to bonus communication and termination communication.  And it often is a period of months beginning sometime in October, November."  *Id.*, Tr. 62, lines 3-6.  Brand then described the minimal effect of pipeline on assessments of the value of individual bankers:

```
 7     Q.  Did you place any reliance on franchise revenue
 8   reports and pipeline reports in making these
 9   assessments?
10           MR. FONSTEIN:  Objection.
11           THE WITNESS:  We placed reliance on many,
12   many factors in coming up with our overall assessment.
13   BY MR. SEYMOUR:
14     Q.  Did you answer my question?
15     A.  I am sorry.  Could you please repeat the
16   question?
17           (Record read.)
18           MR. FONSTEIN:  Objection.
19           THE WITNESS:  We would have placed some
20   reliance on franchise revenue.  I would say less
21   reliance on pipeline.  What do you mean by pipeline?
22   BY MR. SEYMOUR:
                            63
 1     Q.  Is that a terminology commonly used in Deutsche
 2   Bank?
 3     A.  Yes.
 4     Q.  What does it mean at Deutsche Bank?
 5     A.  Future transactions.
 6     Q.  While you were co-head with --
 7     A.  Excuse me.  May I just say some more on that
 8   topic?
 9     Q.  Please finish your answer.
10     A.  Yes.  The reason why we place less reliance on
11   pipeline, in general, is because pipeline is almost
```

12  always overinflated, and we are -- pipeline needs to be
13  probability weighted because of its high degree of
14  uncertainty.  It's only -- only used in rare occasions
15  in order to assess performance.
16      Q.  What do you mean by probability weighted?
17      A.  Assessing the probability of a future transaction
18  happening.

*Id.,* Tr. 62 line 7 to Tr. 63 line 18.

4.  Obtaining probability numbers was important.  The February 26, 2003 e-mail from

Susan Hoffman ██████████████████████████████████████████

████████████████████  DB 31860, Seymour Declaration, ¶ 74, Exhibit 70, stated in relevant

part:

██████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

(Emphasis in original).  ████████████████████████████  February 26,

2003 e-mail from Hoffman to Graves, Hoffman Dep. Exh. 25, DB 34800 to DB 34803, Seymour

Declaration, ¶ 75, Exhibit 71.  Hoffman testified that she did not remember the e-mail, but had

no doubt that she sent it.  January 24, 2011 deposition of Susan Hoffman, Seymour Declaration,

¶ 76, Exhibit 72, Tr. 97 line 11 to Tr. 98, line 13.[14]

[14] Seyfarth Shaw claimed to "represent" Ms. Hoffman in the deposition although no
claim had been made against her, the "representation" was arranged by Defendant, she did not
pay Seyfarth Shaw's fees and assumed Deutsche Bank would, she was not aware of any other
witnesses "represented" by Seyfarth Shaw, and she was not aware of any joint representation
agreement.  Tr. 15 line 16 to Tr. 19 line 3.

#### d.  **Amling's Ability to Change Pipelines**

3.  Amling admitted that he had authority to reject items bankers submitted to him for a pipeline report, had authority to change probability estimates, and had authority to revise the expected revenues in pipeline reports.  He testified that these decisions were internal to the group, but that input would often be sought from the SIB on the account, Directors, and sometimes product heads.  He remembered that he did reject pipeline items, but did not remember specifics.  Exhibit 46, Tr. 28 line 12 to Tr. 36 line 10.

#### e.  **Blocking Graves From Achieving Fees or Pipelines**

1.  On July 29, 2003, Graves sent an e-mail to Amling, ███████████████████ ███████████████████████  DB 47317, Seymour Declaration, ¶ 106, Exhibit 99.

2.  Graves worked on the Gannett account although he was not the SIB.  See his September 23, 2003 e-mail to Sharon Carifi on Gannett, DB 557-DB 558, Seymour Declaration, ¶ 107, Exhibit 100.  See also his October 9, 2003 e-mail to Shazad Dada, with a copy to Amling, on Gannett business, DB 6136-DB 6139, Seymour Declaration, ¶ 108, Exhibit 101, and his December 2, 2003 e-mail to Austin, Dada, and Flieger on Gannett opportunities, with a copy to Amling, DB 9784, Seymour Declaration, ¶ 109, Exhibit 102.

3.  On December 2, 2003, ████████████████████████████████ ██████████████████████████████████████████ December 2, 2003 e-mail from Graves to Amling ██████████████████████████, DB 9787, Seymour Declaration, ¶ 110, Exhibit 103.

4.  On December 15, 2003, ███████████████████████████ ████████████████████████████████████████████████ ████████████ecember 15, 2003 e-mail from Graves to Amling, DB046559-DB046560, Seymour Declaration, ¶ 111, Exhibit 104.

5.  On January 30, 2004, one day before Graves' last day on the payroll, Jeff Marimow of DBSI sent Amling and Chang an e-mail saying that ███████████████████████ ████████████████████████████████████████████ DB 46914-DB 456915, Seymour Declaration, ¶ 112, Exhibit 105.

6.  Amling admitted that Graves had a relationship with Gannett, and stated that he did not remember Graves asking him on a number of occasions to be set up as the SIB for Gannett, and that he did not recall Graves telling him that Gannett used to be on the Client Manager system, then was taken off and Graves wanted it reinstated, but that that would make sense. Exhibit 46, Tr. 176 line 18 to Tr. 177 line 7.

7.  Amling then finally admitted that there was a decision to leave the publishing sector uncovered for a time, but ultimately put it back into coverage.  He did not remember the time period.  *Id.*, Tr. 177 line 8 to Tr. 179 line 4.  He then testified as follows:

```
 5      Q.  If Dan Graves had been allowed to have
 6  the client back on Client Manager at a Senior
 7  Investment Banker and had been able to bring in, bring
 8  revenues into the bank from Gannett, that would have
 9  helped Deutsche Bank, wouldn't it?
10      A.   Revenues would always be helpful, yes.
```

*Id.*, Tr. 177 lines 5-10.

**f.    DBSI Altered Pipeline Documents Submitted to the EEOC, to Create a False Impression of Their Utility**

1.  DBSI's actual Franchise Revenue and Pipeline Summary as of January 15, 2003, DB 596 to DB 844, Seymour Declaration, ¶ 113, Exhibit 106, is ████████████████████████ ███████████████████████████████████ Exhibit 32, Graves 39 to Graves 41.

2.  ████████████████████████████████████████████████████████████

████████████████████

3.  DBSI's actual Franchise Revenue and Pipeline Summary as of January, 2004, DB 837 to DB 844, Seymour Declaration, ¶ 114, Exhibit 107, ████████████████ DBSI's Attachment F to its Position Statement to the EEOC, Graves 74 to Graves 77, Exhibit 98.

4.  

5.  ████████████████████████████████████████

████████████████████████████████████████

6.  Amling testified that he could not ever remember seeing a franchise revenue and pipeline report in actual use at DBSI that showed "total" lines.  Amling Dep., Exhibit 46, Tr. 42 lines 8-12.

7.  DBSI admits that, for morale purposes, it gives every banker involved in a transaction the same credit for the full value of the transaction:  "First, in order to foster a sense of collaboration among bankers working on a single transaction, DBSI attributes full pipeline revenue for a particular transaction to each banker involved in its execution. Thus, in the Reports, all bankers involved in a transaction are attributed the same amount of revenue for the transaction."  DBSI's April 3, 2009 Defendant's Memorandum of Law in Support of its Objections to Magistrate Judge Kevin Nathaniel Fox's Memorandum and Order dated March 20, 2009, Doc. 58, Exhibit 108 to the Seymour Declaration, at pp. 4-5.

8.  The result of this practice is to inflate artificially the achievements of the younger Directors by double- and triple-counting revenues. DBSI took advantage of this to claim in its Position Statement that "████████████████████████████"  Position Statement, Seymour Declaration, ¶ 37, Exhibit 34, Graves 22 to Graves 32, p. 3, Graves 24.

9.  Graves did not benefit from all of this double-counting and triple-counting.

10.  Michael Vigliotti testified in his January 27, 2011 deposition, Seymour Declaration,

¶ 51, Exhibit 47, that he was the Chief Operating Officer or Chief Administrative Officer of

Deutsche Bank, and was a Chief Operator Officer in the 2002-2004 time period.  Tr. 6, lines 3-

12.  He stated that single-counts were at the time of the deposition used for measuring the

productivity of bankers, and he could not remember if double-counts were ever used for that

purpose.  Tr. 77 line 18 to Tr. 79 line 5.  His explanation was as follows:

         2   Q.  What do you mean by a single count view of
         3   revenues?
         4   A.  So a franchise value is essentially a double
         5   count.  So if there are two bankers on a deal, the
         6   franchise value is ten million.  Banker A gets ten
         7   million sort of underneath his name and banker B will
         8   get ten million.  This would then take that ten million
         9   based on effort, contribution, and efforts during the
        10   team would say there is ten million value.  Banker A
        11   gets six and banker B gets four.
        12   Q.  So what is the single count used for?
        13   A.  It's part of measuring productivity.
        14   Q.  Is it used for the comparison of one banker's
        15   performance as opposed to another's?
        16   A.  Yeah.
        17   Q.  Was the double count used to compare the
        18   performance of one banker as opposed to another?
        19   A.  I don't know if I recall that, actually.  Again,
        20   I am struggling with today versus then.  So it's a
        21   little different these days.  So I am not so sure if it
        22   was used in the measurement as opposed to just the
                                   79
         1   single count, but I don't recall.
         2   Q.  Okay.  Do you remember any time when double count
         3   or sometimes triple count was used to compare the
         4   performance of bankers?
         5   A.  I don't recall that specifically.  It may have.

*Id.*, Tr. 78 line 2 to Tr. 79 line 5.

11.  DBSI also admits that numerous transactions have the same pipeline value because

they are the result of rounded estimates multiplied by probabilities, with the estimates appearing

less rounded because of conversions from dollars to Euros.  Exhibit 108 at p. 5.

12.  Jacques Brand testified that DBSI placed some reliance on franchise revenues in making assessments of bankers, but "less reliance on pipeline."  January 25, 2011 Deposition of Jacques Brand, Seymour Declaration, ¶ 52, Exhibit 48, Tr. 62 lines 7-21.  He then asked for a definition of "pipeline," admitted that at DBSI it mean future transactions, *id.*, Tr. 62 line 21 to Tr. 63 line 5, and explained why less reliance was placed on it:

>  9     Q.  Please finish your answer.
>  10     A.  Yes.  The reason why we place less reliance on
>  11   pipeline, in general, is because pipeline is almost
>  12   always overinflated, and we are -- pipeline needs to be
>  13   probability weighted because of its high degree of
>  14   uncertainty.  It's only -- only used in rare occasions
>  15   in order to assess performance.

*Id.*, Tr. 63 lines 9-15.

13.  Mr. Brand was unable to explain how the probability weighting he described would work when a transaction had zero probability, and was unable to explain how it would work if there was a 25% probability, other than to say it was very difficult.  *Id.*, Tr. 63 line 16 to Tr. 65 line 11.

14.  Mr. Brand stated: "Overall, our assessment of pipeline is very low, if any, in our overall assessment."  *Id.*, Tr. 64 lines 11-17.

### 10.  The EEOC's Action

1.  The EEOC re-opened its investigation into the charge and took a day of evidence at a fact-finding conference without making a record.  The June 15, 2010 letter of the EEOC, Seymour Declaration, ¶ , Exhibit 109, found that it was not clear from the fact-finding conference and subsequent letters that DBSI falsified or misrepresented information.

Respectfully submitted,

Richard T. Seymour (RS-8094)
rick@rickseymourlaw.net
Law Office of Richard T. Seymour, P.L.L.C.

Suite 900, Brawner Building
888 17th Street, N.W.
Washington, DC 20006-3307
    (202) 785-2145 – Telephone
    (202) 549-1454 – Cell
    (800) 805-1065 – Telecopier

Steven A. Berger (SB-2038)
sberger@bergerwebb.com
Jonathan Rogin (JR-9800)
jrogin@bergerwebb.com
Berger & Webb, LLP
7 Times Square, 27th Floor
New York, NY 10036
    (212) 319-1900 – Telephone
    (212) 319-2017 and -2018 – Telecopiers

By: /s/ Richard T. Seymour_____
    Richard T. Seymour (RS 8094)
    Attorneys for Plaintiff

Dated: July 9, 2012

**<u>Certificate of Service</u>**

I certify that I have, this 9th day of July, 2012, served a true and correct copy of

Plaintiff's Response to Defendant's Rule 56.1 Statement on counsel of record for Defendant, as

shown below, by service through the Court's ECF system:

    Cliff Fonstein, Esq.
    Seyfarth Shaw LLP
    Nicholas H. De Baun, Esq.
    Tara Conroy, Esq.
    620 Eighth Avenue
    New York, NY 10018


    /s/ Richard T. Seymour_____
    Richard T. Seymour (RS-8094)
    rick@rickseymourlaw.net
    Law Office of Richard T. Seymour, P.L.L.C.
    Suite 900, Brawner Building
    888 17th Street, N.W.
    Washington, DC 20006-3307
     (202) 785-2145 – Telephone
     (202) 549-1454 – Cell
     (800) 805-1065 – Telecopier